**PERKINS COIE LLP**
Tara McGrath, Bar No. 254209
(admission to the Central District of California pending)
TMcGrath@perkinscoie.com
11452 El Camino Real Ste 300
San Diego, CA 92130-2080
Telephone: +1.858.720.5700
Facsimile: +1.858.720.5799

Oliver M. Gold, Bar No. 279033
OGold@perkinscoie.com
1888 Century Park E, Suite 1700
Los Angeles, CA 90067-1721
Telephone: +1.310.788.9900
Facsimile: +1.202.654.6211

David W. T. Daniels, Bar No. 172791
DDaniels@perkinscoie.com
Michael R. Huston (*pro hac vice* application forthcoming)
MHuston@perkinscoie.com
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: +1.202.654.6200
Facsimile: +1.202.654.6211

David B. Massey (*pro hac vice* application forthcoming)
DMassey@perkinscoie.com
1155 Avenue of the Americas, 22nd Floor
New York, New York 10036-2711
Telephone: +1.212.262.6900
Facsimile: +1.212.977.1649

Attorneys for Plaintiff Uber Technologies, Inc.

COMPLAINT; JURY TRIAL DEMANDED

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UBER TECHNOLOGIES, INC., | Case No. |
| Plaintiff, | **UBER TECHNOLOGIES, INC.'S COMPLAINT FOR:** |
| v. | **1) RICO ENTERPRISE VIOLATIONS (18 U.S.C. § 1962(c));** |
| DOWNTOWN LA LAW GROUP, IGOR FRADKIN, THE LAW OFFICES OF JACOB EMRANI, JACOB EMRANI, GSK SPINE, GREG KHOUNGANIAN, and RADIANCE SURGERY CENTER, | **2) RICO CONSPIRACY VIOLATION (18 U.S.C. § 1962(d));** |
| | **3) UNJUST ENRICHMENT; AND** |
| Defendants. | **4) VIOLATION OF BUSINESS & PROFESSIONS CODE SECTION 17200, _ET SEQ._** |
| | **JURY TRIAL DEMANDED** |

Plaintiff Uber Technologies, Inc. ("Uber"), by and through its undersigned attorneys, hereby alleges against Defendants Downtown LA Law, Igor Fradkin, The Law Offices of Jacob Emrani, Jacob Emrani, GSK Spine, Greg Khounganian, and Radiance Surgery Center:

## SUMMARY OF THE ACTION

1. Fraudulent personal injury claims arising from minor motor vehicle collisions are an urgent and growing problem in California. This fraud results in widespread harm to the public far beyond those involved in the litigations themselves by increasing insurance rates and transportation costs. In the case of Uber, this fraud increases the expense of the many thousands who rely on the Uber application as a means of transportation and reduces the earnings of the many others who earn a livelihood from the application. In Los Angeles County specifically, approximately 45% of the fare of every Uber ride goes to mandated insurance costs, driving up prices for riders and pushing down earnings for drivers.

2. Unscrupulous personal injury attorneys and corrupt medical providers in the Los Angeles area are engaged in this fraud scheme. The lawyers direct claimants to pre-selected medical providers to receive procedures for minor or non-existent injuries. Following unnecessary and/or causally unrelated treatment, certain providers generate and submit artificially inflated bills for such treatment. These bills are issued on a lien basis. Rather than using claimants' own medical insurance for treatment, the claimants instead enter into lien agreements with the medical providers, which grant such providers a lien on recoveries from the claim and purport to promise full payment to the medical providers in the event of a shortfall in recovery. Such arrangements are shams. In reality, the claimants' lawyers and certain medical providers secretly enter into side agreements under which the medical providers agree to substantially discount their bills in the event that the recovery is insufficient to pay the artificially inflated medical bills. Because the side agreements

COMPLAINT; JURY TRIAL DEMANDED

are concealed, the medical bills are false and misleading. The bills are then utilized as the basis for a false and artificially inflated damages claim.

3.     The secret side agreement functions as a kickback. In exchange for a steady supply of claimants from the lawyers, certain medical providers agree to surrender their lien rights. The lawyers profit because they receive priority recovery of their fees and other costs. The medical providers profit because when a claimant has a successful claim, the providers recover on most or all of their artificially-inflated bills. And the lawyers and medical providers walk away with larger recoveries than their personal injury clients.

4.     Claimants are passed along to medical provider scheme participants without regard to their need for actual medical treatment. Lawyers send claimants with no or negligible injuries caused by the purported underlying accidents to the medical providers with the foreknowledge that the medical providers will recommend and deliver a variety of unnecessary medical treatments including surgery, and will thereafter submit an artificially inflated bill, and/or recommend future surgeries with artificially inflated estimated fees. As such, it is routine for the medical providers to produce fraudulent documents diagnosing non-existent or exaggerated injuries, falsely linking these injuries causally to the accidents and then proposing and performing costly, invasive, and/or unnecessary surgeries. Together with the artificially inflated resulting bills, the attorneys use these fraudulent documents and unnecessary treatments as a basis for fraudulent lawsuits and/or claims for damages.

5.     Because of such overtreatment and inflated liens held on the recovery by the various medical providers involved, the claimants themselves commonly walk away with relatively minimal recovery compared to the fees that the lawyers and medical providers receive.

COMPLAINT; JURY TRIAL DEMANDED

6.     Rideshare companies such as Uber are prime targets of this fraud scheme because of their $1 million government-mandated insurance policy limits—which are higher than those of almost every other vehicle on California roads. The perpetrators of the fraud make no secret of targeting Uber because of these high policy limits, as depicted below:



*Figure 1 (as further explained herein in discussion of Personal Injury Claimant A).*

7.     While rideshare companies are prime targets, they are by no means the only victims of this scheme. The examples described below are only a partial illustration of the extent of the scheme. It extends well beyond the defendants described herein.

8.     A key repeat participant in this fraud is Defendant Greg Khounganian, a spinal surgeon who owns and controls GSK Spine, an orthopedics practice. Working with personal injury coordinators at Defendant Radiance Surgery Center, a surgery center which specializes in treating patients with pending personal injury lawsuits and which also does business as Sherman Oaks Surgery Center, Khounganian accepts referrals from lawyers who have cases against Uber with the

COMPLAINT; JURY TRIAL DEMANDED

understanding that he will perform specific acts to increase the value of their lawsuits and/or claims. Khounganian produces fraudulent documents diagnosing these lawyers' clients with specific injuries, relating those injuries to minor accidents, and recommending costly, invasive, and/or unnecessary surgeries. In such cases, instead of billing his patients' health insurance, Khounganian works on a lien basis, signing agreements with his patients so that he gets a substantial cut of their eventual lawsuit recovery. Both he and Radiance Surgery Center conceal their secret side agreements with the referring lawyers to discount such liens. To increase his desirability as a referral source for the lawyers, Khounganian produces fraudulent records of medical necessity and/or causation that he transmits to the lawyers for the purposes of artificially inflating claimed amounts. These lawyers include Defendants Igor Fradkin and his law firm, Downtown LA Law Group, as well as Jacob Emrani and his law firm, Law Offices of Jacob Emrani.

9.     Khounganian, Emrani, Fradkin, and their respective practices are engaged in a racketeering scheme that is actively harming Uber. The unnecessary medical treatments, fraudulent medical records, and fraudulent and misleading medical bills allowed Emrani, Fradkin, and their law firms to attempt to induce significantly larger settlement payments out of Uber in personal injury lawsuits. Uber has incurred substantial expenses defending against these false and inflated claims. Uber believes that Khounganian's actions have fraudulently tainted at least nine cases against Uber and dozens more against other personal injury defendants.

10.     Because this fraud spans numerous cases, including those where Uber has not been named as a party, and involves out-of-court corrupt activity, the usual tools of sanctions motions, affirmative defenses, or counterclaims are ill-suited to remediate the fraud. Through the federal RICO statute, Congress gave federal courts the power to address schemes like these that thwart state remedies by specifically authorizing broad equitable powers to terminate the conduct and ensure it will not

COMPLAINT; JURY TRIAL DEMANDED

reoccur. In addition to recovery of the serious injury it has suffered, Uber respectfully seeks both monetary and equitable relief from the Court as authorized by the RICO statute to prevent such conduct going forward.

### THE PARTIES

11. Plaintiff Uber is a Delaware corporation with its principal place of business in California.

12. Defendant Greg Khounganian resides in California. At all relevant times, Khounganian was an orthopedic surgeon specializing in spine surgery.

13. Defendant GSK Spine is a limited liability company duly organized and existing under the laws of the State of California. At all relevant times, GSK Spine maintained its principal place of business in California and was owned and controlled by Khounganian.

14. Defendant Downtown LA Law Group is a limited liability company duly organized and existing under the laws of the State of California. At all relevant times, Downtown LA Law Group maintained its principal place of business in California.

15. Defendant Igor Fradkin resides in California. At all relevant times, Fradkin was a litigation and trial attorney at Defendant Downtown LA Law Group.

16. Defendant Law Offices of Jacob Emrani is a limited liability company duly organized and existing under the laws of the State of California. At all relevant times, Law Offices of Jacob Emrani maintained its principal place of business in California.

17. Defendant Jacob Emrani resides in California. At all relevant times, Emrani was a litigation attorney at Defendant Law Offices of Jacob Emrani.

18. Defendant Radiance Surgery Center is a limited liability company duly organized and existing under the laws of the State of California. At all relevant times, Radiance Surgery Center maintained its principal place of business in California.

COMPLAINT; JURY TRIAL DEMANDED

**JURISDICTION AND VENUE**

19.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under the federal RICO statute.

20.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over claims brought under California law.

21.    Venue is proper pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in the Central District of California and because a substantial amount of the activities forming the basis of this Complaint occurred within the Central District of California.

**MEANS AND METHOD OF THE FRAUD**

22.    The scheme creates fraudulent bills and records of medical necessity and/or causation to artificially inflate the damages in lawsuits against Uber. Khounganian, GSK Spine, Radiance Surgery Center, and the other medical providers involved in this scheme profit through the above-market, artificially inflated rates for performing unnecessary and/or causally unrelated surgeries and other procedures on a lien basis and then asserting a claim on a portion of the plaintiff's recovery. Emrani, Fradkin, and their respective law firms profit through the larger settlements by introducing the fraudulent medical records and artificially inflated billing records produced by Khounganian, as well as the fact of the unnecessary and/or causally unrelated surgeries Khounganian performed and/or recommended. Uber is a principal target—but not the only target—of the scheme. Upon information and belief, the scheme involves numerous additional tainted lawsuits against other parties.

COMPLAINT; JURY TRIAL DEMANDED

A.      **The Defendant Law Firms Identify Clients with Claims against Rideshare Companies and Direct these Clients to the Kickback Scheme Medical Providers**

23.     This scheme begins when Defendants Fradkin, Downtown LA Law Group, Emrani, and Law Offices of Jacob Emrani identify individuals with potential personal injury claims against rideshare companies such as Uber. Because California law requires rideshare companies to carry $1 million of liability and uninsured/underinsured motorist insurance coverage, Emrani and Fradkin and the other Defendants view the claims as highly profitable cases, regardless of the severity of the actual injuries. Both firms aggressively pursue clients to sue Uber, as shown in this online advertisement by Emrani:



*Figure 2.*

24.     Fradkin, Emrani, and their respective law firms take advantage of claimants in vulnerable situations. Many of the claimants are facing economic stress

COMPLAINT; JURY TRIAL DEMANDED

or pre-existing health problems. Emrani, Fradkin, and their law firms entice these vulnerable claimants to receive unnecessary and/or causally unrelated medical treatment with the promise of large settlement payouts. They routinely charge contingency fees of 45% or more.

25.    Many of Fradkin's and Emrani's clients actually have health insurance. But to maximize their eventual recovery in their fraudulent lawsuits, Fradkin and Emrani steer these claimants away from medical providers who would bill their health insurance. Instead, these claimants are directed to specified medical providers, selected by the attorneys, who bill on a lien basis pursuant to a kickback scheme, in which certain medical providers agree to surrender their lien rights in exchange for a steady supply of claimants from the lawyers. These medical providers, including Khounganian and/or Radiance Surgery Center, require claimants to sign lien agreements under which the claimants agree to pay the providers from recoveries on their claims.

26.    Upon information and belief, each lien agreement falsely stated that the claimants were directly and unconditionally responsible for the medical provider's fees, and that the fees were not contingent on any settlement, judgment, verdict, or other recovery. Such statements were knowingly false when made given the concealed side agreement to discount the medical bills in the event of a shortfall.

27.    These medical providers then generate bills for their services at above-market, artificially inflated rates that they send to Fradkin, Emrani, and their respective law firms for insurance claims and for use in the litigation against Uber and other targets of the scheme.

28.    These bills are in fact fraudulent and misleading when issued because the lien agreements are shams. Concealed from the targets of the scheme, the lawyers and the medical providers secretly agree in advance that, in the event that recoveries do not exceed the amount of fees and liens, the medical providers will reduce their

COMPLAINT; JURY TRIAL DEMANDED

bills, so the lawyers can (i) falsely claim credit for obtaining a discount on their bill and (ii) deliver a minimal recovery to clients to preserve their ability to attract more clients in the future.

29.     In exchange for secretly agreeing to discount their bills, the medical providers receive a steady stream of referrals from the lawyers. The arrangement is a kickback scheme.

30.     Because of the liens that Khounganian and other providers hold on their recoveries, the claimants see little financial recovery from the fraudulent cases relative to the high payouts that the attorneys, Khounganian, and other providers receive.

**B.      The Law Firms Direct their Clients to Khounganian for Specific Unnecessary Treatments, Including Costly and Invasive Surgeries**

31.     Fradkin, Emrani, and their law firms direct their clients to these lien providers. In some pattern cases, Emrani and his firm work with a personal injury coordinator at Radiance Surgery Center to direct their clients to these lien providers. The law firms also direct patients to a range of medical providers, including physical therapists, chiropractors, acupuncturists, pain management physicians, and surgeons.

32.     Staff from the law firms and Radiance Surgery Center subsequently schedule appointments and otherwise coordinate medical treatment for the claimants. The law firms authorize and direct diagnostic tests and treatments to be performed.

33.     Defendant Khounganian and his medical practice, Defendant GSK Spine, are important players in this fraud. While unnecessary treatments from various medical providers allow Emrani and Fradkin to increase the value of their lawsuits materially, it is the costly, unnecessary, and/or causally unrelated surgeries recommended and performed by Khounganian that provide the most significant artificial damages enhancement in the scheme.

34.     Khounganian examines the claimants and produces reports diagnosing claimants with serious spinal injuries, causally connecting these injuries to the

COMPLAINT; JURY TRIAL DEMANDED

underlying accidents, and recommending an invasive surgery. Khounganian's reports are often knowingly and intentionally false in that he knows or is recklessly indifferent to the fact that the surgery is not medically warranted, and/or that the purported spinal injury was not caused by the minor accident in question.

35.    Khounganian then performs the requested surgeries, often at Radiance Surgery Center. After performing the surgeries, Khounganian produces materially misleading bills that he transmits to either Emrani or Fradkin and their respective law firms that conceal his side agreements with the lawyers. The resulting false and misleading bills are then utilized to support artificially inflated claims.

36.    This kickback scheme has been employed on numerous claims against Uber and others. It involves a wide-ranging pattern of corrupt activity, including conduct in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud). The following claimants illustrate how the scheme operates in particular cases.

C.    **Examples of the Scheme**

1.    **Personal Injury Claimant A**

37.    On December 9, 2019 Claimant A was driving a vehicle that was struck by another driver in Los Angeles, California. A police officer responded to the scene of the accident. Claimant A's vehicle sustained minor damage, and there were no injuries. A photo from the scene depicts the negligible damage that Claimant A's vehicle sustained:

COMPLAINT; JURY TRIAL DEMANDED



*Figure 3.*

38.    Claimant A did not visit the emergency room following the accident. Instead, on December 16, 2019—a full week later—Claimant A sought medical care and was diagnosed with myalgia (muscle pain). Claimant A used his health insurance to cover this initial treatment.

39.    Thereafter, however, Claimant A retained the Emrani firm. Through the Radiance Surgery Center, the Emrani firm directed Claimant A to a group of lien medical providers. These providers delivered medical treatment pursuant to the kickback scheme and for the purpose of artificially inflating Claimant A's claimed damages. Claimant A did not utilize his medical insurance for the care.

40.    On January 7, 2020, a Radiance Surgery Center employee asked the Emrani firm for approval to refer Claimant A to Khounganian for an orthopedic spine evaluation. On February 6, 2020, the Emrani firm provided its approval.

41.    On February 24, 2020, Claimant A visited Khounganian. In a section of his report labeled "CAUSATION," Khounganian falsely stated as follows: "Within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." This same section appeared in each of the reports of Khounganian's treatments of Claimant A, including

COMPLAINT; JURY TRIAL DEMANDED

Khounganian's reports in which he recommended the two surgeries that he performed on Claimant A as described below. These statements were knowingly false when made. Upon information and belief, Khounganian knew or was recklessly indifferent to the fact that such statements were false, given that Claimant A had not sought care until a week after the accident, had not reported injuries in the police report of the accident, and had suffered no injury in the accident. Khounganian knew or was recklessly indifferent to the fact that the treatments he provided to Claimant A were unnecessary and were for the purpose of fabricating a claim.

42.    In reality, the treatment was authorized and directed by the Emrani law firm. It was based on Emrani's, the law firm's, and the medical providers' desire to fraudulently and artificially increase their fees. For example, on August 14, 2020, Radiance Surgery Center emailed the Emrani firm about Claimant A's treatment. The Emrani firm responded by authorizing a specific injection treatment, adding that the claim involved Uber and a million-dollar bodily injury policy. The Emrani firm directed Radiance Surgery Center to "schedule the patient asap":



*Figure 4 re: Treatment of Claimant A.*

-14-

COMPLAINT; JURY TRIAL DEMANDED

43.    On September 22, 2020, the Emrani firm wrote to Radiance Surgery Center: "I just spoke with the patient, he was a bit confused. Go ahead and scheduled him with Dr. Khounganian and send me the appointment details." This was not the first time that the large number of medical treatments coordinated by the Emrani firm had caused confusion for Claimant A. On February 27, 2020, for example, Radiance Surgery Center emailed the Emrani firm: "Can you please contact [Claimant A] and inform him that [provider] needs to see him … [Claimant A] was called and he stated he is [seeing] a different doctor. Please clarify with him I know he might be a bit confuse[d] due to[o] so many different appt been arrange[d]." (emphasis added). Defendant Emrani was copied on that email.

44.    After an October 8, 2020 follow-up visit with Khounganian in which he recommended surgeries, Radiance Surgery Center emailed the Emrani firm to inform it about Khounganian's recommendations. Defendant Emrani was copied on that email. Fourteen minutes later, the Emrani firm replied: "Just spoke with the patient, he is on board for the surgery. Please schedule him for the pre-op."

45.    On December 23, 2020, Khounganian performed cervical fusion surgery on Claimant A.

46.    On February 19, 2021, Khounganian performed a second back surgery on Claimant A.

47.    Khounganian and Radiance Surgery Center executed sham lien agreements with Claimant A wherein Claimant A promised to repay the providers from recoveries for any claim. Upon information and belief, each such agreement falsely stated that Claimant A was directly and unconditionally responsible for the medical providers' fees, and that the fees were not contingent on any settlement, judgment, verdict, or other recovery. Such statements were knowingly false when made given the concealed side agreements.

COMPLAINT; JURY TRIAL DEMANDED

48.     Khounganian's office prepared bills for the resulting treatment pursuant to his agreement with Claimant A as follows:

      a.     February 24, 2020: $1,500.00.

      b.     October 8, 2020: $700.00.

      c.     December 31, 2020: $700.00.

      d.     January 21, 2021: $700.00.

      e.     February 1, 2021: $125,000.00.

      f.     March 11, 2021: $700.00.

      g.     April 7, 2021: $100,000.00.

      h.     May 22, 2021: $700.00.

      i.     April 28, 2022: $700.00.

      j.     May 21, 2022: $700.00.

      k.     January 26, 2024: $225,000.00.

49.     The bills together with their stated amounts were materially false and misleading, given that the side agreement with the Emrani firm was fraudulently concealed. Khounganian knew or was recklessly indifferent to the fact that the bills and their stated amounts were false and misleading, given that he was aware of the secret side agreement to discount such bills in the event of a shortfall.

50.     Radiance Surgery Center's office prepared bills for the resulting treatment pursuant to its agreement with Claimant A as follows:

      a.     September 15, 2020: $13,995.00.

      b.     December 23, 2020: $163,400.00.

      c.     February 5, 2021: $12,150.00.

      d.     February 19, 2021: $93,400.00.

      e.     April 23, 2021: $7,600.00.

51.     The bills together with their stated amounts were materially false and misleading, given that the side agreement with the Emrani firm was fraudulently

COMPLAINT; JURY TRIAL DEMANDED

concealed. Radiance Surgery Center knew or was recklessly indifferent to the fact that the bills and their stated amounts were false given that it was aware of the secret side agreement to discount such bills in the event of a shortfall.

52.    An Independent Medical Evaluation concluded that the surgery performed on Claimant A was medically unnecessary and below the accepted standard of care. The Evaluation further concluded that the reported charges for the procedures were 10 times the accepted norms and value for such procedures. Similarly, a Medical Bill Audit Analysis and Record Review concluded that the $556,151.00 in total billed charges for Claimant A was over five times greater than the reasonable value of the care that Claimant A received.

53.    The Emrani firm then presented the false and misleading bills generated by Khounganian and Radiance Surgery Center to Uber and others for the purpose of supporting a false and misleading artificially inflated claim. As a result, Uber incurred significant defense costs investigating and defending the claim.

### 2.    Personal Injury Claimant B

54.    Personal Injury Claimant B alleged that on March 10, 2019, she was involved in a low-speed accident with a vehicle driven by an individual logged into the Uber Eats application who was pulling out of a parking lot in Menifee, California. Both Claimant B and the other driver denied any injuries when speaking to the responding officer, and no tickets or citations were issued to either party.

55.    Following the accident, Claimant B retained the Law Offices of Jacob Emrani. Subsequently, the Law Offices of Jacob Emrani referred, encouraged, directed, or otherwise instructed Claimant B to schedule appointments with a select group of medical providers with whom the firm maintained a close relationship. These providers rendered unnecessary treatments at excessive and above-market rates on a lien basis. To facilitate this arrangement, the Law Offices of Jacob Emrani

signed lien agreements with the chosen providers and Claimant B, opting not to utilize Claimant B's available medical insurance.

56.     On May 24, 2019, more than two months after the accident, Claimant B reported the accident to the Menifee Police Department. Again, Claimant B did not report any injuries resulting from the accident.

57.     On December 28, 2020, more than 18 months later, and in furtherance of the scheme, Defendant Law Offices of Jacob Emrani and Defendant Jacob Emrani mailed, via U.S. mail, a demand letter signed by Defendant Emrani to Uber's insurance provider. The letter falsely represented that Claimant B suffered from numerous spinal injuries and would need to undergo future cervical fusion surgery.

58.     Upon information and belief, Emrani and the Law Offices of Jacob Emrani knew or were recklessly indifferent to the fact that such statements were false when made. They were aware that the accident was not serious yet they referred Claimant B for unnecessary medical treatment to artificially inflate the value of her claim.

59.     On March 9, 2021, Claimant B filed a lawsuit against Uber and was represented by the Law Offices of Jacob Emrani, including, among others, Jacob Emrani. The Law Offices of Jacob Emrani directed Claimant B to consult with Khounganian.

60.     On May 18, 2021, during Claimant B's first appointment with him, Khounganian stated that Claimant B had "complete[d] all modalities of conservative management" and that Khounganian was "recommending lumbar decompression/discectomy for her lower back" at an approximate cost of $226,000. This appointment was completed via telehealth, such that Khounganian did not conduct a physical exam of Claimant B prior to recommending and scheduling the surgery.

COMPLAINT; JURY TRIAL DEMANDED

61.    The Law Offices of Jacob Emrani was listed as a payor on the health insurance claim forms submitted by both Khounganian and Radiance Surgery Center—the facility where Khounganian ultimately performed surgery on Claimant B.

62.    This recommendation was false when made. Upon information and belief, Khounganian knew or was recklessly indifferent to the fact that such surgery was unnecessary and unwarranted, given that Claimant B had suffered no injury and that Khounganian had not yet conducted an in-person physical examination at the time of the recommendation.

63.    During the same appointment, Khounganian falsely stated that, "within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss."—*i.e.*, the March 10, 2019 accident.

64.    Upon information and belief, Khounganian knew or was recklessly indifferent to the fact that such causation statement was false when made given that Claimant B had suffered no such injury due to the accident.

65.    On July 16, 2021, Khounganian made identical false causation statements that "within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." Khounganian made these statements knowingly or with reckless indifference to the fact that they were false because Claimant B suffered no such injury due to the accident.

66.    On July 16, 2021, just a few hours before Claimant B underwent surgery, Khounganian completed his first physical exam of Claimant B. Shortly after, Claimant B underwent an L2-3 discectomy by Khounganian at Sherman Oaks Surgery Center, in Sherman Oaks, California.

COMPLAINT; JURY TRIAL DEMANDED

67.     Following the surgery Claimant B completed several follow-up visits with Khounganian and GSK Spine staff. Khounganian referred Claimant B to complete a series of appointments with a physical therapy provider. Claimant B, together with Defendant Emrani, who is listed as Claimant B's attorney on the form, signed a lien agreement with the physical therapy provider in Riverside, California.

68.     Claimant B completed approximately 13 visits with the physical therapy provider over a two-month period. By her last appointment on October 28, 2021, she had reported her pain as a 0 out of 10 in four of her last five visits.

69.     Despite the fact that Claimant B repeatedly reported no pain to her chiropractor, on October 25, 2021 Khounganian signed a record opining that Claimant B would likely "require[] a lumbar fusion procedure in the future," estimated at approximately $265,000, as well as an "anterior cervical disc placement procedure," also estimated at approximately $265,000.

70.     Upon information and belief, Khounganian knew or was recklessly indifferent to the fact that such statements were false and such treatments were unnecessary. The statements were made for the purpose of fabricating a claim, given that Claimant B had suffered no injury and that she had recently reported having no pain.

71.     The majority of the treatment pursued and received by Claimant B was procured through medical lien billing with the various providers, totaling at least $330,308.42.

72.     Upon information and belief, Khounganian executed a sham lien agreement with Claimant B in which Claimant B promised to repay Khounganian from recoveries for any claim. Upon information and belief, the agreement falsely stated that Khounganian's fee was not contingent on recovery. Such statements were knowingly false when made due to the concealed side agreement that Khounganian

COMPLAINT; JURY TRIAL DEMANDED

1 would surrender his right to full payment in the event of a shortfall in the recovery

2 for the claim.

3      73.    Khounganian's office prepared bills for the resulting treatment pursuant

4 to his agreement with Claimant B as follows:

5              f.    May 18, 2021: $1,500.00.

6              g.    July 16, 2021: $1,500.00.

7              h.    July 16, 2021: $100,000.

8              i.    July 21, 2021: $700.00.

9              j.    August 23, 2021: $700.00.

10             k.    October 25, 2021: $700.00.

11     74.    The bills together with their stated amounts were false and misleading,

12 given that the side agreement with the Emrani firm was concealed. They were

13 knowingly false when made, or made with reckless indifference to the truth, given

14 that Khounganian was aware of the secret side agreement to discount such bills.

15     75.    Upon information and belief, Claimant B executed an agreement with

16 Radiance Surgery Center promising to repay Radiance Surgery Center from

17 recoveries for any claim. Upon information and belief, such agreement falsely stated

18 that the claimant was directly and unconditionally responsible for the medical

19 provider's fees, and that the fees were not contingent on any settlement, judgment,

20 verdict, or other recovery. Such statements were knowingly false when made given

21 the concealed side agreement.

22     76.    On September 27, 2021, Radiance Surgery Center's office prepared bills

23 totaling $100,300 pursuant to this agreement.

24     77.    The Radiance Surgery Center bills were false and misleading in light of

25 the concealed side agreement with the Emrani firm. Such statements were knowingly

26 false when made, or made with reckless indifference to the truth, given that Radiance

27 Surgery Center was aware of the secret side agreement to discount such bills.

28

COMPLAINT; JURY TRIAL DEMANDED

78.    These amounts in the medical bills were artificially inflated far above market rates. For example, Khoungian quoted a price nearly four times more than that quoted by a separate spine surgeon for a similar spinal surgery. In her deposition, Claimant B stated that she believed the liens were through her attorney and Defendant Law Offices of Jacob Emrani. These rates, as presented and charged by Khoungian, were, on information and belief, intended to further the fraudulent scheme.

79.    The matter was ultimately settled. In addition to the settlement amount, Uber incurred significant defense costs in defending against the litigation.

### 3.    Personal Injury Claimant C

80.    On March 8, 2019, Personal Injury Claimant C was traveling in an Uber-facilitated ride when the driver's vehicle had a minor collision with another vehicle at an intersection in Los Angeles, California. Claimant C was sitting in the rear passenger's side at the time and on the opposite side from where the impact occurred. Claimant C was en route to Los Angeles International Airport ("LAX") for a flight to return home to St. Louis, Missouri. Within minutes of the accident, Claimant C hailed another ride to the airport and flew back to St. Louis that day. Claimant C has continued to live in or around St. Louis—more than 1,800 miles away from Los Angeles—since the accident.

81.    Claimant C first sought treatment for his injuries on March 14, 2019, eight days after the accident, at a chiropractic facility in St. Louis. Over the next month and a half, Claimant C attended approximately 16 chiropractic sessions in St. Louis. By late April 2019, Claimant C reported nearly non-existent pain in his neck (1/10 pain level), upper back (1/10), lower back (2/10), and shoulders (1/10). Claimant C did not report any higher level of pain in his lower back in his six preceding chiropractic sessions.

COMPLAINT; JURY TRIAL DEMANDED

82.     Claimant C then had a four-month gap in treatment. The treating doctor at Claimant C's last chiropractic session noted there was "no reason to expect any major change in [Claimant C]'s clinical picture in the near future."

83.     Additionally, after the accident and throughout the relevant time, Claimant C posted multiple video clips of himself online that showed Claimant C did not have debilitating back pain. For instance, on April 5, 2019—less than a month after the accident—Claimant C posted online a video clip of himself bouncing, dancing, and singing as part of a music video.

84.     Within a few weeks of the accident, in or around March 2019, Claimant C retained Downtown LA Law Group. Subsequently, Downtown LA Law Group referred, encouraged, directed, or otherwise instructed Claimant C to schedule appointments with a select group of medical providers upon whom the firm relied to render unnecessary treatments at excessive above-market rates on a lien basis.

85.     To facilitate this arrangement, Downtown LA Law Group signed lien agreements with the chosen providers and Claimant C. Upon information and belief, Claimant C executed a sham lien agreement with Khounganian promising to repay Khounganian from recoveries for any claim. Upon information and belief, the agreement falsely stated that Khounganian's fee was not contingent on recovery. Such statement was knowingly false when made, given the concealed side agreement that Khounganian would surrender his right to full payment in the event of a shortfall in the recovery for the claim.

86.     On September 5, 2019, after over four months of no treatment for Claimant C, and despite him reporting low to non-existent pain levels at his last chiropractic session conducted in his home state of Missouri, Downtown LA Law Group directed Claimant C to Khounganian—in California.

87.     At Khounganian's office, Claimant C reported lumbar spine pain with radiating symptoms to his left lower extremities. Khounganian knowingly and falsely

COMPLAINT; JURY TRIAL DEMANDED

stated that Claimant C had "[a]pproximately 50% of normal observed" range of motion in his lumbar spine and, moreover, that Claimant C was "being treated by a chiropractor, however he ate [sic] discontinued treatment due to the severity and worsening symptoms[.]"

88.    Upon information and belief, Khounganian knew or was recklessly indifferent to the fact that Claimant C's stated injuries were false, given that Claimant C had not sought treatment for more than a week after the LAX accident, he had achieved nearly non-existent pain levels through chiropractic care and did not, as Khounganian falsely claimed, stop going because of "worsening symptoms," and Khounganian's treatments were unnecessary and were for the purpose of fabricating a claim.

89.    Khounganian also knowingly, or with reckless indifference, falsely stated that "within a reasonable degree of medical probability, the diagnosis above were caused by the injury during the date of loss."—*i.e.*, the March 8, 2019 minor accident en route to LAX. Upon information and belief, Khounganian knew or was recklessly indifferent to the fact that the statement was false when made given that Claimant C had suffered no such injury.

90.    Despite Claimant C reporting no neck pain, Khounganian diagnosed Claimant C with, among other things, cervicalgia (*i.e.*, neck pain) and other cervical disc displacement. And despite the apparent improvement in Claimant C's condition, Khounganian again recommended a L5-S1 microdiscectomy and cervical spine injections. He also recommended a C3-4 disc replacement if Claimant C's condition did not improve.

91.    On March 1, 2021, Claimant C filed a lawsuit against Uber and was represented by Downtown LA Law Group, including, among others, Igor Fradkin.

92.    On October 12, 2021, Khounganian knowingly or with reckless indifference falsely stated that "due to failure of conservative management, surgical

COMPLAINT; JURY TRIAL DEMANDED

intervention is medically necessary for L5-S1 microdiscectomy." Claimant C then received no treatment for eleven months until another visit with Khounganian, again in Los Angeles, on September 24, 2022.

93.    On January 17, 2023, Claimant C underwent an L5-S1 microdiscectomy and decompression with Khounganian in Los Angeles. According to Claimant C, neither he nor his lawyers—but rather Khounganian, his *doctor*—paid for both his and his mother's roundtrip airfare from St. Louis to LAX and his hotel accommodations for his surgery.

94.    Claimant C received no further treatment except on January 24, 2023, when Claimant C had a post-surgery virtual telehealth visit. Claimant C's medical bills totaled $51,423 excluding surgery and $246,000 including surgery. Upon information and belief, Claimant C executed a fraudulent and misleading agreement with Khounganian promising to repay Khounganian from recoveries for any claim. Upon information and belief, the agreement falsely stated that Khounganian's fee was not contingent on any settlement, judgment, verdict, or other recovery. Such statement was knowingly false when made given the concealed side agreement.

95.    Khounganian's office prepared health insurance claim forms for some of the resulting treatment pursuant to his agreement with Claimant C. The claim forms included the following charges:

a.    September 5, 2019: $1,500.00.

b.    December 5, 2020: $700.00.

c.    October 12, 2021: $700.00.

d.    September 24, 2022: $700.00.

e.    November 22, 2022: $700.00.

f.    January 16, 2023: $700.00.

g.    February 15, 2023: $85,777.93.

h.    January 24, 2023: $700.00.

COMPLAINT; JURY TRIAL DEMANDED

96.     The bills together with their stated amounts were false and misleading given that the side agreement with Downtown LA Law Group was concealed. They were knowingly false when made, or made with reckless indifference to the truth, given that Khounganian was aware of the concealed side agreement to discount such bills in the event of a shortfall in recovery.

97.     These amounts charged in the medical bills were artificially inflated far above market rates. Khounganian's total bill of $108,463.15 for his services was particularly excessive. An independent expert determined the reasonable value of those services to be $10,374.98, less than one-tenth as much.

98.     In May 2023, Claimant C testified in his sworn deposition in his personal injury case that he never paid anything to Khounganian, never saw an invoice or bill from Khounganian, and never was told by Khounganian or his office that he was late on any payment.

99.     Claimant C's lumbar surgery was neither medically necessary nor causally related to the minor accident. MRI scans indicate that Claimant C's herniation at L5-S1 was decreasing in size, yet Khounganian nevertheless operated on Claimant C. Upon information and belief, Khounganian knew or was recklessly indifferent to the fact that Claimant C's stated injuries were false and that the treatments he recommended were unnecessary, not causally connected to the accident, and were recommended fraudulently for the purpose of artificially inflating a claim.

100.    Claimant C's case settled in mediation. In addition to the settlement amount, Uber incurred significant costs in defending the litigation.

### 4.     Personal Injury Claimant D

101.    On January 2, 2019, Personal Injury Claimant D was a passenger in a vehicle involved in a low speed, three-car, rear-end collision in Los Angeles, California with a car driven by a driver logged into the Uber application. The police

-26-

COMPLAINT; JURY TRIAL DEMANDED

report characterized the incident as resulting in "property damage only," noting minor damage to all three vehicles. No injuries were reported at the scene, and paramedics were not called.

102.   Claimant D did not seek emergency care after the accident.

103.   Following the accident, Claimant D retained Downtown LA Law Group. Subsequently, Downtown LA Law Group referred, encouraged, directed, or otherwise instructed Claimant D to schedule appointments with a select group of medical providers with whom the firm had a close relationship. These providers rendered unnecessary treatments at excessive, above-market rates on a lien basis.

104.   To facilitate this arrangement, Downtown LA Law Group signed lien agreements with the chosen providers and Claimant D, opting not to utilize Claimant D's available medical insurance. Upon information and belief, Claimant D executed a sham lien agreement with Khounganian, promising to repay Khounganian from recoveries for any claim. Upon information and belief, the agreement falsely stated that Khounganian's fees were not contingent on recovery. Such statements were knowingly false when made, given the concealed side agreement that Khounganian would surrender his right to full payment in the event of a shortfall in the recovery of the claim.

105.   Between January 8 and May 31, 2019, Claimant D sought treatment from a shock wave therapist and a chiropractor. Following the completion of such treatment, there was a three-month lapse in Claimant D's treatment.

106.   In late August 2019, and proceeding through 2020, Claimant D visited a pain management clinic, where he underwent lumbar medial branch blocks.

107.   To fraudulently and artificially increase the value of the claim, and upon information and belief, Defendant Downtown LA Law Group thereafter referred Claimant D to Khounganian.

COMPLAINT; JURY TRIAL DEMANDED

108.   On July 16, 2020, Claimant D was evaluated by Khounganian for lower back pain. At this initial appointment, Khounganian opined that Claimant D would ultimately "need surgical management in the form of a lumbar microdiscectomy at L3-4 and L5-S1 secondary to injury sustained by this collision."

109.   This recommendation for surgery was knowingly false when made. Upon information and belief, Khounganian knew or was recklessly indifferent to the fact that Claimant D's surgery was unnecessary and not causally related to the minor accident, given that Claimant D had not sought treatment for nearly a week after the accident and that he had successfully managed any injury through chiropractic care and injections, and that such treatments were for the purpose of fabricating a claim.

110.   Khounganian further falsely stated that "within a reasonable degree of medical probability, the diagnosis above were caused and/or exacerbated by the injury during the date of loss."—*i.e.*, the January 2, 2019 rear-end collision. Upon information and belief, Khounganian knew or was recklessly indifferent to the fact that the statement was false when made, given that Claimant D had suffered no such injury.

111.   Upon information and belief, Claimant D executed an agreement with Khounganian promising to repay Khounganian from recoveries for any claim. Upon information and belief, such agreement falsely stated that the claimant was directly and unconditionally responsible for the medical provider's fees, and that the fees were not contingent on any settlement, judgment, verdict, or other recovery. Such statements were knowingly false when made given the concealed side agreement.

112.   On or about July 16, 2020, Khounganian's office prepared a $1,500.00 bill for the resulting treatment pursuant to the agreement.

113.   The bill and the amount were false and misleading given that the side agreement with the Downtown LA Law Group was concealed. They were knowingly

-28-

COMPLAINT; JURY TRIAL DEMANDED

false when made given that Khounganian was aware of the secret side agreement to discount such bills in the event of a shortfall.

114.   Khounganian referred Claimant D to an acupuncturist, with whom he completed six sessions, and a physical therapist practice, where he attended approximately fifteen sessions. By the end of these treatments Claimant D reported low or no pain.

115.   On December 23, 2020, Claimant D filed a lawsuit against Uber and was represented by the Downtown LA Law Group, including, among others, Igor Fradkin.

116.   On March 12, 2021, and in furtherance of the scheme, Defendant Downtown LA Law Group emailed a demand letter signed by Defendant Fradkin to Uber's counsel demanding $750,000 to resolve Claimant D's claims. The letter falsely represented as follows:

> On January 2, 2019 our client [Claimant D] was involved in a serious auto accident with your driver […]. The accident caused significant bodily injuries to [Claimant D]. These injuries continue to disrupt [Claimant D]'s quality of life and will require long term future medical care.

117.   Upon information and belief, Fradkin and Downtown LA Law Group knew or were recklessly indifferent to the fact that such statements were false when made. Among other things, they were aware that the accident was not serious and that they had referred Claimant D for unnecessary medical treatment.

118.   The matter was ultimately settled. In addition to the settlement amount, Uber incurred significant defense costs in defending against the litigation.

## **RACKETEERING ALLEGATIONS**

119.   At all relevant times, Defendants' scheme was in violation of 18 U.S.C. §§ 1962(c) and/or (d) of the RICO statute as further set forth below.

COMPLAINT; JURY TRIAL DEMANDED

### A.    Defendants' Misconduct and Respective Bases for Liability

#### 1.    GSK Spine and Khounganian

120.    As described above, Defendant Khounganian and the medical practice he controls, Defendant GSK Spine, play a central role in advancing the scheme. Khounganian and GSK Spine have participated and likely will in the future continue to participate in the scheme by producing fraudulent bills and fraudulent medical records that tie purported injuries to underlying motor vehicle accidents and/or recommending and performing unnecessary surgeries. Additionally, Khounganian and GSK Spine have participated and likely will in the future continue to participate in the scheme by performing said unnecessary and/or causally unrelated surgeries, producing fraudulent medical records reflecting false statements of the necessity of these surgeries and/or the causation of the injuries, and transmitting these medical records to the other Defendants using interstate mail or wires.

#### 2.    Downtown LA Law Group and Igor Fradkin

121.    As described above, Defendant Downtown LA Law Group and Defendant Igor Fradkin play a key role in effectuating this scheme. Downtown LA Law Group and Fradkin have participated and likely will in the future participate in this scheme by accepting clients with low-value or meritless claims, directing these clients to Khounganian and other providers for treatment of exaggerated or non-existent injuries, directing these providers to recommend specific treatments, directing clients to sign sham lien agreements with Khounganian to pay for those surgeries, and entering into concealed kickback agreements with Khounganian regarding these lien agreements.

122.    Downtown LA Law Group and Igor Fradkin use the associated fraudulent medical records and the evidence of the liens to pursue claims against Uber and others for inflated damages in state court.

COMPLAINT; JURY TRIAL DEMANDED

### 3.    Law Offices of Jacob Emrani and Jacob Emrani

123.    As described above, Defendant Law Offices of Jacob Emrani and Defendant Jacob Emrani play a key role in effectuating this scheme. Law Offices of Jacob Emrani and Jacob Emrani have participated and likely will in the future participate in this scheme by accepting clients with low-value or meritless claims, directing these clients to Khounganian and other providers for treatment of exaggerated or non-existent injuries, directing these providers to recommend specific treatments, encouraging clients to sign sham lien agreements with Khounganian to pay for those surgeries, and entering into concealed kickback agreements with Khounganian regarding these lien agreements.

124.    Law Offices of Jacob Emrani and Jacob Emrani use the associated fraudulent medical records and the evidence of the liens to pursue claims against Uber and others for inflated damages in state court.

### B.    Uber is a Victim of the Scheme and has Suffered Injury

125.    The scheme has resulted in millions of dollars of harm from defense costs and settlements. This action is intended to recover the full extent of such harm.

126.    To date, these false and inflated claims have forced Uber to incur substantial expense to investigate and defend them. The lawyer and law firm Defendants use false medical records and unnecessary treatments to attempt to fraudulently induce significantly larger settlement payments from Uber in personal injury lawsuits. As such, Uber has been forced to incur legal fees and out-of-pocket costs in defending these lawsuits and responding to fraudulent evidence and inflated damages claims in excess of what would have otherwise been required. These inflated costs damaged Uber in its business or property. This damage is the direct result of Defendants' pattern of racketeering activity.

127.    The scheme remains ongoing, and Uber continues to suffer.

### C.    The RICO Enterprise

128.    GSK Spine constitutes an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce. Upon information and belief, the enterprise of GSK Spine engages in at least some legitimate activity, treating patients with actual injuries who pay for their care via health insurance. However, upon information and belief, Defendant Khounganian's predicate acts of mail fraud and wire fraud constituted a material portion of GSK Spine's business.

129.    Defendant Khounganian operated, managed, and controlled the medical practice directly in furtherance of the scheme through a pattern of racketeering activity. Khounganian understood that his ability to extract financial rewards from the pursuit of fraudulent claims against Uber and others depended on (i) the diagnosis of non-existent or exaggerated injuries, (ii) the production of fraudulent medical records and medical bills regarding those injuries and their causation that could be used to artificially inflate damages in resulting litigation, (iii) the use of the fraudulent medical and billing records and materially false statements to advance such litigation, and (iv) the use of sham lien payment arrangements to artificially inflate the resulting claimed damages.

130.    Defendants Emrani and Fradkin, and, through them, their respective law firms participated in the management of the medical practice directly in furtherance of the scheme through a pattern of racketeering activity. Emrani and Fradkin understood that their ability to extract financial rewards from the pursuit of fraudulent claims against Uber and others depended on (i) directing kickbacks to Khounganian in the form of continued referrals in exchange for concealed side agreements regarding lien recovery, and (ii) the transmittal and use of the fraudulent medical records and bills and materially false statements to advance the claims.

COMPLAINT; JURY TRIAL DEMANDED

131.   At all relevant times, the GSK Spine enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c) through its use of mail and interstate wires.

132.   Downtown LA Law Group constitutes an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

133.   Defendant Fradkin operated, managed, and controlled the law firm, Downtown LA Law Group, directly in furtherance of the scheme through a pattern of racketeering activity. Fradkin understood that his ability to extract financial rewards from the pursuit of fraudulent claims against Uber and others depended on (i) directing kickbacks to Khounganian in the form of continued referrals in exchange for concealed agreements regarding lien recovery, and (ii) the transmittal and use of the fraudulent medical records and materially false statements to advance the claims.

134.   At all relevant times, the Downtown LA Law Group enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c) through its use of mail and interstate wires.

135.   Law Offices of Jacob Emrani constitutes an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

136.   Defendant Emrani operated, managed, and controlled his law firm, Law Offices of Jacob Emrani, directly in furtherance of the scheme through a pattern of racketeering activity. Emrani understood that his ability to extract financial rewards from the pursuit of fraudulent claims against Uber and others depended on (i) directing kickbacks to Khounganian in the form of continued referrals in exchange for concealed agreements regarding lien recovery, and (ii) the transmittal and use of the fraudulent medical and billing records and materially false statements to advance the litigation.

COMPLAINT; JURY TRIAL DEMANDED

137.   At all relevant times, the Law Offices of Jacob Emrani enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c) through its use of mail and interstate wires and because its activities were directed at and intended to influence Uber.

138.   In the alternative, Defendants and Radiance Surgery Center constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). Each of the Defendants participated in the operation or management of the enterprise. The enterprise itself is distinct from the culpable persons of Khounganian, Emrani, Fradkin, their respective law firms, and their respective corrupt activities. Khounganian is an employee of his own medical practice, and Fradkin and Emrani are employees of their own respective law firms. Each, along with Radiance Surgery Center, worked to operate the larger association-in-fact enterprise and manage its affairs through their corrupt patterns of kickbacks and production and transmittal of fraudulent medical records and bills.

139.   The association-in-fact enterprise was of sufficient duration to accomplish its purposes, originating at least as early as 2019 and threatening to continue into the future.

140.   Defendants shared longstanding relationships, acted for a common benefit, and depended on one another and their respective activities for such benefit. Fradkin and Emrani and their law firms each shared longstanding relationships with Khounganian. These relationships are described above in the various non-exhaustive pattern cases and were cemented by the kickback arrangement described herein. Emrani and Fradkin and their law firms each also shared longstanding relationships with Radiance Surgery Center through the management and direction of medical care described herein. Khounganian shared a longstanding relationship with Radiance Surgery Center through his pattern of performing surgeries at facilities owned by Radiance Surgery Center.

COMPLAINT; JURY TRIAL DEMANDED

141.   Each Defendant played a critical role and depended on others to carry out their respective roles in furtherance of the scheme, including the initial client intake performed by Emrani and Fradkin and their law firms; the coordination by Radiance Surgery Center of certain medical care for clients of Emrani, Fradkin, and their law firms; the kickback scheme described herein; and the fraudulent medical records and bills produced by Khounganian and transmitted to Emrani, Fradkin, and their law firms.

### D.    Pattern of Racketeering Activity

142.   Defendants' scheme constitutes a pattern of racketeering activity. The pattern of racketeering activity includes, among others, commission of the predicate acts in violation of the federal mail and wire fraud statutes: 18 U.S.C. §§ 1341 and 1343.

143.   Defendants committed these acts willfully and knowingly and with specific intent to defraud.

144.   As discussed herein, Defendant Khounganian made numerous false statements knowingly, and with reckless indifference to the truth, in medical and billing records. It was reasonably foreseeable to Khounganian that the U.S. mail or private or commercial carrier or the interstate wires would be used in furtherance of the scheme by, for example, the sending of false or misleading statements to Downtown LA Law Group or The Law Offices of Jacob Emrani for further transmission by interstate wires to an insurance carrier. Such records were in fact so mailed and transmitted. As such, each such record was prepared and executed in violation of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).

145.   As discussed herein, Defendants Jacob Emrani and The Law Offices of Jacob Emrani made numerous materially false and misleading statements in demand letters or similar communications knowingly or with reckless indifference to the truth. It was reasonably foreseeable to Emrani that these knowingly false and

-35-

COMPLAINT; JURY TRIAL DEMANDED

misleading statements would be subsequently sent by U.S. mail or private or commercial carrier and transmitted through the interstate wires to Uber and/or Uber's insurance carriers. Such records were in fact so mailed and transmitted. As such, each such letter or communication was prepared and executed in violation of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).

146.   As discussed herein, Defendants Igor Fradkin and Downtown LA Law Group made numerous materially false and misleading statements in demand letters or similar communications knowingly or with reckless indifference to the truth. It was reasonably foreseeable to Fradkin that these knowingly false statements would be subsequently sent by U.S. mail or private or commercial carrier and transmitted through the interstate wires to Uber and/or Uber's insurance carriers. Such records were in fact so mailed and transmitted. As such, each such letter or communication was prepared and executed in violation of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).

147.   Defendants' commission of predicate acts included the following specific examples:

148.   **Personal Injury Claimant A**

    a.      On January 3, 2020, Emrani faxed an information demand to an insurer located in a different state. On February 6, 2020, an employee of the Emrani firm corresponded via email with an insurer located in a different state regarding the insurer's acceptance of liability. On October 3 and 4, 2021, Emrani faxed and/or emailed a request for lien information as to Claimant A to an insurer located in a different state. On October 15, 2021, the Emrani firm faxed a request for a Conditional Payment Letter as to Claimant A to a government entity located in a different state. On January 29, 2024, Khounganian caused records of his treatments of Claimant A to be transmitted through the interstate wires to a cloud-based platform of a company located in

COMPLAINT; JURY TRIAL DEMANDED

a different state. Such uses of the interstate wires were reasonably foreseeable and were in furtherance of the scheme and in violation of the federal wire fraud statute (18 U.S.C. § 1343).

b.      On December 31, 2020, and on March 11, 2021, for the purpose of adding the expense of his treatments of Claimant A on those days to Claimant A's claims and to further the scheme, Khounganian falsely represented in connection with Claimant A's visits: "Within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." Upon information and belief, Khounganian knew or was recklessly indifferent to the fact that these statements were false when made. Khounganian caused the records containing such false statements to be transmitted through the interstate wires to a cloud-based platform of a company located in a different state. As such, such records were transmitted in furtherance of the scheme and in violation of the federal wire fraud statute (18 U.S.C. § 1343).

c.      On December 30, 2019, an employee of the Emrani firm executed a Proof of Representation as to Claimant A. On October 20, 2020, the Emrani firm executed a Medical Clearance Request as to Claimant A. On October 8, 2021, an employee of the Emrani firm electronically completed and submitted to the website of a government entity a Personal Injury Notification Form as to Claimant A. It was reasonably foreseeable to Emrani and the Emrani firm that such documents would be subsequently sent by U.S. mail or private or commercial carrier and/or transmitted through the interstate wires to an insurance carrier. Such documents were in fact so mailed and/or transmitted. As such, such documents were executed in furtherance of the scheme in violation of the federal mail and/or wire fraud statutes (18 U.S.C. §§ 1341, 1343).

COMPLAINT; JURY TRIAL DEMANDED

d.      On August 20, 2021, Emrani solicited medical records of Claimant A from a medical provider. It was reasonably foreseeable to Emrani and the Emrani firm that such records would be subsequently sent by U.S. mail or private or commercial carrier and/or transmitted through the interstate wires to an insurance carrier. Such records were in fact so mailed and/or transmitted in furtherance of the scheme. As such, such records were solicited in violation of the federal mail and/or wire fraud statutes (18 U.S.C. §§ 1341, 1343).

e.      On October 22, 2021, the Emrani firm caused to be electronically filed proofs of service of Claimant A's complaint and related papers on Uber and two other defendants in the underlying lawsuit. Each such use of the interstate wires to file the proofs of service was in furtherance of the scheme and in violation of the federal wire fraud statute (18 U.S.C. § 1343).

f.      On or around February 21, 2020, the Emrani firm received three faxes from a medical provider containing medical records of Claimant A. On March 25, 2020, the Emrani firm received medical records of Claimant A from a medical provider in response to a subpoena issued by the Emrani firm. On or around July 22, 2020, the Emrani firm received a fax from a medical provider containing medical records of Claimant A. On October 18, 2021, the Emrani firm received a letter from a government entity containing insurance information of Claimant A. On November 1, 2021, the Emrani firm received a letter from a government entity located in a different state containing insurance information of Claimant A. On November 26, 2021, the Emrani firm received a letter from a government entity located in a different state containing insurance information of Claimant A. The Emrani firm subsequently sent such documents by U.S. mail or private or commercial carrier and/or transmitted such documents through the interstate wires to an insurance carrier. As such, such documents were mailed and/or transmitted in violation of the federal mail

-38-

COMPLAINT; JURY TRIAL DEMANDED

and/or wire fraud statutes (18 U.S.C. §§ 1341, 1343). Each such use of U.S. mail or private or commercial carrier was in furtherance of the scheme and in violation of the federal mail fraud statute (18 U.S.C. § 1341).

149. **Personal Injury Claimant B**

a. On December 28, 2020, Law Offices of Jacob Emrani mailed via U.S. mail and e-mailed a demand letter to Uber's insurance provider in furtherance of its scheme. As such, such records were transmitted in violation of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).

b. From May 18, 2021, through October 28, 2021, Khounganian transmitted treatment records, through the interstate wires to a cloud-based platform of a company located in a different state, in which Khounganian falsely represented in connection with Claimant B's visit: "Within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." Upon information and belief, Khounganian knew or was recklessly indifferent to the fact that these statements were false when made given that this claimant had suffered no injury in the accident. As such, such records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

c. On August 18, 2021, The Law Offices of Jacob Emrani, through its agent, effected service of Claimant B's fraudulent complaint and related papers on Uber in the underlying lawsuit via the mail. Each such use of U.S. mail or private or commercial carrier was in furtherance of the scheme and in violation of the federal mail fraud statute (18 U.S.C. § 1341).

150. **Personal Injury Claimant C**

a. On September 13, 2019, Khounganian faxed or caused to be faxed to Downtown LA Law Group records of his September 5, 2019 treatment notes of Claimant C. In those treatment notes, Khounganian falsely

COMPLAINT; JURY TRIAL DEMANDED

represented in connection with Claimant C's visit: "Within a reasonable degree of medical probability, the diagnosis above were caused by the injury during the date of loss." Upon information and belief, Khounganian knew or was recklessly indifferent to the fact that these statements were false when made given that this claimant had suffered no injury in the accident. Additionally, from September 5, 2020, through November 22, 2022, Khounganian transmitted or caused to be transmitted treatment records containing such false statements through the interstate wires to a cloud-based platform of a company located in a different state. As such, such records were transmitted in furtherance of the scheme and in violation of the federal wire fraud statute (18 U.S.C. § 1343).

b.      On May 14, 2021, Downtown LA Law Group through its agent effected service of Claimant C's fraudulent complaint and related papers on Uber in the underlying lawsuit. Each such use of U.S. mail or private or commercial carrier was in furtherance of the scheme and in violation of the federal mail fraud statute (18 U.S.C. § 1341).

c.      On March 17, 2021, Downtown LA Law Group e-mailed a demand letter to counsel for Uber in furtherance of its scheme. Such records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

151.   **Personal Injury Claimant D**

a.      On November 9, 2020, Khounganian faxed or caused to be faxed to Downtown LA Law Group records of his July 16, 2020, treatment notes of Claimant D. In those treatment notes, Khounganian falsely represented in connection with Claimant D's visit: "Within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." Upon information and belief, Khounganian

COMPLAINT; JURY TRIAL DEMANDED

knew or was recklessly indifferent to the fact that these statements were false when made given that this claimant had suffered no injury in the accident. Additionally, on July 16, 2020, Khounganian transmitted or caused to be transmitted treatment records containing such false statement through the interstate wires to a cloud-based platform of a company located in a different state. As such, such records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

b.      On December 28, 2020, Downtown LA Law Group mailed, via U.S. mail, an arbitration demand letter to Uber's insurance provider in furtherance of its scheme. As such, such records were transmitted via U.S. mail or private or commercial carrier in violation of the federal mail fraud statute (18 U.S.C. § 1341).

c.      On March 12, 2021, Downtown LA Law Group e-mailed a demand letter to counsel for Uber in furtherance of its scheme. As such, such records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

152.   The predicate acts all relate to each other as part of a common plan. The Defendants' roles in the scheme all depended on each other—Fradkin, Downtown LA Law Group, Emrani, and Law Offices of Jacob Emrani directed clients to Khounganian and GSK Spine, directed, requested, or authorized Khounganian to perform certain treatments, and directed Khounganian to produce fraudulent records. Khounganian and GSK Spine treated the patients at the lawyers' direction and produced fraudulent documents concerning unnecessary or non-existent surgeries. The lawyers then used these fraudulent records to pursue phony claims against Uber. Each Defendant was aware of its respective role within the larger scheme.

153.   The predicate acts further relate to the enterprise of GSK Spine. A specific threat of repetition exists with respect to each predicate act of the production

COMPLAINT; JURY TRIAL DEMANDED

and transmittal of fraudulent medical records. Emrani and Fradkin used these fraudulent medical records to advance phony litigation against Uber and fraudulently attempt to induce larger settlements. Such predicate acts are a regular way of conducting the ongoing enterprise at issue herein. Hence, the pattern of activity is part of an open-ended and ongoing scheme.

154.   The following illustrates the pattern of fraudulent billing activity with respect to cases against Uber:

| Claimant | Khounganian inflated bills | Radiance Surgery Center inflated bills | Law firm |
|---|---|---|---|
| Claimant A | $230,000 for surgeries and appointments. | $17,200 (Radiance Anesthesia), $270,795 (Radiance Surgery Center) | Law Offices of Jacob Emrani |
| Claimant B | $105,100 for surgery and appointments. | $4,800 (Radiance Anesthesia), $95,500 (Radiance Surgery Center) | Law Offices of Jacob Emrani |
| Claimant C | $108,463 for surgery and appointments. | N/A | Downtown LA Law Group |
| Claimant D | $1,500 for appointment. | N/A | Downtown LA Law Group |
| Claimant E | $102,900 for surgery and appointments. | $8400 (Radiance Anesthesia), $95,500 (Radiance Surgery Center) | Downtown LA Law Group |
| Claimant F | $2,900 for appointments. | N/A | Downtown LA Law Group |
| Claimant G | $105,000 for surgery and appointments. | N/A | Downtown LA Law Group |

COMPLAINT; JURY TRIAL DEMANDED

| Claimant | Khounganian inflated bills | Radiance Surgery Center inflated bills | Law firm |
|---|---|---|---|
| Claimant H | $124,300 for surgery and appointments. | N/A | Downtown LA Law Group |
| Claimant I | $1,500 for appointment. | N/A | Downtown LA Law Group |

155.    The acts also occurred over a substantial period of time and hence constitute a pattern of activity even if the scheme were not ongoing.

## FIRST CAUSE OF ACTION

**(RICO Violation (18 U.S.C. § 1962(c)—GSK Spine Enterprise)**

**(Against Defendants Greg Khounganian, Jacob Emrani, Law Offices of Jacob Emrani, Igor Fradkin, and Downtown LA Law Group)**

156.    Uber incorporates by reference each and every allegation in the paragraphs above.

157.    GSK Spine is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

158.    Greg Khounganian, Jacob Emrani, Law Offices of Jacob Emrani, Igor Fradkin, and Downtown LA Law Group knowingly conducted and/or participated, directly or indirectly, in the conduct of GSK Spine's affairs through a pattern of racketeering activities, as defined in 18 U.S.C. § 1961(1)(A).

159.    Defendants' racketeering activities, as described in detail in this Complaint, included:

160.    Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of

COMPLAINT; JURY TRIAL DEMANDED

its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations; and

161.   Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations and use of the mail for the purpose of executing these fraudulent representations.

162.   Defendants knowingly and willfully associated with the enterprise and conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.

163.   Uber has been injured in its business and property by reason of the above-described conduct.

164.   By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## SECOND CAUSE OF ACTION

### (RICO Violation (18 U.S.C. § 1962(c)—Downtown LA Law Group Enterprise)
### (Against Defendant Igor Fradkin)

165.   Uber incorporates by reference each and every allegation in the paragraphs above.

166.   Downtown LA Law Group is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

167.   Igor Fradkin knowingly conducted and/or participated, directly or indirectly, in the conduct of Downtown LA Law Group's affairs through a pattern of racketeering activities, as defined in 18 U.S.C. § 1961(1)(A).

COMPLAINT; JURY TRIAL DEMANDED

168.   Defendant's racketeering activities, as described in detail in this Complaint, included:

169.   Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations; and

170.   Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations and use of the mail for the purpose of executing these fraudulent representations.

171.   Defendant knowingly and willfully associated with the enterprise and conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.

172.   Uber has been injured in its business and property by reason of the above-described conduct.

173.   By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## THIRD CAUSE OF ACTION

### (RICO Violation (18 U.S.C. § 1962(c)—Law Offices of

### Jacob Emrani Enterprise)

### (Against Defendant Jacob Emrani)

174.   Uber incorporates by reference each and every allegation in the paragraphs above.

COMPLAINT; JURY TRIAL DEMANDED

175. Law Offices of Jacob Emrani is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

176. Jacob Emrani knowingly conducted and/or participated, directly or indirectly, in the conduct of Law Offices of Jacob Emrani's affairs through a pattern of racketeering activities, as defined in 18 U.S.C. § 1961(1)(A).

177. Defendant's racketeering activities, as described in detail in this Complaint, included:

178. Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations; and

179. Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations and use of the mail for the purpose of executing these fraudulent representations.

180. Defendant knowingly and willfully associated with the enterprise and conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.

181. Uber has been injured in its business and property by reason of the above-described conduct. By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

COMPLAINT; JURY TRIAL DEMANDED

**FOURTH CAUSE OF ACTION**

**(RICO Violation (18 U.S.C. § 1962(c))—Association-in-Fact Enterprise)**

**(Against Defendants Jacob Emrani, Law Offices of Jacob Emrani, Igor Fradkin, Downtown LA Law Group, Greg Khounganian, and GSK Spine)**

182.  Uber incorporates herein by reference each and every allegation in the paragraphs above.

183.  At all relevant times, Defendants constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4). Defendants constituted a group of individuals and legal entities associated in fact, which was engaged in, and the activities of which affected, interstate commerce. Each of the Defendants participated in the management or operation of the enterprise.

184.  The enterprise's racketeering activities, as described in detail in this Complaint, included:

185.  Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations; and

186.  Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations and use of the mail for the purpose of executing these fraudulent representations.

187.  Each of the Defendants knowingly and willfully associated with the association-in-fact and conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.

188.  Uber has been injured in its business and property by reason of the above-described conduct. By reason of its injury, Uber is entitled to equitable relief

COMPLAINT; JURY TRIAL DEMANDED

1  under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable

2  attorneys' fees pursuant to 18 U.S.C. § 1964(c).

3  **FIFTH CAUSE OF ACTION**

4  **(RICO Conspiracy (18 U.S.C. § 1962(d))**

5  **(Against Defendants Jacob Emrani, Law Offices of Jacob Emrani, Igor**

6  **Fradkin, Downtown LA Law Group, Greg Khounganian, and GSK Spine)**

7  189.   Uber incorporates herein by reference each and every allegation in the

8  paragraphs above.

9  190.   For at least the time period referenced herein, Defendants did

10  unlawfully, knowingly, and intentionally combine, conspire, and agree together with

11  each other, and with others whose names are known or unknown, to conduct and

12  participate, directly and/or indirectly, in the conduct of the affairs of each enterprise

13  identified above through a pattern of racketeering activity set forth herein in violation

14  of 18 U.S.C. § 1962(d).

15  191.   This pattern of racketeering activity in which Defendants intentionally

16  conspired to engage involved the specific acts as described in detail in this Complaint

17  constituting wire fraud in violation of 18 U.S.C. § 1343 and mail fraud in violation

18  of 18 U.S.C. § 1341.

19  192.   All of these predicate acts constituted "racketeering activity" as defined

20  in 18 U.S.C. § 1961(1)(A).

21  193.   The overall objective of the conspiracy was to defraud Uber and others

22  by generating and submitting artificially inflated medical bills and creating a basis

23  for false and artificially inflated damages claims.

24  194.   Each Defendant agreed to conduct and/or participate, directly or

25  indirectly, in the conduct of the affairs of each enterprise identified above through a

26  pattern of racketeering activity.

27

28

COMPLAINT; JURY TRIAL DEMANDED

195.   Each Defendant agreed to commit, or participated in, a violation of at least two of the predicate offenses identified above.

196.   Each Defendant was aware of the essential nature and scope of the conspiracy described herein and intended to participate in it.

197.   Uber has been injured in its business and property by reason of the above-described conduct.

198.   By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## SIXTH CAUSE OF ACTION

### (Unjust Enrichment)

### (Against All Defendants)

199.   Uber incorporates herein by reference each and every allegation in the paragraphs above.

200.   As alleged above, each Defendant has been and will continue to be unjustly enriched by benefits received pursuant to the fraudulent scheme, including through payments derived directly or indirectly from Downtown LA Law Group, Igor Fradkin, Law Offices of Jacob Emrani, and Jacob Emrani and through higher settlement payments made by Uber that were driven by Defendants' illicit scheme. These payments were facilitated through preparation of fraudulent medical records and the signing of lien agreements.

201.   Such benefit was received at Uber's expense given that Uber has been required to incur substantial legal expense as a result of the scheme.

202.   Principles of equity and good conscience require restitution of any such benefits received by Downtown LA Law Group, Igor Fradkin, Law Offices of Jacob Emrani, Jacob Emrani, Greg Khounganian, GSK Spine, and Radiance Surgery Center.

COMPLAINT; JURY TRIAL DEMANDED

1    203.   Uber demands judgment against all Defendants, jointly and severally,

2    and for restitution of all such benefits received.

3    ## SEVENTH CAUSE OF ACTION

4    **(Violation of Business & Professions Code section 17200, *et seq.*)**

5    **(Against All Defendants)**

6    204.   Uber incorporates herein by reference each and every allegation in the

7    paragraphs above.

8    205.   By the acts alleged herein, Defendants Downtown LA Law Group, Igor

9    Fradkin, Law Offices of Jacob Emrani, Jacob Emrani, Greg Khounganian, GSK

10   Spine, and Radiance Surgery Center have violated, and continue to violate, California

11   Business and Professions Code Section 17200, *et seq.*, through their unlawful, unfair,

12   fraudulent, and deceptive business acts and practices.

13   206.   Defendants' actions are unlawful as they violate, among other things,

14   the federal wire fraud statute, 18 U.S.C. § 1343, and the federal mail fraud statute,

15   18 U.S.C. § 1341, and Cal. Bus. & Prof. Code § 650, which prohibits illegal

16   kickbacks.

17   207.   Defendants' actions are also unfair, insofar as they are immoral,

18   unethical, and/or oppressive.

19   208.   California Business and Professions Code Section 17204 provides that

20   "[a]ctions for relief pursuant to this chapter shall be prosecuted exclusively in a court

21   of competent jurisdiction or by a person who has suffered injury in fact and has lost

22   money or property as a result of the unfair competition." Cal. Bus. & Prof. Code §

23   17204.

24   209.   Defendants' above-described actions were unlawful, unfair, and/or

25   fraudulent, and Plaintiff Uber is thus entitled to relief in the way of restitution of

26   monies and property that Defendants have acquired through their unfair competition

27   and to injunctive relief.

28

COMPLAINT; JURY TRIAL DEMANDED

## **PRAYER FOR RELIEF**

WHEREFORE, Uber prays for judgment against Defendants as follows:

1.      For restitution;

2.      For general damages according to proof at trial, trebled according to statute;

3.      For prejudgment interest;

4.      For reasonable attorneys' fees and costs;

5.      For punitive damages;

6.      For equitable relief as appropriate pursuant to applicable law, including but not limited to issuance of a temporary restraining order, a preliminary and permanent injunction, disgorgement, imposition of a constructive trust, and appointment of a monitor and/or receiver;

7.      For an order under 18 U.S.C. § 1964(a) preventing and restraining violations of 18 U.S.C. § 1962 by directing Defendants to divest themselves of any interest, direct or indirect, in the above enterprises; imposing restrictions on the future activities of such Defendants, including, but not limited to, prohibiting Defendants from engaging in the same type of endeavor as the above enterprises engaged in; and dissolving or reorganizing the above enterprises; and

8.      For such other relief as the Court may deem appropriate.

## **JURY DEMAND**

Uber demands a trial by jury on all issues so triable.

COMPLAINT; JURY TRIAL DEMANDED

Dated: July 21, 2025

**PERKINS COIE LLP**

By: */s/ Oliver M. Gold*
    Tara McGrath, Bar No. 254209
    (admission to the Central District of
    California pending)
    TMcGrath@perkinscoie.com
    11452 El Camino Real Ste 300
    San Diego, CA 92130-2080
    Telephone: +1.858.720.5700
    Facsimile: +1.858.720.5799

    Oliver M. Gold, Bar No. 279033
    OGold@perkinscoie.com
    1888 Century Park E, Suite 1700
    Los Angeles, CA 90067-1721
    Telephone: +1.310.788.9900
    Facsimile: +1.202.654.6211

    David W. T. Daniels, Bar No. 172791
    DDaniels@perkinscoie.com
    Michael R. Huston (*pro hac vice*
    application forthcoming)
    MHuston@perkinscoie.com
    700 Thirteenth Street, N.W., Suite 800
    Washington, D.C. 20005-3960
    Telephone: +1.202.654.6200
    Facsimile: +1.202.654.6211

    David B. Massey (*pro hac vice* application
    forthcoming)
    DMassey@perkinscoie.com
    1155 Avenue of the Americas, 22nd Floor
    New York, New York 10036-2711
    Telephone: +1.212.262.6900
    Facsimile: +1.212.977.1649

Attorneys for Plaintiff
Uber Technologies, Inc.

COMPLAINT; JURY TRIAL DEMANDED