1  John C. Hueston
   jhueston@hueston.com
2  Marshall A. Camp
   mcamp@hueston.com
3  Bram M. Alden
   balden@hueston.com
4  Stewart J. Rickert
   srickert@hueston.com
5  HUESTON HENNIGAN LLP
   620 Newport Center Drive, Suite 1300
6  Newport Beach, CA 92660
   Telephone: (949) 229-8640
7  Facsimile: (888) 866-4825

**REDACTED VERSION OF
DOCUMENT PROPOSED
TO BE FILED UNDER
SEAL**

8  *Attorneys for Defendants Jacob Emrani and
   The Law Offices of Jacob Emrani*

9

10                UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12

13  UBER TECHNOLOGIES, INC.,          Case No. 2:25-cv-06612-SPG-PD

14          Plaintiff,                Hearing Date: March 11, 2026 at 1:30
                                      p.m.
15      v.

16  DOWNTOWN LA LAW GROUP,            **JACOB EMRANI'S AND THE
    IGOR FRADKIN, THE LAW OFFICES     LAW OFFICE OF JACOB
17  OF JACOB EMRANI, JACOB            EMRANI'S NOTICE OF
    EMRANI, GSK SPINE, GREG           MOTION AND MOTION TO
18  KHOUNGANIAN, and RADIANCE         DISMISS UNDER FED. R. CIV. P.
    SURGERY CENTER,                   12(B)(6) AND SPECIAL MOTION
19                                    TO STRIKE UNDER CAL. CODE
            Defendants.               CIV. P. § 425.16**

20

21                                    *[Filed concurrently with Declaration
                                      of Bram M. Alden and [Proposed]*
22                                    *Order]*

23

24

25

26

27

28

**TO THE COURT, PARTIES, AND THEIR RESPECTIVE COUNSEL:**

PLEASE TAKE NOTICE THAT on March 11, 2026 at 1:30 p.m., or as soon thereafter as the matter may be heard, in the United States District Court for the Central District of California, located at 350 West 1st Street, Los Angeles, California 90012, before the Honorable Sherilyn Peace Garnett, Defendants Jacob Emrani and The Law Offices of Jacob Emrani (the "Emrani Defendants"), by and through counsel, will and hereby do move for an order dismissing the Complaint against them with prejudice for failure to state a claim under Fed. R. Civ. P. 12(b)(6). Additionally, the Emrani Defendants will and hereby do move for an order striking Causes of Action Six and Seven under Cal. Civ. Proc. Code § 425.16.

These motions are based on this Notice, the attached Memorandum of Points and Authorities, Exhibits A and B to the Motions and the Declaration of Bram M. Alden in Support of the Emrani Defendants' Motion to Dismiss and Special Motion to Strike ("Alden Decl.") filed concurrently herewith, all pleadings and papers filed in this action, and any such other matters as may be presented to the Court.

These motions are made following the conference of counsel pursuant to Local Rule 7-3. The parties met and conferred via email on October 9, 2025 and via videoconference on October 10, 2025, and were unable to reach a resolution. (Alden Decl. ¶ 2.)

Dated: November 14, 2025                    HUESTON HENNIGAN LLP


By: _/s/ John C. Hueston_
John C. Hueston
Marshall A. Camp
Bram M. Alden
Stewart J. Rickert

*Attorneys for Defendants Jacob Emrani and The Law Offices of Jacob Emrani*

EMRANI AND HIS LAW OFFICE'S COMBINED MOTION TO STRIKE AND/OR DISMISS

1

## **<u>TABLE OF CONTENTS</u>**

2

**I.    INTRODUCTION** ...................................................................................... 1

3

**II.   FACTUAL BACKGROUND** ...................................................................... 7

4

   A.   Uber Commits Countless Torts Resulting in Countless Injuries ...................... 7

5

   B.   Jacob Emrani Is a Very Prominent Personal Injury Lawyer Who Has
       Represented Injury Victims in Successful Suits Against Uber ......................... 7

6

   C.   Uber Alleges That the Claims It Settled ███████████ Were Actually
       Part of a RICO Conspiracy ........................................................................... 8

7

8

   D.   Uber Sets Forth Implausible Causes of Action, Claiming That Lawyers
       Conspired with Their Rivals and Controlled Doctors ................................... 10

9

**III.  LEGAL STANDARDS** ............................................................................ 12

10

   A.   Anti-SLAPP Motion .................................................................................. 12

11

   B.   Litigation Privilege .................................................................................... 13

12

   C.   Motion to Dismiss ...................................................................................... 13

13

**IV.  ARGUMENT** ........................................................................................... 14

14

   A.   Uber's Claims Impermissibly Seek to Impose Liability Based on the
       Protected Right to Pursue Judicial Redress ................................................. 14

15

16

      1.   California's Anti-SLAPP Statute Bars Uber's State-Law Claims ........... 15

17

      2.   California's Litigation Privilege Bars Uber's State Law Claims ............. 18

18

      3.   The *Noerr-Pennington* Doctrine Bars All of Uber's Claims ................... 20

19

20

   B.   Uber's Claims Are Barred by Fundamental Estoppel And Res Judicata
       Principles .................................................................................................. 23

21

22

      1.   Uber's Claims Are Barred By Claim Preclusion .................................. 24

23

      2.   Uber Was Required to Litigate Its Claims As Compulsory Counterclaims
         in the Underlying State Actions ......................................................... 26

24

25

   C.   Uber Fails to Satisfy the Rule 9(b) Heightened Pleading Standard ............... 28

26

      1.   Uber's State-Law Claims Do Not Satisfy the Rule 9(b) Standard ........... 30

27

      2.   Uber's RICO Claims Do Not Satisfy the Rule 9(b) Standard ................. 30

28

EMRANI AND HIS LAW OFFICE'S COMBINED MOTION TO STRIKE AND/OR DISMISS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

D.  Uber's Claims are Untimely .......................................................................43

E.  Uber Cannot Pursue a Standalone Claim for Unjust Enrichment ....................45

**V.  CONCLUSION** ..........................................................................................................45

EMRANI AND HIS LAW OFFICE'S COMBINED MOTION TO STRIKE AND/OR DISMISS

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                       Page(s)

*Acres Bonusing, Inc. v. Ramsey*,
   2022 WL 17170856 (N.D. Cal. Nov. 22, 2022)................................................31, 32

*Action Apartment Ass'n v. City of Santa Monica*,
   41 Cal. 4th 1232 ...................................................................................................19, 20

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*,
   483 U.S. 143 (1987) ...................................................................................................43

*Align Tech., Inc. v. Tran*,
   179 Cal. App. 4th 949 (2009)....................................................................................27

*Anderson v. Geist*,
   236 Cal. App. 4th 79 (2015)......................................................................................12

*Anza v. Ideal Steel Supply Corp.*,
   547 U.S. 451 (2006) ................................................................................................5, 34

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ......................................................................................13, 39, 40

*Bai v. CMB Exp. Infrastructure Inv. Grp. 48, LP*,
   2025 WL 959099 (E.D. Cal. Mar. 31, 2025) ..........................................................40

*Barry v. State Bar of California*,
   2 Cal. 5th 318 (2017)................................................................................................12

*BE & K Constr. Co. v. NLRB*,
   536 U.S. 516 (2002) ..................................................................................................21

*Best v. Combs*,
   2024 WL 5465052 (C.D. Cal. Dec. 27, 2024) .........................................................29

*Blake v. Dierdorff*,
   856 F.2d 1365 (9th Cir. 1988)...................................................................................29

*Bodenburg v. Apple, Inc.*,
   146 F.4th 761 (9th Cir. 2025)....................................................................................30

*Bonni v. St. Joseph Health Sys.*,
  11 Cal. 5th 995 (2021)..................................................................................16, 17

*Bounds v. Smith*,
  430 U.S. 817 (1977) ............................................................................................32

*Boyle v. United States*,
  556 U.S. 938 (2009) ............................................................................................41

*Briggs v. Eden Council for Hope & Opportunity*,
  19 Cal. 4th 1106 (1999)......................................................................................16

*Bucur v. Ahmad*,
  244 Cal. App. 4th 175 (2016)..............................................................................31

*Canyon Cnty. v. Syngenta Seeds, Inc.*,
  519 F.3d 969 (9th Cir. 2008)........................................................................*passim*

*Capitol W. Appraisals v. Countrywide Fin. Corp.*,
  2009 WL 10677052 (W.D. Wash. Sept. 30, 2009)..............................................42

*Cedric Kushner Promotions, Ltd. v. King*,
  533 U.S. 158 (2001) ............................................................................................40

*Chaverri v. Platinum LED Lights LLC*,
  2022 WL 2275664 (D. Ariz. June 22, 2022) ......................................................33

*Christ v. Schwartz*,
  2 Cal. App. 5th 440 (2016)..................................................................................31

*Church of Scientology v. Wollersheim*,
  42 Cal. App. 4th 628 (1996)................................................................................15

*City of Almaty v. Khrapunov*,
  956 F.3d 1129 (9th Cir. 2020)...............................................................................5

*City of Montebello v. Vasquez*,
  1 Cal. 5th 409 (2016)..........................................................................................12

*CoreCivic, Inc. v. Candide Grp., LLC*,
  46 F.4th 1136 (9th Cir. 2022)..............................................................................13

EMRANI AND HIS LAW OFFICE'S COMBINED MOTION TO STRIKE AND/OR DISMISS

*Coronavirus Rep. v. Apple, Inc.*,
  85 F.4th 948 (9th Cir. 2023)..................................................................4, 28

*Crayton v. Hedgpeth*,
  2011 WL 1988450 (E.D. Cal. May 20, 2011).............................................35

*Davidson v. Sprout Foods, Inc.*,
  106 F.4th 842 (9th Cir. 2024)........................................................................4

*DC Comics v. Pac. Pictures Corp.*,
  706 F.3d 1009 (9th Cir. 2013).....................................................................13

*Depot, Inc. v. Caring for Montanans, Inc.*,
  915 F.3d 643 (9th Cir. 2019).........................................................................4

*Dep't of Forestry & Fire Prot. v. Howell*,
  18 Cal. App. 5th 154 (2017).........................................................................32

*Dodd v. Hood River Cnty.*,
  59 F.3d 852 (9th Cir. 1995).........................................................................25

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
  751 F.3d 990 (9th Cir. 2014).......................................................................28

*Edwards v. Marin Park, Inc.*,
  356 F.3d 1058 (9th Cir. 2004)................................................................14, 28

*Federated Dep't Stores, Inc. v. Moitie*,
  452 U.S. 394 (1981).....................................................................................25

*Finton Constr., Inc. v. Bidna & Keys, APLC*,
  238 Cal. App. 4th 200 (2015).......................................................................18

*Fla. Bar v. Went For It, Inc.*,
  515 U.S. 618 (1995).....................................................................................21

*Flatley v. Mauro*,
  39 Cal. 4th 299 (2006).................................................................................15

*Freeman v. Lasky, Haas & Cohler*,
  410 F.3d 1180 (9th Cir. 2005)......................................................................20

*Gomez v. Guthy-Renker, LLC*,
   2015 WL 4270042 (C.D. Cal. July 13, 2015) ................................................41

*Graham-Sult v. Clainos*,
   756 F.3d 724 (9th Cir. 2014)................................................................13

*Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*,
   742 F.3d 414 (9th Cir. 2014)................................................................16

*Gunn v. Drage*,
   65 F.4th 1109 (9th Cir. 2023)...............................................................16

*Hemi Grp., LLC v. City of New York*,
   559 U.S. 1 (2010) ........................................................................34, 35

*Heshejin v. Rostami*,
   54 Cal. App. 5th 984 (2020)...............................................................27

*Hoffman v. Goli Nutrition, Inc.*,
   2024 WL 230873 (C.D. Cal. Jan. 17, 2024) .................................................26, 27

*Howard v. Am. Online Inc.*,
   208 F.3d 741 (9th Cir. 2000)................................................................5

*Hunt v. Zuffa, LLC*,
   361 F. Supp. 3d 992 (D. Nev. 2019) .......................................................33

*In re Actimmune Mktg. Litig.*,
   614 F. Supp. 2d 1037 (N.D. Cal. 2009) ....................................................29

*In re Airport Car Rental Antitrust Litig.*,
   693 F.2d 84 (9th Cir. 1982)................................................................21

*In re Crown Vantage, Inc.*,
   421 F.3d 963 (9th Cir. 2005)...............................................................3, 26

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008)..............................................................14

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*,
   826 F. Supp. 2d 1180 (C.D. Cal. 2011) ....................................................6, 40

*In re WellPoint Inc. Out-of-Network UCR Rates Litig.*,
  903 F. Supp. 2d 880 (C.D. Cal. 2012) ................................................................ 39

*Int'l Union of Operating Eng'rs-Emps. Const. Indus. Pension, Welfare & Training
  Tr. Funds v. Karr*,
  994 F.2d 1426 (9th Cir. 1993) ........................................................................... 24

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
  998 F.3d 397 (9th Cir. 2021) .............................................................................. 7

*Jogani v. Superior Ct.*,
  165 Cal. App. 4th 901 (2008) ........................................................................ 6, 45

*JST Distribution, LLC v. CNV.com, Inc.*,
  2018 WL 6113092 (C.D. Cal. Mar. 7, 2018) ................................................ 14, 37

*Kashian v. Harriman*,
  98 Cal. App. 4th 892 (2002) ............................................................................ 16

*Kearns v. Ford Motor Co.*,
  567 F.3d 1120 (9th Cir. 2009) .......................................................................... 30

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997) ......................................................................................... 43

*Kottle v. Nw. Kidney Centers*,
  146 F.3d 1056 (9th Cir. 1998) .......................................................................... 20

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*,
  431 F.3d 353 (9th Cir. 2005) ............................................................................ 30

*Los Angeles Cnty. v. Shepos*,
  2024 WL 5277272 (C.D. Cal. Nov. 8, 2024) ..................................................... 29

*Manlin v. Milner*,
  82 Cal. App. 5th 1004 (2022) ........................................................................... 18

*Marijanovic v. Gray, York & Duffy*,
  137 Cal. App. 4th 1262 (2006) ......................................................................... 32

*Maya v. Centex Corp.*,
  658 F.3d 1060 (9th Cir. 2011) .......................................................................... 34

EMRANI AND HIS LAW OFFICE'S COMBINED MOTION TO STRIKE AND/OR DISMISS

*McGowan v. McLane Co.*,
  2025 WL 2087565 (C.D. Cal. May 9, 2025) .......................................................29

*Melchior v. New Line Prods., Inc.*,
  106 Cal. App. 4th 779 (2003).................................................................................45

*Mendoza v. Zirkle Fruit Co.*,
  301 F.3d 1163 (9th Cir. 2002).................................................................................33

*Metabolife Int'l, Inc. v. Wornick*,
  264 F.3d 832 (9th Cir. 2001)...................................................................................12

*Mission Beverage Co. v. Pabst Brewing Co., LLC*,
  15 Cal. App. 5th 686 (2017)....................................................................................12

*ML Prods. Inc. v. Ninestar Tech. Co.*,
  2023 WL 12171006 (C.D. Cal. Sept. 27, 2023).....................................................29

*Monterey Plaza Hotel Ltd. P'ship v. Loc. 483 of Hotel Emps. & Rest. Emps. Union, AFL-CIO*,
  215 F.3d 923 (9th Cir. 2000)..............................................................................3, 26

*Morales v. Coop. of Am. Physicians, Inc.*,
  180 F.3d 1060 (9th Cir. 1999)..........................................................................13, 18

*Morehead v. City of Oxnard*,
  2023 WL 8143973 (C.D. Cal. Oct. 4, 2023).........................................................44

*Moreno v. UtiliQuest, LLC*,
  29 F.4th 567 (9th Cir. 2022)...................................................................................25

*Neubronner v. Milken*,
  6 F.3d 666 (9th Cir. 1993).................................................................................4, 29

*Neville v. Chudacoff*,
  160 Cal. App. 4th 1255 (2008)..........................................................................15, 16

*New England Country Foods, LLC v. VanLaw Food Prods., Inc.*,
  2021 WL 6751898 (C.D. Cal. Nov. 23, 2021) (applying California law)...........27

*O&C Creditors Grp., LLC v. Stephens & Stephens XII, LLC*,
  42 Cal. App. 5th 546 (2019)...................................................................................16

EMRANI AND HIS LAW OFFICE'S COMBINED MOTION TO STRIKE AND/OR DISMISS

*Optional Cap., Inc. v. Akin Gump Strauss, Hauer & Feld LLP,*
    18 Cal. App. 5th 95 (2017)...............................................................15, 17

*Pac. Recovery Sols. v. United Behav. Health,*
    481 F. Supp. 3d 1011 (N.D. Cal. 2020) ..............................................40

*Pincay v. Andrews,*
    238 F.3d 1106 (9th Cir. 2001)................................................6, 43, 44

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress,*
    890 F.3d 828 (9th Cir. 2018)...............................................................13

*Pochiro v. Prudential Ins. Co.,*
    827 F.2d 1246 (9th Cir. 1987)............................................................26

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.,*
    508 U.S. 49 (1993) ......................................................................22, 23

*Procare Lab'ys, Inc. v. Gull Lab'ys, Inc.,*
    50 F.3d 15 n.2 (9th Cir. 1995)............................................................26

*Ramirez v. McCormack,*
    113 Cal. App. 5th 493 (2025)...........................................3, 15, 17, 18

*Relevant Grp., LLC v. Nourmand,*
    116 F.4th 917 (9th Cir. 2024)...............................................20, 21, 23

*Reves v. Ernst & Young,*
    507 U.S. 170 (1993) ...........................................................6, 38, 39, 40

*Ricci v. Cnty. of Sacramento,*
    2020 WL 1046805 (E.D. Cal. Mar. 4, 2020) ......................................34

*Rubin v. Green,*
    4 Cal.4th 1187 (1993)..........................................................................18

*Rusheen v. Cohen,*
    37 Cal. 4th 1048 (2006)......................................................................16

*Rutherford Holdings, LLC v. Plaza Del Rey,*
    223 Cal. App. 4th 221 (2014).............................................................45

EMRANI AND HIS LAW OFFICE'S COMBINED MOTION TO STRIKE AND/OR DISMISS

*San Remo Hotel, L.P. v. City & Cnty. of San Francisco,*
  545 U.S. 323 (2005) ............................................25

*Sanford v. MemberWorks, Inc.,*
  625 F.3d 550 (9th Cir. 2010)....................................43

*Save Bull Trout v. Williams,*
  51 F.4th 1101 (9th Cir. 2022)...................................25

*Schrader Cellars, LLC v. Roach,*
  129 F.4th 1115 (9th Cir. 2025)...............................*passim*

*Sedima, S.P.R.L. v. Imrex Co.,*
  473 U.S. 479 (1985) ............................................32

*Shaw v. Nissan N. Am., Inc.,*
  220 F. Supp. 3d 1046 (C.D. Cal. Oct. 24, 2016)..............38, 40

*SiFi Networks Fullerton, LLC v. Berkshire Hathaway Specialty Co.,*
  2025 WL 1544099 n.4 (C.D. Cal. Apr. 25, 2025) .................29

*Silver v. Duel,*
  2022 WL 16859646 (C.D. Cal. July 11, 2022) ...................14

*Sosa v. DIRECTV, Inc.,*
  437 F.3d 923 (9th Cir. 2006)....................3, 20, 21, 22

*State Farm Mut. Auto. Ins. Co. v. Lee,*
  193 Cal. App. 4th 34 (2011)....................................32

*Stoot v. City of Everett,*
  582 F.3d 910 (9th Cir. 2009)...................................36

*Sun Sav. & Loan Ass'n v. Dierdorff,*
  825 F.2d 187 (9th Cir. 1987)...............................5, 37

*Suzuki Motor v. Mullion,*
  2017 WL 7410993 (C.D. Cal. Oct. 3, 2017).......................42

*Swartz v. KPMG LLP,*
  476 F.3d 756 (9th Cir. 2007)..................4, 28, 29

*Synopsys, Inc. v. Ubiquiti Networks, Inc.*,
 313 F. Supp. 3d 1056 (N.D. Cal. 2018) ........................................................ 41

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
 551 U.S. 308 (2007) ..................................................................................... 13

*Thayer v. Kabateck Brown Kellner LLP*,
 207 Cal. App. 4th 141 (2012) ....................................................................... 15

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
 546 F.3d 991 (9th Cir. 2008) .......................................................... 20, 21, 22, 23

*Thomas v. Fry's Elecs., Inc.*,
 400 F.3d 1206 (9th Cir. 2005) ...................................................................... 13

*Uber Sexual Assault Survivors for Legal Accountability v. Uber Techs., Inc.*,
 562 P.3d 519, 2025 WL 314211 (Nev. 2025) ................................................ 1

*Uber Techs., Inc. v. U.S. Jud. Panel on Multidistrict Litig.*,
 131 F.4th 661 (9th Cir. 2025) ....................................................................... 1

*United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n*,
 389 U.S. 217 (1967) ..................................................................................... 15

*United States v. Turkette*,
 452 U.S. 576 (1981) ......................................................................... 5, 38, 42

*Vess v. Ciba-Geigy Corp. USA*,
 317 F.3d 1097 (9th Cir. 2003) .............................................................. passim

*Villarroel v. Recology Inc.*,
 775 F. Supp. 3d 1050 (N.D. Cal. 2025) ........................................................ 36

*Wagh v. Metris Direct, Inc.*,
 348 F.3d 1102 (9th Cir. 2003) ...................................................................... 14

*Walter v. Drayson*,
 538 F.3d 1244 (9th Cir. 2008) ............................................................. 5, 39, 42

*Webster v. Omnitrition Int'l, Inc.*,
 79 F.3d 776 (9th Cir. 1996) .......................................................................... 42

*Wilson v. Cable News Network, Inc.*,
  7 Cal. 5th 871 (2019)..........................................................................................12

*Wojciechowski v. Kohlberg Ventures, LLC*,
  923 F.3d 685 (9th Cir. 2019)...................................................................3, 25, 26

*Yagman v. Gabbert*,
  2015 WL 13358336 (C.D. Cal. May 14, 2015) ...................................................33

*Yagman v. Garcetti*,
  2014 WL 3687279 (C.D. Cal. July 9, 2014) .........................................................5

**Statutes**

18 U.S.C. § 1961...................................................................................................37

18 U.S.C. § 1962.......................................................................................38, 39, 41

18 U.S.C. § 1964...................................................................................................32

Cal. Bus. & Prof. Code § 17200 ............................................................................4

Cal. Bus. & Prof. Code § 17208 ............................................................................6

Cal. Civ. Code § 47....................................................................................2, 13, 18

Cal. Civ. Proc. Code § 128.7 ...............................................................................31

Cal. Civ. Proc. Code § 425.16 ......................................................................*passim*

Cal. Civ. Proc. Code § 426.10 .............................................................................27

Cal. Civ. Proc. Code § 426.30 ..........................................................................3, 27

**Rules**

Fed. R. Civ. P. 9.............................................................................................*passim*

Fed. R. Civ. P. 12.........................................................................................13, 45

Fed. R. Evid. 501 ..................................................................................................13

EMRANI AND HIS LAW OFFICE'S COMBINED MOTION TO STRIKE AND/OR DISMISS

1        **MEMORANDUM OF POINTS AND AUTHORITIES**

2   **I.    INTRODUCTION**

3        Uber is waging a nationwide campaign to close the courthouse doors to

4 plaintiffs and their attorneys. It championed a "deceptive and misleading" ballot

5 initiative to try to cap contingency fees, which was blocked by the Nevada Supreme

6 Court. *Uber Sexual Assault Survivors for Legal Accountability v. Uber Techs., Inc.*,

7 562 P.3d 519, 2025 WL 314211, at *2 (Nev. 2025). It fought and failed to prevent

8 the consolidation of thousands of claims by sexual assault survivors. *Uber Techs.,*

9 *Inc. v. U.S. Jud. Panel on Multidistrict Litig.*, 131 F.4th 661 (9th Cir. 2025); *see also*

10 Laura Lorek, *3000 Lawsuits: Litigation Mounting Against Uber*, Law.com (Sept. 24,

11 2025). And it has spent millions on ads against personal injury lawyers. *See* Natalie

12 Lung, *Uber Targets Personal Injury Lawyers in Multimillion Dollar Ad Campaign*,

13 Bloomberg (Feb. 14, 2025).

14        But this retaliatory lawsuit may be the most pernicious of all. Years after

15 settling claims by plaintiffs injured by its drivers—and thereby avoiding trials in

16 which those plaintiffs could have proven their cases to a jury—Uber now asserts that

17 the claims it settled were predicate acts of a "racketeering" conspiracy. And, even

18 more incredibly, Uber alleges substantively identical conspiracies in New York,

19 Florida, and Pennsylvania alike. *See Uber Techs., Inc v. Wingate, Russotti, Shapiro,*

20 *Moses & Halperin, LLP et al.*, No. 1:25-cv-00522 (E.D.N.Y.); *Uber Techs., Inc. v.*

21 *Law Grp. of S. Fla. et al.*, No. 1:25-cv-22635-CMA (S.D. Fla.); *Uber Techs., Inc. v.*

22 *Simon & Simon P.C. et al.*, 2:25-cv-05365-MAK (E.D. Pa.). Uber would have this

23 Court believe that it is the victim of multiple, independent racketeering schemes

24 comprised of multiple, independent law firms and medical offices that are separately

25 violating RICO all across the country.

26        The reality is not nearly so far-fetched. Uber, a $200 billion company, hopes

27 to intimidate personal injury attorneys and exhaust their resources in order to avoid

28

liability for the countless injuries and deaths caused by its drivers. Rather than fix its problems and protect its passengers, Uber seeks to silence its adversaries.

That is not how the law works. Plaintiffs injured by Uber drivers have a right to redress, and attorneys like Defendants Jacob Emrani and the Law Offices of Jacob Emrani (Emrani's "Firm") are not only entitled, but duty-bound, to zealously represent their clients. There is nothing wrong with pursuing cases against avaricious corporations responsible for countless torts, nor is there anything wrong with proactively offering legal services to Uber's victims, helping victims access quality medical care, or negotiating to reduce patients' medical bills after legal claims are resolved. Standard, salutary business practices are not RICO schemes.

But if Uber genuinely believed that any personal injury claim was fraudulent, it had obvious recourse: try the case. It also could have sought sanctions or brought a claim for malicious prosecution or abuse of process. It never did. Instead, it voluntarily paid substantial sums to every victim whose claim it now reimagines as part of a RICO conspiracy. That conspiracy is mere fantasy, and belied by Uber's own actions in paying settlements to avoid the scrutiny of a jury time and again.

Uber's claims against Emrani and his Firm fail for five independent reasons.

1.     Uber targets Emrani and his Firm for exercising the constitutionally protected right to petition the courts for redress by pursuing, filing, and settling litigation. Civil claims designed to penalize or chill such protected activity are prohibited by both state and federal law. California's anti-SLAPP statute requires the striking of any state-law claim arising from a person's exercise of the constitutional right to petition the courts, Cal. Civ. Proc. Code § 425.16, and California's litigation privilege, Cal. Civ. Code § 47(b), protects statements made in the course of litigation as well as steps taken to pursue litigation, *Schrader Cellars, LLC v. Roach*, 129 F.4th 1115, 1125 (9th Cir. 2025). These state statutes play a critical role here because "[a] dangerously effective way to chill people's exercise of their right to petition the government is to burden their lawyer with a lawsuit based

1 on that lawyer's services to the petitioner." *Ramirez v. McCormack*, 113 Cal. App.
2 5th 493, 500 (2025). And both the anti-SLAPP and litigation privilege statutes apply
3 to state-law claims in federal court. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d
4 1097, 1109 (9th Cir. 2003) (anti-SLAPP); *Schrader*, 129 F.4th at 1125-26 (litigation
5 privilege). Independently, the *Noerr-Pennington* doctrine, which also safeguards
6 against civil liability for the petitioning of the government for redress, *Sosa v.*
7 *DIRECTV, Inc.*, 437 F.3d 923, 929, 931 (9th Cir. 2006), requires the dismissal of all
8 of Uber's claims, federal and state alike.

9       2.      Uber's claims also cannot overcome foundational estoppel principles.
10 Uber settled all of the cases it now attempts to transform into RICO predicates, and

11 ████████████████████████████████████████████████████████████████

12 ████████████████████████████████ Exs. A, B.[1] Those agreements "determine the
13 preclusive effect of [each] dismissal with prejudice" entered by Emrani's clients,
14 *Wojciechowski v. Kohlberg Ventures, LLC*, 923 F.3d 685, 689 (9th Cir. 2019), and
15 claim preclusion bars Uber from attempting to "relitigate[] in the RICO context"
16 claims that "were capable of being litigated and decided in the state court," *Monterey*
17 *Plaza Hotel Ltd. P'ship v. Loc. 483 of Hotel Emps. & Rest. Emps. Union, AFL-CIO*,
18 215 F.3d 923, 928 (9th Cir. 2000). Moreover, all of Uber's causes of action were
19 compulsory counterclaims in the state-court actions that Uber now attempts to
20 relitigate, *see* Cal. Civ. Proc. Code § 426.30(a), and "[f]ederal courts will not permit
21 an action to be maintained where the claims asserted should have been brought as
22 a compulsory counterclaim in an earlier action," *In re Crown Vantage, Inc.*, 421 F.3d
23 963, 973 n.7 (9th Cir. 2005).

24 _____

25 [1] ████████████████████████████████████████████████████████████
26 ████████████████████████████████████████████████████████████████
27 ████████████████████████████████████████████████████████████████
28 ████████████████████████████████████████████████████████████████

EMRANI AND HIS LAW OFFICE'S COMBINED MOTION TO STRIKE AND/OR DISMISS

3.      Even if Uber could overcome all of these threshold bars, its claims assert wire and mail fraud yet fail to satisfy the applicable heightened pleading standard under Federal Rule of Civil Procedure 9(b).  *See Davidson v. Sprout Foods, Inc.*, 106 F.4th 842, 852 (9th Cir. 2024) (fraud claim under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq., must meet Rule 9(b) standard); *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 958 (9th Cir. 2023) (RICO claim alleging fraud must meet Rule 9(b) standard); *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 665, 668 (9th Cir. 2019) (unjust enrichment claim sounding in fraud must meet Rule 9(b) standard).  "Conclusory allegations" that Emrani and his Firm knew that medical treatments, bills, or records were fraudulent "without any stated factual basis are insufficient as a matter of law," *Swartz v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007), and the Complaint's dozens of allegations on "information and belief," *see, e.g.*, Complaint ("Compl.") ¶¶ 22, 26, 41, 47, 58, 62, 64, 70, 72, 75, 78, 128, 148, fail to "state the factual basis for the belief," as required, *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993).

Uber's specific causes of action also do not satisfy Rule 9(b).  The state-law claims do not even pretend to meet the standard; they fail to identify any of "the who, what, when, where, and how" that Rule 9(b) mandates.  *Vess*, 317 F.3d at 1106.  And the RICO claims are woefully deficient too.  RICO requires "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's business or property."  *Id.*  The Complaint satisfies none of these elements.

a.      There are no predicate acts—nor could there be—because lawyers are permitted to refer injury victims to doctors, doctors are permitted to bill on a lien basis, there is no such thing as a "false" contract where a written agreement contains an enforceable liability provision, doctors are permitted to set the charges for their services, and negotiating reductions in medical bills is industry standard.  "[E]ntirely lawful practice[s] cannot constitute 'racketeering' as a matter of law."

*Yagman v. Garcetti*, 2014 WL 3687279, at *4 (C.D. Cal. July 9, 2014), *aff'd*, 852 F.3d 859 (9th Cir. 2017).

        b.    Uber also cannot allege the requisite "direct causal connection" between any supposed RICO violation and any alleged injury, *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 459–60 (2006), given that it had "no legal obligation" to settle any claims, *City of Almaty v. Khrapunov*, 956 F.3d 1129, 1133 (9th Cir. 2020), and never alleges that its settlements exceeded the $1 million insurance minimum it was required to carry, Compl. ¶ 6. This absence of injury demonstrates that Uber lacks statutory standing to pursue its RICO claims. *Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 (9th Cir. 2008). And even if it were possible for Uber to allege any specific injury from a purported scheme that caused it no damages, Uber's vague and conclusory assertions of harm come nowhere close to satisfying the requirement that a RICO plaintiff allege "concrete financial loss." *Id.*

        c.    Uber's attempt to allege a pattern of racketeering fails too— though its millions of drivers are alleged to have committed hundreds of thousands of torts, Uber mined its files and came up with a grand total of *four* cases underlying the supposed RICO scheme, only *two* of which—"Claimants A and B"—were handled by Emrani and his Firm. "[T]wo isolated acts of [purported] racketeering activity do not constitute a pattern." *Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 191 (9th Cir. 1987). Indeed, far from reflecting "a relationship between the predicates" and a "threat of continuing activity," *Howard v. Am. Online Inc.*, 208 F.3d 741, 750 (9th Cir. 2000), Uber's identification of just two unrelated cases pertaining to Emrani and his Firm magnifies the emptiness of Uber's claims.

        d.    Nor does Uber allege the existence of a RICO "enterprise" functioning "separate and apart from the pattern of activity in which it engages," *United States v. Turkette*, 452 U.S. 576, 583 (1981), or that Emrani and his Firm had "some part in directing [the] affairs" of any such enterprise, *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008). There is no plausible scenario in which Emrani and

his Firm conspired with their rivals at the Downtown LA Law Group to direct the affairs of any enterprise, let alone to direct the affairs of medical practitioners. And Uber does not allege any manner in which Emrani personally conducted any purported racketeering enterprise. The mere fact that Emrani oversees his Firm does not mean that he "participate[s] in the operation or management of the [purported RICO] enterprise itself," *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993); alleging "that the [Emrani] Defendants are associated in a manner directly related to their own primary business activities" does not "state a claim" under the civil RICO statute, *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, 826 F. Supp. 2d 1180, 1202 (C.D. Cal. 2011).

4.    The statute of limitations also independently bars all of Uber's claims. Both RICO and the UCL are governed by four-year statutes of limitation. *Pincay v. Andrews*, 238 F.3d 1106, 1108 (9th Cir. 2001) (RICO); Cal. Bus. & Prof. Code § 17208 (UCL). That period "begins to run when a plaintiff knows or should know of the injury that underlies his cause of action," and "[t]he plaintiff is deemed to have had constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the fraud." *Pincay*, 238 F.3d at 1109-10. At the latest, Uber had the requisite constructive notice for (i) Claimant A when Emrani communicated with Uber's insurer in January and February 2020; (ii) Claimant B when she filed suit against Uber on March 9, 2021; (iii) Claimant C when she filed suit against Uber on March 1, 2021; and (iv) Claimant D when he filed suit against Uber on December 23, 2020. Compl. ¶¶ 59, 91, 115, 148(a). All of those actions occurred more than four years before Uber filed this lawsuit on July 21, 2025. Thus, all of Uber's claims are untimely.

5.    Finally, even the most cursory review of California law reveals that Uber's standalone cause of action for "unjust enrichment," Compl. ¶¶ 199-203, is impermissible: "unjust enrichment is not a cause of action." *Jogani v. Superior Ct.*, 165 Cal. App. 4th 901, 911 (2008).

* * *

Plagued by these multiple fatal, uncurable deficiencies, Uber's retaliatory action—with its transparent design of silencing victims by intimidating their attorneys—should be dismissed with prejudice.

## II.    FACTUAL BACKGROUND

### A.    Uber Commits Countless Torts Resulting in Countless Injuries

Plaintiff Uber Technologies Inc. is a massive company responsible for countless torts.  After its founding in 2009, some investors assigned Uber a valuation as high as $68 billion, *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 401 (9th Cir. 2021); today, its market capitalization is nearly $200 billion, *see* www.finance.yahoo.com/quote/UBER (last accessed Nov. 14, 2025). Meanwhile, Uber has been plagued with safety issues for years.  A recent analysis of sealed court records revealed that Uber received a report of sexual assault or misconduct in the United States almost every eight minutes on average between 2017 and 2022.  Emily Steel, "Uber's Festering Sexual Assault Problem," *The New York Times* (Aug. 6, 2025), https://www.nytimes.com/2025/08/06/business/uber-sexual-assault.html.  And Uber's own safety report covering that same period disclosed that its drivers were involved in 361 fatal car accidents and 75 fatal physical assaults in the United States alone.  Uber, 2021-2022 U.S. Safety Report (Aug. 30, 2024), https://uber.app.box.com/s/lea3xzb70bp2wxe3k3dgk2ghcyr687x3?uclick_id=3c18b7ff-2ae1-4170-9c7d-e06a2b860b7b, at 15, 18.  Those figures of course do not account for all of the non-fatal accidents and injuries caused by Uber drivers.  It is thus unsurprising that victims injured by Uber often require medical care or seek counsel to recover damages for their injuries.

### B.    Jacob Emrani Is a Very Prominent Personal Injury Lawyer Who Has Represented Injury Victims in Successful Suits Against Uber

Jacob Emrani is a prominent personal injury lawyer in Los Angeles, California. Compl. ¶¶ 2, 17.  He is the named leader of The Law Offices of Jacob Emrani, *id.*

¶ 17, a law firm that has litigated thousands of cases, involving pedestrian accidents, slips and falls, sexual assaults, and transportation accidents of all types, including hundreds of cases against Uber.  The Downtown LA Law Group, where Igor Fradkin works, is a separate personal injury law firm.  *Id.* ¶¶ 14-15.  The Law Offices of Jacob Emrani and the Downtown LA Law Group ("Fradkin's Firm") are competitors that both represent clients who have been injured by Uber.  *See id.* ¶ 23.

### C. Uber Alleges That the Claims It Settled ███████████ Were Actually Part of a RICO Conspiracy

This lawsuit is designed to retaliate against Emrani, Fradkin, and their respective law firms for successfully representing Uber's victims and holding Uber accountable for injuries caused by its drivers.  The four supposed RICO predicates at the heart of the Complaint are nothing more than lawsuits arising from crashes caused by Uber drivers.  Compl. ¶¶ 37-118.  Emrani's Firm represented Claimants A and B and had nothing to do with Claimants C and D; Fradkin's Firm represented Claimants C and D and had nothing to do with Claimants A and B.  *See id.*  All four Claimants were involved in crashes caused by Uber drivers in 2019, *id.* ¶¶ 37, 54, 80, 101; all four filed suits against Uber in 2020 or 2021, *id.* ¶¶ 59, 91, 115; ████████████ ███████; and Uber settled all four suits ██████████, *see* Compl. ¶¶ 79, 100, 118; ████████████████.

To transform all of its injury victims' settled claims into a RICO conspiracy, Uber alleges a scheme that supposedly plays out in four parts.

First, Emrani, Fradkin, and their respective Firms pursue clients who have been injured by rideshare companies like Uber, take their cases on contingency, and refer them to medical providers like Dr. Greg Khounganian and Radiance Surgery Center (the "Medical Provider Defendants"), who provide care without the administrative delays, barriers, and restrictions of health insurance.  Compl. ¶¶ 23-25; *see also id.* ¶¶ 2, 6, 8.  The Complaint does not, however, explain how any of

these conventional business practices—which facilitate access to both legal representation and medical care—are in any way improper or unlawful.

Second, the Complaint alleges that in the course of treating injury victims, the Medical Provider Defendants charge "above-market, artificially inflated rates" on medical bills in order "to support artificially inflated claims" in litigation. Compl. ¶¶ 22, 35; *see also id.* ¶¶ 2, 3, 4, 5, 8, 22, 53, 58, 97, 122, 124, 126, 129, 154, 193. The Complaint does not, however, state what the supposed market rates were, how much the bills were supposedly inflated above those rates, or why it is anything other than ordinary to bill more for medical services than a provider expects to be paid.

Third, the Complaint alleges that the Medical Provider Defendants and the injury victims' lawyers "secretly enter into side agreements under which the medical providers agree to substantially discount their bills in the event that the recovery [in litigation] is insufficient to pay the artificially inflated medical bills." Compl. ¶ 2; *see also id.* ¶¶ 3, 8, 26, 35, 47, 49, 51, 72, 74-75, 77, 85, 94, 96, 104, 111, 113, 130. The Complaint does not, however, identify who specifically entered into the supposed secret side agreements, when and where they did so, whether the agreements were all merely verbal, or what their terms provide.

Fourth, the Complaint alleges that the purported secret side agreements vitiate express "lien agreements" in which victims agree to pay their medical expenses out of their lawsuit recoveries but also "promise full payment to the medical providers" and agree to be held "directly and unconditionally responsible for the medical providers' fees," irrespective of the amount recovered in litigation. Compl. ¶¶ 2, 26; *see also id.* ¶¶ 47, 75, 111. The Complaint does not, however, explain how or why an explicit contract would be a "sham" or "knowingly false," *id.* ¶¶ 2, 26, 28, 47, 72, 85, 94, 104, 111, 121, 123, 129, merely because a medical provider has the right to enforce the agreement but chooses not to do so.

Moreover, Uber does not allege that it advanced any of these allegations of fraud in the course of litigating any of the underlying four cases. At no point in any

of those lawsuits does Uber claim to have asserted that any victim's medical bills were artificially inflated or exceeded market rates, that any medical practitioner entered into a secret agreement with any lawyer to reduce a medical bill in the event of a shortfall in a lawsuit's recovery, or that any victim's promise to pay medical bills in full was somehow a sham. Nor does Uber claim to have asserted in any of the underlying lawsuits that any Claimant's injuries or medical diagnosis was "exaggerated," "false," or "falsely" linked to an Uber crash, *see, e.g.*, Compl. ¶¶ 4, 41, 57, 63, 87-88, 92, 110, 116, 148, 149, 150, 151; that any medical treatment was "authorized" or "directed" by lawyers, *see, e.g.*, *id.* ¶¶ 32, 42, 152; or that any lawyer entered into a "kickback scheme" with any doctor, *see, e.g.*, *id.* ¶¶ 3, 25, 29, 36, 39, 121, 130, 133, 136, 140-41, 206. Rather than advance any of these allegations in any of the underlying lawsuits, Uber settled with each Claimant and thereby avoided a jury trial and a potentially significantly higher verdict each time.

### D. Uber Sets Forth Implausible Causes of Action, Claiming That Lawyers Conspired with Their Rivals and Controlled Doctors

The Complaint alleges four illogical RICO causes of action against Emrani and his Firm. Compl. ¶¶ 156-64 (First Cause of Action), 174-81 (Third Cause of Action), 182-88 (Fourth Cause of Action), 189-98 (Fifth Cause of Action). The first, fourth, and fifth causes of action all allege that Emrani and his Firm conspired with their direct competitors, Fradkin and his Firm. *Id.* ¶¶ 158, 183, 190. The first claim alleges that the rival firms directed the affairs of a purported medical group; the fourth claim alleges that the rival firms, along with the Medical Provider Defendants, directed each other's affairs; and the fifth claim merely recasts the preceding allegations as a conspiracy. *Id.*

The third cause of action, asserted only against Emrani personally, effectively alleges that he ran his Firm. *See id.* ¶ 176; *see also id.* ¶ 136 (alleging that "Emrani operated, managed, and controlled his law firm"). Although the Complaint asserts that Emrani "aggressively pursue[s] clients to sue Uber," including by means of

speech like "online advertisement[s]," *Id.* ¶ 23, the sections of the Complaint describing Claimants A, *id.* ¶¶ 37-53, and B, *id.* ¶¶ 54-79, include no allegations about Emrani personally, apart from the assertions that he was copied on two emails regarding Claimant A, *id.* ¶¶ 43, 44, signed a demand letter to Uber's insurance provider regarding Claimant B, *id.* ¶ 57, and was listed as Claimant B's lawyer on a lien agreement with a physical therapist, *id.* ¶ 67. The third cause of action adds nothing to those threadbare allegations. It merely parrots statutory language in conclusory fashion, stating that Emrani "knowingly conducted and/or participated, directly or indirectly, in the conduct of Law Offices of Jacob Emrani's affairs through a pattern of racketeering activities." *Id.* ¶ 176.

Each of Uber's RICO claims is predicated on supposed wire and mail fraud based on wirings and mailings related to litigation, *see id.* ¶¶ 148, 160-61, 178-79, 185-86, 191, yet the Complaint fails to allege how the majority of those wirings and mailings furthered any fraud scheme, *see id.* ¶¶ 148-53, and does not connect any particular wiring or mailing with any particular cause of action, *see id.* ¶¶ 156-98. The Complaint attempts to shore up these deficient allegations with assumption and conjecture, repeatedly claiming that it was "foreseeable" to defendants that documents and records—many of which are not even identified—"would be" mailed or wired. *Id.* ¶¶ 144, 145, 146, 148. In addition, the Complaint alleges that "[t]he acts also occurred over a substantial period of time" but does not specify which acts or what period of time that allegation is referencing. *Id.* ¶ 155.

Uber also tacks on two state-law claims: the Sixth Cause of Action, for "Unjust Enrichment," *id.* ¶¶ 199-203, and the Seventh Cause of Action, asserting a UCL violation, *id.* ¶¶ 204-09. Neither of those causes of action asserts a single fact beyond what is alleged in the preceding sections of the Complaint.

## III.  LEGAL STANDARDS

### A.    Anti-SLAPP Motion

California's anti-SLAPP statute prohibits and penalizes strategic lawsuits against public participation.  Cal. Civ. Proc. Code § 425.16.  The statute is designed to "allow early dismissal of meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation." *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001).  Specifically, to protect "the constitutional rights of freedom of speech and petition for the redress of grievances" and to combat the chilling of those rights "through abuse of the judicial process," the anti-SLAPP statute bars any cause of action arising from "any written or oral statement or writing made before a legislative, executive, or judicial proceeding" or "made in connection with an issue under consideration or review" in such a proceeding.  Cal. Civ. Proc. Code §§ 425.16(a), (b)(1), (e)(1)-(2).

Under the anti-SLAPP statute, a defendant may "bring a special motion to strike a cause of action arising from constitutionally protected speech or petitioning activity." *Barry v. State Bar of California*, 2 Cal. 5th 318, 320 (2017) (citing Cal. Civ. Proc. Code § 425.16(b)(1)).  The analysis proceeds in two steps. *Anderson v. Geist*, 236 Cal. App. 4th 79, 84 (2015).  First, the defendant must make "a threshold showing that the challenged cause of action arises from protected activity." *Mission Beverage Co. v. Pabst Brewing Co., LLC*, 15 Cal. App. 5th 686, 697-98 (2017) (cleaned up).  "[T]he question is only whether a defendant has made out a prima facie case that activity underlying a plaintiff's claims is statutorily protected, not whether it has shown its acts are ultimately lawful." *Wilson v. Cable News Network, Inc.*, 7 Cal. 5th 871, 888 (2019) (citation omitted).  "If the defendant makes this initial showing of protected activity, the burden shifts to the plaintiff at the second step to establish a probability it will prevail on the claim." *City of Montebello v. Vasquez*, 1 Cal. 5th 409, 420 (2016).  And if the anti-SLAPP motion is granted, the defendant is entitled to its attorney's fees and costs.  Cal. Civ. Proc. Code § 425.16(c)(1).

California's anti-SLAPP statute applies to state-law claims in federal court. *CoreCivic, Inc. v. Candide Grp., LLC*, 46 F.4th 1136, 1140-43 (9th Cir. 2022); *DC Comics v. Pac. Pictures Corp.*, 706 F.3d 1009, 1013 n.5 (9th Cir. 2013); *Thomas v. Fry's Elecs., Inc.*, 400 F.3d 1206, 1206-07 (9th Cir. 2005) (per curiam); *Vess*, 317 F.3d at 1109. The Court must treat an anti-SLAPP special motion to strike "in the same manner as a motion under Rule 12(b)(6) except that the attorney's fee provision of § 425.16(c) applies." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018).

## B.    Litigation Privilege

Separate from its anti-SLAPP statute, California has codified the litigation privilege to safeguard statements made in any "judicial proceeding." Cal. Civ. Code § 47(b). The litigation privilege supplies an absolute immunity from state-law tort liability (with the exception of a claim for malicious prosecution) and may be raised at the pleading stage in federal court either by means of an anti-SLAPP motion to strike, *see, e.g.*, *Graham-Sult v. Clainos*, 756 F.3d 724, 735, 741-42 (9th Cir. 2014), or as the basis for a traditional Rule 12(b)(6) motion to dismiss, *see, e.g.*, *Morales v. Coop. of Am. Physicians, Inc.*, 180 F.3d 1060, 1062 (9th Cir. 1999); *see also* Fed. R. Evid. 501 ("in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision").

## C.    Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. In ruling on a motion to dismiss, "courts must consider the complaint in its entirety" along with other sources that "courts ordinarily examine" at the pleading stage, "in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v.*

*Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). The Court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard for claims that sound in fraud: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Rule 9(b)'s "particularity requirement applies to state-law causes of action." *Vess*, 317 F.3d at 1103. It also "applies to civil RICO fraud claims." *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1065-66 (9th Cir. 2004). Indeed, it plays an especially important role in the civil RICO context where "quasi-criminal" claims can have an unfair "stigmatizing effect" on defendants, and courts should therefore "strive to flush out frivolous RICO allegations at an early stage of the litigation." *Wagh v. Metris Direct, Inc.*, 348 F.3d 1102, 1108 (9th Cir. 2003); *Silver v. Duel*, 2022 WL 16859646, at *3 (C.D. Cal. July 11, 2022); *JST Distribution, LLC v. CNV.com, Inc.*, 2018 WL 6113092, at *8 (C.D. Cal. Mar. 7, 2018). "To avoid dismissal for inadequacy under Rule 9(b)," a complaint must "state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Edwards*, 356 F.3d at 1066. The allegations "must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Vess*, 317 F.3d at 1106.

## IV.    ARGUMENT[2]

### A.    Uber's Claims Impermissibly Seek to Impose Liability Based on the Protected Right to Pursue Judicial Redress

Emrani, his law Firm, and his clients injured by Uber have a constitutional right to petition the judiciary for redress. That right is "among the most precious of

---

[2] In addition to the arguments set forth herein, Emrani and his Firm join in all of the arguments advanced by their co-defendants as support for dismissing and striking Uber's claims.

the liberties safeguarded by the Bill of Rights" and is "intimately connected both in origin and in purpose, with the other First Amendment rights of free speech and free press." *United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n*, 389 U.S. 217, 222 (1967); *accord Church of Scientology v. Wollersheim*, 42 Cal. App. 4th 628, 647 (1996) ("The right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances."). Through this lawsuit, Uber seeks to chill the right to petition by imposing liability for its exercise. California's anti-SLAPP and litigation privilege statutes bar Uber's state-law claims, and the *Noerr-Pennington* doctrine bars Uber's federal and state claims alike.

### 1.   California's Anti-SLAPP Statute Bars Uber's State-Law Claims

California's anti-SLAPP statute exists to weed out suits just like this one. Litigation is not a weapon to silence one's adversaries and obstruct the exercise of their constitutional rights. *Flatley v. Mauro*, 39 Cal. 4th 299, 311-12 (2006). Nor may litigants pursue meritless lawsuits "to deplete 'the defendant's energy and drain his or her resources." *Id.* at 312. Doing so is an "abuse of the judicial process." *Id.* And a "dangerously effective" one. *Ramirez*, 113 Cal. App. 5th at 500. "If you want to petition the government successfully, a lawyer helps. Using litigation to scare off or punish that lawyer can deter the petitioning right." *Id.* For that reason, "[t]his terrain is within the heartland of the anti-SLAPP statute," and "[n]umerous cases have held that the SLAPP statute protects lawyers sued for litigation-related speech and activity." *Id.*; *Thayer v. Kabateck Brown Kellner LLP*, 207 Cal. App. 4th 141, 154 (2012); *see also Optional Cap., Inc. v. Akin Gump Strauss, Hauer & Feld LLP*, 18 Cal. App. 5th 95, 113 (2017) ("It is well established that the protection of the anti-SLAPP statute extends to lawyers and law firms engaged in litigation-related activity.").

The anti-SLAPP statute itself directs that it be "construed broadly," Cal. Civ. Proc. Code § 425.16(a), and courts have adopted a "fairly expansive view of what constitutes litigation-related activities within the scope of section 425.16," *Neville v.*

*Chudacoff*, 160 Cal. App. 4th 1255, 1268 (2008); *Kashian v. Harriman*, 98 Cal. App. 4th 892, 908 (2002). The "filing, funding, and prosecution of a civil action" plainly falls within the scope of the anti-SLAPP's protection. *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1056 (2006). But even when litigation "may not have commenced, if a statement concerns the subject of the dispute and is made in anticipation of litigation contemplated in good faith and under serious consideration, then the statement may be petitioning activity protected by section 425.16." *Neville*, 160 Cal. App. 4th at 1268 (internal citations and quotation marks omitted). Statements "preparatory to or in anticipation of the bringing of an action" are "entitled to the benefits" of the anti-SLAPP statute. *Briggs v. Eden Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1115 (1999). California courts give the anti-SLAPP statute its intended breadth and protect constitutional rights by interpreting "rather loosely" the requirement that a defendant show that a plaintiff's causes of action are based on protected conduct. *Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 422 (9th Cir. 2014). And "[u]nder this broad standard," "actions" taken "in anticipation of litigation[] easily qualify" for protection. *Gunn v. Drage*, 65 F.4th 1109, 1121 (9th Cir. 2023) (quotation marks omitted).

Uber's state-law causes of action "aris[e] from" activities protected by the anti-SLAPP statute. Cal. Civ. Proc. Code § 425.16(b). Though both of the claims are tacked onto the Complaint with none of the requisite details, as explained below, the claims—like all of Uber's claims—are plainly premised on protected activity.

The unjust enrichment claim says so: Uber alleges that Emrani and his Firm were "unjustly enriched" by "higher settlement payments" in court cases, forcing Uber "to incur substantial legal expense." Compl. ¶¶ 200-01. "Settlement negotiations" and "settlement activity" are "protected activity for purposes of the anti-SLAPP statute." *Bonni v. St. Joseph Health Sys.*, 11 Cal. 5th 995, 1024 (2021); *O&C Creditors Grp., LLC v. Stephens & Stephens XII, LLC*, 42 Cal. App. 5th 546, 568 (2019). It makes no difference that Uber "alleges fraud in the course of those

negotiations"; "that allegation does not remove them from the definition of protected activity." *Bonni*, 11 Cal. 5th at 1025. Fraud may be a predicate to support a RICO claim, but when the supposed fraud entails "litigation-related activity" by "lawyers and law firms," the anti-SLAPP statute bars the claim. *Optional Cap*, 18 Cal. App. 5th at 113.

Uber's UCL claim fares no better. Although the claim does not allege even a single specific fact, *see* Compl. ¶¶ 204-09, its references to wire fraud and mail fraud, *id.* ¶ 206, and its incorporation of the Complaint's preceding paragraphs, *id.* ¶ 204, reflect that the UCL claim is part and parcel of this whole case, which is itself just one piece of Uber's nationwide "tactic of suing opposing *counsel*" in an effort "to scare off or punish" lawyers who dare to represent victims injured by its drivers. *Ramirez*, 113 Cal. App. 5th at 495, 500. This tactic is evident from the opening sentences of the Complaint: Uber is targeting lawyers for filing "personal injury claims" so that Uber can curtail "litigations." Compl. ¶ 1. That retaliatory theme is woven through the entire Complaint. Uber alleges that Emrani and his Firm engaged in fraud by referring "personal injury clients"—i.e., plaintiffs—to medical practitioners, using those practitioners' inflated medical bills "as a basis for fraudulent *lawsuits* and/or claims for damages," and entering into "secret side agreements" to "discount the medical bills" in the event that the "*lawsuit* recovery" is insufficient. Compl. ¶¶ 2, 3, -4, 8 (emphases added); *see also, e.g.*, Compl. ¶¶ 25, 126 (scheme is designed to maximize recoveries in "lawsuits"); *id.* ¶ 27 (inflated medical bills are designed "for use in the litigation against Uber"); *id.* ¶¶ 136, 153 (Emrani transmitted medical bills "to advance the litigation"). The supposed scheme's entire premise is to "inflate the damages in lawsuits against Uber." Compl. ¶ 22. It is thus clear from the face of the Complaint that Uber is suing Emrani and his Firm for one reason only—because they have filed lawsuits against Uber. All of Uber's claims against Emrani and his Firm, including the UCL cause of action, are "nonclients' causes of action against attorneys[]" targeting quintessential petitioning

activity "within the ambit of SLAPP." *Schrader Cellars*, 129 F.4th at 1126. Indeed, Uber's stratagem of suing "lawyers" for "litigation-related speech and activity" is a "dangerously effective" "abuse of the judicial process" that falls "within the heartland of the anti-SLAPP statute." *Ramirez*, 113 Cal. App. 5th at 500.

Uber's state-law claims should be stricken under the anti-SLAPP law.

### 2.    California's Litigation Privilege Bars Uber's State Law Claims

Emrani and his Firm are also protected by California's litigation privilege, Cal. Civ. Code § 47(b), which "applies to all cases except claims for malicious prosecution and claims for attorney malpractice," *Schrader Cellars*, 129 F.4th at 1125. The California Supreme Court "has emphasized that the litigation privilege is to be interpreted broadly and has evinced a strong policy favoring use of nontort remedies rather than derivative tort causes of action to punish and correct litigation misconduct." *Morales*, 180 F.3d at 1064 (citations and quotation marks omitted). Consistent with that "broad interpretation," the privilege "is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards." *Schrader Cellars*, 129 F.4th at 1126 (quotation marks omitted). As California courts have explained, the "conduct" protected by the privilege includes both "activity preparatory to litigation," *Finton Constr., Inc. v. Bidna & Keys, APLC*, 238 Cal. App. 4th 200, 212 (2015), and "the way a party conducts litigation," *Manlin v. Milner*, 82 Cal. App. 5th 1004, 1021 (2022). "And, of course, the privilege, when applicable, protects not just portions of pleadings or communications from disclosure, but also against claims based on the filing of the suit." *Schrader Cellars*, 129 F.4th at 1126. So long as a communication has "some relation" to litigation that is contemplated in good faith, the communication is protected by the litigation privilege. *Rubin v. Green*, 4 Cal.4th 1187, 1194-95 (1993).

Like the anti-SLAPP statute, the litigation privilege bars Uber's state-law claims against Emrani and his Firm because those claims are all predicated on the pursuit of "lawsuits" and steps preparatory to "litigation." (*See, e.g.*, Compl. ¶¶ 1, 4,

8, 9, 22, 25, 27, 33, 59, 126, 129, 136, 148, 149, 153.) Uber has filed suit in retaliation for Emrani and his Firm's planning and filing of cases against Uber, including by identifying "clients to sue Uber," referring those clients to medical practitioners for evaluations and treatments that constitute "damages" in litigation, preparing and sending "demand letters," and filing suits in state court. Compl. ¶¶ 2, 3, 4, 8, 22, 23, 25, 31, 33, 39, 57, 59, 123, 124, 126, 129, 141, 145, 148, 149, 152. The "gravamen" of the Complaint plainly entails litigation conduct and statements that are protected by the privilege. *See Schrader Cellars*, 129 F.4th at 1127.

Application of the privilege here also serves the exact purposes for which it was designed. The privilege safeguards "the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions"—"an absolute protection of access to the courts." *Action Apartment Ass'n v. City of Santa Monica*, 41 Cal. 4th 1232, 1241, 1244. And in the process of securing that protection, the privilege also "places upon litigants the burden of exposing during trial the bias of witnesses and the falsity of evidence, thereby enhancing the finality of judgments and avoiding an unending roundelay of litigation, an evil far worse than an occasional unfair result." *Id.* The point is to require litigants to air their defenses when they are sued and to preclude collateral actions based on defenses they failed to advance. Uber is thus employing the exact tactics the privilege is intended to prohibit. By seeking liability based on the filing of litigation it settled, Uber hopes to both breach the "absolute protection of access to the courts" and capitalize on its own "roundelay," *id.*—a dance wherein Uber first settles claims to keep its wrongdoing beyond the purview of a jury and then collaterally challenges its own settlements by asserting that they are tainted by fraud. The dance is choreographed so that Uber avoids having to expose any purported "falsity of evidence" at trials in which its victims would be afforded opportunities to prove their claims and instead—years later, when memories have faded and evidence is stale—attempts to undermine "the

finality of judgments" long since settled.  *Id.*  The litigation privilege bars Uber's state-law claims.

### 3.   The *Noerr-Pennington* Doctrine Bars All of Uber's Claims

Federal law, like California law, recognizes a party's right to pursue litigation without fear of reprisal.  Thus, federal courts apply the "*Noerr-Pennington* doctrine" to protect "constitutional rights" by barring both federal and state claims predicated on underlying petitioning activity, "even where a state law doctrine advances a similar goal."  *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1007 (9th Cir. 2008); *see also Schrader Cellars*, 129 F.4th at 1125 n.12 ("The *Noerr-Pennington* doctrine applies to state law tort claims.").  *Noerr-Pennington* "sweeps broadly," *Kottle v. Nw. Kidney Centers*, 146 F.3d 1056, 1059 (9th Cir. 1998), and "[i]n determining whether the burdened conduct falls under the protection of the Petition Clause" for *Noerr-Penington* purposes, courts "must give adequate breathing space to the right of petition," *Sosa*, 437 F.3d at 931-32 (quotation marks omitted).  That breathing space is preserved by construing civil liability statutes to avoid burdening "activity arguably falling within the scope of the Petition Clause."  *Id.* at 942.  "[T]he doctrine overprotects baseless petitions so as to ensure citizens may enjoy the right of access to the courts without fear of prosecution."  *Relevant Grp., LLC v. Nourmand*, 116 F.4th 917, 927-28 (9th Cir. 2024) (quotation marks omitted).  And the protection extends not only to plaintiffs in the underlying litigation but also to the "law firms and lawyers" who represented them.  *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1186 (9th Cir. 2005).

Retaliatory RICO suits designed to penalize and chill litigation activity are barred by *Noerr-Pennington*.  In *Relevant Group*, for example, the Ninth Circuit held that *Noerr-Pennington* barred a real estate developer's claims that its adversaries had violated RICO by pursuing and filing environmental protection lawsuits "to extort funds" from the developer.  116 F.4th at 923-25, 927-28.  And in *Sosa*, the Circuit held that *Noerr-Pennington* barred claims that DIRECTV had violated RICO by

threatening to sue thousands of individuals who settled with DIRECTV rather than incur the expense of defending against accusations that they had illegally accessed satellite television signals. 437 F.3d at 925-27, 942. RICO cannot be used to penalize "communication[s] to the court," "conduct incidental to the prosecution of the suit," or "litigation-related activities preliminary to the formal filing of the litigation." *Id.* at 933, 934-35, 937; *see also Theme Promotions*, 546 F.3d at 1007 ("Conduct incidental to a lawsuit, including a pre-suit demand letter, falls within the protection of the *Noerr–Pennington* doctrine."). By protecting—and "overprotect[ing]"—such conduct and communications, *Noerr-Pennington* "ensure[s] that First Amendment rights are not chilled." *Relevant Grp.*, 116 F.4th at 934-35; *Sosa*, 437 F.3d at 934; *see also BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 532 (2002) ("[T]he ability to lawfully prosecute even unsuccessful suits adds legitimacy to the court system as a designated alternative to force.").

All of Uber's claims are predicated on litigation, litigation-related activities, and conduct incidental to the prosecution of litigation. The purported fraud begins when Emrani and his Firm "aggressively pursue clients to sue Uber," including by means of an "online advertisement" in which Emrani advertises his services to victims injured in Uber accidents. Compl. ¶ 23.[3] Thereafter, Emrani and his Firm allegedly "direct" lawsuit "claimants"—i.e., Uber's injury victims—to "medical providers" who agree to be paid from "recoveries" in litigation. *Id.* ¶ 2. And those medical providers then supposedly generate "artificially inflated medical bills" that are "utilized as the basis for a false and artificially inflated damages claim" in litigation. *Id.*; *see also id.* ¶ 193 (alleging that medical bills "creat[e] a basis" for inflated legal claims.) The specific "purposes" of the fraudulent bills, in Uber's telling, are "to support artificially inflated claims" and to assist lawyers in

---

[3] Emrani's advertising to recruit clients is of course commercially protected speech, *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995), to which *Noerr-Pennington* applies, *see In re Airport Car Rental Antitrust Litig.*, 693 F.2d 84, 87-88 (9th Cir. 1982) (there is no "commercial exception" to *Noerr-Pennington*).

"fabricating" claims against Uber. *Id.* ¶¶ 8, 35, 39, 41, 53, 70, 88, 99, 109, 148(b). The alleged inflated medical bills exist only to support lawsuits and increase damages in litigation.  Thus, the lawyer referrals to medical practitioners and purported preparation of fraudulent medical bills are "litigation-related activities preliminary to the formal filing of the litigation" or "conduct incidental to the prosecution of the suit." *Sosa*, 437 F.3d at 934, 937.  Indeed, the Medical Provider Defendants allegedly "accept[] referrals from lawyers who *have cases* against Uber," *id.* ¶ 8 (emphasis added), which goes well beyond the mere possibility of a future action.

Medical practitioners' purported agreements to be paid on "a lien basis," *id.* ¶¶ 2, 22, 25, 55, 84, 103, are also litigation-related activities and thus protected under *Noerr-Pennington*.  According to Uber, these lien agreements entitle the Medical Provider Defendants to a "cut of their [patients'] eventual lawsuit recovery." *Id.* ¶ 8. An agreement to be paid from the proceeds of a lawsuit is obviously related to litigation, and a doctor's alleged willingness to enter into such an agreement is either "incidental to litigation," protected "prelitigation conduct," or both.  *Sosa*, 437 F.3d at 934, 936.  The same is true of the alleged "secret side agreements" wherein medical practitioners supposedly agree with lawyers to "discount" their medical bills in the event that "the recovery" in a lawsuit "is insufficient to pay the artificially inflated medical bills."  Compl. ¶¶ 2-3, 8, 26, 28-29, 49, 51, 74.  Any such purported agreements would only further confirm that the alleged lawyer-doctor relationships upon which Uber's claims are predicated is purely a function of litigation, designed to further the petitioning activity of Emrani and his Firm's clients.

Because all of the conduct and communications underlying Uber's claims are protected, *Noerr-Pennington* bars those claims unless the targeted petitioning activity constitutes "sham litigation." *Theme Promotions*, 546 F.3d at 1007.  That exception, however, is reserved for lawsuits that satisfy "a two-part test." *Id.*  "First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could reasonably expect success on the merits." *Id.*; *see also Pro. Real Est. Invs., Inc. v. Columbia*

*Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993) ("[A]n objectively reasonable effort to litigate cannot be sham regardless of subjective intent.").  Second, if objectively baseless, courts evaluate "the litigant's subjective motivation," asking "whether the baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a *competitor*" by deploying the litigation process "as an anticompetitive weapon." *Id.* (quotation marks omitted). Neither prong of the test is met here.  First, the Ninth Circuit has recognized that "settlement indicates a lawsuit is not objectively baseless." *Relevant Grp.*, 116 F.4th at 932; *see also Theme Promotions*, 546 F.3d at 1007 ("The fact that this ongoing litigation settled suggests that the original suit was not objectively baseless.").  Here, Uber settled all of the underlying lawsuits, demonstrating that they were not objectively baseless.  Second, none of the underlying lawsuits were filed by an Uber "competitor" (such as Lyft); rather, they were filed by victims injured by Uber's drivers, and there is no sense in which such suits could be "an anticompetitive weapon." *Theme Promotions*, 546 F.3d at 1007.  Accordingly, the sham litigation exception is inapplicable, and all of Uber's claims are barred by the *Noerr-Pennington* doctrine.

**B.     Uber's Claims Are Barred by Fundamental Estoppel And Res Judicata Principles**

Emrani's clients—Claimants A and B—fully litigated their claims against Uber to final judgments. ███████████████████████████████

EMRANI AND HIS LAW OFFICE'S COMBINED MOTION TO STRIKE AND/OR DISMISS

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████

      █████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

     Under well-established principles of estoppel, Uber is barred from relitigating these settled claims.

       1.    <u>Uber's Claims Are Barred By Claim Preclusion</u>

     "The dismissal of [an] action with prejudice constitutes a final judgment on the merits" for preclusion purposes, *Int'l Union of Operating Eng'rs-Emps. Const. Indus. Pension, Welfare & Training Tr. Funds v. Karr*, 994 F.2d 1426, 1429 (9th Cir. 1993), and in "[a]pplying the principles of claim preclusion," federal courts "treat a

state court judgment with the same respect it would receive in the courts of the rendering state," *Moreno v. UtiliQuest, LLC*, 29 F.4th 567, 578 (9th Cir. 2022). Thus, where a final state-court judgment is entered, claim preclusion prohibits "the parties or their privies from relitigating issues that were or could have been raised in that action." *Dodd v. Hood River Cnty.*, 59 F.3d 852, 863 (9th Cir. 1995). Claim preclusion, moreover, safeguards "vital public interests." *San Remo Hotel, L.P. v. City & Cnty. of San Francisco*, 545 U.S. 323, 346 (2005). "It serves to protect against the expense and vexation attending multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibility of inconsistent decisions." *Save Bull Trout v. Williams*, 51 F.4th 1101, 1107 (9th Cir. 2022) (quotation marks omitted). Public policy demands "an end to litigation," and claim preclusion ensures "that those who have contested an issue shall be bound by the result of the contest." *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 401 (1981). That is why "[t]here is simply no principle of law or equity which sanctions the rejection by a federal court of the salutary principle of *res judicata*." *Id.* (quotation marks omitted).

Although claim preclusion traditionally entails a three-part test, the "inquiry is modified in cases where the earlier action was dismissed in accordance with a release or other settlement agreement." *Wojciechowski*, 923 F.3d at 689.[4] In such instances, courts "look to the intent of the settling parties to determine the preclusive effect of a dismissal with prejudice entered in accordance with a settlement agreement, rather than to general principles of claim preclusion." *Id.* "The settlement and release become [the] final judgment" and "determine[] the scope of preclusion in [a subsequent] action as a matter of preclusion law, not as a matter of contract." *Id.* at

---

[4] The traditional three-part test would also preclude relitigation of the claims in the underlying actions for the reasons set forth in Downtown LA Law Group's motion to dismiss.

690-91.  Where parties desire to "limit the scope of the preclusive effect of a dismissal with prejudice," they are free to do so by the terms of their settlement.  *Id.* at 689.

Here, Uber entered into ████████████████████ and settlement agreements with both Claimants A and B.  ████████████████████████████████ ████████████████████████████████████████████████.  In each instance, the state court "approved the settlement agreement and closed the case, giving the agreement preclusive effect."  *Wojciechowski*, 923 F.3d at 690.  ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Nothing permits Uber's claims "to be relitigated in the RICO context when they were capable of being litigated and decided in the state court."  *Monterey Plaza*, 215 F.3d at 928.  ████████████████████████████████████████

████████████████████

### 2.    Uber Was Required to Litigate Its Claims As Compulsory Counterclaims in the Underlying State Actions

Uber's claims are independently barred by its failure to raise them as counterclaims in Claimant A's and Claimant B's state court lawsuits.  A compulsory counterclaim that is not brought in the first action is barred by claim preclusion.  *Crown Vantage*, 421 F.3d at 973 n.7; *see also Hoffman v. Goli Nutrition, Inc.*, 2024 WL 230873, at *13 (C.D. Cal. Jan. 17, 2024) (finding that claims "should have been brought as compulsory counterclaims in the [earlier] litigation" and accordingly "dismiss[ing] them from this action").  Federal courts look to state law to determine "the preclusive effect of the failure to raise a compulsory counterclaim in an earlier state court action."  *Pochiro v. Prudential Ins. Co.*, 827 F.2d 1246, 1253 (9th Cir. 1987); *see also Procare Lab'ys, Inc. v. Gull Lab'ys, Inc.*, 50 F.3d 15, *2 n.2 (9th Cir.

- 26 -

1995) ("The preclusive effect of the failure to raise a compulsory counterclaim in an earlier state court action is determined by state law.").  Because the claims that Uber asserts in this litigation are compulsory counterclaims under California law, they are barred by res judicata and must be dismissed.

Cal. Civ. Proc. Code § 426.30 provides that if a properly served defendant "fails to allege in a cross-complaint any related cause of action which (at the time of serving his answer to the complaint) he has against the plaintiff, such party may not thereafter in any other action assert against the plaintiff the related cause of action not pleaded."  The phrase "a related cause of action" is broadly defined as any "cause of action which arises out of the same transaction, occurrence, or series of transactions or occurrences as the cause of action which the plaintiff alleges in his complaint."  Cal. Civ. Proc. Code § 426.10.  This statute is "designed to prevent piecemeal litigation," and is "liberally construed to advance its purpose." *Heshejin v. Rostami*, 54 Cal. App. 5th 984, 993 (2020) (quotation marks omitted).  As such, "an absolute identity of factual backgrounds for the two claims" is not required. *Align Tech., Inc. v. Tran*, 179 Cal. App. 4th 949, 960 (2009).  Rather, the phrase "related cause of action" encompasses any claims with a "logical relationship between them." *New England Country Foods, LLC v. VanLaw Food Prods., Inc.*, 2021 WL 6751898, at *3 (C.D. Cal. Nov. 23, 2021) (applying California law).

Uber's claims in this case are logically (and indeed obviously) related to the lawsuits Claimants A and B litigated in California.  Uber's suit arises from the same car crashes at issue in those cases Compl. ¶¶ 37, 54, and Uber's theory here is that the Claimants' medical records in those earlier suits were fraudulent, Compl. ¶¶ 49-51, 72-75.  Uber had ample opportunity to bring a counterclaim alleging in the underlying suits that the medical records at issue were fraudulent.  It did not, barring it from now raising these related causes of action in this litigation. *See Hoffman*, 2024 WL 230873, at *13 (finding that plaintiff's RICO claim arose from the "same

- 27 -

aggregate core of operative facts" as the earlier action and dismissing it under the compulsory counterclaim rule) (quotation marks omitted).

### C.    Uber Fails to Satisfy the Rule 9(b) Heightened Pleading Standard

Because all of Uber's claims sound in fraud, the Complaint must satisfy Rule 9(b)'s heightened pleading standard by alleging "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Edwards*, 356 F.3d at 1066 (dismissing RICO claim for failure to meet Rule 9(b) standard). Causes of action premised on mail or wire fraud also require allegations that will support "a showing of a specific intent to defraud." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014). The Complaint here falls far short, impermissibly "lump[ing] multiple defendants together," *Swartz*, 476 F.3d at 764, and eliding key issues by resorting to "vague and conclusory [allegations] without the particularity required by FRCP 9(b)," *Coronavirus Rep.*, 85 F.4th at 958.

These defects doom all of Uber's claims against Emrani and his Firm. "The [C]omplaint is shot through with general allegations that the 'defendants' engaged in fraudulent conduct," *Swartz*, 476 F.3d at 765; *see* Compl. ¶¶ 23, 142-43, 159, 163, 183, 187, 190, 191, 200, 206, 207, 209, but supplies no basis to believe that Emrani or his Firm were aware of the conduct alleged to be fraudulent. The supposed falsity is all premised on "unnecessary medical treatments, fraudulent medical records, and fraudulent and misleading medical bills." Compl. ¶ 9. But Uber's unadorned supposition that victims injured by its drivers did not need medical treatment is insufficient to establish fraud by *anyone*, let alone by lawyers without medical training or experience. Indeed, the speculation that Claimants A and B would subject themselves to extreme and invasive back surgeries requiring rigorous recoveries, despite suffering "no injury" is fanciful, Compl. ¶¶ 41, 45, 46, 60, 61, 64, 65, 66, 67, 68, and, at a minimum, the Complaint "does not tend to exclude [the more] plausible and innocuous alternative explanation," *Eclectic Properties*, 751 F.3d at 998—that

victims injured in car accidents may sustain serious injuries that require serious care. In any event, the fact that an "Independent Medical Evaluation" was necessary to dispute the medical basis for Claimant A's treatment, and a "Medical Bill Audit Analysis" was needed to determine that billed charges exceeded "the reasonable value of the care that Claimant A received," Compl. ¶ 52, only proves that there is no basis to allege that Emrani and his Firm had the requisite "knowledge of falsity, or scienter," *In re Actimmune Mktg. Litig.*, 614 F. Supp. 2d 1037, 1048 (N.D. Cal. 2009), *aff'd*, 464 F. App'x 651 (9th Cir. 2011). Uber is not permitted "to merely lump multiple defendants together" and pretend that lawyers have knowledge of medical needs and billing standards "without any stated factual basis" for that supposition. *Swartz*, 476 F.3d at 764-65; *see also Blake v. Dierdorff*, 856 F.2d 1365, 1372 (9th Cir. 1988) (affirming dismissal of civil RICO claim against attorney where complaint lacked "specific allegations about his individual knowledge of or participation in any fraudulent scheme").

The Complaint's allegation that patient-doctor lien agreements were "false" or "sham" due to the existence of a "secret side agreement" to discount medical bills in the event of a shortfall in a lawsuit's recovery, Compl. ¶¶ 2, 3, 8, 26, 28, 47, 49, 51, 72, 74, 77, 123, is also insufficient under Rule 9(b). The sole basis for the claim that such lien agreements were "false[]" due to the existence of a "concealed side agreement" is Uber's "information and belief." Compl. ¶ 26. But that is not enough. To satisfy Rule 9(b), "a plaintiff who makes allegations on information and belief must state the factual basis for the belief." *Neubronner*, 6 F.3d at 672. Courts in this district apply that rule all the time. *See, e.g.*, *McGowan v. McLane Co.*, 2025 WL 2087565, at *2 (C.D. Cal. May 9, 2025); *SiFi Networks Fullerton, LLC v. Berkshire Hathaway Specialty Co.*, 2025 WL 1544099, at *12 n.4 (C.D. Cal. Apr. 25, 2025); *Best v. Combs*, 2024 WL 5465052, at *3 (C.D. Cal. Dec. 27, 2024); *Los Angeles Cnty. v. Shepos*, 2024 WL 5277272, at *7 (C.D. Cal. Nov. 8, 2024); *ML Prods. Inc. v. Ninestar Tech. Co.*, 2023 WL 12171006, at *9 (C.D. Cal. Sept. 27, 2023). Yet

Uber simply ignores it.  Because Uber alleges no facts to support its belief that doctors and lawyers enter into "secret side agreements," that allegation cannot support Uber's claims.  *See Bodenburg v. Apple, Inc.*, 146 F.4th 761, 771 (9th Cir. 2025) ("conclusory allegations of fraud are insufficient").  With no factual underpinning to support them, Uber's fraud claims must be dismissed.

Though these intrinsic defects defeat all of Uber's claims, the Complaint's specific causes of action are plagued by their own problems too.

1. <u>Uber's State-Law Claims Do Not Satisfy the Rule 9(b) Standard</u>

The Complaint's state-law causes of action do not even attempt to identify any of "the who, what, when, where, and how" that Rule 9(b) mandates.  *Vess*, 317 F.3d at 1106.  Indeed, the state-law claims include no factual allegations whatsoever.  *See* Compl. ¶¶ 199-209.  Emrani and his Firm are entitled to "notice of the particular [alleged] misconduct so that they can defend against the charge and not just deny that they have done anything wrong."  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (alteration mark omitted).  Because the state-law claims provide no such notice whatsoever, they must be dismissed.  *See id.* at 1125-27 (affirming dismissal of inadequately pled state-law fraud claims).

2. <u>Uber's RICO Claims Do Not Satisfy the Rule 9(b) Standard</u>

Uber's RICO claims are also fundamentally deficient.  "The elements of a civil RICO claim are as follows: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as predicate acts) (5) causing injury to plaintiff's business or property."  *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005) (internal quotation marks omitted).  Uber has failed to plausibly allege each element.

(a)   *There Are No Predicate Acts of Racketeering*

Uber advances a startling proposition: that a lawyer's everyday actions in the course of legitimate litigation can constitute predicate acts for a RICO violation.  Not so.  "Litigation activities alone generally cannot serve as predicate acts for civil RICO

claims." *Acres Bonusing, Inc. v. Ramsey*, 2022 WL 17170856, at *10 (N.D. Cal. Nov. 22, 2022). Litigation activities include not only ordinary acts like "signing and filing declarations" but also unwarranted acts like "the filing of malicious lawsuits," the pursuit of "meritless litigation," or the "proffering [of] false affidavits and testimony to a state court." *Id.* (alteration marks omitted). If "filing litigation documents" could form the basis for a RICO action, it would result in a "cascade" of retaliatory litigation that could "chill litigants and lawyers and frustrate the well-established public policy goal of maintaining open access to the courts." *Id.* at *11.

The predicate acts of "racketeering" that Uber imagines are not even improper, let alone so extreme or extraordinary as to fall outside the general prohibition on pursuing RICO claims based on litigation activities. The Complaint alleges that Emrani's Firm "filed proofs of service of Claimant A's complaint and related papers on Uber and two other defendants," "e-mailed a demand letter to Uber's insurance provider," and "effected service of Claimant B's fraudulent complaint and related papers on Uber." Compl. ¶¶ 148-49. These activities are quintessential litigation activity and entirely benign. But if there were any impropriety, Uber had ample recourse. California courts provide multiple avenues to challenge the validity of legal claims, the accuracy of medical records, and any purported litigation misconduct. To start, Uber could have litigated any case in which it was sued. If Uber believed that the claims at issue were fraudulent or relied on false medical records, it could have presented that defense to a jury, and if the defense had merit, it would have defeated any finding of liability or claimed damages. *See, e.g.*, *Christ v. Schwartz*, 2 Cal. App. 5th 440, 455 (2016) (affirming verdict of no damages where "jury could have reasonably rejected [the plaintiff's] entire testimony as not credible and have concluded that she, like [the defendant], was not injured in the [car] accident"). Separately, Uber could have pursued sanctions under Cal. Civ. Proc. Code § 128.7 if it believed that the claims lacked a factual basis. *See Bucur v. Ahmad*, 244 Cal. App. 4th 175, 189 (2016) (affirming trial court's sanctions order for claims that were

"legally and factually frivolous").  It also could have sought discovery sanctions if it believed that the medical records it received were false.  *See Dep't of Forestry & Fire Prot. v. Howell*, 18 Cal. App. 5th 154, 191 (2017) ("Other sanctionable discovery abuses include providing false discovery responses and spoliation of evidence.").  California law also permits claims for abuse of process, *see, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Lee*, 193 Cal. App. 4th 34, 40 (2011), and/or malicious prosecution, *see, e.g.*, *Marijanovic v. Gray, York & Duffy*, 137 Cal. App. 4th 1262, 1270-71 (2006).  All of these potential remedies were on the table if Uber genuinely believed (and could prove) that the claims against it were improper.  But settling cases for value and then turning around to seek civil RICO liability against attorneys is not an option.

Endorsing Uber's tactics would sanction the exact sort of retaliatory lawsuits that courts have cautioned against.  This suit is transparently designed to "chill litigants and lawyers and frustrate the well-established public policy goal of maintaining open access to the courts." *Acres Bonusing*, 2022 WL 17170856, at *10. Those dangers are especially acute when a corporate behemoth like Uber can deploy its vast recourses in service of its aim to shut down its litigation adversaries.   Uber can afford to both settle the individual cases that its victims bring and then use those settled cases as a basis to threaten the plaintiffs' bar with treble damages under RICO. There is a "fundamental constitutional right of access to the courts," *Bounds v. Smith*, 430 U.S. 817, 828 (1977), and Uber should not be allowed to threaten it.

(b)    *There Is No Proximately Caused Injury*

"A civil RICO 'plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation.'" *Canyon Cnty.*, 519 F.3d at 975 (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)); *see also* 18 U.S.C. § 1964(c) (plaintiff may sue if "injured in his business or property by reason of a violation of section 1962").  To pursue a claim based on injury to property, a plaintiff must "allege concrete financial loss."

*Canyon Cnty.*, 519 F.3d at 975 (quotation marks omitted). "Financial loss alone, however, is insufficient." *Id.* Rather, the plaintiff must allege "a harm to a specific business or property interest." *Id.*

Uber makes no such allegation. Nor could it. The Complaint points out that California law required rideshare companies "to carry $1 million of liability and uninsured/underinsured motorist insurance coverage,"[5] Compl. ¶¶ 6, 23, which defeats any possibility of injury. Both settlements with Emrani's Firm—$400,000 for Claimant A and $500,000 for Claimant B—were *far* below Uber's insurance policy limit, meaning that Uber suffered no loss at all. And Uber is not entitled to stand in the shoes of its insurers; under RICO, "potential plaintiffs who have suffered 'passed-on' injury—that is, injury derived from a third party's direct injury—lack statutory standing." *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168-69 (9th Cir. 2002). This case fits that description exactly: any RICO scheme "would directly victimize the [insurers], not [Uber]." *Id.* at 1169; *see also Yagman v. Gabbert*, 2015 WL 13358336, at *3 (C.D. Cal. May 14, 2015), *aff'd*, 684 F. App'x 625 (9th Cir. 2017) (plaintiff failed to adequately plead RICO claim where he asserted that attorney billed over $200,000 and was paid over $180,000 but did not allege that "plaintiff himself paid any money to [the attorney]"). Thus, Uber has no standing.

Beyond that, Uber's allegations that it incurred "significant defense costs" from the lawsuits filed by Claimants A and B, Compl. ¶¶ 53, 79, are precisely the sort of "vague and abstract" claims that do not satisfy the "concrete financial loss" requirement. *Hunt v. Zuffa, LLC*, 361 F. Supp. 3d 992, 1000-01 (D. Nev. 2019) (allegation that scheme "depressed [the plaintiff's] wages" did not satisfy RICO standing requirement); *see also Chaverri v. Platinum LED Lights LLC*, 2022 WL 2275664, at *8 (D. Ariz. June 22, 2022) (same where counterclaimants alleged "lost

---

[5] Uber's lobbyists recently persuaded the California legislature to reduce the uninsured/underinsured motorist coverage minimum from $1 million to just $60,000 per person and $300,000 per accident. *See* www.uber.com/newsroom/california-insurance-reform/. The new law, SB 371, takes effect on January 1, 2026. *See id.*

sales and expenses incurred"); *Ricci v. Cnty. of Sacramento*, 2020 WL 1046805, at *4 (E.D. Cal. Mar. 4, 2020) (same where plaintiff claimed she was "injured 'financially' and 'can no longer work in her area of expertise'"). Uber's failure to properly allege statutory standing "requires dismissal for failure to state a claim." *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).

Furthermore, even if Uber could claim to have sustained injury sufficient to support RICO standing, it must also allege (and ultimately prove) both but-for and proximate causation. *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010). The proximate causation standard is demanding. Uber must allege a "*direct causal connection*" between the alleged violation and the alleged injury. *Anza*, 547 U.S. at 460 (emphasis added). "A link that is too remote, purely contingent, or indirect is insufficient." *Hemi*, 559 U.S. at 9 (quotation marks and alteration marks omitted). And the proximate cause requirement serves a critical function by preventing "intricate, uncertain inquiries from overrunning RICO litigation." *Anza*, 547 U.S. at 460. To maintain this bulwark, "courts must scrutinize the causal link between the RICO violation and the injury, identifying with precision both the nature of the violation and the cause of the injury to the plaintiff." *Canyon Cnty.*, 519 F.3d at 981.

Uber does not nearly clear the bar. The Complaint fails to explain how any alleged wrongdoing "led directly" to any alleged injury. *Anza*, 547 U.S. at 460; *Canyon Cnty.*, 519 F.3d at 980. There is no identification of any particular damages that resulted from the assessment of alleged inflated or above-market charges on medical bills, Compl. ¶¶ 2, 3, 4, 22, 27, 35, 53, 78, 129, 154, 193, let alone damages that could be traced to the purportedly "false" or "sham" lien agreements, *id.* ¶¶ 2, 26, 28, 47, 72, 85, 94, 104, 111, 121, 123, 129, or the supposed "secret side agreement," *id.* ¶¶ 3, 8, 49, 51, 74, 77. There is simply no substance to the claims that "[t]he scheme has resulted in millions of dollars of harm from defense costs and settlements" and "false and inflated claims have forced Uber to incur substantial expense to investigate and defend them." *Id.* ¶¶ 126, 127. "[T]hese allegations of

loss are too vague to draw any inference as to how defendants' conduct directly caused these injuries," *Crayton v. Hedgpeth*, 2011 WL 1988450, at \*14 (E.D. Cal. May 20, 2011), and any "theory of causation" that could be divined from Uber's generalized and conclusory claims "is far too indirect," *Hemi Grp.*, 559 U.S. at 10. Indeed, any causal chain would require speculation across a whole series of links. The Court would be left to guess how much the allegedly inflated medical bills should have been, what additional defense costs Uber incurred as a result of those bills, and whether any possible inflated bill increased the settlement value of any predicate case. Worse still, the Court would be required to construct an alternative universe in which each predicate case went to trial, in which a jury could have awarded *far higher* damages than Uber paid by settling. The Court would then need to try to calculate the damages Uber *avoided* by settling, which would offset, if not overwhelm, any injury it sustained as a result of the alleged RICO scheme.

This exercise in imagination forecloses this suit. Mandating direct causation safeguards against "the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action" and avoids "the speculative nature of the proceedings that would follow if [Uber] were permitted to maintain its claim." *Canyon Cnty.*, 519 F.3d at 981-82. Courts are not expected to attempt "a complex apportionment of fault among various causes," let alone "to construct the alternative scenario of what would have occurred" absent the alleged RICO violation. *Id.* at 982-83. Yet Uber's claims would require the Court to do just that by hypothesizing scenarios in which each of the predicate cases went to trial. Burdening the Court with that exercise is especially improper when Uber itself was the alleged "immediate victim[] of [each] alleged RICO violation" and therefore had every opportunity "to pursue its own remedies for the fraud practiced upon it" by litigating any of the underlying suits. *See id.* at 982. In fact, given that it made its own decisions on what defense costs to incur and what settlements to pay, Uber itself was "an informed, neutral decision-maker," and each of its "intervening decision[s]" "'breaks' the chain

of causation." *Stoot v. City of Everett*, 582 F.3d 910, 926 (9th Cir. 2009).  Uber's claims thus "fail for lack of proximate cause." *Canyon Cnty.*, 519 F.3d at 983.

(c)     <em>There Is No Pattern of Racketeering</em>

"Where RICO is asserted against multiple defendants, a plaintiff must allege at least two predicate acts by each defendant." *Villarroel v. Recology Inc.*, 775 F. Supp. 3d 1050, 1070 (N.D. Cal. 2025) (internal quotation and alteration omitted). The Complaint, lacking the requisite detail, has not plausibly alleged that either Emrani or his Firm committed a pattern of mail or wire fraud.

(i)     Allegations as to Emrani

The Complaint's allegations against Emrani are sparse. For Claimant A, Uber's only allegation that Emrani was involved in his case *at all* is that Emrani was copied on an email to unidentified individuals at his Firm in which Radiance Surgery Center reported that Dr. Khounganian recommended Claimant A have surgery. Compl. ¶ 44.[6]  The Complaint does not allege that Emrani *ever* transmitted any allegedly fraudulent medical records to Uber or anyone else with respect to Claimant A. *See id.* ¶ 53 (alleging that an unidentified individual at Emrani's Firm "presented" the medical records to "Uber and others")).  Separately, Uber alleges as "predicate acts" that Emrani "faxed an information demand to an insurer located in a different state" and "solicited medical records of Claimant A from a medical provider." Compl. ¶¶ 148(a), 148(d).  But these allegations are plainly deficient, because they involve Emrani's requests for information, not any transmission of purportedly fraudulent medical records.

The allegations with respect to Claimant B are similarly deficient.  The Complaint claims that Emrani sent a demand letter to Uber's insurance carrier.  *Id.*

---

[6] Just as it uses a single sliver of an accident scene to distort the picture of what actually happened in a car crash, Compl. ¶ 37, Uber uses isolated email excerpts to misrepresent the context and meaning of larger exchanges, *e.g.*, Compl. ¶¶ 42-44.

¶ 57.[7] But the transmission of the alleged demand letter occurred *before* Claimant B had ever seen Dr. Khounganian. And while the Complaint details Claimant B's alleged treatment and corresponding medical bills from Dr. Khounganian, Uber never claims that these medical records were "presented" to it by anyone, let alone by Emrani personally. *See id.* ¶¶ 78-79.

(ii)    Allegations as to The Law Offices of Jacob Emrani

Uber's allegations regarding Emrani's firm are inadequate too. With respect to Claimant A, Uber alleges that an unidentified individual at The Law Offices of Jacob Emrani "presented" the misleading records to "Uber and others." *Id.* ¶ 53. This allegation fails to meet Rule 9(b)'s heightened pleading standard. Under Rule 9(b), Uber must allege the "particulars" of the alleged mail and wire fraud, not "scant descriptions." *JST Distribution*, 2018 WL 6113092, at *6. This requires alleging, at a minimum, the "who, what, when, where, and how of the misconduct charged." *Vess*, 317 F.3d at 1106. Uber has not alleged "who" at Emrani's Firm transmitted Claimant A's allegedly fraudulent medical records or who the "other[]" recipients were. Nor has it alleged "how" they were transmitted; Uber instead vaguely alleges that the records were "presented" to it. That is insufficient.

As to Claimant B, the Complaint never alleges that anyone at Emrani's Firm transmitted any fraudulent medical records to anyone at Uber or anywhere else. Thus, even if Uber could identify a qualifying predicate as to Claimant A, the Complaint would still only allege one predicate by an unidentified individual at Emrani's Firm. A "pattern" under the RICO statute "requires at least two acts of racketeering activity," 18 U.S.C. § 1961(5). Uber fails to meet even that basic requirement, and even if it could do so, "two isolated acts" arising from separate predicate cases still would "not constitute a pattern" for RICO purposes, *Sun Sav. & Loan*, 825 F.2d at 191. Uber's inability to satisfy such a minimal threshold is telling.

---

[7] The Complaint later contradicts itself on this point, alleging that The Law Offices of Jacob Emrani, not Emrani, mailed the demand letter. Compl. ¶ 149a.

After searching records for the hundreds of cases that Emrani and his Firm have litigated against it, Uber has come up strikingly empty.  It has found a paltry *two* cases allegedly involving "fraudulent" medical records, does not identify a single instance in which Emrani personally transmitted such records, and does not even allege that anyone at Emrani's Firm transmitted such records in the second case. There is thus no pattern of racketeering activity that could possibly support the RICO counts Uber advances.

### (d)    *There Is No RICO Enterprise*

Uber also must allege that Emrani and his Firm were "employed by or associated with an[] enterprise.'"  18 U.S.C. § 1962(c); *Shaw v. Nissan N. Am., Inc.*, 220 F. Supp. 3d 1046, 1053 (C.D. Cal. Oct. 24, 2016).  There are two types of cognizable RICO enterprises: (1) "legal" enterprises, "such as corporations and partnerships, and other 'legal entities'" and (2) "association-in-fact" enterprises, encompassing "any union or group of individuals associated in fact although not a legal entity."  *Turkette*, 452 U.S. at 581-82 (quotation marks omitted).  For both types, RICO requires that Emrani and his Firm "participate[d] in the operation or management of the enterprise itself" and played "some part in directing an enterprise's affairs."  *Reves*, 507 U.S. at 179, 184 (emphasis omitted).

Uber asserts three alternative enterprise theories: (1) Emrani and his Firm conducted the affairs of a "GSK Spine" enterprise (Count 1), Compl. ¶¶ 156-64; (2) Emrani conducted the affairs of his Firm as an enterprise (Count 3), *id.* ¶¶ 174-81; and (3) Emrani and his Firm conducted the affairs of an association-in-fact enterprise with the other defendants (Count 4), *id.* ¶¶ 182-88.  Each theory fails.

### (i)    Neither Emrani Nor His Firm Directed the Affairs of a Medical Practice

Conducting a RICO enterprise under § 1962(c) "requires an element of direction."  *Reves*, 507 U.S. at 178.  Accordingly, Uber must allege that either Emrani or his Firm played "some part in directing the enterprise's affairs."  *Id.* (emphasis

omitted).  "[M]ore is required than simply being involved, and simply performing services for the enterprise does not rise to the level of direction."  *In re WellPoint Inc. Out-of-Network UCR Rates Litig.*, 903 F. Supp. 2d 880, 910 (C.D. Cal. 2012) (quotation marks and alteration marks omitted).  Relevant considerations include whether the defendants "occupy a position in the chain of command . . . through which the affairs of the enterprise are conducted," "knowingly implement[ed] decisions of upper management," or were "indispensable to achievement of the enterprise's goal." *Walter*, 538 F.3d at 1248-49 (concluding that a lawyer and her law firm who "perform[ed] services for the enterprise" did not "rise to the level of direction" needed to state a claim under § 1962(c)).

Uber has not even attempted to allege facts reflecting that Emrani or his Firm played a role in directing the affairs of a medical practice.  The Complaint's only relevant allegation is the entirely conclusory statement that Emrani and his Firm "knowingly conducted and/or participated, directly or indirectly, in the conduct of GSK Spine's affairs."  Compl. ¶ 158.  Such a "formulaic recitation of the elements of a cause of action" does not even suffice under the more lenient Rule 8 pleading standard, *Ashcroft*, 556 U.S. at 678, much less could it satisfy the more demanding requirements of Rule 9(b).  Nor could Uber cure this defect.  Even if it were accurate to claim that Dr. Khounganian "owns and controls" "an orthopedics practice" called "GSK Spine," Compl. ¶¶ 8, 13, any allegation that Emrani or his Firm held "a position in the chain of command" or "knowingly implement[ed] decisions of upper management" at an orthopedics practice, *Walter*, 538 F.3d at 1248-49, would be implausible and untrue.  Section 1962(c) "cannot be interpreted to reach complete 'outsiders' because liability depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Reves*, 507 U.S. at 185.  Emrani and his Firm do not participate in any medical practice's management decisions in any capacity, and Uber does not and cannot allege otherwise.

1

            (ii)      Emrani's Management of His Firm Does Not

2

                   Equate to Operation of a RICO Enterprise

3       The Complaint also fails to allege facts—rather than "naked assertions" of

4 statutory elements, *Iqbal*, 556 U.S. at 678 (alteration marks omitted)—reflecting that

5 Emrani conducted the affairs of his Firm as a RICO enterprise.  That Emrani is the

6 face and name of his own highly successful Firm is not enough.  The Supreme Court

7 has explained emphatically that RICO liability "depends on showing that the

8 defendants conducted or participated in the conduct of the '*enterprise's* affairs, not

9 just their *own* affairs."  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163

10 (2001) (quotation marks omitted); *Reves*, 507 U.S. at 185 (quotation marks omitted).

11 A complaint alleging that defendants "are associated in a manner directly related to

12 their own primary business activities" misses the point.  *Toyota*, 826 F. Supp. 2d at

13 1202; *see also Shaw*, 220 F. Supp. 3d at 1057 (complaint failed for lack of allegations

14 of "a common purpose or organized conduct separate and apart from [company's]

15 ordinary affairs").  There is nothing wrong with a business conducting business or a

16 lawyer running a law firm.  "As a law firm, [the Law Offices of Jacob Emrani's]

17 primary business activity is naturally providing legal representation to clients which

18 includes the filing of lawsuits," and a RICO claim must do more than simply allege

19 "that the primary business activities of a member of the enterprise were conducted

20 fraudulently."  *Bai v. CMB Exp. Infrastructure Inv. Grp. 48, LP*, 2025 WL 959099,

21 at *7 (E.D. Cal. Mar. 31, 2025).  That is true even when the firm has succeeded in

22 collecting judgments against a massive tortfeasor like Uber.

23       Furthermore, even if Uber could identify a common purpose of illegality or

24 organized conduct separate and apart from the ordinary practice of law, there is no

25 basis to allege that Emrani directed the allegedly fraudulent conduct.  Rather, the

26 Complaint alleges only that Emrani is a "litigation attorney at Defendant Law Offices

27 of Jacob Emrani."  Compl. ¶ 17.  That utterly mundane claim is "consistent only with

28 the execution of a routine contract or commercial dealing," *Pac. Recovery Sols. v.*

EMRANI AND HIS LAW OFFICE'S COMBINED MOTION TO STRIKE AND/OR DISMISS

*United Behav. Health*, 481 F. Supp. 3d 1011, 1026-27 (N.D. Cal. 2020), is routine and lawful, which courts have "uniform[ly]" concluded does not satisfy RICO's enterprise element, *Gomez v. Guthy-Renker, LLC*, 2015 WL 4270042, at *10-11 (C.D. Cal. July 13, 2015) (collecting cases).

(iii)  Neither Emrani Nor His Firm Operate a RICO Enterprise with Their Competitors

An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 946 (2009).  To allege the existence of such an enterprise, a plaintiff must plausibly allege "an ongoing organization, formal or informal" and "that the various associates function as a continuing unit." *Id*. at 945.  To allege an "association-in-fact" enterprise, Uber must allege that the enterprise has "(1) a common purpose, (2) an ongoing organization, and (3) [is] a continuing unit." *Synopsys, Inc. v. Ubiquiti Networks, Inc.*, 313 F. Supp. 3d 1056, 1077 (N.D. Cal. 2018).

Uber's own allegations belie any possible claim that the defendants functioned as a continuing unit.  Uber has not alleged that Emrani and his Firm worked with Fradkin and his Firm in any of the cases referenced in the Complaint.  Nor has Uber even attempted to allege any relationship or communications between the two rival law firms. *See Boyle*, 556 U.S. at 946 (explaining that under Section 1962(c), "[t]he concept of 'association' requires both interpersonal relationships and a common interest").  It makes no sense to assert that direct competitors formed a RICO conspiracy.  Nor does it make sense to claim that Emrani and his Firm conspired with doctors to discount their medical bills, *see, e.g.*, Compl. ¶ 28, when any reduction would inure to the benefit of Emrani's Firm's clients but would be directly adverse to the doctors' own interests.

Any thoroughly implausible claim that competitors function as a continuing unit would be further undermined by Uber's allegation that other unidentified and unassociated individuals participated in the scheme. *See, e.g.*, Compl. ¶ 31 ("The

1  law firms also direct patients to a range of medical providers, including physical

2  therapists, chiropractors, acupuncturists, pain management physicians, and

3  surgeons"); *id.*¶ 55 (alleging that Emrani's Firm referred Claimant B to "a select

4  group of medical providers").  The fact that the so-called "association" is never

5  alleged to have worked together on a single case and includes numerous other,

6  unidentified members is emblematic of an enterprise that does not actually exist. *See,*

7  *e.g.*, *Capitol W. Appraisals v. Countrywide Fin. Corp.*, 2009 WL 10677052, at *5

8  (W.D. Wash. Sept. 30, 2009) (plaintiff failed to allege a RICO enterprise where it

9  alleged "unnamed [participants] working independently from one another").

10  Additionally, the alleged enterprise cannot be the alleged pattern of racketeering

11  activity; instead, it must be "an entity separate and apart from the pattern of activity

12  in which it engages." *Turkette*, 452 U.S. at 583.  Taking Uber's allegations as true,

13  it alleges only that the defendants "conducted the wrongful acts together," without

14  any allegation of an entity that exists apart from the wrongful acts. *Suzuki Motor v.*

15  *Mullion*, 2017 WL 7410993, at *4 (C.D. Cal. Oct. 3, 2017).

16      Moreover, even if an association-in-fact enterprise were sufficiently alleged,

17  the Complaint has not plausibly alleged that Emrani or his Firm directed its affairs.

18  Uber alleges that Emrani and his Firm conducted "initial client intake" for the alleged

19  scheme, Compl. ¶ 141, but does not allege that either played any role in "operation

20  and management" of the alleged enterprise.  *See, e.g.*, *Walter*, 538 F.3d at 1248-49;

21  *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 789 (9th Cir. 1996) (defendant's

22  "ministerial role" did not constitute participation in the "operation or management"

23  of the enterprise).  This is, once again, inadequate.

24                                    * * *

25      Each of these defects—and certainly the combined constellation of flaws—is

26  fatal to Uber's substantive RICO and conspiracy causes of action alike.  Because the

27  Complaint does "not adequately plead a substantive violation of RICO," Uber

28

1    "cannot claim that a conspiracy to violate RICO existed" either. *Sanford v.*

2    *MemberWorks, Inc.*, 625 F.3d 550, 559 (9th Cir. 2010).

3    **D.    Uber's Claims are Untimely**

4    The statute of limitations period for a civil RICO claim is four years. *Agency*

5    *Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987). This period

6    starts "when a plaintiff knows or should know of the injury that underlies his cause

7    of action." *Pincay*, 238 F.3d at 1109. The "rule creates a disjunctive two-prong test

8    of actual or constructive notice, under which the statute begins running under either

9    prong." *Id.* For purposes of constructive notice, the limitations period begins when

10   the plaintiff has "enough information to warrant an investigation which, if reasonably

11   diligent, would have led to discovery of the fraud." *Id.* at 1110. And a RICO plaintiff

12   "cannot use an independent, new predicate act as a bootstrap to recover for injuries

13   caused by other earlier predicate acts that took place outside the limitations period."

14   *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997).

15   Uber did not file this suit until July 21, 2025, Compl., but its own allegations

16   establish that it was on constructive notice of its claims regarding both Claimants A

17   and B well before July 21, 2021.

18   Claimant A's injuries arose from an Uber crash on December 9, 2019, and,

19   according to the Complaint, Emrani "faxed an information demand to [Uber's]

20   insurer" on January 3, 2020 and "corresponded via email with [Uber's] insurer" on

21   February 6, 2020. Compl. ¶¶ 37, 148(a). Those facts supplied Uber with enough

22   information to warrant a diligent investigation a year and a half before July 21, 2021.

23   Uber therefore delayed filing this suit for more than four years after it was on

24   constructive notice with respect to Claimant A.

25   The time bar is even more obvious as to Claimant B. She was injured by an

26   Uber driver even earlier—on March 10, 2019—and, on December 28, 2020, "in

27   furtherance of the [alleged] scheme," Emrani and his Firm allegedly mailed "a

28   demand letter . . . to Uber's insurance provider." Compl. ¶¶ 57, 149(a). Uber alleges

that the demand letter itself "falsely represented that Claimant B suffered from numerous spinal injuries and would need to undergo future cervical fusion surgery." Compl. ¶ 57.  Thus, Uber was on constructive notice of the supposed fraud as early as December 2020.  Were that not enough, Claimant B "*filed a lawsuit against Uber*" on March 9, 2021.  Compl. ¶ 59 (emphasis added).  "It is hard to imagine what would constitute 'enough information to warrant an investigation' if receiving a written disclosure of one's purported injury does not."  *Pincay*, 238 F.3d at 1110; *see also Morehead v. City of Oxnard*, 2023 WL 8143973, at *7 (C.D. Cal. Oct. 4, 2023) ("Once a lawsuit is filed, the party has express notice of the claims against it.").  Yet, Uber did not file this suit until more than four years thereafter.

Although Emrani and his Firm had nothing to do with Claimants C and D, Uber's claims based on their injuries are also patently untimely.  The Complaint alleges that Claimant C was injured in an Uber on March 8, 2019 and "filed a lawsuit against Uber" on March 1, 2021, after which "Downtown LA Law Group through its agent effected service of Claimant C's fraudulent complaint and related papers on Uber in the underlying lawsuit" on May 14, 2021.  Compl. ¶¶ 80, 91, 150(b).  Yet Uber did not bring any claims related to Claimant C until more than four years later. And, as to Claimant D, the Complaint alleges that he was injured by Uber on January 2, 2019 and "filed a lawsuit against Uber" on December 23, 2020.  Compl. ¶¶ 101, 115.  Thereafter, "[o]n December 28, 2020, Downtown LA Law Group mailed, via U.S. mail, an arbitration demand letter to Uber's insurance provider," and "[o]n March 12, 2021, Downtown LA Law Group e-mailed a demand letter to counsel for Uber," "demanding $750,000 to resolve Claimant D's claims."  Compl. ¶¶ 116, 151(b)-(c).  But, once again, Uber waited until more than four years later before filing this retaliatory action.

It is rather incredible that after combing its untold terabytes of data for "Examples" of the so-called RICO "Scheme" that Uber has devised to target its litigation adversaries, Compl. at 12, all it could come up with was four claims that all

date back to crashes *in 2019*—i.e., six years ago—including three of which involved lawsuits filed no later than *March 2021*—i.e., more than four years before Uber filed this suit.  The limitations period closed no later than March 2025, rendering Uber's July 2025 Complaint facially untimely.  All of its claims must be dismissed on that basis too.

### E.    Uber Cannot Pursue a Standalone Claim for Unjust Enrichment

On top of all of the other fatal deficiencies that bar Uber's claims, its sixth cause of action for "Unjust Enrichment" ignores the most basic precepts of California law.  "[U]njust enrichment is not a cause of action" but rather "a general principle" that "is synonymous with restitution," *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221, 231 (2014); *Jogani*, 165 Cal. App. 4th at 911; "there is no cause of action in California for unjust enrichment," *Melchior v. New Line Prods., Inc.*, 106 Cal. App. 4th 779, 793 (2003).  The Complaint's pleading of unjust enrichment as a separate cause of action only underscores that in its haste to retaliate against its litigation adversaries, Uber failed to conduct even a cursory review of California law.

## V.    CONCLUSION

The Complaint's state-law causes of action should be struck pursuant to California's anti-SLAPP law, and the Complaint should be dismissed in its entirety under Rule 12(b)(6).

Dated:  November 14, 2025                    HUESTON HENNIGAN LLP


By:  */s/ John C. Hueston*
John C. Hueston
Marshall A. Camp
Bram M. Alden
Stewart J. Rickert

*Attorneys for Defendants Jacob Emrani and The Law Offices of Jacob Emrani*

1

**<u>CERTIFICATE OF SERVICE</u>**

2

The undersigned hereby certifies that:  I am over the age of eighteen (18) and not a party to

3

the within action.  I am employed in the law firm of Hueston Hennigan LLP, 620 Newport Center

4

Drive, Suite 1300, Newport Beach, CA 92660.

5

On November 14, 2025, I used the Central District of California's Electronic Case Filing

6

System, with the ECF registered to John C. Hueston to file the following document(s):

7

8

**JACOB EMRANI'S AND THE LAW OFFICE OF JACOB EMRANI'S NOTICE OF MOTION AND MOTION TO DISMISS UNDER FED. R. CIV. P. 12(B)(6) AND SPECIAL MOTION TO STRIKE UNDER CAL. CODE CIV. P. § 425.16**

9

10

The ECF system is designed to send an e-mail message to all parties in the case, which

constitutes service.  The parties served by e-mail in this case are found on the Court's Electronic

11

Mail Notice List.

12

The parties served via email are:

13

**<u>PARTIES SERVED VIA E-MAIL</u>**

14

15

PERKINS COIE LLP
Oliver Gold
Tara McGrath

16

11452 El Camino Real Ste 300
San Diego, CA 92130-2080

17

OGold@perkinscoie.com
TMcGrath@perkinscoie.com

18

19

*Attorneys for Plaintiff,*
*Uber Technologies*

20

21

I declare under penalty of perjury under the laws of the United States of America that the

22

foregoing is true and correct.

23

Executed on November 14, 2025, at Newport Beach, California.

24

*/s/ John C. Hueston*
JOHN C. HUESTON

25

26

27

28