**PERKINS COIE LLP**
Oliver M. Gold, Cal. Bar No. 279033
OGold@perkinscoie.com
1888 Century Park East, Suite 1700
Gillian Kuhlmann, Cal. Bar No. 316241
GKuhlmann@perkinscoie.com
Los Angeles, CA 90067-1721
Telephone: +1.310.788.9900
Facsimile: +1.202.654.6211

Tara McGrath, Cal. Bar No. 254209
TMcGrath@perkinscoie.com
Joshua Patashnik, Cal. Bar No. 295120
JPatashnik@perkinscoie.com
11452 El Camino Real, Suite 300
San Diego, CA 92130-2080
Telephone: +1.858.720.5700
Facsimile: +1.858.720.5799

David W. T. Daniels, *pro hac vice*
DDaniels@perkinscoie.com
Michael R. Huston, *pro hac vice*
MHuston@perkinscoie.com
700 Thirteenth Street, NW, Suite 800
Washington, DC 20005-3960
Telephone: +1.202.654.6200
Facsimile: +1.202.654.6211

David B. Massey, *pro hac vice*
DMassey@perkinscoie.com
1155 Avenue of the Americas, 22nd Fl.
New York, NY 10036-2711
Telephone: +1.212.262.6900
Facsimile: +1.212.977.1649

Attorneys for Plaintiff Uber Technologies, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UBER TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> DOWNTOWN LA LAW GROUP; IGOR FRADKIN; THE LAW OFFICES OF JACOB EMRANI; JACOB EMRANI; VALLEY ORTHOPEDIC AND SPINE CENTER D/B/A GSK SPINE; and GREG KHOUNGANIAN; <br><br> Defendants. | Case No. 2:25-cv-06612-SPG-PD <br><br> **UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT FOR:** <br><br> **1) RICO ENTERPRISE VIOLATIONS (18 U.S.C. § 1962(c)); AND** <br><br> **2) RICO CONSPIRACY VIOLATION (18 U.S.C. § 1962(d));** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Uber Technologies, Inc. ("Uber"), by and through its undersigned attorneys, hereby alleges against Defendants Downtown LA Law Group, Igor Fradkin, The Law Offices of Jacob Emrani, Jacob Emrani, Valley Orthopedic and Spine Center d/b/a GSK Spine, and Greg Khounganian:

## SUMMARY OF THE ACTION

1.     Fraudulent personal injury claims arising from minor motor vehicle collisions are an urgent and growing problem in California. This fraud results in widespread harms to the public far beyond those involved in the underlying litigations themselves by increasing insurance rates and transportation costs for all California residents. In the case of Uber, this fraud increases the expense of the many thousands who rely on the Uber application as a means of transportation and reduces the earnings of the many others who earn a livelihood from the application. As of October 2025, in Los Angeles County specifically, approximately 45% of the fare of every Uber ride goes to mandated insurance costs, driving up prices for riders and pushing down earnings for drivers.

2.     Unscrupulous personal injury attorneys and corrupt medical providers in the Los Angeles area are engaged in this fraud scheme. The lawyers direct claimants to pre-selected medical providers to receive procedures for minor or non-existent injuries. Following treatment that is unnecessary and/or causally unrelated to the minor accident, certain providers generate and submit artificially inflated bills for such treatment. These bills are issued on a lien basis. Rather than using claimants' own medical insurance for treatment, the claimants instead enter into agreements with the medical providers that grant such providers a lien on recoveries from the claim and purport to promise full payment to the medical providers in the event of a shortfall in recovery.

3.     These lien arrangements are shams. In reality, the claimants' lawyers and certain medical providers secretly enter into side agreements under which the

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

medical providers agree to take a substantial discount in the event that the recovery is insufficient to pay the artificially inflated medical bills. Because the side agreements are concealed, the medical bills are false and misleading. The bills are then utilized as the basis for a false and artificially inflated damages claim. These fraudulent bills and claims are typically presented to Uber and other defendants in the form of a personal-injury lawsuit and/or a pre-suit demand letter.

4.      The secret side agreement between the medical provider and the law firm functions as a kickback. In exchange for a steady supply of claimants from the lawyers, the medical providers agree to surrender their lien rights in the event of a shortfall in the litigation recovery. In some instances, the providers receive payment directly from the law firms at a pre-negotiated reduced rate. The lawyers profit because they receive priority recovery of their fees and other costs—often in the form of contingency fee agreements that entitle them to 45% or more of the total recovery.

5.      The scheme takes advantage of personal-injury claimants, who are often vulnerable individuals suffering from mental and physical health issues and financial distress. These individuals, who have been involved in minor accidents, are enticed with the promise of a significant financial recovery for bringing fraudulent lawsuits and undergoing medical treatments that are unnecessary and/or causally unrelated to the accidents. Yet the lawyers and medical providers involved in the scheme often walk away with significantly larger recoveries than their personal-injury clients.

6.      Claimants are passed along to medical provider scheme participants with minimal (if any) regard to their need for actual medical treatment. Lawyers send claimants with no or negligible injuries caused by the purported underlying accidents to the medical providers with the foreknowledge that the medical providers will recommend and deliver a variety of unnecessary medical treatments including surgery, and will thereafter submit an artificially inflated bill, and/or recommend future surgeries with artificially inflated estimated fees. As such, it is routine for the

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

medical providers to produce fraudulent documents diagnosing non-existent or exaggerated injuries, falsely linking these injuries causally to the accidents and then proposing and performing costly, invasive, and/or unnecessary surgeries. Together with the artificially inflated resulting bills, the attorneys use these fraudulent documents and unnecessary treatments as a basis for fraudulent lawsuits and/or claims for damages.

7.    Because of such overtreatment and inflated liens held on the recovery by the various medical providers involved, the claimants themselves commonly walk away with relatively minimal recovery compared to the fees that the lawyers and medical providers receive.

8.    Rideshare companies such as Uber are prime targets of this fraud scheme because of their $1 million government-mandated insurance policy limits—which are higher than those of almost every other vehicle on California roads. The perpetrators of the fraud make no secret of targeting Uber because of these high policy limits, as depicted below:



UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

9.     While rideshare companies are prime targets, they are by no means the only victims of this scheme. The examples described below are only a partial illustration of the extent of the scheme. It extends well beyond the defendants described herein.

10.     A central player in this fraud is Defendant Greg Khounganian, a spinal surgeon who owns and controls Valley Orthopedic and Spine Center, a California corporation doing business as GSK Spine. Khounganian accepts referrals from lawyers who have cases against Uber with the understanding that he will perform specific acts to increase the value of their lawsuits and/or claims. Khounganian produces fraudulent documents diagnosing these lawyers' clients with specific injuries, stating that those injuries are causally related to minor accidents, and recommending costly, invasive, and/or unnecessary surgeries. In such cases, instead of billing his patients' health insurance—which might deny coverage or require Khounganian to accept a lower, negotiated reimbursement rate—Khounganian works on a lien basis, signing agreements with his patients so that he gets a substantial cut of their eventual lawsuit recovery. He conceals the secret side agreements with the referring lawyers to discount such liens. To increase his desirability as a referral source for the lawyers, Khounganian produces fraudulent records of medical necessity and/or causation that he transmits to the lawyers for the purposes of artificially inflating amounts claimed in personal-injury lawsuits. These lawyers include Defendants Igor Fradkin and his law firm, Downtown LA Law Group,[1] as well as Jacob Emrani and his law firm, The Law Offices of Jacob Emrani.

---

[1] Since the filing of the initial complaint in this action, the *Los Angeles Times* has reported on Downtown LA Law Group's alleged manufacturing of fraudulent claims in Los Angeles county's recent $4-billion settlement for sex abuse inside its juvenile halls and foster homes. *See, e.g.,* Rebecca Ellis, In the biggest sex abuse settlement in U.S. history, some claim they were paid to sue, L.A. Times (Oct. 2, 2025), https://www.latimes.com/california/story/2025-10-02/settlement-story-ab218-sex-abuse, last accessed Dec. 17, 2025.

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

11.     In personal injury cases involving Downtown LA Law Group and the Emrani firm, Khoungian misuses lien agreements in furtherance of scheme to create the false appearance that his patients have "actually incurred" a liability to him (and a corresponding "economic loss" under California law) in the full amount of his fees and expenses, when in fact he understands that, as a matter of economic substance, they have not.  His lien agreements state on their face that the claimant-patients are "personally responsible" for his fees and expenses and that their debt is "not contingent on any settlement."   These terms are shams because, in fact, Khoungian understands that if the patient's litigation results in a shortfall, he negotiates a lower amount for his fees and releases the patient from personal obligation to pay the balance.  He does not check the credit of his lien patients, even as he performs surgery that purports to incur hundreds of thousands of dollars in fees and expenses. He unilaterally extends the due date of patient debt indefinitely—until he decides that the patient's treatment is completed, which date he controls at his sole discretion.  He does not sell patient balances to a third-party collection agency.

12.     Khoungian, Emrani, Fradkin, and their respective practices are engaged in a racketeering scheme that is actively harming Uber. The unnecessary medical treatments, fraudulent medical records, and fraudulent and misleading medical bills allowed Emrani, Fradkin, and their law firms to induce significantly larger settlement payments from Uber in personal injury lawsuits than they could have obtained absent the fraud. Uber has also incurred substantial expenses defending against these false and inflated claims. Khoungian's actions have fraudulently tainted at least 18 cases against Uber and dozens more against other personal injury defendants.

13.     The scheme has persisted over several years, across numerous cases, and continues to this day, with Khoungian maintaining long-term relationships with Emrani, Fradkin, and their respective practices. Each of the participants in the

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

scheme is aware of the fundamental nature of the scheme, the structure of the enterprise, and its unlawful methods and objectives. Each of the participants has agreed to act, and has intentionally committed acts, to further the enterprise and to carry out their essential role in its functioning.

14.    Because this fraud spans numerous cases, including those where Uber has not been named as a party, and involves out-of-court corrupt activity, the usual tools of sanctions motions, affirmative defenses, or counterclaims are ill-suited to remediate the fraud. In addition, the nature of the fraud and the pattern of unlawful activity became apparent to Uber only over time, as it was presented with increasing numbers of cases featuring minor accidents, virtually identical causation statements with no apparent factual foundation, unnecessary or causally unrelated medical procedures, and inflated bills and claims.

15.    Through the federal RICO statute, Congress gave federal courts the power to address schemes like these that thwart traditional state remedies. Uber has filed this action in order to deter and combat this fraudulent scheme; to recoup settlement costs and legal expenses it has wrongfully been forced to bear as a result of the scheme; and to prevent Defendants from continuing to profit from their fraud, at the expense of riders, drivers, and the general public.

## THE PARTIES

16.    Plaintiff Uber is a Delaware corporation with its principal place of business in California.

17.    Defendant Greg Khounganian resides in California. At all relevant times, Khounganian was an orthopedic surgeon specializing in spine surgery.

18.    Defendant Valley Orthopedic and Spine Center ("Valley Orthopedic") is a corporation duly organized and existing under the laws of the State of California, doing business as GSK Spine. At all relevant times, Valley Orthopedic maintained

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

its principal place of business in California and was owned and controlled by Khounganian.

19.    Defendant Downtown LA Law Group (sometimes referred to as DTLA) is a limited liability partnership duly organized and existing under the laws of the State of California. At all relevant times, Downtown LA Law Group maintained its principal place of business in California.

20.    Defendant Igor Fradkin resides in California. At all relevant times, Fradkin was a litigation and trial attorney at Defendant Downtown LA Law Group.

21.    Defendant The Law Offices of Jacob Emrani is a professional corporation duly organized and existing under the laws of the State of California. At all relevant times, The Law Offices of Jacob Emrani maintained its principal place of business in California.

22.    Defendant Jacob Emrani resides in California. At all relevant times, Emrani was a litigation and trial attorney at Defendant The Law Offices of Jacob Emrani.

## JURISDICTION AND VENUE

23.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under the federal RICO statute.

24.    Venue is proper pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in the Central District of California and because a substantial amount of the activities forming the basis of this First Amended Complaint occurred within the Central District of California.

## MEANS AND METHOD OF THE FRAUD

25.    The scheme creates fraudulent bills and records of medical necessity and/or causation to artificially inflate the damages claimed in lawsuits against Uber and other parties. Uber is a principal target—but not the only target—of the scheme. Khounganian, Valley Orthopedic/GSK Spine, and the other medical providers

involved in this scheme profit by charging above-market, artificially inflated rates for performing surgeries and other procedures that are unnecessary and/or causally unrelated to any Uber accident. They perform these procedures on a lien basis and then assert a claim on a portion of the plaintiff's recovery. Emrani, Fradkin, and their respective law firms use the fraudulent medical records and artificially inflated billing records produced by Khounganian in personal-injury litigation to increase the demand and settlement amounts in their cases. Because of these fraudulent medical and billing records, Uber is forced to incur far more in litigation defense and settlement costs than it otherwise would. Uber bears the burden of these costs notwithstanding the insurance it is required by law to carry.

**A.    The Defendant Law Firms Identify Clients with Claims against Rideshare Companies and Direct these Clients to the Kickback Scheme Medical Providers**

26.    This scheme begins when Defendants Fradkin, Downtown LA Law Group, Emrani, and The Law Offices of Jacob Emrani identify individuals with potential personal injury claims against rideshare companies such as Uber. Because California law requires rideshare companies to carry $1 million of liability and uninsured/underinsured motorist insurance coverage, Emrani and Fradkin and the other Defendants view the claims as highly profitable cases, regardless of the severity of the actual injuries. Both firms aggressively pursue clients to sue Uber, as shown in this online advertisement by Emrani:

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT



27.    Fradkin, Emrani, and their respective law firms take advantage of claimants in vulnerable situations. Many of the claimants are facing economic stress or pre-existing health problems. Emrani, Fradkin, and their law firms entice these vulnerable claimants to receive unnecessary and/or causally unrelated medical treatment with the promise of large settlement payouts. But these payments often do not materialize, due in large part to the substantial contingency fees the firms charge and inflated, lien-based bills from medical providers. For example, one claimant obtained a $140,000 settlement, but received only $9,112.53 of that amount, while Downtown LA Law Group walked away with $63,000 in fees (a 45% contingency fee) and $4,892.92 in costs, and MedCapital Solutions—Jacob Emrani's brother's lawsuit funding company—walked away with $26,000, nearly three times the amount the claimant recovered.

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

28.     The law firms seek to target Uber and other parties with high insurance coverage limits in order to extract more lucrative settlements. On one occasion, an employee of the Emrani firm directly contacted the adverse party—an elderly woman—and pretended to be a representative from the woman's own insurance company to try to obtain this information under false pretenses.

29.     Where the adverse party has a high-limit insurance policy, Emrani and his firm refer clients for more extensive medical evaluation and treatment, including unnecessary or redundant care. This includes referring clients for surgical consultations with knowledge and intent that the surgeon—often Khounganian—will recommend surgery even if more conservative treatment might be more appropriate and will falsely attribute the need for such surgery to the incident in question. In this way, the Emrani firm artificially inflates medical damages above the expenses necessary to treat a client's injuries, if any, that actually result from a given incident.

30.     Fradkin and Downtown LA Law Group engage in a similar pattern of conduct. They encourage providers to exaggerate their findings in order to justify additional and more expensive treatment. Where one provider finds minimal injury and/or recommends conservative treatment, the firm often refers the client to different preferred providers, including Khounganian, who the firm knows are more likely to recommend more extensive and expensive treatment.

31.     Many of Fradkin's and Emrani's clients actually have health insurance. But to maximize their eventual recovery in their fraudulent lawsuits, Fradkin and Emrani steer these claimants away from medical providers who would bill their health insurance. Instead, these claimants are directed to specified medical providers, selected by the attorneys, who bill on a lien basis pursuant to a kickback scheme, as described below. The medical providers benefit from this arrangement because (1) they receive a steady supply of claimants, and (2) if they were to bill the patient's health insurance, the insurer might deny coverage for their unnecessary treatments or

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

would require them to accept a lower rate than they charge on their inflated lien-based bills.

32.    The medical providers, including Khounganian, require claimants to sign lien agreements under which the claimants agree to pay the providers from recoveries on their claims. Upon information and belief, each lien agreement falsely or misleadingly states that the claimants are directly and unconditionally responsible for the medical provider's fees, and that the fees are not contingent on any settlement, judgment, verdict, or other recovery.[2]   Khounganian does not check the credit histories of the claimants before beginning treatment that purports to cost tens or hundreds of thousands of dollars—because he knows he will negotiate lower amounts in the event of a shortfall, and he does not expect to pursue personal recovery against the claimants.

33.    These lien agreements are shams. Upon information and belief, the lawyers and the medical providers, including Khounganian, secretly enter into side agreements in which they agree, in the event that recoveries do not exceed the amount of fees and liens, that the providers will reduce their bills accordingly.[3] Khounganian

---

[2] The factual basis for this allegation—and for the other information-and-belief allegations in this Complaint regarding the lien agreements—includes the fact that Uber is aware of certain lien agreements that contain such provisions; that certain individuals have testified regarding the lien agreements in their depositions; and that the providers have sent bills to the law firms for services provided to the claimants.

[3] The factual basis for this allegation—and for the other information-and-belief allegations in this complaint regarding the existence of the concealed side agreements—includes the information provided to Uber from providers set forth in paragraphs 40 through 49 below; the numerous interpleader actions filed by the law firms in state court pertaining to claimants' recoveries in their personal-injury lawsuits; the fact that Khounganian does not check the credit histories of claimants; and the absence of any evidence that Khounganian seeks to recover the full amount of his claimed fees from patients referred by the law firms who have signed lien agreements.

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

and other providers agree to this arrangement because, in exchange, they receive a steady supply of claimants from the lawyers—a kickback scheme.

34.    Because of these concealed side agreements, the lien agreements stating that the claimants are directly and unconditionally responsible for the medical provider's fees in full are knowingly false or materially misleading when made.

35.    These medical providers then generate bills for their services at above-market, artificially inflated rates that they send to Fradkin, Emrani, and their respective law firms for insurance claims and for use in the litigation against Uber and other targets of the scheme.

36.    The medical bills are fraudulent and misleading in one or more ways. First, the bills falsely state that the treatment at issue is medically necessary and is causally linked to the Uber accident in question. Second, the bills charge above-market, artificially inflated rates for the services in question.  And third, as previously alleged, the bills are fraudulent and misleading because the concealed side agreements obscure the nature of the scheme, inducing Uber and others to settle personal-injury lawsuits for more than they would absent the fraud. Uber and other personal-injury defendants have relied on the fraudulent and misleading bills in determining whether and on what terms to settle lawsuits.

37.    Fradkin and Emrani direct the employees of their respective firms to send Uber demand letters and file complaints in court that seek damages based on these fraudulent and misleading medical bills.

38.    Because of the liens that Khounganian and other providers hold on their recoveries and the high contingency fees charged by the attorneys, the claimants typically see little financial recovery from the fraudulent cases relative to the high payouts that the attorneys, Khounganian, and other providers receive.

39.    To make matters worse for those claimants, they are often the victim of deceptive and predatory lending practices by entities with relationships with the law

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

firms. These lending practices often result in claimants receiving extremely high-interest loans (styled as "advances" against their eventual recoveries) that substantially reduce their ultimate settlement recoveries, and sometimes result in claimants repaying these high-interest loans long after their cases resolve.

**B.  Providers Who Work with the Law Firms Have Voluntarily Provided Uber with Documentary Evidence of the Concealed Side Agreements**

40.  Providers who worked with and at the direction of Emrani, Fradkin, The Law Offices of Jacob Emrani, and Downtown LA Law Group have voluntarily provided Uber with documentary evidence of the concealed side agreements.

41.  Both law firms routinely create orders for patients to be sent to medical providers of the law firms' choosing for services directed, ultimately, by the law firms.  The providers—often small businesses in need for patients—agree to take on the clients the law firms direct their way, perform the services at the direction of the law firms, bill the law firms on a lien basis (rather than the patient or the patient's insurance company), and receive payment directly from the law firms.

42.  At the beginning of the relationship, a representative from the law firm will typically contact the business and inquire about the price for providing services. For instance, for an imaging provider, the law firms would contact the business and seek a volume discount for directing some number of patients to the business (such as 100 patients over a one-month period, for example).

43.  The business agrees upfront to be paid a set price (for example $140 per MRI), and is told by the law firm representative to create a bill on a lien basis showing a different and higher amount. Specifically, the business is directed to put the highest possible amount on that bill, notwithstanding that it and the law firm had already agreed to a lower amount for the services.

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

44.    Whether these side agreements are tacit or explicit, it is understood between the provider and the law firm that this is how the scheme operates. Medical providers create and submit the medical bills at the law firms' direction.  They do not receive the full lien amount indicated on the bill; instead, they receive from the law firm the agreed-upon price or less.

45.    Below is an image of a charge detail printout for patients that were referred to a medical imaging provider through Emrani (with personal identifying information for the patients redacted).



46.    As this image shows, there are different amounts tracked in the columns labeled "Pt AttyPaid" (which is the amount Emrani agreed to pay upfront for the procedure) and "Charge" (which is the amount charged on a lien basis per Emrani's direction).  The Pt AttyPaid amount is never greater than the Charge amount, and is usually less—often significantly less (such as $300 for a procedure with a charge

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

amount of $2,375). The difference between the amounts in these two columns reflects the quantum of Emrani's mail and wire fraud, given that the firm's typical practice is to send demand letters and complaints citing the full Charge amount.

47.     Similarly, below is an image of a charge detail printout for patients that were referred to a medical imaging provider through Downtown LA Law Group (with personal identifying information for the patients redacted).

Charge Detail with Payments - All Accounts - Attorney - DOWNTOWN LA LAW GROUP

| ServiceDate | Company | LastName | FirstName | Account# | Phys | Rend_Dr | CPT Code | Procedure | Charge | P Ins Paid | S Ins Paid | Pt AttyPaid | W/Off | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/24/2012 | UNIVERSAL | | | | PI | WILSHIRE | 72100 | XRAY L SPINE LTD 2-3 | 140.00 | 0.00 | 0.00 | 50.00 | 90.00 | 0.00 |
| 09/24/2012 | UNIVERSAL | | | | PI | WILSHIRE | 72040 | XRAY C SPINE 2 OR 3 V | 140.00 | 0.00 | 0.00 | 50.00 | 90.00 | 0.00 |
| 09/24/2012 | UNIVERSAL | | | | PI | WILSHIRE | 72052 | XRAY C SPINE COMPO | 375.00 | 0.00 | 0.00 | 50.00 | 325.00 | 0.00 |
| 09/24/2012 | UNIVERSAL | | | | PI | WILSHIRE | 72110 | XRAY L SPINE COMP 4 | 275.00 | 0.00 | 0.00 | 50.00 | 225.00 | 0.00 |
| 09/24/2012 | UNIVERSAL | | | | PI | WILSHIRE | 73030 | XRAY SHOULDER COM | 235.00 | 0.00 | 0.00 | 50.00 | 185.00 | 0.00 |
| 09/25/2012 | UNIVERSAL | | | | PI | WILSHIRE | 72100 | XRAY S SPINE TWO OR | 140.00 | 0.00 | 0.00 | 50.00 | 90.00 | 0.00 |
| 12/27/2012 | UNIVERSAL | | | | PI | WILSHIRE | 72100 | XRAY L SPINE LTD 2-3 | 140.00 | 0.00 | 0.00 | 50.00 | 90.00 | 0.00 |
| 12/27/2012 | UNIVERSAL | | | | PI | WILSHIRE | 72040 | XRAY C SPINE 2 OR 3 V | 140.00 | 0.00 | 0.00 | 50.00 | 90.00 | 0.00 |
| 12/27/2012 | UNIVERSAL | | | | PI | WILSHIRE | 72072 | XRAY T SPINE 3 VIEW | 140.00 | 0.00 | 0.00 | 50.00 | 90.00 | 0.00 |
| 02/27/2013 | UNIVERSAL | | | | PI | WILSHIRE | 72100 | XRAY L SPINE TWO OR | 140.00 | 0.00 | 0.00 | 0.00 | 140.00 | 0.00 |
| 01/30/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72050 | XRAY C SPINE 3 VIEW | 275.00 | 0.00 | 0.00 | 100.00 | 175.00 | 0.00 |
| 01/30/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72100 | XRAY L SPINE TWO OR | 140.00 | 0.00 | 0.00 | 0.00 | 140.00 | 0.00 |
| 01/30/2014 | UNIVERSAL | | | | PI | WILSHIRE | 73030 | XRAY SHOULDER 2 VI | 235.00 | 0.00 | 0.00 | 100.00 | 135.00 | 0.00 |
| 01/30/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72040 | XRAY C SPINE 2 VIEW | 140.00 | 0.00 | 0.00 | 0.00 | 0.00 | 140.00 |
| 02/19/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72040 | XRAY C SPINE 2 VIEW | 140.00 | 0.00 | 0.00 | 0.00 | 0.00 | 140.00 |
| 02/19/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72100 | XRAY L SPINE TWO OR | 140.00 | 0.00 | 0.00 | 0.00 | 0.00 | 140.00 |
| 02/19/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72040 | XRAY C SPINE 2 VIEW | 140.00 | 0.00 | 0.00 | 0.00 | 0.00 | 140.00 |
| 02/19/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72100 | XRAY L SPINE TWO OR | 140.00 | 0.00 | 0.00 | 0.00 | 0.00 | 140.00 |
| 03/10/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72040 | XRAY C SPINE 2 VIEW | 140.00 | 0.00 | 0.00 | 50.00 | 90.00 | 0.00 |
| 03/10/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72100 | XRAY L SPINE TWO OR | 140.00 | 0.00 | 0.00 | 50.00 | 90.00 | 0.00 |
| 03/31/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72040 | XRAY C SPINE 2 VIEW | 140.00 | 0.00 | 0.00 | 50.00 | 90.00 | 0.00 |
| 03/31/2014 | UNIVERSAL | | | | PI | UN_MRI_CT | 72100 | XRAY T SPINE 2 VIEW | 140.00 | 0.00 | 0.00 | 50.00 | 90.00 | 0.00 |
| 03/31/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72100 | XRAY L SPINE TWO OR | 140.00 | 0.00 | 0.00 | 0.00 | 0.00 | 140.00 |
| 04/04/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72141 | MRI C SPINE W/O CON | 2,375.00 | 0.00 | 0.00 | 550.00 | 1,825.00 | 0.00 |
| 06/09/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72040 | XRAY C SPINE 2 VIEW | 140.00 | 0.00 | 0.00 | 0.00 | 0.00 | 140.00 |
| 06/26/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72040 | XRAY C SPINE 2 VIEW | 140.00 | 0.00 | 0.00 | 0.00 | 0.00 | 140.00 |
| 08/26/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72070 | XRAY T SPINE 2 VIEW | 140.00 | 0.00 | 0.00 | 0.00 | 0.00 | 140.00 |
| 08/26/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72100 | XRAY L SPINE TWO OR | 140.00 | 0.00 | 0.00 | 0.00 | 0.00 | 140.00 |
| 08/26/2014 | UNIVERSAL | | | | PI | WILSHIRE | 73030 | XRAY SHOULDER 2 VI | 235.00 | 0.00 | 0.00 | 0.00 | 0.00 | 235.00 |
| 08/26/2014 | UNIVERSAL | | | | PI | WILSHIRE | 73070 | XRAY ELBOW 2 VIEWS | 135.00 | 0.00 | 0.00 | 0.00 | 0.00 | 135.00 |
| 09/17/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72040 | XRAY C SPINE 2 VIEW | 140.00 | 0.00 | 0.00 | 0.00 | 0.00 | 140.00 |
| 09/17/2014 | UNIVERSAL | | | | PI | WILSHIRE | 73100 | XRAY WRIST 2 VIEWS | 135.00 | 0.00 | 0.00 | 0.00 | 0.00 | 135.00 |
| 10/27/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72100 | XRAY L SPINE TWO OR | 140.00 | 0.00 | 0.00 | 0.00 | 0.00 | 140.00 |
| 10/27/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72040 | XRAY C SPINE 2 VIEW | 140.00 | 0.00 | 0.00 | 0.00 | 0.00 | 140.00 |
| 10/30/2014 | UNIVERSAL | | | | PI | WILSHIRE | 73620 | XRAY FOOT 2 VIEWS | 118.00 | 0.00 | 0.00 | 0.00 | 0.00 | 118.00 |
| 11/13/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72148 | MRI L SPINE W/O CONT | 2,375.00 | 0.00 | 0.00 | 450.00 | 1,925.00 | 0.00 |
| 11/15/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72148 | MRI L SPINE W/O CON | 2,375.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,375.00 |
| 11/17/2014 | UNIVERSAL | | | | PI | FALLBROO | 72141 | MRI C SPINE W/O CON | 2,375.00 | 0.00 | 0.00 | 600.00 | 1,775.00 | 0.00 |
| 11/18/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72141 | MRI C SPINE W/O CON | 2,375.00 | 0.00 | 0.00 | 450.00 | 1,925.00 | 0.00 |
| 12/05/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72148 | MRI L SPINE W/O CON | 2,375.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,375.00 |
| 12/05/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72148 | MRI L SPINE W/O CONT | 2,375.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,375.00 |
| 12/08/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72141 | MRI C SPINE W/O CON | 2,375.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,375.00 |
| 12/08/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72148 | MRI L SPINE W/O CONT | 2,375.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,375.00 |
| 12/08/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72148 | MRI C SPINE W/O CON | 2,375.00 | 0.00 | 0.00 | 400.00 | 1,975.00 | 0.00 |
| 12/08/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72148 | MRI L SPINE W/O CONT | 2,375.00 | 0.00 | 0.00 | 400.00 | 1,975.00 | 0.00 |
| 12/10/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72148 | MRI C SPINE W/O CON | 2,375.00 | 0.00 | 0.00 | 500.00 | 1,875.00 | 0.00 |
| 12/10/2014 | UNIVERSAL | | | | PI | WILSHIRE | 72148 | MRI L SPINE W/O CONT | 2,375.00 | 0.00 | 0.00 | 500.00 | 1,875.00 | 0.00 |

Charge Detail with Payments - All Accounts - Attorney - DOWNTOWN LA LAW GROUP
Service Dates: 2008/08/ 01 to 2020/31/ 12                Date: 8/19/2025

48.     As this image shows, there are different amounts tracked in the columns labeled "Pt AttyPaid" (which is the amount Downtown LA Law Group agreed to pay upfront for the procedure) and "Charge" (which is the amount charged on a lien basis per Downtown LA Law Group's direction).  The Pt AttyPaid amount is never greater than the Charge amount, and is usually less—often significantly less (such as $400 for a procedure with a charge amount of $2,375).  The difference between the amounts in these two columns reflects the quantum of Downtown LA Law Group's

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

mail and wire fraud, given that the firm's typical practice is to send demand letters and complaints citing the full Charge amount.

49.     The excerpts of these records are illustrative of the scheme employed by Emrani, Fradkin, and their law firms to systematically overbill defendants in personal injury cases.  In the aggregate, for a company like Uber that faces scores of lawsuits filed by the law firms each year, each of which comprises inflated fraudulent bills by multiple providers, the costs quickly become substantial.

**C.    The Law Firms Direct their Clients to Khounganian for Specific Unnecessary Treatments, Including Costly and Invasive Surgeries**

50.     Fradkin, Emrani, and their law firms direct their clients to these lien providers. The law firms also direct patients to a range of other medical providers, including physical therapists, chiropractors, acupuncturists, pain management physicians, and surgeons.

51.     Staff from the law firms subsequently schedule appointments and otherwise coordinate medical treatment for the claimants. The law firms authorize and direct diagnostic tests and treatments to be performed.

52.     Defendant Khounganian and his medical practice, Defendant Valley Orthopedic/GSK Spine, are central to this fraud. While unnecessary treatments from various other medical providers allow Emrani and Fradkin to increase the value of their lawsuits materially, it is the costly, unnecessary, and/or causally unrelated surgeries recommended and performed by Khounganian that provide the most significant artificial damages enhancement in the scheme.

53.     Khounganian examines the claimants and produces reports diagnosing claimants with serious spinal injuries, causally connecting these injuries to the underlying accidents, and recommending costly surgery. Khounganian's reports are often knowingly and intentionally false in that he knows or is recklessly indifferent to the fact that the surgery is not medically warranted, and/or that the purported spinal injury was not caused by the minor accident in question.

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

54.    Khounganian then performs the requested surgeries, which are often spinal fusion surgeries. A spinal fusion is a surgical procedure to treat severe spinal injuries that cannot be relieved through less invasive options. In a spinal fusion, the surgeon reinforces a patient's back structure by linking two or more vertebrae in the spine together using bone or bone-like material. The surgeon typically inserts metal screws or rods to hold the bones together. The two bones then "fuse" and heal as one bone. A spinal fusion is major surgery, often requiring a hospital stay of 2-3 days and entailing a wide variety of short-term and long-term risks, including infections, bleeding, and pain. Patients often must undergo months of physical therapy to learn how to move, sit, stand, and walk in a way that keeps their fused spine in line.

55.    After performing the surgeries, Khounganian produces false or materially misleading bills that he transmits electronically or via mail to either Emrani or Fradkin and their respective law firms that conceal his side agreements with the lawyers. The resulting false and misleading bills are then utilized to support artificially inflated claims.

56.    This kickback scheme has been employed on numerous claims against Uber and others. It involves a wide-ranging pattern of corrupt activity, including conduct in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud). The facts of cases involving 18 different claimants—listed below as Claimants A through R—illustrate how the scheme operates in practice.

**D.    Examples of the Scheme**

**1.    Personal Injury Claimant A**

57.    On December 9, 2019, Claimant A was driving a vehicle that was struck by another driver logged into the Uber application in Los Angeles. A police officer responded to the scene of the accident. Claimant A's vehicle sustained minor damage, and there were no injuries. A photo from the scene depicts the negligible damage that Claimant A's vehicle sustained:

58.    Claimant A did not visit the emergency room following the accident. Instead, on December 16, 2019—a full week later—Claimant A sought medical care and was diagnosed with myalgia (muscle pain). Claimant A used his health insurance to cover this initial treatment.

59.    Thereafter, Claimant A retained the Emrani firm. In coordination with the Radiance Surgery Center (an entity that provides a venue for Khounganian to perform surgeries and is involved in the scheme in other ways) the Emrani firm directed Claimant A to a group of lien medical providers. The Emrani firm directed Claimant A to these providers for the purpose of artificially inflating Claimant A's claimed damages pursuant to the kickback scheme. Claimant A did not utilize his medical insurance for the care.

60.    On January 7, 2020, a Radiance Surgery Center employee asked the Emrani firm for approval to refer Claimant A to Khounganian for an orthopedic spine evaluation. On February 6, 2020, the Emrani firm provided its approval.

61.    On February 24, 2020, Claimant A visited Khounganian. In a section of his report labeled "CAUSATION," Khounganian stated as follows: "Within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." This same section appeared in each of the reports of Khounganian's treatments of Claimant A, including Khounganian's reports in which he recommended the two surgeries that he performed on Claimant A as described below. Khounganian knew or was recklessly indifferent to the fact that such statements were false when made, given that Claimant A had not sought care until a week after the accident, had not reported injuries in the police report of the accident, and had suffered no injury in the accident. Khounganian knew or was recklessly indifferent to the fact that the treatments he provided to Claimant A were unnecessary, not causally connected to the accident, and were for the purpose of artificially inflating Claimant A's damages in his personal-injury lawsuit.

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

62.    The treatment was authorized and directed by the Emrani law firm. It was based on Emrani's, the law firm's, and the medical providers' desire to fraudulently and artificially increase their fees. For example, on August 14, 2020, Radiance Surgery Center emailed the Emrani firm about Claimant A's treatment. The Emrani firm responded by authorizing a specific injection treatment, adding that the claim involved Uber and a million-dollar bodily injury policy. The Emrani firm directed Radiance Surgery Center to "schedule the patient asap":



63.    On September 22, 2020, an employee of the Emrani firm wrote to Radiance Surgery Center: "I just spoke with the patient, he was a bit confused. Go ahead and schedule[] him with Dr. Khounganian and send me the appointment details." This was not the first time that the large number of medical treatments coordinated by the Emrani firm had caused confusion for Claimant A. On February 27, 2020, for example, Radiance Surgery Center emailed the Emrani firm: "Can you please contact [Claimant A] and inform him that [provider] needs to see him …

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

[Claimant A] was called and he stated he is [seeing] a different doctor. Please clarify with him I know he might be a bit confuse[d] due to <u>so many different appt been arrange[d]</u>." (emphasis added).  Defendant Emrani was copied on that email.

64.    After an October 8, 2020 follow-up visit with Khounganian in which he recommended surgeries, Radiance Surgery Center emailed the Emrani firm to inform it about Khounganian's recommendations. Defendant Emrani was copied on that email. Fourteen minutes later, the Emrani firm replied: "Just spoke with the patient, he is on board for the surgery. Please schedule him for the pre-op."

65.    On December 23, 2020, Khounganian performed cervical fusion surgery on Claimant A.

66.    On February 19, 2021, Khounganian performed a second back surgery on Claimant A.

67.    Khounganian executed a sham lien agreement with Claimant A wherein Claimant A promised to repay Khounganian from recoveries for any claim. The agreement stated that Claimant A was directly and unconditionally responsible for the medical providers' fees, and that the fees were not contingent on any settlement, judgment, verdict, or other recovery. Upon information and belief, these statements were knowingly false when made given the concealed side agreements. Khounganian did not check the credit history of Claimant A before treatment because he knew he would negotiate lower fees in the event of a shortfall and would not, in fact, pursue any balance from the claimant.

68.    Khounganian's office prepared bills for the resulting treatment pursuant to his sham lien agreement with Claimant A as follows:

        a.     February 24, 2020: $1,500

        b.     October 8, 2020: $700

        c.     December 23, 2020: $125,000 (bill rendered on February 1, 2021)

        d.     December 31, 2020: $700

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

e.    January 21, 2021: $700

f.    February 19, 2021: $100,000 (bill rendered on April 7, 2021)

g.    March 11, 2021: $700

h.    May 22, 2021: $700

i.    April 28, 2022: $700

69.    Upon information and belief, these bills together with their stated amounts were materially false and misleading, given that the side agreement with the Emrani firm was fraudulently concealed. Khounganian knew or was recklessly indifferent to the fact that the bills and their stated amounts were false and misleading, given that he was aware of the secret side agreement to discount such bills in the event of a shortfall.

70.    An independent medical evaluation concluded that the surgery performed on Claimant A was medically unnecessary and below the accepted standard of care. The evaluation further concluded that the reported charges for the procedures were 10 times the accepted norms and value for such procedures.

71.    The Emrani firm then presented the false and misleading bills generated by Khounganian to Uber for the purpose of supporting an artificially inflated claim. The matter ultimately settled. In addition to the settlement amount, Uber incurred significant defense costs in defending against the litigation. These defense and settlement costs were substantially higher than they would have been absent the fraudulent medical and billing records. Uber relied on the fraudulent medical and billing records in determining whether and on what terms to settle Claimant A's lawsuit.

### 2.    Personal Injury Claimant B

72.    On March 10, 2019, Claimant B was involved in a low-speed accident with a vehicle driven by an individual logged into the Uber Eats application who was pulling out of a parking lot in Menifee, California. Both Claimant B and the other

-22-

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

driver denied any injuries when speaking to the responding officer, and no tickets or citations were issued to either party.

73.    Following the accident, Claimant B retained The Law Offices of Jacob Emrani. Subsequently, The Law Offices of Jacob Emrani referred, encouraged, directed, or otherwise instructed Claimant B to schedule appointments with a select group of medical providers with whom the firm maintained a close relationship. These providers rendered unnecessary treatments at excessive and above-market rates on a lien basis. To facilitate this arrangement, The Law Offices of Jacob Emrani signed lien agreements with the chosen providers and Claimant B, opting not to utilize Claimant B's available medical insurance.

74.    On May 24, 2019, more than two months after the accident, Claimant B reported the accident to the Menifee Police Department. Again, Claimant B did not report any injuries resulting from the accident.

75.    On December 28, 2020, more than 18 months later, and in furtherance of the scheme, Defendant The Law Offices of Jacob Emrani and Defendant Jacob Emrani mailed, via U.S. mail, a demand letter signed by Defendant Emrani to Uber's insurance provider. The letter falsely represented that Claimant B suffered from numerous spinal injuries and would need to undergo future cervical fusion surgery.

76.    Emrani and The Law Offices of Jacob Emrani knew or were recklessly indifferent to the fact that such statements were false when made. They were aware that the accident was not serious, yet they referred Claimant B for unnecessary medical treatment to artificially inflate the value of her claim.

77.    On March 9, 2021, Claimant B filed a lawsuit against Uber and was represented by The Law Offices of Jacob Emrani, including, among others, Jacob Emrani. The Law Offices of Jacob Emrani directed Claimant B to consult with Khounganian.

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

78.     On May 18, 2021, during Claimant B's first appointment with him, Khounganian stated that Claimant B had "complete[d] all modalities of conservative management" and that Khounganian was "recommending lumbar decompression/discectomy for her lower back" at an approximate cost of $226,000. This appointment was completed via telehealth, such that Khounganian did not conduct a physical exam of Claimant B prior to recommending and scheduling the surgery.

79.     The Law Offices of Jacob Emrani was listed as a payor on the health insurance claim forms submitted by both Khounganian and Radiance Surgery Center—the facility where Khounganian ultimately performed surgery on Claimant B.

80.     Khounganian's recommendation was false when made. Khounganian knew or was recklessly indifferent to the fact that such surgery was unnecessary and unwarranted, given that Claimant B had suffered no injury and that Khounganian had not yet conducted an in-person physical examination at the time of the recommendation.

81.     During the same appointment, Khounganian falsely stated that, "within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss."—*i.e.*, the March 10, 2019 accident.

82.     Khounganian knew or was recklessly indifferent to the fact that such causation statement was false when made given that Claimant B had suffered no such injury due to the accident.

83.     On July 16, 2021, Khounganian made identical false causation statements that "within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." Khounganian made these statements knowingly or with reckless indifference to the

fact that they were false because Claimant B suffered no such injury due to the accident.

84.    On July 16, 2021, just a few hours before Claimant B underwent surgery, Khounganian completed his first physical exam of Claimant B. Shortly after, Claimant B underwent an L2-3 discectomy by Khounganian at Sherman Oaks Surgery Center, in Sherman Oaks, California. Sherman Oaks Surgery Center is another name used by Radiance Surgery Center.

85.    Following the surgery, Claimant B completed several follow-up visits with Khounganian and his staff. Claimant B reported a miserable recovery from surgery. She was unable to walk or shower herself and required mobility assistance to use the restroom. At her follow up appointment with Khounganian, his surgical assistant revealed that Claimant B's sciatic nerve had been nicked during surgery, producing a severe recovery. Due to such a miserable recovery, Claimant B expressed hesitation with receiving additional surgery on her neck. The Law Offices of Jacob Emrani, in conjunction with Khounganian, exploited a low-income mother by knowingly, or with reckless indifference, directing Claimant B to receive a risky, damaging, and unnecessary surgical procedure for the purpose of artificially inflating her claimed damages.

86.    Khounganian referred Claimant B to complete a series of appointments with a physical therapy provider in Riverside, California. Claimant B, together with Defendant Emrani, who is listed as Claimant B's attorney on the form, signed a lien agreement with the physical therapy provider.

87.    Claimant B completed approximately 13 visits with the physical therapy provider over a two-month period. By her last appointment on October 28, 2021, she had reported her pain as a 0 out of 10 in at least three of her last five visits.

88.    Despite the fact that Claimant B repeatedly reported no pain to her chiropractor, on October 25, 2021 Khounganian signed a record opining that

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

Claimant B would likely "require[] a lumbar fusion procedure in the future," estimated at approximately $265,000, as well as an "anterior cervical disc placement procedure," also estimated at approximately $265,000.

89.    Khounganian knew or was recklessly indifferent to the fact that such statements were false and such treatments were unnecessary. The statements were made for the purpose of fabricating a claim, given that Claimant B had suffered no injury and that she had recently reported having no pain.

90.    The vast majority of Claimant B's treatment was procured through medical lien billing with the various providers, totaling at least $330,308.42.

91.    Khounganian executed a sham lien agreement with Claimant B in which Claimant B promised to repay Khounganian from recoveries for any claim. Upon information and belief, the agreement stated that Khounganian's fee was not contingent on any settlement, judgment, verdict, or other recovery. Upon information and belief, such statements were knowingly false when made due to the concealed side agreement that Khounganian would surrender his right to full payment in the event of a shortfall in the recovery for the claim.

92.    Khounganian's office prepared bills for the resulting treatment pursuant to his sham lien agreement with Claimant B as follows:

> 1.    May 18, 2021: $1,500
>
> 2.    July 16, 2021: $1,500
>
> 3.    July 16, 2021: $100,000 (bill rendered on September 16, 2021)
>
> 4.    July 21, 2021: $700 (bill rendered on July 22, 2021)
>
> 5.    August 23, 2021: $700
>
> 6.    October 25, 2021: $700 (bill rendered on October 28, 2021)

93.    The bills together with their stated amounts were false and misleading, given that the side agreement with the Emrani firm was concealed. Upon information and belief, they were knowingly false when made, or made with reckless indifference

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

to the truth, given that Khounganian was aware of the secret side agreement to discount such bills in the event of a shortfall in recovery.

94.    These amounts in the medical bills were also artificially inflated far above market rates. For example, Khounganian quoted a price nearly four times more than that quoted by a separate spine surgeon for a similar spinal surgery. In her deposition, Claimant B stated that she believed the liens were through her attorney and Defendant The Law Offices of Jacob Emrani. These rates, as presented and charged by Khounganian, were intended to further the fraudulent scheme.

95.    The matter was ultimately settled. In addition to the settlement amount, Uber incurred significant defense costs in defending against the litigation. These defense and settlement costs were substantially higher than they would have been absent the fraudulent medical and billing records. Uber relied on the fraudulent medical and billing records in determining whether and on what terms to settle Claimant B's lawsuit.

### 3.    Personal Injury Claimant C

96.    On March 12, 2019, Claimant C, a low-income woman with severe anxiety, depression, and suicidal ideation, was a backseat passenger in car driven by a driver logged into the Uber application when another driver collided with the right side of the vehicle. Air bags did not deploy in either vehicle and neither the police nor paramedics were called to the scene. Claimant C was ambulatory at the scene of the collision and reported no injuries. She was able to leave the scene in another rideshare vehicle. The photos below depict the negligible damage to the driver's vehicle:

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12



13    97.    Claimant C's driver described the collision as "a minor accident" and

14  that "the other driver was at fault." The excerpt below details the exchange between

15  the driver and Uber's in-app support team:

16  Hi

We recently received a message from one of your riders indicating that you were involved in a minor accident. We wanted
17  to check to make sure you're okay.

18  For safety reasons, you won't be able to use this vehicle for trips until the condition of the vehicle is confirmed.

19  Please respond to this email and attach clear, zoomed-out and well-lit photos of all four sides of your vehicle.

We also ask that you fill out and promptly return the Incident Report Form that we sent to the email address associated
20  with your Uber account.

21  An insurance adjuster will contact you in 2-3 business days to gather additional details and discuss the claims process
with you if you're pursuing a claim.

22  Once we have this information, we'll be able to assist you further.

23  Thanks.

24
Wed, 13 Mar 2019 01:10:57 GMT

25  via agent (external)

I will not need Uber's assistance. It was a minor accident. The other driver was at fault. I will be handling it with my insurance
26  company. Thank you.

27
Wed, 13 Mar 2019 01:14:51 GMT

28  via inappsupport (external)

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

98.     Prior to this minor accident, Claimant C was involved in two accidents. In one accident, Claimant C was a passenger in a severe collision with a semi-truck, where her vehicle spun around, flipped over three times down a hill before landing upside down. Claimant C was also involved in another accident where she was "t-boned."

99.     Approximately one hour after the accident, Claimant C was evaluated at an urgent care for body aches, disorientation, and confusion. The urgent care staff transferred Claimant C to the emergency room for a head injury evaluation after observing Claimant C exhibiting unusual behavior. Claimant C reported being unsure as to whether she hit her head. The Los Angeles Fire Department noted that Claimant C was found sitting in a chair at the urgent care, was alert and oriented, and appeared shaken up.

100.   At the emergency room, Claimant C presented with a chief complaint of anxiety. She did not complain of back, neck, chest, or abdominal pain. Claimant C also did not report shortness of breath, nervousness, headaches, weakness, numbness, or tingling. Claimant C's physical exam was deemed normal. At the emergency room, she exhibited a full range of motion, was not in pain, and was alert and oriented without any sensory deficits. Claimant C underwent a CT scan of her head, a chest x-ray, and an electrocardiogram, which all rendered normal findings. Claimant C was diagnosed with a mild concussion. She was observed for a few hours and was shortly discharged exhibiting improved symptoms.

101.   On or about March 17, 2019, Claimant C retained The Law Offices of Jacob Emrani. Subsequently, The Law Offices of Jacob Emrani referred, encouraged, directed, or otherwise instructed Claimant C to schedule appointments with a select group of medical providers. The email exchanges below depict correspondence between an Emrani case manager arranging imaging appointments for Claimant C with a medical provider:

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

██████

███@calljacob.com < ████@calljacob.com>
Wed 9/1/2021 4:16 PM
To: Referrals <referrals█ ████; ████████

📎 1 attachments (200 KB)
MRI REFERRAL .pdf████

Hello,

Please assist claustrophobic client base on the attached Rx.
Thank you.

| NAME | ████ |
| ADD | ████████ |
| TEL/EMAIL | ████████ ████████ |
| DOB | ████ |
| DOA | 03/12/2019 |
| Type of Accident / Injuries | AUTO /UBER |
| REMARKS | OPEN MRI |

Regards,

████
Junior CM
Tel: (213) 748-7734 ext. █
Fax: (213) 867 9932
████@calljacob.com
🐦 👍 in

███@calljacob.com < ████@calljacob.com>
Tue 7/27/2021 3:47 PM
To: Scheduling / ████████ █; Referrals <████████ █

📎 1 attachments (400 KB)
MRI Rx L-spine.pdf;

Good afternoon ,

Please assist client to get diagnostic test as per the attached.
Thank you.

| NAME | ████ |
| ADD | |
| TEL/EMAIL | ████████ / ████████ |
| DOB | ████ |
| DOA | 03/12/2019 |
| Type of Accident / Injuries | AUTO |
| REMARKS | MRI L/S |

Best Regards,

████
Tel: (213) 748-7734 ███
efax: (213) 867-9932

-30-
UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

**From:** ███@calljacob.com <███@calljacob.com>
**Sent:** Monday, October 5, 2020 2:46 PM
**To:** █████████████████████ Scheduling ████████████████
**Cc:** ██████████████████████
**Subject:** ██████████

Hi ███████

Could we please schedule client for CT BRAIN close to her home?
Thank you.

| NAME | ████████ |
|---|---|
| ADD | ███████████ |
| TEL/EMAIL | ████████████ |
| DOB | ███████ |
| DOA | 03/12/2019 |
| Type of Accident / Injuries | AUTO |
| REMARKS | CAT scan |

102.    These providers rendered treatments that were unnecessary and/or causally unrelated to the March 2019 accident, at excessive and above-market rates. They delivered medical treatment pursuant to the kickback scheme and for the purpose of artificially inflating Claimant C's claimed damages. Claimant C did not utilize her Medi-Cal coverage for the majority of her care.

103.    On March 20, 2019, Claimant C began seeing a chiropractor. At her initial consultation, Claimant C reported that she hit her head on the door of her Uber driver's vehicle but denied any loss of consciousness. Over the next few months, Claimant C attended 29 chiropractic treatments.

104.    On March 21, 2019, Claimant C received x-rays of her cervical, thoracic, and lumbar spine. The x-rays revealed little evidence of acute injury as well as normal alignment of her thoracic spine.

105.    On April 9, 2019, Claimant C presented to a neurologist, recommended by The Law Offices of Jacob Emrani, for a neurological consultation. Prior to her appointment, The Law Offices of Jacob Emrani faxed Claimant C's prior collision-

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

related medical records and included a cover sheet directing the neurologist to schedule Claimant C for a neurological consultation. Claimant C saw this neurologist three separate times thereafter.

106.   From April 9, 2019, to May 6, 2021, Claimant C presented to a wide variety of providers including neurologists, imaging centers, and a pain management specialist to receive trigger point injections and other unnecessary and/or causally unrelated treatments at excessive rates. Throughout this period, Claimant C received three cervical trigger point injections and three lumbar trigger point injections, as well as imaging of her lower back, neck, and head.

107.   On June 5, 2019, Claimant C received an MRI of her cervical and lumbar spine, revealing a disruption/reversal of the cervical lordosis and straightening of the lumbar lordosis. The MRI revealed no other evidence of acute injury.

108.   On October 8, 2020, Claimant C received a CT scan of her brain for "trauma." The CT scan did not reveal any signs of acute trauma.

109.   On May 6, 2021, after almost two years of treatment, Claimant C was cleared to resume normal activities and was not recommended further treatment by her pain management specialist.

110.   Two months later, on July 26, 2021, Claimant C presented to Khounganian. Khounganian asserted that Claimant C had abnormal range of motion in her cervical and lumbar spine, "approximately 50% of normal observed." Khounganian further asserted that Claimant C would be a candidate for disc replacement at C3-4. Khounganian provided a cost estimate of $80,000-90,000 for the surgeon's fee, $15,000-18,000 for the assistant surgeon's fee, and approximately $120,000-130,000 for the facility, anesthesia, and postop rehabilitation.

111.   Finally, Khounganian also asserted that "[w]ithin a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

the injury during the date of loss." Khounganian knew or was recklessly indifferent to the fact that such statements were false when made, given that the accident was not serious and did not cause significant injury to Claimant C.

112.    Upon information and belief, Claimant C executed a sham lien agreement with Khounganian promising to repay Khounganian from recoveries for any claim. Upon information and belief, the agreement stated that the claimant was directly and unconditionally responsible for the medical provider's fees, and that the fees were not contingent on any settlement, judgment, verdict, or other recovery. Upon information and belief, such statements were knowingly false when made given the concealed side agreement. Khounganian did not check the credit history of Claimant C before beginning treatment because he knew that he would negotiate lower fees in the event of a shortfall and that he would not, in fact, pursue any balance from the claimant.

113.    On August 4, 2021, in addition to the fraudulent surgical estimate of approximately $215,000 to $238,000, Khounganian's office prepared a bill for Claimant C's surgical consultation on July 26, 2021 pursuant to her sham lien agreement with Claimant C for a total of $1,500.

114.    The bill with its stated amount was false and misleading, given that the side agreement with The Law Offices of Jacob Emrani was concealed. It was knowingly false when made, or made with reckless indifference to the truth, given that Khounganian was aware of the secret side agreement to discount such bills.

115.    Claimant C thereafter returned to her pain management specialist and received additional cervical and lumbar trigger point injections.

116.    The majority of the treatment pursued and received by Claimant C was procured through medical lien billing with the various providers, totaling at least $124,223.08. Only approximately $3,391 of this amount was paid by her Medi-Cal insurance, an amount that covers Claimant C's urgent and emergency care prior to

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

retaining The Law Offices of Jacob Emrani, as well as visits with her mental health provider—a provider with whom she had a pre-existing treatment relationship. Additionally, The Law Offices of Jacob Emrani asserted that Claimant C would require future cervical spine surgery and incorporated Khounganian's fraudulent surgical estimate of approximately $215,000 to $238,000 as a basis for recovery.

117.   The Law Offices of Jacob Emrani, in conjunction with Khounganian and other providers, exploited a low-income, disabled claimant by knowingly, or with reckless indifference, directing Claimant C to receive unnecessary medical treatment for the purpose of artificially inflating her claimed damages.

118.   On March 23, 2022, three years after the accident, Claimant C called her primary care provider to receive an endocrinology referral. Claimant C stated that she was in a recent car accident and that her attorney requested her to check with an endocrinologist to see whether there was a causal connection between her minor car accident and her thyroid condition.

119.   On August 15, 2022, Claimant C underwent an independent medical evaluation conducted by a neurological medical expert. The expert concluded that she had a normal general medical examination, as well as a normal comprehensive neurological examination. The expert further concluded that Claimant C's complaints were subjective and not accompanied by objective abnormalities. The same expert conducted a medical records review. He noted that her cervical and lumbar spine studies were normal and MRI imaging of her brain was normal.

120.   An orthopedic medical expert reviewed Claimant C's medical records and opined that Claimant C had no orthopedic problems. The expert concluded that it was "criminal" to recommend further treatment. With respect to Claimant C's imaging records, the expert concluded that her lumbar spine MRI was normal and that every disc in her cervical spine was normal. The expert concluded that Claimant C did not need surgery and only suffered, at most, a sprain or strain in her   cervical

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

and lumbar spine, which would only require 12 weeks of chiropractic visits and physical therapy twice a week.

121. The matter was ultimately settled. In addition to the settlement amount, Uber incurred significant costs in defending against the litigation. These defense and settlement costs were substantially higher than they would have been absent the fraudulent medical and billing records. Uber relied on the fraudulent medical and billing records in determining whether and on what terms to settle Claimant C's lawsuit.

### 4.    Personal Injury Claimant D

122. On August 10, 2019, Claimant D was a passenger in Claimant E's vehicle that was rear-ended by a driver logged into the Uber application on northbound Interstate 110 in Los Angeles. The air bags did not deploy and Claimant D did not lose consciousness. California Highway Patrol and Los Angeles County Fire Department responded to the collision.  However, Claimant D did not report any injuries and was not transported to the emergency room.

123. Six days after the collision, on August 16, 2019, Claimant D presented to Kaiser with complaints of headaches and dizziness following the collision. A CT scan of her head was performed and was found to be normal. She was prescribed medication for the headaches and advised to perform home exercises for the dizziness.

124. Claimant D thereafter retained The Law Offices of Jacob Emrani. Upon information and belief, The Law Offices of Jacob Emrani referred, encouraged, directed, or otherwise instructed Claimant D to schedule appointments with a select group of medical providers with whom the firm maintained a close relationship. These referrals were part of a coordinated kickback scheme between The Law Offices of Jacob Emrani and its preferred providers to render medical treatment to Claimant D that was unnecessary and/or causally unrelated to the August 2019 accident. The

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

scheme's purpose was to generate fraudulent medical records and inflated bills to support exaggerated claims, thereby increasing settlement leverage. Claimant D did not utilize her insurance coverage for her treatment. In doing so, The Law Offices of Jacob Emrani exploited an elderly claimant by knowingly, or with reckless indifference, directing Claimant D to receive unnecessary and risky medical treatment for the purpose of artificially inflating her claimed damages.

125.    On November 19, 2019, Claimant D presented to Khounganian. Prior to her appointment, The Law Offices of Jacob Emrani faxed Claimant D's prior collision-related medical records and included a cover sheet directing Khounganian to schedule Claimant D for an orthopedic spine consultation. In his report, Khounganian asserted that Claimant D will require future medical care in the form of a cervical fusion surgery. Khounganian estimated the cost of this future care as approximately $250,000 to $295,000. Finally, Khounganian falsely claimed that "within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." Khounganian knew or was recklessly indifferent to the fact that the estimate and diagnoses he provided to Claimant D were unnecessary and for the purpose of fabricating a claim.

126.    Upon information and belief, Claimant D executed a sham lien agreement with Khounganian promising to repay Khounganian from recoveries for any claim. Upon information and belief, the agreement stated that the claimant was directly and unconditionally responsible for the medical provider's fees, and that the fees were not contingent on any settlement, judgment, verdict, or other recovery. Such statements were knowingly false when made given the concealed side agreement.  Upon information and belief, Khounganian did not check the credit history of Claimant D before beginning treatment because Khounganian knew that he would negotiate lower fees in the event of a shortfall and that he would not, in fact, pursue any balance from the claimant.

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

127.   On January 27, 2020, in addition to a fraudulent surgical estimate of approximately $250,000 to $295,000, Khounganian's office prepared a bill for Claimant D's surgical consultation on November 19, 2019, pursuant to his sham lien agreement with Claimant D, in the amount of $1,500. The bill together with its stated amount was false and misleading, given that the side agreement with The Law Offices of Jacob Emrani was concealed.

128.   On March 31, 2021, The Law Offices of Jacob Emrani sent a demand letter signed by Jacob Emrani, via U.S. mail, to Uber's insurer seeking $1 million in damages. The demand letter bundled the claimed injuries and medical expenses for both Claimant D and E. A majority of the future medical expenses claimed by The Law Offices of Jacob Emrani arise from Khounganian's fraudulent surgical estimates.

129.   The majority of the treatment pursued and received by Claimant D was procured through medical lien billing with the various providers, totaling at least $23,441.86. In its March 31, 2021 demand letter, The Law Offices of Jacob Emrani claimed a total of $340,441.86 for past and future medical care, with the majority of future medical expenses arising from Khounganian's fraudulent surgical estimate.

130.   The matter was ultimately settled. In addition to the settlement amount, Uber incurred significant costs in defending against the litigation. These defense and settlement costs were substantially higher than they would have been absent the fraudulent medical and billing records. Uber relied on the fraudulent medical and billing records in determining whether and on what terms to settle Claimant D's lawsuit.

### 5.    Personal Injury Claimant E

131.   On August 10, 2019, 68-year-old Claimant E and his passenger, Claimant D, were rear-ended by an Uber driver on northbound Interstate 110 in Los

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

Angeles. The airbags did not deploy, and Claimant E did not lose consciousness. Claimant E's truck sustained relatively minor damage, as depicted below:






132.    California Highway Patrol and Los Angeles County Fire Department responded to the scene. Claimant E was transported to Kaiser Hospital via ambulance. At the emergency room, Claimant E received an x-ray of his cervical spine which did not show any significant changes from an x-ray he had received in 2010. Claimant E was diagnosed with a muscle strain and was instructed to follow up with his primary care provider.

133.    At some point thereafter, Claimant E retained The Law Offices of Jacob Emrani. Upon information and belief, The Law Offices of Jacob Emrani referred, encouraged, directed, or otherwise instructed Claimant E to schedule appointments with a select group of medical providers with whom the firm maintained a close

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

relationship. These referrals were part of a coordinated kickback scheme between The Law Offices of Jacob Emrani and its preferred providers to render medical treatment to Claimant E that was unnecessary and/or causally unrelated to the August 2019 accident. The scheme's purpose was to generate fraudulent medical records and inflated bills to support exaggerated claims, thereby increasing settlement leverage. Claimant E did not utilize his insurance coverage for his treatment. In doing so, The Law Offices of Jacob Emrani exploited an elderly claimant by knowingly, or with reckless indifference, directing Claimant E to receive unnecessary medical treatment and a risky surgical procedure for the purpose of artificially inflating his claimed damages.

134.    On August 21, 2019, Claimant E began receiving chiropractic care. He completed chiropractic care on November 19, 2019, after approximately 26 sessions.

135.    On January 27, 2020, Claimant E presented to Khounganian. Prior to his appointment, The Law Offices of Jacob Emrani faxed Claimant E's prior collision-related medical records and included a cover sheet directing Khounganian to schedule Claimant E for an orthopedic spine consultation. In his report, Khounganian claimed that Claimant E had abnormal range of motion in his cervical and lumbar spine, "approximately 50% of normal observed." Khounganian recommended a cervical discectomy and fusion, with an estimated cost of between $250,000 and $295,000, as well as a multi-level lumbar decompressive procedure, with an estimated cost between $215,000 and $238,000. Finally, Khounganian concluded that "within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." Khounganian knew or was recklessly indifferent to the fact that the estimate and diagnoses he provided to Claimant E were for treatment that was unnecessary and/or causally unrelated to the August 2019 accident, and were for the purpose of artificially inflating Claimant E's claimed damages.

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

136.   On July 20, 2020, Claimant E followed up with Khounganian.

137.   Upon information and belief, Claimant E executed a sham lien agreement with Khounganian promising to repay Khounganian from recoveries for any claim. Upon information and belief, the agreement stated that the claimant was directly and unconditionally responsible for the medical provider's fees, and that the fees were not contingent on any settlement, judgment, verdict, or other recovery. Such statements were knowingly false when made given the concealed side agreement. Upon information and belief, Khounganian did not check the credit history of Claimant E before beginning treatment because Khounganian knew that he would negotiate lower fees in the event of a shortfall and that he would not, in fact, pursue any balance from the claimant.

138.   In addition to the approximately $533,000 in fraudulent surgical estimates, Khounganian's office prepared a bill for his surgical consultation and follow up appointment pursuant to his sham lien agreement with Claimant E on January 27, 2020 and July 20, 2020 in the amount of $2,200.   The bills together with their stated amounts were false and misleading, given that the side agreement with The Law Offices of Jacob Emrani was concealed.

139.   On March 31, 2021, The Law Offices of Jacob Emrani sent a demand letter signed by Jacob Emrani, via U.S. mail, to Uber's insurer seeking $1 million in damages. The demand letter bundled the claimed injuries and medical expenses for both Claimant D and E due to claimed injuries allegedly arising from the same accident. A majority of the future medical expenses claimed by The Law Offices of Jacob Emrani arose from Khounganian's fraudulent surgical estimates.

140.   On May 18, 2021, Claimant E received a posterior instrumented fusion at C7-T1. The surgery was performed by a different physician than Khounganian.

141.   Upon information and belief, the majority of the treatment pursued and received by Claimant E was procured through medical lien billing with the various

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

providers, totaling at least $532,226.74.  In its March 31, 2021 demand letter, The Law Offices of Jacob Emrani claimed a total of $627,000 for past and future medical care, with the majority of claimed future medical expenses arising from Khounganian's fraudulent surgical estimates.

142.    The matter was ultimately settled. In addition to the settlement amount, Uber incurred significant defense costs in defending against the litigation. These defense and settlement costs were substantially higher than they would have been absent the fraudulent medical and billing records. Uber relied on the fraudulent medical and billing records in determining whether and on what terms to settle Claimant E's lawsuit.

### 6.    Personal Injury Claimant F

143.    On March 2, 2019, Claimant F, a low-income construction worker with limited formal education and English-speaking ability, was involved in a motor vehicle collision where a Toyota Prius driven by a driver logged into the Uber application struck the right side of his truck. Neither the police nor paramedics were called to the scene of the accident. Claimant F's truck sustained moderate damage on the right side but could still be driven after the impact. Photographs of the damage are depicted below:






144.   Claimant F did not seek any emergency or urgent care immediately after the collision. Claimant F sought medical care five days after the collision, on March 7, 2019.

145.   At some point following the collision, Claimant F retained The Law Offices of Jacob Emrani. Upon information and belief, The Law Offices of Jacob Emrani referred, encouraged, directed, or otherwise instructed Claimant F to schedule appointments with a select group of medical providers with whom the firm maintained a close relationship. These referrals were part of a coordinated kickback scheme between The Law Offices of Jacob Emrani and its preferred providers to render medical treatment to Claimant F that was unnecessary and/or causally unrelated to the March 2019 accident. The scheme's purpose was to generate fraudulent medical records and inflated bills to support exaggerated claims, thereby increasing settlement leverage. The following email, depicting a conversation between an Emrani case manager and a medical provider, is an example of the referral system alleged:



UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

146.   From March 7, 2019, to September 30, 2019, Claimant F attended approximately 65 chiropractic sessions. The chiropractor concluded that maximum therapeutic benefit was attained on September 30, 2019.

147.   On April 2, 2019, Claimant F received x-rays of his cervical and lumbar spine. The x-rays only revealed cervical muscular spasm with straightening of the normal cervical lordosis and mild degenerative changes in the lumbar spine.

148.   On October 14, 2019, Claimant F presented to Defendant Khounganian. Khounganian provided a surgical estimate of "$90,000 to $110,000 for surgeons fee; $20,000 to $25,000 for assistant surgeon fee; and $140,000 to $160,000 for facility fee." Upon information and belief, Khounganian knew or was recklessly indifferent to the fact that the estimate and diagnoses he provided to Claimant F were false when made and were for the purpose of artificially inflating Claimant F's claimed damages.

149.   Upon information and belief, Claimant F executed a sham lien agreement with Khounganian promising to repay Khounganian from recoveries for any claim. Upon information and belief, the agreement stated that the claimant was directly and unconditionally responsible for the medical provider's fees, and that the fees were not contingent on any settlement, judgment, verdict, or other recovery. Such statements were knowingly false when made given the concealed side agreement. Khounganian did not check the credit history of Claimant F before beginning treatment because Khounganian knew that he would negotiate lower fees in the event of a shortfall and that he would not, in fact, pursue any balance from the claimant.

150.   In addition to a fraudulent surgical estimate of approximately $295,000, Khounganian's office prepared a bill for his surgical consultation pursuant to his sham lien agreement with Claimant F on October 14, 2019, for a total of $1,500. The bill together with the stated amount was false and misleading, given that the side agreement with The Law Offices of Jacob Emrani was concealed.

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

151.   Upon information and belief, the majority of the treatment pursued and received by Claimant F was procured through medical lien billing with the various providers, totaling at least $97,903.70.

152.   The Law Offices of Jacob Emrani, in conjunction with Khounganian, exploited a low-income, non-English speaking claimant by directing him to receive unnecessary medical treatment for the purpose of artificially inflating his claimed damages.

153.   The matter was ultimately settled. In addition to the settlement amount, Uber incurred significant costs in defending against the litigation. These defense and settlement costs were substantially higher than they would have been absent the fraudulent medical and billing records. Uber relied on the fraudulent medical and billing records in determining whether and on what terms to settle Claimant F's lawsuit.

### 7.    Personal Injury Claimant G

154.   On November 5, 2019, Claimant G was a passenger in an Uber ride when the vehicle collided with a stopped vehicle while making a right-hand turn in Los Angeles. The collision was minor, with no airbag deployment or injuries reported on the scene. Claimant G did not seek immediate medical attention following the accident.

155.   Two days after the accident, November 7, 2019, Claimant G presented to the Riverside Community Hospital Emergency Room with complaints of neck soreness. A CT scan of Claimant G's cervical and thoracic spine did not reveal any acute fractures or malalignment. Claimant G was diagnosed with a cervical and thoracic sprain and used her Medi-Cal insurance to cover the cost of this visit.

156.   Claimant G has an extensive history of health problems before the accident in question, including a brain tumor that affected part of her neck at least

one prior neck surgery; and numerous mental health struggles including hallucinations, major depressive disorder, and anxiety.

157.   Upon information and belief, Claimant G retained Defendant The Law Offices of Jacob Emrani for representation within a few months of her accident. The Law Offices of Jacob Emrani then referred, encouraged, directed, or otherwise instructed Claimant G to obtain medical treatment from a select group of providers that The Law Offices of Jacob Emrani has a close relationship with, rather than using her Medi-Cal health insurance. The Law Offices of Jacob Emrani knew the accident was not serious and did not cause significant injury to Claimant G, yet it referred Claimant G to these medical providers for unnecessary and/or causally unrelated medical treatment to artificially inflate the value of the claim.

158.   Between December 16, 2019, and June 1, 2021, Claimant G received extensive medical treatment from multiple providers. Treatment during this period included thirteen chiropractic visits within a four-month time span, nine physical therapy sessions within a three-month time span, and four different epidural injections.

159.   Claimant G then had a gap in treatment between June 2021 and October 2021. After this gap, Claimant G was evaluated by Defendant Khounganian.

160.   Khounganian executed a sham lien agreement with Claimant G wherein Claimant G promised to repay Khounganian from recoveries for any claim. Upon information and belief, this agreement falsely stated that Claimant G was directly and unconditionally responsible for Khounganian's fees, and that the fees were not contingent on any settlement, judgment, verdict, or other recovery. Upon information and belief, such statements were knowingly false when made, given the concealed side agreements. Khounganian did not check the credit history of Claimant G before beginning treatment because Khounganian knew that he would negotiate lower fees

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

in the event of a shortfall and that he would not, in fact, pursue any balance from the claimant.

161. On October 11, 2021, Claimant G had an initial consultation with Khounganian and complained of mental health struggles, as well as right knee, neck, and back pain. During the visit, Khounganian told Claimant G that she was a candidate for a multilevel cervical disc replacement, with an estimated cost between $250,000 and $295,000, and also a candidate for an L4-S1 decompression/discectomy, with an estimated cost between $215,000 and $238,000. Khounganian provided recommendations for Claimant G to continue taking anti-inflammatory medications and begin physical therapy.

162. Between October 2021 and February 2022, Claimant G had eighteen physical therapy sessions.

163. On July 13, 2022, Claimant G returned to Khounganian for reevaluation, during which Khounganian provided the same recommendations: a multilevel cervical disc replacement, with an estimated cost between $250,000 and $295,000, and an L4-S1 decompression/discectomy, with an estimated cost between $215,000 and $238,000.

164. Upon information and belief, Claimant G had not scheduled these surgeries prior to settlement; however, Khounganian's recommendations for cervical and L4-S1 surgery were claimed as future medical expenses, with an estimated combined cost between $465,000 and $533,000, in a settlement offer sent by The Law Offices of Jacob Emrani on May 24, 2022.

165. Khounganian prepared reports after Claimant G's visits. In both reports, Khounganian included a section labeled "CAUSATION" which stated: "Within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." These statements were knowingly false when made. Khounganian knew or was recklessly indifferent to the fact that

such statements were false, given Claimant G's extensive pre-existing medical history, including C1-C2 fusion surgery and prior neurological issues. Indeed, the CT scans taken the day after the collision showed no acute injury other than minor strains. Khounganian knew or was recklessly indifferent to the fact that the surgery recommendations that he provided Claimant G were unrelated to the underlying collision and for the purpose of fabricating a claim.

166.   In addition to Khounganian's recommendations for causally unrelated surgeries, with a total estimated cost between $465,000 and $533,000, Khounganian's office prepared bills for the resulting treatment pursuant to his sham lien agreement with Claimant G as follows:

a.  October 11, 2021: $1,500 (bill rendered on October 29, 2021)

b.  July 13, 2022: $700 (bill rendered on July 19, 2022)

167.   Upon information and belief, the bills together with their stated amounts were materially false and misleading, given that the side agreement with The Law Offices of Jacob Emrani was fraudulently concealed. Khounganian knew or was recklessly indifferent to the fact that the bills and their stated amounts were false and misleading, given that he was aware of the secret side agreement to discount such bills in the event of a shortfall.

168.   Defendant Law Offices of Jacob Emrani knew or was recklessly indifferent to the fact that such statements were false when made. The Law Offices of Jacob Emrani was aware that the accident was not serious and did not cause significant injury to Claimant G, yet it took advantage of a low-income woman with a history of mental health challenges by directing her to receive unnecessary medical treatment and surgical recommendations to artificially inflate the value of her claim.

169.   The matter was ultimately settled. In addition to the settlement amount, Uber incurred significant costs in defending against the litigation. These defense and settlement costs were substantially higher than they would have been absent the

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

fraudulent medical and billing records. Uber relied on the fraudulent medical and billing records in determining whether and on what terms to settle Claimant G's lawsuit.

### 8. Personal Injury Claimant H

170. On September 30, 2017, Claimant H was riding on a Los Angeles City Metro Bus that was involved in a low-speed collision with a car driven by a driver logged into the Uber application. Video footage from the bus at the time of the accident shows Claimant H shift from her seat, brace a metal rail with her hands, and shift back to her seat. Claimant H did not visit the emergency room following the accident. A photo from the scene depicts the negligible damage to the bus:



171. Within a few weeks following the collision, Claimant H retained Downtown LA Law Group for representation. Subsequently, the Downtown LA Law Group referred, encouraged, directed, or otherwise instructed Claimant H to schedule appointments with a select group of medical providers with whom the firm maintained a close relationship, rather than providers covered by her insurance.

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

These providers delivered medical treatment to Claimant H as part of the kickback scheme and for the purpose of inflating Claimant H's claimed damages.

172.   An independent medical evaluation of the accident video footage concluded that Claimant H should not have experienced anything more than soft tissue strains or myalgia (muscle pain) from her minor movements during the accident. However, no medical records from the lien-based medical providers Claimant H saw following the accident noted any soft tissue trauma or swelling. Instead, all of Claimant H's diagnoses from Downtown LA Law Group's network of providers following this minor incident were consistent with longstanding preexistent degenerative disease of the cervical and lumbar spine.

173.   Claimant H's longstanding preexisting degenerative diseases are supported by Claimant H's extensive history of cervical and lumbar complaints that date to at least 2011, when she was involved in a different motor vehicle collision. Just the year before the current incident, in 2016, Claimant H had at least forty chiropractic visits within less than six months. Nonetheless, Downtown LA Law Group and their medical providers falsely attributed Claimant H's degenerative issues to trauma caused by her movements during the accident, as part of the scheme to artificially inflate Claimant H's claimed damages.

174.   On October 4, 2017, several days after the accident but before Claimant H retained Downtown LA Law Group, she visited Kaiser Permanente and was diagnosed with a neck strain, lumbar strain, right trapezius strain and left knee sprain. This diagnosis aligns with the independent medical evaluation's conclusion that at most, Claimant H might have experienced soft tissue injuries. Claimant H used her health insurance to cover this initial treatment.

175.   Between October 18, 2017, and April 20, 2018, Claimant H saw a chiropractor, whom her attorney referred her to, for treatment over the course of 36 visits.   Between February 21, 2018, and May 17, 2018, Claimant H saw a physical

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

therapist for 16 visits. Between February 9, 2018, and March 24, 2019, Claimant H also saw a pain management specialist for treatment, which included eight different cervical and lumbar injections.

176.   Claimant H subsequently began treatment with Defendant Khounganian for unnecessary and/or unrelated medical treatment to artificially increase the value of the claim.

177.   Khounganian executed a sham lien agreement with Claimant H wherein Claimant H promised to repay Khounganian from recoveries for any claim. Upon information and belief, such agreement stated that Claimant H was directly and unconditionally responsible for the Khounganian's fees, and that the fees were not contingent on any settlement, judgment, verdict, or other recovery. Such statements were knowingly false when made given the concealed side agreements. Khounganian did not check the credit history of Claimant H before beginning treatment because Khounganian knew that he would negotiate lower fees in the event of a shortfall and that he would not, in fact, pursue any balance from the claimant.

178.   On April 18, 2019, Claimant H first consulted with Khounganian. During this first visit, Khounganian recommended Claimant H to undergo both a C4-C5 disc replacement, with an estimated cost of $275,000, and an L2-L3 decompressive procedure, with an estimated cost of $225,000.

179.   On May 17, 2019, less than a month after Claimant H's first visit, Khounganian performed an L2-L3 discectomy surgery on Claimant H.

180.   A year later, on June 11, 2020, Claimant H was again seen by Khounganian, who then recommended a C4-C5 disc replacement with an estimated cost between $250,000 and $295,000. During the same visit, Khounganian recommended an L2-L3 lumbar fusion with an estimated cost between $250,000 to $295,000. This was the same spinal region that Khounganian had operated on during the May 17, 2019 surgery. These surgery recommendations were claimed as future

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

medical care damages in an updated demand letter sent by Downtown LA Law Group on June 19, 2020.

181. Approximately a year after that, on April 12, 2021, Claimant H again was seen by Khounganian who recommended a multilevel anterior cervical discectomy fusion, with an estimated cost of $250,000 to $295,000. Khounganian again recommended a future L2-L3 surgery, with an estimated cost of $250,000 to $295,000. Again, while no surgery dates were scheduled, Claimant H expressed an intention to proceed with the recommended treatment.

182. Khounganian included a section labeled "CAUSATION" in reports for all of Claimant H's visits, including those with surgical recommendations, which stated: "Within a reasonable degree of medical probability, the diagnosis above were caused by the injury during the date of loss." Khounganian knew or was recklessly indifferent to the fact that such statements were false when made, given that Claimant H had been in two prior motor vehicle accidents, Claimant H had signs of degenerative lumbar and cervical spine issues, and the very minor nature of the September 2017 bus accident. Khounganian knew or was recklessly indifferent to the fact that the treatments he provided to Claimant H were unnecessary and were for the purpose of artificially increasing Claimant H's claimed damages.

183. An independent medical examiner reviewed MRIs of Claimant H's lumbar spine and cervical spine. The reviewer concluded that the L2-L3 disc, on which Khounganian had performed the lumbar discectomy, was black, indicating the bulge was chronic. All other disc bulges from the MRI were chronic in nature. Additionally, the examiner concluded that herniation of any disc requires compression, flexion, and a twist. Video footage of Claimant H during the accident shows slight compression, but no twisting of any sort.

184. Khounganian performed Claimant H's May 17, 2019, lumbar discectomy surgery at Avanguard Surgical Center, which prepared the bill for the

resulting treatment on that date. Khounganian's office prepared other bills for the resulting treatment pursuant to his sham lien agreement with Claimant H as follows:

    a.    April 18, 2019: $1,500 (bill rendered on April 18, 2019).

    b.    May 17, 2019: $125,755 (bill prepared by Avanguard and rendered on October 14, 2019)

    c.    May 22, 2019: $700

    d.    June 24, 2019: $700

    e.    August 5, 2019: $700

    f.    September 19, 2019: $700

185. Upon information and belief, the bills together with their stated amounts were materially false and misleading, given that the side agreement with the Downtown LA Law Group was fraudulently concealed. Khounganian knew or was recklessly indifferent to the fact that the bills and their stated amounts were false and misleading, given that he was aware of the secret side agreement to discount such bills in the event of a shortfall.

186. Defendant Downtown LA Law Group and Khounganian knew or were recklessly indifferent to the fact that such statements were false when made. It was aware that the accident was not serious, yet it referred Claimant H, an elderly, low-income woman with mental health struggles, for unnecessary and/or causally unrelated medical treatment to artificially inflate the value of her claim.

187. The matter was ultimately settled. In addition to the settlement amount, Uber incurred significant costs in defending against the litigation. These defense and settlement costs were substantially higher than they would have been absent the fraudulent medical and billing records. Uber relied on the fraudulent medical and billing records in determining whether and on what terms to settle Claimant H's lawsuit.

### 9.    Personal Injury Claimant I

188.    On January 29, 2021, Claimant I was a passenger in a car driven by a driver logged into the Uber application when the car he was in quickly stopped to avoid colliding with another vehicle. Claimant I alleged that this caused his neck and back to hit the passenger seat in front of him. No airbags were deployed and no paramedics or police were called because there was no accident.

189.    Claimant I is an elderly individual and had recent injuries prior to the January 2021 incident. On September 11, 2020, less than five months before the January 2021 incident, Claimant I slipped and fell while in the shower. The manager of the senior home he was living in had to call paramedics to treat Claimant I. Claimant I underwent imaging of his spine on December 2, 2020, which revealed multilevel disc disease in Claimant I's lumbar spine.

190.    On November 6, 2020, Claimant I began chiropractic treatment for complaints of neck, back, and foot pain that resulted from his fall. Claimant I continued these visits through February 19, 2021. Visit reports from Claimant I's chiropractic treatments indicate that Claimant I gave the same pain scores for his neck, mid-back, and low back prior to the Uber incident, on the day of the Uber incident, and after the Uber incident.

191.    Upon information and belief, Claimant I's extensive medical history also includes a slip and fall accident in or around 2017, causing injury to his neck and back, and an additional motor vehicle collision around 2019, causing injury to his body and neck. Additionally, CT scans from November 2019 reveal that Claimant I has had moderate to severe degenerative changes to his cervical spine, most prominent at C4-C5 and C5-C6, well before the incident involving Uber.

192.    Within a few days following the January 2021 incident, Claimant I retained Defendants Downtown LA Law Group and Igor Fradkin for representation. Upon information and belief, Downtown LA Law Group and Fradkin then referred, encouraged, directed, or otherwise instructed Claimant I to obtain medical treatment

from a select group of providers whom Downtown LA Law Group has a close relationship with, rather than providers Claimant I had been seeing with his insurance. Defendants Downtown LA Law Group and Fradkin knew that the incident was not serious and that Claimant I was a vulnerable individual, so they referred Claimant I to these medical providers for unrelated and unnecessary medical treatment to artificially inflate the value of his claim.

193.   Between February 2, 2021, and May 20, 2021, Claimant I presented to four different medical providers for evaluation, including Defendant Khounganian.

194.   Khounganian executed a sham lien agreement with Claimant I wherein Claimant I promised to repay Khounganian from recoveries for any claim. Upon information and belief, this agreement falsely stated that Claimant I was directly and unconditionally responsible for Khounganian's fees, and that the fees were not contingent on any settlement, judgment, verdict, or other recovery. Such statements were knowingly false when made, given the concealed side agreements. Khounganian did not check the credit history of Claimant I before beginning treatment because Khounganian knew that he would negotiate lower fees in the event of a shortfall and that he would not, in fact, pursue any balance from the claimant.

195.   On May 20, 2021, Claimant I had an initial visit with Khounganian during which Khounganian ordered additional imaging of Claimant I's spine. On June 11, 2021, Claimant I returned to Khounganian following his recent MRIs and x-rays. During this visit, Khounganian recommended an L4-L5 and L5-S1 laminectomy procedure.

196.   On July 30, 2021, Khounganian performed an L4-L5 and L5-S1 surgery at Radiance Surgery Center. Claimant I had one follow-up visit after this procedure on August 18, 2021.

197.   In an independent medical evaluation of Claimant I and his records, a medical expert concluded that Claimant I only sustained cervical and lumbar strains

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

from the alleged incident. This conclusion was based in part on Claimant I's accident history, and his MRI from December 20, 2020, suggesting Claimant I was still experiencing low back pain prior to the January 2021 incident. The independent medical evaluation opined that chiropractic treatment and imaging were medically reasonable treatments to seek, but that the surgery Khounganian performed was not medically indicated or reasonable.

198.    Khounganian, however, included a section labeled "CAUSATION" in reports for all of Claimant I's visits, including those with surgical recommendations, which stated: "Within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." Khounganian knew or was recklessly indifferent to the fact that such statements were false when made, given the minor nature of the January 2021 incident, Claimant I's recent injury from falling in the shower, and imaging from before the incident showing severe degenerative changes in Claimant I's spine. Khounganian knew or was recklessly indifferent to the fact that the treatment he provided to Claimant I was medically unnecessary, not causally connected to the January 2021 incident, and for the purpose of fabricating a claim.

199.    Khounganian's office prepared the bills for the resulting treatment pursuant to his sham lien agreement with Claimant I as follows:

           a.  May 20, 2021: $1,500

           b.  June 11, 2021: $700

           c.  July 30, 2021: $100,002 (bill rendered on September 22, 2023)

           d.  August 18, 2021: $700

200.    A forensic billing review found that Khounganian's billing total of $102,902 was 640% above the usual, customary, and reasonable value of the treatment he provided.

201.   Upon information and belief, Khounganian's bills, together with their stated amounts, were materially false and misleading, given that their side agreements with Downtown LA Law Group were fraudulently concealed. Khounganian knew or was recklessly indifferent to the fact that the bills and their stated amounts were false and misleading, given that he was aware of the secret side agreements to discount such bills in the event of a shortfall.

202.   Downtown LA Law Group and Fradkin knew or were recklessly indifferent to the fact that such statements were false when made. They were aware that the accident was not serious, yet they referred Claimant I, an elderly man with mental health struggles, for unnecessary and/or unrelated medical treatment to artificially inflate the value of his claim.

203.   This matter is currently open, and Uber is incurring significant costs in defending against the litigation.

### 10.   Personal Injury Claimant J

204.   On October 26, 2019, 60-year-old Claimant J was driving his truck with an attached trailer on the I-10 freeway in Los Angeles County, California. While he was driving, another driver collided into the left side of his trailer. His truck was not impacted, and his airbags did not deploy. California Highway Patrol responded to the scene of the accident and completed a report. Claimant J's trailer sustained minor damage, and he had no complaints of pain at the scene of the accident. He was able

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

to drive the truck with the trailer home shortly after the accident. Photos provided by the Claimant depict the negligible damage that Claimant J's trailer sustained:

205.   Claimant J did not seek emergency or urgent care immediately after the



accident and continued working. Two days after the accident, Claimant J contacted Downtown LA Law Group, whom he ultimately retained to represent him in a personal-injury lawsuit. Subsequently, Downtown LA Law Group referred, encouraged, directed, or otherwise instructed Claimant J to schedule appointments with a select group of medical providers. These providers rendered unnecessary treatments, at excessive and above-market rates. These providers delivered medical treatment pursuant to the kickback scheme and for the purpose of artificially inflating Claimant J's claimed damages. Claimant J did not utilize his Medi-Cal coverage for his care.

206.   It was not until December 11, 2019—two and a half months after the collision—that Claimant J finally sought medical care through a chiropractor. Over the next few months, Claimant J attended approximately 23 chiropractic sessions.

207.   On January 7, 2020 and February 10, 2020, Claimant J obtained MRI imaging of his lumbar and cervical spine, showing no evidence of acute injury and only degenerative conditions of the spine. No disc herniations were noted in his imaging reports.

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

208.   On September 25, 2021, Claimant J presented to Khounganian. Khounganian also falsely diagnosed C3-4, C5-6, C6-7, and L4-5 disc herniations, despite reviewing prior imaging that shows no such injuries. Khounganian claimed that Claimant J had abnormal range of motion in his cervical and lumbar spines, "approximately 50% of normal observed." As part of this initial consultation with Claimant J, Khounganian stated that Claimant J had failed conservative treatment and that the Claimant "is a candidate for decompression/discectomy at L4-5." Khounganian provided a surgery estimate ranging from $215,000 to $238,000 and claimed that "[w]ithin a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." Khounganian knew or was recklessly indifferent to the fact that these statements were false when made because Claimant J suffered no such injury due to the accident.

209.   Claimant J executed a sham lien agreement with Khounganian promising to repay Khounganian from recoveries for any claim. Upon information and belief, the agreement stated that the claimant was directly and unconditionally responsible for the medical provider's fees, and that the fees were not contingent on any settlement, judgment, verdict, or other recovery. Upon information and belief, such statements were knowingly false when made given the concealed side agreement. Khounganian did not check the credit history of Claimant J before beginning treatment because Khounganian knew that he would negotiate lower fees in the event of a shortfall and that he would not, in fact, pursue any balance from the claimant.

210.   Prior to the operation on December 14, 2021, Claimant J received a pre-operative evaluation to clear him for surgery due to risks associated with his heart health, history of hypertension, and uncontrolled diabetes. During this appointment, Claimant J was cleared for surgery. In Claimant J's sworn deposition from May 2023,

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

Claimant J revealed that he had a heart valve condition that put him at greater risk of complications in a subsequent surgery.

211.    On December 29, 2021, Khounganian performed an L4-L5 discectomy on Claimant J at Radiance Surgery Center.

212.    On April 18, 2022, during a post-operative follow up visit with Claimant J, Khounganian memorialized a false causation statement, identical to his earlier statement, that "within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." Khounganian knew or was recklessly indifferent to the fact that these statements were false when made because Claimant J suffered no such injury due to the accident.

213.    Shortly after Khounganian operated on his back, Claimant J began experiencing a sudden escalation in pain and numbness in his lower back, radiating down his right leg and hip. Claimant J later testified that his back was in "too much pain" after his surgery and that he "couldn't stand the pain" Claimant J reported that, as of May 2023, he could no longer walk for more than 10 minutes at a time without needing to sit down.

214.    On August 15, 2022, Claimant J received an MRI and x-ray of his lumbar spine, on referral from Khounganian. Compared to the MRIs conducted in January and February 2020, the August 2022 MRI revealed new and worse injuries, including a disc bulge at L1-L2, disc protrusion at L3-L4 and disc herniations at L2-L3 and L4-L5, spinal canal stenosis at L2-L3 through L4-L5, and multilevel foraminal narrowing and degenerative arthrosis of the apophyseal joints.

215.    On August 29, 2022, Claimant J followed up with Khounganian complaining of severe back pain despite completing post-operative physical therapy. Khounganian provided another surgical estimate and claimed that "surgical intervention will be necessary in the form of a revision decompression and L4-L5 posterior lumbar instrumented fusion." Khounganian provided an estimate for

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

surgery ranging from $250,000 to $290,000. Khounganian once again falsely claimed that "within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." Khounganian knew or was recklessly indifferent to the fact that such statements were false when made, given that Claimant J reported no initial injuries from the accident and began experiencing new and worse injury after Khounganian operated on his lumbar spine. Khounganian knew or was recklessly indifferent to the fact that the treatments he provided to Claimant J were unnecessary, damaging, not causally connected to the trailer incident, and were for the purpose of fabricating a claim.

216.  On February 23, 2023, Claimant J was diagnosed with post-laminectomy syndrome as a direct result of Khounganian's dangerous and unnecessary surgical procedure.

217.  In May 2023, Claimant J testified in his sworn deposition that he had hesitation with additional surgery, given his escalated pain. Claimant J testified that he wanted to seek a second opinion before making a final decision. Claimant J notably expressed that he wanted to "see [his] own doctors" before making a final decision to proceed with more surgery.

218.  Khounganian's office prepared bills for the resulting treatment pursuant to his sham lien agreement with Claimant J as follows:

   a.  September 25, 2021: $1,500

   b.  December 29, 2021: $100,000 (bill rendered on March 2, 2022)

   c.  April 18, 2022: $700

   d.  August 29, 2022: $700

219.  Upon information and belief, the bills together with their stated amounts were false and misleading, given that the side agreement with the Downtown LA Law Group was concealed. They were knowingly false when made, or made with

reckless indifference to the truth, given that Khounganian was aware of the secret side agreement to discount such bills.

220.   The majority of the treatment pursued and received by Claimant J was procured through medical lien billing with the various providers, totaling at least $234,771.

221.   On June 21, 2023, Claimant J was examined by an independent expert orthopedic surgeon who confirmed that there was no medical basis to support the surgery performed on December 29, 2021 to the lumbar spine. The expert confirmed that Claimant J did not exhibit injuries to the disc as a result of the subject accident. In addition, the expert opined that Claimant J's MRI did not identify any issues related to nerve compression or irritation. In fact, the expert concluded that the MRI identified spondylolisthesis at L4-L5, which is a degenerative condition and unrelated to the subject incident. The expert further concluded that there was no evidence to support that the subject incident altered, worsened, or in any way changed the patient's preexisting lumbar condition. The expert opined that the only identified injury related to the subject accident was a "muscle spasm." The expert concluded that the surgery recommended by Khounganian was a treatment for a degenerative and preexisting condition for the lumbar spine. In other words, Claimant J would have required this procedure independent of the trailer incident and there is no causal connection between any purported injuries to the underlying collision.

222.   Downtown LA Law Group, in conjunction with Khounganian, exploited a low-income, disabled claimant by knowingly, or with reckless indifference, directing Claimant J to receive a risky, damaging, and unnecessary surgical procedure for the purpose of artificially inflating his claimed damages.

223.   The matter was ultimately settled. In addition to the settlement amount, Uber incurred significant defense costs in defending against the litigation. These defense and settlement costs were substantially higher than they would have been

absent the fraudulent medical and billing records. Uber relied on the fraudulent medical and billing records in determining whether and on what terms to settle Claimant J's lawsuit.

### 11.    Personal Injury Claimant K

224.    On August 8, 2019, Claimant K was a passenger in a car driven by a driver using the Uber application that was involved in a minor accident in Los Angeles. The Uber vehicle was struck on the driver's side, and Claimant K was sitting in the back passenger seat. No airbags were deployed, and both vehicles sustained only minor damage. The police were called but did not respond to the scene. After the collision, Claimant K did not seek immediate medical treatment, but rather arranged another ride with a driver using the Uber application and went to work that day. Photos taken after the accident of the Honda driven by the driver using the Uber application, and the other vehicle, a black Mercedes, depict the minor nature of this collision:



225.    Within a few weeks of the accident, Claimant K retained Defendant Downtown LA Law Group for representation. Downtown LA Law Group then referred, encouraged, directed, or otherwise instructed Claimant K to obtain medical treatment from a select group of providers whom Downtown LA Law Group has a close relationship with, rather than using his available health insurance. Downtown LA Law Group knew the accident was not serious and had not caused significant

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

injury to Claimant K, yet it referred Claimant K to these medical providers for unnecessary medical treatment to artificially inflate the value of his claim. To facilitate this, Downtown LA Law Group signed sham lien agreements with the chosen providers and Claimant K.

226.   On September 9, 2019, Defendant Downtown LA Law Group sent an email to Defendant Khounganian's office asking that Claimant K be scheduled for an appointment "ASAP" and listing the type of case as "Passenger v. Uber Driver."

227.   Khounganian executed a sham lien agreement with Claimant K wherein Claimant K promised to repay Khounganian from recoveries for any claim. Upon information and belief, this agreement falsely stated that Claimant K was directly and unconditionally responsible for Khounganian's fees, and that the fees were not contingent on any settlement, judgment, verdict, or other recovery. Upon information and belief, such statements were knowingly false when made, given the concealed side agreement. Khounganian did not check the credit history of Claimant K before beginning treatment because Khounganian knew that he would surrender his rights to full payment in the event of a shortfall and that he would not, in fact, pursue any balance from the claimant.

228.   On September 30, 2019, less than two months after the accident, Claimant K had an initial visit with Khounganian. During this initial visit, Khounganian recommended that Claimant K undergo a cervical discectomy and fusion at C6-C7, with an estimated cost between $250,000 and $295,000. In Khounganian's report of this visit, he stated that Claimant K completed his current conservative management but was not seeing improvement. The "conservative management" consisted of two chiropractic sessions that Claimant K underwent on August 14, 2019, and August 19, 2019, with chiropractic manipulation performed during only one of these sessions.

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

229.   On October 23, 2019, less than one month after Claimant K first presented to Khounganian, Khounganian performed a C6-C7 decompression and discectomy at Avanguard Surgery Center.

230.   On October 30, 2019, Claimant K had a follow-up visit and appeared to be recovering. However, Claimant K returned less than a month later, on December 27, 2019, with complaints of increased pain after his recent cervical spine surgery. Claimant K was instructed to obtain a new MRI and return for reevaluation.

231.   On January 9, 2020, Claimant K presented for reevaluation following his recent MRI. Khounganian stated that Claimant K was experiencing nerve root irritation from scar tissue adjacent to his recent fusion, or at the level of the fusion itself. Khounganian recommended medication to reduce inflammation and discussed the possibility of injections or a cervical decompression surgery at an adjacent level or the level of Claimant K's prior procedure.

232.   On January 22, 2020, Claimant K obtained an additional MRI of his cervical spine. The radiology report reviewing this MRI noted degenerative changes around C6-C7, the same region of the spine where Khounganian had performed the October 2019 surgery.

233.   On February 27, 2020, Claimant K again presented for reevaluation with Khounganian, and reported feeling much better. Khounganian reviewed Claimant K's recent additional MRIs and noted there was no hardware failure, but that there was degeneration at other levels of Claimant K's spine that could be causing pain. Despite Claimant K's reports of lessened pain, Khounganian again discussed the possibility of additional spine surgery. Khounganian's report stated that Claimant K may need surgical intervention "in the future in the form of an extension of fusion," at an estimated cost between $250,000 and $295,000.

234.   Khounganian included a section labeled "CAUSATION" in reports for all of Claimant K's visits, including those with surgical recommendations, which

stated: "Within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." Khounganian knew or was recklessly indifferent to the fact that such statements were false when made, given the minor nature of the accident and Claimant K's degenerative conditions. Khounganian knew or was recklessly indifferent to the fact that the treatment and surgery recommendations he provided to Claimant K were unnecessary and/or causally unrelated to the August 2019 accident. Claimant K had obtained only minimal conservative treatment to alleviate his reported symptoms before Khounganian recommended that he undergo cervical spine surgery, less than two months after a minor accident. Khounganian knew or was recklessly indifferent to the fact that the treatment and surgery recommendations he provided were for the purpose of artificially increasing the value of Claimant K's lawsuit.

235.    Khounganian's office prepared bills for the resulting treatment pursuant to his sham lien agreement with Claimant K as follows:

      a. September 30, 2019: $1,500

      b. October 23, 2019: $120,000 (bill prepared on December 6, 2019)

      c. October 30, 2019: $700

      d. December 27, 2019: $700 (bill prepared on January 2, 2020)

      e. January 9, 2020: $700

      f. February 27, 2020: $700

236.    Avanguard Surgery Center's office prepared a bill for the resulting treatment totaling $106,390, pursuant to its sham lien agreement with Claimant K.

237.    Upon information and belief, the bills together with their stated amounts were materially false and misleading, given that the side agreement with Downtown LA Law Group was fraudulently concealed. Khounganian knew or was recklessly indifferent to the fact that the bills and their stated amounts were false and

misleading, given that he was aware of the secret side agreement to discount such bills in the event of a shortfall.

238. Defendant Downtown LA Law Group knew or was recklessly indifferent to the fact that such statements were false when made. It was aware that the accident was not serious and had not caused significant injury to Claimant K but referred Claimant K for unnecessary and/or causally unrelated medical treatment to artificially inflate the value of his claim.

239. The matter was ultimately settled. In addition to the settlement amount, Uber incurred significant costs in defending against the litigation. These defense and settlement costs were substantially higher than they would have been absent the fraudulent medical and billing records. Uber relied on the fraudulent medical and billing records in determining whether and on what terms to settle Claimant K's lawsuit.

### 12.    Personal Injury Claimant L

240. On January 2, 2019, Personal Injury Claimant L was a passenger in a vehicle involved in a low speed, three-car, rear-end collision in Los Angeles with a car driven by a driver logged into the Uber application. The police report characterized the incident as resulting in "property damage only," noting minor damage to all three vehicles. No injuries were reported at the scene, and paramedics were not called.

241. Claimant L did not seek emergency care after the accident.

242. Following the accident, Claimant L retained Downtown LA Law Group. Subsequently, Downtown LA Law Group referred, encouraged, directed, or otherwise instructed Claimant L to schedule appointments with a select group of medical providers with whom the firm had a close relationship. These providers rendered unnecessary treatments at excessive, above-market rates on a lien basis.

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

243.   To facilitate this arrangement, Downtown LA Law Group instructed Claimant L to enter into lien agreements with the chosen providers, opting not to utilize Claimant L's available medical insurance. Upon information and belief, Claimant L executed a sham lien agreement with Khounganian, promising to repay Khounganian from recoveries for any claim, and falsely stating that Khounganian's fees were not contingent on recovery. Upon information and belief, such statements were knowingly false when made, given the concealed side agreement that Khounganian would surrender his right to full payment in the event of a shortfall in the recovery of the claim. Khounganian did not check the credit history of Claimant L before beginning treatment because Khounganian knew that he would surrender his rights to full payment in the event of a shortfall and that he would not, in fact, pursue any balance from the claimant.

244.   Between January 8 and May 31, 2019, Claimant L sought treatment from a shock wave therapist and a chiropractor. Following the completion of such treatment, there was a three-month lapse in Claimant L's treatment.

245.   In late August 2019, and proceeding through 2020, Claimant L visited a pain management clinic, where he underwent lumbar medial branch blocks.

246.   To fraudulently and artificially increase the value of the claim, Defendant Downtown LA Law Group thereafter referred Claimant L to Khounganian.

247.   On July 16, 2020, Claimant L was evaluated by Khounganian for lower back pain. At this initial appointment, Khounganian opined that Claimant L would ultimately "need surgical management in the form of a lumbar microdiscectomy at L3-4 and L5-S1 secondary to injury sustained by this collision" at an estimated cost between $225,000 and $238,000.

248.   This recommendation for surgery was knowingly false when made. Upon information and belief, Khounganian knew or was recklessly indifferent to the

fact that Claimant L's surgery was unnecessary and not causally related to the minor accident, given that Claimant L had not sought treatment for nearly a week after the accident and that he had successfully managed any injury through chiropractic care and injections, and that such treatments were for the purpose of fabricating a claim.

249.   Khounganian further falsely stated that "within a reasonable degree of medical probability, the diagnosis above were caused and/or exacerbated by the injury during the date of loss"—*i.e.*, the January 2, 2019 rear-end collision. Upon information and belief, Khounganian knew or was recklessly indifferent to the fact that the statement was false when made, given that Claimant L had suffered no such injury.

250.   In addition to Khounganian's recommendation for causally unrelated surgery, with an estimated cost between $225,000 and $238,000, Khounganian's office prepared a $1,500 bill, on or about July 16, 2020, for the resulting treatment pursuant to the sham lien agreement.

251.   The bill and the amount were false and misleading given that the side agreement with the Downtown LA Law Group was concealed. They were knowingly false when made given that Khounganian was aware of the secret side agreement to discount such bills in the event of a shortfall.

252.   Khounganian referred Claimant L to an acupuncturist, with whom he completed six sessions, and a physical therapist practice, where he attended approximately fifteen sessions. By the end of these treatments Claimant L reported low or no pain.

253.   On December 23, 2020, Claimant L filed a lawsuit against Uber and was represented by the Downtown LA Law Group, including, among others, Igor Fradkin.

254.   On March 12, 2021, and in furtherance of the scheme, Defendant Downtown LA Law Group emailed a demand letter signed by Defendant Fradkin to

Uber's counsel demanding $750,000 to resolve Claimant L's claims. The letter falsely represented as follows:

> On January 2, 2019 our client [Claimant L] was involved in a serious auto accident with your driver […]. The accident caused significant bodily injuries to [Claimant L]. These injuries continue to disrupt [Claimant L]'s quality of life and will require long term future medical care.

255.  Upon information and belief, Fradkin and Downtown LA Law Group knew or were recklessly indifferent to the fact that such statements were false when made. Among other things, they were aware that the accident was not serious and that they had referred Claimant L for unnecessary medical treatment.

256.  The matter was ultimately settled. In addition to the settlement amount, Uber incurred significant defense costs in defending against the litigation. These defense and settlement costs were substantially higher than they would have been absent the fraudulent medical and billing records. Uber relied on the fraudulent medical and billing records in determining whether and on what terms to settle Claimant L's lawsuit.

### 13.    Personal Injury Claimant M

257.  On January 16, 2020, Claimant M was a passenger in a car driven by a driver logged into the Uber application when the car was involved in a collision at an intersection in Los Angeles. Claimant M was seated in the back passenger seat, and the Uber vehicle was hit on the front driver's side. Police responded to the accident scene, but no airbags were deployed and Claimant M did not seek immediate medical treatment.

258.  The day after the incident, January 17, 2020, Claimant M presented to Kaiser urgent care with complaints of low back and neck pain. Claimant M was diagnosed with muscular pains, and was instructed to apply ice and heat, and take

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

Tylenol as needed. The medical provider noted that such muscle soreness could last for a few weeks.

259. Claimant M retained Defendant Downtown LA Law Group for representation shortly after his Kaiser visit. Upon information and belief, Downtown LA Law Group then referred, encouraged, directed, or otherwise instructed Claimant M to obtain medical treatment from a select group of providers whom Downtown LA Law Group has a close relationship with, rather than using his available health insurance. Downtown LA Law Group knew the accident was not serious and had not caused Claimant M significant injury, yet they referred Claimant M to these medical providers for unnecessary medical treatment to artificially inflate the value of his claim. To facilitate this, sham lien agreements were executed between the chosen providers and Claimant M.

260. On January 21, 2020, Claimant M was evaluated by a chiropractor, with Downtown LA Law Group listed as his attorney on the chiropractor's intake forms. The medical provider referred Claimant M to obtain updated x-rays of his cervical and lumbar spine, which Claimant M completed on January 27, 2020. Following that x-ray appointment, Claimant M waited over five months before seeking any further medical treatment.

261. Between August 14, 2020, and December 10, 2020, Claimant M underwent chiropractic care and acupuncture, as well as eight physical therapy sessions where he was discharged with good prognosis and transition to a home exercise plan. Between July 8, 2020, and March 3, 2021, Claimant M also had eight visits with a pain management expert, which included two different epidural injections.

262. Upon information and belief, Claimant M was next referred to Defendant Khounganian for unnecessary and/or unrelated medical treatment to artificially increase the value of the claim.

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

263.   Khounganian executed a sham lien agreement with Claimant M wherein Claimant M promised to repay Khounganian from recoveries for any claim. This agreement falsely stated that Claimant M was directly and unconditionally responsible for Khounganian's fees, and that the fees were not contingent on any settlement, judgment, verdict, or other recovery. Upon information and belief, such statements were knowingly false when made, given the concealed side agreements. Khounganian did not check the credit history of Claimant M before beginning treatment because Khounganian knew that he would surrender his rights to full payment in the event of a shortfall and that he would not, in fact, pursue any balance from the claimant.

264.   On May 6, 2021, Claimant M had an initial consultation with Khounganian. During the initial visit, Khounganian recommended that Claimant M undergo lumbar decompression surgery with an estimated cost between $215,000 and $238,000.  Khounganian did not recommend any conservative treatment.

265.   On July 27, 2021, Khounganian performed L4-L5 and L5-S1 lumbar decompression surgery at Avanguard Surgery Center.

266.   Khounganian included a section labeled "CAUSATION" in reports for all of Claimant M's visits, including those with surgical recommendations, which stated: "Within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." Khounganian knew or was recklessly indifferent to the fact that such statements were false when made.  Khounganian knew or was recklessly indifferent to the fact that the treatments he provided to Claimant M were unnecessary and causally unrelated to the January 2020 accident and were for the purpose of artificially inflating the value of his claim.

267.   Khounganian's office prepared bills for the resulting treatment pursuant to his sham lien agreement with Claimant M as follows:

    a.  May 6, 2021: $1,500

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

b. July 27, 2021: $100,002 (bill prepared on September 17, 2021)

c. August 2, 2021: $700

d. August 26, 2021: $700

268.  Avanguard Surgery Center's office prepared a bill for the resulting treatment totaling $90,529.

269.  Upon information and belief, the bills together with their stated amounts were materially false and misleading, given that the side agreement with Downtown LA Law Group was fraudulently concealed. Khounganian knew or was recklessly indifferent to the fact that the bills and their stated amounts were false and misleading, given that he was aware of the secret side agreement to discount such bills in the event of a shortfall.

270.  Defendant Downtown LA Law Group knew or was recklessly indifferent to the fact that such statements were false when made. It was aware that the accident was not serious and had not caused Claimant M significant injury, yet it referred Claimant M for unnecessary and causally unrelated medical treatment to artificially inflate the value of his claim.

271.  The matter was ultimately settled. In addition to the settlement amount, Uber incurred significant costs in defending against the litigation. These defense and settlement costs were substantially higher than they would have been absent the fraudulent medical and billing records. Uber relied on the fraudulent medical and billing records in determining whether and on what terms to settle Claimant M's lawsuit.

### 14.  Personal Injury Claimant N

272.  On February 11, 2022, Claimant N visited Downtown LA Law Group offices regarding representation in a prior accident. At that time, Downtown LA Law Group offered to arrange a ride with a driver using the Uber application for him so he could cash a check. Claimant N was riding in the back seat of the car that

-72-

Downtown LA Law Group had called for him when it was involved in a collision with another vehicle. No police or ambulances were called to the scene. Claimant N left the scene shortly after the accident. He walked to a nearby train station, took a train, and walked from the station to a check cashing location.

273.   Claimant N had already had a relationship with Downtown LA Law Group due to an earlier collision involving a car driven by a driver logged into the Uber application in 2020. During representation for that previous accident, Downtown LA Law Group referred Claimant N to Khounganian, who performed two different back surgeries on Claimant N.

274.   Following the February 2022 accident, Claimant N again retained Downtown LA Law Group for representation. Downtown LA Law Group referred, encouraged, directed, or otherwise instructed Claimant N to schedule appointments with a hand-picked group of medical providers with whom the firm maintained a close relationship. These referrals were not based on medical necessity but were part of a coordinated kickback scheme between Downtown LA Law Group and its preferred providers. The scheme's purpose was to generate fraudulent medical records and artificially inflated bills to support exaggerated claims, thereby increasing settlement leverage. According to an unsolicited email Claimant N sent to counsel for Uber, Defendants Downtown LA Law Group and Khounganian were engaged in "padded medical billing."

275.   Between February 22, 2022, and March 26, 2022, Claimant N sought treatment from two different providers: one for spine and shoulder complaints, and another for ankle complaints. Both medical providers recommended that Claimant N seek conservative treatment for his complaints.

276.   Instead of following these initial recommendations for conservative treatment, Claimant N presented to Khounganian, who had already performed two spine surgeries on Claimant N following his prior accident.

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

277.   Upon information and belief, Khounganian executed a sham lien agreement with Claimant N wherein Claimant N promised to repay Khounganian from recoveries for any claim. Such agreement falsely stated that Claimant N was directly and unconditionally responsible for Khounganian's fees, and that the fees were not contingent on any settlement, judgment, verdict, or other recovery. Upon information and belief, such statements were knowingly false when made given the concealed side agreements. Khounganian did not check the credit history of Claimant N before beginning treatment because Khounganian knew that he would surrender his rights to full payment in the event of a shortfall and that he would not, in fact, pursue any balance from the claimant.

278.   On April 7, 2022, Claimant N saw Khounganian for an evaluation, during which Khounganian recommended additional spine surgery: disc replacements at C4-5, C5-6, L4-L5, and L5-S1.

279.   On June 16, 2023, Khounganian performed cervical spine surgery at Sherman Oaks Surgery Center, which is another name used by Radiance Surgery Center.

280.   Between May 7, 2022, and September 26, 2023, Claimant N received additional treatment, including physical therapy sessions. Claimant N also was seen for follow-up visits with Khounganian on June 21, 2023; July 17, 2023; and March 18, 2024.

281.   Following the February 11, 2022 accident, Claimant N has been involved in at least two additional incidents: on May 27, 2022, Claimant N was beat up by a bouncer at a nightclub, causing head, neck, lower back, and foot injuries; and on May 19, 2024, Claimant N was involved in an additional motor vehicle collision that did not involve a driver logged into the Uber application.

282.   Upon information and belief based on Khounganian's typical practice, despite Khounganian's knowledge of Claimant N's prior accidents and the May 27,

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

2022 incident, Khounganian included a section labeled "CAUSATION" in the report of Claimant N's visit, which stated: "Within a reasonable degree of medical probability, the diagnosis above were caused by the injury during the date of loss." Khounganian knew or was recklessly indifferent to the fact that such statements were false, given the minor nature of the February 2022 collision and Claimant N's history of accidents and medical treatment. Khounganian knew or was recklessly indifferent to the fact that the treatments he provided to Claimant N were unnecessary and causally unrelated to the February 2022 accident and were for the purpose of fabricating a claim.

283.    Khounganian's office prepared bills for the resulting treatment pursuant to his sham lien agreement with Claimant N as follows:

a.    April 7, 2022: $1,500 (bill rendered on April 11, 2022)

b.    December 7, 2022: $1,500 (bill rendered on December 8, 2022)

c.    March 20, 2023: $700

d.    June 16, 2023: $125,309.87 (bill rendered on August 29, 2023)

e.    June 21, 2023: $700

f.    July 17, 2023: $700

g.    March 18, 2024: $700

284.    Upon information and belief, these bills, together with their stated amounts, were materially false and misleading, given that the side agreements with the Downtown LA Law Group were fraudulently concealed. Khounganian knew or was recklessly indifferent to the fact that the bills and their stated amounts were false and misleading, given that he was aware of the secret side agreement to discount such bills in the event of a shortfall.

285.    Defendant Downtown LA Law Group knew or was recklessly indifferent to the fact that such statements were false when made. Downtown LA Law Group was aware of Claimant N's prior injuries and treatment yet referred

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

Claimant N for additional medical treatment to artificially inflate the value of his most recent claim. This additional medical treatment was unnecessary and/or causally unrelated to the February 2022 accident.

286.   The matter was ultimately settled. In addition to the settlement amount, Uber incurred significant costs in defending against the litigation. These defense and settlement costs were substantially higher than they would have been absent the fraudulent medical and billing records. Uber relied on the fraudulent medical and billing records in determining whether and on what terms to settle Claimant N's lawsuit.

287.   On September 15, 2025, Claimant N sent an unsolicited email to counsel for Uber regarding his experience with Downtown LA Law Group. In the email, Claimant N asserts that Downtown LA Law Group was withholding "[u]ndisputed funds" of his totaling more than $165,000. He also states that Fradkin "personally told" him that "they used medical bills from other cases to leverage [his] Uber settlement," and that the firm engaged in "[d]uplicate / inflated billing." A copy of the email with names and other identifying information redacted appears below:

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

My name is ███████████, plaintiff in ██████ v. Downtown LA Law Group LLP & ███████ (Case No. ████████████). I believe my case provides **first-hand evidence of systemic misconduct by Downtown LA Law** that overlaps directly with Uber's pending RICO claims.

Key facts:

- **Undisputed funds withheld:** $165,682+ being held despite **Liberty Legal confirming no dispute exists**, only priority payment, which I accepted.
- **Mischaracterization of "priority" as "dispute":** DTLA has deliberately misused the term "dispute" to justify stalling and threatening interpleader/arbitration, in direct violation of Rule 1.15(d).
- **Duplicate / inflated billing:** I have a lien sheet with **duplicate charges across multiple cases** used to pad liens and block disbursement.
- **Direct admission from Igor:** After a mediation session, **Igor personally told me** they used medical bills from other cases to leverage my Uber settlement. This wasn't in writing; it was said directly to me.
- **Threats & obstruction:** ████ has threatened me for pressing him on this, including statements implying harm if I pursued complaints.
- **Judicial acknowledgment:** In my recent ex parte hearings, the judge stated on record this is a **State Bar issue**, and I have filed these facts under **State Bar Complaint No.** ██████.

This conduct isn't isolated. It shows the same **pattern of fraudulent billing, lien manipulation, and trust account abuse** that Uber alleges in its RICO complaint. I have clean, organized exhibits (emails, lien duplicates, Liberty confirmations, service proofs, minute orders) ready to provide.

### 15.    Personal Injury Claimant O

288.    On June 28, 2019, Claimant O requested a ride with a driver logged into the Uber application. While Claimant O was reaching for the car door handle to enter the vehicle, the Uber began to drive away. Claimant O's hand was still on the handle, which pulled him forward and purportedly caused him to fall. Claimant O did not call the police or receive any emergency medical treatment. When Claimant O presented to an Emergency Room three days after this incident, he made no mention of any neck or back pain but rather complained of anxiety and sought a refill of his Xanax prescription.

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

289.   Following the incident, Claimant O retained Defendant Igor Fradkin and Downtown LA Law Group to represent him in a lawsuit against Uber. Upon information and belief, Fradkin and Downtown LA Law Group referred, encouraged, directed, or otherwise instructed Claimant O to schedule appointments with a select group of medical providers with whom Fradkin and Downtown LA Law Group maintained a close relationship. They were aware that the accident was not serious and had not caused Claimant O significant injury, yet they referred him to these medical providers for unnecessary and causally unrelated medical treatment to artificially inflate the value of his claim. To facilitate this, Fradkin and Downtown LA Law Group signed sham lien agreements with the chosen providers and Claimant O, opting not to utilize Claimant O's available medical insurance, which Claimant O used during the same period for other treatment.

290.   Claimant O first sought medical treatment relating to the June 2019 incident over six months later, on February 20, 2020. On that date, Claimant O presented to a medical provider for an evaluation. The medical provider ordered further MRIs and suggested conservative care such as physical therapy or chiropractic care.

291.   Rather than receiving conservative care, as he was encouraged to do, Claimant O was funneled into a sequence of high-cost interventions, including injections and multiple spinal surgeries.

292.   Upon information and belief, Defendants Fradkin and Downtown LA Law Group referred, encouraged, directed, or otherwise instructed Claimant O to begin treatment with Defendant Khounganian in order to artificially increase the value of the claim.

293.   Khounganian executed a sham lien agreement with Claimant O wherein Claimant O promised to repay Khounganian from recoveries for any claim. This agreement falsely stated that Claimant O was directly and unconditionally

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

responsible for Khounganian's fees, and that the fees were not contingent on any settlement, judgment, verdict, or other recovery. Upon information and belief, such statements were knowingly false when made, given the concealed side agreements. Khounganian did not check the credit history of Claimant O before beginning treatment because Khounganian knew that he would surrender his rights to full payment in the event of a shortfall and that he would not, in fact, pursue any balance from the claimant.

294.   On March 2, 2020, Claimant O had an initial consultation with Khounganian. Khounganian recommended that Claimant O see a pain management specialist for injections for the cervical and/or lumbar spine, and begin physical therapy; with Claimant O to return for reevaluation of possible cervical disc fusion surgery and a lumbar microdiscectomy procedure.

295.   On March 13, 2020, Claimant O saw a pain management specialist for an initial consultation, during which the provider recommended medial block branch injections. On April 17, 2020, Claimant O underwent bilateral L3 and L4 medial branch blocks, and a bilateral L5 posterior rami block. On May 8, 2020, Claimant O underwent a left L3 and L4 medial branch blocks, and a left L5 posterior rami block.

296.   On May 11, 2020, Claimant O returned to Khounganian for additional treatment following injections. Khounganian recommended a lumbar microdiscectomy, with an estimated cost between $215,000 and $238,000. Khounganian also recommended that Claimant O either seek injections for his neck or undergo a two-level cervical discectomy and fusion, with an estimated cost between $250,000 and $295,000. Claimant O agreed to undergo the lumbar microdiscectomy, which was then arranged to occur at Radiance Surgery Center.

297.   Less than two weeks after the surgical recommendation, on May 22, 2020, Khounganian performed a lumbar surgery on Claimant O at Radiance Surgery Center. On June 3, 2020, and June 24, 2020, Claimant O had follow-up visits. On

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

June 24, 2020, just over one month after his lumbar surgery, Claimant O indicated that he was ready to proceed with another spine surgery.

298. Less than two months after the first surgery, on July 3, 2020, Khounganian performed cervical spine surgery on Claimant O at Sherman Oaks Surgery Center, another name used by Radiance Surgery Center.

299. An independent medical evaluation of Claimant O's medical history found that Claimant O experienced low back pain for at least five years leading up to the June 2019 incident. In 2014, Claimant O had four days of low back pain without injury and muscle spasms; in 2015, intermittent midline and low back pain over ten days; and in 2016, treatment following a motor vehicle accident, with imaging documenting degenerative changes in the spine, but no acute findings. The independent medical evaluation concluded that Claimant O had significant, pre-existing, degenerative changes in his spine. Because of this, the independent medical expert stated that they could not attribute any aggravation or injury to Claimant O's spine resulting from the June 2019 incident.

300. Khounganian included a section labeled "CAUSATION" in reports for all of Claimant O's visits, including those with surgical recommendations, which stated: "Within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." These statements were knowingly false when made. Khounganian knew or was recklessly indifferent to the fact that such statements were false, given the very minor nature of Claimant O's incident, and the showing of degenerative changes in Claimant O's spine, and Claimant O's history of back and neck pain. Khounganian knew or was recklessly indifferent to the fact that the treatments he provided to Claimant O were unnecessary, not causally connected to the incident, and were for the purpose of fabricating a claim.

301.    Khounganian's office prepared bills for the resulting treatment pursuant to his sham lien agreement with Claimant O as follows:

a.    March 2, 2020: $1,500

b.    May 11, 2020: $700

c.    May 22, 2020: $100,000 (bill rendered on June 6, 2020)

d.    June 3, 2020: $700

e.    June 24, 2020: $700 (bill rendered on June 25, 2020)

f.    July 3, 2020: $125,000 (bill rendered on July 14, 2020)

g.    July 9, 2020: $700

h.    July 30, 2020: $700

302.    Upon information and belief, the bills together with their stated amounts were materially false and misleading, given that the side agreement with the Downtown LA Law Group was fraudulently concealed. Khounganian knew or was recklessly indifferent to the fact that the bills and their stated amounts were false and misleading, given that he was aware of the secret side agreement to discount such bills in the event of a shortfall.

303.    Defendants Igor Fradkin and Downtown LA Law Group knew or were recklessly indifferent to the fact that such statements were false when made. They were aware that the accident was not serious and had not caused Claimant O any injury, yet they referred Claimant O, who had financial struggles and a history of substance abuse, for unnecessary and/or causally unrelated medical treatment to artificially inflate the value of his claim.

304.    The matter was ultimately settled. In addition to the settlement amount, Uber incurred significant costs in defending against the litigation. These defense and settlement costs were substantially higher than they would have been absent the fraudulent medical and billing records. Uber relied on the fraudulent medical and

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

billing records in determining whether and on what terms to settle Claimant O's lawsuit.

### 16.    Personal Injury Claimant P

305.    On March 8, 2019, Personal Injury Claimant P was traveling in a car driven by a driver logged into the Uber application when the driver's vehicle had a minor collision with another vehicle at an intersection in Los Angeles. Claimant P was sitting in the rear passenger's side at the time and on the opposite side from where the impact occurred. Neither police nor paramedics arrived at the scene, and Claimant P did not seek any immediate medical attention. Claimant P was en route to Los Angeles International Airport (LAX) for a flight to return home to St. Louis, Missouri. Within minutes of the accident, Claimant P hailed another ride to the airport and flew back to St. Louis that day. Claimant P has continued to live in or around St. Louis—more than 1,800 miles away from Los Angeles—since the accident.

306.    Claimant P first sought treatment for his injuries on March 14, 2019, eight days after the accident, at a chiropractic facility in St. Louis. Over the next month and a half, Claimant P attended approximately 16 chiropractic sessions in St. Louis. By late April 2019, Claimant P reported nearly non-existent pain in his neck (1/10 pain level), upper back (1/10), lower back (2/10), and shoulders (1/10). Claimant P did not report any higher level of pain in his lower back in his six preceding chiropractic sessions.

307.    Claimant P then had a four-month gap in treatment. The treating doctor at Claimant P's last chiropractic session noted there was "no reason to expect any major change in [Claimant P]'s clinical picture in the near future."

308.    Additionally, after the accident and throughout the relevant time, Claimant P posted multiple video clips of himself online that showed he did not have debilitating back pain. For instance, on April 5, 2019—less than a month after the

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

accident—Claimant P posted online a video clip of himself bouncing, dancing, and singing as part of a music video.

309.   Within a few weeks of the accident, in or around March 2019, Claimant P retained Downtown LA Law Group. Subsequently, Downtown LA Law Group referred, encouraged, directed, or otherwise instructed Claimant P to schedule appointments with a select group of medical providers upon whom the firm relied to render unnecessary treatments at excessive above-market rates on a lien basis.

310.   On September 5, 2019, after over four months of no treatment for Claimant P, and despite him reporting low to non-existent pain levels at his last chiropractic session conducted in his home state of Missouri, Downtown LA Law Group directed Claimant P to Khounganian—in California.  Claimant P executed a sham lien agreement with Khounganian promising to repay Khounganian from recoveries for any claim. The agreement falsely stated that Khounganian's fee was not contingent on recovery. Such statement was knowingly false when made, given the concealed side agreement that Khounganian would surrender his right to full payment in the event of a shortfall in the recovery for the claim. Khounganian did not check the credit history of Claimant P before beginning treatment because Khounganian knew that he would surrender his rights to full payment in the event of a shortfall and that he would not, in fact, pursue any balance from the claimant.

311.   At Khounganian's office, Claimant P reported lumbar spine pain with radiating symptoms to his left lower extremities. Khounganian knowingly and falsely stated that Claimant P had "[a]pproximately 50% of normal observed" range of motion in his lumbar spine and, moreover, that Claimant P was "being treated by a chiropractor, however he ate [sic] discontinued treatment due to the severity and worsening symptoms[.]"

312.   Upon information and belief, Khounganian knew or was recklessly indifferent to the fact that Claimant P's stated injuries were false, given that Claimant

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

P had not sought treatment for more than a week after the LAX accident, he had achieved nearly non-existent pain levels through chiropractic care and did not, as Khounganian falsely claimed, stop going because of "worsening symptoms." Khounganian's treatments were unnecessary and were for the purpose of fabricating a claim.

313.  Khounganian also knowingly, or with reckless indifference, falsely stated that "within a reasonable degree of medical probability, the diagnosis above were caused by the injury during the date of loss."—*i.e.*, the March 8, 2019 minor accident en route to LAX. Upon information and belief, Khounganian knew or was recklessly indifferent to the fact that the statement was false when made given that Claimant P had suffered no such injury.

314.  Despite Claimant P reporting no neck pain, Khounganian diagnosed Claimant P with, among other things, cervicalgia (*i.e.*, neck pain) and other cervical disc displacement. And despite the apparent improvement in Claimant P's condition, Khounganian again recommended a L5-S1 microdiscectomy and cervical spine injections. He also recommended a C3-C4 disc replacement if Claimant P's condition did not improve.

315.  On March 1, 2021, Claimant P filed a lawsuit against Uber and was represented by Downtown LA Law Group, including, among others, Igor Fradkin.

316.  On October 12, 2021, Khounganian knowingly or with reckless indifference to the truth falsely stated that "due to failure of conservative management, surgical intervention is medically necessary for L5-S1 microdiscectomy." Claimant P then received no treatment for eleven months until another visit with Khounganian, again in Los Angeles, on September 24, 2022.

317.  On January 17, 2023, Claimant P underwent an L5-S1 microdiscectomy and decompression with Khounganian in Los Angeles. According to Claimant P, neither he nor his lawyers—but rather Khounganian, his doctor—paid for both his

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

and his mother's roundtrip airfare from St. Louis to LAX and his hotel accommodations for his surgery.

318.   Claimant P received no further treatment except on January 24, 2023, when Claimant P had a post-surgery virtual telehealth visit. Claimant P's medical bills totaled $51,423 excluding surgery and $246,000 including surgery.

319.   Khounganian's office prepared health insurance claim forms for some of the resulting treatment pursuant to his sham lien agreement with Claimant P. The claim forms included the following charges:

        a.      September 5, 2019: $1,500

        b.      December 5, 2020: $700

        c.      October 12, 2021: $700

        d.      September 24, 2022: $700

        e.      November 22, 2022: $700

        f.      January 16, 2023: $700

        g.      January 17, 2023: $85,777.93 (bill rendered on February 15, 2023)

        h.      January 24, 2023: $700

320.   The bills together with their stated amounts were false and misleading given that the side agreement with Downtown LA Law Group was concealed. They were knowingly false when made, or made with reckless indifference to the truth, given that Khounganian was aware of the concealed side agreement to discount such bills in the event of a shortfall in recovery.

321.   These amounts charged in the medical bills were artificially inflated far above market rates. Khounganian's total bill of $108,463.15 for his services was particularly excessive. An independent expert determined the reasonable value of those services to be $10,374.98, less than one-tenth as much.

322.    In May 2023, Claimant P testified in his sworn deposition in his personal injury case that he never paid anything to Khounganian, never saw an invoice or bill from Khounganian, and never was told by Khounganian or his office that he was late on any payment.

323.    Claimant P's lumbar surgery was neither medically necessary nor causally related to the minor accident. MRI scans indicate that Claimant P's herniation at L5-S1 was decreasing in size, yet Khounganian nevertheless operated on Claimant P. Upon information and belief, Khounganian knew or was recklessly indifferent to the fact that Claimant P's stated injuries were false and that the treatments he recommended were unnecessary, not causally connected to the accident, and were recommended fraudulently for the purpose of artificially inflating Claimant P's claimed damages.

324.    Claimant P's case settled in mediation. In addition to the settlement amount, Uber incurred significant costs in defending the litigation. These defense and settlement costs were substantially higher than they would have been absent the fraudulent medical and billing records. Uber relied on the fraudulent medical and billing records in determining whether and on what terms to settle Claimant P's lawsuit.

### 17.    Personal Injury Claimant Q

325.    On November 29, 2018, Claimant Q was a passenger in a car driven by a driver logged into the Uber application when the driver's Cadillac was side-swiped by a truck. The Uber driver chased after the truck driver in an attempt to flag him down. No ambulance or police were called to the scene. Shortly after the incident, Claimant Q left the scene in another car driven by a driver logged into the Uber application and met his girlfriend for dinner. Photos of the negligible damage to the Cadillac are depicted below:

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT



326.   Claimant Q was previously represented by Defendant Downtown LA Law Group due to an earlier motor vehicle collision as an Uber driver in 2017. In connection with that matter, Claimant Q sought treatment from a chiropractor, received injections, and received two surgical estimates for his right shoulder.

327.   Following the November 2018 incident, Claimant Q contacted Downtown LA Law Group prior to beginning any medical treatment. Thereafter, Downtown LA Law Group referred, encouraged, directed, or otherwise instructed Claimant Q to schedule appointments with a select group of medical providers with whom the firm maintained a close relationship. These referrals were part of a coordinated kickback scheme between Downtown LA Law Group and its preferred providers to render medical treatment to Claimant Q that was unnecessary and causally unrelated to the November 2018 accident. The scheme's purpose was to generate fraudulent medical records and inflated bills to support exaggerated claims, thereby increasing settlement leverage. Claimant Q did not utilize his insurance coverage for his treatment.

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

328.   Shortly after contacting Downtown LA Law Group, Claimant Q sought medical treatment on December 7, 2018, more than a week after the collision. He attended approximately 24 chiropractic sessions through May 2019.

329.   On February 25, 2019, Claimant Q began seeing a pain management specialist recommended to him by Downtown LA Law Group. On April 27, 2019, Claimant Q received an L4-5 epidural steroid injection, as well as a left SI joint injection and trigger point injection to the cervical trapezius muscle.

330.   On May 16, 2019, Claimant Q presented to Defendant Khounganian. Khounganian asserted that Claimant Q had abnormal range of motion in his cervical and lumbar spine, "approximately 50% of normal observed." Khounganian further asserted that Claimant Q would benefit from an L3-4 discectomy. Khounganian provided an estimate for this procedure, claiming that the approximate cost would be "$85,000 for surgeon's fee, $15,000 for assistant surgeon's fee, and approximately $125,000 for facility, anesthesia, and postop rehabilitation." Khounganian additionally recommended a one level cervical discectomy and fusion or disc replacement and approximated a cost of "$85,000 for surgeon's fee, $15,000 for assistant surgeon's fee, and approximately $125,000 for facility, anesthesia, and postop rehabilitation."

331.   Khounganian also asserted that "within a reasonable degree of medical probability, the diagnosis above were caused by the injury during the date of loss." Khounganian knew or was recklessly indifferent to the fact that such statements were false when made, given that the accident was not serious and did not cause injury to Claimant Q.

332.   Claimant Q executed a sham lien agreement with Khounganian promising to repay Khounganian from recoveries for any claim. Upon information and belief, the agreement stated that the claimant was directly and unconditionally responsible for the medical provider's fees, and that the fees were not contingent on

any settlement, judgment, verdict, or other recovery. Upon information and belief, such statements were knowingly false when made given the concealed side agreement. Khounganian did not check the credit history of Claimant Q before beginning treatment because Khounganian knew that he would surrender his rights to full payment in the event of a shortfall and that he would not, in fact, pursue any balance from the claimant.

333.   In addition to the $450,000 in fraudulent surgical estimates, Khounganian's office prepared a bill for the surgical consultation pursuant to his sham lien agreement with Claimant Q on May 16, 2019, for a total of $1,500.

334.   The bill with its stated amount was false and misleading, given that the side agreement with the Downtown LA Law Group was concealed. It was knowingly false when made, or made with reckless indifference to the truth, given that Khounganian was aware of the secret side agreement to discount such bills in the event of a shortfall.

335.   On June 22, 2021, in furtherance of the scheme, Defendant Downtown LA Law Group sent a demand letter, via email, signed by Defendant Igor Fradkin, demanding $1 million to settle Claimant Q's claim. The demand letter falsely represented that Claimant Q sustained significant injuries requiring surgical intervention to resolve. The demand incorporated Khounganian's false surgical estimates including $225,000 for an L3-4 discectomy and $225,000 for a one level cervical discectomy/fusion or disc replacement, as a basis for recovery.

336.   Defendant Downtown LA Law Group knew or was recklessly indifferent to the fact that such statements were false when made. The Downtown LA Law Group was aware that the accident was not serious and did not cause injury to Claimant Q, yet it referred Claimant Q for unnecessary medical treatment and surgical recommendations to artificially inflate the value of his claim.

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

337.    The majority of the treatment Claimant Q received was procured through medical lien billing with the various providers, totaling at least $50,917.20. Claimant Q's future medical expenses claimed by the Downtown LA Law Group arose solely from Khounganian's fraudulent surgical estimates.

338.    On November 22, 2021, Claimant Q was examined for an independent medical examination. The medical expert concluded that Claimant Q's MRIs showed mild degenerative changes at L3-L4, mild degenerative changes in the cervical spine that are normal for his age. He ultimately concluded that "there are no findings on any of these scans that one can relate to the subject accident." The expert further noted that Claimant Q's L4-L5 epidural steroid injections, left SI joint injections, and trigger point injections in the cervical spine were not reasonable and appropriate treatment because (1) they were all done at the same time, (2) there was no evidence of L5 radiculopathy, and (3) there was no evidence of SI joint dysfunction. The expert noted that most of the bills for Claimant's care exceeded the reasonable value. Finally, the medical expert concluded that "reasonable treatment would have been the initial chiropractic care along with the x-rays and the MRI scans" and that Claimant Q's "subjective complaints of constant pain . . . are not supported by any objective findings on exam or diagnostic testing."

339.    The matter was ultimately settled. In addition to the settlement amount, Uber incurred significant costs in defending against the litigation. These defense and settlement costs were substantially higher than they would have been absent the fraudulent medical and billing records. Uber relied on the fraudulent medical and billing records in determining whether and on what terms to settle Claimant Q's lawsuit.

### 18.    Personal Injury Claimant R

340.    On May 11, 2019, Claimant R was entering a car driven by a driver logged into the Uber application when the car briefly reversed, running over a portion

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

of his right foot. Claimant R did not call the police or summon an ambulance after this incident. Instead, Claimant R completed the ride home and did not seek any immediate medical attention.

341.   Claimant R did not seek medical treatment in the days following the incident but retained Defendant Downtown LA Law Group two days later, on May 13, 2019. Downtown LA Law Group then referred, encouraged, directed, or otherwise instructed Claimant R to obtain medical treatment from a select group of providers whom Downtown LA Law Group has a close relationship with, rather than using his available health insurance. Downtown LA Law Group knew the accident was not serious and did not cause significant injury to Claimant R, yet it referred Claimant R to these medical providers for unnecessary medical treatment to artificially inflate the value of his claim. To facilitate this, Downtown LA Law Group signed sham lien agreements with the chosen providers and Claimant R.

342.   On May 15, just two days after retaining Defendant Downtown LA Law Group, Claimant R visited a medical provider for complaints of pain in his right foot, per his attorney's recommendation. During this evaluation, Claimant R was recommended to obtain an MRI of his right ankle.

343.   On July 25, 2019, and proceeding through August 2019, Claimant R visited a pain management provider referred by Downtown LA Law Group.

344.   Downtown LA Law Group next referred Claimant R to Defendant Khounganian to artificially inflate the value of the claim with unnecessary medical treatment relating to Claimant R's spine.

345.   Khounganian executed a sham lien agreement with Claimant R wherein Claimant R promised to repay Khounganian from recoveries for the claim. Upon information and belief, this agreement falsely stated that Claimant R was directly and unconditionally responsible for the medical providers' fees, and that the fees were not contingent on any settlement, judgment, verdict, or other recovery. Upon

information and belief, such statements were knowingly false when made, given the concealed side agreements. Khounganian did not check the credit history of Claimant R before beginning treatment because Khounganian knew that he would surrender his rights to full payment in the event of a shortfall and that he would not, in fact, pursue any balance from the claimant.

346. On July 29, 2019, Claimant R had an initial consultation with Khounganian. During this visit, Khounganian asserted that Claimant R's difficulty with ambulation, due to pain in his right ankle, had caused overcompensation in his lower back. Khounganian ordered an MRI of Claimant R's lower back and instructed Claimant R to return for further assessment.

347. On August 26, 2019, following that MRI, Claimant R returned to Khounganian for further assessment. Khounganian recommended that Claimant R undergo a lumbar discectomy and estimated the surgery would cost between $225,000 and $238,000.

348. On February 10, 2020, Claimant R returned to Khounganian to further discuss possible spinal surgery or pain management injections. Again, Khounganian recommended that Claimant R undergo a lumbar discectomy with an estimated cost between $225,000 and $238,000.

349. Claimant R did not return to Khounganian following the February 10, 2020, visit. Claimant R testified in his deposition that he had significant hesitations about undergoing the back surgery Khounganian suggested. Claimant R believed the surgery seemed invasive and disproportionate to his situation. For this reason, Claimant R sought out a second opinion for any surgical treatment. Claimant R decided to not proceed with any surgeries related to his complaints of back pain. Claimant R did receive additional treatment for his ankle and foot pain, including a spinal cord stimulator trial, but did not opt to undergo a permanent placement of the stimulator.

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

350.   Khounganian prepared reports for each of Claimant R's visits, including those with spine surgery recommendations. In his reports, Khounganian included a section labeled "CAUSATION" which stated: "Within a reasonable degree of medical probability, the diagnosis above were caused by the injury during the date of loss." Khounganian knew or was recklessly indifferent to the fact that such statements were false when made, as the accident involved Claimant R's right foot and was not causally related to any condition warranting spinal surgery. Khounganian knew or was recklessly indifferent to the fact that the surgery recommendations that he provided to Claimant R were unnecessary and for the purpose of artificially inflating the value of Claimant R's lawsuit.

351.   In addition to Khounganian's recommendations for an unnecessary surgery, estimated to be between $225,000 and $238,000, Khounganian's office prepared bills for the resulting treatment pursuant to his sham lien agreement with Claimant R as follows:

a. July 29, 2019: $1,500

b. August 26, 2019: $700

c. February 10, 2020: $700

352.   Upon information and belief, the bills together with their stated amounts were materially false and misleading, given that the side agreement with the Downtown LA Law Group was fraudulently concealed. Khounganian knew or was recklessly indifferent to the fact that the bills and their stated amounts were false and misleading, given that he was aware of the secret side agreement to discount such bills in the event of a shortfall.

353.   The matter was ultimately settled. In addition to the settlement amount, Uber incurred significant costs in defending against the litigation. These defense and settlement costs were substantially higher than they would have been absent the fraudulent medical and billing records. Uber relied on the fraudulent medical and

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

billing records in determining whether and on what terms to settle Claimant R's lawsuit.

## RACKETEERING ALLEGATIONS

354.    At all relevant times, Defendants' scheme was in violation of 18 U.S.C. § 1962(c) and/or (d) of the RICO statute as further set forth below.

### A.    Defendants' Misconduct and Respective Bases for Liability

#### 1.    Valley Orthopedic and Spine Center/GSK Spine and Greg S. Khounganian

355.    As described above, Defendant Khounganian and the medical practice he controls, Defendant Valley Orthopedic and Spine Center, doing business as GSK Spine, play a key role in effectuating this scheme. They have participated and likely will in the future continue to participate in the scheme by producing fraudulent bills and fraudulent medical records that falsely tie purported injuries to underlying motor vehicle accidents and by recommending and performing unnecessary surgeries. Additionally, Khounganian and Valley Orthopedic and Spine Center/GSK Spine have participated and likely will in the future continue to participate in the scheme by performing said unnecessary and/or causally unrelated surgeries, producing fraudulent medical records reflecting false statements of the necessity of these surgeries and/or the causation of the injuries, and transmitting these medical records in furtherance of the fraud scheme using interstate mail or wires.

356.    In addition, Khounganian frequently engages in an improper medical billing practice known as "unbundling."  Unbundling refers to a practice in which a healthcare provider submits separate billing codes for individual components of a procedure or service that should be reported together under a single comprehensive (bundled) code. Comprehensive codes are designed to capture all routine elements of a service in one charge—for example, a single surgical procedure code that includes the incision, operative work, and typical postoperative care—so that those

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

components are not billed separately. By breaking a bundled service into its constituent parts, unbundling can result in higher total invoiced amount than is permitted under standard coding rules, such as those in the CPT or Medicare guidelines.

## 2.    Downtown LA Law Group and Igor Fradkin

357.   As described above, Defendant Downtown LA Law Group and Defendant Igor Fradkin play a key role in effectuating this scheme. Downtown LA Law Group and Fradkin have participated and likely will in the future participate in this scheme by accepting clients with low-value or meritless claims; directing these clients to Khounganian and other providers for treatment of exaggerated, non-existent, or causally unrelated injuries; directing these providers to recommend specific treatments; directing clients to sign sham lien agreements with Khounganian and other providers to pay for those surgeries; and entering into concealed kickback agreements with Khounganian and other providers regarding these lien agreements. Downtown LA Law Group and Fradkin sometimes also directly pay providers at reduced, pre-negotiated rates that are lower than the claimed rates that appear on fraudulent bills.

358.   Downtown LA Law Group and Igor Fradkin use the associated fraudulent medical records and the evidence of the liens to pursue claims against Uber and others for inflated damages in personal-injury lawsuits.

## 3.    The Law Offices of Jacob Emrani and Jacob Emrani

359.   As described above, Defendant The Law Offices of Jacob Emrani and Defendant Jacob Emrani play a key role in effectuating this scheme. The Law Offices of Jacob Emrani and Jacob Emrani have participated and likely will in the future participate in this scheme by accepting clients with low-value or meritless claims, directing these clients to Khounganian and other providers for treatment of exaggerated, non-existent, or causally unrelated injuries, directing these providers to

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

recommend specific treatments, encouraging clients to sign sham lien agreements with Khounganian and other providers to pay for those surgeries, and entering into concealed kickback agreements with Khounganian and other providers regarding these lien agreements. The Law Offices of Jacob Emrani and Emrani sometimes also directly pay providers at reduced, pre-negotiated rates that are lower than the claimed rates that appear on fraudulent bills.

360.   The Law Offices of Jacob Emrani and Jacob Emrani use the associated fraudulent medical records and the evidence of the liens to pursue claims against Uber and others for inflated damages in personal-injury lawsuits.

**B.    Uber is a Victim of the Scheme and Has Suffered Injury**

361.   The scheme has resulted in millions of dollars of harm from defense costs and settlements. This action is intended to recover the full extent of such harm.

362.   To date, these false and inflated claims have forced Uber to incur substantial expense to investigate and defend them. The lawyer and law firm Defendants use false medical records and unnecessary treatments to attempt to fraudulently induce significantly larger settlement payments from Uber in personal injury lawsuits than Uber would pay absent the fraud. As such, Uber has been forced to incur legal fees, settlement costs, and other out-of-pocket costs in defending these lawsuits and responding to fraudulent evidence and inflated damages claims in excess of what would have otherwise been required. Uber relied on the fraudulent medical and billing records in determining whether and on what terms to settle personal-injury lawsuits. These inflated costs damaged Uber in its business or property. Uber has incurred these costs notwithstanding the insurance it is required by law to carry. This damage is the direct result of Defendants' pattern of racketeering activity.

363.   The scheme remains ongoing, and Uber and other victims of the fraud continue to suffer.

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

### C.    The RICO Enterprise

364.    Defendants shared longstanding relationships, acted for a common benefit, and depended on one another and their respective activities for such benefit. Fradkin and Emrani and their law firms each shared longstanding relationships with Khounganian and Valley Orthopedic and Spine/GSK Spine. These relationships are described above in the various non-exhaustive pattern cases and were cemented by the kickback arrangement described herein. The relationships are distinct from the ordinary business activities and arm's-length commercial relationships that Defendants are engaged in.

365.    Each Defendant played a critical role and depended on others to carry out their respective roles in furtherance of the scheme, including the initial client intake performed by Emrani and Fradkin and their law firms; the kickback scheme described herein; and the fraudulent medical records and bills produced by Khounganian and transmitted to Emrani, Fradkin, and their law firms.

#### 1.    Association-in-Fact Enterprises

366.    Defendants The Law Offices of Jacob Emrani, Emrani, Valley Orthopedic and Spine Center/GSK Spine, and Khounganian constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). Each of the Defendants participated in the operation or management of the enterprise. The enterprise itself is distinct from the culpable defendants Emrani, Khounganian, The Law Offices of Jacob Emrani, and Valley Orthopedic and Spine Center/GSK Spine, and their respective corrupt activities. Each defendant worked to operate the association-in-fact enterprise and manage its affairs through their corrupt patterns of kickbacks and production and transmittal of fraudulent medical records and bills. The lawyers then use these records and bills to obtain court judgments or (more often) settlements, which produce large contingency fees for the lawyers and enable Khounganian to recover the inflated, above-market liens claimed on his bills.

367.   The association-in-fact enterprise was of sufficient duration to accomplish its purposes, originating at least as early as 2019, continuing for at least several years, and threatening to continue into the future.

368.   Defendants Downtown LA Law Group, Fradkin, Valley Orthopedic and Spine Center/GSK Spine, and Khoungian constitute a separate association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). Each of the Defendants participated in the operation or management of the enterprise. The enterprise itself is distinct from the culpable persons of Fradkin, Khoungian, Downtown LA Law Group, and Valley Orthopedic and Spine Center/GSK Spine, and their respective corrupt activities. Each Defendant worked to operate the association-in-fact enterprise and manage its affairs through their corrupt patterns of kickbacks and production and transmittal of fraudulent medical records and bills. The lawyers then use these records and bills to obtain court judgments or (more often) settlements, which produce large contingency fees for the lawyers and enable Khoungian to recover the inflated, above-market liens claimed on his bills.

369.   The association-in-fact enterprise was of sufficient duration to accomplish its purposes, originating at least as early as 2019, continuing for at least several years, and threatening to continue into the future.

## 2.    Valley Orthopedic and Spine Center

370.   Valley Orthopedic and Spine Center, doing business as GSK Spine, constitutes an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce. The enterprise of Valley Orthopedic and Spine/GSK Spine engages in at least some legitimate activity, treating patients with actual injuries. However, upon information and belief,

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

Defendant Khounganian's predicate acts of mail fraud and wire fraud constituted a material portion of Valley Orthopedic and Spine/GSK Spine's business.

371.   Defendant Khounganian operated, managed, and controlled the medical practice directly in furtherance of the scheme through a pattern of racketeering activity. Khounganian understood that his ability to extract financial rewards from the pursuit of fraudulent claims against Uber and others depended on (i) the diagnosis of non-existent, exaggerated, or causally unrelated injuries, (ii) the production of fraudulent medical records and medical bills regarding those injuries and their causation that could be used to artificially inflate damages in resulting litigation, (iii) the use of the fraudulent medical and billing records and materially false statements to advance such litigation, and (iv) the use of sham lien payment arrangements to artificially inflate the resulting claimed damages.

372.   Defendants Emrani and Fradkin, and, through them, their respective law firms, participated in the management of the medical practice directly in furtherance of the scheme through a pattern of racketeering activity. They did so by, for example, making referrals pursuant to the kickback scheme described above, scheduling appointments and treatments for patients, and authorizing Khounganian to perform medical procedures. Emrani and Fradkin understood that their ability to extract financial rewards from the pursuit of fraudulent claims against Uber and others depended on (i) directing kickbacks to Khounganian and Valley Orthopedic and Spine/GSK Spine in the form of continued referrals in exchange for concealed side agreements regarding lien recovery, and (ii) the transmittal and use of the fraudulent medical records and bills and materially false statements to advance the claims.

373.   At all relevant times, the Valley Orthopedic and Spine Center/GSK Spine enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c) through its use of mail and interstate wires.

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

### 3. Downtown LA Law Group

374. Downtown LA Law Group constitutes an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce. The enterprise of Downtown LA Law Group engages in at least some legitimate activity providing legal services to clients. However, upon information and belief, Defendant Fradkin's predicate acts of mail fraud and wire fraud constituted a material portion of Downtown LA Law Group's business.

375. Defendant Fradkin operated, managed, and controlled the law firm, Downtown LA Law Group, directly in furtherance of the scheme through a pattern of racketeering activity. Fradkin understood that his ability to extract financial rewards from the pursuit of fraudulent claims against Uber and others depended on (i) directing kickbacks to Khounganian and Valley Orthopedic and Spine/GSK Spine in the form of continued referrals in exchange for concealed agreements regarding lien recovery, and (ii) the transmittal and use of the fraudulent medical records and materially false statements to advance the claims. Fradkin undertook these actions intentionally to further the unlawful objectives of the enterprise.

376. At all relevant times, the Downtown LA Law Group enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c) through its use of mail and interstate wires.

### 4. The Law Offices of Jacob Emrani

377. The Law Offices of Jacob Emrani constitutes an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce. The enterprise of The Law Offices of Jacob Emrani engages in at least some legitimate activity providing legal services to clients. However, upon information and belief, Defendant Emrani's predicate acts of mail fraud and wire fraud constituted a material portion of The Law Offices of Jacob Emrani's business.

378. Defendant Emrani operated, managed, and controlled his law firm, The Law Offices of Jacob Emrani, directly in furtherance of the scheme through a pattern

of racketeering activity. Emrani understood that his ability to extract financial rewards from the pursuit of fraudulent claims against Uber and others depended on (i) directing kickbacks to Khounganian and Valley Orthopedic and Spine/GSK Spine in the form of continued referrals in exchange for concealed agreements regarding lien recovery, and (ii) the transmittal and use of the fraudulent medical and billing records and materially false statements to advance the litigation. Emrani undertook these actions intentionally to further the unlawful objectives of the enterprise.

379.   At all relevant times, The Law Offices of Jacob Emrani enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c) through its use of mail and interstate wires and because its activities were directed at and intended to influence Uber.

**D.    Pattern of Racketeering Activity**

380.   Defendants' scheme constitutes a pattern of racketeering activity. The pattern of racketeering activity includes, among others, commission of the predicate acts in violation of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343.

381.   Defendants committed these acts willfully and knowingly and with specific intent to defraud.

382.   As discussed herein, Defendants Khounganian and Valley Orthopedic and Spine Center/GSK Spine made numerous materially false and misleading statements knowingly, and with reckless indifference to the truth, in medical and billing records. It was reasonably foreseeable to Khounganian that the U.S. mail or private or commercial carrier or the interstate wires would be used in furtherance of the scheme by, for example, the sending of false or misleading statements to Downtown LA Law Group or The Law Offices of Jacob Emrani for further transmission by interstate wires to an insurance carrier. Such records were in fact so

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

mailed and transmitted. As such, each such record was prepared and executed in violation of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).

383.    As discussed herein, Defendants Jacob Emrani and The Law Offices of Jacob Emrani made numerous materially false and misleading statements in demand letters or similar communications knowingly or with reckless indifference to the truth. It was reasonably foreseeable to Emrani that these knowingly false and misleading statements would be subsequently sent by U.S. mail or private or commercial carrier and transmitted through the interstate wires to Uber and/or Uber's insurance carriers. Such records were in fact so mailed and transmitted. As such, each such letter or communication was prepared and executed in violation of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).

384.    As discussed herein, Defendants Igor Fradkin and Downtown LA Law Group made numerous materially false and misleading statements in demand letters or similar communications knowingly or with reckless indifference to the truth. It was reasonably foreseeable to Fradkin that these knowingly false statements would be subsequently sent by U.S. mail or private or commercial carrier and transmitted through the interstate wires to Uber and/or Uber's insurance carriers. Such records were in fact so mailed and transmitted. As such, each such letter or communication was prepared and executed in violation of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).

385.    Defendants' commission of predicate acts included the following specific examples:

386.    **Personal Injury Claimant A**

   a.      On January 3, 2020, Emrani faxed an information demand, signed by Jacob Emrani, to an insurer located in a different state. On February 6, 2020, an employee of the Emrani firm corresponded via email with an insurer located in a different state regarding the insurer's acceptance of liability. On October

3 and 4, 2021, Emrani faxed and/or emailed a request for lien information as to Claimant A, signed by Jacob Emrani, to an insurer located in a different state. On October 15, 2021, the Emrani firm faxed a request for a Conditional Payment Letter as to Claimant A to a government entity located in a different state. On January 29, 2024, Khounganian caused records of his treatments of Claimant A to be transmitted through the interstate wires to a cloud-based platform of a company located in a different state. Such uses of the interstate wires were reasonably foreseeable and were in furtherance of the scheme and in violation of the federal wire fraud statute (18 U.S.C. § 1343).

b.    On December 31, 2020, and on March 11, 2021, for the purpose of adding the expense of his treatments of Claimant A on those days to Claimant A's claims and to further the scheme, Khounganian falsely represented in connection with Claimant A's visits: "Within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." Upon information and belief, Khounganian knew or was recklessly indifferent to the fact that these statements were false when made. Khounganian caused the records containing such false statements to be transmitted through the interstate wires to a cloud-based platform of a company located in a different state. As such, such records were transmitted in furtherance of the scheme and in violation of the federal wire fraud statute (18 U.S.C. § 1343).

c.    On December 30, 2019, an employee of the Emrani firm executed a Proof of Representation as to Claimant A. On October 20, 2020, the Emrani firm executed a Medical Clearance Request as to Claimant A. On October 8, 2021, an employee of the Emrani firm electronically completed and submitted to the website of a government entity a Personal Injury Notification Form as to Claimant A. It was reasonably foreseeable to Emrani and the Emrani firm

that such documents would be subsequently sent by U.S. mail or private or commercial carrier and/or transmitted through the interstate wires to an insurance carrier. Such documents were in fact so mailed and/or transmitted. As such, such documents were executed in furtherance of the scheme in violation of the federal mail and/or wire fraud statutes (18 U.S.C. §§ 1341, 1343).

d.     On August 20, 2021, Emrani solicited medical records of Claimant A from a medical provider. It was reasonably foreseeable to Emrani and the Emrani firm that such records would be subsequently sent by U.S. mail or private or commercial carrier and/or transmitted through the interstate wires to an insurance carrier. Such records were in fact so mailed and/or transmitted in furtherance of the scheme. As such, such records were solicited in violation of the federal mail and/or wire fraud statutes (18 U.S.C. §§ 1341, 1343).

e.     On October 22, 2021, the Emrani firm caused to be electronically filed proofs of service of Claimant A's complaint and related papers on Uber and two other defendants in the underlying lawsuit. Each such use of the interstate wires to file the proofs of service was in furtherance of the scheme and in violation of the federal wire fraud statute (18 U.S.C. § 1343).

f.     On or around February 21, 2020, the Emrani firm received three faxes from a medical provider containing medical records of Claimant A. On March 25, 2020, the Emrani firm received medical records of Claimant A from a medical provider in response to a subpoena issued by the Emrani firm. On or around July 22, 2020, the Emrani firm received a fax from a medical provider containing medical records of Claimant A. On October 18, 2021, the Emrani firm received a letter from a government entity containing insurance information of Claimant A. On November 1, 2021, the Emrani firm received a letter from an entity located in a different state containing insurance

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

information of Claimant A. On November 26, 2021, the Emrani firm received a letter from an entity located in a different state containing insurance information of Claimant A. The Emrani firm subsequently sent such documents by U.S. mail or private or commercial carrier and/or transmitted such documents through the interstate wires to an insurance carrier. As such, such documents were mailed and/or transmitted in violation of the federal mail and/or wire fraud statutes (18 U.S.C. §§ 1341, 1343). Each such use of U.S. mail or private or commercial carrier was in furtherance of the scheme and in violation of the federal mail fraud statute (18 U.S.C. § 1341).

387. **Personal Injury Claimant B**

a.    On December 28, 2020, The Law Offices of Jacob Emrani, signed by Jacob Emrani, mailed via U.S. mail and emailed a demand letter to Uber's insurance provider in furtherance of its scheme. As such, such records were transmitted in violation of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).

b.    From May 18, 2021, through October 28, 2021, Khounganian transmitted treatment records, through the interstate wires to a cloud-based platform of a company located in a different state, in which Khounganian falsely represented in connection with Claimant B's visit: "Within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." Upon information and belief, Khounganian knew or was recklessly indifferent to the fact that these statements were false when made given that this claimant had suffered no injury in the accident. As such, such records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

c.    On April 2, 2021, The Law Offices of Jacob Emrani, through its agent, effected service of Claimant B's fraudulent complaint and related papers

on Uber in the underlying lawsuit. Each such use of U.S. mail or private or commercial carrier was in furtherance of the scheme and in violation of the federal mail fraud statute (18 U.S.C. § 1341).

388. **Personal Injury Claimant C**

a. On May 11, 2021, The Law Offices of Jacob Emrani, through its agent, effected service of Claimant C's fraudulent complaint and related papers on Uber in the underlying lawsuit. Each such use of U.S. mail or private or commercial carrier was in furtherance of the scheme and in violation of the federal mail fraud statute (18 U.S.C. § 1341).

b. On July 26, 2021, Khounganian transmitted treatment records, through the interstate wires to a cloud-based platform of a company located in a different state, in which Khounganian falsely represented in connection with Claimant C's visit: "Within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." Upon information and belief, Khounganian knew or was recklessly indifferent to the fact that these statements were false when made given that this claimant had suffered no injury in the accident. As such, those records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

389. **Personal Injury Claimants D and E**

a. On November 19, 2019 and January 27, 2020, Khounganian transmitted treatment records, through the interstate wires to a cloud-based platform of a company located in a different state, in which Khounganian falsely represented in connection with Claimant D's visits: "Within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." Upon information and belief, Khounganian knew or was recklessly indifferent to the fact that

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

these statements were false when made given that this claimant had suffered no injury in the accident. As such, those records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

      b.     On March 31, 2021, The Law Offices of Jacob Emrani, via U.S. mail, sent a demand letter signed by Jacob Emrani to Uber's insurer demanding a $1 million settlement in furtherance of the scheme. As such, those records were transmitted in violation of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).

      c.     On December 3, 2021, The Law Offices of Jacob Emrani, through its agent, effected service of Claimant D's fraudulent complaint and related papers on Uber in the underlying lawsuit. Each such use of U.S. mail or private or commercial carrier was in furtherance of the scheme and in violation of the federal mail fraud statute (18 U.S.C. § 1341).

390.    **Personal Injury Claimant F**

      a.     On November 2, 2020 The Law Offices of Jacob Emrani, through its agent, effected service of Claimant F's fraudulent complaint and related papers on Uber in the underlying lawsuit. Each such use of U.S. mail or private or commercial carrier was in furtherance of the scheme and in violation of the federal mail fraud statute (18 U.S.C. § 1341).

      b.     On October 14, 2019, Khounganian transmitted treatment records, through the interstate wires to a cloud-based platform of a company located in a different state. Upon information and belief, Khounganian knew or was recklessly indifferent to the fact that these statements were false when made given that this claimant had suffered no injury in the accident. As such, those records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

391.    **Personal Injury Claimant G**

a.    On October 11, 2021 and July 13, 2022, Khounganian transmitted, or caused to be transmitted visit records of his respective treatment of Claimant G, through the interstate wires to a cloud-based platform of a company located in a different state, in which Khounganian falsely represented in connection with Claimant G's visit: "Within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." Khounganian knew or was recklessly indifferent to the fact that this statement was false when made given Claimant G's extensive pre-existing medical history, and CT scans from the day after the incident with no indication of acute injury beyond minor strains. As such, those records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

b.    On December 8, 2021, The Law Offices of Jacob Emrani, through its agent, effected service of Claimant G's fraudulent complaint and related papers on Uber in the underlying lawsuit. Each such use of U.S. mail or private or commercial carrier was in furtherance of the scheme and in violation of the federal mail fraud statute (18 U.S.C. § 1341).

c.    Upon information and belief, on May 24, 2022, in furtherance of the scheme, Defendant The Law Offices of Jacob Emrani sent a settlement letter, via email, signed by a partner from The Law Offices of Jacob Emrani. As such, those records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

392.    **Personal Injury Claimant H**

a.    On December 18, 2019, Downtown LA Law Group, through its agent, effected service of Claimant H's fraudulent complaint and related papers on Uber in the underlying lawsuit. Each such use of U.S. mail or private

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

or commercial carrier was in furtherance of the scheme and in violation of the federal mail fraud statute (18 U.S.C. § 1341).

b.    On October 18, 2019, in furtherance of the scheme, Downtown LA Law Group, via email, sent a demand letter to Uber's insurance provider. The letter falsely represented that Claimant H has suffered from numerous injuries caused by the September 2017 bus accident and as a result, had required spine surgery with Khounganian. As such, those records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

c.    On June 19, 2020, in furtherance of the scheme, Downtown LA Law Group, via U.S. mail and email, sent an updated demand letter signed by a partner from Defendant Downtown LA Law Group. The letter falsely represented that Claimant H suffered from numerous injuries caused by the September 2017 bus accident, including spinal injuries. The letter included a future medical care section, stating Claimant H would need to undergo the same surgeries that Khounganian recommended during Claimant H's June 2020 consultation: a cervical disc replacement surgery and a lumbar fusion surgery. As such, those records were transmitted in violation of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).

d.    On June 17, 2020, and April 15, 2021, in furtherance of the scheme, Downtown LA Law Group, via email, sent recent reports from Claimant H's additional visits with Khounganian. In these reports, Khounganian falsely represented in connection with Claimant H's visits: "Within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." Khounganian knew or was recklessly indifferent to the fact that these statements were false when made given that Claimant H had been in two prior motor vehicle accidents, Claimant H had signs of degenerative lumbar and

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

cervical spine issues, and the very minor nature of the September 2017 bus accident. As such, those records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

393.    **Personal Injury Claimant I**

a.    From May 20, 2021, through August 18, 2021, Khounganian transmitted or caused to be transmitted treatment records, through interstate wires to a cloud-based platform of a company located in a different state, in which Khounganian falsely represented in connection with Claimant I's visit: "Within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." Khounganian knew or was recklessly indifferent to the fact that these statements were false given that there was no accident, and Claimant I had an extensive history of medical conditions and back pain. As such, those records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

b.    On January 31, 2023, Downtown LA Law Group, through its agent, effected service of Claimant I's fraudulent complaint and related papers on Uber in the underlying lawsuit. Each such use of the U.S. mail or private or commercial carrier was in furtherance of the scheme and in violation of the federal mail fraud statute (18 U.S.C. § 1341).

c.    On November 23, 2023, Downtown LA Law Group sent a demand letter signed by Fradkin via email. As such, those records were transmitted in furtherance of the scheme and in violation of the federal wire fraud statute (18 U.S.C. § 1343).

394.    **Personal Injury Claimant J**

a.    From September 25, 2021 to August 29, 2022, Khounganian transmitted, or caused to be transmitted, treatment records, by fax to the

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

Downtown LA Law Group, in which Khounganian falsely represented in connection with Claimant J's visits: "Within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." Khounganian knew or was recklessly indifferent to the fact that these statements were false when made given that Claimant J had signs of degenerative lumbar and cervical spine issues and no injury from the subject collision in 2019. As such, those records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

b.    On July 22, 2022, Downtown LA Law Group, through its agent, effected service of Claimant J's fraudulent complaint and related papers on Uber in the underlying lawsuit. Each such use of U.S. mail or private or commercial carrier was in furtherance of the scheme and in violation of the federal mail fraud statute (18 U.S.C. § 1341).

c.    On May 23, 2023, in furtherance of the scheme, Downtown LA Law Group, via email, sent a demand for "policy limits" to Uber. The demand falsely represented that Claimant J has suffered from numerous injuries caused by the 2019 accident and as a result, had required spine surgery with Khounganian. As such, those records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

395.    **Personal Injury Claimant K**

a.    From September 30, 2019, through February 27, 2020, Khounganian transmitted or caused to be transmitted treatment records, through the interstate wires to a cloud-based platform of a company located in a different state, in which Khounganian falsely represented in connection with Claimant K's visit: "Within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." Khounganian knew or was recklessly indifferent to the fact that

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

these statements were false when made given the minor nature of the accident and Claimant K's degenerative conditions. As such, those records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

b.    On July 28, 2020, Downtown LA Law Group, through its agent, effected service of Claimant K's fraudulent complaint and related papers on Uber in the underlying lawsuit. Each such use of U.S. mail or private or commercial carrier was in furtherance of the scheme and in violation of the federal mail fraud statute (18 U.S.C. § 1341).

c.    On July 28, 2020, in furtherance of the scheme, Downtown LA Law Group sent a demand letter, via email, signed by a Downtown LA Law Group partner. The demand letter falsely represented that Claimant K suffered from significant bodily injuries caused by the accident and had required surgical treatment. As such, those records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

d.    On August 20, 2020; September 3, 2020; and October 8, 2020; Downtown LA Law Group sent amended demand letters, via email and in furtherance of the scheme. The demand letters falsely represented that Claimant K suffered from significant bodily injuries caused by the accident and had required surgical treatment. As such, those records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

396.    **Personal Injury Claimant L**

a.    On November 9, 2020, Khounganian faxed or caused to be faxed to Downtown LA Law Group records of his July 16, 2020, treatment notes of Claimant L. In those treatment notes, Khounganian falsely represented in connection with Claimant L's visit: "Within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." Upon information and belief, Khounganian

knew or was recklessly indifferent to the fact that these statements were false when made given that this claimant had suffered no injury in the accident. Additionally, on July 16, 2020, Khounganian transmitted or caused to be transmitted treatment records containing such false statement through the interstate wires to a cloud-based platform of a company located in a different state. As such, such records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

b.      On December 28, 2020, Downtown LA Law Group mailed, via U.S. mail, an arbitration demand letter to Uber's insurance provider in furtherance of its scheme. As such, such records were transmitted via U.S. mail or private or commercial carrier in violation of the federal mail fraud statute (18 U.S.C. § 1341).

c.      On March 12, 2021, Downtown LA Law Group emailed a demand letter to counsel for Uber in furtherance of its scheme. As such, such records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

397.    **Personal Injury Claimant M**

a.      From May 6, 2021, through August 26, 2021, Khounganian transmitted treatment records, through the interstate wires to a cloud-based platform of a company located in a different state, in which Khounganian falsely represented in connection with Claimant M's visit: "Within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." Khounganian knew or was recklessly indifferent to the fact that these statements were false when made . As such, those records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

b.      On April 8, 2022, in furtherance of the scheme, Defendant

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

Downtown LA Law Group sent a demand letter, via email, signed by a partner from Defendant Downtown LA Law Group. The demand letter falsely represented that Claimant M suffered from severe spinal injuries caused by the January 2020 accident and had required surgical treatment. As such, those records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

c.      On October 19, 2021, Downtown LA Law Group, through its agent, effected service of Claimant M's fraudulent complaint and related papers on Uber in the underlying lawsuit. Each such use of U.S. mail or private or commercial carrier was in furtherance of the scheme and in violation of the federal mail fraud statute (18 U.S.C. § 1341).

398.    **Personal Injury Claimant N**

a.      On November 7, 2023, Downtown LA Law Group through its agent, effected service of Claimant N's fraudulent complaint and related papers on Uber in the underlying lawsuit. Each such use of U.S. mail or private or commercial carrier was in furtherance of the scheme and in violation of the federal mail fraud statute (18 U.S.C. § 1341).

399.    **Personal Injury Claimant O**

a.      On March 3, 2020, Khounganian faxed or caused to be faxed to Downtown LA Law Groups records of his March 2, 2020 treatment notes of Claimant O. In those treatment notes, Khounganian falsely represented in connection with Claimant O's visit: "Within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." Khounganian knew or was recklessly indifferent to the fact that these statements were false when made given that this claimant had suffered no injury in the accident. Additionally, from March 2, 2020, through July 30, 2020, Khounganian transmitted or caused to be

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

transmitted treatment records containing such false statement through the interstate wires to a cloud-based platform of a company located in a different state. As such, those records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

b.     On June 9, 2020, Downtown LA Law Group through its agent, effected service of Claimant O's fraudulent complaint and related papers on Uber in the underlying lawsuit. Each such use of U.S. mail or private or commercial carrier was in furtherance of the scheme and in violation of the federal mail fraud statute (18 U.S.C. § 1341).

c.     On June 30, 2020, in furtherance of the scheme, Defendant Downtown LA Law Group emailed a demand letter to Uber's insurance provider signed by Defendant Igor Fradkin. The demand letter falsely represented that Claimant O suffered "very serious injuries" caused by the accident, had required lumbar surgery, and would require an additional spine surgery. As such, those records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

d.     On October 22, 2020; December 16, 2020; and March 1, 2021, Defendant Downtown LA Law Group emailed updated demand letters Uber's counsel, signed by Defendant Igor Fradkin. These demand letters falsely represented that Claimant O suffered "very serious injuries" caused by the accident and had required both lumbar surgery and cervical fusion surgery. As such, those records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

e.     On July 18, 2021, Defendant Downtown LA Law Group emailed an updated demand letter to Uber's counsel, signed by Defendant Igor Fradkin. This demand letter falsely represented that Claimant O suffered "very serious injuries" caused by the accident, had required both lumbar surgery and cervical

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

fusion surgery, and would require a future surgery for Adjacent Segment Disease. As such, those records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

400.    **Personal Injury Claimant P**

a.    On September 13, 2019, Khounganian faxed or caused to be faxed to Downtown LA Law Group records of his September 5, 2019 treatment notes of Claimant P. In those treatment notes, Khounganian falsely represented in connection with Claimant P's visit: "Within a reasonable degree of medical probability, the diagnosis above were caused by the injury during the date of loss." Upon information and belief, Khounganian knew or was recklessly indifferent to the fact that these statements were false when made given that this claimant had suffered no injury in the accident. Additionally, from September 5, 2019, through January 24, 2023, Khounganian transmitted or caused to be transmitted treatment records containing such false statements through the interstate wires to a cloud-based platform of a company located in a different state. As such, such records were transmitted in furtherance of the scheme and in violation of the federal wire fraud statute (18 U.S.C. § 1343).

b.    On May 14, 2021, Downtown LA Law Group through its agent effected service of Claimant P's fraudulent complaint and related papers on Uber in the underlying lawsuit. Each such use of U.S. mail or private or commercial carrier was in furtherance of the scheme and in violation of the federal mail fraud statute (18 U.S.C. § 1341).

c.    On March 17, 2021, Downtown LA Law Group emailed a demand letter to counsel for Uber in furtherance of its scheme. Such records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

401.    **Personal Injury Claimant Q**

a.      On May 16, 2019, Khounganian transmitted treatment records, through the interstate wires to a cloud-based platform of a company located in a different state, in which Khounganian falsely represented in connection with Claimant Q's visit: "Within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." Upon information and belief, Khounganian knew or was recklessly indifferent to the fact that these statements were false when made given that this claimant had suffered no injury in the accident. As such, those records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

b.      On September 4, 2020, Downtown LA Law Group, through its agent, effected service of Claimant Q's fraudulent complaint and related papers on Uber in the underlying lawsuit. Each such use of U.S. mail or private or commercial carrier was in furtherance of the scheme and in violation of the federal mail fraud statute (18 U.S.C. § 1341).

c.      On January 14, 2021, Downtown LA Law Group, through its agent, effected service of Claimant Q's fraudulent amended complaint and related papers on Uber, via mail, in the underlying lawsuit. Each such use of U.S. mail or private or commercial carrier was in furtherance of the scheme and in violation of the federal mail fraud statute (18 U.S.C. § 1341).

d.      On June 22, 2021, Downtown LA Law Group, via email, sent a demand letter to Uber's defense counsel demanding a $1 million settlement in furtherance of the scheme. As such, those records were transmitted in violation of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).

402.    **Personal Injury Claimant R**

a.      From July 29, 2019, through February 10, 2020, Khounganian

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

transmitted, or caused to be transmitted visit records of his treatments of Claimant R, through the interstate wires to a cloud-based platform of a company located in a different state, in which Khounganian falsely represented in connection with Claimant R's visit: "Within a reasonable degree of medical probability, the diagnosis above were caused by the injury during the date of loss." Additionally, on February 12, 2020, Khounganian faxed or caused to be faxed, the records of his February 10, 2020, visit with Claimant R to Downtown LA Law Group. Khounganian knew or was recklessly indifferent to the fact that this statement was false when made given the unrelated nature of Claimant R's accident. As such, those records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

b.    On August 22, 2019, Downtown LA Law Group through its agent, effected service of Claimant R's fraudulent complaint and related papers on Uber in the underlying lawsuit. Each such use of U.S. mail or private or commercial carrier was in furtherance of the scheme and in violation of the federal mail fraud statute (18 U.S.C. § 1341).

c.    On April 16, 2021, in furtherance of the scheme, Defendant Downtown LA Law Group sent a follow-up demand letter, via U.S. and email, to counsel for Uber's insurance provider. Such records were transmitted in violation of the federal wire fraud statute (18 U.S.C. § 1343).

*    *    *

403.    The predicate acts all relate to each other as part of a common plan. The Defendants' roles in the scheme all depended on each other—Fradkin, Downtown LA Law Group, Emrani, and The Law Offices of Jacob Emrani directed clients to Khounganian and Valley Orthopedic and Spine/GSK Spine, directed, requested, or authorized Khounganian to perform certain treatments, and directed Khounganian to produce fraudulent records. Khounganian and Valley Orthopedic and Spine/GSK

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

Spine treated the patients at the lawyers' direction and produced fraudulent documents concerning unnecessary or non-existent surgeries. The lawyers then used these fraudulent records to pursue phony claims against Uber. Each Defendant was aware of its respective role within the larger scheme.

404. The predicate acts further relate to the enterprise of Valley Orthopedic and Spine Center/GSK Spine. A specific threat of repetition exists with respect to each predicate act of the production and transmittal of fraudulent medical records. Emrani and Fradkin used these fraudulent medical records to advance phony litigation against Uber and fraudulently attempt to induce larger settlements. Such predicate acts are a regular way of conducting the ongoing enterprise at issue herein. Hence, the pattern of activity is part of an open-ended and ongoing scheme.

405. The following table illustrates the pattern of fraudulent billing activity and estimates of future medical expenses with respect to cases against Uber:

| Claimant | Khounganian inflated bills | Khounganian Surgical Estimates | Law firm |
|---|---|---|---|
| Claimant A | $230,700 for surgeries and appointments. | N/A | The Law Offices of Jacob Emrani |
| Claimant B | $105,100 for surgery and appointments. | N/A | The Law Offices of Jacob Emrani |
| Claimant C | $1,500 for appointment. | Between $215,000 and $238,000. | The Law Offices of Jacob Emrani |
| Claimant D | $1,500 for appointment. | Between $250,000 and $295,000. | The Law Offices of Jacob Emrani |
| Claimant E | $2,200 for appointments. | Approximately $533,000. | The Law Offices of Jacob Emrani |

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

| Claimant | Khounganian inflated bills | Khounganian Surgical Estimates | Law firm |
|---|---|---|---|
| Claimant F | $1,500 for appointment. | Approximately $295,000. | The Law Offices of Jacob Emrani |
| Claimant G | $2,200 for appointments. | Between $465,000 and $533,000. | The Law Offices of Jacob Emrani |
| Claimant H | $5,700 for appointments. | N/A | Downtown LA Law Group |
| Claimant I | $102,902 for surgery and appointments. | N/A | Downtown LA Law Group |
| Claimant J | $102,900 for surgery and appointments. | N/A | Downtown LA Law Group |
| Claimant K | $124,300 for surgery and appointments. | N/A | Downtown LA Law Group |
| Claimant L | $1,500 for appointment. | Between $225,000 and $238,000. | Downtown LA Law Group |
| Claimant M | $102,902 for surgery and appointments. | N/A | Downtown LA Law Group |
| Claimant N | $131,109.87 for surgery and appointments. | N/A | Downtown LA Law Group |
| Claimant O | $230,000 for surgeries and appointments. | N/A | Downtown LA Law Group |

-120-

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

| Claimant | Khounganian inflated bills | Khounganian Surgical Estimates | Law firm |
|---|---|---|---|
| Claimant P | $91,477.93 for surgery and appointments. | N/A | Downtown LA Law Group |
| Claimant Q | $1,500 for appointment. | Approximately $450,000. | Downtown LA Law Group |
| Claimant R | $2,900 for appointments. | Between $225,000 and $238,000. | Downtown LA Law Group |

406.   The acts also occurred over a substantial period of time and hence constitute a pattern of activity even if the scheme were not ongoing.

## **FIRST CAUSE OF ACTION**

**(RICO Violation (18 U.S.C. § 1962(c))—Association-in-Fact Enterprise 1)**

**(Against Defendants Igor Fradkin, Downtown LA Law Group, Greg Khounganian, and Valley Orthopedic and Spine Center d/b/a GSK Spine)**

407.   Uber incorporates herein by reference each and every allegation in the paragraphs above.

408.   At all relevant times, Defendants constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4). Defendants constituted a group of individuals and legal entities associated in fact, which was engaged in, and the activities of which affected, interstate commerce. Each of the Defendants participated in the management or operation of the enterprise.

409.   The enterprise's racketeering activities, as described in detail in this Amended Complaint, included:

410.   Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations; and

411.   Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations and use of the mail for the purpose of executing these fraudulent representations.

412.   Each of the Defendants knowingly and willfully associated with the association-in-fact and conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.

413.   Uber has been injured in its business and property by reason of the above-described conduct. By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## SECOND CAUSE OF ACTION

**(RICO Violation (18 U.S.C. § 1962(c))—Association-in-Fact Enterprise 2)**

**(Against Defendants Jacob Emrani, The Law Offices of Jacob Emrani, Greg Khounganian, and Valley Orthopedic and Spine Center d/b/a GSK Spine)**

414.   Uber incorporates herein by reference each and every allegation in the paragraphs above.

415.   At all relevant times, Defendants constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4). Defendants constituted a group of individuals and legal entities associated in fact, which was engaged in, and the activities of which affected, interstate commerce. Each of the Defendants participated in the management or operation of the enterprise.

416.   The enterprise's racketeering activities, as described in detail in this Amended Complaint, included:

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

417.   Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations; and

418.   Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations and use of the mail for the purpose of executing these fraudulent representations.

419.   Each of the Defendants knowingly and willfully associated with the association-in-fact and conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.

420.   Uber has been injured in its business and property by reason of the above-described conduct. By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## THIRD CAUSE OF ACTION

**(RICO Violation (18 U.S.C. § 1962(c)—Valley Orthopedic and Spine Center/GSK Spine Enterprise)**

**(Against Defendant Greg Khounganian)**

421.   Uber incorporates by reference each and every allegation in the paragraphs above.

422.   Valley Orthopedic and Spine Center, doing business as GSK Spine, is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

423.    Greg Khounganian knowingly conducted and/or participated, directly or indirectly, in the conduct of Valley Orthopedic and Spine Center's affairs through a pattern of racketeering activities, as defined in 18 U.S.C. § 1961(1)(A).

424.    Defendants' racketeering activities, as described in detail in this Amended Complaint, included:

425.    Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations; and

426.    Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations and use of the mail for the purpose of executing these fraudulent representations.

427.    Defendants knowingly and willfully associated with the enterprise and conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.

428.    Uber has been injured in its business and property by reason of the above-described conduct.

429.    By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## **FOURTH CAUSE OF ACTION**

**(RICO Violation (18 U.S.C. § 1962(c)—Downtown LA Law Group Enterprise)**

**(Against Defendant Igor Fradkin)**

430.  Uber incorporates by reference each and every allegation in the paragraphs above.

431.  Downtown LA Law Group is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

432.  Igor Fradkin knowingly conducted and/or participated, directly or indirectly, in the conduct of Downtown LA Law Group's affairs through a pattern of racketeering activities, as defined in 18 U.S.C. § 1961(1)(A).

433.  Defendant's racketeering activities, as described in detail in this Amended Complaint, included:

434.  Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations; and

435.  Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations and use of the mail for the purpose of executing these fraudulent representations.

436.  Defendant knowingly and willfully associated with the enterprise and conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.

437.  Uber has been injured in its business and property by reason of the above-described conduct.

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

438.   By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### FIFTH CAUSE OF ACTION

**(RICO Violation (18 U.S.C. § 1962(c)—The Law Offices of**

**Jacob Emrani Enterprise)**

**(Against Defendant Jacob Emrani)**

439.   Uber incorporates by reference each and every allegation in the paragraphs above.

440.   The Law Offices of Jacob Emrani is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

441.   Jacob Emrani knowingly conducted and/or participated, directly or indirectly, in the conduct of The Law Offices of Jacob Emrani's affairs through a pattern of racketeering activities, as defined in 18 U.S.C. § 1961(1)(A).

442.   Defendant's racketeering activities, as described in detail in this Amended Complaint, included:

443.   Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations; and

444.   Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations and use of the mail for the purpose of executing these fraudulent representations.

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

445.   Defendant knowingly and willfully associated with the enterprise and conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.

446.   Uber has been injured in its business and property by reason of the above-described conduct. By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## SIXTH CAUSE OF ACTION

### (RICO Conspiracy (18 U.S.C. § 1962(d))

**(Against Defendants Jacob Emrani, The Law Offices of Jacob Emrani, Igor Fradkin, Downtown LA Law Group, Greg Khounganian, and Valley Orthopedic and Spine Center d/b/a GSK Spine)**

447.   Uber incorporates herein by reference each and every allegation in the paragraphs above.

448.   For at least the time period referenced herein, Defendants did unlawfully, knowingly, and intentionally combine, conspire, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and/or indirectly, in the conduct of the affairs of each enterprise identified above through a pattern of racketeering activity set forth herein in violation of 18 U.S.C. § 1962(d).

449.   This pattern of racketeering activity in which Defendants intentionally conspired to engage involved the specific acts as described in detail in this Amended Complaint constituting wire fraud in violation of 18 U.S.C. § 1343 and mail fraud in violation of 18 U.S.C. § 1341.

450.   All of these predicate acts constituted "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

451.   The overall objective of the conspiracy was to defraud Uber and others by generating and submitting artificially inflated medical bills and creating a basis for false and artificially inflated damages claims.

452.   Each Defendant agreed to conduct and/or participate, directly or indirectly, in the conduct of the affairs of each enterprise identified above through a pattern of racketeering activity.

453.   Each Defendant agreed to commit, or participated in, a violation of at least two of the predicate offenses identified above.

454.   Each Defendant was aware of the essential nature and scope of the conspiracy described herein and intended to participate in it.

455.   Uber has been injured in its business and property by reason of the above-described conduct.

456.   By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## **PRAYER FOR RELIEF**

WHEREFORE, Uber prays for judgment against Defendants as follows:

1.     For restitution;

2.     For general damages according to proof at trial, trebled according to statute;

3.     For prejudgment interest;

4.     For reasonable attorneys' fees and costs;

5.     For punitive damages;

6.     For equitable relief as appropriate pursuant to applicable law, including but not limited to issuance of a preliminary and permanent injunction, disgorgement, imposition of a constructive trust, and appointment of a monitor and/or receiver;

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

7. For an order under 18 U.S.C. § 1964(a) preventing and restraining violations of 18 U.S.C. § 1962 by directing Defendants to divest themselves of any interest, direct or indirect, in the above enterprises; imposing restrictions on the future activities of such Defendants, including, but not limited to, prohibiting Defendants from engaging in the same type of endeavor as the above enterprises engaged in; and dissolving or reorganizing the above enterprises; and

8. For such other relief as the Court may deem appropriate.

## **JURY DEMAND**

Uber demands a trial by jury on all issues so triable.

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT

Dated: December 19, 2025

**PERKINS COIE LLP**

By: */s/ Oliver M. Gold*

    Oliver M. Gold, California Bar No. 279033
    OGold@perkinscoie.com
    Gillian Kuhlmann, California Bar No. 316241
    GKuhlmann@perkinscoie.com
    1888 Century Park East, Suite 1700
    Los Angeles, CA 90067-1721
    Telephone: +1.310.788.9900
    Facsimile: +1.202.654.6211

    Tara McGrath, California Bar No. 254209
    TMcGrath@perkinscoie.com
    Joshua Patashnik, California Bar No. 295120
    JPatashnik@perkinscoie.com
    11452 El Camino Real, Suite 300
    San Diego, CA 92130-2080
    Telephone: +1.858.720.5700
    Facsimile: +1.858.720.5799

    David W. T. Daniels, *pro hac vice*
    DDaniels@perkinscoie.com
    Michael R. Huston, *pro hac vice*
    MHuston@perkinscoie.com
    700 Thirteenth Street, NW, Suite 800
    Washington, DC 20005-3960
    Telephone: +1.202.654.6200
    Facsimile: +1.202.654.6211

    David B. Massey, *pro hac vice*
    DMassey@perkinscoie.com
    1155 Avenue of the Americas, 22nd Floor
    New York, NY 10036-2711
    Telephone: +1.212.262.6900
    Facsimile: +1.212.977.1649

Attorneys for Plaintiff
Uber Technologies, Inc.

UBER TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT