John C. Hueston
jhueston@hueston.com
Marshall A. Camp
mcamp@hueston.com
Bram M. Alden
balden@hueston.com
Stewart J. Rickert
srickert@hueston.com
HUESTON HENNIGAN LLP
620 Newport Center Drive, Suite 1300
Newport Beach, CA 92660
Telephone: (949) 229-8640
Facsimile: (888) 866-4825

*Attorneys for Defendants Jacob Emrani and
The Law Offices of Jacob Emrani*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UBER TECHNOLOGIES, INC., | Case No. 2:25-cv-06612-SPG-PD |
| Plaintiff, | Hearing Date: April 29, 2026 at 1:30 p.m. |
| v. | |
| DOWNTOWN LA LAW GROUP, IGOR FRADKIN, THE LAW OFFICES OF JACOB EMRANI, JACOB EMRANI, VALLEY ORTHOPEDIC AND SPINE CENTER D/B/A GSK SPINE, and GREG KHOUNGANIAN, | **JACOB EMRANI'S AND THE LAW OFFICE OF JACOB EMRANI'S NOTICE OF MOTION AND MOTION TO DISMISS THE FIRST AMENDED COMPLAINT UNDER FED. R. CIV. P. 12(B)(6)** |
| Defendants. | **Filed Provisionally Under Seal** |

EMRANI AND HIS LAW OFFICE'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

**TO THE COURT, PARTIES, AND THEIR RESPECTIVE COUNSEL:**

PLEASE TAKE NOTICE THAT on April 29, 2026 at 1:30 p.m., or as soon thereafter as the matter may be heard, in the United States District Court for the Central District of California, located at 350 West 1st Street, Los Angeles, California 90012, before the Honorable Sherilyn Peace Garnett, Defendants Jacob Emrani and The Law Offices of Jacob Emrani (the "Emrani Defendants"), by and through their counsel, will and hereby do move for an order dismissing the First Amended Complaint against them with prejudice for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

This motion is based on this Notice, the attached Memorandum of Points and Authorities, Exhibits A-G to the Motion and the Declaration of Bram M. Alden in Support of the Emrani Defendants' Motion to Dismiss ("Alden Decl.") filed concurrently herewith, all pleadings and papers filed in this action, and any such other matters as may be presented to the Court.

These motions are made following the conference of counsel pursuant to Local Rule 7-3. The parties met and conferred via videoconference on January 16, 2026, and were unable to reach a resolution. Alden Decl. ¶ 2.

Dated: January 23, 2026

HUESTON HENNIGAN LLP

By:_____
John C. Hueston
Marshall A. Camp
Bram M. Alden
Stewart J. Rickert

*Attorneys for Defendants Jacob Emrani and The Law Offices of Jacob Emrani*

EMRANI AND HIS LAW OFFICE'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

## TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................... 1

II.  FACTUAL BACKGROUND ..................................................................... 7

   A.  Uber Commits Countless Torts Resulting in Countless Injuries ................... 7

   B.  Jacob Emrani Is a Very Prominent Personal Injury Lawyer Who Has Represented Injury Victims in Successful Suits Against Uber ...................... 8

   C.  Uber Alleges That the Claims It Settled For Substantial Sums Were Actually Part of a RICO Conspiracy ........................................................... 9

   D.  Uber Sets Forth Implausible Causes of Action, Claiming That Lawyers Conspired with Their Rivals and Controlled Doctors ................................. 12

III. LEGAL STANDARD ............................................................................. 13

IV.  ARGUMENT ......................................................................................... 14

   A.  Uber's Claims Impermissibly Seek to Impose Liability Based on the Protected Right to Pursue Judicial Redress ............................................. 14

   B.  Uber's Claims Are Barred by Fundamental Estoppel and Res Judicata Principles ................................................................................................. 19

      1.  Uber's Claims Are Barred By Claim Preclusion ................................ 22

      2.  Uber Was Required to Litigate Its Claims As Compulsory Counterclaims in the Underlying State Actions ................................... 24

   C.  Uber's Claims Are Barred by the Statute of Limitations ........................... 25

   D.  Uber Fails to Satisfy the Rule 9(b) Heightened Pleading Standard ............ 28

      1.  There Are No Predicate Acts of Racketeering .................................. 32

      2.  There Is No Proximately Caused Injury ........................................... 34

      3.  There Is No Pattern of Racketeering ............................................... 38

      4.  There Is No RICO Enterprise ......................................................... 41

V.   CONCLUSION ...................................................................................... 46

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acres Bonusing, Inc. v. Ramsey,*
2022 WL 17170856 (N.D. Cal. Nov. 22, 2022)................................................33, 34

*Align Tech., Inc. v. Tran,*
179 Cal. App. 4th 949 (2009)...............................................................................25

*Anza v. Ideal Steel Supply Corp.,*
547 U.S. 451 (2006) .........................................................................................6, 37

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ...............................................................................13, 36, 43

*Bai v. CMB Exp. Infrastructure Inv. Grp. 48, LP,*
2025 WL 959099 (E.D. Cal. Mar. 31, 2025) .......................................................44

*Basco v. Toyota Motor Corp.,*
2010 WL 11462992 (C.D. Cal. Mar. 3, 2010) ......................................................31

*Baumer v. Pachl,*
8 F.3d 1341 (9th Cir. 1993)..................................................................................39

*BE & K Constr. Co. v. NLRB,*
536 U.S. 516 (2002) ............................................................................................15

*Best v. Combs,*
2024 WL 5465052 (C.D. Cal. Dec. 27, 2024) .....................................................31

*Blake v. Dierdorff,*
856 F.2d 1365 (9th Cir. 1988)..............................................................................30

*Bodenburg v. Apple, Inc.,*
146 F.4th 761 (9th Cir. 2025)..........................................................................32, 36

*Bounds v. Smith,*
430 U.S. 817 (1977) ............................................................................................34

*Boyle v. United States,*
556 U.S. 938 (2009) ........................................................................................41, 45

EMRANI AND HIS LAW OFFICE'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

*Bucur v. Ahmad,*
  244 Cal. App. 4th 175 (2016)...................................................................................34

*Canyon Cnty. v. Syngenta Seeds, Inc.,*
  519 F.3d 969 (9th Cir. 2008)...........................................................................passim

*Capitol W. Appraisals v. Countrywide Fin. Corp.,*
  2009 WL 10677052 (W.D. Wash. Sept. 30, 2009)................................................45

*Cedric Kushner Promotions, Ltd. v. King,*
  533 U.S. 158 (2001) ..............................................................................................44

*Chagby v. Target Corp.,*
  358 F. App'x 805 (9th Cir. 2009) ..........................................................................42

*Chaverri v. Platinum LED Lights LLC,*
  2022 WL 2275664 (D. Ariz. June 22, 2022) .........................................................36

*Christ v. Schwartz,*
  2 Cal. App. 5th 440 (2016).....................................................................................33

*City of Almaty v. Khrapunov,*
  956 F.3d 1129 (9th Cir. 2020)..................................................................................6

*Coronavirus Reporter v. Apple, Inc.,*
  85 F.4th 948 (9th Cir. 2023)...............................................................................5, 29

*Crayton v. Hedgpeth,*
  2011 WL 1988450 (E.D. Cal. May 20, 2011).......................................................37

*Dep't of Forestry & Fire Prot. v. Howell,*
  18 Cal. App. 5th 154 (2017)...................................................................................34

*Dodd v. Hood River Cnty.,*
  59 F.3d 852 (9th Cir. 1995)....................................................................................22

*Eclectic Props. E., LLC v. Marcus & Millichap Co.,*
  751 F.3d 990 (9th Cir. 2014).......................................................................29, 30, 32

*Edwards v. Marin Park, Inc.,*
  356 F.3d 1058 (9th Cir. 2004).....................................................................13, 14, 28

*Ellis v. JPMorgan Chase & Co.,*
  752 F. App'x 380 (9th Cir. 2018) ..........................................................................42

-iv-

*Federated Dep't Stores, Inc. v. Moitie*,
  452 U.S. 394 (1981) ......................................................................................23

*Fla. Bar v. Went For It, Inc.*,
  515 U.S. 618 (1995) ......................................................................................16

*Ford Motor Co. v. Knight Law Grp.*,
  2025 WL 3306280 (C.D. Cal. Nov. 24, 2025).................................3, 15, 17, 42

*Freeman v. Lasky, Haas & Cohler*,
  410 F.3d 1180 (9th Cir. 2005).....................................................................15

*Gomez v. Guthy-Renker, LLC*,
  2015 WL 4270042 (C.D. Cal. Jul. 13, 2015)..............................................42, 44

*Hemi Grp., LLC v. City of New York*,
  559 U.S. 1 (2010) ....................................................................................36, 37

*Heshejin v. Rostami*,
  54 Cal. App. 5th 984 (2020).........................................................................25

*Hoffman v. Goli Nutrition, Inc.*,
  2024 WL 230873 (C.D. Cal. Jan. 17, 2024) ...............................................24, 25

*Howard v. Am. Online Inc.*,
  208 F.3d 741 (9th Cir. 2000)........................................................................6, 39

*Hunt v. Zuffa, LLC*,
  361 F. Supp. 3d 992 (D. Nev. 2019) ...............................................................36

*In re Actimmune Mktg. Litig.*,
  614 F. Supp. 2d 1037 (N.D. Cal. 2009) ..........................................................30

*In re Airport Car Rental Antitrust Litig.*,
  693 F.2d 84 (9th Cir. 1982)...........................................................................16

*In re Crown Vantage, Inc.*,
  421 F.3d 963 (9th Cir. 2005).......................................................................4, 24

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008).......................................................................13

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*,
  826 F. Supp. 2d 1180 (C.D. Cal. 2011) .......................................................7, 44

EMRANI AND HIS LAW OFFICE'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
903 F. Supp. 2d 880 (C.D. Cal. Sept. 6, 2012) ..................................................38, 42

*Int'l Union of Operating Eng'rs-Emps. Const. Indus. Pension, Welfare & Training Tr. Funds v. Karr*,
994 F.2d 1426 (9th Cir. 1993).................................................................................22

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
998 F.3d 397 (9th Cir. 2021)......................................................................................7

*JST Distrib., LLC v. CNV.com, Inc.*,
2018 WL 6113092 (C.D. Cal. Mar. 7, 2018) ......................................................14, 40

*Kim v. Kimm*,
884 F.3d 98 (2d Cir. 2018) .........................................................................................6

*Klehr v. A.O. Smith Corp.*,
521 U.S. 179 (1997) .......................................................................................4, 25, 26

*Kottle v. Nw. Kidney Ctrs.*,
146 F.3d 1056 (9th Cir. 1998).................................................................................14, 18

*Limcaco v. Wynn*,
2023 WL 154965 (9th Cir. Jan. 11, 2023) ...............................................................36

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*,
431 F.3d 353 (9th Cir. 2005)....................................................................................32

*Los Angeles Cnty. v. Shepos*,
2024 WL 5277272 (C.D. Cal. Nov. 8, 2024)............................................................31

*Lust v. Merrell Dow Pharm., Inc.*,
89 F.3d 594 (9th Cir. 1996).......................................................................................16

*Marijanovic v. Gray, York & Duffy*,
137 Cal. App. 4th 1262 (2006)..................................................................................34

*Maya v. Centex Corp.*,
658 F.3d 1060 (9th Cir. 2011)...................................................................................36

*McGowan v. McLane Co.*,
2025 WL 2087565 (C.D. Cal. May 9, 2025) ............................................................31

*Mendoza v. Zirkle Fruit Co.*,
301 F.3d 1163 (9th Cir. 2002)...................................................................................35

EMRANI AND HIS LAW OFFICE'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

*ML Prods. Inc. v. Ninestar Tech. Co.*,
  2023 WL 12171006 (C.D. Cal. Sept. 27, 2023)................................................31, 32

*Monterey Plaza Hotel Ltd. P'ship v. Loc. 483 of Hotel Emps. & Rest. Emps. Union, AFL-CIO*,
  215 F.3d 923 (9th Cir. 2000)................................................................3, 24

*Morehead v. City of Oxnard*,
  2023 WL 8143973 (C.D. Cal. Oct. 4, 2023)...................................................27

*Moreno v. UtiliQuest, LLC*,
  29 F.4th 567 (9th Cir. 2022)................................................................22

*Neubronner v. Milken*,
  6 F.3d 666 (9th Cir. 1993)................................................................5, 31

*New England Country Foods, LLC v. VanLaw Food Prods., Inc.*,
  2021 WL 6751898 (C.D. Cal. Nov. 23, 2021)....................................................25

*Pac. Recovery Sols. v. United Behav. Health*,
  481 F. Supp. 3d 1011 (N.D. Cal. 2020) ......................................................44

*Patel v. Am. Dental Ass'n*,
  2024 WL 5279870 (C.D. Cal. Dec. 16, 2024) ................................................26

*Pincay v. Andrews*,
  238 F.3d 1106 (9th Cir. 2001).......................................................4, 25, 26, 27

*Pochiro v. Prudential Ins. Co. of Am.*,
  827 F.2d 1246 (9th Cir. 1987)................................................................24

*Procare Lab'ys, Inc. v. Gull Lab'ys, Inc.*,
  50 F.3d 15 n.2 (9th Cir. 1995)................................................................24

*Prof'l Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*,
  508 U.S. 49 (1993) ................................................................18

*Quach v. Cross*,
  2004 WL 2860346 (C.D. Cal. Jun. 10, 2004) ................................................2

*Relevant Grp., LLC v. Nourmand*,
  116 F.4th 917 (9th Cir. 2024)................................................................15, 18

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993) .......................................................7, 41, 42, 44

EMRANI AND HIS LAW OFFICE'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

*Ricci v. Cnty. of Sacramento*,
  2020 WL 1046805 (E.D. Cal. Mar. 4, 2020) ......................................................36

*Rotella v. Wood*,
  528 U.S. 549 (2000) ....................................................................................4, 26

*San Remo Hotel, L.P. v. City & Cnty. of San Francisco*,
  545 U.S. 323 (2005) ...........................................................................................22

*Sanford v. MemberWorks, Inc.*,
  625 F.3d 550 (9th Cir. 2010)..............................................................................46

*Save Bull Trout v. Williams*,
  51 F.4th 1101 (9th Cir. 2022)..............................................................................23

*Sedima, S.P.R.L. v. Imrex Co.*,
  473 U.S. 479 (1985) ............................................................................................34

*Shaw v. Nissan N. Am., Inc.*,
  220 F. Supp. 3d 1046 (C.D. Cal. Oct. 24, 2016)..............................................41, 44

*SiFi Networks Fullerton, LLC v. Berkshire Hathaway Specialty Co.*,
  2025 WL 1544099 n.4 (C.D. Cal. Apr. 25, 2025) .................................................31

*Silver v. Duel*,
  2022 WL 16859646 (C.D. Cal. July 11, 2022)......................................................14

*Sosa v. DIRECTV, Inc.*,
  437 F.3d 923 (9th Cir. 2006).......................................................................passim

*State Farm Mut. Auto. Ins. Co. v. Lee*,
  193 Cal. App. 4th 34 (2011)................................................................................34

*Steele v. Hosp. Corp. of Am.*,
  36 F.3d 69 (9th Cir. 1994)...................................................................................35

*Steinle v. United States*,
  17 F.4th 819 (9th Cir. 2021)................................................................................16

*Stoot v. City of Everett*,
  582 F.3d 910 (9th Cir. 2009)...............................................................................38

*Sun Sav. & Loan Ass'n v. Dierdorff*,
  825 F.2d 187 (9th Cir. 1987)...............................................................................40

-viii-

*Suzuki Motor of Am., Inc. v. Mullion*,
  2017 WL 7410993 (C.D. Cal. Oct. 3, 2017)........................................................46

*Swartz v. KPMG LLP*,
  476 F.3d 756 (9th Cir. 2007)..............................................................5, 29, 30

*Synopsys, Inc. v. Ubiquiti Networks, Inc.*,
  313 F. Supp. 3d 1056 (N.D. Cal. 2018) .............................................................42

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ..............................................................................................13

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
  546 F.3d 991 (9th Cir. 2008)........................................................................15, 18, 19

*Thomas v. Baca*,
  308 F. App'x 87 (9th Cir. 2009) ..........................................................................36

*U.S. & Cal. ex rel. Mohamad v. Harper's Pharm. Inc.*,
  2025 WL 3724875 (C.D. Cal. Nov. 13, 2025)....................................................31

*U.S. ex rel. Shutt v. Cmty. Home & Health Care Servs., Inc.*,
  550 F.3d 764 (9th Cir. 2008)...............................................................................16

*Uber Sexual Assault Survivors for Legal Accountability v. Uber Techs., Inc.*,
  562 P.3d 519, 2025 WL 314211 (Nev. 2025)......................................................1

*Uber Techs., Inc. v. U.S. Jud. Panel on Multidistrict Litig.*,
  131 F.4th 661 (9th Cir. 2025)................................................................................1

*United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n*,
  389 U.S. 217 (1967) ..............................................................................................14

*United States v. Blinder*,
  10 F.3d 1468 (9th Cir. 1993).................................................................................39

*United States v. Frega*,
  179 F.3d 793 (9th Cir. 1999).................................................................................39

*United States v. Turkette*,
  452 U.S. 576 (1981) .....................................................................................6, 41, 46

*Vaughan v. Wardhaugh*,
  2024 WL 2853972 (N.D. Cal. May 10, 2024)......................................................38

-ix-

*Vess v. Ciba-Geigy Corp. USA*,
  317 F.3d 1097 (9th Cir. 2003)................................................................5, 14, 40

*Wagh v. Metris Direct, Inc.*,
  348 F.3d 1102 (9th Cir. 2003)..............................................................................14

*Walter v. Drayson*,
  538 F.3d 1244 (9th Cir. 2008)...............................................................6, 43, 46

*Webster v. Omnitrition Int'l, Inc.*,
  79 F.3d 776 (9th Cir. 1996)...................................................................................46

*White v. Lee*,
  227 F.3d 1214 (9th Cir. 2000)...............................................................................18

*Wojciechowski v. Kohlberg Ventures, LLC*,
  923 F.3d 685 (9th Cir. 2019)..........................................................................3, 23

*Yagman v. Gabbert*,
  2015 WL 13358336 (C.D. Cal. May 14, 2015) .....................................................35

*Yagman v. Garcetti*,
  2014 WL 3687279 (C.D. Cal. July 9, 2014) .........................................................5

**Statutes**

18 U.S.C. § 1962(c) ...............................................................................5, 41, 42, 43

18 U.S.C. § 1964(c) ...............................................................................................34

Cal. Civ. Proc. Code § 128.7 .................................................................................33

Cal. Civ. Proc. Code § 426.10 ...............................................................................25

Cal. Civ. Proc. Code § 426.30 ...........................................................................4, 24

**Rules**

Fed. R. Civ. P. 12(b)(6) .........................................................................................46

Fed. R. Civ. P. 9(b) .........................................................................................passim

-x-
EMRANI AND HIS LAW OFFICE'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Uber is waging a nationwide campaign to close the courthouse doors to plaintiffs and their attorneys.  It championed a "deceptive and misleading" ballot initiative to try to cap contingency fees, which was blocked by the Nevada Supreme Court.  *Uber Sexual Assault Survivors for Legal Accountability v. Uber Techs., Inc.*, 562 P.3d 519, 2025 WL 314211, at *2 (Nev. 2025).  Undeterred, it is spearheading a similar 2026 ballot initiative in California to try to limit both contingency fees and the amount of medical damages its victims can recover.  Malcolm Maclachlan, *Tens of Millions Raised as Uber, Trial Lawyers Gird for 2026 Ballot Initiatives*, Daily Journal (Jan. 6, 2026).  It has also fought and failed to prevent the consolidation of thousands of claims against it by sexual assault survivors.  *Uber Techs., Inc. v. U.S. Jud. Panel on Multidistrict Litig.*, 131 F.4th 661 (9th Cir. 2025); *see also* Laura Lorek, *3000 Lawsuits: Litigation Mounting Against Uber*, Law.com (Sept. 24, 2025).  And it has spent millions on ads against personal injury lawyers.  *See* Natalie Lung, *Uber Targets Personal Injury Lawyers in Multimillion Dollar Ad Campaign*, Bloomberg (Feb. 14, 2025).

But this retaliatory lawsuit may be the most pernicious of all.   Years after settling claims by plaintiffs injured by its drivers—and thereby avoiding trials in which those plaintiffs could have proven their cases to juries—Uber now asserts that the claims it settled were predicate acts of a "racketeering" conspiracy.  And, even more incredibly, Uber alleges substantively identical "conspiracies" in New York, Florida, and Pennsylvania alike.  *See Uber Techs., Inc v. Wingate, Russotti, Shapiro, Moses & Halperin, LLP et al.*, No. 1:25-cv-00522 (E.D.N.Y.); *Uber Techs., Inc. v. Law Grp. of S. Fla. et al.*, No. 1:25-cv-22635-CMA (S.D. Fla.); *Uber Techs., Inc. v. Simon & Simon P.C. et al.*, 2:25-cv-05365-MAK (E.D. Pa.).  Uber would have this Court believe that it is the victim of multiple, independent racketeering schemes

EMRANI AND HIS LAW OFFICE'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

comprised of multiple, independent law firms and medical offices that are separately violating RICO all across the country.

The reality is not nearly so far-fetched. Uber, a $175 billion company, hopes to intimidate personal injury attorneys and exhaust their resources in order to avoid liability for the countless injuries and deaths caused by its drivers. Rather than fix its problems and protect its passengers, Uber seeks to silence its adversaries through the "thermonuclear device" of the federal RICO statute. *Quach v. Cross*, 2004 WL 2860346, at *4 (C.D. Cal. Jun. 10, 2004), *aff'd*, 252 F. App'x 775 (9th Cir. 2007).

That is not how the law works. Plaintiffs injured by Uber drivers have a right to redress, and attorneys like Defendants Jacob Emrani and the Law Offices of Jacob Emrani (Emrani's "Firm") are not only entitled, but duty-bound, to zealously represent their clients. There is nothing wrong with pursuing cases against avaricious corporations responsible for countless torts, nor is there anything wrong with proactively offering legal services to Uber's victims, helping victims access quality medical care, or negotiating to reduce patients' medical bills after legal claims are resolved. Standard, salutary business practices are not RICO schemes.

But if Uber genuinely believed that any personal injury claim was fraudulent, it had obvious recourse: try the case. It also could have sought sanctions or brought a claim for malicious prosecution or abuse of process. It never did. Instead, it voluntarily paid substantial sums to every victim whose claim it now reimagines as part of a RICO conspiracy. That conspiracy is mere fantasy, and belied by Uber's own actions in paying settlements to avoid the scrutiny of jurors time and again.

Uber's First Amended Complaint ("FAC") against Emrani and his Firm fails for four independent reasons.

1. Uber targets Emrani and his Firm for exercising the constitutionally protected right to petition the courts for redress by pursuing, filing, and settling litigation. The *Noerr-Pennington* doctrine safeguards against civil liability for exercise of those First Amendment rights. *Sosa v. DIRECTV, Inc.*, 437 F.3d 923,

929-32 (9th Cir. 2006). To ensure that lawyers have the "breathing space" needed to fully represent their clients, *Noerr-Pennington* protects not only court filings but also "conduct incidental to the prosecution of the suit." *Id.* at 934-35. That is why another judge of this court ruled just two months ago that a RICO claim predicated upon the creation and submission of allegedly inflated attorneys' bills seeking to recover fees was barred by *Noerr-Pennington*. *Ford Motor Co. v. Knight Law Grp.*, 2025 WL 3306280, at *7 (C.D. Cal. Nov. 24, 2025). Yet Uber seeks to impose RICO liability upon Emrani and his Firm for activities far more essential to the prosecution of their clients' cases—namely, the diagnosis and treatment of injuries along with the medical bills necessary to prove the damages proximately caused by Uber and its drivers. Uber's RICO claims thus reach to the heart of the petitioning activity protected by the *Noerr-Pennington* doctrine.

2.    Uber's claims also cannot overcome foundational estoppel principles. Uber settled all of the cases it now attempts to transform into RICO predicates, and the settlement agreements with Emrani's clients have a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Exs. A, B, C, D/E, F, and G.[1] Those agreements "determine the preclusive effect of [each] dismissal with prejudice" entered by Emrani's clients, *Wojciechowski v. Kohlberg Ventures, LLC*, 923 F.3d 685, 689 (9th Cir. 2019), and claim preclusion bars Uber from attempting to "relitigate[] in the RICO context" claims that "were capable of being litigated and decided in the state court," *Monterey Plaza Hotel Ltd. P'ship v. Loc. 483 of Hotel*

---

[1] Exhibit A is the settlement and release agreement with ▮▮▮▮▮▮▮▮, who is the FAC. Exhibit B is the settlement and re▮▮▮▮▮▮ment with ▮▮▮▮▮▮▮▮, who i▮▮▮▮▮▮t B" in the FAC. Exhibit C is the settlement and ▮t with ▮▮▮▮▮, who is "C▮▮▮▮▮▮▮▮▮▮▮▮▮it D/E is the settlement and re▮▮ment with ▮▮▮▮▮▮▮▮▮▮, who are C▮▮▮▮▮d E in the FAC. Exhibit F i▮▮▮▮▮▮▮▮▮▮▮ement with ▮▮▮▮, who▮▮▮▮F in the FAC. Exhibit G is the settlement and releas▮▮▮with ▮▮▮▮▮▮, who is Claimant G in the FAC. The FAC discloses that all of these▮▮▮▮. FAC ¶¶ 71, 95, 121, 130, 142, 153, 169. All other facts related to the settlements are redacted herein for the reasons set forth in the motion to seal filed concurrently herewith.

-3-

*Emps. & Rest. Emps. Union*, *AFL-CIO*, 215 F.3d 923, 928 (9th Cir. 2000). Moreover, all of Uber's causes of action were compulsory counterclaims in the state-court actions that Uber now attempts to relitigate, *see* Cal. Civ. Proc. Code § 426.30(a), and "[f]ederal courts will not permit an action to be maintained where the claims asserted should have been brought as a compulsory counterclaim in an earlier action," *In re Crown Vantage, Inc.*, 421 F.3d 963, 973 n.7 (9th Cir. 2005).

3. The statute of limitations also independently bars all of Uber's claims. Civil RICO claims are governed by a four-year statute of limitations. *Pincay v. Andrews*, 238 F.3d 1106, 1108 (9th Cir. 2001). That period "begins to run when a plaintiff knows or should know of the injury that underlies his cause of action," and "[t]he plaintiff is deemed to have had constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the fraud." *Id.* at 1109-10. The limitations period, moreover, does *not* restart with every "predicate act within the limitations period." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 186-87 (1997). Nor is the limitations period tolled until a plaintiff discovers the alleged "pattern" of racketeering—it is the "injury" that matters. *Rotella v. Wood*, 528 U.S. 549, 553-54 (2000). Applied here, the limitations period began no later than May 11, 2021, by which point: (i) Claimant B had made a demand to Uber's insurer with alleged false representations and also filed suit, serving Uber with an allegedly "fraudulent complaint," FAC ¶¶ 75, 77, 387a, 387c; (ii) Claimant C had filed suit and served Uber with an allegedly "fraudulent complaint," *id.* ¶ 388a; (iii) Claimants D and E had sent Uber's insurer a demand letter with allegedly "fraudulent surgical estimates," *id.* ¶¶ 128-29, 139, 141, 389b; and (iv) Claimant F had filed suit and served Uber with an allegedly "fraudulent complaint," *id.* ¶ 390a. Equipped with all of that information, Uber waited more than four years before filing this suit on July 21, 2025. Its claims are plainly untimely.

4. Even if Uber could overcome all of these threshold bars, its RICO claims assert wire and mail fraud yet fail to satisfy the applicable heightened pleading

-4-

standard under Federal Rule of Civil Procedure 9(b). *See Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948, 958 (9th Cir. 2023) (RICO claim alleging fraud must meet Rule 9(b) standard). Rule 9(b) mandates that Uber identify "the who, what, when, where, and how" of the alleged fraud. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). "Conclusory allegations" that Emrani and his Firm knew that medical treatments, bills, or records were fraudulent "without any stated factual basis are insufficient as a matter of law," *Swartz v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007), and Uber's hollow gesturing to unspecified agreements, unspecified depositions in unspecified cases, and unspecified bills from unspecified providers to unspecified law firms for unspecified claimants, FAC ¶¶ 32-33 nn.2-3, does not "state the factual basis," *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993), for Uber's *dozens* of allegations on "information and belief," FAC ¶¶ 67, 69, 91, 93, 112, 124, 126, 133, 137, 141, 145, 148, 149, 151, 157, 160, 164, 167, 377, 387-91.

Uber also fails to satisfy Rule 9(b) with respect to RICO's elements. Each RICO claim requires "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's business or property." *Coronavirus Reporter*, 85 F.4th at 958; *see* 18 U.S.C. § 1962(c). The FAC does not adequately allege *any* of these elements.

a. There are no predicate acts—nor could there be—because lawyers are permitted to refer injury victims to doctors, doctors are permitted to bill on a lien basis, there is no such thing as a "false" contract where a written agreement contains an enforceable liability provision, doctors are permitted to set the charges for their services, and negotiating reductions in medical bills is industry standard. "[E]ntirely lawful practice[s] cannot constitute 'racketeering' as a matter of law." *Yagman v. Garcetti*, 2014 WL 3687279, at *4 (C.D. Cal. July 9, 2014), *aff'd*, 852 F.3d 859 (9th Cir. 2017). That is particularly true when entirely lawful practices are underlying litigation activities; otherwise, "every" lawsuit—including, unlike here, "unsuccessful" ones—"could spawn a retaliatory action, which would inundate the

EMRANI AND HIS LAW OFFICE'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

federal courts with procedurally complex RICO pleadings," "engender wasteful satellite litigation," and generate "ad infinitum litigation with each party claiming that the opponent's previous action was malicious and meritless." *Kim v. Kimm*, 884 F.3d 98, 104 (2d Cir. 2018) (quotation marks and alteration marks omitted).

b.      Uber also cannot allege the requisite "direct causal connection" between any supposed RICO violation and any alleged injury, *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 459–60 (2006), given that it had "no legal obligation" to settle any claims, *City of Almaty v. Khrapunov*, 956 F.3d 1129, 1133 (9th Cir. 2020), and never alleges that its settlements exceeded the $1 million insurance minimum it was required to carry, FAC ¶ 8.  This absence of injury demonstrates that Uber lacks statutory standing to pursue its RICO claims.  *Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 (9th Cir. 2008).  And even if it were possible for Uber to allege any specific injury from a purported scheme that caused it no damages, Uber's vague and conclusory assertions of harm come nowhere close to satisfying the requirement that a RICO plaintiff allege "concrete financial loss." *Id.*

c.      Uber's attempt to allege a pattern of racketeering fails too—though its millions of drivers are alleged to have committed hundreds of thousands of torts, Uber mined its files (both before and after amending its complaint) and came up with a grand total of just six cases that were handled by Emrani and his Firm.  Far from reflecting "a relationship between the predicates" and a "threat of continuing activity," *Howard v. Am. Online Inc.*, 208 F.3d 741, 750 (9th Cir. 2000), Uber's identification of just a handful of unrelated cases pertaining to Emrani and his Firm magnifies the emptiness of Uber's claims.

d.      Nor does Uber allege the existence of a RICO "enterprise" functioning "separate and apart from the pattern of activity in which it engages," *United States v. Turkette*, 452 U.S. 576, 583 (1981), or that Emrani and his Firm had "some part in directing [the] affairs" of any such enterprise, *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008).  There is no plausible scenario in which Emrani and

-6-

EMRANI AND HIS LAW OFFICE'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

his Firm conspired with their *rivals* at the Downtown LA Law Group to direct the affairs of any enterprise, nor has Uber plausibly alleged that Emrani or his law Firm exercised control over a fully independent medical practice. Even more confoundingly, Uber purports to sue Emrani himself without alleging any manner in which he personally conducted any purported racketeering enterprise. The mere fact that he oversees his Firm does not mean that Emrani "participate[s] in the operation or management of the [purported RICO] enterprise itself," *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993), and alleging "that the [Emrani] Defendants are associated in a manner directly related to their own primary business activities" does not "state a claim" under the civil RICO statute, *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, 826 F. Supp. 2d 1180, 1202 (C.D. Cal. 2011).

\* \* \*

Plagued by these multiple fatal, uncurable deficiencies, Uber's retaliatory action—with its transparent design of silencing victims by intimidating their attorneys—should be dismissed with prejudice.

## II. FACTUAL BACKGROUND

### A. Uber Commits Countless Torts Resulting in Countless Injuries

Plaintiff Uber Technologies Inc. is a massive company responsible for countless torts. After its founding in 2009, some investors assigned Uber a valuation as high as $68 billion, *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 401 (9th Cir. 2021); today, its market capitalization is roughly $175 billion, *see* www.finance.yahoo.com/quote/UBER (last accessed Jan. 22, 2025). Meanwhile, Uber has been plagued with safety problems for years. A recent analysis of sealed court records revealed that Uber received a report of sexual assault or misconduct in the United States almost every eight minutes on average between 2017 and 2022. Emily Steel, *Uber's Festering Sexual Assault Problem*, The New York Times (Aug. 6, 2025), https://www.nytimes.com/2025/08/06/business/uber-sexual-assault.html.

In the wake of that bombshell report, a House oversight subcommittee opened an investigation into Uber's policies and protocols for addressing sexual assault and misconduct, https://oversight.house.gov/wp-content/uploads/2025/09/Uber-Sexual-Assault-letter-092425.pdf, and Congresswoman Debbie Dingell wrote to Uber to denounce its "extremely disturbing" failure "to remove potentially dangerous drivers," and "take meaningful action" to remedy its safety problems. https://debbiedingell.house.gov/uploadedfiles/dingell_jan2026_letter_to_uber.pdf, at 2. Congresswoman Dingell pointed out that Uber's background check process approves drivers with "many types of criminal convictions, including violent felonies" such as "child abuse, assault, and stalking." *Id.* at 1. Uber prioritizes its "image and bottom line" over the well-being of its passengers. *Id.* at 2; *see also* Emily Steel, *Uber Faces Growing Pressure Over Sexual Assault Record*, The New York Times (Jan. 21, 2026), https://nytimes.com/2026/01/21/business/uber-scrutiny-sexual-assault.html.

Meanwhile, Uber's own safety report for 2017 to 2022 disclosed that its drivers were involved in 361 fatal car accidents and 75 fatal physical assaults in the U.S. alone. Uber, 2021-2022 U.S. Safety Report (Aug. 30, 2024), https://uber.app.box.com/s/lea3xzb70bp2wxe3k3dgk2ghcyr687x3?uclick_id=3c18b7ff-2ae1-4170-9c7d-e06a2b860b7b, at 15, 18. Those figures of course do not account for all of the non-fatal accidents and injuries caused by Uber drivers. It is thus unsurprising that victims injured by Uber often require medical care and seek counsel to recover damages for their injuries. Uber's own decision to put profits ahead of safety explains why it is subject to legitimate lawsuits.

**B.  Jacob Emrani Is a Very Prominent Personal Injury Lawyer Who Has Represented Injury Victims in Successful Suits Against Uber**

Jacob Emrani is a prominent personal injury lawyer in Los Angeles, California. FAC ¶¶ 12, 21-22. He is the named leader of The Law Offices of Jacob Emrani, *id.* ¶ 22, a law firm that has litigated thousands of cases, involving pedestrian accidents,

-8-

slips and falls, sexual assaults, and transportation accidents of all types, including hundreds of cases against Uber. The Downtown LA Law Group, where Igor Fradkin works, is a separate personal injury law firm. *Id.* ¶¶ 19-23. The Law Offices of Jacob Emrani and the Downtown LA Law Group ("Fradkin's Firm") are competitors that both represent clients who have been injured by Uber. *See id.* ¶ 26. As rivals, the firms are routinely adverse to each other.

**C.    Uber Alleges That the Claims It Settled For Substantial Sums Were Actually Part of a RICO Conspiracy**

This lawsuit is designed to retaliate against Emrani, Fradkin, and their respective law firms for successfully representing Uber's victims and holding Uber accountable for injuries caused by its drivers. The supposed RICO predicates at the heart of Uber's claims are nothing more than lawsuits arising from crashes caused by Uber's drivers. FAC ¶¶ 57-353. Emrani's Firm represented Claimants A-G (the "Emrani Claimants") and had nothing to do with Claimants H-R; Fradkin's Firm represented Claimants H-R (the "Fradkin Claimants") and had nothing to do with Claimants A-G. *See id.* All of the Emrani Claimants were involved in crashes caused by Uber drivers in 2019, FAC ¶¶ 57, 72, 96, 122, 131, 143, 154, and the Fradkin Claimants were involved in crashes caused by Uber's drivers between 2017 and 2022, *id.* ¶¶ 170, 188, 204, 224, 240, 272, 288, 305, 325, 340. All of the Emrani Claimants filed suits against Uber in 2020 or 2021, FAC ¶¶ 387c, 388a, 389c, 390a, 391b; ▮▮▮▮▮▮▮▮▮▮▮▮ and Uber settled of their lawsuits for substantial sums, ▮▮▮▮ ▮▮▮▮, Exs. A-G. As the FAC repeatedly suggests without candidly admitting, all of the settlements involving the Emrani Claimants were paid by Uber's insurers. *See* FAC ¶¶ 28-29, 35, 75, 128, 139, 382-83, 386, 387, 389.

To transform all of its injury victims' settled claims into a RICO conspiracy, Uber alleges a scheme that supposedly plays out in four parts.

First, Emrani, Fradkin, and their respective Firms pursue clients who have been injured by rideshare companies like Uber, and take their cases on contingency. FAC ¶ 27. The FAC does not allege that Emrani or his Firm communicate with Fradkin or his Firm; nor could it—rival personal-injury practices compete, not coordinate. According to Uber, however, the two firms both refer clients to medical providers like Dr. Greg Khounganian and Valley Orthopedic and Spine Center (the "Medical Provider Defendants"), who provide care without the administrative delays, barriers, and restrictions of health insurance. *Id*. ¶ 10. The FAC does not explain how such conventional business practices by lawyers and doctors—which facilitate access to both legal representation and medical care—are in any way improper or unlawful.

Second, the FAC alleges that in the course of treating injury victims, the Medical Provider Defendants charge "above-market, artificially inflated rates" on medical bills in order "to support artificially inflated claims" in litigation. *Id*. ¶¶ 25, 27, 31, 35, 36, 49, 55, 71, 73, 94, 102, 366, 368. The FAC does not, however, state what the supposed market rates were, how much the bills were supposedly inflated above those rates, or why it is anything other than ordinary to bill more for medical services than a provider expects to be paid.

Third, the FAC alleges that the Medical Provider Defendants and the injury victims' lawyers "secretly enter into side agreements under which the medical providers agree to take a substantial discount in the event that the recovery [in litigation] is insufficient to pay the artificially inflated medical bills." FAC ¶ 3; *see also id*. ¶¶ 4, 10, 69, 93, 114, 167, 185, 201, 219, 237, 251, 269, 284, 302, 334, 352. The FAC does not, however, identify who specifically entered into the supposed secret side agreements, when and where they did so, whether the agreements were all merely verbal, or what their terms provide.

Fourth, the FAC alleges that the purported secret side agreements vitiate express "lien agreements" in which victims agree to pay their medical expenses out

of their lawsuit recoveries but also "promise full payment to the medical providers" and agree to be held "directly and unconditionally responsible for the medical provider's fees," irrespective of the amount recovered in litigation. FAC ¶¶ 2, 32; *see also id.* ¶¶ 11, 33-34, 67, 73, 91, 112, 126, 137, 149, 160. The FAC does not, however, explain how or why an explicit contract would be a "sham" or "knowingly false," *id.* ¶¶ 3, 11, 33-34, 67, 91, 92, 112, 126, 137, 149, 160, merely because a medical provider has the right to enforce the agreement but chooses not to do so.

Moreover, Uber does not allege that it advanced any of these allegations of fraud in the course of litigating any of the underlying cases. At no point in any of those lawsuits does Uber claim to have asserted that any victim's medical bills were artificially inflated or exceeded market rates, that any medical practitioner entered into a secret agreement with any lawyer to reduce a medical bill in the event of a shortfall in a lawsuit's recovery, or that any victim's promise to pay medical bills in full was somehow a sham. Nor does Uber claim to have asserted in any of the underlying lawsuits that any Claimant's injuries or medical diagnosis was "exaggerated," "false," or "falsely" linked to an Uber crash, *see, e.g.*, FAC ¶¶ 6, 124, 133, 145, 274, 327, 357, 359, 371; that any medical treatment was "authorized" or "directed" by lawyers, *see, e.g., id.* ¶¶ 41, 62, 403; or that any lawyer entered into a "kickback scheme" with any doctor, *see, e.g., id.* ¶¶ 4, 31, 33, 56, 59, 102, 124, 133, 145, 171, 205, 274, 327. Uber's failure to advance any of these allegations in any of the underlying lawsuits is especially unjustifiable given that those suits not only progressed through discovery with documentation of police reports and "medical examination[s]" but often entailed "independent medical evaluation[s]" and "independent expert" assessments of medical bills. *E.g., id.* ¶¶ 70, 119, 172, 174, 183, 197, 221, 299, 321. Armed with all of that evidence, Uber did not contest medical records or treatment decisions but instead settled with each Claimant, thereby avoiding jury trials and a potentially significantly higher verdicts each time.

**D.      Uber Sets Forth Implausible Causes of Action, Claiming That Lawyers Conspired with Their Rivals and Controlled Doctors**

The FAC alleges three illogical RICO causes of action against Emrani and/or his Firm.  FAC ¶¶ 414-20 (Second Cause of Action), 439-46 (Fifth Cause of Action), 447-56 (Sixth Cause of Action).  The second cause of action alleges that Emrani and his Firm conspired with the Medical Provider Defendants, perplexingly lumping together all four defendants as both the RICO "enterprise" and the RICO "person." *Id.* ¶¶ 415, 419.  The sixth cause of action alleges that Emrani and his Firm conspired with their direct competitors, Fradkin and his Firm, as well as the Medical Provider Defendants.  *Id.* ¶¶ 447-56.  Once again, the FAC draws no distinction between the purported RICO "enterprise" and the purported RICO "person."  *Id.* ¶¶ 448, 452.

The fifth cause of action, asserted only against Emrani personally, effectively alleges that he ran his Firm. *See id.* ¶ 441; *see also id.* ¶ 378 (alleging that "Emrani operated, managed, and controlled his law firm").  Although the FAC asserts that Emrani "aggressively pursue[s] clients to sue Uber," including by means of speech like "online advertisement[s]," *Id.* ¶ 26, the sections of the FAC describing the Emrani Claimants, *id.* ¶¶ 57-169, include no allegations about Emrani personally, apart from the assertions that he was copied on two emails regarding Claimant A, *id.* ¶¶ 63, 64, signed a demand letter to Uber's insurance provider regarding Claimant B, *id.* ¶ 75, filed a lawsuit against Uber on Claimant B's behalf, *id.* ¶ 77, was listed as Claimant B's lawyer on a lien agreement with a physical therapist, *id.* ¶ 86, and signed a demand letter to Uber's insurer for Claimants D and E, *id.* ¶¶ 128, 139.  The fifth cause of action adds nothing to those threadbare allegations.  It merely parrots statutory language in conclusory fashion, stating that Emrani "knowingly conducted and/or participated, directly or indirectly, in the conduct of The Law Offices of Jacob Emrani's affairs through a pattern of racketeering activities."  *Id.* ¶ 441.

Uber's RICO claims are predicated on supposed wire and mail fraud based on wirings and mailings related to litigation, *see id.* ¶¶ 383, 386-402, yet the FAC fails

-12-

to allege how the majority of those wirings and mailings furthered any fraud scheme, *see id.*, and does not connect any particular wiring or mailing with any particular cause of action, *see id.* ¶¶ 407-56.  Uber attempts to shore up these deficient allegations with assumption and conjecture, repeatedly claiming that it was "foreseeable" to defendants that documents and records—many of which are not even identified—"would be" mailed or wired.  *See, e.g., id.* ¶¶ 383, 386c-d.  In addition, the FAC alleges that "[t]he acts also occurred over a substantial period of time" but does not specify which acts or what period of time that allegation is referencing.  *Id.* ¶ 406.

## III.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.  In ruling on a motion to dismiss, "courts must consider the complaint in its entirety" along with other sources that "courts ordinarily examine" at the pleading stage, "in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).  The Court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

The Federal Rules impose a heightened pleading standard for claims that sound in fraud: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  Rule 9(b) "applies to civil RICO fraud claims." *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1065-66 (9th Cir. 2004).  Indeed, it plays an especially important role in the civil RICO context where "quasi-criminal" claims can have an unfair "stigmatizing effect" on

-13-

defendants, and courts should therefore "strive to flush out frivolous RICO allegations at an early stage of the litigation." *Wagh v. Metris Direct, Inc.*, 348 F.3d 1102, 1108 (9th Cir. 2003); *Silver v. Duel*, 2022 WL 16859646, at *3 (C.D. Cal. July 11, 2022); *JST Distrib., LLC v. CNV.com, Inc.*, 2018 WL 6113092, at *8 (C.D. Cal. Mar. 7, 2018). "To avoid dismissal for inadequacy under Rule 9(b)," a complaint must "state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Edwards*, 356 F.3d at 1066. The allegations "must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Vess*, 317 F.3d at 1106.

## IV.    ARGUMENT[2]

### A.    Uber's Claims Impermissibly Seek to Impose Liability Based on the Protected Right to Pursue Judicial Redress

Emrani, his law Firm, and his clients injured by Uber have a constitutional right to petition the judiciary for redress. That right is "among the most precious of the liberties safeguarded by the Bill of Rights" and is "intimately connected both in origin and in purpose, with the other First Amendment rights of free speech and free press." *United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n*, 389 U.S. 217, 222 (1967). The *Noerr-Pennington* doctrine protects this constitutional right by immunizing litigation activity from civil liability. *Sosa*, 437 F. 3d at 929.

To ensure that lawyers and their clients may pursue litigation without fear of reprisal, *Noerr-Pennington* "sweeps broadly." *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1059 (9th Cir. 1998). "In determining whether the burdened conduct falls under the protection of the Petition Clause" for *Noerr-Penington* purposes, courts "must give adequate breathing space to the right of petition." *Sosa*, 437 F.3d at 931-32 (quotation marks omitted). That breathing space is preserved by construing civil liability statutes to avoid burdening "activity arguably falling within the scope of the

---

[2] In addition to the arguments set forth herein, Emrani and his Firm join in all of the arguments advanced by their co-defendants as support for dismissing Uber's claims.

-14-

EMRANI AND HIS LAW OFFICE'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Petition Clause." *Id.* at 942. "[T]he doctrine overprotects baseless petitions so as to ensure citizens may enjoy the right of access to the courts without fear of prosecution." *Relevant Grp., LLC v. Nourmand*, 116 F.4th 917, 927-28 (9th Cir. 2024) (quotation marks omitted). And the protection extends not only to plaintiffs in the underlying litigation but also to the "law firms and lawyers" who represented them. *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1186 (9th Cir. 2005).

Retaliatory RICO suits designed to penalize and chill litigation activity are barred by *Noerr-Pennington*. In *Relevant Group*, for example, the Ninth Circuit held that *Noerr-Pennington* barred a real estate developer's claims that its adversaries had violated RICO by pursuing and filing environmental protection lawsuits "to extort funds" from the developer. 116 F.4th at 923-25, 927-28. And in *Sosa*, the Circuit held that *Noerr-Pennington* barred claims that DIRECTV had violated RICO by threatening to sue thousands of individuals who settled with DIRECTV rather than incur the expense of defending against accusations that they had illegally accessed satellite television signals. 437 F.3d at 925-27, 942. RICO cannot be used to penalize "communication[s] to the court," "conduct incidental to the prosecution of the suit," or "litigation-related activities preliminary to the formal filing of the litigation." *Id.* at 933, 934-35, 937; *see also Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1007 (9th Cir. 2008) ("Conduct incidental to a lawsuit, including a pre-suit demand letter, falls within the protection of the *Noerr–Pennington* doctrine."). By protecting—and "overprotect[ing]"—such conduct and communications, *Noerr-Pennington* "ensure[s] that First Amendment rights are not chilled." *Relevant Grp.*, 116 F.4th at 934-35; *Sosa*, 437 F.3d at 934; *see also BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 532 (2002) ("[T]he ability to lawfully prosecute even unsuccessful suits adds legitimacy to the court system as a designated alternative to force.").

The freshly inked decision in *Ford Motor Co.* is particularly instructive. In that case, Ford alleged that a group of consumer advocacy lawyers and their staff violated RICO by pursuing and recovering attorneys' fees based on allegedly

-15-

"inflated" fee petitions filed in connection with successful "Lemon Law" cases against Ford. 2025 WL 3306280, at *2. A judge of this court granted the defendants' motions to dismiss, reasoning that Ford's RICO claim "would quite plainly burden Defendants' ability to seek fees for its litigation activity," conduct that was "at least incidental to the prosecution of the suit." *Id*. at *7-8 (quotation marks omitted).

This case is an even clearer candidate for dismissal. While "all attorney's fees requests" of the sort at issue in *Ford* "are collateral to the main action," *U.S. ex rel. Shutt v. Cmty. Home & Health Care Servs., Inc.*, 550 F.3d 764, 766 (9th Cir. 2008), Uber's RICO causes of action target components of the predicate suits that were fundamental to their underlying claims. Proof of "proximate cause resulting in injury" is a basic "requirement of California tort law." *Steinle v. United States*, 17 F.4th 819, 825 (9th Cir. 2021); *see also Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 595 (9th Cir. 1996) ("California law dictates that causation is a necessary element of a personal injury action."). To carry the burden of proving causal injury, it makes perfect sense that personal-injury lawyers would refer their clients to doctors for diagnoses and treatment and would need clients' medical bills to establish damages. Uber's claim that those basic prerequisites of tort law were tainted by fraud falls within the heartland of *Noerr-Pennington*.

Indeed, all of Uber's allegations are predicated on litigation, litigation-related activities, and conduct incidental to the prosecution of litigation. The purported fraud begins when Emrani and his Firm "aggressively pursue clients to sue Uber," including by means of an "online advertisement" in which Emrani advertises his services to victims injured in Uber accidents. FAC ¶ 26.[3] That is the pursuit of *litigation*, plain and simple. Thereafter, Emrani and his Firm allegedly "direct" lawsuit "claimants"—i.e., Uber's injury victims—to "medical providers" who agree

---

[3] Emrani's advertising to recruit clients is of course commercially protected speech, *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995), to which *Noerr-Pennington* applies, *see In re Airport Car Rental Antitrust Litig.*, 693 F.2d 84, 87-88 (9th Cir. 1982) (there is no "commercial exception" to *Noerr-Pennington*).

-16-

EMRANI AND HIS LAW OFFICE'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

to be paid from "recoveries" in *litigation*. *Id.* ¶ 2. And those medical providers then supposedly generate "artificially inflated bills" that are "utilized as the basis for a false and artificially inflated *damages claim*" in *litigation*. *Id.* ¶¶ 2-3 (emphasis added). The specific "purposes" of the fraudulent bills, in Uber's telling, are to "artificially inflate the *damages* claimed in *lawsuits*" and to assist lawyers in "fabricating" *legal claims* against Uber. *Id.* ¶¶ 25 (emphases added), 89, 125, 165, 198, 215, 248, 282, 300, 312. The alleged inflated medical bills exist only to support lawsuits and increase damages in litigation: the purportedly "fraudulent bills and claims are typically presented to Uber and other defendants in the form of a personal-injury lawsuit and/or a pre-suit demand letter." *Id.* ¶ 3. Thus, the lawyer referrals to medical practitioners and purported preparation of fraudulent medical bills are "litigation-related activities preliminary to the formal filing of the litigation" or "conduct incidental to the prosecution of the suit." *Sosa*, 437 F.3d at 934, 937; *see also Ford Motor Co.*, 2025 WL 3306280, at *8 ("It is difficult to imagine" how the preparation of "allegedly false billing statements both based on litigation activity and in anticipation of submitting fee petitions" could not be "incidental to the prosecution of the suit."). In fact, the Medical Provider Defendants allegedly "accept[] referrals from lawyers who *have cases* against Uber," FAC ¶ 10 (emphasis added), which goes well beyond the mere possibility of a future action.

Medical practitioners' purported agreements to be paid on "a lien basis," *id.* ¶¶ 2, 10, 25, 31, 41, 73, are also litigation-related activities and thus protected under *Noerr-Pennington*. According to Uber, these lien agreements entitle the Medical Provider Defendants to a "cut of their [patients'] eventual lawsuit recovery." *Id.* ¶ 10. An agreement to be paid from the proceeds of a lawsuit is obviously related to litigation, and a doctor's alleged willingness to enter into such an agreement is either "incidental to litigation," protected "prelitigation conduct," or both. *Sosa*, 437 F.3d at 934, 936; *Ford Motor Co.*, 2025 WL 3306280, at *7. The same is true of the alleged "secret side agreements" wherein medical practitioners supposedly agree

with lawyers to "discount" their medical bills in the event that "the recovery" in a lawsuit "is insufficient to pay the artificially inflated medical bills." FAC ¶¶ 3, 4, 10, 69, 93, 114, 167, 185, 201, 237, 251, 269, 284, 302, 334, 352. Any such purported agreements would only further confirm that the alleged lawyer-doctor relationships upon which Uber's claims are predicated is purely a function of litigation, designed to further the petitioning activity of Emrani and his Firm's clients.

Because all of the conduct and communications underlying Uber's claims are protected, *Noerr-Pennington* bars those claims unless the targeted petitioning activity constitutes "sham litigation." *Theme Promotions*, 546 F.3d at 1007. That exception, however, is reserved for lawsuits that satisfy "a two-part test." *Id.* "First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could reasonably expect success on the merits." *Id.*; *see also Prof'l Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 57 (1993) ("[A]n objectively reasonable effort to litigate cannot be sham regardless of subjective intent."). Second, if objectively baseless, courts evaluate "the litigant's subjective motivation," asking "whether the baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a *competitor*" by deploying the litigation process "as an anticompetitive weapon." *Id.* (quotation marks omitted).

Neither prong is met here. First, the Ninth Circuit has recognized that "settlement indicates a lawsuit is not objectively baseless." *Relevant Grp.*, 116 F.4th at 932; *see also Theme Promotions*, 546 F.3d at 1008 ("The fact that this ongoing litigation settled suggests that the original suit was not objectively baseless."); *White v. Lee*, 227 F.3d 1214, 1232 (9th Cir. 2000) ("A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham."); *Kottle*, 146 F.3d at 1063 ("In the litigation context, the Supreme Court has reminded us that a winning lawsuit is, by definition, not objectively baseless."). Here, Uber settled *all* of the underlying lawsuits, demonstrating that they were not objectively baseless. Second, none of the underlying lawsuits were filed by an Uber "competitor" (such as

-18-

Lyft); rather, they were filed by victims injured by Uber's drivers, and there is no sense in which such suits could be "an anticompetitive weapon." *Theme Promotions*, 546 F.3d at 1007. Accordingly, the sham litigation exception is inapplicable, and all of Uber's claims are barred by the *Noerr-Pennington* doctrine.

### B. Uber's Claims Are Barred by Fundamental Estoppel and Res Judicata Principles

Emrani's clients—Claimants A, B, C, D, E, F, and G—fully litigated their claims against Uber to final judgments.

On October 14, 2021, Claimant A sued Uber and others in Los Angeles County Superior Court for damages arising from a car crash caused by an Uber driver. *See* Compl., ███████████ Uber answered the Complaint, and after nearly four years of litigation, the parties settled. ████████████

████████████

████████████

████████████

████████████

████████████

████████████

On March 9, 2021, Claimant B sued Uber and others in Riverside County Superior Court for damages arising from a car crash caused by an Uber driver. *See* Compl., *Richardson v. Uber Techs., et al.*, No. CVRI2101286 (Cal. Super. Mar. 9, 2021). Uber answered the Complaint, and after more than three years of litigation, Claimant B moved to voluntarily dismiss the action with prejudice. Request For Dismissal, *Richardson* (Apr. 10, 2023). ████████████

████████████

████████████

-19-

On March 9, 2021, Claimant C sued Uber and others in Los Angeles County Superior Court for damages arising from a car crash caused by an Uber driver. FAC ¶ 96; Compl., *Soto v. Uber Techs., et al.*, No. 21STCV09313 (Cal. Super. Mar. 9, 2021). Uber answered the Complaint, and after nearly two years of litigation, Claimant C moved to voluntarily dismiss the action with prejudice. Request For Dismissal, *Soto* (Mar. 1, 2023).

On August 9, 2021, Claimants D and E sued Uber and others in Los Angeles County Superior Court for damages arising from a car crash caused by an Uber driver. FAC ¶¶ 122, 131; Compl., *Taylor et al. v. Uber Techs., et al.*, No. 21STCV29247 (Cal. Super. Aug. 9, 2021). Uber answered the Complaint, and after approximately a year and half of litigation, Claimants D and E moved to voluntarily dismiss the action with prejudice. Request For Dismissal, *Taylor* (Cal. Super. Feb.

-20-

3, 2023). ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

On October 19, 2020, Claimant F sued Uber and others in Los Angeles County Superior Court for damages arising from a car crash caused by an Uber driver. FAC ¶ 143; Compl., *Martinez v. Uber Techs., et al.*, No. 20STCV40086 (Cal. Super. Oct. 19, 2020). Uber answered the Complaint, and after nearly two years of litigation, Claimant F moved to voluntarily dismiss the action with prejudice. Request For Dismissal, *Martinez* (Cal. Super. July 19, 2022). ██████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████

On November 5, 2021, Claimant G sued Uber and others in Riverside County Superior Court for damages arising from a car crash caused by an Uber driver. FAC ¶ 154; Compl., *Payne v. Uber Techs., et al.*, No. CVRI2105143 (Cal. Super. Nov. 5,

2021).   Uber answered the Complaint, and after nearly two years of litigation, Claimant G moved to voluntarily dismiss the action with prejudice.  Request For Dismissal, *Payne* (Cal. Super. Oct. 24, 2023).



Under well-established principles of estoppel, Uber is barred from relitigating these settled claims.

1.      Uber's Claims Are Barred By Claim Preclusion

"The dismissal of [an] action with prejudice constitutes a final judgment on the merits" for preclusion purposes, *Int'l Union of Operating Eng'rs-Emps. Const. Indus. Pension, Welfare & Training Tr. Funds v. Karr*, 994 F.2d 1426, 1429 (9th Cir. 1993), and in "[a]pplying the principles of claim preclusion," federal courts "treat a state court judgment with the same respect it would receive in the courts of the rendering state," *Moreno v. UtiliQuest, LLC*, 29 F.4th 567, 578 (9th Cir. 2022).  Thus, where a final state-court judgment is entered, claim preclusion prohibits "the parties or their privies from relitigating issues that were or could have been raised in that action."  *Dodd v. Hood River Cnty.*, 59 F.3d 852, 863 (9th Cir. 1995).  Claim preclusion, moreover, safeguards "vital public interests." *San Remo Hotel, L.P. v. City & Cnty. of San Francisco*, 545 U.S. 323, 346 (2005).  "It serves to protect against the expense and vexation attending multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibility of inconsistent

-22-

decisions." *Save Bull Trout v. Williams*, 51 F.4th 1101, 1107 (9th Cir. 2022) (quotation marks omitted). Public policy demands "an end to litigation," and claim preclusion ensures "that those who have contested an issue shall be bound by the result of the contest." *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 401 (1981). That is why "[t]here is simply no principle of law or equity which sanctions the rejection by a federal court of the salutary principle of *res judicata*." *Id.* (quotation marks omitted).

Although claim preclusion traditionally entails a three-part test, the "inquiry is modified in cases where the earlier action was dismissed in accordance with a release or other settlement agreement." *Wojciechowski*, 923 F.3d at 689.[4] In such instances, courts "look to the intent of the settling parties to determine the preclusive effect of a dismissal with prejudice entered in accordance with a settlement agreement, rather than to general principles of claim preclusion." *Id.* "The settlement and release become [the] final judgment" and "determine[] the scope of preclusion in [a subsequent] action as a matter of preclusion law, not as a matter of contract." *Id.* at 690-91 (quotation marks omitted). Where parties desire to "limit the scope of the preclusive effect of a dismissal with prejudice," they are free to do so by the terms of their settlement. *Id.* at 689.

████████████████████████████████████████████████████████ In each instance, the state court "approved the settlement agreement and closed the case, giving the agreement preclusive effect." *Wojciechowski*, 923 F.3d at 690. ████ ████████████████████████████████████████████████████████

---

[4] The traditional three-part test would also preclude relitigation of the claims in the underlying actions for the reasons set forth in Downtown LA Law Group's motion to dismiss.

-23-

[text redacted]

Nothing permits Uber's claims "to be relitigated in the RICO context when they were capable of being litigated and decided in the state court." *Monterey Plaza*, 215 F.3d at 928. The agreements it wrote and signed preclude Uber from advancing its claims against Emrani and his Firm.

### 2. Uber Was Required to Litigate Its Claims As Compulsory Counterclaims in the Underlying State Actions

Uber's claims are independently barred by its failure to raise them as counterclaims in the Emrani Claimants' state court lawsuits. A compulsory counterclaim that is not brought in the first action is barred by claim preclusion. *Crown Vantage*, 421 F.3d at 973 n.7; *see also Hoffman v. Goli Nutrition, Inc.*, 2024 WL 230873, at *13 (C.D. Cal. Jan. 17, 2024) (finding that claims "should have been brought as compulsory counterclaims in the [earlier] litigation" and accordingly "dismiss[ing] them from this action"). Federal courts look to state law to determine "the preclusive effect of the failure to raise a compulsory counterclaim in an earlier state court action." *Pochiro v. Prudential Ins. Co. of Am.*, 827 F.2d 1246, 1253 (9th Cir. 1987); *see also Procare Lab'ys, Inc. v. Gull Lab'ys, Inc.*, 50 F.3d 15, *2 n.2 (9th Cir. 1995) ("The preclusive effect of the failure to raise a compulsory counterclaim in an earlier state court action is determined by state law."). Because the claims that Uber asserts in this litigation are compulsory counterclaims under California law, they are barred by res judicata and must be dismissed.

Cal. Civ. Proc. Code § 426.30 provides that if a properly served defendant "fails to allege in a cross-complaint any related cause of action which (at the time of serving his answer to the complaint) he has against the plaintiff, such party may not thereafter in any other action assert against the plaintiff the related cause of action

-24-

not pleaded." The phrase "a related cause of action" is broadly defined as any "cause of action which arises out of the same transaction, occurrence, or series of transactions or occurrences as the cause of action which the plaintiff alleges in his complaint." Cal. Civ. Proc. Code § 426.10. This statute is "designed to prevent piecemeal litigation," and is "liberally construed to advance its purpose." *Heshejin v. Rostami*, 54 Cal. App. 5th 984, 993 (2020) (quotation marks omitted). As such, "an absolute identity of factual backgrounds for the two claims" is not required. *Align Tech., Inc. v. Tran*, 179 Cal. App. 4th 949, 960 (2009). Rather, the phrase "related cause of action" encompasses any claims with a "logical relationship between them." *New England Country Foods, LLC v. VanLaw Food Prods., Inc.*, 2021 WL 6751898, at *3 (C.D. Cal. Nov. 23, 2021) (applying California law).

Uber's claims in this case are logically (and indeed obviously) related to the lawsuits the Emrani Claimants litigated in California state court. Uber's suit arises from the same car crashes at issue in those cases FAC ¶¶ 57, 72, 96, 122, 131, 143, 154, and Uber's theory here is that the Claimants' medical records in those earlier suits were fraudulent, FAC ¶¶ 68-69, 92-93, 113-14, 129, 141, 150-51, 166-67. Uber had ample opportunity to bring a counterclaim alleging in the underlying suits that the medical records at issue were fraudulent. It did not, barring it from now raising these related causes of action in this litigation. *See Hoffman*, 2024 WL 230873, at *13 (finding that plaintiff's RICO claim arose from the "same aggregate core of facts" as the earlier action and dismissing it under the compulsory counterclaim rule (quotation marks omitted)).

### C.   Uber's Claims Are Barred by the Statute of Limitations

Uber's civil RICO causes of action are also independently barred the statute of limitations. That limitations period is four years. *Pincay*, 238 F.3d at 1108.

The Supreme Court long ago rejected a "last predicate act rule" whereby a plaintiff could pursue a civil RICO claim so long as it alleged at least one predicate act within the four years preceding suit. *Klehr*, 521 U.S. at 186-87. Such a rule

would extend the limitations period beyond what Congress contemplated and defy principles of repose by permitting plaintiffs "simply to wait, sleeping on their rights, as the pattern continues and treble damages accumulate, perhaps bringing suit only long after the memories of witnesses have faded or evidence is lost." *Id.* at 187 (quotation marks and citation omitted). Following *Klehr*, the Supreme Court also rejected an "injury *and pattern* discovery rule," holding that the limitations period commences based on injury discovery alone. *Rotella*, 528 U.S. at 555-57 (emphasis added). It does not matter "that a considerable effort may be required before a RICO plaintiff can tell whether a pattern of racketeering is demonstrable." *Id.* at 556. Permitting treble damages is only "justified by the expected benefit of suppressing racketeering activity, an object pursued the sooner the better." *Id.* at 558.

In the wake of those decisions, the Ninth Circuit adopted the standard and sensible rule that the civil RICO limitations period begins "when a plaintiff knows *or should know* of the injury that underlies his cause of action." *Pincay*, 238 F.3d at 1109 (emphasis added). The "rule creates a disjunctive two-prong test of actual or constructive notice, under which the statute begins running under either prong." *Id.* For purposes of constructive notice, the limitations period begins when the plaintiff has "enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the fraud." *Id*. at 1110; *see also Patel v. Am. Dental Ass'n*, 2024 WL 5279870, at *7-8 (C.D. Cal. Dec. 16, 2024) (finding civil RICO claims barred by statute of limitations where plaintiff "had sufficient knowledge to suspect wrongdoing" five years before filing action).

In service of its goal of exhausting the resources of its adversaries, Uber ignores all of these decades-old precedents. The FAC's allegations, however, make plain that Uber's claims are time-barred. Uber did not file this suit until July 21, 2025, Docket No. 1 (Compl.), but it was on constructive (if not actual) notice of its claims long before July 21, 2021. All six of the Uber crashes involving the Emrani Claimants occurred in 2019. FAC ¶¶ 57, 72, 96, 122, 131, 143, 154. Before July

-26-

2021, three of those victims—Claimants B, C, and F—had already *filed three separate lawsuits* against Uber and, in each case, had served Uber with a supposedly "fraudulent complaint and related papers." FAC ¶¶ 387c, 388a, 390a. Specifically, Emrani's Firm served the "fraudulent complaint and related papers" for Claimant B on April 2, 2021, Claimant C on May 11, 2021, and Claimant F on November 2, 2020. *Id.* Were that enough, on December 28, 2020, "in furtherance of the [alleged] scheme," Emrani and his Firm allegedly mailed "a demand letter . . . to Uber's insurance provider." *Id*. ¶¶ 75, 387a. Uber alleges that the demand letter itself "falsely represented that Claimant B suffered from numerous spinal injuries and would need to undergo future cervical fusion surgery." *Id*. ¶ 75. Thus, Uber was on constructive notice of the supposed fraud no later than December 2020. "It is hard to imagine what would constitute 'enough information to warrant an investigation' if receiving a written disclosure of one's purported injury does not." *Pincay*, 238 F.3d at 1110; *see also Morehead v. City of Oxnard*, 2023 WL 8143973, at *7 (C.D. Cal. Oct. 4, 2023) ("Once a lawsuit is filed, the party has express notice of the claims against it."). Nothing more is necessary.

Yet that is not all. The FAC also alleges that Emrani's Firm sent Uber's insurer a demand letter with respect to two other victims—Claimants D and E—on March 31, 2021, "demanding a $1 million settlement in furtherance of the scheme." FAC ¶ 389b. That letter added to Uber's constructive notice: it allegedly "bundled the claimed injuries and medical expenses for both Claimant[s] D and E," "claimed a total of $340,441.86 for past and future medical care [for Claimant D], with the majority of future medical expenses arising from Khounganian's fraudulent surgical estimate," and "claimed a total of $627,000 for past and future medical care [for Claimant E], with the majority of future medical expenses arising from Khounganian's fraudulent surgical estimate." FAC ¶¶ 128-29, 139, 141.[5] Those

_____

[5] Though, again, nothing more is necessary, as to Claimant A, Uber alleges that Emrani faxed an information demand to Uber's insurer on January 3, 2020 and an

allegations, too, prove that Uber had at least enough information to warrant an investigation before July 2021.

The FAC's allegations regarding Fradkin's Firm add even more evidence to the statute of limitations mountain.  With respect to Claimant H alone, Uber alleges that: (i) Fradkin's Firm sent Uber's insurer a demand letter with false injury claims on October 18, 2019; (ii) served "Claimant H's fraudulent complaint and related papers" on December 18, 2019; (iii) sent an updated demand letter on June 19, 2020 with false claims regarding necessary "future medical care"; and (iv) emailed Uber on June 17, 2020 and April 15, 2020 with "recent reports from Claimant H's additional visits with Khounganian."  FAC ¶ 392.  All of that conduct predates the July 2021 limitations period, and Uber cannot possibly claim to have lacked at least constructive knowledge after receiving such extensive evidence of the purported RICO scheme.  That constructive knowledge was compounded by similar evidence Uber received before July 2021 regarding no fewer than *six more* victims represented by Fradkin's Firm: Claimants K, L, O, P, Q, and R.  FAC ¶¶ 395, 396, 399, 400, 401, 402.  Given the extraordinary breadth of information Uber had about the supposed RICO scheme well before the limitations period, it either knew of the purported scheme or was duty-bound to investigate.  Its claims are untimely and must be dismissed on that basis alone.

**D.     Uber Fails to Satisfy the Rule 9(b) Heightened Pleading Standard**

Assuming counterfactually that Uber could overcome all of these threshold bars, the FAC still fails to state a claim.

Because each of its RICO causes of action sounds in fraud, Uber must satisfy Rule 9(b)'s heightened pleading standard by alleging "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation."  *Edwards*, 356 F.3d at 1066 (dismissing RICO claim for failure

employee of Emrani's Firm corresponded via email with Uber's insurer on February 6, 2020—actions that preceded the July 2021 outer bound by a year and a half.

-28-

EMRANI AND HIS LAW OFFICE'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

to meet Rule 9(b) standard). Causes of action premised on mail or wire fraud also require allegations that will support "a showing of a specific intent to defraud." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014). The FAC falls far short, impermissibly "lump[ing] multiple defendants together," *Swartz*, 476 F.3d at 764, and eliding key issues by resorting to "vague and conclusory [allegations] without the particularity required by Rule 9(b)," *Coronavirus Reporter*, 85 F.4th at 958.

These defects doom all of Uber's claims against Emrani and his Firm. "The [FAC] is shot through with general allegations that the 'defendants' engaged in fraudulent conduct," *Swartz*, 476 F.3d at 765; *see* FAC ¶¶ 2, 12, 26, 36, 354-60, 362, 365, 366, 368, 370, 372, 377-78, 381, 383, but supplies no basis to believe that Emrani or his Firm were even aware of the alleged underlying wrongdoing. The supposed falsity is all premised on "unnecessary medical treatments, fraudulent medical records, and fraudulent and misleading medical bills." FAC ¶ 12. But Uber's unadorned supposition that victims injured by its drivers did not need medical treatment is insufficient to establish fraud by anyone, let alone by lawyers without medical training or experience. Indeed, the speculation that the Emrani Claimants would subject themselves to extreme and invasive surgeries requiring rigorous, "miserable" recoveries, despite suffering "no injury" and experiencing no pain is fanciful. FAC ¶¶ 57, 61, 65, 72, 76, 80, 84, 85, 87, 96, 122. It is also contradicted by the FAC's own allegations, which include Emrani Claimants who were transported to the emergency room via ambulance, FAC ¶ 132; checked themselves into hospitals within days or hours after Uber's car crashes—and before hiring Emrani's Firm—seeking treatment for "myalgia," "body aches, disorientation, and confusion," "headaches and dizziness," and a "cervical and thoracic sprain," FAC ¶¶ 58, 99, 123, 144, 155; were revealed to have spinal injuries based on MRIs and x-rays, *id.* ¶¶ 107, 147; endured dozens of chiropractor appointments, physical therapy sessions, and epidural injections, FAC ¶¶ 134, 146, 158; and underwent surgeries

performed by doctors who are not alleged to have participated in any fraud scheme, *id.* ¶ 140. And that is just what Uber itself includes in the FAC about all these claims it settled for substantial sums. Much like the fragmented snapshots and isolated email excerpts Uber uses to distort the picture of what actually happened in its crashes, *see* FAC ¶¶ 62-64, 96, 131, 143, 170, 205, 224, 325, Uber's selective excerpts of medical records do not tell the full story. The FAC's incomplete narrative "does not tend to exclude [the more] plausible and innocuous alternative explanation," *Eclectic Props.*, 751 F.3d at 998—that victims injured in car accidents may sustain serious injuries that require serious care.

In any event, the fact that an "independent medical evaluation" was necessary to dispute the medical basis for Claimant A's treatment and an "orthopedic medical expert" was needed to dispute Claimant C's treatment, FAC ¶¶ 70, 120, only proves that there is no basis to allege that Emrani and his Firm had the requisite "knowledge of falsity, or scienter," *In re Actimmune Mktg. Litig.*, 614 F. Supp. 2d 1037, 1048 (N.D. Cal. 2009), *aff'd*, 464 F. App'x 651 (9th Cir. 2011). Uber is not permitted "to merely lump multiple defendants together" and pretend that lawyers have knowledge of medical needs and billing standards "without any stated factual basis" for that supposition. *Swartz*, 476 F.3d at 764-65; *see also Blake v. Dierdorff*, 856 F.2d 1365, 1372 (9th Cir. 1988) (affirming dismissal of civil RICO claim against attorney where complaint lacked "specific allegations about his individual knowledge of or participation in any fraudulent scheme").

The FAC's allegation that patient-doctor lien agreements were "false" or a "sham" due to the existence of a "secret side agreement" to discount medical bills in the event of a shortfall in a lawsuit's recovery, FAC ¶¶ 4, 69, 93, 114, 167, 251, 269, 284, 302, 334, 351-52, is also insufficient under Rule 9(b). The sole basis for the claim that such lien agreements were "false[]" due to the existence of "concealed side agreements" is Uber's "information and belief." FAC ¶ 33 & n.3. To satisfy Rule 9(b), "a plaintiff who makes allegations on information and belief must state the

-30-

EMRANI AND HIS LAW OFFICE'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

factual basis for the belief." *Neubronner*, 6 F.3d at 672. Courts in this district apply that rule all the time. *See, e.g.*, *U.S. & Cal. ex rel. Mohamad v. Harper's Pharm. Inc.*, 2025 WL 3724875, at *8 (C.D. Cal. Nov. 13, 2025); *McGowan v. McLane Co.*, 2025 WL 2087565, at *2 (C.D. Cal. May 9, 2025); *SiFi Networks Fullerton, LLC v. Berkshire Hathaway Specialty Co.*, 2025 WL 1544099, at *12 n.4 (C.D. Cal. Apr. 25, 2025); *Best v. Combs*, 2024 WL 5465052, at *3 (C.D. Cal. Dec. 27, 2024); *Los Angeles Cnty. v. Shepos*, 2024 WL 5277272, at *7 (C.D. Cal. Nov. 8, 2024); *ML Prods. Inc. v. Ninestar Tech. Co.*, 2023 WL 12171006, at *9 (C.D. Cal. Sept. 27, 2023).

Uber's factual basis for its "information and belief" is throwaway thin. The FAC adds two footnotes. FAC ¶¶ 32, 33 nn.2, 3. The footnote regarding alleged lien agreements references "certain [unspecified] lien agreements" and claims that Uber is "aware" that "certain [unspecified] individuals have testified [in unspecified cases] regarding the lien agreements" and "[unspecified] providers have sent bills to the law firms for [unspecified] services provided to the [unspecified] claimants." *Id.* ¶ 32 n.2. The footnote regarding alleged side agreements references "[unspecified] interpleader actions filed by the law firms in state court pertaining to [unspecified] claimants' recoveries in their personal-injury lawsuits" and couples that with Uber's other beliefs for which it offers no foundation: that Dr. Khounganian "does not check the credit histories of claimants" and does not "seek[] to recover the full amount of his claimed fees from patients referred by the law firms." *Id.* ¶ 33 n.3. These "speculative," *Best*, 2024 WL 5465052, at *3, "conclusory and vague allegation[s]," *Basco v. Toyota Motor Corp.*, 2010 WL 11462992, at *2 (C.D. Cal. Mar. 3, 2010), are far too "general and lacking in detail," *Shepos*, 2024 WL 5277272, at *7-8, to sufficiently "specify the factual basis," *SiFi Networks*, 2025 WL 1544099, at *12 n.4, for the FAC's many assertions based on mere information and belief.

The only other purported basis for Uber's beliefs is a reference to "paragraphs 40 through 49," FAC ¶ 33 n.3, but those paragraphs further loosen the gravel.

Paragraph 40 alleges that unspecified medical "[p]roviders" have given Uber unspecified "documentary evidence of the concealed side agreements," *id*. ¶ 40. The single piece of such evidence Uber actually proffers—an alleged "image of a charge detail printout for patients that were referred to [an unspecified] medical imaging provider," *id*. ¶¶ 45, 47—has nothing to do with this case. The screenshot reflects charges from 2008 to 2014, predating all of the Uber crashes in this case by *years*, and involving neither of the Medical Provider Defendants named in the FAC. And as to those charges, the screenshot shows only that Emrani and Fradkin paid less than the unidentified medical provider charged. *Id*. So what? Paying less than an initial charge is entirely consistent with the innocent and more plausible explanation that medical providers routinely bill more than they expect to recover. *Eclectic Props.*, 751 F.3d at 999; *see, e.g.*, *ML Products*, 2023 WL 12171006, at *9 (plaintiff did not sufficiently support belief that defendants paid for false reviews or placed fake orders by pointing to a "statistically inexplicable volume of reviews" that could, in fact, "be due to other conduct"). Because Uber fails to plausibly allege facts that support its belief that doctors and lawyers enter into "secret side agreements," that allegation cannot support Uber's claims. *See Bodenburg v. Apple, Inc.*, 146 F.4th 761, 771 (9th Cir. 2025) ("conclusory allegations of fraud are insufficient").

Though these intrinsic defects defeat Uber's fraud claims, the FAC also fails to satisfy Rule 9(b) with respect to RICO's specific elements. Those elements are: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as predicate acts) (5) causing injury to plaintiff's business or property." *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005) (quotation marks omitted). Uber has failed to plausibly allege each one.

### 1.    There Are No Predicate Acts of Racketeering

Uber advances a startling proposition: that a lawyer's everyday actions in the course of legitimate litigation can constitute predicate acts for a RICO violation. Not so. "Litigation activities alone generally cannot serve as predicate acts for civil RICO

-32-

claims." *Acres Bonusing, Inc. v. Ramsey*, 2022 WL 17170856, at *10 (N.D. Cal. Nov. 22, 2022). Litigation activities include not only ordinary acts like "signing and filing declarations" but also unwarranted acts like "the filing of malicious lawsuits," the pursuit of "meritless litigation," or the "proffering [of] false affidavits and testimony to a state court." *Id*. (alteration marks omitted). If "filing litigation documents" could form the basis for a RICO action, it would result in a "cascade" of retaliatory litigation that could "chill litigants and lawyers and frustrate the well-established public policy goal of maintaining open access to the courts." *Id*. at *11.

The predicate acts of "racketeering" that Uber imagines are not even improper, let alone so extraordinary as to fall outside the general prohibition on pursuing RICO claims based on litigation activities. The FAC alleges that Emrani's Firm effected service of complaints and related papers, filed proofs of service of those complaints and related papers, and emailed or sent demand and settlement letters to Uber and its insurers. FAC ¶¶ 386-91. These are quintessential litigation activities and entirely benign—the documents Emrani's Firm provided to Uber were not actually "fraudulent" and the conclusory sprinkling of that epithet, *e.g.*, *id.* ¶¶ 387c, 388a, 389c, 390a, 391b, does nothing to advance Uber's claims.

But if there were any impropriety, Uber had ample recourse. California courts provide multiple avenues to challenge the validity of legal claims, the accuracy of medical records, and any purported litigation misconduct. To start, Uber could have litigated any case in which it was sued. If Uber believed that the claims at issue were fraudulent or relied on false medical records, it could have presented that defense to a jury, and if the defense had merit, it would have defeated any finding of liability or claimed damages. *See, e.g.*, *Christ v. Schwartz*, 2 Cal. App. 5th 440, 455 (2016) (affirming verdict of no damages where "jury could have reasonably rejected [the plaintiff's] entire testimony as not credible and have concluded that she, like [the defendant], was not injured in the [car] accident"). Separately, Uber could have pursued sanctions under Cal. Civ. Proc. Code § 128.7 if it believed that the claims

-33-

lacked a factual basis. *See Bucur v. Ahmad*, 244 Cal. App. 4th 175, 189 (2016) (affirming trial court's sanctions order for claims that were "legally and factually frivolous"). It also could have sought discovery sanctions if it believed that the medical records it received were false. *See Dep't of Forestry & Fire Prot. v. Howell*, 18 Cal. App. 5th 154, 191 (2017) ("Other sanctionable discovery abuses include providing false discovery responses and spoliation of evidence."). And California law also permits claims for abuse of process, *see, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Lee*, 193 Cal. App. 4th 34, 40 (2011), and/or malicious prosecution, *see, e.g.*, *Marijanovic v. Gray, York & Duffy*, 137 Cal. App. 4th 1262, 1270-71 (2006). All of these potential remedies were on the table if Uber genuinely believed (and could prove) that the claims against it were improper. But settling cases for value and then turning around to assert civil RICO liability against attorneys is not an option.

Endorsing Uber's tactics would sanction the exact sort of retaliatory lawsuits that courts have cautioned against. This suit is transparently designed to "chill litigants and lawyers and frustrate the well-established public policy goal of maintaining open access to the courts." *Acres Bonusing*, 2022 WL 17170856, at *11. Those dangers are especially acute when a corporate behemoth like Uber can deploy its vast recourses in service of its aim to shut down its litigation adversaries. Uber can afford to both settle the individual cases that its victims bring and then use those settled cases as a basis to threaten the plaintiffs' bar with treble damages under RICO. There is a "fundamental constitutional right of access to the courts," *Bounds v. Smith*, 430 U.S. 817, 828 (1977), and Uber should not be allowed to threaten it.

### 2. There Is No Proximately Caused Injury

"A civil RICO 'plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation.'" *Canyon Cnty.*, 519 F.3d at 975 (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)); *see also* 18 U.S.C. § 1964(c) (plaintiff may sue if "injured in his business or property by reason of a violation of section 1962"). To pursue a

claim based on injury to property, a plaintiff must "allege concrete financial loss." *Canyon Cnty.*, 519 F.3d at 975 (quotation marks omitted). "Financial loss alone, however, is insufficient." *Id.* Rather, the plaintiff must allege "a harm to a specific business or property interest." *Id.*

Uber makes no such allegation. Nor could it. The FAC points out that California law required rideshare companies "to carry $1 million of liability and uninsured/underinsured motorist insurance coverage,"[6] FAC ¶¶ 8, 26, which defeats any possibility of injury. ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████, meaning that Uber suffered no loss at all. And Uber is not entitled to stand in the shoes of its insurers; under RICO, "potential plaintiffs who have suffered 'passed-on' injury—that is, injury derived from a third party's direct injury—lack statutory standing." *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168-69 (9th Cir. 2002). That rule is why the Ninth Circuit has specifically held that an overbilling scheme that causes an insurance company to overpay for "services that were not provided or were inappropriate" does not cause a RICO injury to the insured. *Steele v. Hosp. Corp. of Am.*, 36 F.3d 69, 70 (9th Cir. 1994). If plaintiffs "have paid none of the allegedly excessive charges out of their own pockets because those charges were covered by insurance, then they have suffered no financial loss." *Id.* This case fits the exact fact pattern: Uber fails to identify any allegedly excessive charges it paid out of its own pockets, *id.*, and any RICO scheme "would directly victimize the [insurers], not [Uber]," *Mendoza*, 301 F.3d at 1169. *See also Yagman v. Gabbert*, 2015 WL 13358336, at *3 (C.D. Cal. May 14, 2015), *aff'd*, 684 F. App'x 625 (9th Cir. 2017) (plaintiff failed to adequately

---

[6] Uber's lobbyists persuaded the California legislature to reduce the uninsured/underinsured motorist coverage minimum from $1 million to just $60,000 per person and $300,000 per accident. *See* www.uber.com/newsroom/california-insurance-reform/. The new law, SB 371, took effect on January 1, 2026. *See id.*

EMRANI AND HIS LAW OFFICE'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

plead RICO claim where he asserted that attorney billed over $200,000 and was paid over $180,000 but did not allege that "plaintiff himself paid any money to [the attorney]"). Nor can the absence of injury be salvaged by Uber's bare assertion that it "bears the burden of the costs notwithstanding the insurance it is required by law to carry." FAC ¶ 25. That is precisely the sort of "conclusory" allegation that does not satisfy Rule 9(b). *Iqbal*, 556 U.S. at 681; *Bodenburg*, 146 F.4th at 771.

Uber's allegation that it incurred defense costs "that were substantially higher than they would have been absent the fraudulent medical records," FAC ¶ 71, is similarly inadequate. The Ninth Circuit has never "recognized the incurment of legal fees as a cognizable injury under RICO." *Limcaco v. Wynn*, 2023 WL 154965, at *2 (9th Cir. Jan. 11, 2023); *Thomas v. Baca*, 308 F. App'x 87, 88 (9th Cir. 2009). But even if legal fees theoretically could constitute "a cognizable interest" under RICO, Uber's "assertions still fail to be sufficiently financial or concrete." *Limcaco*, 2023 WL 154965, at *2. No matter how many times Uber repeats its "defense costs" allegation, *see* FAC ¶¶ 71, 95, 121, 130, 142, 153, 169, the claim remains "vague and abstract," which does not satisfy RICO's "concrete financial loss" requirement. *Hunt v. Zuffa, LLC*, 361 F. Supp. 3d 992, 1000-01 (D. Nev. 2019) (allegation that scheme "depressed [the plaintiff's] wages" did not satisfy RICO standing requirement); *see also Chaverri v. Platinum LED Lights LLC*, 2022 WL 2275664, at *8 (D. Ariz. June 22, 2022) (same where counterclaimants alleged "lost sales and expenses incurred"); *Ricci v. Cnty. of Sacramento*, 2020 WL 1046805, at *4 (E.D. Cal. Mar. 4, 2020) (same where plaintiff claimed she was "injured 'financially' and 'can no longer work in her area of expertise'"). Uber's failure to properly allege injury to support statutory standing "requires dismissal for failure to state a claim." *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).

Furthermore, even if Uber could claim to have sustained a cognizable RICO injury, it must also allege (and ultimately prove) both but-for and proximate causation. *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010). The proximate

causation standard is demanding.  Uber must allege a "*direct causal connection*" between the alleged violation and the alleged injury.  *Anza*, 547 U.S. at 460 (emphasis added).  "A link that is too remote, purely contingent, or indirect is insufficient." *Hemi Grp.*, 559 U.S. at 9 (quotation marks and alteration marks omitted).  And the proximate cause requirement serves a critical function by preventing "intricate, uncertain inquiries from overrunning RICO litigation."  *Anza*, 547 U.S. at 460.  To maintain this bulwark, "courts must scrutinize the causal link between the RICO violation and the injury, identifying with precision both the nature of the violation and the cause of the injury to the plaintiff."  *Canyon Cnty.*, 519 F.3d at 981.

Once again, Uber does not nearly clear the bar.  The FAC fails to explain how any alleged wrongdoing "led directly" to any alleged injury.  *Anza*, 547 U.S. at 460; *Canyon Cnty.*, 519 F.3d at 980.  There is no identification of any particular damages that resulted from the assessment of alleged inflated or above-market charges on medical bills, FAC ¶¶ 2-4, 14, 55, 71, 95, 121, 130, 142, 153, 169, 187, 223, 239, 256, 271, 304, 324, 339, 353, let alone damages that could be traced to the purportedly "false" or "sham" lien agreements, *id.* ¶¶ 3, 11, 33, or the supposed "secret side agreement," *id.* ¶¶ 4, 69, 93, 114, 167, 185, 201, 219, 237, 251, 269, 284, 302, 334.  There is simply no substance to the claims that "[t]he scheme has resulted in millions of dollars of harm from defense costs and settlements" and "false and inflated claims have forced Uber to incur substantial expense to investigate and defend them."  *Id.* ¶¶ 361, 362.  "[T]hese allegations of loss are too vague to draw any inference as to how defendants' conduct directly caused these injuries," *Crayton v. Hedgpeth*, 2011 WL 1988450, at *14 (E.D. Cal. May 20, 2011), and any "theory of causation" that could be divined from Uber's generalized and conclusory claims "is far too indirect," *Hemi Grp.*, 559 U.S. at 10.  Indeed, any causal chain would require speculation across a whole series of links.  The Court would be left to guess how much the allegedly inflated medical bills should have been, what additional defense costs Uber incurred as a result of those bills, and whether any possible

inflated bill increased the settlement value of any predicate case. Worse still, the Court would be required to construct an alternative universe in which each predicate case went to trial, in which a jury could have awarded *far higher* damages than Uber paid by settling. The Court would then need to try to calculate the damages Uber *avoided* by settling, which would offset, if not overwhelm, any injury it sustained as a result of the alleged RICO scheme.

This exercise in imagination forecloses this suit. Mandating direct causation safeguards against "the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action" and avoids "the speculative nature of the proceedings that would follow if [Uber] were permitted to maintain its claim." *Canyon Cnty.*, 519 F.3d at 981-82. Courts are not expected to attempt "a complex apportionment of fault among various causes," let alone "to construct the alternative scenario of what would have occurred" absent the alleged RICO violation. *Id.* at 982-83. Yet Uber's claims would require the Court to do just that by hypothesizing scenarios in which each of the predicate cases went to trial. Burdening the Court with that exercise is especially improper when Uber itself was the alleged "immediate victim[] of [each] alleged RICO violation" and therefore had every opportunity "to pursue its own remedies for the fraud practiced upon it" by litigating any of the underlying suits. *See id.* at 982. In fact, given that it made its own decisions on what defense costs to incur and what settlements to pay, Uber itself was "an informed, neutral decision-maker," and each of its "intervening decision[s]" "'breaks' the chain of causation." *Stoot v. City of Everett*, 582 F.3d 910, 926 (9th Cir. 2009). Uber's claims thus "fail for lack of proximate causation." *Canyon Cnty.*, 519 F.3d at 983.

### 3. There Is No Pattern of Racketeering

"Where RICO is asserted against multiple defendants, a plaintiff must allege at least two predicate acts by *each* defendant." *Vaughan v. Wardhaugh*, 2024 WL 2853972, at *2 (N.D. Cal. May 10, 2024); *In re WellPoint, Inc. Out-of-Network UCR*

*Rates Litig.*, 903 F. Supp. 2d 880, 914 (C.D. Cal. Sept. 6, 2012).[7] And such a showing is "necessary, but not sufficient," to establish a pattern. *Howard*, 208 F.3d at 746. "The term 'pattern' itself requires the showing of a relationship between the predicates and of the threat of continuing activity." *Id.* The FAC lacks the requisite detail to allege that Emrani or his Firm committed a pattern of mail or wire fraud.

(a)    *Allegations as to Emrani*

The FAC's allegations against Emrani are sparse. For Claimant A, Uber alleges that Emrani was copied on two emails: one in which an unidentified individual at his Firm wrote to Radiance Surgery Center to schedule an appointment for Claimant A, and another in which an unidentified Radiance Surgery Center employee reported to an unidentified recipient at Emrani's Firm that Dr. Khounganian recommended surgery for Claimant A. FAC ¶¶ 63-64. But the FAC does not allege that Emrani transmitted any allegedly fraudulent medical bills or records to Uber or anyone else with respect to Claimant A. *See id*. ¶ 71 (alleging that an unidentified individual at Emrani's Firm "presented" medical records to "Uber")). Separately, Uber alleges as "predicate acts" that Emrani "faxed an information demand, signed by Jacob Emrani, to an insurer located in a different state" and "solicited medical records of Claimant A from a medical provider," *id.* ¶¶ 386a, 386d. But these allegations are plainly deficient, because they involve Emrani's requests for information, not any transmission of purportedly fraudulent materials.

The allegations with respect to Claimant B are similarly deficient. The Complaint alleges that Emrani sent a demand letter to Uber's insurance carrier. *Id*.

---

[7] Although the FAC's single conspiracy cause of action, FAC ¶¶ 447-56, need not allege that a defendant "participated personally, or agreed to participate personally, in two predicate offenses," *United States v. Frega*, 179 F.3d 793, 810 n.21 (9th Cir. 1999), it must allege that each defendant joined the alleged "*agreement* to conduct or participate in the affairs of an enterprise through a pattern of racketeering," *United States v. Blinder*, 10 F.3d 1468, 1477 (9th Cir. 1993); *see also Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993) ("conspiracy to violate RICO requires a showing that defendant was aware of the essential nature and scope of the enterprise and intended to participate in it" (quotation marks omitted)).

¶ 75.   But the transmission of the alleged demand letter occurred months before Claimant B had ever even seen Dr. Khounganian, meaning that nothing in the letter could have been connected to the alleged RICO scheme.  *Id.* ¶¶ 75, 78.  And while the FAC also details Claimant B's subsequent treatment and corresponding medical bills from Dr. Khounganian, Uber never claims that these medical records were "presented" to it by anyone, let alone by Emrani personally.  *See id.* ¶¶ 92-94.

The remainder is even thinner.  The FAC alleges *no* involvement whatsoever by Emrani with respect to Claimants C, F, and G.  *See id*. ¶¶ 96-121, 143-69, 388, 390, 391.  And Emrani's only alleged involvement with respect to Claimants D and E is that an unidentified member of his firm transmitted a demand letter to Uber's insurer that Emrani signed.  *Id*. ¶¶ 128, 139.

The sum total of these undetailed allegations does not make out a "pattern" of predicate acts by Emrani personally.  Receiving two emails and seeking information regarding one client and attempting to settle the separate claims of other clients are not RICO predicates at all, and, even if they were, they would still be "isolated events" arising from separate cases—which do not constitute a RICO pattern, *Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 193 (9th Cir. 1987).

(b)   *Allegations as to The Law Offices of Jacob Emrani*

Uber's allegations regarding Emrani's Firm are inadequate too.  The core of the alleged wrongdoing by Emrani's Firm is the transmission of litigation documents to Uber for seven clients.  *See* FAC ¶¶ 386e, 387c, 388a, 389b-c, 390a, 391b-c.  But those allegations fail to meet Rule 9(b)'s heightened pleading standard.  To satisfy the Rule, Uber must allege the "particulars" of the alleged mail and wire fraud, not "scant descriptions."  *JST Distrib*, 2018 WL 6113092, at *6.  This requires alleging, at a minimum, the "who, what, when, where, and how of the misconduct charged."  *Vess*, 317 F.3d at 1106 (quotation marks omitted).  Uber has not alleged "who" at Emrani's Firm transmitted any of the allegedly fraudulent materials, "who" the

recipients were, "what" specifically was fraudulent about those materials, and "where" the senders and recipients were located.

### 4. There Is No RICO Enterprise

Uber also must allege that Emrani and his Firm were "employed by or associated with an[] enterprise.'" 18 U.S.C. § 1962(c); *Shaw v. Nissan N. Am., Inc.*, 220 F. Supp. 3d 1046, 1053 (C.D. Cal. Oct. 24, 2016). There are two types of cognizable RICO enterprises: (1) "legal" enterprises, "such as corporations and partnerships, and other 'legal entities'" and (2) "association-in-fact" enterprises, encompassing "any union or group of individuals associated in fact although not a legal entity." *Turkette*, 452 U.S. at 581-82 (quotation marks omitted). For both types, RICO requires that Emrani and his Firm "participated in the operation or management of the enterprise itself," playing at least "some part in directing the enterprise's affairs." *Reves*, 507 U.S. at 179, 183-84 (emphasis omitted).

Uber asserts three alternative enterprise theories: (1) Emrani and his Firm conducted the affairs of an association-in-fact enterprise with the Medical Provider Defendants (Count 2), FAC ¶¶ 414-20; (2) Emrani conducted the affairs of his Firm as an enterprise (Count 5), *id.* ¶¶ 439-46; and (3) Emrani and his Firm conducted the affairs of an association-in-fact enterprise with the other defendants (Count 6), *id.* ¶¶ 182-88. Each theory fails.

(a) *Emrani and His Firm Neither Formed an Enterprise with the Medical Provider Defendants Nor Directed Any Such Enterprise's Affairs*

An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 946 (2009). To allege the existence of such an enterprise, a plaintiff must plausibly allege "an ongoing organization, formal or informal" and "that the various associates function as a continuing unit." *Id.* at 945. To allege an "association-in-fact" enterprise, Uber must allege that the enterprise has "(1) a common purpose,

-41-

(2) an ongoing organization, and (3) [is] a continuing unit." *Synopsys, Inc. v. Ubiquiti Networks, Inc.*, 313 F. Supp. 3d 1056, 1077 (N.D. Cal. 2018); *see, e.g.*, *Ellis v. JPMorgan Chase & Co.*, 752 F. App'x 380, 382 (9th Cir. 2018) (affirming dismissal where plaintiff failed to allege facts showing that entities "existed together as a single unit with a common purpose"); *Chagby v. Target Corp.*, 358 F. App'x 805, 807-08 (9th Cir. 2009) (affirming dismissal where plaintiff failed to "properly plead a 'common purpose' and an 'ongoing organization'").

Uber's allegation of an association-in-fact enterprise fails on multiple levels.

First, "[c]ourts have overwhelmingly rejected attempts to characterize routine commercial relationships as RICO enterprises." *Gomez v. Guthy-Renker, LLC*, 2015 WL 4270042, at *8 (C.D. Cal. Jul. 13, 2015); *see also Ford Motor Co.*, 2025 WL 3306280, at *13 ("To plead a common purpose sufficient to allege the existence of RICO enterprise, a plaintiff typically must show more than the parties engaging in ordinary business conduct and an ordinary business purpose."). Yet that is the tack Uber takes. Its entire case is premised on commercial relationships between lawyers referring clients to medical providers for treatment and evaluation in connection with personal injury claims. The FAC lacks the requisite particularized allegations that Emrani, his Firm, and the Medical Provider Defendants came together *for the purpose* of fraudulently inflating damages. *See Ford Motor Co.*, 2025 WL 3306280, at *14 (RICO plaintiff failed to allege that "the parties came together for the purpose of fraudulently inflating their billing, rather than having formed for the purpose of bringing Lemon Law cases but having utilized poor billing practices in doing so").

Second, conducting a RICO enterprise in violation of § 1962(c) "requires an element of direction." *Reves*, 507 U.S. at 178. Accordingly, Uber must allege that either Emrani or his Firm played "some part in directing the enterprise's affairs." *Id.* at 179 (emphasis omitted). "[M]ore is required than simply being involved, and simply performing services for the enterprise does not rise to the level of direction." *WellPoint*, 903 F. Supp. 2d at 910 (quotation marks and alteration marks omitted).

-42-

EMRANI AND HIS LAW OFFICE'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Relevant considerations include whether the defendants "occupy a position in the chain of command . . . through which the affairs of the enterprise are conducted," "knowingly implement[ed] decisions of upper management," or were "indispensable to achievement of the enterprise's goal." *Walter*, 538 F.3d at1248-49 (concluding that a lawyer and her law firm who "perform[ed] services for the enterprise" did not "rise to the level of direction" needed to state a claim under § 1962(c)).

Uber has not alleged facts reflecting that Emrani or his Firm played a role in directing the affairs of the alleged association-in-fact enterprise. The FAC's only relevant allegations are conclusory statements that "[e]ach of the defendants participated in the operation or management of the enterprise" and "[e]ach defendant worked to operate the association-in-fact enterprise and manage its affairs through their corrupt patterns of kickbacks and production and transmittal of fraudulent medical records and bills." FAC ¶ 366. Such a "formulaic recitation of the elements of a cause of action" does not even suffice under the more lenient Rule 8 pleading standard, *Iqbal*, 556 U.S. at 678, much less could it satisfy the more demanding requirements of Rule 9(b). Nor could Uber cure this defect. Even if it were accurate to claim that Dr. Khounganian "owns and controls" Valley Orthopedic and Spine Center, FAC ¶ 10, any allegation that Emrani or his Firm held "a position in the chain of command" or "knowingly implement[ed] decisions of upper management" at an orthopedics practice, *Walter*, 538 F.3d at 1249 (quotation marks omitted), would be implausible and untrue. Emrani and his Firm do not participate in any medical practice's management decisions, and Uber does not and cannot allege otherwise.

(b)    *Emrani's Management of His Firm Does Not Equate to Operation of a RICO Enterprise*

The FAC also fails to allege facts—rather than "naked assertions" of statutory elements, *Iqbal*, 556 U.S. at 678 (alteration marks omitted)—reflecting that Emrani conducted the affairs of his Firm as a RICO enterprise. That Emrani is the face and name of his own highly successful Firm is not enough. The Supreme Court has

-43-

explained emphatically that RICO liability "depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs, not just their *own* affairs." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001) (quotation marks omitted); *Reves*, 507 U.S. at 185 (quotation marks omitted). A complaint alleging that defendants "are associated in a manner directly related to their own primary business activities" misses the point. *Toyota*, 826 F. Supp. 2d at 1202; *see also Shaw*, 220 F. Supp. 3d at 1057 (complaint failed for lack of allegations of "a common purpose or organized conduct separate and apart from [company's] ordinary affairs"). There is nothing wrong with a business conducting business or a lawyer running a law firm. "As a law firm, [the Law Offices of Jacob Emrani's] primary business activity is naturally providing legal representation to clients which includes the filing of lawsuits," and a RICO claim must do more than simply allege "that the primary business activities of a member of the enterprise were conducted fraudulently." *Bai v. CMB Exp. Infrastructure Inv. Grp. 48, LP*, 2025 WL 959099, at *7 (E.D. Cal. Mar. 31, 2025). That is true even when the firm has succeeded in collecting judgments against a massive tortfeasor like Uber.

Furthermore, even if Uber could identify a common purpose of illegality or organized conduct separate and apart from the ordinary practice of law, there is no basis to allege that Emrani directed the allegedly fraudulent conduct. The utterly mundane claim that Emrani is a "litigation and trial attorney at Defendant The Law Offices of Jacob Emrani," FAC ¶ 22, is "consistent only with the execution of a routine contract or commercial dealing," *Pac. Recovery Sols. v. United Behav. Health*, 481 F. Supp. 3d 1011, 1026-27 (N.D. Cal. 2020). Courts have demonstrated "remarkable uniformity" in concluding that such conduct does not satisfy RICO's enterprise element, *Gomez*, 2015 WL 4270042, at *11.

-44-

(c)      *Neither Emrani Nor His Firm Operate a RICO Enterprise with Their Competitors*

Uber's claim that all the defendants formed an "association-in-fact" enterprise is even less viable.  First, Uber's own allegations belie any possibility that the defendants functioned as a "continuing unit."  *Boyle*, 556 U.S. at 946.  As the FAC reflects, Emrani and his Firm did not work with Fradkin and his Firm on any of the cases that supposedly qualify as RICO predicates.  Indeed, there are not even any alleged *communications* between the two rival law firms, much less any "interpersonal relationships" or "common interest," which are "both" required to demonstrate RICO "association."  *Id.*  Such allegations are absent because they would be absurd.  Emrani and his Firm do not share any common interest with their direct competitors at Fradkin's Firm.  Nor does it make sense to claim that Emrani and his Firm conspired with doctors to discount their medical bills, *see, e.g.*, FAC ¶ 10, when any reduction would inure to the benefit of Emrani's Firm's clients but would be directly adverse to the doctors' own interests.

Any thoroughly implausible claim that adverse parties function as a continuing unit would be further undermined by Uber's allegation that other unidentified and unassociated individuals participated in the scheme.  *See, e.g.*, FAC ¶ 50 ("The law firms also direct patients to a range of other medical providers, including physical therapists, chiropractors, acupuncturists, pain management physicians, and surgeons"); *id.* ¶¶ 73, 101 (alleging that Emrani's Firm referred Claimants B, C, D, E, and F to "a select group of medical providers").  The fact that the so-called "association" never all worked together on a single case and includes numerous other, unidentified members is emblematic of an enterprise that does not actually exist.  *See, e.g.*, *Capitol W. Appraisals v. Countrywide Fin. Corp.*, 2009 WL 10677052, at *5 (W.D. Wash. Sept. 30, 2009) (plaintiff failed to allege a RICO enterprise where it alleged "unnamed [participants] working independently from one another").  Additionally, the alleged enterprise cannot be the alleged pattern of racketeering

-45-

activity itself; it must be "an entity separate and apart from the pattern of activity in which it engages." *Turkette*, 452 U.S. at 583. Taking Uber's allegations as true, it alleges, at most, that certain defendants "conducted wrongful acts together," without any allegation of an entity that exists apart from those wrongful acts. *Suzuki Motor of Am., Inc. v. Mullion*, 2017 WL 7410993, at *4 (C.D. Cal. Oct. 3, 2017).

Moreover, even if an association-in-fact enterprise were sufficiently alleged, the FAC has not plausibly alleged that Emrani or his Firm directed its affairs. Uber alleges that Emrani and his Firm conducted "initial client intake" for the alleged scheme, FAC ¶ 365, but does not allege that either played any role in "operation and management" of the alleged enterprise. *See, e.g.*, *Walter*, 538 F.3d at 1248-49; *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 789 (9th Cir. 1996) (defendant's "ministerial role" did not constitute participation in the "operation or management" of the enterprise). This is, once again, inadequate.

* * *

Each of these defects—and certainly the combined constellation of flaws—is fatal to Uber's substantive RICO and conspiracy causes of action alike. Because the Complaint does "not adequately plead a substantive violation of RICO," Uber "cannot claim that a conspiracy to violate RICO existed" either. *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 559 (9th Cir. 2010).

## V.     CONCLUSION

The entire FAC should be dismissed with prejudice under Rule 12(b)(6).

Dated:  January 23, 2026

HUESTON HENNIGAN LLP

By:_____
John C. Hueston
Marshall A. Camp
Bram M. Alden
Stewart J. Rickert

*Attorneys for Defendants Jacob Emrani and The Law Offices of Jacob Emrani*

-46-