**WINSTON & STRAWN LLP**
David Scheper (SBN 120174)
dscheper@winston.com
Alexander Cote (SBN 211558)
acote@winston.com
Katelyn Taira (SBN 359683)
ktaira@winston.com
333 S. Grand Ave.
Los Angeles, CA 90071-1543
Telephone:  +1 213-615-1700
Facsimile:   +1 213-615-1750

Attorneys for Defendants
Igor Fradkin and Downtown LA Law Group

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UBER TECHNOLOGIES, INC.,<br><br>            Plaintiff,<br><br>    vs.<br><br>DOWNTOWN LA LAW GROUP; IGOR FRADKIN; THE LAW OFFICES OF JACOB EMRANI; JACOB EMRANI; VALLEY ORTHOPEDIC AND SPINE CENTER D/B/A GSK SPINE; and GREG KHOUNGANIAN,<br><br>            Defendant. | **Case No. 2:25-cv-06612**<br><br>**IGOR FRADKIN'S NOTICE OF MOTION AND MOTION TO DISMISS**<br><br>[Filed concurrently with Igor Fradkin and Downtown LA Law Group's Request for Judicial Notice and Incorporation by Reference, the Declaration of Igor Fradkin, the Declaration of Alexander H. Cote, Igor Fradkin and Downtown LA Law Group's Notice of Joinder, and [Proposed] Order]<br><br>Date:     April 29, 2026<br>Time:     1:30 p.m.<br>Court:    Hon. Sherilyn Peace Garnett<br><br>Complaint Filed: July 21, 2025<br>FAC Filed:          December 19, 2025 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on April 29, 2026 at 1:30 p.m., or as soon thereafter as the matter shall be heard, in Courtroom 5C of the First Street Courthouse, located at 350 West 1st Street, Los Angeles, California 90012, before the Honorable Sherilyn Peace Garnett, Defendant Igor Fradkin, by and through his counsel of record, will move for an order dismissing with prejudice the First, Fourth, and Sixth Causes of Action in Uber Technologies, Inc.'s ("Uber") First Amended Complaint ("FAC"), alleging violations of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d) pursuant to Federal Rule of Civil Procedure 12(b)(6).

This Motion is based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the concurrently filed Motions of Defendants Downtown LA Law Group ("DTLA"), The Law Offices of Jacob Emrani, Jacob Emrani, Greg Khounganian, and Valley Orthopedic and Spine Center d/b/a GSK Spine; Fradkin and DTLA's Request for Judicial Notice and Incorporation by Reference; the Declaration of Igor Fradkin ("Fradkin Decl."); the Declaration of Alexander H. Cote; Fradkin and DTLA's Notice of Joinder; and such other further evidence and argument as may be presented at any hearing of this motion.

This Motion is made after the conference of counsel under Local Rule 7-3. The parties met and conferred via videoconference on January 16, 2026. *See* Decl. of Alexander H. Cote ¶ 2. The parties were unable to resolve the issues raised in Fradkin's and DTLA's motions to dismiss during the videoconference. *Id*.

Dated: January 23, 2026

*/s/ David Scheper*
WINSTON & STRAWN LLP
David Scheper (SBN 120174)
dscheper@winston.com
Alexander Cote (SBN 211558)
acote@winston.com
Katelyn Taira (SBN 359683)
ktaira@winston.com
333 S. Grand Ave.
Los Angeles, CA 90071-1543
Telephone:  +1 213-615-1700
Facsimile:   +1 213-615-1750

Attorneys for Defendants
Igor Fradkin and Downtown LA Law Group

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................1

ARGUMENT ......................................................................................................2

I.   *NOERR-PENNINGTON* BARS UBER'S CLAIMS ...................................2

    A.   Uber's FAC Burdens Petitioning Rights........................................3

    B.   Fradkin's Litigation Activities Are Protected.................................4

    C.   Fradkin's Litigation Activities Are Not Mail or Wire Fraud.......4

II.  UBER's RICO CLAIMS ARE BASELESS ...........................................5

    A.   Uber Failed To Allege An Enterprise ...........................................6

    B.   Uber Failed to Allege Predicate Acts...........................................10

        1.   None Of The Mail Or Wire Fraud Is Pled With Particularity ..........11

        2.   Uber's Fraudulent Treatment Claims Are Inadequately Pled...........13

        3.   Uber's Claims Of Secret Side Agreements Do Not Establish Fraud ........15

    C.   Uber's RICO Claims Are Barred By The Statute Of Limitations ..............19

    D.   Uber Failed To Allege A Pattern....................................................20

    E.   Uber Failed To Allege A RICO Injury .........................................20

    F.   Uber Fails To Allege A Viable RICO Conspiracy .......................21

    G.   Uber Is Not Entitled To Injunctive Relief Under RICO ............23

CONCLUSION.......................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aetna Life Ins. Co. v. Young*,
2024 WL 5182638 (C.D. Cal. Sep. 25, 2024) ....................................................10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..............................................................................................8

*B&G Foods N. Am., Inc. v. Embry*,
29 F.4th 527 (9th Cir. 2022) .........................................................................3, 4, 5

*Baumer v. Pachl*,
8 F.3d 1341 (9th Cir. 1993) ................................................................................21

*BE & K Constr. Co. v. NLRB*,
536 U.S. 516 (2002)..............................................................................................5

*Beck v. Prupis*,
529 U.S. 494 (2000)............................................................................................19

*Beneficial Standard Life Ins. Co. v. Madariaga*,
851 F.2d 271 (9th Cir. 1988) ..............................................................................18

*Berg v. First State Ins. Co.*,
915 F.2d 460 (9th Cir. 1990) ..............................................................................20

*Best v. Combs*,
2024 WL 5465052 (C.D. Cal. Dec. 27, 2024)....................................................10

*Biofeedtrac, Inc. v. Kolinor Optical Enter. & Consultants, S.R.L*,
832 F. Supp. 585 (E.D.N.Y. 1993) .......................................................................8

*Boyd v. Luna*,
2024 WL 4799873 (C.D. Cal. Nov. 7, 2024) ......................................................11

*Boyle v. United States*,
556 U.S. 938 (2009)..............................................................................................6

*Cedric Kushner Promotions Ltd. v. King*,
533 U.S. 158 (2001)..............................................................................................9

*City of Columbia v. Omni Outdoor Advert., Inc.*,
499 U.S. 365 (1991)....................................................................................................3

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
2012 WL 10731957 (C.D. Cal. June 29, 2012).......................................................7

*Cruz v. FXDirectDealer, LLC*,
720 F.3d 115 (2d Cir. 2013) ...................................................................................10

*D. Penguin Bros. v. City Nat'l Bank*,
587 F. App'x 663 (2d Cir. 2014) .............................................................................22

*Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*,
924 F. Supp. 449 (S.D.N.Y. 1996) .........................................................................21

*Design Pallets, Inc. v. Gray Robinson, P.A.*,
2008 WL 3200275 (M.D. Fla. Aug. 5, 2008)...........................................................7

*Drummond v. Zimmerman*,
454 F. Supp. 3d 1210 (S.D. Fla. 2020)....................................................................7

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014) ...........................................................................5, 9, 10

*Edwards v. Marin Park, Inc.*,
356 F.3d 1058 (9th Cir. 2004) .................................................................................10

*Eller v. EquiTrust Life Ins. Co.*,
778 F.3d 1089 (9th Cir. 2015) .................................................................................17

*Elliot v. Geogh*,
2005 WL 8156574 (C.D. Cal. Dec. 16, 2025)........................................................20

*Freeman v. Lasky, Haas & Cohler*,
410 F.3d 1180 (9th Cir. 2005) ..................................................................................3

*Gomez v. Guthy-Renker, LLC*,
2015 WL 4270042 (C.D. Cal. July 13, 2015)..........................................................7

*Gordon v. City of Moreno*,
687 F. Supp. 2d 930 (C.D. Cal. 2009)......................................................................8

*Gurung v. MetaQuotes Ltd.*,
2024 WL 3849460 (E.D.N.Y. Aug. 16, 2024) .......................................................21

*H.J., Inc. v. Nw. Bell Tel. Co.*,
  492 U.S. 229 (1989)...................................................................................6, 20

*Howard v. Am. Online Inc.*,
  208 F.3d 741 (9th Cir. 2000) .......................................................................6, 20

*Int'l Tech. & Sys. Corp. v. Samsung Elec. Co.*,
  2018 WL 4963129 (C.D. Cal. June 22, 2018)...................................................8

*In re Jordan*,
  7 Cal. 3d 930 (1972) .........................................................................................18

*Kearney v. Foley & Lardner, LLP*,
  590 F.3d 638 (9th Cir. 2009) ...................................................................2, 3, 4

*Kelly v. Palmer, Reifler, & Assocs., P.A.*,
  681 F. Supp. 2d 1356 (S.D. Fla. 2010) .............................................................9

*Kolavev v. Sepansky*,
  2020 WL 553843 (E.D. Pa. Feb. 4, 2020) .......................................................20

*Kottle v. Nw. Kidney Ctrs.*,
  146 F.3d 1056 (9th Cir. 1998) ...........................................................................3

*Lechter v. Aprio, LLP*,
  565 F. Supp. 3d 1279 (N.D. Ga. 2021)..............................................................7

*Loomer v. Zuckerberg*,
  2025 WL 927186 (9th Cir. Mar. 27, 2025) ......................................................22

*McMurtry v. Brasfield*,
  654 F. Supp. 1222 (E.D. Va. 1987) .................................................................10

*Molus v. Swan*,
  2007 WL 2326132 (S.D. Cal. Aug. 13, 2007)..................................................19

*Moss v. BMO Harris Bank, N.A.*,
  258 F. Supp. 3d 289 (E.D.N.Y. 2017) ...............................................................6

*Neder v. United States*,
  527 U.S. 1 (1999)...............................................................................................15

*Olenicoff v. UBS AG*,
  2012 WL 1192911 (C.D. Cal. Apr. 12, 2012)...................................................18

*Oregon Laborers-Emps. Health & Welfare Tr. Fund v. Philip Morris Inc.*,
185 F.3d 957 (9th Cir. 1999) ...................................................................22

*Oscar v. Univ. Students Co-operative Ass'n*,
965 F.2d 783 (9th Cir. 1992) (en banc) ..............................................20

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms.*,
943 F.3d 1243 (9th Cir. 2019) .........................................................11

*Pebley v. Santa Clara Organics, LLC*,
22 Cal. App. 5th 1266 (2018) ...............................................7, 15, 16

*Pro. Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*,
508 U.S. 49 (1993)................................................................................3

*Qaadir v. Figueroa*,
67 Cal. App. 5th 790 (2021) ...............................................................16

*Reed v. East End Props., Inc.*,
2018 WL 6131211 (C.D. Cal. Mar. 15, 2018)......................................5

*Religious Tech. Ctr. v. Wollersheim*,
971 F.2d 364 (9th Cir. 1992) .............................................................22

*Relevant Grp., LLC v. Nourmand*,
116 F.4th 917 (9th Cir. 2024) ..........................................................2, 3

*Reves v. Ernst & Young*,
507 U.S. 170 (1993).............................................................................7

*Rotella v. Wood*,
528 U.S. 549 (2000)...........................................................................18

*Sedima, S.P.R.L. v. Imrex Co.*,
473 U.S. 479 (1985)........................................................................5, 6

*Shaw v. Nissan N. Am., Inc.*,
220 F. Supp. 3d 1046 (C.D. Cal. 2016) ...........................................7, 8

*Shorter v. Cal.*,
2025 WL 1908562 (C.D. Cal. June 9, 2025), *report and recommendation adopted*,
2025 WL 1908561 (C.D. Cal. July 9, 2025)......................................22

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) ...................................................................2, 3, 4, 5

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001) ................................................................................13

*State Farm Mut. Auto. Ins. Co. v. Abrams*,
    2000 WL 574466 (N.D. Ill. May 11, 2000)..........................................................7

*Steele v. Hosp. Corp. of Am.*,
    36 F.3d 69 (9th Cir. 1994) ....................................................................................20

*Tanasescu v. Kremer*,
    2018 WL 2223093 (C.D. Cal. May 1, 2018), *report and recommendation adopted*, 2018 WL 3735861 (C.D. Cal. May 18, 2018), *aff'd sub nom. Tanasescu v. Coroian*, 2021 WL 7085104 (9th Cir. May 20, 2021)..................18

*Turkish v. Kasenetz*,
    964 F. Supp. 689 (E.D.N.Y. 1997) ........................................................................8

*United States v. Jesenik*,
    2025 WL 2553729 (9th Cir. Sept. 5, 2025) ............................................14, 15, 17

*United States v. Shields*,
    844 F.3d 819 (9th Cir. 2016) ........................................................................17, 18

*United States v. Turkette*,
    452 U.S. 576 (1981)..............................................................................................6

*United States v. Valera*,
    845 F.2d 923 (11th Cir. 1988) .............................................................................21

*Vaughn v. Wells Fargo Bank, N.A.*,
    2013 WL 12138850 (C.D. Cal. May 15, 2013)....................................................11

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) .............................................................................11

**Statutes**

18 U.S.C. § 1961(4) .................................................................................................6

18 U.S.C. § 1962(d) ..........................................................................................21, 22

18 U.S.C. § 1964(b) ...............................................................................................22

42 U.S.C. § 1983 ...................................................................................................5

Cal. Bus. & Prof. Code § 2052(a)........................................................................14

Cal. Bus. & Prof. Code § 6068(e)(1) ...................................................................18

**Other Authorities**

Cal. R. Prof. Conduct 1.6 cmt. 1 ..........................................................................18

Cal. R. Prof. Conduct 1.6 cmt. 2 ..........................................................................18

Cal. R. Prof. Conduct 4.1(b) cmt. 1 .....................................................................18

Daniel J. Raffi, *Uber's Lawsuit Aims to Rewrite the Rules, Not Right a Wrong*, Daily Journal (July 31, 2025), https://www.dailyjournal.com/article/386914-uber-s-lawsuit-aims-to-rewrite-the-rules-not-right-a-wrong .......................................................1

Fed. R. Civ. P. 9(b) ...............................................................................................10

U.S. Const. amend. I ...............................................................................................2

## INTRODUCTION

Uber Technologies, Inc. ("Uber") appears to be suffering from buyer's remorse after settling several lawsuits brought by attorney Igor Fradkin on behalf of his personal injury clients ("Clients").  But Uber does not seek to void those settlements, nor does it seek the return of the money it paid the Clients.  Instead, Uber brings baseless federal Racketeer Influenced and Corruption Organization Act ("RICO") claims against the Clients' lawyers, Fradkin and DTLA, in the state court cases, claiming it was tricked into settling.  Uber relies on materials that Uber obtained in defending those cases—cases that Uber chose to settle anyway—to allege that it overpaid because DTLA sent its clients to defendant Dr. Greg Khounganian for medical treatment, and that Dr. Khounganian prepared inflated bills for treating minor or non-causally related injuries.

Uber's FAC also advances a puzzling fraud theory with sixty-four references to "side agreements," which it characterizes as "secret" nineteen times, and claims to exist based solely on "information and belief," in which medical providers obtained liens against any judgments obtained by the Clients to cover their medical fees.  But Uber should know from discovery in those prior cases that no such side agreements exist, at least with respect to Fradkin and DTLA.  The fact that Uber doubles down in making these claims even after Fradkin and DTLA pointed out the error in their motion to dismiss the initial Complaint highlights Uber's indifference to the truth.  In any event, it is implausible that the manner in which Clients pay for their medical treatment could injure Uber in any way.

None of Uber's claims have any legal merit. Uber must know this, but it forges ahead in using this lawsuit as a publicity stunt as it lobbies for legislation that would decimate the statutory minimum amount of insurance that Uber is required to purchase. *See* Daniel J. Raffi, *Uber's Lawsuit Aims to Rewrite the Rules, Not Right a Wrong*, Daily Journal (July 31, 2025), https://www.dailyjournal.com/article/386914-uber-s-lawsuit-aims-to-rewrite-the-rules-not-right-a-wrong ("[T]his is not about the nine personal injury lawsuits listed within the Uber lawsuit as fraudulent.  This is about legislative influence,

public manipulation and corporate immunity at all costs. Uber's filing comes amid a high-stakes lobbying push in Sacramento to pass Senate Bill 371 (SB 371), a bill that would slash the mandatory $1 million in uninsured/underinsured motorist (UM/UIM) coverage for rideshare accidents down to just $100,000. The timing of the lawsuit is not coincidental; it's strategic."). Hoping the California legislature will gut the statutory minimum insurance that Uber must purchase for the victims of its drivers' car accidents, Uber tries to convince the public and the legislature that those accidents never harm anyone, and that any injuries claimed are fabricated by the plaintiffs' bar.

In addition to Uber's claims being barred by the numerous preclusion principles addressed in DTLA's separate motion to dismiss, which Fradkin joins, Uber's FAC fails to properly allege any valid cause of action against Fradkin. First, Uber's effort to punish lawyers for representing their Clients runs afoul of the *Noerr-Pennington* doctrine. Second, Uber failed to plead the RICO elements with particularity, including the existence of an enterprise, a pattern of racketeering activity, or the supposed predicate acts of mail and wire fraud. Instead, Uber makes broad-sweeping allegations, often on information and belief, which are belied by the FAC'S more specific allegations or the documents it cites. The RICO claims are also time-barred. Finally, Uber has failed to allege any injury to its business or property because insurance covered all its alleged losses. For all these reasons, Uber's FAC should be dismissed.

**ARGUMENT**

## I. *NOERR-PENNINGTON* BARS UBER'S CLAIMS

Uber's claims are barred by the *Noerr-Pennington* doctrine, which secures the First Amendment rights of lawyers by making them "generally immune from statutory liability for their petitioning conduct." *Relevant Grp., LLC v. Nourmand*, 116 F.4th 917, 927 (9th Cir. 2024); *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 645 (9th Cir. 2009). As to litigation activity, "the doctrine 'overprotects baseless petitions so as to ensure citizens enjoy the right of access to the courts without fear of prosecution.'" *Relevant Grp.*, 116 F.4th at 927–28 (quoting *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 934 (9th Cir. 2006)); *see*

*also id.* at 934–35. *Noerr-Pennington* protects both the parties in the underlying litigation and their lawyers. *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1186 (9th Cir. 2005). The Ninth Circuit has repeatedly held that the *Noerr-Pennington* doctrine applies broadly to nearly all "conduct incidental to the prosecution of the suit," *Sosa*, 437 F.3d at 934, including demand letters, the "discovery communications surrounding that litigation and the trial advocacy of that litigation," *Kearney*, 590 F.3d at 646.

"To determine whether a defendant's conduct, which allegedly violates a statute, is immunized under *Noerr-Pennington*, [courts] apply a three-step analysis to determine: (1) whether the lawsuit imposes a burden on petitioning rights, (2) whether the alleged activities constitute protected petitioning activity, and (3) whether the statute at issue may be construed to avoid that burden." *B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 535 (9th Cir. 2022). An affirmative answer to each step indicates that "a defendant's conduct is immunized under *Noerr-Pennington*," and that is plainly the case here. *Id.*[1]

### A.     Uber's FAC Burdens Petitioning Rights

At the first step, there can be no question that the success of this suit would burden Fradkin's and DTLA's petitioning rights. *B&G Foods*, 29 F.4th at 535. This inquiry does not "consider any alleged misconduct tied to the petitioning activities." *Id.* Instead, it asks whether Uber's FAC, if successful, "places a burden on defendant's ability to prosecute its suit." *Id.* Plainly, it does.

---

[1] There is a narrow sham litigation exception, which does not apply here. *See Pro. Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 51 (1993) ("We hold that litigation cannot be deprived of immunity as a sham unless the litigation is objectively baseless."). "A 'sham' situation involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all, not one who genuinely seeks to achieve his governmental result, but does so through improper means." *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 380 (1991) (cleaned up). "A winning lawsuit is by definition not a sham." *Relevant Grp.*, 116 F.4th at 932; *see Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1063 (9th Cir. 1998) ("[T]he Supreme Court has reminded us that a winning lawsuit is, by definition, not objectively baseless."). Uber's FAC recognizes that DTLA and Fradkin prevailed and acknowledges that the "purpose" of their supposed scheme was "increasing settlement leverage" in those cases. FAC ¶133.

The very purpose of Uber's case is to prevent Fradkin and DTLA from bringing litigation against it, including through injunctive relief "imposing restrictions on the future activities of [the] Defendants" in suing Uber. FAC Prayer ¶7.  Uber alleges that every action DTLA takes in litigating against it are criminal racketeering acts.  *See Kearney*, 590 F.3d at 645 (9th Cir. 2009) (suit challenging "interactions with expert witnesses and contractors" burdened petitioning activity); *Sosa*, 437 F.3d at 933 (RICO suit challenging demand letters burdened petitioning activity).  The treble damages Uber seeks imposes a heavy burden as well.  *Id.* at 933.  Thus, there can be no doubt that the FAC is designed to burden Fradkin's petitioning rights; that is the whole point of Uber's case.  Because Uber's suit "would completely prevent [Fradkin] from engaging in their petitioning activities—sending prelitigation communications and suing to enforce" the Clients' rights, the first requirement is easily met.  *B&G Foods*, 29 F.4th at 535.

**B.      Fradkin's Litigation Activities Are Protected**

Likewise, the "focus at step two is whether Defendants' conduct qualifies as protected petitioning activity," and it plainly does because Uber is challenging Fradkin and DTLA's activity in petitioning the courts for the Clients.  *B&G Foods*, 29 F.4th at 535–36 (quote omitted).  "[T]o preserve the breathing space required for the effective exercise of the rights the Petition Clause protects, conduct incidental to the prosecution of the suit may also be immunized under the *Noerr-Pennington* doctrine."  *Kearney*, 590 F.3d at 646. Where litigation is protected, "it follows that [litigation-related misconduct] likewise comes within *Noerr-Pennington*."  *Id.*  And that is the only conduct that Uber has challenged: sending settlement demand letters and bringing cases against Uber.

**C.      Fradkin's Litigation Activities Are Not Mail or Wire Fraud**

The final, third step of the *Noerr-Pennington* analysis asks whether the statute at issue can be interpreted to avoid an unconstitutional burden on the defendant's petitioning rights.  "The *Noerr-Pennington* doctrine stands for a generic rule of statutory construction, applicable to any statutory interpretation that could implicate the rights protected by the Petition Clause."  *B&G Foods*, 29 F.4th at 539 (quoting *Sosa*, 437 F.3d at 931).  When

considering RICO's application to litigation activity, courts look to the alleged predicate acts to determine whether their statutory prohibitions can be interpreted to avoid infringing the defendant's petitioning rights. *Sosa*, 437 F.3d at 939.

There is no difficulty in construing the mail and wire fraud predicates as inapplicable to litigation activity. In the RICO context, the Ninth Circuit in *Sosa* already did: "The mail and wire fraud statutes . . . can be, we conclude, construed to avoid burdening the ability of potentially adverse parties to make legal representations in demand letters and other presuit communications sent in contemplation of possible litigation." 437 F.3d at 940–41. The Ninth Circuit explained: "Nothing in the mail and wire fraud statutes addresses the issue of legal representations directly. Nor need we impute to Congress an intent to include within the statutory phrase 'scheme or artifice to defraud' erroneous representations of law made in a presuit demand letter; legal representations made by potential litigation adversaries are exceedingly unlikely to be believed without investigation." *Id.* at 941; *see also BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 535 (2002) (adopting a limiting construction of the NLRA to exclude petitioning activity); *B&G Foods*, 29 F.4th at 540 (excluding from 42 U.S.C. § 1983 claims conduct that would otherwise fall within *Noerr-Pennington*). Thus, the Court should find the complaints and settlement demands served on Uber are "so characteristic of the posturing that occurs at the start of any litigation and capable of being tested in any ensuing suit," that they are beyond the reach of the mail and wire fraud statutes, and dismiss Uber's claims under *Noerr-Pennington*. *Sosa*, 437 F.3d at 942; *Reed v. East End Props., Inc.*, 2018 WL 6131211, at *14 (C.D. Cal. Mar. 15, 2018).

## II.   UBER'S RICO CLAIMS ARE BASELESS

RICO was intended to shut down organized crime, not to police the legal profession. "The RICO statute sets out four elements: a defendant must participate in (1) the conduct of (2) an enterprise that affects interstate commerce (3) through a pattern (4) of racketeering activity or collection of unlawful debt." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014). "In addition, the conduct must be (5)

the proximate cause of harm to the victim." *Id.* (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496–97 (1985)). "To show the existence of an enterprise under the second element, plaintiffs must plead that the enterprise has (A) a common purpose, (B) a structure or organization, and (C) longevity necessary to accomplish the purpose." *Id.* (citing *Boyle v. United States*, 556 U.S. 938, 946 (2009)). "Racketeering activity, the fourth element, requires predicate acts." *Id.* "Two [predicate] acts are necessary, but not sufficient, for finding a violation" of RICO. *Howard v. Am. Online Inc.*, 208 F.3d 741, 746 (9th Cir. 2000) (citing *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 238 (1989)).

### A.    Uber Failed To Allege An Enterprise

Uber alleges two types of enterprises that DTLA and/or Fradkin allegedly operated or managed: an association-in-fact enterprise of DTLA, Fradkin, Dr. Khoungainian, and Valley Orthopedic and Spine Center d/b/a GSK Spine; and against Fradkin alone for managing DTLA. None meets the legal requirements to either form or participate in an enterprise.

**Count 1 – Association-in-fact enterprise.** Uber fails to allege an association-in-fact enterprise. Although a RICO enterprise may consist of an association-in-fact, as distinct from a discrete entity, it is not a catch-all category. *United States v. Turkette*, 452 U.S. 576, 581–82 (1981) (citing 18 U.S.C. § 1961(4)). An "association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Boyle*, 556 U.S. at 946. "An association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* None of these are present here.

A law firm, its attorneys, and doctors cannot form an association-in-fact enterprise when each acts in their own self-interest. *Boyle*, 556 U.S. at 946 (requiring a "common purpose" to form an association-in-fact enterprise); *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 301–02 (E.D.N.Y. 2017) (holding no association-in-fact enterprise when "there are 'no alleged facts [that] support an inference that the [ACH Network] entities

were acting in any way but in their own independent interests'"). That is why "[c]ourts have overwhelmingly rejected attempts to characterize routine commercial relationships as RICO enterprises." *Shaw*, 220 F. Supp. 3d at 1054; *Gomez v. Guthy-Renker, LLC*, 2015 WL 4270042, at *8 (C.D. Cal. July 13, 2015) (same); *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 2012 WL 10731957, at *9 (C.D. Cal. June 29, 2012) (same).

As to the "common purpose" between the law firms and lawyers on one hand and the doctors on the other, Uber fails to allege any facts establishing that DTLA and Fradkin have a "common purpose" to form an enterprise. Uber fails to allege any facts other than a routine referral network that is a customary business relationship between personal injury law firms, their attorneys, and doctors. All doctors are trained in medicine and focus on helping their patients, but not all doctors are prepared to assist their patients in litigation. Such doctors often come under intense scrutiny by defense counsel, and they must take extra care to document their work and be prepared to testify about it. Not surprisingly, plaintiffs' counsel often seek doctors with such skills. *See Pebley v. Santa Clara Organics, LLC*, 22 Cal. App. 5th 1266, 1277 (2018) (an injured plaintiff has the right to seek treatment from a doctor more "willing to participate in the litigation process"). As with all business relationships, plaintiffs' counsel often enlist people they have worked well with previously. *See Lechter v. Aprio, LLP*, 565 F. Supp. 3d 1279, 1314–16 (N.D. Ga. 2021) (holding that plaintiff failed to allege an association-in-fact enterprise by failing to explain how a diverse collection of accountants, lawyers, and others agreed to create an enterprise).

DTLA and Fradkin do not possess the requisite control of Dr. Khounganian or GSK Spine to participate in "operating or managing the enterprise itself." *Drummond v. Zimmerman*, 454 F. Supp. 3d 1210, 1219 (S.D. Fla. 2020) (citing *Reves v. Ernst & Young*, 507 U.S. 170 (1993)). Courts routinely hold that "providing standard legal services does not subject an attorney to RICO liability, even if the attorney's services furthered the alleged illicit nature of the enterprise's affairs." *Id.*; *see Design Pallets, Inc. v. Gray Robinson, P.A.*, 2008 WL 3200275, at *5 (M.D. Fla. Aug. 5, 2008) (providing run-of-the-

IGOR FRADKIN'S NOTICE OF MOTION AND MOTION TO DISMISS
7
CASE NO. 2:25-cv-06612

mill professional services is not equivalent to directing or controlling an enterprise); *State Farm Mut. Auto. Ins. Co. v. Abrams*, 2000 WL 574466, at \*11 (N.D. Ill. May 11, 2000) ("attorney . . . cannot be liable under RICO even with knowledge of the illicit nature of the alleged enterprise, merely for providing legal services"); *Turkish v. Kasenetz*, 964 F. Supp. 689, 694–95 (E.D.N.Y. 1997) ("Generally, an attorney's provision of legal services does not constitute 'operation or management' of the alleged enterprise."); *Biofeedtrac, Inc. v. Kolinor Optical Enter. & Consultants, S.R.L*, 832 F. Supp. 585, 591 (E.D.N.Y. 1993) (attorney did not operate or manage a RICO enterprise, even though he may have intentionally assisted a scheme to defraud). Uber's allegations almost exclusively center around DTLA providing routine legal services—filing complaints, sending settlement demands, and directing clients to seek treatment for their injuries. FAC ¶¶2, 10, 31, 50, 59, 73, 243, 253, 254, 315.

Uber makes the conclusory and unsubstantiated assertion that such an association-in-fact exists and that all Defendants participated in managing it. FAC ¶¶408, 412. Courts reject such "mere conclusory statements," and stating a "plausible" claim requires something "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Allegations must negate an "obvious alternative explanation" besides unlawful conduct. *Id.* at 672; *see Int'l Tech. and Sys. Corp. v. Samsung Elec. Co. Ltd.*, 2018 WL 4963129, at \*5 (C.D. Cal. June 22, 2018); *Gordon v. City of Moreno*, 687 F. Supp. 2d 930, 943–44 (C.D. Cal. 2009).

Uber claims that lawyers recommend pre-selected doctors with "foreknowledge that the medical providers" will recommend unnecessary procedures and bill excessively, FAC ¶6, and "encourage [medical] providers to exaggerate their findings in order to justify additional and more expensive treatment" and even directed "specific treatments," *id.* ¶¶30, 357. But these allegations fail as a matter of law because whatever medical recommendations lawyers may suggest, the obvious alternative explanation for what doctors actually do is that doctors make medical decisions for themselves and set their own prices. *See Shaw v. Nissan N. Am., Inc.*, 220 F. Supp. 3d 1046, 1053–54 (C.D. Cal.

2016) ("When faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are merely consistent with their favored explanation but are also consistent with the alternative explanation. Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, in order to render plaintiffs' allegations plausible."). When a defendant is engaging in activity that is facially legitimate, "a significant level of factual specificity is required to allow a court to infer reasonably that such conduct is plausibly part of a fraudulent scheme." *Eclectic Props.*, 751 F.3d at 998.

Such "factual specificity" is lacking here. Uber does not allege a single email, text, or phone call in which Fradkin or DTLA instructed, directed, or communicated with the doctors in any way about performing any medical treatment. Instead, the allegation appears in generic boilerplate unconnected to any Client. *See, e.g.*, FAC ¶357.

When the FAC discusses the Clients in detail, its more specific allegations disprove the boilerplate. Specifically, Uber alleges that Dr. Khounganian, not the lawyers, diagnosed the Clients, and decided what treatments each Client should receive. *Id.* ¶¶247–249, 252, 311–314, 316–317, 323. DTLA, in contrast, merely "referred, encouraged, directed, or otherwise instructed" these Clients to see Dr. Khounganian, according to the Complaint. *See, e.g.*, *id.* ¶¶171, 192, 205. Because Uber fails to allege DTLA's supposed demand for "specific treatments" with any particularity and instead admits that Dr. Khounganian made his own medical diagnoses and recommendations without interference from DTLA, the Court must disregard those allegations.

Further undercutting any claims that DTLA and Fradkin were part of an enterprise with the doctors, DTLA and Fradkin have been adverse to the doctors in the state court cases by filing interpleaders against them. *See* Dkt. 67-2, 68-2. Rather than operate in unison, they have competing claims against one another.

**Count 4 – DTLA and Fradkin.** DTLA and Fradkin cannot form an enterprise because an employee in association with a law firm cannot form a distinct enterprise from that law firm. *Cedric Kushner Promotions Ltd. v. King*, 533 U.S. 158, 161 (2001) (holding

a person and enterprise must be distinct); *Kelly v. Palmer, Reifler, & Assocs., P.A.*, 681 F. Supp. 2d 1356, 1378 (S.D. Fla. 2010) ("Thus, where employees of a corporation associate together to commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, the employees in association with the corporation do not form an enterprise distinct from the corporation."). That is why courts routinely hold that a law firm and an employee cannot be both the defendants and the enterprise. *McMurtry v. Brasfield*, 654 F. Supp. 1222, 1226 (E.D. Va. 1987) ("However, the law firm cannot be both a defendant and the alleged RICO enterprise"); *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 121 (2d Cir. 2013) ("We have long since rejected the idea that a RICO enterprise may consist 'merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant.'").

### B.    Uber Failed to Allege Predicate Acts

The FAC alleges that Fradkin and DTLA engaged in mail and wire fraud by making "numerous materially false and misleading statements in demand letters or similar communications knowingly or with reckless indifference to the truth" that were foreseeably sent to "Uber and/or Uber's insurance carriers." FAC ¶384. Uber also claims Defendants committed mail fraud by serving a "fraudulent complaint and related papers on Uber in the underlying lawsuit[s]." *Id.* ¶¶392–95, 397–402; *see also id.* ¶396(b) ("arbitration demand letter to Uber's insurance provider"). None of these communications is actionable.

"The mail and wire fraud statutes are identical except for the particular method used to disseminate the fraud, and contain three elements: (A) the formation of a scheme to defraud, (B) the use of the mails or wires in furtherance of that scheme, and (C) the specific intent to defraud." *Eclectic*, 751 F.3d at 997. To state a claim for wire fraud, Uber must also allege "a specific intent to defraud" or by alleging "a scheme which was reasonably calculated to deceive persons of ordinary prudence and comprehension" from which the Court "may infer a defendant's specific intent to defraud." *Id.* Rule 9(b)'s heightened pleading standard for allegations of fraud applies to "predicate acts" of "racketeering

activity" alleged under RICO. *Best v. Combs*, 2024 WL 5465052, at *2 (C.D. Cal. Dec. 27, 2024); *see Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1065–66 (9th Cir. 2004); *Aetna Life Ins. Co. v. Young*, 2024 WL 5182638, at *4 (C.D. Cal. Sept. 25, 2024). Under Rule 9(b), Uber must state with particularity the circumstances constituting fraud, including "the who, what, when, where, and how of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (cleaned up); *see also Boyd v. Luna*, 2024 WL 4799873, at *7 (C.D. Cal. Nov. 7, 2024) (Garnett, J); *Vaughn v. Wells Fargo Bank, N.A.*, 2013 WL 12138850, at *3 (C.D. Cal. May 15, 2013). None of that is alleged here.

### 1.    None Of The Mail Or Wire Fraud Is Pled With Particularity

Uber does not plead with particularity who at Uber (or anyone else) relied upon any of the complaints, demand letters, or other materials that were sent to it from a litigation adversary, and that defect alone cannot support a finding of reliance. *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*, 943 F.3d 1243, 1259 (9th Cir. 2019) ("[I]t may well be that a RICO plaintiff alleging injury by reason of a pattern of mail fraud must establish at least [indirect] reliance in order to prove causation. This is because, logically a plaintiff cannot even establish but-for causation if *no one* relied on the defendant's alleged misrepresentation.") (internal quotation marks and citation omitted). Additionally, while Uber repeatedly complains about "inflated" medical bills and that the misinformation resulted in "significantly larger settlement payments from Uber," it never states what it believes the appropriate medical bills should be or the fair settlement value of these cases. FAC ¶¶2, 12. Thus, there is no baseline to measure any overpayment by Uber against.

While Uber's failure to allege this information alone renders its predicate acts defective, the FAC itself eliminates any possibility that Uber or anyone else relied upon anything that DTLA, Fradkin, or any other litigation opponent communicated to it. Every defendant recognizes that plaintiffs' counsel is duty bound to present the strongest case

for their clients, just as Uber's counsel owes that same duty to protect Uber, so both sides are expected to test their opponents' claims.

Indeed, Uber's FAC demonstrates that it did test DTLA's claims and that it did not blindly rely upon what its adversary told it. For example, Uber reviewed video footage, accident photos, and medical records, and retained an "independent medical evaluation" of Claimant H, and Uber claims this evidence proves he was not seriously injured. FAC ¶¶170, 172, 183. Yet Uber settled Claimant H's case anyway. The FAC demonstrates that Uber settled the remaining cases, despite conducting its own investigation and concluding that these cases were not worth as much as plaintiffs' counsel claimed for Claimant J, *id.* ¶¶205 (concluding he received "unnecessary treatments, at excessive and above-market rates"), 207 (claiming his MRI revealed "no evidence of acute injury"), 208 (claiming Khounganian "falsely diagnosed" multiple disc herniations from an MRI that did not show such herniations), 210 (addressing claimant's deposition), 221 ("independent expert orthopedic surgeon" found surgery was not needed); Claimant K, *id.* ¶¶224 ("minor accident" and claimant did not seek immediate medical treatment and went to work afterward); Claimant L, *id.* ¶¶240 (police report showed only minor property damage), 248 (alleging claimant needed no treatment beyond chiropractic care, rendering "surgery . . . unnecessary"); Claimant M, *id.* ¶270 (the accident was "not serious and had not caused Claimant M serious injury"); Claimant N, *id.* ¶¶272 (walked away from accident), 276 (ignored more conservative treatment recommendations from other providers), 278 (medical history showed prior injury); Claimant O, *id.* ¶¶288 (no immediate treatment), 291 (ignored advice for more conservative treatment), 299 (medical history of prior injury); Claimant P, *id.* ¶¶305 (no immediate treatment and claimant continued traveling), 307 (medical records show chiropractic care effective), 308 (social media posts show active lifestyle), 321 ("independent expert" confirmed excessive bills), 322 (claimant deposed); Claimant Q. *id.* ¶¶325 (photos of "negligible damage" to vehicle, left scene without treatment), 338 ("independent medical examination" and MRIs found no injury); and Claimant R, *id.* ¶¶349 (claimant explained that he rejected surgery recommendation

IGOR FRADKIN'S NOTICE OF MOTION AND MOTION TO DISMISS
12                                    CASE NO. 2:25-cv-06612

at deposition). In each case, Uber settled knowing the very same information about the claimants that Uber claims should have put DTLA and Fradkin on notice that injuries were overstated.

In each of those cases, Uber also claims it was defrauded because of "secret side agreement[s]" for the doctors to discount their bills if there was a shortfall in the claimants' financial recovery (*see, e.g., id.* ¶185), but there is much wrong with this claim. No such side agreements existed with respect to DTLA Clients and, even so, there is no fraud in doctors discounting their bills to help patients. In any event, like Uber's claim that it learned of overbilling before settlement, the FAC alleges that Uber was aware of these supposedly "secret side agreements" before it settled, having learned of them from "depositions," bills sent to law firms from the providers, and "numerous interpleader actions." *Id.* at 12 n.2 & 3. Thus, Uber could not have been defrauded through any sin of omission because Uber knew the supposed "secret." *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (court can reject conclusory allegations when they are contradicted by more specific admissions).

The only open matter addressed by Uber concerns Claimant I, but Uber's FAC here makes clear that it does not believe it caused his injuries based on "Claimant I's extensive medical history" and subjecting him to an "independent medical evaluation," and Uber claims that a "forensic billing review" establishes inflated medical bills. FAC ¶¶191, 197, 200. Because Uber has neither settled this case nor relied upon any alleged misrepresentation by DTLA, it has not been defrauded. Likewise, although Uber complains here and in the other cases about incurring litigation costs (*id.* ¶203), those costs arise from litigation and not reliance upon any fraudulent misrepresentation.

### 2. Uber's Fraudulent Treatment Claims Are Inadequately Pled

Uber makes a host of unsubstantiated allegations that Dr. Khounganian misdiagnosed the Client's injuries and then recommended or performed unnecessary treatments and surgeries on the Clients, that DTLA directed him to "recommend specific

---

IGOR FRADKIN'S NOTICE OF MOTION AND MOTION TO DISMISS

13          CASE NO. 2:25-cv-06612

treatments" (*id*. ¶357); and Dr. Khounganian charged "above-market" rates for his services (*id*. ¶25). None of these claims is stated with any semblance of particularity.

The FAC'S specific allegations contradict Uber's conclusory narrative. Whatever disagreement Uber may have with Dr. Khounganian's medical conclusions, the FAC admits that the Clients sought treatment for pain from doctors unrelated to the supposed "fraudulent" scheme—including physical therapists, chiropractors, shockwave therapists, acupuncturists, pain management clinics and a host of other doctors—*before* they saw Dr. Khounganian, which strongly suggests that they had actual injuries requiring medical treatment. *See, e.g.*, *id*. ¶175, 193, 206, 244-45, 252, 258, 260-61, 275, 280, 290, 294, 306, 329, 349. Thus, there is no reason DTLA would question its Clients' claim of injury.

Indeed, the FAC fails to allege any reason to hold DTLA and Fradkin liable for Dr. Khounganian's supposed malpractice. An attorney has no duty to second-guess or countermand a licensed medical doctor's diagnoses or treatment plan. In fact, it would be a crime for DTLA to do so. *See* Bus. & Prof. Code § 2052(a) ("any person who . . . diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person [without a license] is guilty of a public offense"). Had Fradkin interfered with Dr. Khounganian's medical diagnoses or treatments, he would have faced up to $10,000 in fines and up to three years in prison. *Id*. Fradkin and DTLA's compliance with the criminal prohibition of the unauthorized practice of medicine, and their reliance on Dr. Khounganian's professional judgment, cannot amount to a "scheme to defraud" or a "specific intent to defraud," and thus these allegations cannot support mail or wire fraud.

Uber also alleges that Dr. Khounganian's bills were fraudulent because the Clients' lawyers demanded that Dr. Khounganian perform "specific treatments," but that claim fares no better. FAC ¶357. The Complaint is not specific as to any particular treatment recommended by DTLA for any specific Client. Moreover, Uber's specific allegations are that Dr. Khounganian, not DTLA, diagnosed the Clients, and prescribed each Client's treatments. DTLA, in contrast, merely "referred, encouraged, directed, or otherwise

instructed" these Clients to see Dr. Khounganian, according to the FAC.  *See, e.g.*, *Id.* ¶¶171, 192, 205.  Because Uber fails to allege DTLA's supposed demand for "specific treatments" with any particularity and admits that Dr. Khounganian made his own medical diagnoses and recommendations without interference from DTLA, those allegations must be disregarded.

Finally, Uber claims that Dr. Khounganian's bills are "fraudulent" because he charges above-market rates.  But Uber does not allege that anyone *concealed* these supposed and unspecified "above-market" rates.  Uber instead concedes that DTLA *disclosed* those rates to extract larger settlement from Uber, which allowed Uber to compare them to market rates through its own experts and "forensic billing review[s]." *Id.* ¶200.  For this reason alone, the allegations fail to establish wire fraud.  *United States v. Jesenik*, 2025 WL 2553729, at \*10 (9th Cir. Sept. 5, 2025) (no "scheme to defraud" without "material falsehoods").

Nor is there anything wrong with charging above-market rates.  Rates for all services vary, but there is no fraud when one vendor charges more than another.  A gas station, for example, does not commit fraud by advertising its price without disclosing that the same gallon of gas is five cents cheaper a block away.

So long as Dr. Khounganian's bills correctly state his charges, the bills themselves cannot be a "scheme to defraud" or reflect a "specific intent to defraud." *Id*.  To be sure, Uber had every opportunity to use its own experts to challenge the reasonableness of Dr. Khounganian's fees.  *See Pebley*, 22 Cal. App. 5th at 1280 (parties can proffer "their own expert evidence regarding the reasonable value of [the plaintiff's] past and future medical expenses").  If Uber wanted a judicial determination that Dr. Khounganian's rates are unreasonable, it could have and should have presented its "independent expert" evidence *to the jury in the personal injury case*.  *Id.*

### 3. Uber's Claims Of Secret Side Agreements Do Not Establish Fraud

Uber argues that there was somehow fraud in Dr. Khounganian entering into agreements with the Clients providing him with a lien on any recovery from Uber coupled

with "concealed side agreements" that required him to reduce his lien rights if the recovery is insufficient to pay his bills.  There is so much wrong with this theory that it is difficult to know where to start.

First, Uber never alleges that this lien arrangement itself was unlawful—it only complains that the lawyers concealed it, on the mistaken theory that it was memorialized in a "secret side agreement" rather than the lien agreements themselves.  *See, e.g.*, FAC ¶201.  But Uber is wrong; the lien agreements themselves required Dr. Khounganian to reduce his fees when the judgments against Uber were inadequate to cover his fees.  *See, e.g.*, Fradkin Decl., Ex. A at ¶10.  Nothing was separate or concealed—the lien agreement itself explained the contingency, and thus there could be no fraud.  *See Jesenik*, 2025 WL 2553729, at *10 (a "'scheme to defraud' requires the use of 'material falsehoods'") (quoting *Neder v. United States*, 527 U.S. 1, 20 (1999)).

Second, there was nothing improper about lawyers referring Clients to Dr. Khounganian because California patients have the *right* to seek medical treatment from doctors working on a lien basis and the *right* to seek medical treatment from doctors outside their insurance plans.  *Pebley*, 22 Cal. App. 5th at 1278.  "A tortfeasor cannot force a plaintiff to use his or her insurance to obtain medical treatment for injuries caused by the tortfeasor."  *Id* at 1277.  That remains true even if "treating on a lien basis increases the 'settlement value' of personal injury cases."  *Id*. at 1270; *see also Qaadir v. Figueroa*, 67 Cal. App. 5th 790, 810 (2021) (plaintiff "had a right to seek treatment outside of his insurance plan").  As the Court of Appeal recognized in *Pebley*, there are many legitimate reasons "why an injured plaintiff may elect to treat outside his or her insurance plan." 22 Cal. App. 5th at 1277.  For example, patients may seek treatment on a lien basis because "health care providers that bill through insurance, rather than on a lien basis, may be less willing to participate in the litigation process."  *Id.*

Yet Uber claims these lien agreements were fraudulent because they stated that the client is obligated to pay Dr. Khounganian's fees in full, but that was false because "concealed side agreements" made them contingent on the size of the recovery against

Uber. *See, e.g.*, FAC ¶32 ("each lien agreement falsely or misleadingly state[d] that the claimants [we]re directly and unconditionally responsible for the medical provider's fees, and that the fees [we]re not contingent on any settlement, judgment, verdict, or other recovery"). Again, there are *no side agreements*. The lien agreement itself explained the contingency.

Third, the hypothetical side agreements would not amount to fraud, even if DTLA had concealed them, because they could make no difference in Uber's liability. As Uber imagines them, the side agreements impose a conditional obligation on Dr. Khounganian to reduce his liens if (but only if) the Client's recovery is insufficient to cover the full amount. But sending Dr. Khounganian's bills to Uber could not be fraudulent because that condition can only occur at the *end of the litigation*, after the recovery is determined by settlement or trial. And Uber alleges that DTLA filed complaints, delivered settlement demands and forwarded Dr. Khounganian's bills *before* settlement, and thus before the condition could occur. *Id*. ¶¶396(b), 396(c), 400(b), 400(c). Because the condition had not yet occurred, Dr. Khounganian had no obligation to reduce his liens, and thus the Clients still owed Dr. Khounganian the full billed amounts when DTLA communicated with Uber. The conditional possibility that Dr. Khounganian might accept less than the full amount *later* did not change the Client's responsibility for paying that full amount at the time of DTLA's communications with Uber. Thus, even if the supposed "concealed side agreements" did exist, they could not make DTLA's communications with Uber fraudulent and thus cannot support mail or wire fraud. *Jesenik*, 2025 WL 2553729, at *10 (no "scheme to defraud" without "material falsehoods").

Fourth, there is no plausible rationale as to how this arrangement—whether concealed from Uber or not—would be fraudulent. Uber's liability would obligate it to pay the fair market value of the medical services rendered, and Uber would be free to dispute those expenses if they were too high. The fact that Dr. Khounganian would discount his expenses if the patients did not obtain sufficient recoveries to cover those expenses is irrelevant, as it would not result in Uber paying more than it owed. The fact

that doctors or any business may discount their fees for certain customers in certain circumstances does not make it fraudulent not to extend the same discounts to everyone else. The fact that Dr. Khounganian was willing to show his patients some charity in the event they were stuck having to pay the bills for injuries caused by Uber does not entitle Uber to any sort of a windfall. There is no fraud in asking Uber to pay the fair market sticker price without offering Uber a discount.

Finally, even if a "concealed side agreement" had existed, DTLA had no obligation to disclose it to Uber outside of discovery because "nondisclosure can support a wire fraud charge only when there exists an independent duty that has been breached by the person so charged." *United States v. Shields*, 844 F.3d 819, 822 (9th Cir. 2016) (quoting *Eller v. EquiTrust Life Ins. Co.*, 778 F.3d 1089, 1092 (9th Cir. 2015)). The "relationship creating a duty to disclose may be a formal fiduciary relationship, or an informal, trusting relationship in which one party acts for the benefit of another and induces the trusting party to relax the care and vigilance which it would ordinarily exercise." *Id.* at 823. Uber does not allege that it had any such relationship with DTLA. Just the opposite, DTLA and Fradkin were Uber's adversaries in litigation.

Because DTLA and Uber were adversaries, DTLA had "no affirmative duty to inform [Uber] of relevant facts." Cal. R. of Prof. Conduct, Rule 4.1(b) cmt. 1. To the contrary, California law required each DTLA lawyer to "maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client." Cal. Bus. & Prof. Code § 6068(e)(1). This obligation is not limited to privileged communications—it instead applies to all "information a lawyer acquires by virtue of the representation, whatever its source." Cal. R. of Prof. Conduct, Rule 1.6 cmt. 2. And the "protection of confidences and secrets is not a rule of mere professional conduct, but instead involves public policies of paramount importance." *In re Jordan*, 7 Cal. 3d 930, 940–41 (1972); *see also* Cal. R. of Prof. Conduct, Rule 1.6 cmt. 1.

## C.      Uber's RICO Claims Are Barred By The Statute Of Limitations

Uber's RICO claims are time-barred. "The statute of limitations for a substantive claim of civil RICO or for a RICO conspiracy is four years, and the period begins to run when a plaintiff knows or should have known of the injury underlying the action." *Tanasescu v. Kremer*, 2018 WL 2223093, at *9 (C.D. Cal. May 1, 2018), *report and recommendation adopted*, 2018 WL 3735861 (C.D. Cal. May 18, 2018), *aff'd sub nom. Tanasescu v. Coroian*, 2021 WL 7085104 (9th Cir. May 20, 2021); *see Olenicoff v. UBS AG*, 2012 WL 1192911, at *14 (C.D. Cal. Apr. 12, 2012) (same time limit for conspiracy claims). A plaintiff has the required "constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to the discovery of the fraud." *Pincay v. Andrews*, 238 F.3d 1106, 1110 (9th Cir. 2011) (quoting *Beneficial Standard Life Ins. Co. v. Madariaga*, 851 F.2d 271, 275 (9th Cir. 1988)). That means that the discovery of the *injury*—not the *claim*—starts the clock on the statute of limitations. *Rotella v. Wood*, 528 U.S. 549, 555 (2000).

Uber claims that it was injured by having to defend lawsuits filed well over four years ago in 2017 (Claimant H), 2018 (Claimant Q), 2019 (Claimants J, K, L, O, P, and R), 2020 (Claimant M), and January 2021 (Claimant I). Claimant N's claim arose in 2022 but, according to the FAC, Uber's RICO injury from this scheme had begun years earlier. Moreover, Uber's FAC claims that it had obtained documents, testimony, and expert analysis in those earlier cases that revealed its RICO injury earlier. *See Molus v. Swan*, 2007 WL 2326132, at *5–6 (S.D. Cal. Aug. 13, 2007) (holding that plaintiff receiving the alleged fraudulent billing statements from an attorney functioned as constructive notice). Additionally, any injury caused by Claimants H, J, K, L, M, O, P, Q and R came to a conclusion more than four years ago, when Uber settled those cases.

Uber must know that it has a statute of limitations problem with respect to these alleged injuries, which is why it includes empty, throw-away claims that the alleged "scheme remains ongoing" and Uber "continue[s] to suffer," and that "Uber bears the burden of these costs notwithstanding the insurance it is required by law to carry." FAC

¶¶25, 363. These claims lack the requisite particularity because Uber nowhere identified what costs it has incurred that are not covered by insurance. And while litigation undoubtedly places burdens on litigants, that burden arises from the fact of litigation and not the reliance upon fraudulent misrepresentations, so those injuries are not actionable under RICO. *Beck v. Prupis*, 529 U.S. 494, 505 (2000) (RICO injuries must be caused by the predicate acts and not some other conduct). Nor does the FAC plausibly claim a continuing threat as the only matter that remains pending concerns Claimant J and, as explained above, there is no fraud that would make it a valid part of any RICO claim.

### D.   Uber Failed To Allege A Pattern

Eliminating the inadequately pled instances of fraud leaves Uber as having failed to allege any pattern of fraudulent conduct, particularly one that poses an ongoing threat of unlawful conduct. Uber's original Complaint was deficient in relying upon only a few isolated cases, but amending its Complaint to add a plethora of cases that were resolved between four and nine years ago does nothing to show that a threat of ongoing conduct remains. Just the opposite. RICO requires more than a few recent, isolated incidents of illegality, and Uber's failure to prove a pattern independently justifies dismissal. *See H.J., Inc.*, 492 U.S. at 238; *Howard*, 208 F.3d at 746.

### E.   Uber Failed To Allege A RICO Injury

Uber fails to allege any injury to its business or property because any out-of-pocket loss was caused to its insurers. *See Elliot v. Geogh*, 2005 WL 8156574, at *4 (C.D. Cal. Dec. 16, 2025) ("This injury must be 'a concrete financial loss, and not mere injury to a valuable intangible property interest.'") (quoting *Oscar v. Univ. Stud. Co-operative Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992) (en banc)). Uber alleges that it is the target of this litigation because it carries a $1 million insurance policy for its vehicles (FAC ¶¶8, 26) and alleges the wire and mail fraud involved transmissions to "Uber's "insurance carriers." *Id.* ¶¶383, 384; *see id.* ¶382. Uber repeatedly alleges the fraud was sending "demand letter[s] to Uber's insurance provider." *Id.* ¶¶392(b), 396(b) ("arbitration demand letter"), 399(c), 402(c). The Ninth Circuit already has held that an insured has suffered no RICO

injury when out-of-pocket expenses are paid by an insurance company. *See Steele v. Hosp. Corp. of Am.*, 36 F.3d 69, 70 (9th Cir. 1994) ("It is not enough that the patients show that their insurance company had to pay out more than it otherwise would have without the alleged RICO violation. This does not constitute financial loss to them."); *see also Kolavev v. Sepansky*, 2020 WL 553843, at *4 n.3 (E.D. Pa. Feb. 4, 2020) ("It is not enough for Kovalev to allege that his insurance company paid out more than it had to pay without the alleged RICO violations; this does not constitute financial loss to him."). Even a RICO violation that causes an insurance policy to be cancelled is insufficient, as there is no loss absent an otherwise insurable injury occurring. *Berg v. First State Ins. Co.*, 915 F.2d 460, 464 (9th Cir. 1990). Tracking RICO's statutory language, Uber routinely alleges that it has been "injured in its business or property" (*see, e.g.*, FAC ¶413), but that is inconsistent with its claim that DTLA targeted Uber's insurers. Nowhere does Uber plead with any particularity how the alleged fraud caused Uber injuries that were not covered by insurance. Thus, Uber fails to allege a RICO injury to itself and that is fatal to both its substantive RICO and conspiracy claims as well.

### F.    Uber Fails To Allege A Viable RICO Conspiracy

In the Sixth Cause of Action, Uber brings a throw-away RICO conspiracy claim under 18 U.S.C. §1962(d) alleging that all Defendants joined a single conspiracy to further each of the five alleged enterprises in the First through Fifth Causes of Action. Although it makes the naked claim that each Defendant engaged "in the conduct of the affairs of each enterprise" (FAC ¶448), that is undermined by each of the preceding Causes of Action, which only allege the involvement of particular Defendants in each of the distinct enterprises. Nowhere, for example, is there is single allegation that DTLA or Fradkin were involved in the enterprises alleged in the Second, Third, or Fifth Causes of Action, and it is not plausible that they were involved in the operation of the Emrani law firm enterprise or GSK enterprise—or whatever association-in fact enterprise that Uber imagines to exist between them.

Courts emphasize that an "outsider['s]" actions rarely qualify as "operation or management" of the enterprise, and that is the case here. *Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*, 924 F. Supp. 449, 466–67 (S.D.N.Y. 1996). Emrani's law firm openly competes with DTLA for clients so, rather than sharing a common purpose, they are antagonistic to each other. And just as each law firm is out to make money for itself, the same is true of the doctors and GSK. As the FAC notes, there are "numerous interpleader actions" where DTLA files competing claims against those doctors as well. FAC at 33 n.3. Thus, there is no overarching conspiracy and, given the inconsistencies throughout the FAC, none is adequately pled. "[T]he bare allegations of the complaint provide no basis to infer assent to contribute to a common enterprise," so the conspiracy claim must be dismissed. *Baumer v. Pachl*, 8 F.3d 1341, 1347 (9th Cir. 1993) (explaining that "[a]ssociation, alone, with the enterprise is, of course, insufficient for violation of RICO: an individual must *agree* to participate in the affairs of the enterprise") (quoting *United States v. Valera*, 845 F.2d 923, 929 (11th Cir. 1988)); *see Gurung v. MetaQuotes Ltd.*, 2024 WL 3849460, at *9 (E.D.N.Y. Aug. 16, 2024) (finding no common purpose in the face of "little more than a naked assertion devoid of further factual enhancement" and absent "a plausible basis for inferring that [the defendants] acted 'on behalf of the enterprise as opposed to . . . their individual self-interests'") (quoting *D. Penguin Bros. v. City Nat'l Bank*, 587 F. App'x 663, 668 (2d Cir. 2014))).

Moreover, a RICO conspiracy claim requires that there be a conspiracy "to violate any provisions of subsections (a), (b), or (c) of this section," 18 U.S.C. § 1962(d), so where the plaintiff "has failed to allege the requisite substantive elements of RICO, a RICO conspiracy claim cannot stand." *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 367 n.8 (9th Cir. 1992); *see Loomer v. Zuckerberg*, 2025 WL 927186, at *2 (9th Cir. Mar. 27, 2025). That is the situation here, as Defendants have established that none of the violations alleged in the First through Fifth Causes of Action are viable.

---

IGOR FRADKIN'S NOTICE OF MOTION AND MOTION TO DISMISS

22                                                                                      CASE NO. 2:25-cv-06612

## G.    Uber Is Not Entitled To Injunctive Relief Under RICO

Uber seeks injunctive relief not permitted for private litigants under the statute. The plain language of 18 U.S.C. § 1964(b) prescribes only one party who can seek injunctive relief for a civil RICO violation: the Attorney General. *Id.* ("The Attorney General may institute proceedings under this section . . . such [as] restraining orders or prohibitions.") The Ninth Circuit and courts in this District agree. *Oregon Laborers-Emps. Health & Welfare Tr. Fund v. Philip Morris Inc.*, 185 F.3d 957, 967 (9th Cir. 1999) ("[I]njunctive relief is not available to a private party in a civil RICO action."); *Shorter v. Cal.*, 2025 WL 1908562, at *24 (C.D. Cal. June 9, 2025), *adopted*, 2025 WL 1908561 (C.D. Cal. July 9, 2025) ("Plaintiff also seeks injunctive and declaratory relief against Judge Rosenbloom . . . [b]ut a private plaintiff has no right to such relief under the civil RICO statute."). Thus, Uber's request for injunctive relief should be dismissed with prejudice.

### CONCLUSION

The Court should dismiss Uber's claims because they are barred by the *Noerr-Pennington* doctrine and the statute of limitations and because they are meritless.


Dated: January 23, 2026                    */s/ David Scheper*
                                           WINSTON & STRAWN LLP
                                           David Scheper (SBN 120174)
                                           dscheper@winston.com
                                           Alexander Cote (SBN 211558)
                                           acote@winston.com
                                           Katelyn Taira (SBN 359683)
                                           ktaira@winston.com
                                           333 S. Grand Ave.
                                           Los Angeles, CA 90071-1543
                                           Telephone:  +1 213-615-1700
                                           Facsimile:   +1 213-615-1750

                                           Attorneys for Defendants
                                           Igor Fradkin and Downtown LA Law Group

## CERTIFICATION OF COMPLIANCE

The undersigned, counsel of record for Igor Fradkin, certifies that this brief contains 23 pages, which complies with the page limit set by court order. *See* Standing Order, Dkt. 14 at 11.

Dated: January 23, 2026                    WINSTON & STRAWN LLP


By: */s/ David Scheper*
David Scheper
Alexander Cote
Katelyn Taira