Stephen G. Larson (SBN 145225)
slarson@larsonllp.com
John S. Lee (SBN 272229)
jlee@larsonllp.com
Amelia L.B. Sargent (SBN 280243)
asargent@larsonllp.com
Benjamin Falstein (SBN 342867)
bfalstein@larsonllp.com
**LARSON LLP**
555 South Flower Street, 30th Floor
Los Angeles, California 90071
Telephone:(213) 436-4888
Facsimile: (213) 623-2000

Attorneys for Defendants GREG
KHOUNGANIAN and VALLEY
ORTHOPEDIC AND SPINE CENTER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UBER TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> DOWNTOWN LA LAW GROUP, IGOR FRADKIN, THE LAW OFFICES OF JACOB EMRANI, JACOB EMRANI, VALLEY ORTHOPEDIC AND SPINE CENTER D/B/A GSK SPINE, and GREG KHOUNGANIAN, <br><br> Defendants. | Case No. 2:25-CV-06612-SPG-PD <br><br> **DEFENDANTS GREG KHOUNGANIAN AND VALLEY ORTHOPEDIC AND SPINE CENTER'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT** <br><br> [*Filed concurrently with Declaration of Amelia L.B. Sargent; [Proposed] Order*] <br><br> Date:    April 29, 2026 <br> Time:    1:30 p.m. <br> Crtrm.:  5C <br><br> Judge:   Hon. Sherilyn Peace Garnett |

MOTION TO DISMISS FIRST AMENDED COMPLAINT

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, on April 29, 2026 at 1:30 p.m., or as soon thereafter as the matter may be heard before the Honorable Sherilyn Peace Garnett in Courtroom 5C of the First Street Courthouse, located at 350 West 1st Street, Los Angeles, California 90012, Defendants Greg Khounganian ("Dr. Khounganian") and Valley Orthopedic and Spine Center ("Valley Orthopedic") will and hereby do move the Court to dismiss with prejudice all claims asserted by Plaintiff Uber Technologies, Inc. against Valley Orthopedic and Dr. Khounganian pursuant to Federal Rule of Civil Procedure 12(b)(6).

This motion is based on this notice of motion and motion; the accompanying memorandum of points and authorities; the concurrently-filed motions of Defendants Downtown LA Law Group, Igor Fradkin, The Law Offices of Jacob Emrani, and Jacob Emrani (the "Co-Defendants' Motions"); the concurrently-filed Declaration of Amelia L.B. Sargent; and such further evidence and argument presented to the Court at or before the hearing.

PLEASE TAKE FURTHER NOTICE that Dr. Khounganian and Valley Orthopedic hereby join in the Co-Defendants' Motions because the arguments raised therein apply with equal force to Dr. Khounganian and Valley Orthopedic.

This motion is made following the conference of counsel on January 16, 2026 in accordance with Local Rule 7-3, during which the parties thoroughly discussed the substance and potential resolution of the filed motion by videoconference. *See* Decl. of Amelia L.B. Sargent.

///

///

///

///

LARSON
LOS ANGELES

MOTION TO DISMISS FIRST AMENDED COMPLAINT

Dated:  January 23, 2026          LARSON LLP

By: */s/ John S. Lee*
Stephen G. Larson
John S. Lee
Amelia L.B. Sargent
Benjamin Falstein
Attorneys for Defendants
Greg Khounganian and Valley Orthopedic and
Spine Center

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ..................................................................................... 1

II.   STATEMENT OF FACTS ....................................................................... 4

    A.    Dr. Khounganian Is a Respected Spinal Surgeon Who Treats Patients with Personal Injury Claims Against Uber Drivers ................. 4

    B.    Uber Alleges Dr. Khounganian Is Part of a "Fraud Scheme" for Treating Uber Car Crash Victims and Testifying on their Behalf ......... 5

    C.    Uber Claims Injury in the Form of Litigation Costs and Settlements to Injured Victims ................................................................ 6

    D.    Uber Has Engaged in a National Litigation Strategy Against Personal Injury Attorneys and Doctors .................................................. 6

III.  LEGAL STANDARD ............................................................................... 7

IV.   UBER FAILS TO STATE ANY COGNIZABLE RICO CLAIM ................... 7

    A.    Uber Cannot Establish the Existence of an Enterprise .......................... 8

        1.    Uber's Association-In-Fact Theories Fail ................................... 8

            a.    Uber Fails to Plead a Common Purpose Distinct from Each Entity's Business Practices ............................ 8

            b.    Neither Dr. Khounganian Nor Valley Orthopedic "Conducted the Affairs" of the Enterprise. ...................... 11

        2.    Valley Orthopedic Is Not a RICO Enterprise ............................ 13

        3.    Uber Fails to Allege that Any Enterprise Affected Interstate Commerce ............................................................... 15

    B.    Uber Fails To Allege A Plausible Fraudulent Scheme ........................ 16

        1.    Neither Lien-Based Medical Care Nor the Reduction of Such Liens Constitute Fraud ...................................................... 17

        2.    The Supposedly Inflated Medical Bills Are Not Actionable ..... 20

        3.    Dr. Khounganian's Treatments and Medical Opinions Are Not Fraudulent ................................................................... 22

    C.    Uber Fails to Allege a Cognizable RICO Injury ................................. 26

        1.    Uber's Injury Is Not Compensable Under RICO ...................... 26

        2.    Uber Does Not Connect Its Purported Harm to Defendants' RICO Conduct ................................................... 27

D.    Uber's RICO Conspiracy Claim Necessarily Fails................................31

E.    The *Noerr-Pennington* Doctrine Bars This Action .........................32

    1.    Uber's Claims Burdens Petitioning Rights................................32

    2.    Defendants' Conduct Is Protected Petitioning Activity .............33

    3.    The Statutes Can Be Construed to Avoid Burdening Dr. Khounganian's Petitioning Activity ...........................................34

    4.    The Sham Litigation Exception Does Not Apply.......................35

V.    DR. KHOUNGANIAN AND VALLEY ORTHOPEDIC JOIN CO-DEFENDANTS' ARGUMENTS ........................................................38

VI.    CONCLUSION ......................................................................38

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Anza v. Ideal Supply Corp.*,
    547 U.S. 451 (2006) ..................................................................................27

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..........................................................................7, 8, 23

*B&G Foods N.A., Inc. v. Embry*,
    29 F.4th 527 (9th Cir. 2022) ................................................................*passim*

*Belczak v. Shute*,
    2009 WL 10674167 (C.D. Cal. June 29, 2009)..................................16

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544, 570 (2007) ....................................................7, 17, 19, 25

*Boone v. Redevelopment Agency of City of San Jose*,
    841 F.2d 886 (9th Cir. 1988)..................................................................35

*Canyon Cnty v. Syngenta Seeds, Inc.*,
    519 F.3d 969 (9th Cir. 2008)..............................................................26, 30

*Cedric Kushner Promotions, Ltd. v. King*,
    533 U.S. 158 (2001) .........................................................................8, 12, 13

*City of Almaty v. Khrapunov*,
    956 F.3d 1129 (9th Cir. 2020)................................................................29

*City of Columbia v. Omni Outdoor Advert., Inc.*,
    499 U.S. 365 (1991) ................................................................................37

*Eclectic Props. v. Marcus & Millichap Co.*,
    751 F.3d 990 (9th Cir. 2014)................................................................*passim*

*Edwards v. Marin Park, Inc.*,
    356 F.3d 1058 (9th Cir. 2004)................................................................7

*Eller v. EquiTrust Life Ins. Co.*,
    778 F.3d 1089 (9th Cir. 2015)................................................................20

LARSON
LOS ANGELES

MOTION TO DISMISS FIRST AMENDED COMPLAINT

*Evans Hotels, LLC v. Unite Here! Loc. 30*,
   2021 WL 10310815 (S.D. Cal. Aug. 26, 2021) ....................................................26

*Fraser v. Team Health Holdings, Inc.*,
   2022 WL 971579 (N.D. Cal. Mar. 31, 2022) ...............................................20, 22

*Freeman v. Lasky, Haas & Cohler*,
   410 F.3d 1180 (9th Cir. 2005)...........................................................................34

*Gomez v. Guthy-Renker, LLC*,
   2015 WL 4270042 (C.D. Cal. July 13, 2015) ...........................................9, 11, 14

*Hill v. Opus Corp.*,
   841 F. Supp. 2d 1070 (C.D. Cal. 2011)................................................................31

*Holloway v. Clackamas River Water*,
   2014 WL 6998069 (D. Or. Sept. 9, 2014).....................................................26, 28

*Howard v. Am. Online Inc.*,
   208 F.3d 741 (9th Cir. 2000) ..............................................................................31

*In re Jamster Marketing Litigation*,
   2009 WL 1456632 (S.D. Cal. 2009).......................................................................9

*In re JUUL Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation*,
   497 F.Supp.3d 552 (N.D. Cal. 2020)...........................................................8, 9, 15

*In re Outlaw Lab'ys, LP Litig.*,
   352 F. Supp. 3d 992 (S.D. Cal. 2018) .................................................................38

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*,
   826 F. Supp. 2d 1180 (C.D. Cal. 2011).............................................................7, 9

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
   865 F. Supp. 2d 1002 (C.D. Cal. 2011)...............................................................12

*In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*,
   601 F. Supp. 3d 625 (C.D. Cal. 2022)..................................................................20

*Kamal v. Cnty. of Los Angeles*,
   2018 WL 4328467 (C.D. Cal. Sept. 6, 2018)......................................................28

LARSON
LOS ANGELES

MOTION TO DISMISS FIRST AMENDED COMPLAINT

*Kearney v. Foley & Lardner, LLP,*
    590 F.3d 638 (9th Cir. 2009) ....................................................................32, 33, 38

*Lopez v. Cher Koon Teo,*
    2010 WL 11515370 (C.D. Cal. Feb. 24, 2010) ...................................................15

*Mendoza v. Zirkle Fruit Co.,*
    301 F.3d 1163 (9th Cir. 2002) .............................................................................31

*Mohebbi v. Khazen,*
    50 F. Supp. 3d 1234 (N.D. Cal. 2014)................................................................14

*Musick v. Burke,*
    913 F.2d 1390 (9th Cir. 1990) .............................................................................16

*Ogden v. Wells Fargo Bank, N.A.,*
    2015 WL 13413390 (C.D. Cal Feb. 20, 2015) ....................................................26

*Ozeran v. Jacobs,*
    798 F. App'x 120 (9th Cir. 2020).........................................................................31

*Pac. Surf Designs, Inc. v. Whitewater W. Indus., Ltd.,*
    2021 WL 5326529 (S.D. Cal. Nov. 16, 2021)......................................................26

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda
    Pharms. Co. Ltd.,*
    943 F.3d 1243 (9th Cir. 2019) ........................................................................27, 28

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.,*
    508 U.S. 49 (1993) ...............................................................................................37

*Realtek Semiconductor Corp. v. MediaTek, Inc.,*
    732 F. Supp. 3d 1101 (N.D. Cal. 2024)...............................................................37

*Reed v. E. End Props., Inc.,*
    2018 WL 6131211 (C.D. Cal. Mar. 15, 2018) ...............................................33, 34

*Relevant Grp., LLC v. Nourmand,*
    116 F.4th 917 (9th Cir. 2024)...................................................................32, 36, 37

*Reves v. Ernst & Young,*
    507 U.S. 170 (1993) ....................................................................................8, 11, 15

*Rosner v. Bank of China*,
　528 F.Supp.2d 419 (S.D.N.Y. 2007) ....................................................................... 10

*Shaw v. Nissan N. Am., Inc.*,
　220 F.Supp.3d 1046 (C.D. Cal. 2016) .............................................................. 9, 10

*Sosa v. DIRECTV, Inc.*,
　437 F.3d 923 (9th Cir. 2006) ....................................................... 32, 33, 34, 35

*Steele v. Hosp. Corp. of Am.*,
　36 F.3d 69 (9th Cir. 1994) ................................................................................ 31

*Stitt v. Citibank, N.A.*,
　942 F. Supp. 2d 944 (N.D. Cal. 2013) ............................................................ 32

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
　546 F.3d 991 (9th Cir. 2008) .................................................................... 36, 37

*Thomas v. Baca*,
　308 Fed. App'x 87 (9th Cir. 2009) ................................................................. 26

*Uber Techs., Inc. v. Law Grp. of S. Fla. et al.*,
　No. 1:25-cv-22635-CMA (S.D. Fla.) ................................................................ 6

*Uber Techs., Inc. v. Simon & Simon P.C. et al.*,
　2:25-cv-05365-MAK (E.D. Pa.) ....................................................................... 6

*Uber Techs., Inc v. Wingate, Russotti, Shapiro, Moses & Halperin, LLP et al.*,
　No. 1:25-cv-00522 (E.D.N.Y.) ......................................................................... 6

*United States v. Bagnariol*,
　665 F.2d 877 (9th Cir. 1981) .......................................................................... 16

*United States v. Turkette*,
　452 U.S. 576 (1981) ........................................................................................ 14

*Vess v. Ciba-Geigy Corp. USA*,
　317 F.3d 1097 (9th Cir. 2003) .................................................................. 19, 23

*Vollarroel v. Recology Inc.*,
　775 F.Supp.3d 1050 (N.D. Cal. 2025) ............................................................ 15

LARSON
LOS ANGELES

MOTION TO DISMISS FIRST AMENDED COMPLAINT

*Walter v. Drayson*,
   538 F.3d 1244 (9th Cir. 2008) .............................................................................. 12

*Wilcox v. First Interstate Bank of Oregon, N.A.*,
   815 F.2d 522 (9th Cir. 1987) ................................................................................ 15

**California Cases**

*Bermudez v. Ciolek*,
   (2015) 237 Cal. App. 4th 1311 ........................................................................ 21, 28

*Gilman v. Dalby*,
   (2009) 176 Cal. App. 4th 606 .............................................................. 17, 18, 33, 34

*Smith v. Schumacker*,
   (1938) 30 Cal. App. 2d 251 .............................................................................. 24, 25

**Federal Statutes**

18 U.S.C.
   § 1962(c) ............................................................................................................ 9, 11
   § 1962(d) .................................................................................................................. 31

**Other Authorities**

FRCP
   Rule 8 ....................................................................................................................... 32
   Rule 9(b) ......................................................................................................... 7, 9, 19
   Rule 12(b)(6) .............................................................................................................. 2

LARSON
LOS ANGELES

MOTION TO DISMISS FIRST AMENDED COMPLAINT

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiff Uber Technologies, Inc. has embarked on a dangerous and damaging nationwide campaign to weaponize the RICO statute and associated state-law claims as a tool to chill personal injury litigation.  Uber absurdly claims that entirely unrelated groups of lawyers and doctors in jurisdictions as far-reaching as New York, Pennsylvania, Florida and California each comprise distinct "racketeering" enterprises directed at Uber.  Their supposed organized crime: providing medical treatment to those injured by at-fault Uber drivers, and seeking related legal redress for the victims' injuries.

Defendant Dr. Greg Khounganian is a new casualty of Uber's lawfare.  He is a board-certified spinal surgeon with a flawless record at USC's medical center and in his own private practice.  Dr. Khounganian performs procedures involving the cervical, thoracic and lumbar spine.  Part of his practice involves the lien-based treatment of car accident victims, including those harmed by Uber drivers.  Offering treatment on a lien basis expands access to premium care that would otherwise be unavailable through limited, cost-contained insurance networks.

Uber's coordinated nationwide attack on personal injury claimants seeking lien-based care is designed to eliminate this higher-end healthcare option and drive claimants back to lower-cost insurance-based providers.  In fact, Uber has just recently sponsored a ballot initiative toward that end.  It is immaterial to Uber whether its lawsuits succeed; simply by filing, Uber ruins the reputations of professionals like Dr. Khounganian and deters personal injury firms from directing claims at Uber for fear of winding up in the crosshairs of this deep-pocketed aggressor.  Indeed, Uber's actions upon filing this lawsuit are telling.  The very next day after filing, Uber's lawsuit was splashed across the major media outlets.  Uber then sat on its hands for 48 days before initiating service on Dr. Khounganian.

Uber's improper purpose underlying this action (and its similar lawsuits

LARSON
LOS ANGELES

1

against others) is obvious from the fact that the asserted claims are barred on their face as a matter of law.  All of the conduct at issue arises from protected litigation and prelitigation activity—*i.e.*, lawsuits against Uber for its drivers' injury-causing accidents.  In other words, Uber has filed this lawsuit in retaliation for being sued.  Notably, in the underlying actions, Uber *settled* the claims.  Instead of defending the claims on their merits at the time, Uber now wages litigation against those who treated the victims' injuries and obtained legal redress on their behalf.  The *Noerr-Pennington* doctrine exists precisely to prevent such perversion of the legal system.

Beyond the *Noerr-Pennington* bar, Uber has altogether failed to state any cause of action under RICO, and its claims should therefore be dismissed under Rule 12(b)(6).  None of the conduct alleged is illegal, under any theory of fraud.  The so-called RICO allegations rest on a house of cards: Uber hypothesizes purported "side agreements" between Dr. Khounganian and personal injury attorneys to discount medical bills as the sole hook for a "concealment" theory of fraud.  Setting aside that no such agreements exist, no duty exists in law to disclose such "side agreements," and certainly not to a third party like Uber with whom Dr. Khounganian never interacted.  Without a duty of disclosure, there can be no actionable concealment—and thus no fraud.  Indeed, the California Court of Appeal has expressly held that personal injury victims may lawfully elect and seek as damages from tortfeasors like Uber the cost of lien-based care rather than being forced to rely on their medical insurance.  And caselaw expressly acknowledges the financial reality that if a treated patient does not obtain a monetary recovery in a lawsuit, such medical liens will likely remain unpaid.  That is not fraud; it is life.  Uber thus fails to plausibly establish the RICO elements—much less to the heightened degree of particularly that the law requires.

The remainder of Uber's Amended Complaint devolves into a mishmash of contradictory and facially implausible allegations.  Uber contends Dr. Khounganian issued faulty medical opinions, despite admitting other non-defendants arrived at the

same medical conclusions and the patients likewise received related treatment from non-defendant facilities.  Uber cannot mount a belated, collateral challenge to medical necessity of care in the underlying actions here, after having failed to prevail on that point in those cases.  Just as fatally, Uber cannot even establish baseline standing due to the absence of any allegation establishing proximation cause between any action by Dr. Khounganian and any injury suffered by Uber.  And the only purported injury Uber identifies—litigation expenses—cannot be recovered through RICO.  Uber's claims fail at every level.

Uber's indifference to the actual merits of this case is aptly captured by the fact that, in its original complaint, Uber sued a non-existent entity called "GSK Spine," which it characterized as a supposed hub of the RICO enterprise.  As Uber ultimately realized, a basic search of the Secretary of State website reveals no such entity exists; Uber did not conduct this minimal diligence before leveling serious RICO charges.  Uber's mulligan fares no better, as it has blindly swapped in Defendant Valley Orthopedic and Spine Center—an entity uninvolved with Dr. Khounganian's medical practice as a sole practitioner.  Tellingly, despite asserting that Valley Orthopedic is a "central player" in the supposed fraud, Uber does not include a single factual allegation of any role in Defendants' purported scheme.  In fact, Uber does not once mention Valley Orthopedic while describing 18 personal injury claimants supposedly underlying the RICO claims.  This wholesale failure to provide factual information is fatal to Uber's claims against Valley Orthopedic and precludes any finding that it somehow comprised a RICO enterprise.

At bottom, this is a lawsuit designed purely for tabloid effect with no meaningful effort at substance.  To characterize it is as merely frivolous, however, does not do justice to the severely damaging impact its filing has on professionals like Dr. Khounganian, who rely on their reputation to earn a livelihood.  This case warrants swift and permanent relief at the pleading stage.  This motion should be granted, and Uber's case should be dismissed with prejudice.

LARSON
LOS ANGELES

3

MOTION TO DISMISS FIRST AMENDED COMPLAINT

## II.   STATEMENT OF FACTS

### A.   Dr. Khounganian Is a Respected Spinal Surgeon Who Treats Patients with Personal Injury Claims Against Uber Drivers

Dr. Khounganian is a licensed orthopedic surgeon specializing in spinal surgery.  FAC ¶ 12.  Certain of his patients were injured in car crashes involving Uber drivers.  *Id.* ¶ 10.  These patients are referred to Dr. Khounganian by personal injury lawyers in specific connection with "lawsuits and/or claims."  *Id.*  Prior to recommending any course of treatment, each patient attends an initial orthopedic spine evaluation conducted by Dr. Khounganian, during which he assesses the nature and extent of their injuries.  *See, e.g., id.* ¶¶ 125, 135, 161.  Following the initial evaluation, Dr. Khounganian documents his diagnoses and opinions regarding causation, and he sometimes recommends and performs surgeries or other procedures on the injured patients.  *See, e.g., id.* ¶¶ 161, 208, 264.

As a medical expert who has performed numerous successful spinal surgeries, and given his particular experience treating patients with pending personal injury claims, Dr. Khounganian is a preferred choice for many patients involved in personal injury actions.  *See id.* ¶ 10.  As a patient-favorable alternative to billing through health insurance companies—which typically dictate the patients' choice of medical provider, require expensive copays and other charges, deny needed care, and artificially cap the standard reimbursement for particular procedures—Dr. Khounganian instead enters into medical lien agreements with his personal injury patients by which he is to be compensated on a deferred basis through the patients' eventual recovery in the personal injury actions.  *Id.*  Due to the lien arrangements, the resulting charges for Dr. Khounganian's services are not subject to the artificially-capped amounts dictated by insurers, *i.e.* the "market rate."  Uber refers to these charges as "above-market" and "artificially inflated."  *Id.* ¶ 25.

Dr. Khounganian carefully documents his diagnoses for each patient, his opinions regarding causation of their injuries, the treatments and procedures he

performs, and the resulting medical bills for his services, which he then transmits to personal injury attorneys for use in pending litigation, including claims against Uber. *Id.* As demonstrated by Uber's Amended Complaint, the highly effective services Dr. Khounganian provides for his patients exposes Uber to future personal injury liability, such that Uber now seeks equitable relief to "prevent [his] conduct going forward." *Id.* p. 29 (Prayer for Relief).

### B.    Uber Alleges Dr. Khounganian Is Part of a "Fraud Scheme" for Treating Uber Car Crash Victims and Testifying on their Behalf

According to the Amended Complaint, the medical services Dr. Khounganian provides his patients are part of a "fraud scheme" against Uber in order "to artificially inflate the damages in lawsuits against Uber." *Id.* ¶¶ 2, 25.

First, Uber alleges Dr. Khounganian's medical bills were "false and misleading" and/or "inflated" because he entered into purported "secret side agreement[s]" with referring personal injury attorneys. *Id.* ¶¶ 3, 10. In these so-called "secret side agreements," Dr. Khounganian allegedly agreed to discount his medical bills—forgiving the debt to the injured victim—if the claimant's recovery turned out to be insufficient to cover the full cost of his services. *Id.* ¶ 10. Uber contends that discounting medical bills depending on the victim's eventual recovery renders Dr. Khounganian's bills fraudulently "inflated" because the agreements were not disclosed to Uber. *Id.* According to the Amended Complaint, the benefit Dr. Khounganian received from the purported side agreements was the expectation of future personal injury referrals. *Id.* ¶ 34.

Second, Uber alleges that Dr. Khounganian committed fraud because the bills he prepares for his services "charge above-market, artificially inflated rates for the services in question." *Id.* ¶ 36.

Third, Uber also alleges with zero factual basis that Dr. Khounganian's medical treatment was itself fraudulent because the personal injury victims, according to Uber, sustained "non-existent or exaggerated injuries." *Id.* ¶ 6 Yet,

LARSON
LOS ANGELES

5
MOTION TO DISMISS FIRST AMENDED COMPLAINT

Uber's specific allegations regarding the 18 personal injury claimants detailed in the Amended Complaint directly contradict this conclusory assertion.  That is, Uber concedes that all 18 claimants: actually *were* in car-related incidents involving Uber, *see, e.g., id.* ¶¶ 57, 122, 143; actually *did* suffer injuries, *see, e.g., id.* ¶¶ 58, 132, 147, 155, 174; and *independently sought treatment* for these injuries, including from medical providers that had *no connection* to the alleged fraud scheme, *before* presenting to Dr. Khounganian.  *See, e.g., id.* ¶¶ 147, 175, 206, 261, 349.

Critically, each of the underlying instances of supposed fraud occurred in the context of personal injury lawsuits filed against Uber.  *Id.* ¶¶ 358, 360.  In each case, the allegedly fraudulent documentation prepared by Dr. Khounganian containing his opinions regarding causation and recommended treatments were transmitted to the personal injury lawyers for use in legal proceedings.  *Id.*

### C.    Uber Claims Injury in the Form of Litigation Costs and Settlements to Injured Victims

Although it now contends that none of the 18 Claimants were actually injured, Uber elected to settle the claims.  *Id.* ¶ 361.  Uber claims as damages the litigation-related expenses it incurred in defending and settling the 18 underlying personal injury actions.  *Id.*

### D.    Uber Has Engaged in a National Litigation Strategy Against Personal Injury Attorneys and Doctors

This lawsuit does not stand in isolation, but is instead part of a multi-pronged, national litigation campaign against personal injury attorneys and the medical providers that treat victims injured by Uber's drivers.  In addition to this action, Uber has also filed RICO actions in New York, Florida, and Pennsylvania.  *See Uber Techs., Inc v. Wingate, Russotti, Shapiro, Moses & Halperin, LLP et al.*, No. 1:25-cv-00522 (E.D.N.Y.); *Uber Techs., Inc. v. Law Grp. of S. Fla. et al.*, No. 1:25-cv-22635-CMA (S.D. Fla.); *Uber Techs., Inc. v. Simon & Simon P.C. et al.*, 2:25-cv-05365-MAK (E.D. Pa.).  Uber's allegation of "minor or nonexistent injuries" is a

LARSON
LOS ANGELES

common feature in each of these lawsuits and reveals Uber's underlying strategy of intimidating personal injury lawyers and medical providers to deter future litigation.

## III.  LEGAL STANDARD

Dismissal is appropriate if the complaint fails to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To determine plausibility, a court should first "identify pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Eclectic Props. v. Marcus & Millichap Co.*, 751 F.3d 990, 998 (9th Cir. 2014) (citing *Iqbal*, 556 U.S. at 679).  Then, a court "should assume the veracity of well pleaded factual allegations and determine whether they plausibly give rise to entitlement to relief." *Id.*  Facts that are "merely consistent" with liability "stop[] short" of plausibility. *Id.*  The court "must also consider an 'obvious alternative explanation' for defendant's behavior." *Id.*; *Twombly*, 550 U.S. at 567 (same).  When a defendant is engaging in activity that is facially legitimate, "a significant level of factual specificity is required to allow a court to infer reasonably that such conduct is plausibly part of a fraudulent scheme." *Eclectic Props.*, 751 F.3d at 998.

Uber faces another steep barrier because *all* its claims sound in fraud, and therefore it must "state with particularity the circumstances constituting fraud" under Rule 9(b). *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1065-66 (9th Cir. 2004).

## IV.  UBER FAILS TO STATE ANY COGNIZABLE RICO CLAIM

To state a RICO claim, Uber must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's 'business or property.'" *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, 826 F. Supp. 2d 1180, 1201 (C.D. Cal. 2011).  The enterprise must also engage in interstate commerce. *Eclectic Properties*, 751 F.3d at 997.  Uber's purported RICO claims fail at multiple levels

for the reasons stated below.

**A.     Uber Cannot Establish the Existence of an Enterprise**

The Amended Complaint alleges three RICO enterprises that Dr. Khounganian and Valley Orthopedic supposedly managed or operated: (1) an association-in-fact enterprise involving the DTLA Law Defendants, Dr. Khounganian, and Valley Orthopedic (Count 1); (2) an association-in-fact enterprise involving the Emrani Defendants, Dr. Khounganian, and Valley Orthopedic (Count 2); and (3) a formal enterprise consisting of Valley Orthopedic (Count 3). None of these allegations meet the plausibility standard under *Iqbal*.

**1.     Uber's Association-In-Fact Theories Fail**

Uber's First and Second Causes of Action are based on the contention that a standard referral arrangement between Dr. Khounganian and the Law Firm Defendants constitutes an association-in-fact enterprise. Such a theory falls short for at least two independent reasons. First, Uber fails to plead the required element that the enterprise has a "common purpose" separate from each entity's own business practices. *See In re JUUL Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation*, 497 F.Supp.3d 552, 594 (N.D. Cal. 2020). RICO liability "depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001) (emphasis in original). Thus, "where the individual constituents of an asserted enterprise are alleged only to have conducted the[ir] 'regular business' . . . in their own interests, those allegations are insufficient to support a RICO enterprise." *In re JUUL Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation*, 497 F.Supp.3d 552, 599 (N.D. Cal. 2020). Second, Uber fails to allege that Dr. Khounganian or Valley Orthopedic had any part in the "operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 184 (1993).

**a.     Uber Fails to Plead a Common Purpose Distinct from**

LARSON
LOS ANGELES

8
MOTION TO DISMISS FIRST AMENDED COMPLAINT

Each Entity's Business Practices

Uber cannot satisfy the requirement that the members of the enterprise share a "common purpose" separate from each entity's own business practices. *In re JUUL Labs*, 497 F.Supp.3d at 599. The Amended Complaint does nothing more than allege a standard commercial relationship in which the Law Firm Defendants refer personal injury claimants to Dr. Khounganian for treatment. All of the allegations involving Dr. Khounganian relate to him evaluating and treating injured patients, issuing bills, and opining on causation consistent with his normal business practices and participation in the litigation. *See* FAC ¶ 25. Even if this were done fraudulently—which is flatly untrue—"that does not transform it into distinct 'enterprise' conduct actionable under RICO." *In re JUUL Labs*, 497 F.Supp.3d at 599; *see also In re Toyota*, 826 F.Supp.2d at 1202-03 (where "plaintiffs merely allege that the Defendants are associated in a manner directly related to their own primary business activities" and alleged "no more than that Defendants' primary business activity . . . was conducted fraudulently," that was "insufficient to state a claim under § 1962(c).") Baselessly calling Dr. Khounganian's alleged conduct "fraudulent" is insufficient: "Without the adjectives, the allegations allege conduct consistent with ordinary business conduct and an ordinary business purpose. . . . Pleading by adjective does not comply with Rule 9(b)." *In re Jamster Marketing Litigation*, 2009 WL 1456632, *5 (S.D. Cal. 2009).

It is for precisely this reason that courts have "overwhelmingly rejected attempts to characterize routine commercial relationships as RICO enterprises." *Shaw v. Nissan N. Am., Inc.*, 220 F.Supp.3d 1046, 1054 (C.D. Cal. 2016). "The consensus among courts reflects the judgment that the statutory requirements of RICO cannot be circumvented by attempting to characterize a routine contractual relationship for services as an independent enterprise." *Gomez v. Guthy-Renker, LLC*, 2015 WL 4270042, at *11 (C.D. Cal. July 13, 2015).

For example, in *Shaw*, the court rejected plaintiff's argument that the

LARSON
LOS ANGELES

MOTION TO DISMISS FIRST AMENDED COMPLAINT

defendants "shared a common purpose of fraudulently selling defective vehicles" because, "[a]t best, the allegations here only demonstrate that the parties are associated in a manner directly related to their own primary business activities." 220 F.Supp.3d at 1055, 1057.  The court distinguished plaintiff's allegations from a prior RICO action that was deemed to satisfy the common purpose requirement because that "complaint included pages of references to specific communications showing the defendants acting as an enterprise and engaged in a collaborative scheme to defraud." *Id.* at 1057.  As in *Shaw*, Uber is only able to allege routine commercial relationships between Dr. Khounganian and the Law Firm Defendants consistent with their ordinary business provision of services to car accident victims.

The Amended Complaint does not provide any plausible indication that Dr. Khounganian and the Law Firm Defendants pursued a common scheme motivated by a common purpose.  For example, Uber asserts that "Downtown LA Law Group sent an email to Defendant Khounganian's office asking that Claimant K be scheduled for an appointment 'ASAP' and listing the type of case as 'Passenger v. Uber Driver.'"  FAC ¶ 226.  This does not plausibly demonstrate that Dr. Khounganian and DTLA Law were united by a common purpose to defraud Uber or that they had a shared understanding that the personal injury claimant was uninjured.  All this communication demonstrates is that DTLA Law referred a patient to Dr. Khounganian for evaluation and potential treatment, consistent with Dr. Khounganian's standard business practices.

Indeed, the services Dr. Khounganian provides to patients referred by DTLA Law and the Emrani Firm are no different than the services he provides to any other patients.  *See Rosner v. Bank of China*, 528 F.Supp.2d 419, 428–29 (S.D.N.Y. 2007) ("The fact that BoC provided general professional services to IFS and Siu Lap, services that BoC provides to the public at large, does not provide a basis for inferring that BoC, IFS, and Siu Lap shared a common unlawful purpose.").  By alleging no more than the fact that Dr. Khounganian and the Law Firm Defendants

independently pursued their own economic interests, Uber is unable to allege the existence of an enterprise.

                b.       <u>Neither Dr. Khounganian Nor Valley Orthopedic "Conducted the Affairs" of the Enterprise.</u>

To demonstrate the existence of a RICO enterprise, a defendant must also "conduct or participate, directly or indirectly, in the conduct of [the] enterprise's affairs." 18 U.S.C. § 1962(c). "Conduct" here means more than mere participation in the enterprise's affairs. RICO liability only attaches to "those who participate in the *operation or management* of an enterprise through a pattern of racketeering activity." *Reves v. Ernst & Young*, 507 U.S. 170, 184 (1993) (emphasis added). Thus, in order to meet this element, Uber must allege that each Defendant (i) had "*some* part in directing the enterprise's affairs," and (ii) "conducted or participated in the conduct of the enterprise's affairs, not just their own affairs." *Id.* at 179. Further, "one is not liable under [RICO] unless one has participated in the operation or management of the enterprise itself," which is separate and apart from the racketeering acts. *Reves*, 507 U.S. at 183; *see also Gomez*, 2015 WL 4270042, at *7-8 ("RICO liability requires more than a pattern of . . . predicate crimes.").

Fatally as to Dr. Khounganian and Valley Orthopedic, the Amended Complaint alleges that the operational and managerial aspects of any enterprise were performed by others. *See, e.g.*, FAC ¶ 50 (alleging "[law firms] *direct* their clients to [] lien providers" and "also direct patients to a range of other medical providers."); *id.* ¶ 51 ("Staff from the law firms subsequently schedule appointments and otherwise *coordinate medical treatment* for the claimants. The law firms *authorize* and *direct* diagnostic tests and treatments to be performed."); *id.* ¶ 41 ("Both law firms routinely create orders for patients to be sent to medical providers of the law firms' choosing for services directed, ultimately, *by the law firms*."); *id.* ¶ 30 (the lawyers "*encourage* providers to exaggerate their findings in order to justify additional and more expensive treatment"); *id.* ¶ 403 ("Khounganian and Valley

Orthopedic [] treated the patients *at the lawyers' direction*.").  And for each personal injury claimant, Uber asserts that it was the *lawyers* who "referred, encouraged, directed, or otherwise instructed [the claimants] to schedule appointments with a select group of medical providers."  *See*, *e.g.*, *id.* ¶¶ 73, 101, 124, 133.

In contrast, Dr. Khounganian merely is alleged to "accept[] referrals from lawyers who have cases against Uber with the understanding that he will perform specific acts to increase the value of their lawsuits."  *Id.* ¶ 10.  And Dr. Khounganian was only one of "various medical providers involved" in the alleged scheme.  *Id.* ¶ 7.  The Amended Complaint is entirely devoid of any non-conclusory allegation that Dr. Khounganian took part in the management or operation of any RICO enterprise, and it is simply not enough for Uber to point to Dr. Khounganian's operation of his own medical practice—because he must "conduct [] the '*enterprise's* affairs,' not just [his] *own* affairs."  *Cedric*, 533 U.S. at 163 (emphasis in original).

Critically, the mere provision of services in the form of medical procedures and related documentation on behalf of an enterprise cannot constitute RICO conduct.  *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008) ("Simply performing services for the enterprise does not rise to the level of direction . . . .").  Yet, according to Uber, that is all that Dr. Khounganian did.  Indeed, the Amended Complaint makes clear that Dr. Khounganian was among "a range of other medical providers" that participated in the alleged scheme.  FAC ¶ 50.  Yet, Uber fails to identify any distinguishing feature as to Dr. Khounganian that would take his conduct out of the realm of mere *participation* in the RICO enterprises and into the realm of managerial or operational control.  Dr. Khounganian's mere submission of allegedly fraudulent medical documentation for the patients he treated is no different than the conduct of the various other unnamed providers.  Such conduct does not rise to the level of operation or management of a RICO enterprise.  *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002, 1034 (C.D. Cal. 2011)

("[Defendant's] submission of its own [false] data does not plausibly show that [it] controlled the other members in the associated-in-fact enterprise. In fact, all it really establishes is that [Defendant] was acting on its own."). Uber's attempt to allege the existence of a RICO enterprise therefore fails on this ground.

### 2. Valley Orthopedic Is Not a RICO Enterprise

Uber's contention that Valley Orthopedic itself constituted a RICO enterprise fares no better. The Amended Complaint still fails to demonstrate that this supposed enterprise consisted of anything other than ordinary business conduct carried out by law firms and a doctor who were independently pursuing their own economic interests, as discussed above. Nor is there any indication that the participants in the alleged Valley Orthopedic enterprise were in any way united by a common purpose. And, again, there is no indication in the Amended Complaint that Dr. Khounganian participated in the management or operation of such an enterprise, as opposed to merely directing his own medical practice. *See Cedric*, 533 U.S. at 163. Uber's enterprise theory as to Valley Orthopedic is therefore deficient for the same reasons as its association-in-fact theories.

Even more fundamentally, Uber cannot plausibly maintain that Valley Orthopedic constitutes a RICO enterprise because it offers no explanation of what Valley Orthopedic actually is or how it fits into the supposed scheme. All of the allegations in the Amended Complaint pertain to Dr. Khounganian only—which is not enough to satisfy RICO's distinctiveness requirement. That is, to establish RICO liability, "one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric*, 533 U.S. at 161. This means that "the person and the tool[ ] are different entities, not the same." *Id.* at 162. But because Uber focuses its attention solely on the alleged acts of mail and wire fraud committed by the Defendants, it never identifies how Valley Orthopedic was a "tool" used in furtherance of the scheme. Uber's singular focus on Defendants' predicate offenses

thus dooms its enterprise theory as to Valley Orthopedic. *See United States v. Turkette*, 452 U.S. 576, 583 (1981) ("The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages.")

In discussing the specific instances of alleged fraud for the 18 personal injury claimants, Uber does not mention Valley Orthopedic *at all*.[1]  Notably, Uber does not identify any medical bills or documentation prepared by Valley Orthopedic or submitted on its behalf—which, since it litigated and settled the cases, Uber would have knowledge of.  Nor does Uber allege that Dr. Khounganian's patients were seen at Valley Orthopedic's offices—or whether Valley Orthopedic even had a physical location.  (It does not.)  In fact, Uber alleges that Dr. Khounganian performed surgeries *elsewhere* at medical offices that have no connection to Valley Orthopedic.  *See* FAC ¶¶ 84, 279 298 (surgeries performed at Sherman Oaks Surgery Center); *id.* ¶¶ 79, 196, 211, 297 (surgeries performed at Radiance Surgery Center); *id.* ¶ 184, 229, 265 (surgeries performed at Avanguard Surgical Center).

The lack of any factual information regarding Valley Orthopedic vitiates any finding that it was used as a RICO enterprise.  *See Mohebbi v. Khazen*, 50 F. Supp. 3d 1234, 1254 (N.D. Cal. 2014) ("Plaintiff has not pled any facts that would allow the Court to ascertain the 'enterprise' for purposes of the RICO violation. . . . Such a cursory allegation gives the Court no information as to the form or structure of that enterprise, the ways in which decisions are made in the enterprise, or even the

[1] In truth, Dr. Khounganian operates as a sole practitioner and Valley Orthopedic is wholly unrelated to his medical practice.  Uber's ad hoc naming of first "GSK Spine" and now Valley Orthopedic represents sham pleading in a misguided effort to cobble together a RICO enterprise.  *See Gomez*, 2015 WL 4270042, at *5 (rejecting plaintiff's attempt to establish RICO enterprise and cautioning that, "[a]s is well known, the *sine qua non* of the legal profession is the circumvention of reality through creative wordplay.  Whatever facts reality fails to supply can be replaced with creative pleading.").

hierarchy of the alleged actors in the enterprise.  Plaintiff does not cite *any* facts about the alleged enterprise whatsoever—only that every Defendant sued in this matter is a part of the enterprise.").  And because of this omission, Uber has failed to identify the existence of any enterprise distinct from the Defendants' underlying predicate acts.  *Wilcox v. First Interstate Bank of Oregon, N.A.*, 815 F.2d 522, 529 (9th Cir. 1987) ("[A] RICO enterprise refers to a being different from, not the same as or part of, the person whose behavior the Act was designed to prohibit.").

Based on the paucity of factual allegations explaining what Valley Orthopedic is or how it was used as a tool in furtherance of any fraudulent scheme, Uber is unable to establish its existence as a RICO enterprise.

> 3.     Uber Fails to Allege that Any Enterprise Affected Interstate Commerce

Uber's Amended Complaint is devoid of allegations that Dr. Khounganian or Valley Orthopedic use a pattern of racketeering activity to "obtain or operate an interest *in an interstate business*."  *Reves*, 507 U.S. at 183.  This alone is fatal Uber's entire claim: all of the "conduct" alleged by Uber takes place in the greater Los Angeles area.  *See In re JUUL Labs.*, 497 F.Supp.3d at 594 (RICO requires allegations of an enterprise "that affects interstate commerce").

Uber's allegations that Defendants used email or cloud-based services are not sufficient to allege the effect on interstate commerce that RICO requires.  *Vollarroel v. Recology Inc.*, 775 F.Supp.3d 1050, 1071 (N.D. Cal. 2025) ("Plaintiffs' RICO claim is based entirely on conduct that occurred in California" and "the alleged enterprise's use of the internet is clearly insufficient to plead an effect on interstate commerce.");  *Lopez v. Cher Koon Teo*, 2010 WL 11515370, at *5 (C.D. Cal. Feb. 24, 2010) (rejecting plaintiff's argument that allegations that "[d]efendants used instrumentalities of interstate commerce, such as telephone, e-mail, and international travel, to reach out to him in United States in order to induce him to enter the join-venture" was sufficient to state an effect on interstate commerce.);  *Belczak v. Shute*,

LARSON
LOS ANGELES

15
MOTION TO DISMISS FIRST AMENDED COMPLAINT

2009 WL 10674167, at *1 (C.D. Cal. June 29, 2009) (A "plaintiff[ ] . . . must show more than the fact that an alleged RICO enterprise has purchased goods and supplies from out of state.") (citation omitted).

This is because "the statute requires the activities of the enterprise, not each predicate act, to affect interstate commerce." *United States v. Bagnariol*, 665 F.2d 877, 892 (9th Cir. 1981). "A plaintiff must therefore "demonstrate that the enterprise which is involved in or benefits from the racketeering activity is one engaged in, or having an effect on, interstate commerce." *Musick v. Burke*, 913 F.2d 1390, 1398 (9th Cir. 1990). The Amended Complaint does not make this showing, and instead merely repeats the conclusory allegation that the activities of each alleged enterprise affected interstate commerce. This is plainly insufficient.

**B.    Uber Fails To Allege A Plausible Fraudulent Scheme**

Uber similarly fails to allege a plausible scheme to defraud sufficient to plead "racketeering activity" under RICO. Here, Uber alleges predicate acts of mail and wire fraud, which require: (a) the formation of a scheme to defraud; (b) the use of the mails or wires in furtherance of that scheme; and (c) the specific intent to defraud. *Eclectic Prop.*, 751 F.3d at 997. Plaintiffs can establish a specific intent to defraud "by showing the existence of a plausible fraudulent scheme." *Id.* Where, as here, a defendant engages in conduct that is facially legitimate, "a significant level of factual specificity is required to allow a court to infer reasonably that such conduct is plausibly part of a fraudulent scheme." *Id.*

Uber alleges three types of supposedly fraudulent conduct: (i) false and misleading medical bills due to an allegedly concealed side agreement between Dr. Khounganian and the personal injury lawyers to forgive his fees for victims who do not obtain monetary recovery; (ii) artificially inflated medical bills; and (iii) false statements regarding causation of the claimants' injuries and the medical necessity of the procedures Dr. Khounganian recommended or performed. *See*, *e.g.*, FAC ¶ 36. In each instance, however, Uber has failed to make the kind of factual

allegations that "nudg[e] [its] claims" of a fraudulent scheme "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

### 1. Neither Lien-Based Medical Care Nor the Reduction of Such Liens Constitute Fraud

Uber first alleges that the lien agreements that Dr. Khounganian entered into with the personal injury claimants are false because he secretly agreed with the referring lawyers to discount the claimants' medical bills in the event of a shortfall in recovery. According to Uber, "[b]ecause the side agreements are concealed, the medical bills are false and misleading." FAC ¶ 3; *see also id.* ¶ 69 ("The bills together with their stated amounts were materially false and misleading, given that the side agreement with the [personal injury lawyers] was fraudulently concealed."). Even setting aside the failure to allege any such "secret side agreements" (which do not exist) with specificity or plausibility, Uber's allegations simply do not amount to fraud.

As a threshold matter, there is nothing fraudulent about using medical liens in personal injury cases. Indeed, public policy strongly favors the use of medical liens where "the injured party's need for medical attention may be immediate while the ability to pay for that attention before it is provided may be absent." *Gilman v. Dalby*, 176 Cal. App. 4th 606, 617 (2009) (citing *Wujcik v. Wujcik*, 21 Cal. App. 4th 1790, 1795 (1994)).

This is not only the case for victims who lack health insurance. California strongly protects a personal injury victim's right to choose lien-based care with a specialist (who may charge higher rates), even if the patient has medical insurance. In *Pebley*, 22 Cal. App. 5th at 1277, the California Court of Appeal (Second District) held that an insured plaintiff who elects to receive treatment from outside his insurance plan on a lien basis is entitled to recover the full amount of his medical bills and is not limited to the amount insurance carriers typically pay—*i.e.*, the "market rate." The Court explained that a plaintiff's rationale for choosing health

LARSON
LOS ANGELES

17
MOTION TO DISMISS FIRST AMENDED COMPLAINT

insurance such as an HMO "may appear much different after a serious accident, when the plaintiff suddenly needs complex, extensive care that an HMO is not structured to provide." *Id.* Further, as the Court aptly noted:

> The plaintiff may also wish to choose a physician or surgeon who specializes in treating the specific type of injury involved, but who does not accept the plaintiff's insurance or any other type of insurance. In addition, health care providers that bill through insurance, rather than on a lien basis, may be less willing to participate in the litigation process.

*Id.* In allowing the plaintiff to recover the full cost of his medical care and excluding evidence of the victim's insured status, the Court explained: "A tortfeasor cannot force a plaintiff to use his or her insurance to obtain medical treatment for injuries caused by the tortfeasor," and "Defendants cite no authority suggesting that Pebley's tort recovery should be limited to what Kaiser (and possibly Medicare) would have paid had he chosen to treat with providers who accept that insurance." *Id.* at 1277-78. The law thus expressly permits the so-called "scheme" that allows Dr. Khounganian to use liens to provide care to his patients, and the commensurate setting of rates for his services that are not constrained by insurance caps.

Inherent in the use of medical liens, of course, is the chance that recovery in litigation may not be sufficient to fully reimburse the medical provider. As the panel of the Third District of the California Court of Appeal explained in *Gilman*:

> As a practical matter, medical liens have value only if the treated patient obtains a judgment from which the liens can be paid. Although the patient is personally liable for the cost of services, a collection action against a patient with limited resources is economically unfeasible. *Thus, unless the patient gets a monetary recovery in a lawsuit, the medical liens will usually remain unpaid, and the provider will never obtain payment for the services rendered.*

176 Cal. App. 4th at 618 (emphasis added). This, again, is not fraud; it is simply how medical liens operate, as multiple California Courts of Appeal recognize.

Given this background, Uber's hyperbolic allegations fail to meet the plausibility requirement under *Twombly* or Rule 9(b)'s heightened pleading standard. First, Uber fails to allege any reliable indicia that any "secret side-agreement" to discount medical bills in exchange for referrals actually exists (when it was formed, what it says, who agreed to it, why it was executed). And second, even if such an agreement did exist (it does not)—what about this agreement, which operates precisely the way every medical lien in a personal injury case operates— renders Dr. Khounganian's medical bills fraudulent? *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (complaint "must set forth what is false or misleading about a statement, and why it is false").

The Amended Complaint fails to meaningfully articulate how Uber was defrauded by the supposed side agreements. The only explanation it offers is that "the concealed side agreements obscure the nature of the scheme, [thereby] inducing Uber and others to settle personal-injury lawsuits for more than they would absent the fraud." FAC ¶ 36. If that were the case, Uber does not explain how so, or why this is sufficient to upset stated California public policy in favor of lien-based care for personal injury victims. Aside from this vague assertion, there are no particularized allegations as to how the side agreements increased the settlement amount of any personal injury lawsuit. Uber never even alleges that it read the actual lien agreements Dr. Khounganian executed with his patients, or that Uber would have acted differently had it known that Dr. Khounganian had supposedly agreed not to pursue the full cost of his services from the claimants in the event of a shortfall in their recovery.

Uber levels a host of accusations of supposedly nefarious conduct in an attempt to add a veneer of legitimacy to its fraud claims, such as Dr. Khounganian "not check[ing] the credit history" of the claimants because "he knew he would negotiate lower fees in the event of a shortfall and would not, in fact, pursue any balance from the claimant[s]." FAC ¶ 67. But so what? All this suggests is that Dr.

Khounganian genuinely believed that the claimants had meritorious claims and would receive compensation for their injuries from Uber, or did not deem it economically feasible to pursue costly collections actions against his own patients, many of whom were low income.  This is debt forgiveness, not fraud.

Uber's allegations further fail because no legal duty requires Dr. Khounganian to share with Uber his private decisions whether or not to pursue collections actions against his patients.  Nondisclosure of the purported side agreements is the *only* basis upon which Uber alleges that the medical bills in the 18 underlying lawsuits were fraudulent.  *Id.* ¶¶ 49, 74, 96, 113.  Allegations based on "[a] non-disclosure [] can support a fraud charge only when there exists an independent duty that has been breached by the person so charged." *Eller v. EquiTrust Life Ins. Co.*, 778 F.3d 1089, 1092 (9th Cir. 2015) (citation omitted). "Absent an independent duty, such as a fiduciary duty or an explicit statutory duty, failure to disclose cannot be the basis of a [RICO] fraudulent scheme." *Id.* (alteration in original) (citation omitted).  And critically, "[a] fraudulent concealment claim must rest upon an independent fiduciary or statutory duty to disclose *owed to the party seeking relief.*" *In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*, 601 F. Supp. 3d 625, 743 (C.D. Cal. 2022) (emphasis added) (citation omitted).  No such duty exists here, and as such, Uber's fraudulent concealment theory falls short on this ground as well.

2.    The Supposedly Inflated Medical Bills Are Not Actionable

Uber also offers the unsupported allegation that the medical bills for Dr. Khounganian's services were fraudulent because they charged "above-market, artificially inflated rates."  FAC ¶ 25.  But this could not possibly constitute fraud given that Uber does not provide any benchmark to assess what the true "market rate" for Dr. Khounganian's services actually was.  *See Fraser v. Team Health Holdings, Inc.*, 2022 WL 971579, at *13 (N.D. Cal. Mar. 31, 2022) (dismissing RICO claim alleging medical providers charged certain patients "inflated

LARSON
LOS ANGELES

20

MOTION TO DISMISS FIRST AMENDED COMPLAINT

chargemaster rates" because plaintiffs "fail[ed] to allege what price Plaintiffs should have been charged for the services they received or why the chargemaster price billed for the specific service received was not a reasonable approximation of the value of that service.").

Indeed, the entire concept of a "market rate" for medical services rests on a false premise. In the context of personal injury litigation, the reasonable value of a plaintiff's medical treatment is necessarily a matter of expert opinion that requires "a wide-ranging inquiry into the reasonable value of medical services provided." *Bermudez v. Ciolek*, 237 Cal. App. 4th 1311, 1331 (2015). There is accordingly no set rate for such services that Dr. Khounganian's medical bills would have exceeded. Nor can Uber argue that the "market rate" is based on the amount insurers or Medicare would pay when a claimant exercises his or her right to treat with lien-based providers. *Pebley*, 22 Cal. App. 5th at 1277-78 ("Defendants cite no authority suggesting that Pebley's tort recovery should be limited to what Kaiser (and possibly Medicare) would have paid had he chosen to treat with providers who accept that insurance.").

A lien-based medical provider may be higher cost for a host of non-fraudulent reasons, either because they have more experience, specialize in complex care and procedures, understand the demands for participating in the litigation process, or build the risk of loss into his or her pricing. *Cf. Pebley*, 22 Cal. App. 5th at 1277 (discussing reasons a plaintiff personal injury victim might opt for lien-based rather than insurance-based care). Uber utterly fails to allege facts that indicate this structure is anything but "typical, appropriate, or the product of legitimate market forces." *See Eclectic Prop.*, 751 F.3d at 998 (high increase in price of real estate did not "tend to exclude a plausible and innocuous alternative explanation" where "[p]laintiffs plead no facts that would tend to show this increase was not typical, appropriate, or the product of legitimate market forces") (affirming dismissal of RICO claim); *see also Fraser*, 2022 WL 971579, at *13 ("[T]he alleged fraudulent

scheme appears to be standard practice in the healthcare industry. That the practice may be viewed unfavorably does not necessarily establish that it is fraudulent.").

### 3. Dr. Khounganian's Treatments and Medical Opinions Are Not Fraudulent

Uber next makes the outrageous assertion that Dr. Khounganian performed or recommended unnecessary surgeries that were not causally related to the car crashes that Uber itself admits occurred, and that therefore, Dr. Khounganian's resulting medical bills and documentation were fraudulent. *See*, *e.g.*, FAC. ¶ 52. According to Uber, Dr. Khounganian's treatments and medical opinions rose to the level of fraud because, purely on Uber's say-so, the claimants only suffered "minor or nonexistent injuries" in the accidents. *Id.* ¶ 2. Such a contention cannot withstand even a modicum of scrutiny. Setting aside how wildly offensive this allegation is to the victims themselves, and how damaging it has been to Dr. Khounganian's practice, it is also entirely belied by the actual facts alleged.

To start, the claimants *were* in fact injured, as Uber itself admits. For example, Claimant A was diagnosed with myalgia (muscle pain) by a medical provider with no connection to Uber's concocted RICO enterprise. FAC ¶ 58. Claimant E was "transported to Kaiser Hospital via ambulance" and "received an e-ray of his cervical spine" resulting in a diagnosis of muscle strain. *Id.* ¶ 132. Claimant F underwent X-rays, which "revealed cervical muscular spasm with straightening of the normal cervical lordosis" as well as "degenerative changes in the lumbar spine." *Id.* ¶ 147. Claimant G went to the emergency room and underwent a "CT scan of [her] cervical and thoracic spine" and "was diagnosed with a cervical and thoracic sprain." *Id.* ¶ 155. Claimant H went to the hospital and "was diagnosed with a neck strain, lumbar strain, right trapezius strain and left knee sprain." *Id.* ¶ 174. Uber thus cannot rationally contend that the claimants suffered only "minor or nonexistent injuries." Because this contention is clearly contradicted by the pled facts, it is "not entitled to the assumption of truth" and should be

disregarded. *Eclectic Props.*, 751 F.3d at 998 (citing *Iqbal*, 556 U.S. at 679).

Further undermining Uber's allegation of noninjury is the fact that the claimants underwent a range of medical interventions *before* presenting to Dr. Khounganian, including: diagnostic imaging, *id.* ¶ 147 (Claimant F); 16 physical therapy sessions, *id.* ¶ 175 (Claimant H); "23 chiropractic sessions," *id.* ¶ 206 (Claimant J), multiple "epidural injections" from a pain management specialist, *id.* ¶ 261 (Claimant M); and a "spinal cord stimulator," *id.* ¶ 349 (Claimant R).  Notably, although Uber generally asserts that there were numerous medical providers involved in the supposed scheme, Uber never actually alleges that any of the other specific providers that treated the 18 claimants did so fraudulently, let alone with any particularity.  That these claimants received extensive treatments from medical providers who have no connection to the alleged RICO scheme undermines any notion that they were uninjured.  As such, Uber fails to allege with particularity "what is false or misleading about [Dr. Khounganian's] statement[s], and why [they are] false." *Vess*, 317 F.3d at 1106.

Rather than demonstrating that the surgeries Dr. Khounganian performed or recommended were unnecessary, the Amended Complaint indicates the opposite. Prior to undergoing surgery with Dr. Khounganian, Claimant J "received a pre-operative evaluation" *from another provider* and "was cleared for surgery." *Id.* ¶ 210.  And after Claimant F visited Dr. Khounganian for an orthopedic spine consultation, Claimant F thereafter underwent surgery that "was performed by *a different physician than Khounganian*" who had no connection to the supposed fraud scheme. *Id.* ¶ 140.  These admissions alone disprove any finding of unnecessary surgeries.  They also undermine any notion of fraudulent intent. *See Eclectic Prop.*, 751 F.3d at 997.  Take yet another example: rather than operating on Claimant O, "Khounganian recommended that Claimant O see a pain management specialist . . . and begin physical therapy." FAC ¶ 294.  If Dr. Khounganian was insistent on performing unnecessary surgeries for his own personal gain, he would

LARSON
LOS ANGELES

not have recommended more conservative treatment options performed by other providers. As the Amended Complaint makes abundantly clear, there was no intent to deceive. These were real claimants who were in real car accidents and suffered real injuries.

Uber also points to several claimants having preexisting injuries prior to their car accidents as preclusive of any finding that the claimants were actually injured by Uber's drivers. *See, e.g., id.* ¶ 156. Yet, as any first-year law student knows, the well-established eggshell-plaintiff doctrine dictates that negligent defendants like Uber and its drivers must take their victims as they find them: "[T]he rule is recognized in all jurisdictions that an accident which aggravates a preexisting disease may constitute a cause of action for damages. In such a case plaintiff may recover all damages for such aggravation." *Smith v. Schumacker*, 30 Cal. App. 2d 251, 263 (1938). Uber fails to account for the plausible reality that the claimants' prior injuries were exacerbated by subsequent car accidents, in which case Uber would be responsible—as Dr. Khounganian concluded.

Moreover, Uber asserts that of all the unnecessary treatments arranged by the Law Firm Defendants, "it is the costly, unnecessary, and/or causally unrelated surgeries recommended and performed by Khounganian that provide the most significant artificial damages enhancement in the scheme." FAC ¶ 52. Yet, of the 18 claimants detailed by Uber, nine of the claimants did not have any surgery performed by Dr. Khounganian at all. *See id.* ¶ 405. This strongly suggests Dr. Khounganian *does not* perform indiscriminate surgeries on every claimant referred to him by personal injury attorneys, contrary to Uber's allegations.

The fact that Dr. Khounganian did not operate on these claimants also further illustrates a lack of intent to defraud Uber. This is because Dr. Khounganian receives no financial benefit by merely *recommending* surgeries or providing an estimate of their cost. Rather, under the lien agreements, Dr. Khounganian would only be compensated for the services he actually performed. And half of the

claimants did not receive any medical intervention by Dr. Khounganian at all. For these claimants, the only charges in Dr. Khounganian's medical bills were for their consultations and occasional follow-up appointments. *See id.* Uber, of course, cannot rationally contend that Dr. Khounganian fraudulently billed for a medical consultation.

Furthermore, even if Dr. Khounganian recommended surgeries for these claimants and opined that the claimants' injuries were causally related to the car accidents, this would still not support any allegation of fraud because Uber fails to explain how these recommendations and opinions were ever communicated to Uber. While Uber points to Dr. Khounganian's various statements of causation included in his medical reports, Uber never states that these reports were actually transmitted to or relied on by Uber.

Lastly, as to claimants who actually did receive surgeries performed by Dr. Khounganian, even aside from Uber's concession that these claimants (i) were actually in car-related accidents, (ii) were in fact injured and (iii) underwent a range of treatments prior to seeing Dr. Khounganian and often prior to even retaining legal counsel, Uber's allegations of noninjury simply make no sense. On the one hand, Uber portrays these claimants as victims of Defendants' supposed scheme. Yet, on the other hand, Uber also contends that these same claimants were actually in on the scheme and were somehow willing to undergo invasive, often painful surgeries despite supposedly not having suffered any actual injury. FAC ¶ 5. As Uber explains: "A spinal fusion is major surgery, often requiring a hospital stay of 2-3 days and entailing a wide variety of short-term and long-term risks," after which "[p]atients often must undergo months of physical therapy to learn how to move, sit, stand, and walk." *Id.* ¶ 54. In assessing the plausibility of Uber's allegations, the Court "must also consider an 'obvious alternative explanation' for defendant's behavior." *Eclectic Props.,* 751 F.3d at 998; *Twombly*, 550 U.S. at 567 (same). Here, the obvious explanation is this: these were bona fide car accident victims,

seeking bona fide medical care.  Uber's blatant attempt to recharacterize valid medical treatments as predicate acts of mail and wire fraud utterly fails.

### C.    Uber Fails to Allege a Cognizable RICO Injury

Uber also falls well short of satisfying RICO's onerous standing requirements because its injuries are not cognizable under RICO.  To have standing, "a civil RICO plaintiff must show: (1) that his alleged harm qualifies as injury to his business or property; and (2) that his harm was by reason of the RICO violation, which requires the plaintiff to establish proximate causation[.]"  *Canyon Cnty v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008) (citation omitted).

### 1.    Uber's Injury Is Not Compensable Under RICO

The primary harm Uber alleges—litigation expenses incurred in defending the underlying personal injury proceedings, FAC ¶ 361—is not compensable under RICO.  *Thomas v. Baca*, 308 Fed. App'x 87, 88 (9th Cir. 2009) ("This court has not recognized the incurment of legal fees as an injury cognizable under RICO, and we decline to do so here."); *see also Ogden v. Wells Fargo Bank, N.A.*, 2015 WL 13413390, at *2 (C.D. Cal Feb. 20, 2015) ("The Ninth Circuit has generally refused to recognize legal fees as a valid injury to a business or property under RICO."); *Evans Hotels, LLC v. Unite Here! Loc. 30*, 2021 WL 10310815, at *26 (S.D. Cal. Aug. 26, 2021) ("Although unpublished and therefore not precedential, [] the Court finds the Ninth Circuit's only guidance on the issue persuasive.  Plaintiffs' cases, on the other hand, apply out-of-Circuit authorities in determining that attorneys' fees are compensable under RICO. . . .  The Court therefore concludes that Plaintiffs' attorneys' fees are not a compensable injury."); *Pac. Surf Designs, Inc. v. Whitewater W. Indus., Ltd.*, 2021 WL 5326529, at *2 (S.D. Cal. Nov. 16, 2021) (plaintiffs' claimed injury in the form of "additional costs of litigation from defending what they allege to be sham cases by Defendants . . . fails to plead a cognizable injury under RICO that would confer standing."); *Holloway v. Clackamas River Water*, 2014 WL 6998069, at *9 (D. Or. Sept. 9, 2014) ("The

caselaw in this circuit holds that legal fees expended to defend against sham lawsuits are not the type of injury to business or property interest which confer standing to bring a civil RICO claim.").

Uber's RICO claims therefore fail at the threshold to establish any compensable injury.

### 2. Uber Does Not Connect Its Purported Harm to Defendants' RICO Conduct

Uber also fails to show that its supposed injuries were proximately caused by Defendants' alleged predicate acts. "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Supply Corp.*, 547 U.S. 451, 461 (2006). Thus, a plaintiff cannot establish proximate cause if "it would be too difficult to ascertain what damages are attributable to Defendants' alleged RICO violation, as opposed to factors other than, and independent of, Defendants' alleged misrepresentations." *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*, 943 F.3d 1243, 1251 (9th Cir. 2019).

Uber alleges predicate acts of mail and wire fraud based on the preparation and submission of "fraudulent medical records and bills produced by Khounganian and transmitted to Emrani, Fradkin, and their law firms." FAC ¶ 365. Uber then alleges two forms of injury it suffered: "defense costs and settlements" incurred in the underlying personal injury actions. *Id.* ¶ 361. Uber, however, does not explain how Defendants' alleged misrepresentations "led directly" to these expenditures. *Anza*, 547 U.S. at 461.

Uber's defense costs: Even if cognizable under RICO, Uber cannot plausibly contend that its legal fees were directly caused by Dr. Khounganian's purportedly false medical documentation and inflated medical bills. The Amended Complaint simply makes the conclusory allegation of increased legal fees without providing any explanation of how these fees were higher than they otherwise would have been

in the absence of the alleged fraud. *Holloway*, 2014 WL 6998069, at *9 ("Even if paying legal fees were cognizable injuries under RICO, [plaintiff's] claim still fails because she does not establish that racketeering activity was the proximate cause of her injury. The most proximate cause of [plaintiff's] attorney-fee losses is Defendants' act of filing lawsuits, but filing sham lawsuits is not 'racketeering activity' under RICO."); *Kamal v. Cnty. of Los Angeles*, 2018 WL 4328467, at *14 (C.D. Cal. Sept. 6, 2018) ("Plaintiff has not stated—beyond conclusory allegations—how Defendants' conduct directly or proximately caused Plaintiff to incur the substantial alleged legal fees in the state-court action.").

When faced with a personal injury claim, a defendant does not simply take at face value a plaintiff's representation as to the extent of his or her injuries but is instead entitled to conduct "a wide-ranging inquiry into the reasonable value of medical services provided." *Bermudez*, 237 Cal.App.4th at 1331. A personal injury defendant, such as Uber, thus as matter of course investigates a treating physician's representations concerning a claimant's injuries *regardless of whether such representations are false*—and the defendant will necessarily incur legal fees in doing so. In other words, Uber would have incurred these legal fees "independent of [Dr. Khounganian's] alleged misrepresentations." *Painters*, 943 F.3d at 1251.

As previously discussed, *all* of the 18 personal injury claimants identified by Uber suffered real injuries, and if Dr. Khounganian thereafter opined on the extent and cause of those injuries, then it would have been incumbent on Uber to conduct its own inquiry into the veracity of Dr. Khounganian's opinions, whether or not such opinions were fraudulent. *Pebley*, 22 Cal.App.5th 1266, 1281 (2018) ("This was not, as defendants assert, a situation in which the only measure of cost or value … was the medical professionals' full bills."). The Amended Complaint is thus entirely devoid of any allegation detailing how the allegedly inflated medical bills and false medical documentation proximately caused Uber's litigation expenses. *See City of Almaty v. Khrapunov*, 956 F.3d 1129, 1133 (9th Cir. 2020) (concluding

that the plaintiff "fail[ed] to satisfy the proximate cause inquiry" because the "[p]laintiff has not shown that it was forced to spend its money" in response to the defendants' money laundering).

Uber's settlement payments:  In an attempt to establish a causal connection between Defendants' alleged predicate acts and Uber's settlement payments, Uber repeatedly advances the conclusory assertion that it "relied on the fraudulent and misleading bills in determining whether and on what terms to settle lawsuits." *See, e.g.*, FAC ¶ 36.  The flaw in this contention is that Uber never bothers to explain how this was the case.  In fact, to the contrary, the allegations in the FAC definitively establish that Uber *did not* rely on any false representation, and instead voluntarily chose to settle the personal injury claims with eyes wide open.

Uber's purported loss in connection with the settlement payments is directly undermined by its allegation that it was forced "to investigate . . . and respond[] to fraudulent evidence and inflated damages claims." *Id.* ¶ 362.  Uber repeatedly concedes this point.  Prior to settling any of the personal injury actions, Uber conducted numerous "independent medical evaluations" to determine the extent of the claimants' injuries, *id.* ¶¶ 70, 119, 172, 183, 197, 221, 299, 338; Uber had its experts "determine[] the reasonable value of [Dr. Khounganian's] services," *id.* ¶¶ 321, 338; it had the claimants sit for depositions, *id.* ¶¶ 32 n. 2, 210, 217, 322, 349, and it even conducted a "forensic billing review" of Dr. Khounganian's medical bills.  If Uber was able to investigate and discover the fraudulent evidence during the course of the underlying litigation, as the Amended Complaint indicates, then this conclusively establishes that Uber did not pay any increased settlement amount as a result of the supposed fraud.  Uber had already uncovered the fraud *before* settling.  There is accordingly zero causal connection between Defendants' predicate acts and Uber's voluntary settlement payments.

Uber's theory of injury in the form of legal fees and settlement payments suffer from additional defects as well.  Even if Uber could establish a connection

between its injuries and Defendants' conduct, even *indirectly*, determining the portion of Uber's damages attributed to the RICO violations would "requir[e] a complex apportionment of fault among various causes." *Canyon Cnty.*, 519 F.3d at 982. Uber alleges that the claimants were "funneled into a sequence of high-cost interventions" from numerous unnamed providers who were supposedly in on the scheme. FAC ¶ 291. Uber also references numerous other providers that rendered treatment without any involvement in the fraud whatsoever. *See, e.g.*, *id.* ¶¶ 146-147.

As such, Uber cannot maintain that its injuries were caused by any false statement made by *Dr. Khounganian*, given that numerous other providers rendered treatments, issued bills, and offered opinions on causation—either fraudulently or non-fraudulently—that were then used to support the personal injury lawsuits. In other words, Uber simply cannot say that Dr. Khounganian's statements, as opposed to any other provider's statements, caused it to incur a particular cost. *See Canyon Cnty.*, 519 F.3d at 983 ("The causal chain would [] be difficult to ascertain because there are numerous alternative causes that might be the actual source or sources of the County's alleged harm."). This is precisely why RICO imposes a demanding proximate causation requirement, which "is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation." *Id.* at 982.

Lastly, Uber cannot establish proximate cause because any out-of-pocket loss would have been incurred by Uber's insurer, not Uber itself. Uber repeatedly asserts that Defendants prepared "artificially inflated" medical bills that were then used in "insurance claims" submitted to certain insurers. FAC ¶ 35. Uber also asserts that it is a target for fraud solely "because of [its] $1 million government-mandated insurance policy limits." *Id.* ¶ 8. And it repeatedly asserts that Defendants' false representations were submitted to its "insurance carriers." *Id.* ¶¶ 383-84. It is thus the third-party insurers who incurred any injury, not Uber.

Yet, in an attempt to overcome this defect, Uber adds a new, entirely

conclusory allegation in the Amended Complaint that "Uber bears the burden of these costs notwithstanding the insurance it is required by law to carry." *Id.* ¶ 25. But again, Uber makes no effort to explain why this is so. None of the medical bills or settlement amounts identified in the FAC exceeded $1 million, meaning that any losses Uber would have incurred were fully covered by its insurer. *See Ozeran v. Jacobs*, 798 F. App'x 120, 122 (9th Cir. 2020) ("[Plaintiff] does not, and could not, contend that he was the *direct* victim of the alleged predicate acts of mail and wire fraud on which his RICO claim is based; rather, the direct victims of those fraudulent acts were the recruited clients and the insurance companies from whom the [] scheme was hidden.").

Even if Uber incurred some incidental cost, this nevertheless does not change the reality that Uber's insurer was the more direct victim of the scheme. *Hill v. Opus Corp.*, 841 F. Supp. 2d 1070, 1098 (C.D. Cal. 2011) (finding no proximate cause where "there are more direct victims than plaintiffs" of the RICO scheme); *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168–69 (9th Cir. 2002) ("[P]otential plaintiffs who have suffered 'passed-on' injury—that is, injury derived from a third party's direct injury—lack statutory standing."); *Steele v. Hosp. Corp. of Am.*, 36 F.3d 69, 70 (9th Cir. 1994) (overbilling scheme that causes an insurance company to overpay for services is not a RICO injury to the insured.).

Uber therefore cannot establish proximate causation because its purported injuries bear no direct relation to any alleged predicate act.

### D. Uber's RICO Conspiracy Claim Necessarily Fails

Because Uber has failed to establish a substantive RICO violation for the multiple reasons discussed above, its Sixth Cause of Action for RICO conspiracy under 18 U.S.C. § 1962(d) necessarily fails in tandem. *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000) ("Plaintiffs cannot claim that a conspiracy to violate RICO existed if they do not adequately plead a substantive violation of RICO."); *Stitt v. Citibank, N.A.*, 942 F. Supp. 2d 944, 959 (N.D. Cal. 2013) ("[T]he

failure to adequately plead a substantive violation of RICO precludes a claim for conspiracy.").

### E.   The *Noerr-Pennington* Doctrine Bars This Action

Separate and apart from Uber's failure to state a claim under Rule 8 or 9(b), Uber's claims are independently barred because the pleaded conduct is protected petitioning activity immunized by the *Noerr-Pennington* doctrine. "The *Noerr–Pennington* doctrine derives from the Petition Clause of the First Amendment and provides that 'those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct.'" *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 643-44 (9th Cir. 2009) (quoting *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006)). The doctrine even "overprotects baseless petitions so as to ensure citizens may enjoy the right of access to the courts without fear of prosecution." *Relevant Grp., LLC v. Nourmand*, 116 F.4th 917, 923 (9th Cir. 2024) (quoting *Sosa*, 437 F.3d at 934).

"To determine whether a defendant's conduct … is immunized under *Noerr-Pennington*," the Ninth Circuit applies a three-step analysis to determine: "(1) whether the lawsuit imposes a burden on petitioning rights, (2) whether the alleged activities constitute protected petitioning activity, and (3) whether the statute[] at issue may be construed to [avoid] that burden." *B&G Foods N.A., Inc. v. Embry*, 29 F.4th 527, 535 (9th Cir. 2022) (citing *Kearney*, 590 F.3d at 644). "If the answer at each step is 'yes,' then a defendant's conduct is immunized under *Noerr-Pennington*." *Id.* The allegations in Uber's Amended Complaint easily satisfy these factors. Moreover, the narrow "sham" litigation exception is inapplicable because Uber does not and cannot allege that the underlying personal injury actions were objectively baseless. Uber's claims must therefore be dismissed in their entirety.

#### 1.   Uber's Claims Burdens Petitioning Rights

Uber's claims are expressly predicated on underlying personal injury lawsuits that were brought against it, FAC ¶¶ 358, 360—*i.e.*, "petitions sent directly to the

court" that are undoubtedly "protected by the *Noerr–Pennington* doctrine." *Sosa*, 437 F.3d at 934. Moreover, Uber seeks as a remedy an order "imposing restrictions on the future activities of such Defendants, including, but not limited to, prohibiting Defendants from engaging in the same type of endeavor as the above enterprises engaged in[.]" FAC p. 51 (Prayer for Relief). That is, by this lawsuit, Uber seeks an order restraining Defendants from treating and bringing personal injury lawsuits on behalf of victims injured by Uber vehicles.

This expressly and unacceptably "places a burden on [their] ability to bring suit and [their] ability to zealously advocate for their clients in furtherance of their interests in the litigation." *Reed v. E. End Props., Inc.*, 2018 WL 6131211, at *12 (C.D. Cal. Mar. 15, 2018). "Indeed, if successful, [Uber's] suit would completely prevent Defendants from engaging in their petitioning activities"—such as representing injured claimants, working with medical providers to coordinate treatment for those claimants, and using the resulting medical and billing records from the providers to bring legal claims on the claimants' behalf. *B&G Foods*, 29 F.4th at 535; *see also Gilman v. Dalby*, 176 Cal. App. 4th 606, 617 (2009) ("[T]he medical providers' efforts in treating the injured plaintiff directly contribute to the success of the litigation."). Therefore, this lawsuit unquestionably burdens petitioning rights, both of Defendants and their future clients.

### 2. Defendants' Conduct Is Protected Petitioning Activity

Because *Noerr-Pennington* is intended "to preserve the breathing space essential to the fruitful exercise of the right of petition," the scope of conduct entitled to immunity is broad. *Sosa*, 437 F.3d at 939. The *Noerr-Pennington* doctrine applies to nearly all "conduct incidental to the prosecution of the suit," including pre-litigation conduct, the "discovery communications surrounding that litigation and the trial advocacy of that litigation." *Sosa*, 437 F.3d at 942; *Kearney*, 590 F.3d at 646. Indeed, the Ninth Circuit has established that, in addition to immunizing the attorneys and parties to the prior litigation, "their agents in that

litigation[] get to benefit as well." *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1186 (9th Cir. 2005); *see also Reed*, 2018 WL 6131211, at \*12 ("Notably, the doctrine immunizes not only the parties to litigation, but also their agents and representatives.").

Dr. Khounganian's alleged conduct (and by extension, that of Valley Orthopedic) is precisely the type that the petition clause protects. "[I]n a personal injury action, medical reports and bills from healthcare providers *are typically essential* to establish the extent of the plaintiff's injuries and damages. Thus, the medical providers' efforts in treating the injured plaintiff *directly contribute* to the success of the litigation." *Gilman*, 176 Cal. App. 4th at 617 (emphasis added). Uber alleges that Dr. Khounganian produced diagnoses and reports of causation for personal injury claimants, recommended and performed various medical treatments, and thereafter generated bills for such treatment—*all* of which were then allegedly used "as a basis for fraudulent lawsuits and/or claims for damages." FAC ¶ 6. In other words, the entirety of Uber's Complaint is premised on "conduct incidental to the prosecution of the [underlying personal injury] suit[s]." *Sosa*, 437 F.3d at 934.

Indeed, a personal injury plaintiff *cannot recover* without proper medical documentation supporting a diagnosis of injury, causation of that injury, and the associated cost of treatment. In the context in which Uber has pled its injury, such conduct unquestionably constitutes protected petitioning activity that was incidental, and indeed critical, to the prosecution of those lawsuits. *See Reed*, 2018 WL 6131211, at \*12 (*Noerr-Pennington* barred plaintiff's RICO claim alleging that defendants "misrepresented [their] property interests … and used the U.S. mail and e-mail to file lawsuits, serve misleading documents and send harassing correspondence" because such actions were incidental to pending litigation).

### 3. The Statutes Can Be Construed to Avoid Burdening Dr. Khounganian's Petitioning Activity

The third prong is easily met. "Under the *Noerr-Pennington* rule of statutory

construction, we must construe . . . statutes so as to avoid burdening conduct that implicates the protections afforded by the Petition Clause unless the statute clearly provides otherwise.  Thus, we ask at step three whether the statute . . . can be construed to avoid burdening Defendants' Petition Clause rights." *B&G Foods*, 29 F.4th at 540.

None of the statutes pled here proscribe the petitioning conduct at issue— issuing settlement demand letters, filing personal injury lawsuits, and preparing medical reports and billings records for use in those lawsuits.  *Sosa*, 437 F.3d at 940-41.  Dr. Khounganian's conduct as-pled thus falls squarely within the scope of *Noerr-Pennington* immunity.

### 4. The Sham Litigation Exception Does Not Apply

The broad immunity that the *Noerr-Pennington* doctrine provides to litigation activity is subject only to a "narrow 'sham litigation' exception."  *Sosa*, 437 F.3d at 932 n.6.  It is Uber's burden to demonstrate that the sham litigation exception applies.  This burden is considerable: "In order not to chill legitimate [petitioning] activities, it is important that a plaintiff's complaint contain specific allegations demonstrating that the *Noerr–Pennington* protections do not apply.  Conclusory allegations are insufficient to strip [Defendants] of their *Noerr–Pennington* protection.  Although we may be more generous in reviewing complaints in other contexts, our responsibilities under the first amendment in a case like this one require us to demand that a plaintiff's allegations be made with specificity."  *Boone v. Redevelopment Agency of City of San Jose*, 841 F.2d 886, 894 (9th Cir. 1988) (citations omitted).

To determine whether the sham litigation exception applies, the Ninth Circuit employs one of three tests depending on the conduct at issue:

> [F]irst, where the lawsuit is objectively baseless and the defendant's motive in bringing it was unlawful; second, where the conduct involves a series of lawsuits brought pursuant to a policy of starting legal proceedings without regard to the merits and for an unlawful purpose;

and third, if the allegedly unlawful conduct consists of making intentional misrepresentations to the court, litigation can be deemed a sham if a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy.

*B&G Foods*, 29 F.4th at 537-38 (citing *Sosa*, 437 F.3d at 938).  Applying any of the three tests, Uber cannot prevail.

The first test requires Uber to specifically allege that the 18 underlying personal injury actions were "objectively baseless" and were brought with an "unlawful" motive.  *B&G*, 29 F.4th at 537.  "An action is objectively baseless when no reasonable litigant could realistically expect success on the merits."  *Relevant Grp.*, 116 F.4th at 932.  Uber cannot do so: there is no dispute that all 18 claimants were involved in vehicle-related incidents involving Uber.  Nor is there any dispute that each claimant sought personal injury counsel following these incidents— presumably with the belief that they had sustained at least *some* form of compensable injury.

That the claimants sustained injuries that they attributed to the vehicle collisions is itself sufficient to demonstrate the potential merit of the subsequent personal injury actions.  *See Relevant Grp.*, 116 F.4th at 932 (to show that litigation is not objectively baseless "requires no more than a 'reasonable belief' that there is '*some* chance' 'that [a] claim may be held valid upon adjudication.'") (citation omitted); *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1008 (9th Cir. 2008) (finding that a "potentially meritorious" suit was not objectively baseless).  Even if, as Uber erroneously contends, the claimants' injuries did not justify the level of medical intervention that Dr. Khounganian recommended, this does not show that the personal injury lawsuits were objectively baseless given that the claimants had, at the very least, suffered *some* form of compensable injury.

Uber additionally concedes that the claimants ultimately received monetary settlements in the ensuing litigation, again disproving any notion that their claims

LARSON
LOS ANGELES

36

MOTION TO DISMISS FIRST AMENDED COMPLAINT

were objectively baseless. *Relevant Grp.*, 116 F.4th at 932 ("[S]ettlement indicates a lawsuit is not objectively baseless."); *Theme Promotions*, 546 F.3d at 1008 ("The fact that this ongoing litigation settled suggests that the original suit was not objectively baseless."). Thus, by Uber's own admission, the underlying proceedings were in no manner objectively baseless.[2]

Uber cannot invoke the second test here because it is unable to show that the lawsuits were "brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival." *B&G Foods*, 29 F.4th at 539 (citation omitted). Uber, of course, is not a market rival of any of the Defendants, and, at any rate, the fact that each of the lawsuits resulted in successful settlements conclusively establishes that they were not brought "without regard to the merits" and "for an unlawful purpose." *See id.* (holding that lawsuits were not brought without regard to the merits or for an unlawful purpose given that the lawsuits were "largely successful").

Uber likewise cannot invoke the third test because it has not alleged that Defendants made any in-court misrepresentations that deprived the underlying proceedings of their legitimacy—indeed, Uber has entirely failed to allege any fraud with the particularity required at the pleading stage. *See In re Outlaw Lab'ys, LP Litig.*, 352 F. Supp. 3d 992, 1004 n.4 (S.D. Cal. 2018) (third test does not apply

---

[2] A defendant's motive for bringing the suit is only examined if the proceedings were "objectively meritless." *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993). Here, the sham exception could only apply if Defendants sought to injure Uber through the "use [of] the governmental *process*— as opposed to the *outcome* of that process." *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991) (emphasis in original). Of course, Uber cannot show that Defendants merely desired to institute the underlying proceedings without regard to the end result, given that "[Uber's] allegations suggest [] that the defendants genuinely desired the relief sought in the [18] proceedings." *Realtek Semiconductor Corp. v. MediaTek, Inc.*, 732 F. Supp. 3d 1101, 1115 (N.D. Cal. 2024) (holding that sham exception was inapplicable).

where the complaint did not "expressly make any assertions that [defendant] has made intentional misrepresentations to the Court."); *Kearney*, 590 F.3d at 647 (third test does not apply if plaintiff asserts "insufficiently specific allegations" concerning defendants' misrepresentations in court). Therefore, this test also cannot apply.

The entirety of Defendants' alleged conduct thus constitutes protected petitioning activity under *Noerr-Pennington*, and the sham litigation exception does not apply. Because Uber cannot overcome this well-recognized immunity, leave to amend would be futile. Uber's claims should therefore be dismissed with prejudice.

## V.    DR. KHOUNGANIAN AND VALLEY ORTHOPEDIC JOIN CO-DEFENDANTS' ARGUMENTS

For the purpose of judicial economy, Dr. Khounganian and Valley Orthopedic do not repeat the remaining arguments raised in the other Defendants' motions to dismiss, but instead incorporate them by reference here as further support that warrants dismissal of Uber's claims.

## VI.    CONCLUSION

For these reasons, Uber's claims against Dr. Khounganian and Valley Orthopedic should be dismissed with prejudice.

Dated:  January 23, 2026                LARSON LLP

By:  */s/ John S. Lee*
_____
Stephen G. Larson
John S. Lee
Amelia L.B. Sargent
Benjamin Falstein
Attorneys for Defendants Greg Khounganian and Valley Orthopedic and Spine Center

LARSON
LOS ANGELES

MOTION TO DISMISS FIRST AMENDED COMPLAINT

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendant Greg Khounganian certifies that this brief contains 38 pages, which complies with the page limit set forth in the Court's January 6, 2026 Order Granting Joint Stipulation To Set Page Limits for Briefs Related to Motions to Dismiss. Dkt. 85 at 2.

Dated:  January 23, 2026        LARSON LLP

By:  */s/ John S. Lee*
      Stephen G. Larson
      John S. Lee
      Amelia L.B. Sargent
      Benjamin Falstein
Attorneys for Defendants Greg Khounganian and Valley Orthopedic and Spine Center

LARSON
LOS ANGELES

39

MOTION TO DISMISS FIRST AMENDED COMPLAINT