**PERKINS COIE LLP**

Oliver M. Gold, SBN 279033
OGold@perkinscoie.com
Gillian Kuhlmann, SBN 316241
GKuhlmann@perkinscoie.com
1888 Century Park East, Suite 1700
Los Angeles, CA 90067-1721
Telephone: +1.310.788.9900
Facsimile: +1.202.654.6211

David W. T. Daniels, SBN 172791
DDaniels@perkinscoie.com
Michael R. Huston, *pro hac vice*
MHuston@perkinscoie.com
700 Thirteenth Street, NW, Suite 800
Washington, DC 20005-3960
Telephone: +1.202.654.6200
Facsimile: +1.202.654.6211

Joshua Patashnik, SBN 295120
JPatashnik@perkinscoie.com
11452 El Camino Real, Suite 300
San Diego, CA 92130-2080
Telephone: +1.858.720.5700
Facsimile: +1.858.720.5799

David B. Massey, *pro hac vice*
DMassey@perkinscoie.com
1155 Avenue of the Americas, 22nd Fl.
New York, NY 10036-2711
Telephone: +1.212.262.6900
Facsimile: +1.212.977.1649

Attorneys for Plaintiff Uber Technologies, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UBER TECHNOLOGIES, INC., | Case No. 2:25-cv-06612-SPG-PD |
| Plaintiff, | **PLAINTIFF UBER TECHNOLOGIES, INC.'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** |
| v. | |
| DOWNTOWN LA LAW GROUP, IGOR FRADKIN, THE LAW OFFICES OF JACOB EMRANI, JACOB EMRANI, GSK SPINE, GREG KHOUNGANIAN, and RADIANCE SURGERY CENTER, | |
| Defendants. | |

# TABLE OF CONTENTS

**Page(s)**

Introduction.................................................................................................1

Factual Background .....................................................................................3

Legal Standard ............................................................................................8

Argument ....................................................................................................9

      I.     The *Noerr-Pennington* Doctrine Does Not Apply............................10

           A.     Uber's RICO Action Does Not Burden Defendants'
                  Petitioning Rights ......................................................................10

           B.     The Conduct Alleged in the First Amended Complaint
                  Does Not Constitute Protected Petitioning Activity...............13

           C.     The Conduct Alleged by Uber Unambiguously Violates
                  the RICO and Mail and Wire Fraud Statutes.........................16

           D.     Uber's Allegations Bring this Case Within the Sham
                  Exception to Noerr-Pennington .................................................17

      II.    Claim Preclusion from Prior Settlements in Personal-Injury
          Lawsuits Does Not Bar Uber's RICO Action Here...........................24

           A.     This Case Does Not Involve the Same Parties as the
                  Personal-Injury Actions.............................................................25

           B.     This Case Does Not Involve the Same Cause of Action as
                  the Personal-Injury Actions......................................................30

      III.   California's Compulsory Counterclaim Rule Does Not Apply.........35

      IV.   The *Rooker-Feldman* Doctrine Does Not Apply..............................37

      V.    Uber Has Properly Alleged a Civil RICO Cause of Action ..............40

           A.     The Medical Practice, the Law Firms, and the
                  Associations-in-Fact of Lawyers and Doctors are Each a
                  RICO Enterprise .........................................................................40

           B.     Uber Has Alleged Predicate Acts of Mail and Wire Fraud
                    with the Requisite Specificity..................................................49

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

C.    Uber Has Alleged a Continuous Pattern of Racketeering Activity ............................................................................... 56

D.    Uber Has Alleged Injury to Its Business or Property Resulting from Defendants' Pattern of Racketeering Activity ............................................................................... 58

E.    Uber Has Alleged a Nexus to Interstate Commerce ............... 69

VI.    Uber Has Properly Alleged a RICO Conspiracy Cause of Action .... 71

VII.    Uber's Claims Are Not Barred by the Statute of Limitations .......... 72

VIII.    The Availability of Injunctive Relief Is Not Relevant at this Stage ........................................................................................ 75

Conclusion .......................................................................................... 76

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adams v. Johnson*,
355 F.3d 1179 (9th Cir. 2004) ........................................................................ 60

*Agha-Khan v. United States*,
2015 WL 5734380 (E.D. Cal. Sept. 29, 2015) ............................................... 28

*Alavez v. Brinker Rest. Corp.*,
2016 WL 11746260 (C.D. Cal. Sept. 23, 2016) .............................................. 70

*Allied Fire Prot. v. Diede Constr., Inc.*,
127 Cal. App. 4th 150 (2005) .................................................................... 31, 33

*Anheuser-Busch, Inc. v. Nat. Beverage Distribs.*,
69 F.3d 337 (9th Cir. 1995) ........................................................................... 23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ......................................................................................... 8

*Bai v. CMB Export Infrastructure Inv. Grp. 48, LP*,
2025 WL 959099 (E.D. Cal. Mar. 31, 2025) .................................................. 43

*Banco Nacional de Cuba v. First Nat. City Bank of N.Y.*,
478 F.2d 191 (2d Cir. 1973) ........................................................................... 37

*Banerian v. O'Malley*,
42 Cal. App. 3d 604 (1974) ............................................................................ 35

*Bankers Tr. Co. v. Rhoades*,
859 F.2d 1096 (2d Cir. 1988) ......................................................................... 62

*Bell v. City of Boise*,
709 F.3d 890 (9th Cir. 2013) .......................................................................... 38

*Bell v. Weinstock, Friedman & Friedman, P.A.*,
285 A.3d 505 (D.C. 2022) ......................................................................... 27, 29

*Berg v. First State Insurance Co.*,
915 F.2d 460 (1990) ....................................................................................... 60

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

*Berry Creek Rancheria of Maidu Indians of Cal. v. Howard*,
2022 WL 43696 (E.D. Cal. Jan. 5, 2022)............................................................71

*Bias v. Wells Fargo & Co.*,
942 F. Supp. 2d 915 (N.D. Cal. 2013)......................................................53, 56, 72

*Boyle v. United States*,
556 U.S. 938 (2009) ..............................................................................................44

*Branning v. Morgan Guar. Tr. Co. of N.Y.*,
739 F. Supp. 1056 (D.S.C. 1990) ..........................................................................27

*Branson v. Sun-Diamond Growers*,
24 Cal. App. 4th 327 (1994)..................................................................................31

*Bridge v. Phx. Bond & Indem. Co.*,
553 U.S. 639 (2008) ........................................................................................54, 68

*Bui v. Nguyen*,
712 F. App'x 606 (9th Cir. 2017).....................................................................44, 47

*Bullock v. Philip Morris USA, Inc.*,
198 Cal. App. 4th 543 (2011).................................................................................31

*Burdette v. Carrier Corp.*,
158 Cal. App. 4th 1668 (2008)...............................................................................31

*Burgess v. Peebles*,
1991 WL 109241 (9th Cir. June 20, 1991).......................................................34, 35

*Burke v. Benworth Cap. Partners, LLC*,
2026 WL 194390 (Cal. Ct. App. Jan. 26, 2026) ...................................................27

*Cal. Pharm. Mgmt., LLC v. Zenith Ins. Co.*,
669 F. Supp. 2d 1152 (C.D. Cal. 2009)..................................................................14

*Cantu v. Resol. Tr. Corp.*,
4 Cal. App. 4th 857 (1992).....................................................................................47

*Canyon County v. Syngenta Seeds, Inc.*,
519 F.3d 969 (9th Cir. 2008)......................................................................57, 65, 66

*Castillo v. J.P. Morgan Chase Bank, N.A.*,
2020 WL 496072 (N.D. Cal. Jan. 30, 2020) .........................................................37

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

*Cedric Kushner Promotions, Ltd. v. King*,
    533 U.S. 158 (2001) ...................................................................................... 40, 42

*Chavveri v. Platinum LED Lights LLC*,
    2022 WL 2275664 (D. Ariz. June 22, 2022) ...................................................... 67

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*,
    690 F.2d 1240 (9th Cir. 1982) .......................................................................... 18

*Cobb v. JPMorgan Chase Bank, N.A.*,
    2012 WL 5335309 (N.D. Cal. Oct. 26, 2012) .................................................... 62

*Columbia Pictures, Indus., Inc. v. Pro. Real Est. Invs., Inc.*,
    944 F.2d 1525 (9th Cir. 1991) .......................................................................... 18

*Cont'l Sav. Ass'n v. Collins*,
    814 S.W.2d 829 (Tex. App. 1991) ................................................................ 27, 28

*Cooley v. Servicemaster Co.*,
    2021 WL 3630489 (E.D. Cal. Aug. 17, 2021) .................................................... 70

*Cooper v. Ramos*,
    704 F.3d 772 (9th Cir. 2012) ............................................................................ 39

*Core Health & Fitness, LLC v. Transmedik Specialized Inc.*,
    2025 WL 2958866 (C.D. Cal. Aug. 13, 2025) ................................................ 58, 64

*Cruz v. FXDirectDealer, LLC*,
    720 F.3d 115 (2d Cir. 2013) .............................................................................. 43

*Diaz v. Gates*,
    420 F.3d 897 (9th Cir. 2005) ............................................................................ 65

*DKN Holdings LLC v. Faerber*,
    61 Cal. 4th 813 (2015) ................................................................................. 25, 30

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
    751 F.3d 990 (9th Cir. 2014) ............................................................................ 34

*Evans Hotels, LLC v. Unite Here! Loc. 30*,
    2021 WL 10310815 (S.D. Cal. Aug. 26, 2021) .................................................. 63

*Experian Information Solutions, Inc. v. Stein Saks, PLLC*,
    2024 WL 5261159 (C.D. Cal. Nov. 19, 2024) .................................................... 22

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*,
  544 U.S. 280 (2005) ........................................................................37, 38, 39

*First Cap. Asset Mgmt., Inc. v. Brickellbush, Inc.*,
  218 F. Supp. 2d 369 (S.D.N.Y. 2002) ...............................................................62

*Flores v. Emerich & Fike*,
  2008 WL 2489900 (E.D. Cal. June 18, 2008) ..................................................74

*Ford Motor Co. v. Knight Law Group*,
  2025 WL 3306280 (C.D. Cal. Nov. 24, 2025) ..........................12, 23, 24, 46

*Ford Motor Co. v. Mikhov*,
  2026 WL 691879 (C.D. Cal. Mar. 10, 2026) ..........................................12, 23, 24

*Freeman v. Lasky, Haas & Cohler*,
  410 F.3d 1180 (9th Cir. 2005) ...................................................................10, 12, 13

*Ghebreyesus v. Fed. Democratic Republic of Ethiopia*,
  2023 WL 6392611 (D. Nev. Sept. 30, 2023) ....................................................71

*Gomez v. Guthy-Renker, LLC*,
  2015 WL 4270042 (C.D. Cal. July 13, 2015) ..................................................46

*Grande v. Eisenhower Med. Ctr.*,
  13 Cal. 5th 313 (2022)........................................................................26, 28, 29

*Grimmett v. Brown*,
  75 F.3d 506 (9th Cir. 1996)..............................................................................72, 73

*Grisham v. Philip Morris U.S.A., Inc.*,
  40 Cal. 4th 623 (2007)........................................................................................32

*H.J. Inc. v. Nw. Bell Tel. Co.*,
  492 U.S. 229 (1989) ..............................................................................33, 40, 57

*Hakak v. Geffen*,
  2023 WL 4681385 (C.D. Cal. June 28, 2023)..............................................14, 15

*Handeen v. Lemaire*,
  112 F.3d 1339 (8th Cir. 1997)..........................................................................62

*Hemi Grp., LLC v. City of New York*,
  559 U.S. 1 (2010) ..............................................................................................64

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

*Holloway v. Clackamas River Water*,
2014 WL 6998069 (D. Or. Sept. 9, 2014).................................................63, 64, 66

*Hong Sang Mkt., Inc. v. Peng*,
20 Cal. App. 5th 474 (2018)......................................................................25, 32

*Howell v. Hamilton Meats & Provisions, Inc.*,
52 Cal. 4th 541 (2011)...................................................................................55

*In re JNC Cos.*,
1993 WL 239304 (9th Cir. June 30, 1993)......................................................28

*In re JUUL Labs, Inc. Mktg., Sales Pracs., & Prods. Liab. Litig.*,
497 F. Supp. 3d 552 (N.D. Cal. 2020)......................................................45, 46

*In re Nat'l W. Life Ins. Deferred Annuities Litig.*,
467 F. Supp. 2d 1071 (S.D. Cal. 2006) ...........................................................43

*In re Outlaw Lab'y*, LP Litig.,
2020 WL 1953584 (S.D. Cal. Apr. 23, 2020) ........................................62, 66, 67

*In re Outlaw Lab'y, LP Litig.*,
2020 WL 5552558 (S.D. Cal. Sept. 16, 2020) ..................................................47

*In re Rickert*,
2020 WL 7043609 (B.A.P. 9th Cir. Dec. 1, 2020)............................................28

*In re Wells Fargo Ins. Mktg. & Sales Pracs. Litig.*,
2018 WL 9536803 (C.D. Cal. Dec. 14, 2018) ..................................................74

*JW Gaming Dev., LLC v. James*,
2020 WL 3640004 (N.D. Cal. July 6, 2020) ....................................................48

*Kamal v. County of Los Angeles*,
2018 WL 4328467 (C.D. Cal. Sept. 6, 2018)....................................................66

*Kearney v. Foley & Lardner, LLP*,
590 F.3d 638 (9th Cir. 2009)...................................................................passim

*Kearney v. Foley & Lardner*,
2011 WL 3172787 (S.D. Cal. July 27, 2011)....................................................43

*Kearney v. Foley & Lardner, LLP*,
747 F. App'x 478 (9th Cir. 2018)........................................................29, 34, 35

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

*Kerner v. Superior Court*,
   206 Cal. App. 4th 84 (2012)...................................................................27, 28, 29

*Kesiraju v. Makker*,
   2024 WL 5516005 (C.D. Cal. Mar. 12, 2024) ....................................................... 74

*Kottle v. Nw. Kidney Ctrs.*,
   146 F.3d 1056 (9th Cir. 1998) ................................................................. 18

*Kovalev v. Stepansky*,
   2020 WL 553843 (E.D. Pa. Feb. 4, 2020)............................................. 60, 61

*Lane v. Bayview Loan Servicing, LLC*,
   831 S.E.2d 709 (Va. 2019) ....................................................................27

*Lilienthal & Fowler v. Superior Court*,
   12 Cal. App. 4th 1848 (1993)................................................................32

*LiMandri v. Judkins*,
   52 Cal. App. 4th 326 (1997)..................................................................55

*Limcaco v. Wynn*,
   2023 WL 154965 (9th Cir. Jan 11, 2023)......................................... 62, 63

*Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*,
   431 F.3d 353 (9th Cir. 2005).........................................................passim

*Mains v. Citibank, N.A.*,
   852 F.3d 669 (7th Cir. 2017)................................................................39

*Maldonado v. Harris*,
   370 F.3d 945 (9th Cir. 2004)................................................30, 31, 34, 36

*Marrese v. Am. Acad. of Orthopaedic Surgeons*,
   470 U.S. 373 (1985) ..............................................................................25

*Marshall v. Goguen*,
   604 F. Supp. 3d 980 (D. Mont. 2022) ..................................................63

*Med. Marijuana, Inc. v. Horn*,
   604 U.S. 593 (2025) ..............................................................................61

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
   521 F.3d 1097 (9th Cir. 2008).................................................................9

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

*Mendoza v. Zirkle Fruit Co.*,
  301 F.3d 1163 (9th Cir. 2002) ................................................................. 58, 64

*Miroth v. County of Trinity*,
  136 F.4th 1141 (9th Cir. 2025) ............................................................... 38, 39

*Mohebbi v. Khazen*,
  50 F. Supp. 3d 1234 (N.D. Cal. 2014) .......................................................... 42

*Monterey Plaza Hotel Ltd. P'ship v. Loc. 483 of the Hotel Emps. &
  Rest. Emps. Union*,
  215 F.3d 923 (9th Cir. 2000) ................................................................ 31, 34

*Moore v. Saniefar*,
  2016 WL 2764768 (E.D. Cal. May 12, 2016) ............................................ 19, 21

*Moran v. Bromma*,
  675 F. App'x 641 (9th Cir. 2017) ................................................................ 43

*Morehead v. City of Oxnard*,
  2023 WL 8143973 (C.D. Cal. Oct. 4, 2023) ................................................... 75

*Morris v. Blank*,
  94 Cal. App. 4th 823 (2001) ...................................................................... 34

*Mpoyo v. Litton Electro-Optical Sys.*,
  430 F.3d 985 (9th Cir. 2005) ..................................................................... 37

*Nakash v. Superior Court*,
  196 Cal. App. 3d 59 (1987) ....................................................................... 32

*Nat. Immunogenics Corp. v. Newport Trial Grp.*,
  2016 WL 11520711 (C.D. Cal. Aug. 1, 2016) .......................................... 21, 22

*Nat.-Immunogenics Corp. v. Newport Trial Grp.*,
  2020 WL 7263544 (C.D. Cal. Nov. 23, 2020) ................................................ 62

*Natomas Gardens Inv. Grp., LLC v. Sinadinos*,
  710 F. Supp. 2d 1008 (E.D. Cal. 2010) ........................................................ 72

*Navajo Health Found. - Sage Mem'l Hosp., Inc. v. Razaghi Dev. Co.*,
  2021 WL 1397229 (D. Nev. Jan. 15, 2021) .................................................. 71

*Navarro v. Block*,
  250 F.3d 729 (9th Cir. 2001) ................................................................ 75, 76

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

*Neder v. United States*,
527 U.S. 1 (1999) ...........................................................................................49, 63

*Netflix, Inc. v. Blockbuster, Inc.*,
2006 WL 2458717 (N.D. Cal. Aug. 22, 2006)....................................................18

*Odom v. Microsoft Corp.*,
486 F.3d 541 (9th Cir. 2007).........................................................................passim

*Ogden v. Wells Fargo Bank, N.A.*,
2015 WL 13413390 (C.D. Cal. Feb. 20, 2015) ..................................................63

*Oyekwe v. Rsch. Now Grp., Inc.*,
542 F. Supp. 3d 496 (N.D. Tex. 2021)................................................................28

*Ozeran v. Jacobs*,
798 F. App'x 120 (9th Cir. 2020)........................................................................61

*Pac. Surf Designs, Inc. v. Whitewater W. Indus., Ltd.*,
2021 WL 5326529 (S.D. Cal. Nov. 16, 2021).....................................................63

*Palumbo Design, LLC v. 1169 Hillcrest, LLC*,
2020 WL 5498065 (C.D. Cal. July 14, 2020) .....................................................36

*Pasadena Hosp. Ass'n, Ltd. v. Superior Court*,
204 Cal. App. 3d 1031 (1988).............................................................................41

*Patel v. Crown Diamonds, Inc.*,
247 Cal. App. 4th 29 (2016)................................................................................26

*Pedrina v. Chun*,
97 F.3d 1296 (9th Cir. 1996)...............................................................................35

*Perez v. DirecTV Grp. Holdings, LLC*,
2019 WL 6362471 (C.D. Cal. July 23, 2019) ........................................14, 16, 18

*Pincay v. Andrews*,
238 F.3d 1106 (9th Cir. 2001)........................................................................72, 75

*Planned Parenthood Fed. of Am., Inc. v. Ctr. for Med. Progress*,
402 F. Supp. 3d 615 (N.D. Cal. 2019).................................................................70

*Pyankovska v. Abid*,
65 F.4th 1067 (9th Cir. 2023).........................................................10, 11, 12, 16

-x-        No. 2:25-cv-06612-SPG-PD
PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

*Rabang v. Kelly*,
  2017 WL 1496415 (W.D. Wash. Apr. 26, 2017) .................................................. 71

*Rechanik v. Microsoft Corp.*,
  2009 WL 721005 (N.D. Ill. Mar. 17, 2009) ....................................................... 35

*Reiter v. Sonotone Corp.*,
  442 U.S. 330 (1979) ......................................................................................... 58

*Relevant Grp., LLC v. Nourmand*,
  116 F.4th 917 (9th Cir. 2024) ......................................................................... 17

*Rotec Indus. v. Mitsubishi Corp.*,
  163 F. Supp. 2d 1268 (D. Or. 2001) ................................................................ 71

*Rowell v. Transpacific Life Ins. Co.*,
  94 Cal. App. 3d 818 (1979) ......................................................................... 26, 36

*Rucker v. Schmidt*,
  794 N.W.2d 114 (Minn. 2011) ......................................................................... 27

*Savla v. Nithyananda Found.*,
  2011 WL 13585607 (C.D. Cal. Dec. 15, 2011) ................................................ 70

*Sawyer v. First City Fin. Corp.*,
  124 Cal. App. 3d 390 (1981) ..................................................................... passim

*Sedima, S.P.R.L. v. Imrex Co.*,
  473 U.S. 479 (1985) ......................................................................................... 40

*Shaw v. Nissan N. Am., Inc.*,
  220 F. Supp. 3d 1046 (C.D. Cal. 2016) ....................................................... 45, 46

*Shaw v. Sears*,
  2010 WL 11595818 (C.D. Cal. Oct. 18, 2010) ................................................ 72

*Skinner v. Switzer*,
  562 U.S. 521 (2011) ............................................................................. 37, 38, 39

*Slater v. Blackwood*,
  15 Cal. 3d 791 (1975) ..................................................................................... 31

*Smith v. Am. Gen. Life Ins. Co.*,
  2017 WL 7362724 (C.D. Cal. Feb. 7, 2017) .................................................... 72

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

*Sonus Networks, Inc. v. Inventergy, Inc.*,
2015 WL 4539814 (N.D. Cal. July 27, 2015) ........................................................ 18

*Sosa v. DirecTV, Inc.*,
437 F.3d 923 (9th Cir. 2006) ...................................................................... passim

*State Comp. Ins. Fund v. Capen*,
2015 WL 13298073 (C.D. Cal. Dec. 18, 2015) ..................................................... 56

*State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*,
120 F.4th 59 (2d Cir. 2024) ...................................................... 33, 68, 75

*Steele v. Hospital Corp. of America*,
36 F.3d 69 (9th Cir. 1994) ........................................................................ 60

*Stillaguamish Tribe of Indians v. Nelson*,
2012 WL 13028100 (W.D. Wash. July 24, 2012) ................................................. 71

*Stoot v. City of Everett*,
582 F.3d 910 (9th Cir. 2009) ..................................................................... 67

*Tax Relief, Inc. v. Selb*,
2021 WL 8919077 (C.D. Cal. June 7, 2021) ........................................................ 32

*Theofel v. Farey-Jones*,
359 F.3d 1066 (9th Cir. 2004) .................................................................. 24

*Thomas v. Baca*,
308 F. App'x 87 (9th Cir. 2009) ............................................................ 62, 63

*Ticor Title Ins. Co. v. Florida*,
937 F.2d 447 (9th Cir. 1991) ..................................................................... 57

*Transamerica Occidental Life Ins. Co. v. Aviation Off. of Am., Inc.*,
292 F.3d 384 (3d Cir. 2002) ....................................................................... 36

*United States v. Blinder*,
10 F.3d 1468 (9th Cir. 1993) ..................................................................... 42

*United States v. Christensen*,
828 F.3d 763 (9th Cir. 2015) ..................................................................... 71

*United States v. Hanley*,
190 F.3d 1017 (9th Cir. 1999) .................................................................... 13

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

*United States v. Hussain*,
972 F.3d 1138 (9th Cir. 2020) ................................................................. 53, 55

*United States v. Jesenik*,
152 F.4th 924 (9th Cir. 2025) ................................................................. 49, 55

*United States v. Juvenile Male*,
118 F.3d 1344 (9th Cir. 1997) ................................................................. 69, 70

*United States v. Marbella*,
73 F.3d 1508 (9th Cir. 1996) ................................................................. 49, 50

*United States v. Meredith*,
685 F.3d 814 (9th Cir. 2012) ................................................................. 10

*United States v. Ordonez-Zometa*,
141 F.4th 531 (4th Cir. 2025) ................................................................. 70

*United States v. Stevens*,
559 U.S. 460 (2010) ................................................................. 16

*United States v. Sullivan*,
522 F.3d 967 (9th Cir. 2008) ................................................................. 16, 49

*United States v. Turkette*,
452 U.S. 576 (1981) ................................................................. 44

*Venetian Casino Resort, LLC v. NLRB*,
484 F.3d 601 (D.C. Cir. 2007) ................................................................. 16

*Volk v. D.A. Davidson & Co.*,
816 F.2d 1406 (9th Cir. 1987) ................................................................. 69

*Walter v. Drayson*,
538 F.3d 1244 (9th Cir. 2008) ................................................................. 48, 60

*Walters v. Fid. Mortg. of Cal.*,
730 F. Supp. 2d 1128 (E.D. Cal. Aug. 4, 2010) ................................................................. 71

*Weinberger v. Tucker*,
510 F.3d 486 (4th Cir. 2007) ................................................................. 29, 30

*Whitewater W. Indus., Ltd. v. Pac. Surf Designs, Inc.*,
2017 WL 4518526 (S.D. Cal. Oct. 10, 2017) ................................................................. 59

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

*Woods v. Slayton*,
   2023 WL 5835429 (C.D. Cal. Aug. 16, 2023) ....................................................... 27

*Yagman v. Gabbert*,
   2015 WL 13358336 (C.D. Cal. May 14, 2015) ....................................................... 61

*Zheng Liu v. Terry*,
   2021 WL 2688846 (N.D. Cal. June 30, 2021) ....................................................... 60

**STATUTES**

18 U.S.C.
   § 1341 ....................................................................................................... 16, 49
   § 1343 ....................................................................................................... 16, 49
   § 1961(1) .............................................................................................. 16, 49, 56
   § 1961(4) ........................................................................................................ 40
   § 1961(5) .................................................................................................... 72, 74
   § 1962(c) .................................................................................................... 60, 61
   § 1964(c) .................................................................................................... 58, 61

Cal. Bus. & Prof. Code
   § 583 ............................................................................................................. 45
   § 725(a) ......................................................................................................... 45

Cal. Civ. Proc. Code
   § 426.10(c) ..................................................................................................... 37
   § 426.30(a) ................................................................................................ 36, 37

Cal. Corp. Code
   § 13401 .......................................................................................................... 41
   § 13403 .......................................................................................................... 41

**RULES**

Cal. Prof. Conduct R.
   Rule 3.3(a)(1) ................................................................................................. 45
   Rule 3.3(a)(3) ................................................................................................. 45
   Rule 3.4(c)-(d) ............................................................................................... 45

Federal Rules of Civil Procedure
   Rule 9(b) ................................................................................................... 56, 58
   Rule 12 .......................................................................................................... 71
   Rule 12(b)(6) .................................................................................................. 75
   Rule 13 .......................................................................................................... 36

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

**OTHER AUTHORITIES**

California Secretary of State, Business Search,
https://bizfileonline.sos.ca.gov/search/business ................................................. 41

7 Witkin, *California Procedure Judgment* § 456 (5th ed. 2008) ............................ 26

7 Witkin, *California Procedure Judgment* § 491 (6th ed. 2025) ............................ 26

**INTRODUCTION**

This case involves a brazen scheme by Defendants—Los Angeles personal-injury attorneys Igor Fradkin and Jacob Emrani; their respective law firms Downtown LA Law Group (DTLA) and the Law Offices of Jacob Emrani; and Dr. Gregory S. Khounganian and his medical practice Valley Orthopedic and Spine—to exploit vulnerable individuals and defraud Uber out of millions of dollars.

The fraud works as follows: Fradkin, Emrani, and their firms identify people involved in minor accidents with Uber, many of whom suffer from longstanding mental and physical health issues, financial distress, and other serious challenges. Fradkin, Emrani, and their firms then steer the patients to Khounganian and his practice, where they are promptly diagnosed with fabricated or exaggerated spinal injuries that Khounganian falsely asserts were caused by the minor Uber accidents. Khounganian then performs costly, invasive, and medically unnecessary spinal fusion and other surgeries, which form the basis for fraudulent and inflated personal-injury lawsuits against Uber. Concealed in the background, Khounganian and the law firms negotiate secret side deals in which Khounganian agrees to significantly discount his fees in the event the recovery in the lawsuits is insufficient to pay his inflated sticker price, thereby rendering the face amount of the bill false and misleading. The claimants are initially lured in with the promise of large settlement payouts, but more often than not, Defendants pocket the lion's share of any recovery and the claimants receive little or nothing. That basic pattern has repeated itself dozens of times in Los Angeles over the past several years, costing Uber millions of dollars and driving up prices for riders while pushing down earnings for drivers.

This is exactly the kind of coordinated, complex, years-long scheme that the Racketeer Influenced and Corrupt Organizations Act (RICO) was designed to root out. Looking at each personal-injury case individually, the nature of the fraud might not be easily identified. But taking a wider lens and looking at Defendants' conduct in the aggregate, the pattern becomes unmistakable. Each of the attorney defendants

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

collaborated with Khounganian to carry out a scheme that neither of them could effectuate individually. As orchestrators of the scheme, the attorneys needed Khounganian to render fraudulent medical diagnoses and bills and deliver unnecessary surgery, and Khounganian needed the attorneys to file lawsuits and refer him a steady supply of patients he could treat on a lien basis, with the expectation of a large payout funded in part by the $1 million per ride in liability insurance that California law requires Uber to carry. They each profited handsomely at the expense of Uber, riders, drivers, and the integrity of the legal system.

Uber's First Amended Complaint (FAC) recounts in detail eighteen example cases that illustrate the scheme. These cases collectively involved millions of dollars in medical bills from Khounganian to treat injuries allegedly resulting from accidents that resulted in little or no visible damage to the automobiles involved. Defendants dispute Uber's factual allegations, which will be put to the test in discovery and beyond. But the legal arguments Defendants advance in their motions to dismiss have no merit.

Defendants contend that Uber's civil RICO lawsuit interferes with their First Amendment right to petition courts for redress, but their fraudulent conduct is not constitutionally protected and indeed is not even petitioning activity. The Ninth Circuit has repeatedly allowed civil RICO claims premised on fraudulent litigation conduct to proceed, as this case should. Defendants also suggest that Uber should be precluded from filing this civil RICO lawsuit now because it previously litigated and settled the underlying personal-injury claims. But Defendants were not parties in those cases and, as Uber alleges, it was not aware of Defendants' fraud at the time it settled them, as the pattern of conduct became evident only over time, when repeated in multiple cases. Uber was not required to pursue—nor would it be in any way feasible to pursue—a federal RICO claim to remediate Defendants' years-long pattern of racketeering spanning multiple cases in the context of a single state court personal-injury lawsuit. And while Defendants assert that Uber has failed to plead

-2-       No. 2:25-cv-06612-SPG-PD

PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

the elements of a civil RICO claim, Uber's detailed factual allegations easily clear that bar. Uber has identified multiple RICO enterprises and has described how Defendants have conducted the enterprises' affairs through a continuing pattern of racketeering activity (mail and wire fraud). The complaint further details how that racketeering activity has injured Uber's business or property in the form of legal expenses and settlements that far exceed what Uber would have paid absent Defendants' fraud.

Defendants' conduct is not simply outrageous, it is criminal. It cannot be allowed to stand. Yet the upshot of Defendants' arguments here is that—*even if all of Uber's factual allegations are true*—Uber has no recourse but to be stuck defending itself against fraudulent personal-injury actions, one at a time, with no end in sight. That cannot be right. In enacting the civil RICO statute, Congress created a flexible cause of action to remediate pervasive and unlawful schemes like this one. Defendants' motions to dismiss should be denied.

## FACTUAL BACKGROUND

California law requires rideshare companies like Uber to maintain "$1 million of liability and uninsured/underinsured motorist insurance coverage." FAC ¶ 26. As a result, "[a]s of October 2025, in Los Angeles County specifically, approximately 45% of the fare of every Uber ride goes to mandated insurance costs, driving up prices for riders and pushing down earnings for drivers." FAC ¶ 1. The Law Firm Defendants—i.e., the Emrani firm, Emrani, DTLA, and Fradkin—saw an opportunity to pilfer these deep pockets, and they "make no secret of targeting Uber because of these high policy limits." FAC ¶ 8.[1] They constructed a scheme with Khounganian to lure in vulnerable personal-injury claimants, fabricate exorbitant medical costs in

---

[1] This opposition refers to Emrani and his firm collectively as the "Emrani Defendants"; Fradkin and DTLA collectively as the "DTLA Defendants," and Khounganian and Valley Orthopedic and Spine collectively as the "Khounganian Defendants."

PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

the form of unnecessary surgeries to drive up their recovery against Uber, and then pocket the lion's share of that recovery.

Not only does this fraudulent scheme impose significant financial damage on Uber (and drivers and riders), it often leaves Defendants' vulnerable clients in worse condition both financially and physically. Defendants "take advantage of claimants in vulnerable situations," as "[m]any of the claimants are facing economic stress or pre-existing health problems." FAC ¶ 27. Defendants "entice these vulnerable claimants to receive unnecessary and/or causally unrelated medical treatment with the promise of large settlement payouts. But these payments often do not materialize, due in large part to the substantial contingency fees the firms charge and inflated, lien-based bills from medical providers," as well as predatory financing arrangements. *Id.* For instance, "one claimant obtained a $140,000 settlement, but received only $9,112.53 of that amount, while Downtown LA Law Group walked away with $63,000 in fees (a 45% contingency fee)." *Id.* And to add injury to insult, many of the claimants report experiencing more pain after Khounganian's unnecessary surgeries than they did before. *See, e.g.*, FAC ¶¶ 85, 213-216, 230-231. Claimant B, for example, "reported a miserable recovery from surgery" and was "unable to walk or shower herself" after Khounganian nicked her sciatic nerve during surgery. FAC ¶ 85.

The first step of the scheme requires the Law Firm Defendants to "identify individuals with potential personal injury claims against rideshare companies such as Uber." FAC ¶ 26. "Both firms aggressively pursue clients to sue Uber," including through "online advertisement[s]." *Id.* Often, the people that respond to these advertisements are in very minor accidents like fender-benders and report no injuries or only minor, pre-existing injuries. FAC ¶¶ 53, 57, 72-74, 96-97, 131-132, 154. To take one example, Claimant B denied any injuries at the scene of the accident, did not seek medical care in the wake of the accident, and did not even report the accident until two months later, after he had retained the Emrani firm (and even then, did not

report any injuries). FAC ¶¶ 72-74. In some cases, there was not even any accident at all. For example, Claimant I was involved in an incident where the car he was in quickly stopped to avoid a collision, causing no injuries. FAC ¶ 188.

The Law Firm Defendants communicate to these potential claimants that they will represent them in suing Uber, but that they have to see the medical providers that the Law Firm Defendants arrange, particularly Khounganian. FAC ¶¶ 31, 59, 73, 102, 124. Critically, "[m]any of Fradkin's and Emrani's clients actually have health insurance. But to maximize their eventual recovery in their fraudulent lawsuits, Fradkin and Emrani steer these claimants away from medical providers who would bill their health insurance. Instead, these claimants are directed to specified medical providers, selected by the attorneys, who bill on a lien basis." FAC ¶ 31. The Law Firm Defendants also require potential claimants to sign an engagement agreement entitling [the Law Firm Defendants] to a contingency fee of 45% or more of the client's potential recovery. FAC ¶ 4.

Frequently, the Law Firm Defendants also arrange for the claimant to meet with litigation financing entities affiliated with them. FAC ¶ 39. These entities represent to the clients that they will give them "advances" against their eventual recoveries, when in fact these are extremely high-interest loans that must be repaid regardless of whether the claimant prevails. *Id.* These loans "substantially reduce [the claimants'] ultimate settlement recoveries and sometimes result in claimants repaying these high-interest loans long after their cases resolve" and well after they have depleted their own small share of their personal injury settlement. *Id.*

After a claimant has agreed to advance his or her personal-injury claim against Uber with the Law Firm Defendants as counsel, they send the claimant to Khounganian, who is "[a] central player" in the fraud. FAC ¶ 10. "Khounganian accepts referrals from lawyers who have cases against Uber with the understanding that he will perform specific acts to increase the value of their lawsuits and/or claims." *Id.* First, despite the fact that Khounganian accepts medical insurance and

-5-   No. 2:25-cv-06612-SPG-PD

many of the claimants have insurance, Defendants make clear to the claimant that she will be billed for Khounganian's services on a lien basis. FAC ¶¶ 31, 59, 73, 102, 124. Khounganian "benefit[s] from this arrangement because" (1) he "receive[s] a steady supply of claimants," and (2) if he "were to bill the patient's health insurance, the insurer might deny coverage for their unnecessary treatments or would require" Khounganian to accept a lower rate than he charges on his "inflated lien-based bills." FAC ¶ 31.

Before beginning treatment, Khounganian "require[s] claimants to sign lien agreements under which claimants agree to pay the providers from recoveries on their claims." FAC ¶ 32. But "[t]hese lien arrangements are shams," because Khounganian secretly agreed that he would not seek to recover payment from the claimants. FAC ¶ 3. Indeed, Khounganian does not even "check the credit histories of the claimants before beginning treatment that purports to cost tens or hundreds of thousands of dollars—because he knows he will negotiate lower amounts in the event of a shortfall, and he does not expect to pursue personal recovery against the claimants." FAC ¶ 32.

In the background, the Law Firm Defendants and Khounganian "secretly enter into side agreements in which they agree, in the event that recoveries do not exceed the amount of fees and liens, that the providers will reduce their bills accordingly." FAC ¶ 33. Khounganian agrees to this arrangement because, in exchange, he "receive[s] a steady supply of claimants from the lawyers"—in other words, it is "a kickback scheme." Id. "In exchange for a steady supply of claimants from the lawyers, the medical providers agree to surrender their lien rights in the event of a shortfall in the litigation recovery." FAC ¶ 4. The practical result of this arrangement is a boon for both the Law Firm Defendants and Khounganian, who is able to charge "above-market, artificially inflated rates for performing surgeries and other procedures that are unnecessary and/or causally unrelated to any Uber accident." FAC ¶ 25. Because these concealed side agreements are not disclosed to Uber

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

alongside the bills indicating that Khounganian has provided genuine lien-based care, the bills are false, misleading, and fraudulent in that respect. FAC ¶ 36.

Once the lien agreement is in place, "Khounganian produces fraudulent documents diagnosing these lawyers' clients with specific injuries, stating that those injuries are causally related to minor accidents, and recommending costly, invasive, and/or unnecessary surgeries." FAC ¶ 10. Khounganian then issues surgical estimates and invoices that "charge above-market, artificially inflated rates for the services in question." FAC ¶ 36. For example, for Claimants A and O, Khounganian billed more than $200,000 each for surgeries that were medically unnecessary, were not caused by any Uber-related incident, or both. FAC ¶¶ 68-70, 300-302. And for several patients—including Claimants B, C, D, E, H, and Q—Khounganian produced fraudulent estimates of hundreds of thousands of dollars in future medical expenses, driving up the value of those claimants' lawsuits and settlement demands. FAC ¶¶ 88, 113, 125, 127, 135, 138, 178, 180-181, 330, 333.

Khounganian transmits these fraudulent medical and billing records to the Law Firm Defendants, who file personal-injury actions against Uber on behalf of the claimants. FAC ¶ 10. The hundreds of thousands of dollars billed by Khounganian for surgeries that are unnecessary or causally unrelated to the accident in question drive up the claimant's asserted damages and settlement demand to Uber. FAC ¶¶ 35-37. When the claimant's case settles—as the vast majority of personal-injury lawsuits do—the settlement amount and the Law Firm Defendants' contingency fee is significantly higher than it would have been in the absence of Khounganian's fraudulent medical and billing records. FAC ¶ 37. And, after the Law Firm Defendants take their contingency fee off the top of the settlement amount, Khounganian is able to demand that the claimant pay the full overbilled amount from what remains of their recovery. FAC ¶ 32.

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

The pattern detailed in Uber's eighteen example cases is stark. In each case, there was a minor accident (or no accident at all) that produced minor injuries (or no injuries at all). Yet the Law Firm Defendants nonetheless referred each claimant to Khounganian pursuant to the scheme, who then created false bills and estimates totaling hundreds of thousands of dollars for invasive surgeries that were unnecessary and unrelated to the Uber incidents. Khounganian produced fraudulent records linking the surgery to the accident—records he then transmitted to the Law Firm Defendants in order to extract inflated settlements from Uber in personal-injury litigation. The Law Firm Defendants could not obtain their artificially inflated contingency fees without the help of Khounganian's fraudulent medical and billing records. Khounganian could not obtain above-market rates for performing surgeries that are medically unnecessary, or unrelated to any Uber accident, without the Law Firm Defendants monetizing the fraudulent resulting evidence. And the pattern of fraud repeated time and again over dozens of cases, costing Uber millions of dollars and increasing costs for drivers and riders alike. The scheme serves to unjustly enrich both the Law Firm Defendants and Khounganian, at the expense of Uber, the general ridesharing public, and frequently the claimants themselves.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The Court must take Uber's well-pleaded allegations as true and draw all inferences in Uber's favor. *Id.* at 679. Dismissal is only appropriate "where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr*., 521 F.3d 1097, 1104 (9th Cir. 2008).

-8-    No. 2:25-cv-06612-SPG-PD

# ARGUMENT

Defendants raise a litany of non-merits defenses in an effort to avoid being held accountable for their fraudulent conduct, but none has any legal basis. Defendants invoke the *Noerr-Pennington* doctrine, a rule of statutory construction to avoid impinging on First Amendment protections for exercising a right to petition the government, including in courts. But Uber seeks to hold Defendants liable for their pre-litigation, out-of-court conduct in furtherance of a fraud scheme, not for the act of filing lawsuits. Moreover, it is well established that the First Amendment does not protect fraud, and the allegations in Uber's complaint—which must be taken as true at this stage—fit readily within an exception to the *Noerr-Pennington* doctrine that the Ninth Circuit has recognized for fraudulent litigation conduct.

The doctrine of claim preclusion and the related compulsory counterclaim rule under California law do not bar Uber's lawsuit because the parties and claims at issue in the prior personal-injury actions—in which individual claimants were suing Uber—are not the same as Uber's civil RICO lawsuit here. Uber's RICO suit challenges (as it must) a *pattern* of conduct by Defendants stretching across many years and numerous cases. Uber was not aware of that overarching pattern at the time it settled individual cases. And it would have been absurd for Uber to attempt to litigate its RICO claim against Defendants within any (or each) of the dozens of individual personal-injury actions in which Defendants were not even parties.

On the merits, Uber's allegations satisfy each of the elements of a civil RICO claim. Uber alleges an orchestrated, years-long scheme by Defendants to defraud Uber of millions of dollars for meritless and inflated personal-injury claims. The First Amended Complaint recounts a pattern of repeated fraudulent activity that resulted in injury to Uber's business and property. While Defendants attempt to dispute the veracity of Uber's allegations, that is improper at the pleading stage, before any discovery has occurred. Defendants' motions to dismiss should be denied.

## I.      The *Noerr-Pennington* Doctrine Does Not Apply

Defendants argue that their fraudulent scheme is protected by the *Noerr-Pennington* doctrine. *See* ECF 87 at 14-19; ECF 93 at 2-5; ECF 96 at 32-38. It is not. *Noerr-Pennington* "is a rule of statutory construction that requires courts to ask whether the statute at issue may be construed to avoid burdening conduct protected by the First Amendment," including the right to petition in court. *Pyankovska v. Abid*, 65 F.4th 1067, 1076 (9th Cir. 2023). The Ninth Circuit has applied a "three-part test to determine whether the defendant's conduct is immunized" under *Noerr-Pennington*. *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 644 (9th Cir. 2009). The court must "(1) identify whether the lawsuit imposes a burden on petitioning rights, (2) decide whether the alleged activities constitute protected petitioning activity, and (3) analyze whether the statutes at issue may be construed to preclude that burden on the protected petitioning activity." *Id.*; *accord, e.g.*, *Pyankovska*, 65 F.4th at 1077. Defendants' *Noerr-Pennington* argument fails at every step. And even if that were not so, Defendants' fraud scheme fits comfortably into the "sham" exception to *Noerr-Pennington* immunity—particularly here at the pleading stage, where courts cannot resolve *Noerr-Pennington* defenses in the face of allegations like Uber's regarding Defendants' fraudulent conduct.

### A.      Uber's RICO Action Does Not Burden Defendants' Petitioning Rights

"Because the *Noerr-Pennington* doctrine grows out of the Petition Clause, its reach extends only so far as necessary" to prevent a statute from "violating the First Amendment." *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1184 (9th Cir. 2005). But Uber has alleged—and its allegations must be taken as true at this stage—a scheme involving the creation of fraudulent evidence in violation of the wire and mail fraud statutes. *See, e.g.*, FAC ¶ 362. And the First Amendment does not protect fraud. Rather, the Supreme Court and Ninth Circuit have long included fraud among the "limited categories of 'unprotected' speech." *United States v. Meredith*, 685 F.3d

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

814, 819 (9th Cir. 2012) (quoting *United States v. Stevens*, 559 U.S. 460, 469 (2010)). It does not burden Defendants' petitioning rights to hold them liable for creating fraudulent evidence and using it in litigation to extract inflated settlements.

*Pyankovska* is directly on point. In that case, the defendant had illegally wiretapped his ex-wife in order to obtain evidence to use against her in a child custody proceeding in state court. 65 F.4th at 1071. The ex-wife sued under the Federal Wiretap Act, alleging that the defendant had "filed selectively edited transcripts of the illegally recorded conversations on the court's public docket." *Id.* The district court granted the ex-husband's motion to dismiss based on *Noerr-Pennington*, but the Ninth Circuit reversed, explaining that "filing illegally obtained evidence on a public court docket is conduct not immunized under *Noerr-Pennington*." *Id.*

The court of appeals reasoned that the *Noerr-Pennington* defense faced "insurmountable hurdles under step one" of the analysis because a "damages action in federal court" for illegal conduct does not "impose[] an unconstitutional 'burden' on the state court litigation." *Id.* at 1077. That is because a party in a judicial proceeding must "play by the rules applicable to all litigants," including the federal statutory provision prohibiting a party from introducing in any court the contents of unlawfully intercepted communications. *Id.* (citing 18 U.S.C. § 2515). Having to follow rules of that kind does not impermissibly burden petitioning rights.

The same is true here. While the Law Firm Defendants are free to file complaints and transmit settlement demands, they are *not* free to support those lawsuits or demands with evidence that is fraudulent under federal law. The manufacture of false evidence is not protected petitioning activity even if a fraudster aims to use the evidence in litigation. Just as the Wiretap Act sets limits on what evidence a party may introduce in state court, so too do the RICO and mail and wire fraud statutes. *Noerr-Pennington* may in some circumstances protect "'baseless petitions,'" ECF 87 at 15 (quoting *Relevant Grp., LLC v. Nourmand*, 116 F.4th 917,

927-28 (9th Cir. 2024)), but it does *not* protect the creation and dissemination of fraudulent evidence.

Defendants assert that the court's decision in *Ford Motor Co. v. Knight Law Group*, 2025 WL 3306280 (C.D. Cal. Nov. 24, 2025) is "particularly instructive." ECF 87 at 15.[2] But the fraud at issue here—the creation of fraudulent medical bills and records for unnecessary treatment—is different in kind from the fraud at issue in *Ford Motor*. That fraud involved petitions for attorney's fees and supporting billing records prepared in the context of Lemon Law suits which permitted prevailing parties to recover fees incurred "on the case." 2025 WL 3306280, at *2. The fraud in this case is prior to and external to the litigation. By contrast, the court in *Ford Motor* emphasized that "the activities for which" the attorney defendants were fraudulently billing was "litigation" and that they constituted petitioning activity because they were "based on litigation activity." *Id.* at *8. Khounganian's records, in contrast, were not based on litigation activity. Moreover, *Ford Motor* failed to persuasively distinguish *Pyankovska*. While it may be true that the claim at issue in *Pyankovska* "arose under the Wiretap Act rather than as a RICO claim," *id.*, the Ninth Circuit's analysis in *Pyankovska* hinged on the illegal and unprotected nature of the conduct, not on the statute giving rise to the claim, *see* 65 F.4th at 1077.

Separately, even if the Court were to conclude that this lawsuit burdens the Law Firm Defendants' petitioning rights, it certainly does not burden *Khounganian*'s petitioning rights in any way. Attorneys exercise First Amendment petitioning rights in filing lawsuits on behalf of clients. *See Freeman*, 410 F.3d at 1186. But doctors do not petition courts on behalf of their patients, and the predicate acts alleged against Khounganian do not involve any petitioning activity on his part. Indeed, it is telling that Khounganian is unable to cite a single case in which a court has held that the

---

[2] The district court recently issued an opinion dismissing Ford's second amended complaint, this time with prejudice, on similar grounds. *See Ford Motor Co. v. Mikhov*, 2026 WL 691879, at *8-9 (C.D. Cal. Mar. 10, 2026).

*Noerr-Pennington* doctrine protects a doctor whose patient files a personal-injury lawsuit. *See* ECF 96 at 33-34 (citing inapposite authorities involving attorneys and other non-physician "agents and representatives" of parties). As such, *Noerr-Pennington* provides no defense to claims against Khounganian.

And if Khounganian is liable for actions that do not count as petitioning activity, so too are the Law Firm Defendants. Even if one were to set aside the specific predicate acts alleged in the complaint against each Law Firm Defendant relating to petitioning activity, the Law Firm Defendants would still be liable for Khounganian's criminal actions because they directed them. *United States v. Hanley*, 190 F.3d 1017, 1023 (9th Cir. 1999) ("[T]he defendant need not personally have mailed the letter or made the telephone call; the offense may be established where one acts with the knowledge that the prohibited actions will follow in the ordinary course of business or where the prohibited acts can reasonably be foreseen.").

### B. The Conduct Alleged in the First Amended Complaint Does Not Constitute Protected Petitioning Activity

The Ninth Circuit has also emphasized that *Noerr-Pennington* immunity "applies only to what may fairly be described as *petitions*, not to litigation conduct generally." *Freeman*, 410 F.3d at 1184. To be sure, the Ninth Circuit has recognized that in order to "give adequate 'breathing space' to the right of petition," *Noerr-Pennington* protects "not only petitions sent directly to the court in the course of litigation, but also 'conduct incidental to the prosecution of the suit.'" *Sosa v. DirecTV, Inc.*, 437 F.3d 923, 932, 934 (9th Cir. 2006); *see also Freeman*, 410 F.3d at 1184. But however far that "breathing space" principle can be stretched, it does not reach Uber's allegations here.

In general, "[t]he types of conduct that have been found to be incidental to a petition are generally intertwined with the petition and implicate the Petition Clause's protection." *Hakak v. Geffen*, 2023 WL 4681385, at *5 (C.D. Cal. June 28, 2023) (citing *Columbia Pictures, Indus., Inc. v. Pro. Real Est. Invs., Inc.*, 944 F.2d 1525,

1528-29 (9th Cir. 1991), *aff'd,* 508 U.S. 49 (1993)). Courts have found that a wide range of out-of-court conduct that occurs either before litigation commences or after it concludes is not protected by the "breathing space" doctrine. *See, e.g., id.* ("campaign of fraudulent conduct" undertaken in anticipation of litigation not protected); *Cal. Pharm. Mgmt., LLC v. Zenith Ins. Co.*, 669 F. Supp. 2d 1152, 1168 (C.D. Cal. 2009) (false communications about the parties' intent to resolve a dispute before a state agency was unprotected "fraudulent conduct" that "predated their protected petitioning activity" and "was merely a vehicle to effectuate Defendants' scheme"); *Perez v. DirecTV Grp. Holdings, LLC*, 2019 WL 6362471, at *7 (C.D. Cal. July 23, 2019) (pre-litigation threat to report plaintiff to collection and credit reporting agencies not protected).

The facts of *Hakak* are on all fours with those here. An attorney and two siblings performed predicate acts of "bank fraud, identity fraud, fraud in connection with access devices, and fraud in connection with computer use" in order to manufacture an elder abuse claim against their father's personal assistant and caretaker. *Id.* Judge Birotte denied a motion to dismiss the caretaker's civil RICO suit, finding that the fraudulent actions taken in preparation for filing the elder abuse lawsuit—a "campaign of fraudulent conduct" that included bank fraud and identity fraud—"cannot be characterized as either petitioning conduct or conduct incidental to a petition." *Id.* at *5. The court noted that despite being allegedly "part and parcel to the prosecution of the [Elder Abuse Case]," fraudulent activity including a "call to Wells Fargo or the fraudulent use of another's identity to cancel issued checks are not petitions seeking redress from the government and, in this case, do not implicate Defendants' rights under the Petition clause." *Id.*

Similarly here, the First Amended Complaint includes extensive and detailed allegations regarding out-of-court fraudulent conduct by Defendants that significantly predated the personal-injury lawsuits. The Law Firm Defendants referred their respective clients to Khounganian and other providers for expensive

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

and unnecessary medical care with the understanding that the providers would produce fraudulent documents supporting the necessity of their procedures. FAC ¶¶ 28-31. Defendants then required their clients to sign sham lien agreements and fraudulently concealed the existence of secret side agreements between the law firms and Khounganian, specifying that Khounganian would agree to accept reduced fees in the event of a shortfall. FAC ¶¶ 32-34. Khounganian and the other medical providers then produced inflated medical bills and estimates, as well as causation statements falsely linking the patients' alleged medical conditions to Uber accidents, which were themselves fraudulent documents. FAC ¶¶ 34-36. Although these fraudulent actions were undertaken with an eye toward eventual litigation, that does not suffice to make them "conduct … incidental to a petition." *Hakak*, 2023 WL 4681385, at *5.

Defendants rely heavily on *Sosa*, *see* ECF 96 at 14-15, 17; ECF 93 at 3-5, but that case does not extend the definition of "conduct incidental to a petition," 437 F.3d at 935, to reach manufacturing false evidence in advance of litigation. *Sosa* concerned pre-litigation demand letters that had been issued in clear contemplation of imminent litigation. *Id.* at 925-27. The court of appeals concluded that the demand letters were protected by *Noerr-Pennington* because they were "the type of activity that arises only in the context of contemplated petitioning activity." *Id.* at 936. The court further emphasized that "the formal filing of litigation with an invitation to engage in negotiations to settle legal claims is a common, if not universal, feature of modern litigation," with such communications protected by litigation privilege in California and other states. *Id.* But *Sosa* did not involve fraud or medical records at all. And its holding was "limited to a narrow category of 'incidental' activity," namely "prelitigation communications demanding settlement," given the unique features of such communications. *Venetian Casino Resort, LLC v. NLRB*, 484 F.3d 601, 613 (D.C. Cir. 2007).

PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

In this case, "the type of activity" alleged in the First Amended Complaint—the production of fraudulent billing and medical records, and the concealment of secret agreements—is certainly not something that "arises only in the context of contemplated petitioning activity," nor is it a "common, if not universal" feature of litigation. *Sosa*, 437 F.3d at 936. These predicate acts of fraud would not be protected petitioning activity had the fraudulent records merely been submitted to an insurer instead of used as the basis for a personal injury lawsuit, *see id.*, and "[m]erely adding a threat to litigate does not insulate conduct … that is not closely related to litigation activity." *Perez*, 2019 WL 6362471, at *7.

### C. The Conduct Alleged by Uber Unambiguously Violates the RICO and Mail and Wire Fraud Statutes

Because *Noerr-Pennington* is ultimately "a rule of statutory construction," *Pyankovska*, 65 F.4th at 1076, it can apply only if "the statutes at issue may be construed to preclude that burden on the protected petitioning activity," *Kearney*, 590 F.3d at 644. If the statutes may *not* be so construed, then the First Amendment provides a defense only if the conduct at issue is *actually protected*—which, again, fraud is not, *see Stevens*, 559 U.S. at 468.

The statutes here are unambiguous. RICO unequivocally makes violations of the mail and wire fraud statutes predicate offenses. 18 U.S.C. § 1961(1). Nor is there any question that the mail and wire fraud statutes, *id.* §§ 1341, 1343, apply even in the context of litigation. Those statutes cover any "scheme to defraud" perpetrated by mail or wire and with intent to defraud. *United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008). Schemes to defraud can and do occur in the litigation context. The Ninth Circuit's decision in *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353 (9th Cir. 2005), which allowed a RICO claim to proceed premised on mail and wire fraud occurring in litigation for the purpose of influencing the terms of a settlement, confirms that the statutes apply in this context. *Id.* at 356, 362-63.

PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

*Sosa* is not to the contrary; if anything, it confirms that the mail and wire fraud statutes apply here. There, the court concluded that the "mail and wire fraud statutes do not unambiguously reach demands to settle reasonably based legal claims," in part because the demand letters at issue in *Sosa* involved alleged "false representations of … law" and "misrepresentations of the law are not actionable as fraud." 437 F.3d at 940. But this case involves fraudulent evidence designed to induce higher settlement payments, not misrepresentations of the law. And *Sosa* recognized that the statutes reach "fraudulent discovery conduct in prior litigation that induced the plaintiffs to settle for a lower amount than they would have in the absence of the fraud." *Id.* (citing *Living Designs*, 431 F.3d at 365). That is analogous to what Uber alleges here.

**D.     Uber's Allegations Bring this Case Within the Sham Exception to Noerr-Pennington**

Even if the court were persuaded that *Noerr-Pennington* would otherwise apply to any of the Defendants, the defense still fails because, under the facts alleged by Uber, the case fits within the "sham exception" (sometimes also referred to as the "sham litigation exception") to the doctrine. *Kearney*, 590 F.3d at 643. As the Ninth Circuit has repeatedly emphasized, "neither the Petition Clause nor the *Noerr-Pennington* doctrine protects sham petitions, and statutes need not be construed to permit them." *Relevant Grp.*, 116 F.4th at 927; *accord Sosa*, 437 F.3d at 932. The sham exception to *Noerr-Pennington* developed in the antitrust context "to prevent the immunization of conduct that used 'governmental process … as an anticompetitive weapon.'" *Kearney*, 590 F.3d at 644. The *Noerr-Pennington* doctrine was never intended as a blanket protection for fraud effectuated through litigation.[3]

---

[3] Since the filing of Uber's First Amended Complaint, additional evidence of Defendants' fraudulent and unethical conduct has come to light. The State Bar has instituted a charge against the co-founder of DTLA for the unauthorized practice of law, based in part on DTLA's representation of two Maryland residents who traveled across the country to be treated by Khounganian, who billed $300,000 for two surgeries. *See* Notice of Disciplinary Charges at 11, *In re Hendizadeh*, No. SBC-26-O-30254 (Cal. State Bar Ct. Mar. 5, 2026), https://tinyurl.com/dmvvxtrs.

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

At the outset, Defendants face an uphill battle in overcoming Uber's invocation of the sham exception at the pleading stage. The question of whether otherwise protected petitioning activity "is a genuine effort to influence government action, or a mere sham, is a question of fact." *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1253 (9th Cir. 1982); *see also, e.g.*, *Columbia Pictures*, 944 F.2d at 1531 (collecting cases holding that "the applicability of the sham exception is a question of fact"). Courts thus "rarely award *Noerr-Pennington* immunity at the motion to dismiss stage, because well-pleaded allegations of sham litigation must be accepted as true." *Perez*, 2019 WL 6362471, at *8; *see also, e.g.*, *Sonus Networks, Inc. v. Inventergy, Inc.*, 2015 WL 4539814, at *2 (N.D. Cal. July 27, 2015) (same); *Netflix, Inc. v. Blockbuster, Inc.*, 2006 WL 2458717, at *8 (N.D. Cal. Aug. 22, 2006) (rejecting *Noerr-Pennington* defense at pleading stage because if the plaintiff's "allegations … are proven," it could "demonstrate the requisite abuse of process to succeed on a sham-litigation claim"). The same result is warranted here.

### 1. Defendants' fraudulent litigation conduct deprived the state court litigation of its legitimacy

The sham litigation exception will generally apply where, as here, a party "mak[es] intentional misrepresentations to the court" which "deprive the litigation of its legitimacy.'" *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1060 (9th Cir. 1998) (citation modified); *see Kearney*, 590 F.3d at 646.[4] Fraudulent litigation conduct meets that test if the misrepresentations "would be material to th[e] court's analysis" of the litigation claims at issue and the party making the misrepresentations had

---

[4] The sham exception also applies where (1) a lawsuit is "objectively baseless" and reflects "a concealed attempt to interfere with the plaintiff's business relationships," and (2) a "series of lawsuits" are "brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival." *Kottle*, 146 F.3d at 1060 (citation modified). Uber does not contend that either of those circumstances is present here.

"knowledge of [their] falsity." *Moore v. Saniefar*, 2016 WL 2764768, at *7, *9 (E.D. Cal. May 12, 2016).

The facts alleged in the First Amended Complaint satisfy that standard. Defendants' false and misleading statements concerning the severity of their clients' injuries, the necessities of the surgeries performed by Khounganian, and the nature of the lien agreements were material to an "essential element" of their claims. *Moore*, 2016 WL 2764768, at *8. The false and misleading billing records, medical records, and lien agreements provided the basis for artificially inflated damages claims. FAC ¶¶ 3-4. In each of the pattern cases identified in the First Amended Complaint that was settled, Uber directly relied on these fraudulent documents in making settlement determinations. FAC ¶¶ 71, 95, 121, 130, 142, 153, 169, 187, 223, 239, 256, 271, 286, 304, 324, 339, 353. The false statements were material because they allowed Defendants to transform meritless or low-value claims into expensive settlement demands. And Uber plausibly alleges that Defendants knew or were recklessly indifferent to the fact that the medical and billing records in question were fraudulent. FAC ¶¶ 69, 94, 120, 129, 140, 152, 168, 186, 201, 222, 238, 255, 270, 285, 303, 323, 338, 352. Khounganian and the Law Firm Defendants knew that Khounganian's billing records and their stated amounts were false and misleading because they were aware of and parties to the secret side agreements to discount such bills in the event of a shortfall. *See, e.g.*, FAC ¶ 69.

Ninth Circuit and district court case law provide several examples of analogous situations that have fit within the sham exception. *Kearney*, for example, is directly on point. There, a landowner filed a civil RICO suit against a law firm that had represented a school district in eminent domain proceedings against her. 590 F.3d at 641. She alleged that the law firm concealed the results of an environmental percolation test that would have significantly increased the value of her land in the eminent domain proceeding. *Id.* at 646-47. The alleged predicate acts included that the law firm "suppressed the percolation test results, instructed CTE's engineers not

-19-    No. 2:25-cv-06612-SPG-PD

to prepare a formal report of those results, and repeatedly misrepresented during trial that [the school district] had not conducted percolation testing." *Id.* The conduct also involved false "discovery communications, interactions with expert witnesses and contractors, and statements to the court by [the school district's] agents pursuant to those proceedings." *Id.* at 645. The Ninth Circuit found that the plaintiff had properly pled that the scheme fit into the third type of sham litigation exception, because the complaint "alleged intentional misrepresentations to the court, and fraud upon the court through the suppression of evidence, that ultimately led to her property being valued lower than it should have been." *Id.* at 646-47. The court went on to note that even if the plaintiff "could have done more to discover the test results, the sufficiency of Kearney's efforts is a question of fact not properly dealt with at the pleading stage, and does nothing to negate allegations of Defendants' misrepresentations to the court and jury on the central issue in the litigation." *Id.* at 648.

The Ninth Circuit's analysis in *Kearney* should guide this Court's decision on the sham litigation exception. Just as in *Kearney*, the First Amended Complaint alleges that the Law Firm Defendants intentionally suppressed evidence of the true nature of their clients' injuries and medical bills. FAC ¶¶ 28-38. In *Kearney*, such suppression occurred through direction to the engineers who conducted the percolation test; here, the suppression occurred through the side agreements with Khounganian. FAC ¶¶ 34-36. And in *Kearney*, the law firm then intentionally misled the court about the existence of the percolation test, leading to a settlement at a "lower amount than they would have in the absence of the fraud." 590 F.3d at 647. Here, the Law Firm Defendants intentionally misled the courts regarding the scope and degree of their clients' injuries and the resulting medical bills, and were able to obtain higher settlements. FAC ¶¶ 28-36. Both cases involve "misconduct" that is "precisely the sort the sham exception was created to address." *Kearney*, 590 F.3d at 646. Moreover, as in *Kearney*, Uber's "complaint includes the required specifics with extensive

factual descriptions" regarding the nature of the misrepresentations, who made them, and when. *Id.* at 647.

*Kearney* and *Sosa* also discussed how the Ninth Circuit's decision in *Living Designs* involved conduct that "quite clearly fell within the third prong of *Kottle*'s sham litigation exception, in that it amounted to a 'knowing fraud . . . upon the court depriv[ing] the litigation of its legitimacy.'" *Sosa*, 437 F.3d at 940 (citation modified). In *Living Designs*, a chemical company induced product-liability plaintiffs to settle claims related to a fungicide at lower amounts in part by concealing damaging test results, and the Ninth Circuit allowed the plaintiffs' civil RICO suit to proceed. 431 F.3d at 357, 361-69. *Sosa* specifically cited *Living Designs* as an example of "a RICO suit predicated on fraudulent discovery conduct in prior litigation that induced the plaintiffs to settle the suit for a lower amount than they would have in the absence of the fraud." *Sosa*, 437 F.3d at 940. Just as "Kearney's allegations are very similar to those described by the *Sosa* court in *Living Designs*" and thus "fall within the third prong of the sham litigation exception," *Kearney*, 590 F.3d at 647, so too here Uber alleges fraudulent litigation conduct designed to mislead the court and extract an inflated settlement.

District courts in the Ninth Circuit have repeatedly applied *Kearney* in rejecting *Noerr-Pennington* challenges to civil RICO suits similar to Uber's here:

- In *Moore*, the court found that the sham exception applied because the plaintiff knowingly "lied to the court regarding his disability," which was material to his ADA claim. 2016 WL 2764768, at *8; *see also id.* at *9 (sustaining RICO counterclaim against plaintiff's brother and attorney, who "directed his employees to make misrepresentations to the court in the filing of more than 250 ADA lawsuits" on the plaintiff's behalf).

- In *Natural Immunogenics Corp. v. Newport Trial Group*, 2016 WL 11520711 (C.D. Cal. Aug. 1, 2016), a supplements manufacturer filed a civil RICO claim against a law firm, alleging that a prior consumer class

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

action was fraudulent because the firm had bribed the lead plaintiff, who had never purchased the product. *Id.* at \*1. Judge Selna denied a motion to dismiss on *Noerr-Pennington* grounds, finding that the lawsuit alleged that the firm made intentional misrepresentations in pleadings and "filed these fraudulent lawsuits with the improper purpose to extract out-of-court settlement from the corporate defendants in these lawsuits." *Id.* at \*5.

- In *Experian Information Solutions, Inc. v. Stein Saks, PLLC*, 2024 WL 5261159 (C.D. Cal. Nov. 19, 2024), the court considered a civil RICO complaint against law firms accused of manufacturing fraudulent Fair Credit Reporting Act lawsuits. *Id.* at \*1. The underlying predicate acts involved fabrication of evidence of credit denials in order to circumvent standing requirements in FCRA lawsuits against Experian. *Id.* at \*5. The Court found that Experian had adequately pleaded all three versions of the sham exception, because they "knowingly and intentionally caused" misrepresentations to be made in at least one case "in order to fraudulently induce Experian to pay money to settle the case." *Id.*

As these cases illustrate, courts routinely invoke the sham exception to allow for lawsuits—particularly civil RICO suits—premised on fraudulent litigation conduct that taints proceedings, including by (as here) prompting a party to settle on less favorable terms than it would have absent the fraud. At the motion-to-dismiss stage, these allegations suffice to defeat Defendants' *Noerr-Pennington* defense. *See Kearney*, 590 F.3d at 647.

### 2. Defendants' arguments regarding the sham exception are unpersuasive

Defendants almost entirely ignore the third "sham litigation" exception—their "knowing fraud" in the personal-injury lawsuits. And their arguments regarding the first two exceptions, *see* ECF 96 at 18-19; ECF 93 at 3 n.1; ECF 94 at 35-38, are wholly irrelevant to Uber's arguments here, *see supra* p. 18 n.4.

Only Khounganian even addresses the third sham exception circumstance, in one short paragraph. *See* ECF 96 at 37-38. But his arguments fail to grapple with the extensive Ninth Circuit and district court case law discussed above. Khounganian contends that Uber "has not alleged that Defendants made any in-court misrepresentations that deprived the underlying proceedings of their legitimacy." *Id.* at 37. But he cites no case law supporting his apparent theory that this sham-exception circumstance is limited to in-court misrepresentations, which is foreclosed by both *Kearney* and *Living Designs*: they allowed civil RICO suits to proceed, notwithstanding *Noerr-Pennington*, because there was "'fraudulent discovery conduct in prior litigation that induced the plaintiffs to settle the suit for a lower amount than they would have in the absence of the fraud.'" *Kearney*, 590 F.3d at 647 (quoting *Sosa*, 437 F.3d at 940). The situation here, as alleged by Uber, is directly analogous. Nor would it make any sense to limit the sham exception to in-court misrepresentations: where a party has "engaged deliberately in deceptive practices" in discovery or in anticipation of litigation, that certainly has the potential to "undermine the integrity of judicial proceedings," warranting sanction as severe as dismissal of a lawsuit. *Anheuser-Busch, Inc. v. Nat. Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995).

Nor does the district court's analysis in *Ford Motor* provide a basis for rejecting the sham exception here. *See* 2025 WL 3306280 (order dismissing first amended complaint); 2026 WL 691879 (order dismissing second amended complaint). There, in the context of an alleged fraudulent scheme to submit inflated attorney fee petitions in "Lemon Law" cases, the court reasoned that the sham exception did not apply because the alleged conduct did not "deprive[] the entire litigation or the fee petition proceedings of their legitimacy." 2025 WL 3306280, at *11; *see also* 2026 WL 691879, at *11. But as the Emrani Defendants acknowledge, attorney fee litigation is "collateral to the main action," ECF 96 at 16, and that consideration was central to Judge Court's reasoning. She explained that the alleged

-23-    No. 2:25-cv-06612-SPG-PD
PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

inflated billing statements did not deprive the underlying Lemon Law cases of their legitimacy, and Ford did not "deny that [defendants] performed substantial legal services" and were "entitled to substantial fee awards." *Ford Motor*, 2025 WL 3306280, at *10. Rather, the nature of the fraud was to "claim[] a few extra hundred in fees here and a few extra thousand in fees there." *Id.* at *11; *see also* 2026 WL 691879, at *11 (noting that even absent the alleged fraud, "the outcome—granting the vast majority of Defendants' fee requests—would remain the same"). Those facts are not analogous to the situation here, where Uber alleges that Defendants' fraudulent medical and billing records infected all aspects of the litigation and caused Uber to incur litigation expense in defending against lawsuits that would never have been brought but for the fraud. *See, e.g.*, FAC ¶¶ 72-74, 240-241, 288-290.[5]

## II. Claim Preclusion from Prior Settlements in Personal-Injury Lawsuits Does Not Bar Uber's RICO Action Here

Defendants contend that the doctrine of claim preclusion (also known as res judicata) bars Uber's lawsuit because Uber should have prosecuted its claims against Defendants in state-court lawsuits in which Defendants were not even parties. ECF 94 at 3-13; ECF 96 at 19-23. The implication of that argument, as Defendants acknowledge, is that Uber somehow was required to litigate its federal RICO claim— which challenges Defendants' *pattern* of unlawful activity across many different cases—by adding lawyers and witnesses as third-party defendants in individual personal injury actions. That would have been wildly impractical for any number of

---

[5] Separately, to the extent *Ford Motor* suggests that the third prong of the sham exception applies only where the fraudulent conduct "deprived the entire proceeding of its legitimacy," 2026 WL 691879, at *12 (citation modified), that view is at odds with Ninth Circuit precedent, which rejects the theory that "a litigant should have immunity for any and all discovery abuses so long as his lawsuit has some merit," *Theofel v. Farey-Jones*, 359 F.3d 1066, 1079 (9th Cir. 2004). *Noerr-Pennington* is thus "no bar" to imposing liability for "discovery conduct" even if the entire litigation is not rendered illegitimate. *Id.*

PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

reasons, and unsurprisingly, principles of claim preclusion do not require such a strange outcome.

Because Defendants seek to invoke the preclusive effect of prior state court judgments, California (rather than federal) preclusion law applies here. *See Marrese v. Am. Acad. of Orthopaedic Surgeons,* 470 U.S. 373, 380 (1985).[6] Under California law, "claim preclusion arises if a second suit involves: (1) the same cause of action (2) between the same parties (3) after a final judgment on the merits in the first suit." *DKN Holdings LLC v. Faerber*, 61 Cal. 4th 813, 824 (2015). "A party who asserts claim . . . preclusion as a bar to further litigation bears the burden of proving that the requirements of the doctrine are satisfied." *Hong Sang Mkt., Inc. v. Peng*, 20 Cal. App. 5th 474, 489 (2018). Defendants cannot satisfy either of the first two elements: neither the parties nor the causes of action are the same here as they were in the state court personal-injury lawsuits Defendants cite.

**A.   This Case Does Not Involve the Same Parties as the Personal-Injury Actions**

While Uber is a party both here and in the prior personal-injury lawsuits, Defendants are not. The parties adverse to Uber in those lawsuits were individual claimants, not Defendants. While claim preclusion applies to both "the same parties [and] those in privity with them," *DKN Holdings LLC*, 61 Cal. 4th at 825, that has no bearing on Khounganian and Valley Orthopedic, who do not advance any preclusion argument.[7] And the Law Firm Defendants that represented the claimants in those prior cases are not in privity with the claimants for purposes of claim preclusion.

---

[6] The Emrani Defendants' claim preclusion argument cites only federal preclusion law, ECF 87 at 22-24, which is inapposite here. DTLA correctly recognizes that California law applies. *See* ECF 94 at 4-5.

[7] Khounganian and Valley Orthopedic do seek to "incorporate … by reference" the "arguments raised in the other Defendants' motions to dismiss," ECF 96 at 38, but they offer no explanation regarding how they could possibly be in privity with the personal-injury claimants in the prior cases.

-25-   No. 2:25-cv-06612-SPG-PD

PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

"The loose term 'privity' refers to some relationship or connection with the party that makes it proper to hold 'privies' bound with the actual parties.'" *Grande v. Eisenhower Med. Ctr.*, 13 Cal. 5th 313, 323 (2022) (quoting 7 Witkin, *California Procedure Judgment* § 456 (5th ed. 2008)). But in the context of claim preclusion in particular, there is a specific requirement that Defendants fail to satisfy: the "rule of mutuality." *Id.* at 324. That requirement "restricts the set of litigants who can benefit from a prior judgment to those who could have had the judgment used against them." *Id.*; *see also* 7 Witkin, *California Procedure Judgment* § 491 (6th ed. 2025). That rule exists for good reason: "[a]llowing nonmutual claim preclusion would … exert pressure akin to a mandatory joinder rule," requiring a party to either "join the nonparties in the initial action or lose its claims against them." *Grande*, 13 Cal. 5th at 324.

Here, it would have required Uber to seek to join Khounganian and the Law Firm Defendants as third party defendants in personal-injury cases—even though Uber was not aware of the fraud at the time it was being perpetrated. It strains credulity to think that Defendants would have viewed that as an appropriate course of action. Indeed, with respect to the Law Firm Defendants, it is doubtful whether that kind of third-party claim would have been allowed in the first place. *See Rowell v. Transpacific Life Ins. Co.*, 94 Cal. App. 3d 818, 821 (1979) (rejecting cross-complaint against plaintiff's counsel because "reasons of policy preclude a lawyer's liability by way of cross-complaint" given the potential for a conflict of interest).

Under the rule of mutuality, a nonparty to the initial action may assert claim preclusion only where the nonparty *would have been bound by* an adverse judgment in the initial action. This requirement may be satisfied, for instance, where "after rendition of the judgment," the nonparty "acquired an interest in the subject matter affected by the judgment through or under one of the parties, as by inheritance, succession, or purchase." *Patel v. Crown Diamonds, Inc.*, 247 Cal. App. 4th 29, 37-38 (2016); *see, e.g., Burke v. Benworth Cap. Partners, LLC*, 2026 WL 194390, at *4

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

(Cal. Ct. App. Jan. 26, 2026) (unpublished) (finding privity where a party to the first action formally assigned its claims to a party asserting preclusion in a later action). Or the requirement may be satisfied where principles of vicarious liability would have bound the nonparty—such as when employees are a party in one case and the entity employing then is a party in a second case, *see Woods v. Slayton*, 2023 WL 5835429, at \*3 (C.D. Cal. Aug. 16, 2023), *report and recommendation adopted*, 2023 WL 5833853 (C.D. Cal. Sept. 8, 2023).

Khounganian obviously is not in privity with the claimants in the personal-injury cases; he does not argue otherwise or advance any claim preclusion argument. As to the Law Firm Defendants, numerous courts in California and elsewhere have concluded that "the existence of an attorney-client relationship does not establish privity between the attorney and client" for purposes of preclusion. *Kerner v. Superior Court*, 206 Cal. App. 4th 84, 126 (2012).[8] That is because "an attorney for a party is not the party and does not share the party's legal rights and interests. Although an attorney may control the litigation to a significant degree, the attorney does so on behalf of the client rather than in service of the attorney's own interests."

---

[8] *See also, e.g.*, *Rucker v. Schmidt*, 794 N.W.2d 114, 119 (Minn. 2011) ("Something more than the common objective of attorney and client in obtaining an outcome favorable to the client is necessary to establish privity. That something more—here, a mutuality of legal interest in the outcome of the dissolution action—is missing in this case."); *Bell v. Weinstock, Friedman & Friedman, P.A.*, 285 A.3d 505, 511 (D.C. 2022) ("Although attorneys may act as agents of their clients when they act in their role as counsel, the required mutuality of interests will not exist in every circumstance. It is not sufficient that the actions taken by an attorney in a prior case were on behalf of a client or within the scope of their agency."); *Lane v. Bayview Loan Servicing, LLC*, 831 S.E.2d 709, 715 (Va. 2019) ("[A]n attorney does not share the same legal interest as his or her client merely by virtue of his or her representation of that client."); *Branning v. Morgan Guar. Tr. Co. of N.Y.*, 739 F. Supp. 1056, 1063-64 (D.S.C. 1990) ("[t]he agency relationship between Morgan and its attorneys is not sufficient, standing alone, to establish privity" because "there is no evidence that [the] attorneys … have any mutual or successive relationship in the same rights of property"); *Cont'l Sav. Ass'n v. Collins*, 814 S.W.2d 829, 832 (Tex. App. 1991).

PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

*Id.* And the requirement of mutuality generally will not be satisfied, because "the circumstances" will rarely "support a finding of privity to invoke preclusion against" the attorney based on the first lawsuit in which he or she was not a party. *Id.* at 127 (quoting 18A *Wright & Miller's Federal Practice & Procedure* § 4464.1, at 716-17 (2d. ed. 2002)). As one court asked rhetorically, does an attorney asserting privity with a former client "accept responsibility for [a] money judgment rendered against his client in the prior suit? It hardly seems likely." *Cont'l Sav. Ass'n v. Collins*, 814 S.W.2d 829, 832 (Tex. App. 1991).

Defendants do not claim they satisfy the rule of mutuality, nor could they: there is no possibility that the personal-injury cases brought by their claimants "would have bound [Defendants], had they been decided differently." *Grande*, 13 Cal. 5th at 324. Defendants instead cite a litany of inapposite, mostly unpublished, out-of-jurisdiction cases. None of these cases applies anything resembling the mutuality requirement that governs claim preclusion under California law. Rather, these cases consider whether an attorney-client relationship establishes privity in the context of claim or issue preclusion under *federal law*,[9] in the context of claim preclusion under *other states' laws*,[10] and in the context of *issue preclusion* under California law,[11] where

---

[9] ECF 94 at 11 n.6 (citing *In re: Wansdown Props. Corp. N.V. v. 29 Beekman Corp.*, 2023 WL 2751288, at *2 (Bankr. S.D.N.Y. Mar. 31, 2023); *Oyekwe v. Rsch. Now Grp., Inc.*, 542 F. Supp. 3d 496, 507 (N.D. Tex. 2021); *Agha-Khan v. United States*, 2015 WL 5734380, at *5 (E.D. Cal. Sept. 29, 2015; *In re Rickert*, 2020 WL 7043609, at *4 (B.A.P. 9th Cir. Dec. 1, 2020); *In re JNC Cos.*, 1993 WL 239304 (9th Cir. June 30, 1993) (unpublished)).

[10] ECF 94 at 11 (citing *McCann v. Taleff*, 2019 WL 2406336, at *5 (D. Mont. Apr. 24, 2019); *Pincus v. L. Offs. of Erskine & Fleisher*, 2010 WL 286790, at *1 (S.D. Fla. Jan. 19, 2010)).

[11] ECF 94 at 11 (citing *People v. Sims*, 32 Cal. 3d 468, 487 (1982); *People v. Garcia*, 39 Cal. 4th 1070, 1078 (2006); *Zapata v. Dep't of Motor Vehicles*, 2 Cal. App. 4th 108, 112 (1991); *Jae Jeong Lyu v. Hight*, 2020 WL 1052583, at *5 (C.D. Cal. Jan. 29, 2020), *report and recommendation adopted*, 2020 WL 1043437 (C.D. Cal. Mar. 4, 2020); *Riley v. Giguiere*, 631 F. Supp. 2d 1295, 1306 (E.D. Cal. 2009)).

PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

the rule of mutuality no longer applies, *see Grande*, 13 Cal. 5th at 324. Several of these cases reflect "courts [finding] that an attorney-client relationship created privity with little to no analysis of the mutuality of legal interests," *Bell*, 285 A.3d at 510—exactly the kind of "bogus privity" that California law rejects, *Kerner*, 206 Cal. App. 4th at 127 (citation modified). These cases do not help Defendants satisfy the requirement that a party asserting *claim preclusion* under *California law* must satisfy the rule of mutuality.

For example, DTLA repeatedly cites the Ninth Circuit's unpublished decision in *Kearney v. Foley & Lardner, LLP*, 747 F. App'x 478 (9th Cir. 2018) (*Kearney II*). *See* ECF 94 at 4, 8, 10-12. They wrongly assert that the case involved "res judicata," i.e., claim preclusion, *id.* at 12, but in reality the case involved "collateral estoppel (also known as 'issue preclusion')." *Kearney II*, 747 F. App'x at 480. As just discussed, under California law, the rule of mutuality does not apply to issue preclusion, but it *does* apply to claim preclusion. *Grande*, 13 Cal. 5th at 324. But Defendants do not raise any issue preclusion argument here—nor could they, given that the cases were resolved by settlement. Without any analysis regarding mutuality, *Kearney II* is of no relevance in the context of Defendants' claim preclusion defense.

Another case DTLA cites (ECF 94 at 11 n.6), *Weinberger v. Tucker*, 510 F.3d 486 (4th Cir. 2007), illustrates the kind of fact pattern needed to satisfy mutuality in the context of an attorney-client relationship—precisely what is lacking here. The court emphasized (contrary to Defendants' view) that "[w]e do not hold … that privity exists with respect to every attorney-client interaction," *id.* at 493, but only when the rule of mutuality is satisfied, *id.* at 491. Applying Virginia law, the court determined that it was, but only under the particular circumstances of the case. The plaintiff, Weinberger, sued his former lawyer, Tucker, for professional negligence, fraud, and breach of fiduciary duty because Tucker concurrently represented Volftsun, a party adverse to Weinberger in an earlier case. *Id.* at 489-91. Tucker argued that the professional negligence action against him was precluded by the

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

earlier case between Weinberger and Volftsun. *Id.* at 491. In that earlier case, Tucker represented Voltsfun, and Weinberger moved to disqualify Tucker from that representation due to a conflict of interest. *Id.* at 490. The court in the first case denied Weinberger's motion to disqualify, and the case proceeded to a final judgment. *Id.* The Fourth Circuit concluded that mutuality was satisfied because "if [Weinberger] had prevailed on the motion to disqualify [Tucker's firm] or in its fraudulent inducement affirmative defense, Tucker would have been bound by the ruling with respect to liability in a subsequent legal malpractice action." *Id.* at 496. The contrast between *Weinberger* (in which an adverse ruling in the first case would have *directly bound* the attorney in the successive case) and the instant case (in which an adverse ruling in the personal injury actions would have had no bearing on Defendants) confirms that there is no mutuality, and therefore no privity, here.

### B. This Case Does Not Involve the Same Cause of Action as the Personal-Injury Actions

Nor can Defendants satisfy the requirement that the prior litigation involve "the same cause of action" as the subsequent litigation. *DKN Holdings*, 61 Cal. 4th at 824. To determine what constitutes the same cause of action, California courts employ the "primary rights" theory, which instructs that a "cause of action is comprised of a primary right of the plaintiff, a corresponding primary duty of the defendant, and a wrongful act by the defendant constituting a breach of that duty." *Maldonado v. Harris*, 370 F.3d 945, 952 (9th Cir. 2004) (quoting *Mycogen Corp. v. Monsanto Co.*, 28 Cal. 4th 888, 904 (2002)). Here, Defendants' claim preclusion argument fails because the primary rights in the two cases are different: Uber's RICO action against Defendants seeks to vindicate its right to operate its business without being the target of a pattern of fraud, whereas the claimants' personal injury actions involve their right to be free from bodily injury in the context of the automobile accidents. And the legal theories and evidence at issue in the cases are miles apart.

PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Importantly, the fact that two causes of action may be factually linked to each other does *not* mean that they involve the same primary right under California preclusion law. "The same primary right may be broken by many kinds of wrong-doing; and the same wrongful act or default may invade many different rights." *Branson v. Sun-Diamond Growers*, 24 Cal. App. 4th 327, 341 (1994) (citation modified). As such, "even though two suits involve the same nucleus of facts, they do not necessarily raise the same cause of action under California law." *Maldonado*, 370 F.3d at 953 (citing *Branson*, 24 Cal. App. 4th at 340 n.6).

The primary right involved in the personal-injury claimants' lawsuits against Uber is easy to identify: a "plaintiff's right to be free from injury to her person." *Slater v. Blackwood*, 15 Cal. 3d 791, 795 (1975). Like the claimants' lawsuits against Uber, *Slater* involved a plaintiff who was "injured in an automobile accident," *id.* at 794, and the California Supreme Court explained that for preclusion purposes, "there is but one cause of action for one personal injury which is incurred by reason of one wrongful act," *id.* at 795 (citation modified); *see also, e.g.*, *Burdette v. Carrier Corp.*, 158 Cal. App. 4th 1668, 1687 (2008) ("There is in such a case a single cause of action, based upon the primary right of the plaintiff to be free from injury to his person or property and a violation by the defendant of that right through his failure to use proper care.").

Needless to say, that is *not* the primary right Uber seeks to vindicate in this civil RICO action. The primary right at issue here is the right "to be free of economic injury" to Uber's business and property interests caused by Defendants' fraudulent conduct. *Allied Fire Prot. v. Diede Constr., Inc.*, 127 Cal. App. 4th 150, 153 (2005); *see also, e.g.*, *Monterey Plaza Hotel Ltd. P'ship v. Loc. 483 of the Hotel Emps. & Rest. Emps. Union*, 215 F.3d 923, 928 (9th Cir. 2000) (primary right at issue in civil RICO claim was "the protection of the Hotel's business"). And California courts have repeatedly emphasized that for preclusion purposes, "personal physical and emotional injuries differ from … economic injuries." *Bullock v. Philip Morris USA*,

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

*Inc.*, 198 Cal. App. 4th 543, 557 (2011); *see also, e.g.*, *Grisham v. Philip Morris U.S.A., Inc.*, 40 Cal. 4th 623, 643 (2007) ("Here, what is alleged are two different types of injury, one serious physical injury or injuries, the other an economic injury, giving rise to two different types of action."); *Lilienthal & Fowler v. Superior Court*, 12 Cal. App. 4th 1848, 1853 (1993) ("injury to person" and "injury to property" involve different primary rights).

In addition, the "substantially different proof" between the claimants' personal-injury cases and Uber's civil RICO action confirms that the causes of action are not identical. *Nakash v. Superior Court*, 196 Cal. App. 3d 59, 70 (1987); *see also, e.g.*, *Sawyer v. First City Fin. Corp.*, 124 Cal. App. 3d 390, 402-03 (1981) (no identity of claims where "no evidence was presented" in the first case regarding the theories at issue in the second case); *Tax Relief, Inc. v. Selb*, 2021 WL 8919077, at *6 (C.D. Cal. June 7, 2021) (rejecting claim preclusion defense in civil RICO action where allegations at issue in the first case differed from those in the second case). Here, Uber's RICO cause of action against Defendants will require evidence of the existence of an enterprise, a pattern of racketeering activities, and resulting injury to Uber's business, among other issues. *See infra* at 40-71. It will also focus on the relationship between the law firm Defendants and Khounganian across many different cases. No evidence was presented regarding any of those issues in the personal-injury claimants' state court lawsuits, each of which was focused narrowly on the individual automobile accident being litigated in each case. It would have been highly impractical if not impossible for Uber to join all Defendants—including counsel for the claimants in the underlying state court cases—and litigate its RICO claims, involving very different evidence, in the context of multiple, diffuse personal-injury actions.

Indeed, given the timing of the cases, it is doubtful whether it would have even been possible to do so. Claim preclusion does not apply "if the matter could *not* have been raised or litigated in the earlier action." *Hong Sang Mkt.*, 20 Cal. App. 5th at

491; *see also, e.g.*, *Allied Fire Prot.*, 127 Cal. App. 4th at 156 ("[W]here it cannot be said that plaintiff knew or should have known of the claim when the first action was filed, res judicata should not bar the second action."). Here, Defendants' pattern of unlawful activity was not known to Uber when the individual personal-injury actions were litigated; it became apparent only over time. Indeed, that is inherent in the very nature of civil RICO actions. *See State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 80 (2d Cir. 2024) (RICO insurance fraud scheme was "not readily apparent when viewed on an individual claim-by-claim basis"). RICO requires plaintiffs to establish "a pattern of racketeering activity," which entails a showing both "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). They often involve—as this one does—"a series of related predicates extending over a substantial period of time." *Id.* at 242. As the party advancing a res judicata argument, Defendants bear the burden of establishing that Uber *could have* brought its civil RICO claim in the prior state court personal-injury actions, and they have failed to carry that burden.

Defendants' principal counterargument is that the primary right at issue in this civil RICO action is "the right to compensation for physical injuries caused by Uber," because Uber is arguing "that the injuries alleged" in the prior state court actions "were non-existent or exaggerated." ECF 94 at 7. That argument misunderstands both the nature of Uber's claims and the governing law. While it is true that Uber contends that many of the alleged injuries were nonexistent or exaggerated, that is not the *primary right* Uber seeks to vindicate here; rather, it is merely one component of Uber's claims. As discussed above, the primary right at issue in this civil RICO action is Uber's right to be free in its business from a pattern of concerted, fraudulent activity by Defendants.

Both the Ninth Circuit and California courts have rejected arguments analogous to the one Defendants make—i.e., that claim preclusion bars a subsequent

PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

action merely because there is some factual or legal overlap between the two cases. For example, in *Maldonado*, plaintiff Maldonado sued the California Department of Transportation (Caltrans) in federal district court, alleging that its prohibition on Maldonado's off-premises advertising violated the First Amendment. 370 F.3d at 948-49. Caltrans moved to dismiss on claim preclusion grounds, arguing that Maldonado's federal case was precluded by a state court judgment in a nuisance action it brought against Maldonado for the same off-premises advertising. *Id.* The Ninth Circuit rejected that argument, reasoning that the primary right at issue in Maldonado's suit was his "right to advertise freely on his property," while the primary right at issue in the prior action was "the right of the people of California to be free from obtrusive advertising displays along major highways." *Id.* at 952; *see also, e.g.*, *Morris v. Blank*, 94 Cal. App. 4th 823, 831-32 (2001) (rejecting claim preclusion argument where two parties involved in a car accident each filed separate lawsuits asserting that the other was negligent).

The case law Defendants cite (ECF 94 at 8-10) does not support their view that claim preclusion applies here. For instance, in *Monterey Plaza Hotel*, a hotel's civil RICO suit against a union was barred by claim preclusion because the hotel had filed and litigated an earlier state court suit against the union stemming from "mass picketing" and alleged defamation. 215 F.3d at 927. Both suits, the court of appeals explained, involved the same primary rights: "the protection of the Hotel's business and its right to be free from the Union's disruptive activities." *Id.* at 928. Here, as just discussed, the earlier state court personal-injury lawsuits did *not* involve Uber's right to operate its business free from Defendants' fraud.

Defendants also cite *Kearney II* at length, but as noted above (*supra* p. 29), that case did not involve claim preclusion, only issue preclusion. 747 F. App'x at 480. The causes of action need not be the same for issue preclusion to apply, so the court did not discuss the primary rights doctrine at all. *See id.* Nor did the Ninth Circuit discuss primary rights in *Burgess v. Peebles*, 1991 WL 109241 (9th Cir. June

20, 1991) (unpublished). The court's cursory analysis of California preclusion law in that unpublished memorandum disposition, *see id.* at *1, sheds little light on the issues here. Moreover, in both *Kearney II* and *Burgess*, the court of appeals concluded that the plaintiff could have, but did not, "diligently pursue" its arguments and claims in prior state court litigation. *Kearney II*, 747 F. App'x at 481; *see Burgess*, 1991 WL 109241, at *1 ("[T]he Burgesses could easily have asserted their present claim in the state court action[.]"). Here, Uber could not plausibly have litigated its RICO claims against Defendants in the context of individual personal-injury lawsuits. *See supra* pp. 32-33. And the civil RICO claims at issue in *Kearney* and *Burgess* included nothing like Uber's extensive, detailed allegations regarding Defendants' sprawling pattern of fraud across eighteen cases.[12]

## III.   California's Compulsory Counterclaim Rule Does Not Apply

As Defendants acknowledge, California's "statutory compulsory counterclaim rule" is "narrower" than the related doctrine of claim preclusion. ECF 94 at 13. Because Defendants' claim preclusion defense fails, it necessarily follows that their argument regarding the compulsory counterclaim rule fails as well. Regardless, the argument suffers from multiple fatal defects.

"Except as between plaintiffs and defendants, there is no compulsory cross-complaint in California procedure. Rather, a cross-complaint is permissive as between co-parties and between parties and nonparties." *Banerian v. O'Malley*, 42

---

[12] Defendants' other authorities, *see* ECF 94 at 9-10, are even further afield. *Pedrina v. Chun*, 97 F.3d 1296 (9th Cir. 1996), involved Hawaii law, not California law, and did not discuss the primary rights doctrine at all. *Id.* at 1301. *Rechanik v. Microsoft Corp.*, 2009 WL 721005 (N.D. Ill. Mar. 17, 2009) is an out-of-circuit, unpublished district court case that involved federal claim preclusion law, not California law or the primary rights doctrine. *Id.* at *2, *4. And the plaintiff's RICO suit there amounted to little more than an attempt to "nullify rights won by Microsoft" in a prior proceeding. *Id.* at *4. Here, Uber is not seeking to nullify or invalidate the prior state court settlements; rather, it is seeking to hold Defendants—who were not parties in those cases—liable for their fraudulent racketeering activities.

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

Cal. App. 3d 604, 612 (1974) (citation modified). This result is compelled by the statutory text, which provides that "if a party against whom a complaint has been filed and served fails to allege in a cross-complaint any related cause of action which (at the time of serving his answer to the complaint) he has *against the plaintiff*, such party may not thereafter in any other action assert *against the plaintiff* the related cause of action not pleaded." Cal. Civ. Proc. Code § 426.30(a) (emphases added). Defendants here were not "the plaintiff" in the prior state-court actions. As the Ninth Circuit explained in *Maldonado*, under California law, cross-claims against parties other than the original plaintiff in the first action are "permissive" rather than mandatory, so under the "plain language" of Section 426.30(a), the compulsory counterclaim rule does not apply. 370 F.3d at 951-52 (citing Cal. Civ. Proc. Code § 428.10(b)). And it is especially untenable to suggest that Uber should have filed a cross-complaint against the law firm Defendants in the very cases in which they were representing personal-injury claimants. *See Rowell*, 94 Cal. App. 3d at 821 (rejecting such a claim for public policy reasons).

It is thus unsurprising that Defendants cannot cite a single California case in which the compulsory counterclaim rule set forth in Section 426.30(a) has been applied to bar a subsequent action against a nonparty in the first action. They cite several federal cases addressing Federal Rule of Civil Procedure 13, but those cases do not involve California law. And even on their own terms, those decisions are inapposite: they involve situations in which the party to the subsequent action was in true privity with the party in the first action, in the sense of having a formal legal interest in the judgment in the initial action.[13]

---

[13] *See Transamerica Occidental Life Ins. Co. v. Aviation Off. of Am., Inc.*, 292 F.3d 384, 392 (3d Cir. 2002) (finding privity for the purposes of the compulsory counterclaim rule between parties to the first action and those parties' "successor in interest and assignee of all rights implicated by these actions"); *Palumbo Design, LLC v. 1169 Hillcrest, LLC*, 2020 WL 5498065, at *7 (C.D. Cal. July 14, 2020) (finding privity for compulsory counterclaim rule because of the "unity of ownership

Nor are the other elements of the compulsory counterclaim rule satisfied. Uber's civil RICO claim does not "arise[] out of the same transaction, occurrence, or series of transactions or occurrences" as the personal-injury claimants' lawsuits. Cal. Civ. Proc. Code § 426.10(c); *see id.* § 426.30(a). There is no "common nucleus of operative fact." *Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d 985, 987 (9th Cir. 2005); *see, e.g.*, *Castillo v. J.P. Morgan Chase Bank, N.A.*, 2020 WL 496072, at *4 (N.D. Cal. Jan. 30, 2020) (finding that counterclaims were not compulsory because "the counterclaims will require proof of different facts, involve different witnesses, and apply different law"). And the two sets of claims could not "conveniently be tried together." *Mpoyo*, 430 F.3d at 987. It would be unwieldy and impractical to litigate Uber's civil RICO claim in the context of individual personal-injury lawsuits.

## IV.    The *Rooker-Feldman* Doctrine Does Not Apply

DTLA invokes the *Rooker-Feldman* doctrine, ECF 94 at 19-24, but this case falls comfortably outside the "narrow ground" that doctrine occupies, *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). *Rooker-Feldman* is "confined to cases … brought by state-court losers complaining of injuries caused by state-court judgments rendered before the federal district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.*; *accord Skinner v. Switzer*, 562 U.S. 521, 532 (2011). The doctrine is one of "subject-matter jurisdiction," *Exxon Mobil*, 544 U.S. at 284, because federal district courts "are empowered to exercise original, not appellate, jurisdiction" and lack the authority "to review and reverse unfavorable state-court judgments," *id.* at 283. In contrast, *Rooker-Feldman* does not apply where a "federal plaintiff presents an

and interest between [the party to the successive suit] and [the party to the first suit] that any separateness has ceased to exist, and they conduct their business interchangeably"); *Banco Nacional de Cuba v. First Nat. City Bank of N.Y.*, 478 F.2d 191, 193 (2d Cir. 1973) (finding privity for compulsory counterclaim rule because "[t]here is no serious question that the Government of Cuba and [its national bank] are one and the same for the purposes of this litigation").

PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

independent claim," because "it is not an impediment to the exercise of federal jurisdiction that the 'same or a related question' was earlier aired between the parties in state court." *Skinner*, 562 U.S. at 532; *see also Bell v. City of Boise*, 709 F.3d 890, 897 (9th Cir. 2013) (doctrine applies only where federal district court action "contains a forbidden de facto appeal of a state court decision").

*Rooker-Feldman* has no relevance here because Uber does not contend that the personal-injury settlements were the product of legal error by the state court, nor is Uber asking this Court to have the settlements "declared null and void." *Exxon Mobil*, 544 U.S. at 283. Indeed, Uber is not seeking any relief with respect to the claimants in those underlying lawsuits. Rather, Uber alleges that Defendants are engaged in a pattern of fraudulent conduct that resulted in injury to Uber's business and property interests and seeks as damages the resulting injury caused by the underlying settlements. Such a remedy may be sought and awarded without disturbing the result achieved in the underlying state court lawsuit. The state court lawsuits and settlements are one important aspect of that claim—but Uber is seeking to hold Defendants liable *for their own fraud*, not to undo the settlements.

The Ninth Circuit's recent decision in *Miroth v. County of Trinity*, 136 F.4th 1141 (9th Cir. 2025), confirms that *Rooker-Feldman* does not apply in that scenario. The plaintiffs in *Miroth* filed a federal civil rights lawsuit against a county, alleging that county officials "made false and misleading statements to the state court that caused the court to terminate the Miroths' parental rights" over their minor children. *Id.* at 1151. The court of appeals reversed the district court's *Rooker-Feldman* dismissal, concluding that the doctrine does not bar actions in which "the federal plaintiff sues an adverse party from a state court proceeding and claims that the adverse party fraudulently procured the state court judgment." *Id.* at 1150 (citing *Kougasian v. TMSL, Inc.*, 359 F.3d 1136 (9th Cir. 2004), and *Benavidez v. County of San Diego*, 993 F.3d 1134 (9th Cir. 2021)); *see also id.* at 1149 ("Our caselaw has further narrowed the doctrine as applying only to suits alleging errors by the state

-38-          No. 2:25-cv-06612-SPG-PD

PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

courts in rendering judgment, as opposed to misconduct by litigants in obtaining such a judgment."). *Miroth* is on all fours here.

Defendants' arguments on *Rooker-Feldman* ignore *Exxon Mobil*, *Skinner*, and *Miroth*, and accordingly misstate the law. *See* ECF 94 at 19-23. They contend that Uber's civil RICO action is "inextricably intertwined" with the state court judgments, *id.* at 21-23, but this Court would only reach that "inextricably intertwined" analysis if it *first* concludes that Uber's lawsuit is "at least in part a forbidden de facto appeal of a state court judgment." *Cooper v. Ramos*, 704 F.3d 772, 781 (9th Cir. 2012); *see also id.* at 778 ("Our circuit has emphasized that only where there is already a forbidden de facto appeal in federal court does the 'inextricably intertwined' test come into play" (citation modified)).[14] It is not: Uber is not "complain[ing] of a legal wrong allegedly committed by the state court," nor is it "seek[ing] relief from the judgment of that court." *Id.* at 778. Instead, Uber is seeking to hold Defendants liable for their role in perpetrating the fraud that facilitated those settlements—but that is exactly the kind of "independent claim" that does not implicate *Rooker-Feldman*. *Skinner*, 562 U.S. at 532.[15]

---

[14] In any event, the "inextricably intertwined" test is not satisfied either, because none of the "relief requested" here would "reverse the state court decision or void its ruling." *Cooper*, 704 F.3d at 779. There was no state court decision; the cases were resolved pursuant to settlement, and again, Uber is not seeking to set aside those settlements or recoup funds from the claimants.

[15] That consideration distinguishes the other cases Defendants cite (ECF 94 at 22-23), where—by Defendants' own description—the plaintiffs were asking the federal district court to "consider the state court judgment a nullity," *id.* at 23, declare "that [the] state court judgment was wrong," *id.* at 22, or "reject[] [the] state court['s] legal conclusions," *id.*; *see also Mains v. Citibank, N.A.*, 852 F.3d 669, 676 (7th Cir. 2017) (cited at ECF 94 at 23) ("the only relief" a federal court "could give would be to vacate [the state court's] judgment … which is not permissible" under *Rooker-Feldman*). Uber is *not* seeking to void or disturb the state court settlements here.

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

## V.   Uber Has Properly Alleged a Civil RICO Cause of Action

To state a claim for relief under the civil RICO statute, 18 U.S.C. § 1962(c), Uber must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's 'business or property.'" *Living Designs*, 431 F.3d at 361; *see Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). The First Amended Complaint satisfies each of those elements. It alleges that Defendants engaged in a coordinated, years-long pattern of mail and wire fraud to file meritless and inflated personal-injury lawsuits against Uber, using fraudulent medical and business records to obtain larger settlements than they otherwise could have obtained. As the Supreme Court has explained, Congress enacted the civil RICO statute to create a "flexible" cause of action capable of reaching all manner of "pattern[s] of racketeering activity." *H.J. Inc.*, 492 U.S. at 238. Defendants' creative fraud scheme here fits the bill.

### A.   The Medical Practice, the Law Firms, and the Associations-in-Fact of Lawyers and Doctors are Each a RICO Enterprise

"[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "As is evident from the text, this definition is not very demanding." *Odom v. Microsoft Corp.*, 486 F.3d 541, 548 (9th Cir. 2007). "A single" corporation or "other legal entity" is "an enterprise under RICO." *Id.*

The First Amended Complaint alleges RICO claims arising from five enterprises: the Valley Orthopedic and Spine medical practice (Count 3), the DTLA and Emrani law firms (Counts 4 and 5), and associations-in-fact between and among

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

the DTLA and the Khounganian Defendants (Count 1) and the Emrani and the Khounganian Defendants (Count 2). Each meets the requirements of Section 1962(c).

### 1.    The Valley Orthopedic medical practice is a RICO enterprise

Valley Orthopedic and Spine Center is a California corporation. FAC ¶¶ 10, 18. As a corporation, it is a legal entity, an "enterprise under RICO." *Odom*, 486 F.3d at 548. The Khounganian Defendants assert—without any citation—that Valley Orthopedic "is wholly unrelated to [Khounganian's] medical practice," that "Dr. Khounganian operates as a sole practitioner," and that Valley Orthopedic does not have a "physical location." ECF 96 at 14 & n.1. Even if this Court were free to ignore the allegations of the First Amended Complaint on a motion to dismiss (which it is not), none of that is true. In 2013, Khounganian amended the articles of incorporation of his California corporation, Greg S. Khounganian, M.D., Inc., a professional medical corporation, to change the name to Valley Orthopedic and Spine Center.[16] A professional medical corporation is a species of corporation under California law (with attendant limited liability), as distinct from a sole proprietorship. Cal. Corp. Code §§ 13401, 13403; *see also Pasadena Hosp. Ass'n, Ltd. v. Superior Court*, 204 Cal. App. 3d 1031, 1036 (1988) (noting that "professional corporations are considered to be separate entities" and that essentially a professional medical corporation is an employer and the physician is "its sole employee"). Per the California Secretary of State, Valley Orthopedic has as its principal address at 5363 Balboa Boulevard #433 in Encino, California—the same address that Khounganian advertises on his website, gskspine.com. Valley Orthopedic is Khounganian's medical practice.

---

[16]    *See* California Secretary of State, Business Search, https://bizfileonline.sos.ca.gov/search/business. A search for "Valley Orthopedic and Spine Center," reveals that the change occurred on July 31, 2013.

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

Khounganian also argues (ECF 96 at 13) that Valley Orthopedic is not a distinct entity from Khounganian. But, where the alleged enterprise is a "legal entity," the "existence of that entity fulfill[s] the higher standard that 'the enterprise have an ascertainable structure apart from the racketeering activity,'" because "[l]egal entities are garden-variety 'enterprises' which generally pose no problem of separateness from the predicate acts." *United States v. Blinder*, 10 F.3d 1468, 1474 (9th Cir. 1993). The First Amended Complaint alleges that Khounganian used his medical practice, a separate corporate entity, as a tool to bill the Law Firm Defendants and obtain kickbacks. FAC ¶¶ 370-373. That is sufficient because Khounganian, "a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities." *Cedric Kushner Promotions*, 533 U.S. at 163. And only Khounganian (and not Valley Orthopedic) is a defendant in Count 3. Khounganian cites *Mohebbi v. Khazen*, 50 F. Supp. 3d 1234 (N.D. Cal. 2014), to argue that more detail about Valley Orthopedic is needed. ECF 94 at 14. But *Mohebbi* concerns the pleading of an association-in-fact enterprise. 50 F. Supp. 3d at 1253-54. It has no relevance here.

### 2.    The DTLA and Emrani Law Firms are RICO enterprises

The First Amended Complaint alleges that DTLA is a limited liability partnership and that the Emrani Firm is a professional corporation. FAC ¶¶ 19, 21. They are therefore RICO enterprises. *Odom*, 486 F.3d at 548.

Fradkin argues that a "law firm and an employee cannot be both the defendants and the enterprise." ECF 93 at 10. That is true, but inapplicable here: DTLA is not a defendant in Count 4. FAC ¶¶ 430-432. The First Amended Complaint alleges that Fradkin, a natural person, is conducting the affairs of DTLA through a pattern of racketeering activities. *Id.* Those were exactly the allegations that the Supreme Court held in *Cedric Kushner Promotions* sufficed to plead a RICO enterprise. 533 U.S. at 160 ("Petitioner sued Don King, the president and sole shareholder of Don King Productions, a corporation, claiming that King had conducted the boxing-related

-42-    No. 2:25-cv-06612-SPG-PD
PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

affairs of Don King Productions in part through a RICO 'pattern[.]'"); *see also Moran v. Bromma*, 675 F. App'x 641, 645 (9th Cir. 2017) ("[A] corporate officer is sufficiently distinct from the corporation for which he works such that a plaintiff can allege the officer as the RICO person and the corporation as the RICO enterprise.").[17]

The Emrani Firm similarly relies on association-in-fact cases to argue that Uber failed to plead that Jacob Emrani and the Emrani Firm operated with a "common purpose." ECF 87 at 43-44.[18] But common purpose is not required to plead a legal entity as an enterprise. *Odom*, 486 F.3d at 548; *Kearney v. Foley & Lardner*, 2011 WL 3172787, at *3 (S.D. Cal. July 27, 2011) ("[A]n enterprise may be a legal entity, such as a corporation, *or* may be a group of persons associated together for a common purpose of engaging in a course of conduct." (emphasis added) (citation modified)); *In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 467 F. Supp. 2d 1071, 1082 (S.D. Cal. 2006) ("Defendants are alleged to be corporations, which can satisfy the enterprise element's requirement of a separate structure so long as the corporations … were involved in the RICO activity and had legal existences separate from their participation in the racketeering."). In any event, the First Amended Complaint clearly alleges that Emrani was directing the conduct of his law firm with the purpose of engaging in racketeering conduct. FAC ¶ 378.

---

[17] DTLA also cites (ECF 93 at 10) *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115 (2d Cir. 2013), another association-in-fact case that has no relevance here. *Id.* at 120-21.

[18] Emrani mischaracterizes *Bai v. CMB Export Infrastructure Inv. Grp. 48, LP*, 2025 WL 959099 (E.D. Cal. Mar. 31, 2025), *see* ECF 87 at 44, which does not describe pleading requirements for a "RICO claim," generally, but rather—in language he omits from his partial quotation—for establishing "the existence of a common purpose," as required for an association-in-fact. *Id.* at *7.

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

**3.** **The First Amended Complaint also properly alleges association-in-fact enterprises between Khounganian and each Law Firm**

The First Amended Complaint also alleges, in the alternative, the existence of two association-in-fact enterprises: the first between Fradkin, DTLA, Khounganian, and Valley Orthopedic; and the second between Emrani, the Emrani Firm, Khounganian, and Valley Orthopedic. FAC ¶¶ 408, 415. An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). The "concept of an association in fact is expansive" and "has a wide reach." *Boyle v. United States*, 556 U.S. 938, 944 (2009). It has "three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946. There is no requirement to plead that the "enterprise have a structure beyond that necessary to carry out its racketeering activities"—an association-in-fact may, but need not, engage in both legitimate and illegitimate conduct. *Odom*, 486 F.3d at 551.

Defendants do not dispute that Uber pleaded the second and third elements of an association-in-fact: "(B) a structure or organization, and (C) longevity necessary to accomplish the purpose." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014); *see Boyle*, 556 U.S. at 946. Nor could they: Uber plainly alleges both an "ongoing organization" between Defendants and that the conduct at issue "was 'ongoing' rather than isolated activity." *Odom*, 486 F.3d at 552-53; *see also Bui v. Nguyen*, 712 F. App'x 606, 608-09 (9th Cir. 2017). The First Amended Complaint describes years-long schemes by both DTLA and the Emrani Firm beginning as early as 2017 and continuing to the present. FAC ¶¶ 57-59, 72-73, 170-171, 280, 367, 386(a).

Defendants contend that Uber has alleged only "routine" commercial relationships that fall short of the requirement of a "common purpose." ECF 93 at 7;

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

*see* ECF 87 at 42-43; ECF 96 at 8-10. On the contrary, the First Amended Complaint alleges a scheme far outside the ordinary business relationship between a personal injury lawyer and his client's treating physician. Rather than refer patients to a doctor who will exercise independent medical judgment, the Law Firm Defendants steer clients with high-limit insurance policies to Khounganian and direct him to provide specific, medically unnecessary treatments and surgeries intended to maximize litigation recovery through false medical bills. FAC ¶¶ 2-4, 10-12, 28-30, 59, 62, 222. For his part, Khounganian performs invasive, medically unnecessary surgeries and provides the Law Firm Defendants with false and fraudulent testimony that such surgeries were both medically necessary and caused by the underlying car accidents. FAC ¶¶ 25, 52-54, 61. Khounganian and the Law Firm Defendants secretly enter into side deals pursuant to which Khounganian agrees to significantly discount his fees in the event the recovery in the claimant's personal-injury lawsuit is insufficient to cover the full amount of his inflated fees. FAC ¶¶ 3, 10, 33. These side deals, which are not disclosed to Uber, render false and misleading the bills Khounganian produces, which indicate that he has provided genuine lien-based medical care to the claimants for the full price asserted. FAC ¶¶ 34, 36. A scheme of that nature violates both criminal law and the legal and ethical obligations of attorneys and physicians. *See* Cal. Prof. Conduct R. 3.3(a)(1), (3), 3.4(c)-(d); Cal. Bus. & Prof. Code §§ 583, 725(a); *see also Living Designs*, 431 F.3d at 362 (relying on the Rules of Professional Conduct in determining that an association-in-fact enterprise involving attorneys was properly pleaded). The scheme is well outside the "ordinary course of business" for attorneys and physicians. *Shaw v. Nissan N. Am., Inc.*, 220 F. Supp. 3d 1046, 1055 (C.D. Cal. 2016).

The cases Defendants cite bear no resemblance to Uber's allegations here. *See* ECF 93 at 7, ECF 96 at 8-10. In these cases, courts failed to find an associated-in-fact enterprise between an automobile manufacturer and its parts supplier, *Shaw*, 220 F. Supp. 3d 1046, or a nicotine vape seller and its eventual cigarette company

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

acquirer, *In re JUUL Labs, Inc. Mktg., Sales Pracs., & Prods. Liab. Litig.*, 497 F. Supp. 3d 552 (N.D. Cal. 2020). The plaintiffs in those cases alleged only that the putative enterprise members were acting in their own respective corporate interests. *Shaw*, 220 F. Supp. 3d at 1057 (noting that the parts supplier unsuccessfully sought for the automobile manufacturer to implement remedial measures regarding the allegedly defective part); *JUUL Labs*, 497 F. Supp. 3d at 599 (alleged common purpose was the same as the legitimate business purpose of both Juul and Altria—expanded nicotine product sales); *see also Gomez v. Guthy-Renker, LLC*, 2015 WL 4270042 (C.D. Cal. July 13, 2015) (declining to recognize association-in-fact enterprise between fraudulent seller of skincare products and its payment-processing vendor). But there is no legitimate corporate interest in knowingly engaging in a coordinated scheme to manufacture false evidence.

Moreover, Defendants could not accomplish their common purpose of fraudulently extracting inflated settlements and verdicts from deep-pocketed defendants like Uber without the participation of both the Law Firm Defendants and Khounganian. Without the Law Firm Defendants' prosecution of the lawsuits, Khounganian will not receive payment of his phony bills for surgeries that are medically unnecessary or causally unrelated to any Uber accident. And without Khounganian's fraudulent medical bills and records and unnecessary surgery, the Law Firm Defendants cannot effectively monetize minor motor vehicle accidents that do not cause any serious injury. Emrani's effort to analogize Defendants here to the defendants in *Ford Motor* (ECF 87 at 42) fails for that reason. In *Ford Motor*, the defendants were all Lemon Law attorneys who allegedly inflated their bills; they did not come together for the common purpose of perpetrating a scheme that no member could accomplish independently. 2025 WL 3306280, at *14. Their fraudulent business practices thus did not evidence the formation of a new and distinct enterprise. *Id.* Defendants' conduct here, by contrast, forwards the common purpose of extracting money from Uber "and doing so by fraudulent means." *Odom*, 486 F.3d

-46- No. 2:25-cv-06612-SPG-PD

PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

at 552; *see also, e.g.*, *Bui*, 712 F. App'x at 608 (defendants' "scheme to plunder millions of dollars from" the plaintiff which was accomplished "by means of deliberate, calculated, and malicious legal acts" sufficed to show a common purpose).

Defendants' arguments that the First Amended Complaint lacks specificity ignore the voluminous factual allegations it contains. For example, although Fradkin argues that "Uber does not allege a single email, text, or phone call in which Fradkin or DLTA instructed, directed, or communicated with the doctors" about "medical treatment," ECF 93 at 9, the First Amended Complaint in fact alleges such an email with specificity: "On September 9, 2019, Defendant Downtown LA Law Group sent an email to Defendant Khounganian's office asking that Claimant K be scheduled for an appointment 'ASAP' and listing the type of case as 'Passenger v. Uber Driver.'" FAC ¶ 226. The detailed allegations of the First Amended Complaint are far from "generic boilerplate." ECF 93 at 9.

DTLA's contention that a common purpose is foreclosed by the existence of interpleader actions filed by DTLA against Khounganian, ECF 93 at 9, misunderstands interpleader law. An interpleader does not reflect "competing claims against one another." *Id*. To the contrary, the party filing an interpleader action must "disclaim[] any interest in the money or property claimed." *Cantu v. Resol. Tr. Corp.*, 4 Cal. App. 4th 857, 873 (1992). The purpose of the action is to distribute the funds at issue to potential claimants; the fact that Khounganian is sometimes a claimant in an interpleader case filed by DTLA in no way establishes any adversity between DTLA and Khounganian. Nor does it nullify the First Amended Complaint's allegations of a common purpose. And at any rate, none of the interpleader actions DTLA cites concerned any of the personal injury claimants at issue here.

### 4. The First Amended Complaint alleges that Defendants conducted the affairs of the association-in-fact enterprise

The "'conduct' element of RICO requires" pleading that Defendants "conduct[ed] or participate[d], directly or indirectly, in the conduct of such

enterprise's affairs." *In re Outlaw Lab'y, LP Litig.*, 2020 WL 5552558, at *8 (S.D. Cal. Sept. 16, 2020) (quoting 18 U.S.C. § 1962(c)). This language requires that a defendant 'have *some* part in directing [the enterprise's] affairs.'" *Id.* (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993)). While "[s]imply performing services for the enterprise does not rise to the level of direction," *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008), defendants will be liable if they "had [a] role in the enterprise and [were] part of the chain of command," *JW Gaming Dev., LLC v. James*, 2020 WL 3640004, at *4 (N.D. Cal. July 6, 2020).

In arguing that the conduct element is not satisfied, *see* ECF 93 at 8; ECF 96 at 12, Defendants misunderstand the nature of Uber's allegations. Uber does not allege that the Law Firm Defendants provided legal services to the enterprise, or that Khounganian provided medical services to the enterprise. The personal injury claimants, who received the legal and medical services, are not even part of the enterprise. This is simply not a case premised on Defendants' provision of their professional services to the enterprise.

Rather, the First Amended Complaint contains numerous, specific allegations about the control exercised by each Defendant over their shared enterprise. Khounganian helpfully collects allegations regarding the control exercised by the Law Firm Defendants. ECF 96 at 11-12 (citing FAC ¶¶ 30, 41, 50, 51, 403). Uber also alleges that Khounganian participated in the enterprise's affairs by accepting referrals, producing fraudulent documents for use in the litigation, and producing fraudulent lien bills with no relationship to the value of the medical services provided with the knowledge and intention that the Law Firm Defendants will use them to obtain an inflated settlement that will be used to pay the lien. FAC ¶¶ 10-12. That places Khounganian within the "chain of command"—without his expertise and decision-making, the scheme would fall apart because the Law Firm Defendants would be unable to monetize their non-injury or minor-injury cases. *See JW Gaming*, 2020 WL 3640004, at *4.

**B.    Uber Has Alleged Predicate Acts of Mail and Wire Fraud with the Requisite Specificity**

The allegations in the amended complaint establish each element of mail and wire fraud, 18 U.S.C. §§ 1341, 1343, which are the predicate acts underpinning Uber's RICO claim, *id.* § 1961(1). "The elements of mail and wire fraud are: (1) proof of a scheme to defraud; (2) using the mails or wires to further the fraudulent scheme; and (3) specific intent to defraud." *Sullivan*, 522 F.3d at 974. A "scheme to defraud," in turn, "requires the use of 'material falsehoods,'"—including "[f]alse statements," "misleading half-truths," and "a failure to disclose material facts." *United States v. Jesenik*, 152 F.4th 924, 938 (9th Cir. 2025). "A false statement is material if it has a natural tendency to influence, or is capable of influencing, the decisionmaker to whom the statement was addressed." *Id.* (citation modified); *see Neder v. United States*, 527 U.S. 1, 16 (1999). Uber's allegations satisfy that standard.

**1.    Defendants knowingly created and transmitted fraudulent medical and billing records to Uber in litigation in order to extract lucrative settlements**

The First Amended Complaint identifies three distinct categories of material falsehoods, each independently sufficient to constitute a scheme to defraud when presented to Uber in the context of personal-injury litigation. *See Living Designs*, 431 F.3d at 358 (fraudulent litigation conduct designed to "induce [a party] to settle" lawsuit on less favorable terms may constitute mail or wire fraud).

*First*, Khounganian produced false diagnoses and performed medically unnecessary surgeries in order to inflate the value of the claimants' personal-injury lawsuits filed by the Law Firm Defendants. Producing false medical records of this kind for purposes of inflating the value of a personal-injury claim or settlement is a well-recognized type of mail and wire fraud. *See, e.g.*, *United States v. Marbella*, 73 F.3d 1508, 1510-11 (9th Cir. 1996) (affirming conviction for mail and wire fraud

PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

premised on a "settlement demand" presented to an insurance company involving "inflated medical bills"); *Living Designs*, 431 F.3d at 362-63.

The FAC alleges that Khounganian diagnosed claimants with serious spinal injuries that they did not have—including disc herniations contradicted by prior imaging. FAC ¶¶ 53, 208. He then recommended and performed costly spinal surgeries, including spinal fusion and discectomy procedures, that were medically unnecessary and unrelated to the accidents in question. FAC ¶¶ 54, 80, 84, 196, 211, 229, 265, 298, 317. Independent medical evaluations repeatedly confirmed that Khounganian's surgeries were not medically indicated. For example, an independent expert concluded that Claimant A's surgery was "medically unnecessary and below the accepted standard of care." FAC ¶ 70. Another independent expert confirmed that Claimant J's lumbar surgery had no medical basis, and Claimant J was subsequently diagnosed with post-laminectomy syndrome as a direct result of Khounganian's unnecessary procedure. FAC ¶¶ 216, 221. An independent medical evaluation of Claimant I concluded that the surgery Khounganian performed was "not medically indicated or reasonable." FAC ¶¶ 197-198. In several cases, Khounganian recommended surgery during a telehealth visit without even conducting a physical examination, FAC ¶ 78, or after only minimal conservative treatment—for example, recommending cervical spine surgery less than two months after a minor accident based on just two chiropractic sessions, FAC ¶¶ 228-229. As Uber alleges, these false diagnoses and unnecessary surgeries served a single purpose: to generate the appearance of serious injuries requiring expensive medical intervention, thereby inflating the settlement value of the underlying claims.

*Second*, Khounganian produced, and the Law Firm Defendants transmitted to Uber, false causation statements linking these alleged injuries to minor Uber accidents that did not, in fact, cause any injury. This conduct too, when done for the purpose of inflating the value of a personal-injury claim or settlement, constitutes

mail and wire fraud. *See, e.g.*, *Marbella*, 73 F.3d at 1510-11; *Living Designs*, 431 F.3d at 362-63.

In case after case, Khounganian included a boilerplate "CAUSATION" section in his medical reports asserting that "[w]ithin a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." FAC ¶¶ 61, 81-83, 111, 125, 165, 182, 198, 208, 234, 249, 266, 282, 300, 313, 331, 350. Uber alleges that these statements were knowingly false or made with reckless indifference to the truth, for the purpose of increasing the value of the claimants' personal-injury lawsuits. *See id.* The FAC details, for each of the eighteen pattern cases, the specific reasons these causation statements were false— including that claimants suffered no injury from the accident, had extensive pre-existing degenerative conditions, or had only minor soft-tissue injuries that did not require the surgeries Khounganian recommended or performed. *See, e.g.*, FAC ¶ 61 (Claimant A: no injury from accident), ¶¶ 82-83 (Claimant B: no injury from accident), ¶ 165 (Claimant G: extensive pre-existing conditions), ¶ 198 (Claimant I: minor incident, pre-existing degenerative spine changes), ¶ 300 (Claimant O: pre-existing degenerative conditions). These false causation statements were the linchpin of Defendants' scheme: when transmitted to Uber by the Law Firm Defendants in litigation, they provided the evidentiary foundation for claims that the patients' extensive (and costly) medical treatment was attributable to Uber accidents, and thus recoverable from Uber.

*Third*, the medical bills and records produced by Khounganian and transmitted to Uber by the Law Firm Defendants were fraudulent because they did not disclose the side agreements between Khounganian and the Law Firm Defendants, which rendered the bills' assertions regarding the cost of treatment false and misleading. As Uber alleges, rather than billing claimants' health insurance—which might deny coverage for unnecessary treatments or require acceptance of lower, negotiated reimbursement rates—Khounganian billed on a lien basis, executing agreements with

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

claimants that purported to make them "directly and unconditionally responsible" for the full amount of his inflated fees and that stated the fees were "not contingent on any settlement, judgment, verdict, or other recovery." FAC ¶¶ 11, 32, 67, 91, 112, 126, 177, 194, 209, 227, 263, 277, 293, 310, 332, 345. These lien agreements and resulting bills were shams. In reality, the Law Firm Defendants and Khounganian secretly entered into side agreements providing that Khounganian would accept a substantial discount in the event of a recovery shortfall—and Khounganian never checked claimants' credit histories because he never intended to collect the stated amounts from them. FAC ¶¶ 3, 11, 32-34.

Uber has alleged specific facts showing the falsity of these bills. The Amended Complaint describes how the law firms directly paid providers a fraction of the stated charges to induce their participation in the scheme. Providers who worked with the Law Firm Defendants voluntarily furnished Uber with charge detail printouts showing two sets of figures tracked side by side: the "Charge" amount (the inflated lien amount the provider was directed to bill) and the "Pt AttyPaid" amount (the far lower sum the law firm actually agreed to pay). FAC ¶¶ 40-48. These records show that the Law Firm Defendants instructed providers to "put the highest possible amount on [the] bill," even though the law firm had already agreed to pay a fraction of that amount—in some cases, as little as $300 for a procedure billed at $2,375, or $400 for a procedure with the same $2,375 charge and the medical providers had secretly agreed not to pursue patients for any shortfall. FAC ¶¶ 43, 46, 48. Obviously, it is false and misleading to represent that the cost of a medical procedure is one number when the medical provider has in reality already agreed to accept a lesser payment to perform the procedure. The inflated number is a mere sham that falls away absent a litigation recovery given the secret side agreements. This was not isolated: the FAC includes charge detail printouts from a different medical provider for both the Emrani firm and DTLA, each reflecting the same systematic pattern of inflated billing at the law firms' direction and secret discounted payments. FAC ¶¶

PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

45-48. These records are "illustrative of the scheme employed by Emrani, Fradkin, and their law firms to systematically overbill defendants in personal injury cases." FAC ¶ 49.

These records satisfy the elements of a scheme to defraud. They were material because they had a "natural tendency" to influence Uber's decisions regarding whether to settle the personal-injury actions and on what terms. *Neder*, 521 U.S. at 16. Had Uber known the bills were subject to the concealed side agreements, it would not have been willing to settle the cases for the amount it did. Just as a company commits fraud when it recognizes revenue that is subject to side agreements reducing its value, *see, e.g.*, *United States v. Hussain*, 972 F.3d 1138, 1140-41 (9th Cir. 2020), so is a medical bill fraudulent if it is subject to a secret side agreement specifying that the provider has agreed to accept a lower amount in lieu of full payment. And the transmittal of false records to increase the sender's recovery against an adverse party is a common theory of mail and wire fraud. *See, e.g.*, *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 938 (N.D. Cal. 2013).

### 2. Uber has alleged the use of mail or wires and specific intent to defraud

Uber's allegations plainly satisfy the other two elements of mail or wire fraud: use of the mail or wires and a specific intent to defraud. Uber repeatedly alleges that Defendants used the mail and wires to transmit their fraudulent medical records, demand letters, and other documents. *See* FAC ¶¶ 386-402. Defendants do not argue otherwise.

Uber has also alleged that Defendants have acted with the specific intent to defraud. *See* FAC ¶ 381 ("Defendants committed these acts willfully and knowingly and with specific intent to defraud."); *see also* FAC ¶¶ 13, 53, 94, 375, 378, 410-411, 417-418, 425-426, 434-435, 443-444. That is all that is needed at the pleading stage. In the context of a civil RICO suit predicated on mail or wire fraud, "general allegations are sufficient" to satisfy the "specific intent to deceive or defraud"

-53-   No. 2:25-cv-06612-SPG-PD

requirement. *Odom*, 486 F.3d at 554. "The only aspects of wire fraud that require particularized allegations are the factual circumstances of the fraud itself." *Id.*

Khounganian disputes Uber's allegations of intent, arguing that the fact that he did not perform surgery on *some* claimants (but not others) "illustrates a lack of intent to defraud Uber." ECF 96 at 24. But the fact that Khounganian did not perform unnecessary surgeries on *every* claimant identified in Uber's complaint does not change the fact that Uber alleges he did perform numerous surgeries that were either unnecessary or not causally linked to any Uber accident, yet he produced medical bills falsely stating the opposite. And Uber alleges that he did so with the specific intent to defraud.

### 3.    Defendants' contrary arguments are unpersuasive

None of defendants' responses to these points has merit. *First*, Defendants assert that Uber did not plead with particularity who relied on Defendants' false statements. ECF 93 at 11; ECF 87 at 28-29. But reliance is not an element of mail fraud, wire fraud, or RICO. *See Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 649 (2008). Regardless, the FAC alleges that—as common sense would suggest—Uber relied on Defendants' fraudulent medical and billing records when determining whether and on what terms to settle each personal injury claimant's lawsuit. FAC ¶¶ 69-71, 94-95, 121, 128-130, 133, 141-142, 152-153, 167-169, 185-187, 200-202, 221-223, 237-239, 253-256, 269-271, 284-287, 302-304, 320-324, 338-339, 352-353. That is sufficient at the pleading stage. *See Living Designs*, 431 F.3d at 363.

Defendants also argue that it is not fraudulent to bill medical patients on a lien basis or to discount medical bills out of "charity." ECF 93 at 17-18; ECF 96 at 18-19. But those arguments improperly draw inferences against Uber and ignore the broader scheme that Uber alleges. Lien-based medical care may not be fraudulent, but that is true only so long as the patient is actually financially liable for the full amount billed. Here, as Uber alleges, pursuant to the concealed side agreements, Khounganian had secretly agreed with the Law Firm Defendants to accept a fraction

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

of those amounts. FAC ¶¶ 11, 32-34. Yet the inflated bills were fraudulently presented to Uber as though they represented genuine economic obligations and were not subject to contingencies or side agreements. *Cf. Hussain*, 972 F.3d at 1141. In fact, under California law, a personal-injury plaintiff may recover only the actual amount paid for medical care; she may not recover "amounts that were included in a provider's bill but for which the plaintiff never incurred liability because the provider, by prior agreement, accepted a lesser amount as full payment." *Howell v. Hamilton Meats & Provisions, Inc.*, 52 Cal. 4th 541, 548 (2011). The fact that Khounganian had secretly agreed to accept an amount less than indicated on the bill would certainly be material to Uber's decision whether and on what terms to settle the personal-injury claim.[19]

Defendants also contend that "even if a 'concealed side agreement' had existed," they had no obligation to disclose it because there is no "independent duty" giving rise to a duty to disclose. ECF 93 at 18; ECF 96 at 20. But this is not an instance of mere nondisclosure: as Uber alleges, the bills that Khounganian prepared and transmitted were affirmatively misleading because they falsely indicated that the claimant was financially liable for the full billed amount. Fraud extends to "misleading half-truths," *Jesenik*, 152 F.4th 924, 938, and imposes liability where "the defendant makes partial representations but also suppresses some material facts," *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997). Defendants did not

---

[19] Fradkin asserts that there were no "secret side agreement[s]" because "the lien agreements themselves required Dr. Khounganian to reduce his fees when the judgments against Uber were inadequate to cover his fees." ECF 93 at 16. But the First Amended Complaint alleges the opposite, and Fradkin impermissibly cites material outside the complaint (in the form of a declaration he submitted) to contradict Uber's allegations. *Id.* The Court must credit the allegations in Uber's complaint over Fradkin's assertions to the contrary. Moreover, Fradkin's characterization of the opaque language in the lien agreement he cites, *see* ECF 95-2 at ¶ 10, is highly debatable—underscoring why it is inappropriate for it to be considered at the pleading stage.

have any *freestanding* obligation to inform Uber of their side agreements, but transmitting to Uber lien-based bills claiming certain dollar amounts gave rise to a duty to disclose the side agreements, which Defendants failed to do.

Finally, Defendants contend that Uber's allegations of fraud are insufficiently specific to satisfy Rule 9(b)'s particularity requirement. But the FAC presents 18 concrete examples of Defendants' scheme to defraud in action. FAC ¶¶ 57-93. These examples provide granular details about the claimant at issue and their Uber-related accident that resulted in little to no injury, FAC ¶¶ 57, 72, 74, 96-100, 122-123, 131-132, 143-144, 154-156, 170-173, 188-191, 204-205, 224, 240-241, 257-258, 272-273, 288, 305-308, 325-326, 340; the specific attorney defendant that represented that claimant, FAC ¶¶ 59, 73, 104, 124, 133, 145, 157, 174, 192, 205, 225, 242, 259, 274, 289, 309, 327, 341; the lien-based nature of the claimant's arrangement with Khounganian, FAC ¶¶ 67, 73, 112, 126, 137, 177, 194, 209, 227, 243, 263, 277, 293, 310, 332, 345; the claimant's specific appointments with Khounganian and the diagnoses, recommended treatments, and invoiced charges associated with each appointments, FAC ¶¶ 60-68, 75-92, 110-116, 125-127, 135-141, 148-151, 159-166, 176-184, 195-199, 208-218, 226-236, 246-252, 262-268, 275-283, 294-301, 310-319, 330-337, 344-351; and multiple documents that were transmitted by mail or the interstate wires that contain misrepresentations about the extent of the claimants' injuries and the amount that Khounganian actually charged for procedures. FAC ¶¶ 386-402. That is far more than courts have required to allow civil RICO claims premised on allegations of mail and wire fraud to proceed. *See, e.g., Bias*, 942 F. Supp. 2d at 938; *State Comp. Ins. Fund v. Capen*, 2015 WL 13298073, at *8 (C.D. Cal. Dec. 18, 2015).

**C.    Uber Has Alleged a Continuous Pattern of Racketeering Activity**

The First Amended Complaint also establishes that Defendants' racketeering activities constitute a continuous pattern. "A 'pattern of racketeering activity' requires at least two predicate acts of racketeering activity, as defined in 18 U.S.C.

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

§ 1961(1), within a period of ten years." *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008). A plaintiff must also "show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc.*, 492 U.S. at 239. "The relationship requirement is satisfied by a showing that the racketeering predicates 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Ticor Title Ins. Co. v. Florida*, 937 F.2d 447, 450 (9th Cir. 1991) (quoting *H.J. Inc.*, 492 U.S. at 240). "To satisfy the continuity prong of the test, one need only show that the predicates pose a threat of continued criminal activity." *Id.*

Uber's allegations easily satisfy this requirement. Uber alleges eighteen separate instances of the same basic pattern: the Law Firm Defendants referred personal-injury claimants to Khounganian, with an understanding that he would perform costly surgeries that were unnecessary and/or causally unconnected to the Uber accidents in order to inflate the claimants' damages in personal-injury lawsuits. *See, e.g.*, FAC ¶¶ 2-15. Defendants do not and cannot dispute that the conduct alleged in the First Amended Complaint has "the same or similar purposes, results, participants, victims, [and] methods of commission." *Ticor Title*, 937 F.2d at 450. Indeed, it is exactly this kind of conduct—a "series of related" acts, "extending over a substantial period of time," that may appear isolated in themselves but amount to "long-term criminal conduct"—that the Congress enacted the RICO statute to address. *H.J. Inc.*, 492 U.S. at 242.

Only in passing do Defendants challenge this aspect of Uber's First Amended Complaint. Fradkin argues that "[e]liminating the inadequately pled instances of fraud leaves Uber as having failed to allege any pattern," ECF 93 at 20, but for the reasons just discussed, Uber has sufficiently alleged fraud. Fradkin makes no separate argument that the allegations, if properly pled, do not amount to a pattern. For his part, Emrani complains that some of his predicate acts were inadequately alleged,

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

and that some of the Emrani Firm's predicate acts were carried out by Emrani's partners or employees rather than by him personally. ECF 87 at 38-41. But Emrani acknowledges that Uber has alleged at least two predicate acts by Emrani, including personally signing two allegedly fraudulent demand letters, *id.* at 40 (citing FAC ¶¶ 128, 139), sending another allegedly fraudulent demand letter, *id.* at 39-40 (citing FAC ¶ 75), and directing his employees to transmit fraudulent litigation documents to Uber, *id.* at 40. That is sufficient to constitute a pattern. While Emrani complains that the fraud allegations "fail to meet Rule 9(b)'s heightened pleading standard," *id.*, like Fradkin, he does not make any separate argument that the allegations do not constitute a pattern.

### D. Uber Has Alleged Injury to Its Business or Property Resulting from Defendants' Pattern of Racketeering Activity

To bring a civil RICO claim, a plaintiff must demonstrate an injury to "business or property by reason of a violation of section 1962," 18 U.S.C. § 1964(c), a "requirement the Supreme Court has interpreted to encompass proximate as well as factual causation." *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168 (9th Cir. 2002). This requirement is commonly referred to as statutory standing. *Id.* "When a commercial enterprise suffers a loss of money it suffers an injury in both its 'business' and its 'property.'" *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979). Uber has statutory standing because it has incurred clear and definite loss of property—including its legal fees, settlements, and other defense costs—that were proximately caused by Defendants' predicate acts of fraud.

#### 1. Uber alleges that it directly paid legal fees, defense costs, and settlement awards

The First Amended Complaint plainly alleges injury to Uber's business through the "loss of money." *Reiter*, 442 U.S. at 339; *see, e.g., Core Health & Fitness, LLC v. Transmedik Specialized Inc.*, 2025 WL 2958866, at *9 (C.D. Cal. Aug. 13, 2025). Specifically, Uber alleges that as a result of the scheme, "Uber

PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

incurred significant defense costs" and was induced to pay settlements, which were both "substantially higher than they would have been absent the" fraud. *E.g.*, FAC ¶¶ 71, 95, 121. As the FAC explains, because of Defendants' "fraudulent medical and billing records, Uber is forced to incur far more in litigation defense and settlement costs than it otherwise would. Uber bears the burden of these costs notwithstanding the insurance it is required by law to carry." FAC ¶ 25. Uber further alleges that Defendants' racketeering conduct "forced Uber to incur substantial expense to investigate" false and fraudulent claims, and that Uber "has been forced to incur legal fees, settlement costs, *and other out-of-pocket costs* in defending these lawsuits and responding to fraudulent evidence and inflated damages claims[.]" FAC ¶ 362 (emphasis added).

Defendants argue that the Court should disregard these allegations because "any out-of-pocket loss was caused to its insurers," and not to Uber. ECF 93 at 20-21; *see also* ECF 87 at 35-36; ECF 96 at 30-31. But the First Amended Complaint plainly alleges out-of-pocket loss—the clear implication of which is an out-of-pocket loss *to Uber*, not to its insurers. FAC ¶¶ 15, 25, 362. And, "[i]n the RICO context, '[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.'" *Carey v. J.A.K.'s Puppies, Inc.*, 763 F. Supp. 3d 952, 980-81 (C.D. Cal. 2025) (quoting *Mendoza*, 301 F.3d at 1168).

Defendants ask the Court to draw two inferences *against* Uber and in favor of Defendants: (i) that Uber's insurer must have paid 100% of Uber's defense costs, without any deductible, coinsurance, self-insured retention, or other cost-sharing, and (ii) that Uber's insurer similarly must have paid 100% of any settlements without any participation or cost-sharing by Uber. "Defendants' arguments require the Court to … draw inferences against the non-moving party. That is improper on a motion to dismiss." *Whitewater W. Indus., Ltd. v. Pac. Surf Designs, Inc.*, 2017 WL 4518526,

at *3 (S.D. Cal. Oct. 10, 2017); *see also, e.g.*, *Zheng Liu v. Terry*, 2021 WL 2688846, at *1 (N.D. Cal. June 30, 2021) (rejecting defendants' motion to dismiss argument because it "improperly draws inferences in Defendants' favor"). On a motion to dismiss, "[a]ll allegations and reasonable inferences are taken as true, and the allegations are construed in the light most favorable to the non-moving party." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004); *see also Walter*, 538 F.3d at 1247. The Court thus may not credit Defendants' argument that merely holding liability insurance is enough to thwart RICO standing. Uber may sue to recover the out-of-pocket injuries it alleges in the First Amended Complaint.

Defendants are, in any event, wrong that insurance reimbursement nullifies an injury to business or property for purposes of RICO standing. As the Ninth Circuit explained in *Berg v. First State Insurance Co.*, 915 F.2d 460 (1990), on which the DTLA Defendants rely, *see* ECF 93 at 21, under California's collateral source rule, "if an injured party receives some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor." 915 F.2d at 467 (citation modified). While in *Berg* the collateral source rule was inapplicable because the plaintiffs "did not actually or constructively pay for" the insurance policies at issue, *id.* at 468, here it is a reasonable inference that Uber pays for the insurance it carries, FAC ¶¶ 8, 25. So, under the collateral source rule, insurance reimbursement does not reduce Uber's damages and Defendants' argument would fail even if the Court were to accept their mischaracterizations of Uber's allegations.

None of the cases on which Defendants rely are to the contrary. *See* ECF 87 at 35; ECF 93 at 20-21; ECF 96 at 31. In *Steele v. Hospital Corp. of America*, 36 F.3d 69 (9th Cir. 1994), and *Kovalev v. Stepansky*, 2020 WL 553843 (E.D. Pa. Feb. 4, 2020), natural persons were not harmed when their health insurance was overbilled for services that were not provided (or not medically indicated) because the plaintiffs did not pay *anything* out of pocket. *Steele*, 36 F.3d at 70 (in opposing summary

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

judgment, "the patients failed to show that they ever paid out *any* of their own money as a result of the alleged scheme" (emphasis added)); *Kovalev*, 2020 WL 553843, at *4 n.3 ("It appears from the Amended Complaint that Kovalev did not make *any* payments out of his own pocket." (emphasis added)).[20] Even on Defendants' reimbursement theory, Uber *directly* paid defense and settlement costs, so these cases are inapposite. Similarly, the plaintiff in *Yagman v. Gabbert*, 2015 WL 13358336 (C.D. Cal. May 14, 2015), was careful not to allege that he himself ever "paid any money" to the defendant. *Id.* at *3. Uber does not allege that it indirectly "caused money to be paid" to its lawyers or to personal injury plaintiffs, *id.*, it expressly alleges that Uber itself incurred "out-of-pocket costs," FAC ¶ 362. Finally, the plaintiff in *Ozeran v. Jacobs*, 798 F. App'x 120 (9th Cir. 2020), was a workers' compensation attorney who alleged a theory of competitive harm from an "unlawful referral scheme" by other attorneys in the same market. 798 F. App'x at 121. That case did not involve any payments by or on behalf of the plaintiff, and so it has no possible relevance here.

### 2. Legal fees are compensable injury to business or property under RICO

Defendants contend that legal fees and other defense and settlement costs are categorically not cognizable as damages under RICO. *See* ECF 87 at 36; ECF 96 at 26. While the Ninth Circuit has not yet squarely addressed that issue, Defendants' theory lacks any basis in the statutory text. Legal expenses, no less than other forms of monetary harm, can readily be viewed as injury to a company's "business or property," 18 U.S.C. § 1964(c). The case law supports that view as well, and the contrary authorities Defendants cite are inapposite.

---

[20] *Kovalev* was essentially a *pro se* dental malpractice claim, and was primarily decided on the now-abrogated rule that "losses which flow from personal injuries are not damage to property under RICO." 2020 WL 553843, at *3 (citation modified); *see Med. Marijuana, Inc. v. Horn*, 604 U.S. 593, 596 (2025) (overruling RICO personal injury bar).

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

In cases like this one—where a party incurred legal fees and costs as a result of fraudulent litigation designed to extract payments from the party—numerous courts, including courts in this Circuit, have recognized that monetary loss as a cognizable RICO injury. *See, e.g.*, *Handeen v. Lemaire*, 112 F.3d 1339, 1354 (8th Cir. 1997) (attorneys' fees incurred as a result of fraudulent claims could constitute injury); *In re Outlaw Lab'y*, *LP Litig.*, 2020 WL 1953584, at *9 (S.D. Cal. Apr. 23, 2020) (finding injury where plaintiff paid attorney's fees responding to defendants fraudulent demand letters); *Nat.-Immunogenics Corp. v. Newport Trial Grp.*, 2020 WL 7263544, at *6 (C.D. Cal. Nov. 23, 2020) (legal fees spent defending "sham claims" were appropriately characterized as injury); *Cobb v. JPMorgan Chase Bank, N.A.*, 2012 WL 5335309, at *6 (N.D. Cal. Oct. 26, 2012) (recognizing that legal fees that were incurred "in prior litigation" and "proximately caused by conduct that would qualify as a RICO predicate act" could "establish RICO injury"); *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1100 (2d Cir. 1988); *First Cap. Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369 (S.D.N.Y. 2002), (it is "well settled that legal fees may constitute RICO damages when they are the proximate consequence of a RICO violation").

Moreover, the Ninth Circuit recognized in *Living Designs* that the difference between the value of a settlement tainted by fraud and its value absent the fraud is a proper measure of RICO injury. 431 F.3d at 363-64. Although the fact pattern here is flipped—the party injured by the alleged fraud is the settling *defendant*, rather than the settling *plaintiff* in *Living Designs*, *see id.*—there is no reason why monetary losses in settlement attributable to fraud should be recoverable only to settling plaintiffs and not to settling defendants like Uber.

Defendants rely on two unpublished Ninth Circuit cases, *Limcaco v. Wynn*, 2023 WL 154965 (9th Cir. Jan 11, 2023); *Thomas v. Baca*, 308 F. App'x 87 (9th Cir. 2009). ECF 87 at 36. But neither of those cases held that legal fees were not cognizable damages in a case like this one, where one party is subjected to fraudulent

PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

litigation. Rather, in both cases, the plaintiff voluntarily incurred legal fees to pursue lawsuits challenging the defendant's conduct. *Limaco*, 2023 WL 154965, at *2; *Thomas*, 308 F. App'x at 88. In that context, the court of appeals rejected the plaintiff's theory of RICO injury; it did not hold that legal fees could *never* be cognizable as damages in a RICO case.[21] In a similar vein, Defendants cite other district court decisions involving legal fees incurred as self-help in "cleaning up the mess" caused by alleged racketeering conduct. *See* ECF 96 at 26 (citing *Ogden v. Wells Fargo Bank, N.A.*, 2015 WL 13413390, at *2 (C.D. Cal. Feb. 20, 2015) (alleged identity theft caused plaintiff to retain a lawyer); *Evans Hotels, LLC v. Unite Here! Loc. 30*, 2021 WL 10310815, at *25-26 (S.D. Cal. Aug. 26, 2021) (legal fees were "caused by Plaintiffs' *own decision* to spend money *affirmatively lobbying* the City Council")). Again, the situation here is quite different. Finally, Defendants cite cases in which the filing of sham lawsuits (and associated costs) was incidental to a much broader racketeering scheme. *Pac. Surf Designs, Inc. v. Whitewater W. Indus., Ltd.*, 2021 WL 5326529, at *2 (S.D. Cal. Nov. 16, 2021) (sham cases were incidental to a lost market share claim against a competitor); *Holloway v. Clackamas River Water*, 2014 WL 6998069, at *9 (D. Or. Sept. 9, 2014) (retaliation campaign by fellow board members, where the sham lawsuits were not racketeering activity), *report and recommendation adopted*, 2014 WL 6998084 (D. Or. Dec. 9, 2014).

*None* of Defendants' cases concerned an overarching scheme by which an ongoing series of false and fraudulent litigations were used to extract payments from its victims. Unlike in *Limcaco, Thomas*, *Ogden*, and *Evans*, Uber did not choose to

---

[21] Moreover, "[d]istrict courts have taken issue with both the breadth and nonbinding nature of *Thomas*. As a result, a number of courts have reached a more nuanced determination that attorney fees that were caused by defendants' RICO violation qualify." *Marshall v. Goguen*, 604 F. Supp. 3d 980, 1004 (D. Mont. 2022) (citing *Dunmore v. Dunmore*, 2013 WL 5569979, at *6 (E.D. Cal. Oct. 9, 2013), *report and recommendation adopted*, 2014 WL 466257 (E.D. Cal. Feb. 5, 2014)).

file any of the underlying actions (or collateral litigations), but rather was compelled to defend fraudulent lawsuits filed and engineered by Defendants. And unlike in *Pacific Surf* and *Holloway*, the racketeering activity at issue is not tangential to, but rather sits at the core of, the pattern of activity that RICO was designed by Congress to thwart. It is axiomatic that the RICO statute awards compensation for an injury to business or property, and that the "loss of money" by a "commercial enterprise" like Uber is "an injury in both its 'business' and its 'property.'" *Core Health*, 2025 WL 2958866, at *9. No exception to that clear statutory command warrants taking the litigation expenses that Uber had no choice but to incur outside the scope of "loss of money" constituting an injury to business or property.

### 3.     Uber's injuries were directly caused by Defendants' racketeering activity

Defendants assert that Uber has not shown a "direct relation between the injury asserted and the injurious conduct alleged." *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010); *see* ECF 87 at 36-38; ECF 96 at 27-31.  But the causal chain alleged in the First Amended Complaint is simple and direct: false and fraudulent evidence is manufactured to extract artificially inflated settlements or verdicts. These acts necessarily cause Uber to incur defense costs in responding to that fraud that it otherwise would not incur, as well as increased settlement expense incurred in reliance on the fraud.

In the Ninth Circuit, courts "focus on three nonexhaustive factors in considering causation," including "(1) whether there are more direct victims of the alleged wrongful conduct; (2) whether it will be difficult to ascertain the amount of a plaintiff's damages attributable to a defendant's wrongful conduct; and (3) whether courts will struggle to apportion damages to obviate the risk of multiple recoveries." *Mendoza*, 301 F.3d at 1169. None of those factors favors Defendants here. Uber is the most obvious and "direct" victim of Defendants' alleged racketeering scheme; the damages Uber sustained (including settlement payouts and associated legal fees)

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

can be identified and attributed to each underlying personal injury claim; and this Court need not invent any "complicated rules" to apportion any eventual recovery. The RICO proximate causation standard is "generous enough to include" the "foreseeable[] consequences of RICO predicate acts," *Diaz v. Gates*, 420 F.3d 897, 901 (9th Cir. 2005) (en banc) (per curiam), and it is certainly foreseeable that Defendants' fraudulent conduct would result in increased litigation and settlement costs to Uber. *Cf. Living Designs*, 431 F.3d at 363-64. Indeed, that was its central purpose.

Defendants feign confusion about how, exactly, false medical testimony and the provision of medically unnecessary surgeries—like spinal fusions—increased defense costs and the settlement value of the cases that were part of the scheme. ECF 87 at 37-38; ECF 96 at 27-28. Indeed, the Emrani Defendants misunderstand Uber's theory entirely, asserting that it "would require the Court to … hypothesiz[e] scenarios in which each of the predicate cases went to trial" instead of settling. ECF 87 at 38. But the proper causation analysis is what costs Uber would have incurred *absent Defendants' fraud*, not absent settlement. For example, had Khounganian not provided a false diagnosis, false causation testimony, and performed a medically unnecessary cervical fusion surgery on Claimant A, Uber alleges that case would have been resolved much more quickly and at less overall expense because it would have been worth far less (if anything at all) absent the fake injuries and unnecessary treatment. FAC ¶¶ 57-66. As the Ninth Circuit recognized in *Living Designs*, the difference between the value of a settlement tainted by fraud and its value absent the fraud is a proper measure of RICO injury under principles of proximate causation. 431 F.3d at 363-64.

Defendants' cases illustrate—by comparison—the tight causal nexus pleaded by Uber. In *Canyon County*, a municipal government tried to hold private companies liable for employing undocumented immigrants, on the theory that this somehow caused increased municipal "expenditures on health care and criminal justice

PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

services." 519 F.3d at 982. The causal chain there was "quite attenuated," and was further confounded by "numerous alternative causes" for increased expenditure aside from the employment practices of four companies. *Id.* at 983. Similarly, the pro se plaintiff in *Kamal v. County of Los Angeles*, 2018 WL 4328467 (C.D. Cal. Sept. 6, 2018), asserted that the municipal defendant's activities somehow caused him to file numerous lawsuits, thereby incurring legal fees. *Id.* at *2-3, *14. That is very different from the situation here, where Uber has foreseeably incurred substantial costs in *defending* and settling fraudulent lawsuits filed by the Law Firm Defendants, as was Defendants' intention. And in *Holloway*, the plaintiff identified just one predicate act relating to the filing of sham lawsuits which was far too attenuated because it relied on the conduct of non-parties: "Holloway alleges that an attorney published a fraudulent report which was later used by a third-party as an exhibit in frivolous lawsuits against Holloway." 2014 WL 6998069, at *10. Here, Defendants themselves procured, created, and filed the false evidence as part of their scheme to extract money from Uber.

Emrani makes the related argument that Uber's damages are too speculative because Uber did not allege the specific dollar amounts it paid to attorneys and that trial would require assessing the reasonableness of medical billing. ECF 87 at 36, 38. But Uber is not required to plead its evidence, and "[i]n the RICO context, '[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Carey*, 763 F. Supp. 3d at 980-81. A RICO plaintiff need only plead the "fact of damage," not the "amount of damage." *Outlaw Lab'y*, 2020 WL 1953584, at *8 (denying motion to dismiss where the complaint did not "include a precise calculation of damages" but specifically alleged "the fact that there was an injury").[22] Uber's complaint was sufficient to put Emrani on notice of the cases

---

[22] Khounganian likewise argues (ECF 96 at 30) that Uber has not alleged causation because it has not disaggregated Khounganian's false statements from the other evidence in the personal-injury cases. That argument fails for the same

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

involved and the settlement amounts that Uber was fraudulently induced to pay in those cases. ECF 87 at 35. Expert evidence is commonly required to prove damages—there is nothing alien or unduly speculative about the testimony of a healthcare economist. Unlike in *Chavveri v. Platinum LED Lights LLC*, 2022 WL 2275664, at *8-9 (D. Ariz. June 22, 2022), where the plaintiff's theory would have required a jury to determine that the defendant's "defrauding [of] third-party consumers" somehow cost the plaintiff sales (and how much), the causal chain here is straightforward. If the case proceeds to trial, the jury will likely hear expert testimony regarding the expected settlement value of the underlying personal injury claims but for the fraudulent causation evidence and medically unnecessary surgeries, and compare that to the actual settlement amounts and other out-of-pocket expenditures. Valuing claims is something that mediators, insurers, and litigation funders do every day, unlike broad speculation about the market effect of one participant's illegality on a competitor's sales. *Chavveri*, 2022 WL 2275664, at *9.

### 4. Uber's settlement of cases did not break the causal chain between Defendants' predicate racketeering acts and Uber's injury

The Emrani Defendants assert that Uber's "decisions on what defense costs to incur and what settlements to pay" break the causal chain. ECF 87 at 38 (citing *Stoot v. City of Everett*, 582 F.3d 910, 926 (9th Cir. 2009)). That is not what the Ninth Circuit held in *Stoot*. That case concerned the question of when the actions of a third party—a prosecutor—break the causal chain with respect to the police officer defendant's violation of the plaintiff's Fifth Amendment rights. 582 F.3d at 926. It has nothing to say about when the actions of a *plaintiff* break the causal chain.

The Emrani Defendants' theory contravenes both Ninth Circuit case law and common sense. *Living Designs* is directly to the contrary: the plaintiffs in that case

reason—Uber need not plead the quantum of its injury so long as it pleads the fact of injury by Khounganian's predicate acts. *Outlaw Lab'y*, 2020 WL 1953584, at *8.

-67-    No. 2:25-cv-06612-SPG-PD

stated a civil RICO claim by alleging that they reasonably relied on the defendant's fraudulent representations in settling lawsuits for less than they otherwise would have. 431 F.3d at 363-64. The plaintiffs' decisions to settle did not break the causal chain between the defendant's fraud and plaintiffs' injury, and it does not do so here either. More broadly, while reliance is not an element of a civil RICO claim, in the fraud context, injury may result from the plaintiff's detrimental reliance on the defendant's false statements. *See Bridge*, 553 U.S. at 655-56. If Defendants were correct that a plaintiff's actions taken in reasonable reliance on false statements break the causal chain, then in none of those cases could the plaintiff obtain RICO damages. That is not the law. Mail and wire fraud are among the most commonly invoked RICO predicates, *see, e.g.*, *id.* at 641-42; *Living Designs*, 431 F.3d at 362, and there is no suggestion in the case law that a plaintiff's actions taken in reliance on false statements break the causal chain.

Khounganian, for his part, again asks this Court to disregard the allegations in the First Amended Complaint and to draw inferences against Uber. ECF 96 at 29. He asserts that Uber should have been able to detect their fraud earlier, and so the Court should thus infer that Uber "had already uncovered the fraud *before* settling" the underlying cases. *Id.* But Uber alleges that it was *not* aware of the nature of the fraud at the time it settled the cases and incurred defense costs. *See, e.g.*, FAC ¶ 14 ("[T]he nature of the fraud and the pattern of unlawful activity became apparent to Uber only over time, as it was presented with increasing numbers of cases featuring minor accidents, virtually identical causation statements with no apparent factual foundation, unnecessary or causally unrelated medical procedures, and inflated bills and claims."). Courts have recognized that this is a common reality of civil RICO claims in the context of insurance fraud, where a fraudulent scheme may not be "readily apparent when viewed on an individual claim-by-claim basis," and "becomes apparent only when the claims are analyzed altogether." *State Farm*, 120

F.4th at 80. There is no basis for inferring, contrary to Uber's allegations, that it was aware of the fraud when it settled and incurred defense costs.

Defendants suggest that Uber *should have* discovered the fraud earlier, but that argument has no merit here at the pleading stage. "Ordinarily, a defendant has an extremely difficult burden to show that a fraud action is barred as a matter of law. The determination of whether a plaintiff knew or should have known of a cause of action presents a question for the trier of fact." *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1417 (9th Cir. 1987). Defendants offer no reason to depart from that rule. Until it became aware of the pattern of cases involving the Law Firm Defendants and Khounganian, Uber had no reason to presume that Khounganian was systematically performing highly invasive and painful surgeries without medical necessity or without any connection to the accidents at issue.

**E.    Uber Has Alleged a Nexus to Interstate Commerce**

Finally, Defendants argue that Uber fails to satisfy the interstate commerce prong of RICO because "all of the 'conduct' alleged by Uber takes place in the greater Los Angeles area." ECF 96 at 15. That is not true; but even if it were, Uber's nationwide operations and its allegations that Defendants accomplished their scheme through the instrumentalities of interstate commerce is enough to establish the required "de minimis impact on interstate commerce." *United States v. Juvenile Male*, 118 F.3d 1344, 1347 (9th Cir. 1997).

*First*, Uber alleges that Defendants represented and treated clients from outside of California. Claimant P lives in Missouri and was allegedly injured in a collision during a business trip to Los Angeles. FAC ¶ 305. Immediately after the collision, Claimant P flew back to Missouri. *Id.* DTLA agreed to represent Claimant P, who lives out of state, in a lawsuit against Uber. FAC ¶¶ 309, 315. He then traveled back to California to receive treatment by Khounganian and executed a sham lien agreement with Khounganian. FAC ¶¶ 310, 317. In fact, Khounganian paid for the airfare and hotel of Claimant P so that he could travel from Missouri to Los Angeles

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

for the medically unnecessary surgery, which was then used to defraud Uber. FAC ¶ 317. That is quintessential interstate commerce by the enterprise supporting a RICO claim. *See, e.g.*, *Planned Parenthood Fed. of Am., Inc. v. Ctr. for Med. Progress*, 402 F. Supp. 3d 615, 649-50 (N.D. Cal. 2019).

*Second*, the enterprise affected interstate commerce by targeting Uber, a business with nationwide operations. "[A]ll that is required" to satisfy the interstate-commerce element of a RICO claim is a "de minimis impact on interstate commerce." *Juvenile Male*, 118 F.3d at 1347. To establish this kind of de minimis impact, no showing is required "that a defendant's acts actually affected interstate commerce." *Id.* at 1349. Rather, "proof of a probable or potential impact" is sufficient. *Id.* Here, that requirement is satisfied because the target of the scheme is Uber—just as it was sufficient in *Juvenile Male* that the defendant had robbed a Subway restaurant, a nationwide business. *Id.* Numerous other courts have reached the same conclusion.[23]

*Third*, Defendants' use of the instrumentalities of interstate commerce— including phones, e-mail, and the internet—is sufficient to show a de minimis impact on interstate commerce. *Savla v. Nithyananda Found.*, 2011 WL 13585607, at *6 (C.D. Cal. Dec. 15, 2011) (finding sufficient allegations of "the use of interstate mails and wires to conduct Defendants' fraudulent scheme"). "Demanding kick-backs over

---

[23] *See, e.g.*, *Countrywide Home Loans, Inc. v. Am.'s Wholesale Lender, Inc.*, 2012 WL 12892182, at *4 (C.D. Cal. Oct. 11, 2012) (plaintiffs pleaded a sufficient effect on interstate commerce because they "alleged that Defendants' actions affected several national corporations operating throughout the United States"); *see also United States v. Ordonez-Zometa*, 141 F.4th 531, 559-60 (4th Cir.) (evidence that defendants used Uber's services "was not merely suggestive of interstate commerce; it was specific and substantial evidence that the enterprise was reliant on commercial services that operate across state lines"), *cert. denied sub nom. Hernandez-Garcia v. United States*, 146 S. Ct. 345 (2025); *Cooley v. Servicemaster Co.*, 2021 WL 3630489, at *5 n.7 (E.D. Cal. Aug. 17, 2021) ("[G]iven Defendants' nationwide operations, the interstate commerce element of the FAA is satisfied."); *Alavez v. Brinker Rest. Corp.*, 2016 WL 11746260, at *4 (C.D. Cal. Sept. 23, 2016) (holding that a "relationship involved interstate commerce" where the "defendant was a national corporation that was engaged in business in multiple states").

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

the telephone—which is an instrumentality of interstate commerce—shows a sufficient nexus to interstate commerce for purposes of RICO." *Berry Creek Rancheria of Maidu Indians of Cal. v. Howard*, 2022 WL 43696, at \*5 (E.D. Cal. Jan. 5, 2022), *report and recommendation adopted*, 2022 WL 446677 (E.D. Cal. Feb. 14, 2022). So does the use of a fax machine. *Rotec Indus. v. Mitsubishi Corp.*, 163 F. Supp. 2d 1268, 1279 (D. Or. 2001). So does the use of the mails—even when "all of the mailings were intrastate." *Rabang v. Kelly*, 2017 WL 1496415, at \*9 (W.D. Wash. Apr. 26, 2017). And so do other "instrumentalities of interstate commerce, including email, other telecommunications, and wire transfers from U.S. banks." *Ghebreyesus v. Fed. Democratic Republic of Ethiopia*, 2023 WL 6392611, at \*10 (D. Nev. Sept. 30, 2023); *see also, e.g.*, *Navajo Health Found. - Sage Mem'l Hosp., Inc. v. Razaghi Dev. Co.*, 2021 WL 1397229, at \*8 (D. Nev. Jan. 15, 2021), *report and recommendation adopted*, 2021 WL 961746 (D. Nev. Mar. 15, 2021); *Stillaguamish Tribe of Indians v. Nelson*, 2012 WL 13028100, at \*5 (W.D. Wash. July 24, 2012); *Walters v. Fid. Mortg. of Cal.*, 730 F. Supp. 2d 1128, 1209 (E.D. Cal. Aug. 4, 2010). Defendants' handful of outlier cases are contrary to the great weight of precedent.

**VI.    Uber Has Properly Alleged a RICO Conspiracy Cause of Action**

Defendants are likewise wrong in arguing that Uber has not stated a viable claim for RICO conspiracy. *See* ECF 93 at 21-22, ECF 96 at 31-32. A RICO conspiracy under § 1962(d) requires only that the defendant was "aware of the essential nature and scope of the enterprise and intended to participate in it." *United States v. Christensen*, 828 F.3d 763, 780 (9th Cir. 2015). The First Amended Complaint easily clears this threshold, alleging that each Defendant was aware of the essential nature and scope of the five enterprises outlined in the First through Fifth Causes of Action. *See* FAC ¶¶ 13, 403. Courts within this Circuit have found that defendants were aware of the "essential nature and scope" of an enterprise—enough to sustain a RICO conspiracy claim at the Rule 12 stage—in ways that are pertinent here: for example, when co-conspirators were connected to bank accounts holding a

-71-                    No. 2:25-cv-06612-SPG-PD

PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

"victim's funds," *see Shaw v. Sears*, 2010 WL 11595818, at *3 (C.D. Cal. Oct. 18, 2010); through side agreements and promises made as part of a scheme to defraud, *see Natomas Gardens Inv. Grp., LLC v. Sinadinos*, 710 F. Supp. 2d 1008, 1023 (E.D. Cal. 2010) (denying motion to dismiss RICO conspiracy claim and drawing "logical inference" that defendant was aware of the essential nature and scope of the enterprise); and where defendants "omitted a true itemization or description" of assessed fees and demanded payment of "fraudulently concealed marked-up fees," *see Bias*, 942 F. Supp. 2d at 938.

Defendants also argue that the conspiracy claim must fail because the substantive RICO claims underlying it fails. ECF 93 at 22, ECF 96 at 31. But that argument is simply derivative of its substantive RICO argument, which fails for the reasons discussed above. *Supra* pp. 40-71. Uber's conspiracy claim therefore survives. *See Smith v. Am. Gen. Life Ins. Co.*, 2017 WL 7362724, at *4 (C.D. Cal. Feb. 7, 2017) ("Because Plaintiffs' RICO conspiracy cause of action incorporates by reference predicate acts by [the defendant] cognizable under RICO, Plaintiffs adequately allege a RICO conspiracy cause of action against him.").

## VII.  Uber's Claims Are Not Barred by the Statute of Limitations

Defendants incorrectly argue that Uber's RICO claims are time-barred.  ECF 87 at 25-28; ECF 93 at 19-20. This argument fails for multiple reasons. "The statute of limitations for civil RICO actions is four years," *Pincay v. Andrews*, 238 F.3d 1106, 1108 (9th Cir. 2001), and begins to run "when a plaintiff knows or should know of the injury that underlies his cause of action," *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996). Importantly, so long as the plaintiff satisfies the statute of limitations, the court in a civil RICO action may consider conduct stretching back well before the beginning of the limitations period. The statute specifies that a "pattern of racketeering activity" may include acts "occur[ing] within ten years … after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

Uber has alleged that it suffered injury as a result of multiple acts of fraud that occurred within the four-year limitations period—i.e., after July 21, 2021. For instance, Uber alleges that on multiple occasions, Khounganian prepared fraudulent bills of $100,000 or more after that date. *See, e.g.*, FAC ¶¶ 92, 218, 267, 283. Obviously, there is no way that Uber either knew or should have known that these bills were fraudulent *before they were prepared*, much less before they were even presented to Uber in the context of personal-injury litigation. Defendants do not argue otherwise. For that reason alone, Uber's First Amended Complaint is not barred by the statute of limitations.

Moreover, Defendants overlook the "separate accrual rule" that the Ninth Circuit follows. *Grimmett*, 75 F.3d at 510. Under the separate accrual rule, a "new cause of action accrues for each new and independent injury, even if the RICO violation causing the injury happened more than four years before." *Id.* In other words, a claim here is timely if Uber sustained a new and independent injury after July 21, 2021, four years before the initial complaint was filed. Uber's FAC alleges—and case law supports—that Uber sustained a new and independent injury each time it settled one of the pattern cases. *See, e.g.*, FAC ¶¶ 71, 95, 121, 130, 142, 153, 169, 187, 223, 239, 256, 271, 286, 304 (all alleging that "[i]n addition to the settlement amount, Uber incurred significant defense costs in defending against the litigation"). And the cases of Claimants A, B, C, G, J, M, N, P, and Q all settled *after* July 21, 2021, and thus within the limitations period. *See* FAC ¶¶ 68, 71, 92, 95, 119, 121, 166, 169, 221, 223, 267, 271, 283, 286, 319, 324, 338, 339. Each of those settlements caused a new and independent injury to Uber's business or property within the limitations period, making Uber's lawsuit timely.

Defendants make two principal arguments to the contrary, but neither is persuasive. First, Defendants simply ignore Uber's allegations within the limitations period, focusing instead on other claimants where Uber makes allegations of conduct occurring before July 21, 2021. *See* ECF 86 at 26-28; ECF 93 at 19-20. But the RICO

-73-    No. 2:25-cv-06612-SPG-PD

statute expressly contemplates allowing evidence of *additional* predicate acts outside the statute of limitations but within the last ten years to prove a "pattern of racketeering activity," so long as RICO injury occurs within the limitations period. *See* 18 U.S.C. § 1961(5); *see also Kesiraju v. Makker,* 2024 WL 5516005, at *3 n.1 (C.D. Cal. Mar. 12, 2024) ("[T]he limitations period does not preclude allegations of a pattern of racketeering activity based on acts that occurred more than four years before the filing of the Complaint."); *Flores v. Emerich & Fike,* 2008 WL 2489900, at *24 (E.D. Cal. June 18, 2008) (observing that "an act falling within the ten year pattern of racketeering but not within the statute of limitations" can "serve as a predicate act"). Thus, Defendants' arguments regarding injuries occurring outside the limitations period would be relevant to determining the amount Uber ultimately may recover, but not whether Uber's claims are timely.

Defendants' second, more puzzling, rebuttal is that Uber was on notice of its RICO injury at the *outset* of each claimant's lawsuit—with the filing of the complaint—or even earlier with the service of a demand letter or at the time of the accident itself. For instance, the Emrani Defendants argue that all six of the accidents involving their law firm occurred in 2019; that three of those personal injury lawsuits were initiated before the limitations period began; and that a demand letter, in one of those actions, was served in December 2020. ECF 87 at 26-27. Thus, the Emrani Defendants contend, "Uber was on constructive notice of the supposed fraud no later than December 2020." This is illogical. The Emrani Defendants' argument is premised on the notion that their fraud must have been so obvious, so far-reaching, and so conspicuous that Uber should *instantly* have had constructive notice of it *as soon as the lawsuits were filed* or a demand letter was sent.

This strained reasoning does not comport either with common sense or with case law. *See, e.g., In re Wells Fargo Ins. Mktg. & Sales Pracs. Litig.*, 2018 WL 9536803, at *4 (C.D. Cal. Dec. 14, 2018) (rejecting argument that bank's customers should have known of alleged improper charges on their accounts years before a

PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

newspaper expose of alleged fraud scheme). None of the cases Defendants cite hold otherwise. For instance, the Emrani Defendants cite *Morehead v. City of Oxnard*, 2023 WL 8143973, at *7 (C.D. Cal. Oct. 4, 2023), for the proposition that a party has "express notice of the claims against it" once a lawsuit is filed. ECF 87 at 27. But that language, which dealt with spoliation and a party's duty to preserve evidence, is beside the point. A complaint may apprise a defendant of the claims against it *in that lawsuit*—but not knowledge that the claims are premised on fraudulent allegations or manufactured evidence, much less knowledge of a *pattern* of illegal behavior across many other cases. Similarly, in *Pincay*, the Ninth Circuit noted that a "written disclosure of one's purported injury" constitutes "enough information to warrant an investigation." 238 F.3d at 1110. But such an investigation, in the circumstances here, would relate to the underlying car accident; not to the defendant doctors' and lawyers' racketeering scheme.

Ultimately, Defendants' statute-of-limitations arguments boil down to the notion that Uber should have discovered their fraud sooner. But the FAC alleges that that Defendants engaged in "secret" side agreements, *see, e.g.*, FAC ¶ 3, and that their pattern of fraud became apparent to Uber "only over time," as Uber was presented with an increasing number of similar and suspicious cases, FAC ¶ 14. Those allegations must be taken as true. And in the context of civil RICO claims premised on insurance fraud, the nature of the scheme may not be "readily apparent when viewed on an individual claim-by-claim basis," and "becomes apparent only when the claims are analyzed altogether." *State Farm*, 120 F.4th at 80. Uber's civil RICO claim here is timely.

## VIII. The Availability of Injunctive Relief Is Not Relevant at this Stage

Finally, Fradkin argues that Uber is not entitled to seek injunctive relief in a civil RICO action. ECF 93 at 23. But that argument is premature. A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a claim," not what relief may or may not be available if a claim has merit. *Navarro v. Block*, 250 F.3d 729, 732 (9th

Cir. 2001); *see also id.* ("Dismissal is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory."). Uber's complaint seeks a variety of remedies, including restitution, damages, and equitable relief. FAC pp. 128-29. While it may be true that Ninth Circuit precedent—unlike the law in other circuits—makes injunctive relief unavailable to private civil RICO plaintiffs, Uber has prayed for injunctive relief to preserve the possibility of en banc or Supreme Court review on that issue as well as to seek such ultimate relief under this Court's inherent powers. The unavailability of injunctive relief to civil RICO plaintiffs under existing Ninth Circuit precedent is not a basis for dismissal of Uber's complaint.

## CONCLUSION

The motions to dismiss should be denied.

PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Dated: March 23, 2026

**PERKINS COIE LLP**

By: */s/ Oliver M. Gold*
    Oliver M. Gold, Cal. Bar No. 279033
    OGold@perkinscoie.com
    Gillian Kuhlmann, Cal. Bar No. 316241
    GKuhlmann@perkinscoie.com
    1888 Century Park East, Suite 1700
    Los Angeles, CA 90067-1721
    Telephone: +1.310.788.9900
    Facsimile: +1.202.654.6211

    Joshua Patashnik, Cal. Bar No. 295120
    JPatashnik@perkinscoie.com
    11452 El Camino Real, Suite 300
    San Diego, CA 92130-2080
    Telephone: +1.858.720.5700
    Facsimile: +1.858.720.5799

    David W. T. Daniels, Cal. Bar No. 172791
    DDaniels@perkinscoie.com
    Michael R. Huston, *pro hac vice*
    MHuston@perkinscoie.com
    700 Thirteenth Street, NW, Suite 800
    Washington, DC 20005-3960
    Telephone: +1.202.654.6200
    Facsimile: +1.202.654.6211

    David B. Massey, *pro hac vice*
    DMassey@perkinscoie.com
    1155 Avenue of the Americas, 22nd Floor
    New York, NY 10036-2711
    Telephone: +1.212.262.6900
    Facsimile: +1.212.977.1649

Attorneys for Plaintiff
Uber Technologies, Inc.

-77-    No. 2:25-cv-06612-SPG-PD
PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS