John C. Hueston
jhueston@hueston.com
Marshall A. Camp
mcamp@hueston.com
Bram M. Alden
balden@hueston.com
Stewart J. Rickert
srickert@hueston.com
HUESTON HENNIGAN LLP
620 Newport Center Drive, Suite 1300
Newport Beach, CA 92660
Telephone: (949) 229-8640
Facsimile: (888) 866-4825

PUBLIC VERSION OF
DOCUMENT PROPOSED TO BE
FILED UNDER SEAL

*Attorneys for Defendants Jacob Emrani and
The Law Offices of Jacob Emrani*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

UBER TECHNOLOGIES, INC.,

Plaintiff,

v.

DOWNTOWN LA LAW GROUP,
IGOR FRADKIN, THE LAW OFFICES
OF JACOB EMRANI, JACOB
EMRANI, VALLEY ORTHOPEDIC
AND SPINE CENTER D/B/A GSK
SPINE, and GREG KHOUNGANIAN,

Defendants.

Case No. 2:25-cv-06612-SPG-PD

**JACOB EMRANI'S AND THE
LAW OFFICES OF JACOB
EMRANI'S REPLY IN SUPPORT
OF MOTION TO DISMISS THE
FIRST AMENDED COMPLAINT
UNDER FED. R. CIV. P. 12(B)(6)**

## TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................1

II.    ARGUMENT .......................................................................................8

    A.    Uber's Claims Are Barred by the *Noerr-Pennington* Doctrine ...........8

        1.    This Lawsuit Burdens Petitioning Rights.................................9

        2.    Uber Collapses Steps One and Two of *Noerr-Pennington* .....11

        3.    RICO Can Be Construed to Avoid Burdening Protected Activity ..................................................................................14

        4.    The Sham Litigation Exception Does Not Apply ...................15

    B.    Uber's Claims Are Precluded by the Terms of Uber's Settlements..18

    C.    Uber's Claims Are Barred By the Statute of Limitations..................20

    D.    Uber Fails to Satisfy the Rule 9(b) Heightened Pleading Standard ..23

        1.    There Are No Predicate Acts of Racketeering ........................24

        2.    There Is No Proximately Caused Injury.................................26

        3.    There Is No Pattern of Racketeering .....................................28

        4.    There Is No RICO Enterprise .................................................29

III.   CONCLUSION ..................................................................................30

## TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*In re Abrams & Abrams, P.A.*,
   605 F.3d 238 (4th Cir. 2010) ................................................................................ 1

*Acres Bonusing, Inc. v. Ramsey*,
   2022 WL 17170856 (N.D. Cal. Nov. 22, 2022) ............................................. 6, 24

*Anza v. Ideal Steel Supply Corp.*,
   547 U.S. 451 (2006) ............................................................................................ 27

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ......................................................................................... 5, 23

*B&G Foods N. Am., Inc. v. Embry*,
   29 F.4th 527 (9th Cir. 2022) .................................................................. 2, 9, 11, 12

*BE & K Constr. Co. v. NLRB*,
   536 U.S. 516 (2002) ............................................................................................ 17

*Boyle v. United States*,
   556 U.S. 938 (2009) ............................................................................................ 30

*Canyon Cnty. v. Syngenta Seeds, Inc.*,
   519 F.3d 969 (9th Cir. 2008) ..................................................................... 6, 26, 28

*Capitol W. Appraisals v. Countrywide Fin. Corp.*,
   2009 WL 10677052 (W.D. Wash. Sept. 30, 2009) ............................................. 30

*Cedric Kushner Promotions, Ltd. v. King*,
   533 U.S. 158 (2001) ............................................................................................ 30

*Coronavirus Reporter v. Apple, Inc.*,
   85 F.4th 948 (9th Cir. 2023) ............................................................................... 26

*Crown Chevrolet v. Gen. Motors, LLC*,
   637 F. App'x 446 (9th Cir. 2016) ........................................................................ 20

*Edwards v. Comstock Ins. Co.*,
   205 Cal. App. 3d 1164 (1988) .......................................................................... 4, 19

-iii-

*Ford Motor Co. v. Knight Law Grp.*,
    2025 WL 3306280 (C.D. Cal. Nov. 24, 2025) ...............................................*passim*

*Ford Motor Co. v. Mikhov*,
    2026 WL 691879 (C.D. Cal. Mar. 10, 2026) ................................................*passim*

*Freeman v. Lasky, Haas & Cohler*,
    410 F.3d 1180 (9th Cir. 2005) ................................................................... 16

*Gomez v. Guthy-Renker, LLC*,
    2015 WL 4270042 (C.D. Cal. Jul. 13, 2025) ............................................. 8, 29

*Gouvis Eng'g v. Superior Court*,
    37 Cal. App. 4th 642 (1995) ...................................................................... 19

*Grimmett v. Brown*,
    75 F.3d 506 (9th Cir. 1996) .................................................................. 22, 23

*Hemi Grp., LLC v. City of New York*,
    559 U.S. 1 (2010) ..................................................................................... 27

*Holloway v. Clackamas River Water*,
    2014 WL 6998069 (D. Or. Sept. 9, 2014) .............................................. 7, 27

*Howard v. Am. Online Inc.*,
    208 F.3d 741 (9th Cir. 2000) ................................................................. 8, 29

*Hunt v. Zuffa, LLC*,
    361 F. Supp. 3d 992 (D. Nev. 2019) ....................................................... 7, 27

*I.S. Joseph Co. v. J. Lauritzen A/S*,
    751 F.2d 265 (8th Cir. 1984) .................................................................... 24

*JST Distrib., LLC v. CNV.com, Inc.*,
    2018 WL 6113092 (C.D. Cal. Mar. 7, 2018) ............................................... 7

*Kearney v. Foley & Lardner, LLP*,
    590 F.3d 638 (9th Cir. 2009) ...................................................................*passim*

*Kim v. Kimm*,
    884 F.3d 98 (2d Cir. 2018) ............................................................... 6, 24, 25

*Kim v. Reins Int'l Cal., Inc.*,
    9 Cal. 5th 73 (2020) ................................................................................. 19

- iv -

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997) ........................................................................................22

*Kottle v. Nw. Kidney Ctrs.*,
    146 F.3d 1056 (9th Cir. 1998)................................................................... 4, 16

*LaCour v. Marshalls of Cal., LLC*,
    94 Cal. App. 5th 1172 (2023)........................................................................19

*Limcaco v. Wynn*,
    2023 WL 154965 (9th Cir. Jan. 11, 2023)...................................................6, 27

*Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*,
    431 F.3d 353 (9th Cir. 2005).......................................................14, 16, 18, 25

*Lockwood v. Sheppard, Mullin, Richter & Hampton, LLP*,
    2009 WL 9419499 (C.D. Cal. Nov. 24, 2009) ...............................................24

*Montway LLC v. Navi Transp. Servs. LLC*,
    --- F. Supp. 3d ----, 2026 WL 866290 (D. Del. 2026)...................................14

*Nat.-Immunogenics Corp. v. Newport Trial Grp.*,
    2020 WL 5239856 (C.D. Cal. Aug. 3, 2020) .............................................17, 18

*Neubronner v. Milken*,
    6 F.3d 666 (9th Cir. 1993) .............................................................................23

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    572 U.S. 545 (2014) ...........................................................................3, 15, 16

*Ogden v. Wells Fargo Bank, N.A.*,
    2015 WL 13413390 (C.D. Cal. Feb. 20, 2015)...........................................7, 27

*Pac. Surf Designs, Inc. v. Whitewater W. Indus., Ltd.*,
    2021 WL 5326529 (S.D. Cal. Nov. 16, 2021) ............................................7, 27

*Patel v. Am. Dental Ass'n*,
    2024 WL 5279870 (C.D. Cal. Dec. 16, 2024) ................................................21

*Perez v. DirecTV Grp. Holdings, LLC*, 2019 WL 6362471 (C.D. Cal.
    Jul. 23, 2019) ................................................................................................11

*Pick v. Kay*,
    2022 WL 193197 (9th Cir. Jan. 21, 2022).....................................................10

- v -

*Pincay v. Andrews*,
238 F.3d 1106 (9th Cir. 2001) ............................................................. 5, 20, 21

*Plouviez v. Duel*,
2022 WL 18278581 (C.D. Cal. Nov. 23, 2022) ................................................ 14

*Pyankovska v. Abid*,
65 F.4th 1067 (9th Cir. 2023) ........................................................ 12, 13

*Quick v. EduCap, Inc.*,
318 F. Supp. 3d 121 (D.D.C. 2018) ................................................. 25

*Regueiro v. FCA US, LLC*,
671 F. Supp. 3d 1085 (C.D. Cal. 2023) .......................................... 4, 19

*Relevant Grp. LLC v. Nourmand*,
116 F.4th 917 (9th Cir. 2024) ....................................................... 3, 13, 15

*Republic of Kazakhstan v. Stati*,
380 F. Supp. 3d 55 (D.D.C. 2019) ................................................. 24

*Reves v. Ernst & Young*,
507 U.S. 170 (1993) ....................................................................... 29

*Rose v. Slater, Slater & Schulman, LLP*,
2025 WL 3691864 (C.D. Cal. Nov. 19, 2025) ................................... 24

*Rotella v. Wood*,
528 U.S. 549 (2000) ....................................................................... 22

*Silver v. Duel*,
2022 WL 1837076 (C.D. Cal. Apr. 26, 2022) ................................... 14

*Snow Ingredients, Inc. v. SnoWizard, Inc.*,
833 F.3d 512 (5th Cir. 2016) .......................................................... 24

*Sosa v. DIRECTV, Inc.*,
437 F.3d 923 (9th Cir. 2006) ....................................................*passim*

*Steele v. Hosp. Corp. of Am.*,
36 F.3d 69 (9th Cir. 1994) .............................................................. 27

*Theme Promotions, Inc. v. News Am. Mtkg. FSI*,
546 F.3d 991 (9th Cir. 2008) .......................................................... 15

- vi -

*Thomas v. Baca*,
308 F. App'x 87 (9th Cir. 2009)..................................................................6, 27

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*,
826 F. Supp. 2d 1180 (C.D. Cal. 2011).....................................................8, 30

*Uber Techs., Inc. v. Law Grp. of S. Fla., LLC. et al.*,
No. 1:25-cv-22635-CMA (S.D. Fla.) ...................................................................1

*Uber Techs., Inc. v. Simon & Simon P.C. et al.*,
2:25-cv-05365-MAK (E.D. Pa.)........................................................*passim*

*Uber Techs., Inc. v. Wingate, Russotti, Shapiro, Moses & Halperin, LLP et al.*,
No. 1:25-cv-00522 (E.D.N.Y.) ...........................................................................1

*United States v. Marbella*,
73 F.3d 1508 (9th Cir. 1996)....................................................................25

*United States v. Pendergraft*,
297 F.3d 1198 (11th Cir. 2002).................................................................24

*Vess v. Ciba-Geigy Corp. USA*,
317 F.3d 1097 (9th Cir. 2003)..................................................................7, 29

*Walter v. Drayson*,
538 F.3d 1244 (9th Cir. 2008).............................................................8, 29, 30

*Washington v. U.S. Food & Drug Admin.*,
108 F.4th 1163 (9th Cir. 2024)..................................................................26

*Wilding v. DNC Servs. Corp.*,
941 F.3d 1116 (11th Cir. 2019)..................................................................26

*Wojciechowski v. Kohlberg Ventures, LLC*,
923 F.3d 685 (9th Cir. 2019)....................................................................19

**Statutes**

18 U.S.C. § 1341..............................................................................14

18 U.S.C. § 1343..............................................................................14

JACOB EMRANI'S AND HIS LAW OFFICE'S COMBINED REPLY IN SUPPORT OF MOTION TO DISMISS THE FIRST AMENDED COMPLAINT UNDER FED. R. CIV. P. 12(B)(6)

18 U.S.C. § 1961(5) .......................................................................................................22

**Rules**

Federal Rule of Civil Procedure 8 ................................................................................23

Federal Rule of Civil Procedure 9(b) ...................................................................*passim*

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.       INTRODUCTION

Uber's nationwide campaign to close the courthouse doors to its injury victims and their counsel continues.  The strategy involves two prongs: Uber pours cash into ballot measures and legislation targeting the plaintiffs' bar—some $32.5 million to date in California alone—while simultaneously pursuing meritless RICO claims against its litigation adversaries.  *See* Justin Klockzko, *A License to Kill: How Uber's Rush to Close Courthouse Doors and Roll Out Robocars Threatens Public Safety*, Consumer Watchdog (Mar. 17 2026), https://tinyurl.com/4xdrucuf; Levi Sumagaysay, *Uber Ballot Initiative Sparks Showdown with Lawyers, Doctors*, CalMatters (Feb. 24, 2026), https://tinyurl.com/3dxek24d; *Uber Techs., Inc. v. Wingate, Russotti, Shapiro, Moses & Halperin, LLP et al.*, No. 1:25-cv-00522 (E.D.N.Y.); *Uber Techs., Inc. v. Law Grp. of S. Fla., LLC. et al.*, No. 1:25-cv-22635-CMA (S.D. Fla.); *Uber Techs., Inc. v. Simon & Simon P.C. et al.*, 2:25-cv-05365-MAK (E.D. Pa.).  The dual-pronged strategy is no accident.  The point, as in California, is "to get the [ballot] initiative passed by disparaging the lawyers who represent automobile accident victims."  Erwin Chemerinsky, *Uber's Ballot Initiative Would Help the Company at Our Expense*, The Sacramento Bee (Mar. 22, 2026), https://tinyurl.com/yd85zr65.

Consistent with the disparagement strategy, Uber's brief in opposition to dismissal (the "Opposition" or "Opp.") is heavy on invective—baselessly accusing lawyers of attempting "to exploit vulnerable individuals" in order "to pilfer [Uber's] deep pockets," Opp. 1, 3—but wrong on the law.[1]  There is nothing unusual about a

---

[1] Uber's attack on contingency fees, *see* Opp. 4, 5, 7, 8, is part and parcel of its overarching objective to shut down litigation by its injury victims.  "[C]ontingency fees provide access to counsel for individuals who would otherwise have difficulty obtaining representation" and often function as "the key to the courthouse door," ensuring that access is not restricted to the rich. *In re Abrams & Abrams, P.A.*, 605 F.3d 238, 245-46 (4th Cir. 2010).

$175 billion perpetual tortfeasor having to defend itself in multiple "personal-injury actions, one at a time." Opp. 3. That is the American legal system, not a RICO conspiracy. And Uber's own brief announces at the outset how the system works: a plaintiff's allegations are "put to the test in discovery" (and at trial), Opp. 2, which is exactly what should have happened in the underlying cases that Uber settled for substantial sums. The fundamentals of litigation do not shift to accommodate whichever side of the "v" Uber happens to occupy.

Permitting Uber to proceed with its RICO campaign against its litigation adversaries poses dangerous hazards with no guardrails. Any recidivist tortfeasor—and especially the richest among them—could abuse the judicial process by settling claims for value and then unsettling them via RICO. Whether motivated by retaliatory malice or simply regretting its own litigation decisions, tortfeasors would be permitted fresh bites at rotten apples. And, under Uber's theory, courts are powerless to prevent the harm by acting decisively on the pleadings. Even if the RICO relitigation stratagem ultimately fails, the damage is done: defense costs are accrued, First Amendment rights are chilled, and Uber is insulated from liability for car crashes caused by its drivers. That is of course what Uber wants. But, as explained by Jacob Emrani and the Law Offices of Jacob Emrani in their motion to dismiss (the "Motion" or "Mot."), it is not the law.

Uber's counterarguments fail on each score.

1.    Uber fails to understand the point of the *Noerr-Pennington* doctrine. It protects First Amendment petitioning rights by supplying "immunity" from suit, including suits alleging civil RICO violations. *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006); *Ford Motor Co. v. Mikhov*, 2026 WL 691879, at *7 (C.D. Cal. Mar. 10, 2026) ("*Ford II*"); *Ford Motor Co. v. Knight Law Grp.*, 2025 WL 3306280, at *12 (C.D. Cal. Nov. 24, 2025) ("*Ford I*"). Defendants are entitled to that immunity regardless of "any alleged misconduct tied to the petitioning activities." *B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 535 (9th Cir. 2022). If a plaintiff could evade

- 2 -

immunity simply by slapping on a "fraud" label, there would be no immunity at all. Any plaintiff could deploy the same label. Where courts protect the First Amendment by safeguarding "breathing space" around petitioning activity, *Sosa*, 437 F.3d at 930, Uber would suffocate the doctrine altogether.

*Noerr-Pennington* applies here because every step of the "fraud" Uber alleges lies within the heartland of litigation activity that the First Amendment protects: identifying victims "with potential personal injury claims" in order "to sue Uber," Opp. 4; referring victims for medical treatment "to increase the value of their lawsuits," Opp. 5; "driving up the value of those claimants' lawsuits" with medical expenses, Opp. 7; and using medical records to obtain "settlements from Uber in personal-injury litigation," Opp. 8. These allegations far exceed the *Noerr-Pennington* threshold, which is triggered whenever a statutory interpretation "could implicate the rights protected by the Petition Clause" and which occurs when, as here, a lawsuit targets "presuit litigation-related conduct." *Sosa*, 437 F.3d at 931, 938 (emphasis added). The decision in Uber's Eastern District of Pennsylvania lawsuit is not to the contrary, as the court there recognized that while the Third Circuit "has never opined on when conduct is 'incidental' enough to litigation to be covered by *Noerr-Pennington*," *this* lawsuit is "governed by Ninth Circuit law"—"a *Sosa* jurisdiction." *Simon*, Dkt. 99 at 11; Dkt. 96-2 at 86.

Uber also cannot overcome *Noerr-Pennington* by invoking its narrow exception for "sham litigation." *Sosa*, 437 F.3d at 934. To satisfy that exception, the "lawsuit must be objectively baseless," *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 556 (2014), which Uber expressly does not assert, Opp. 18 n.4. Nor could it, because it settled each of the underlying lawsuits. *See Relevant Grp. LLC v. Nourmand*, 116 F.4th 917, 932 (9th Cir. 2024). *Simon* is distinguishable on this basis too, since the predicate actions in that case did *not* uniformly result in settlement. *Simon*, Dkt. 99 at 44 n.117. In fact, Uber alleges that the lawyer defendants in *Simon* "quickly dismissed Uber" from nearly 30 cases after it sought

- 3 -

discovery from the doctor defendants, suggesting *actual* sham litigation pursued via a "policy of starting legal proceedings without regard to merit." *Id.* at 15-16. Nothing of the sort happened here. In this case, moreover, Uber alleges only misstatements in discovery and settlement communications between the parties, Opp. 18-19, which could never satisfy a sham litigation exception for cases involving "intentional misrepresentations *to the court*," *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1060 (9th Cir. 1998) (emphasis added). The *Noerr-Pennington* doctrine thus bars this suit.

2. Uber reverts to the traditional preclusion test with a lengthy exegesis, Opp. 24-37, ignoring Emrani's argument that, under binding Ninth Circuit law, courts must "'look to the intent of the settling parties to determine the preclusive effect of a dismissal with prejudice entered in accordance with a settlement agreement, rather than to general principles of claim preclusion,'" Mot. 23 (quoting *Wojciechowski v. Kohlberg Ventures, LLC*, 923 F.3d 685, 689 (9th Cir. 2019)). But even if California law applies, Opp. 25 n.6, that would make no difference: as a matter of black-letter contract law, an executed release precludes litigation of claims a party agreed not to pursue. *See Edwards v. Comstock Ins. Co.*, 205 Cal. App. 3d 1164, 1167 (1988). By failing to respond to Emrani's argument that Uber's settlement agreements preclude this suit, Uber has waived any opposition. *Regueiro v. FCA US, LLC*, 671 F. Supp. 3d 1085, 1104 (C.D. Cal. 2023). Nor is there any viable response. Uber drafted settlement agreements that have a ████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████ *See, e.g.*, Mot. Ex. A §§ 3 (emphasis added), 11, 18. Uber's settlement agreements—which also fully distinguish this suit from *Simon*—bar this action against Emrani and his Firm.

3. Uber's attempt to overcome the four-year statute of limitations brushes aside the settled rule of "constructive notice," which triggers the limitations period

- 4 -

when a RICO plaintiff "*should know* of the injury" it alleges. *Pincay v. Andrews*, 238 F.3d 1106, 1109 (9th Cir. 2001) (emphasis added). Uber's own allegations establish constructive notice: when served with lawsuits and damages demands purportedly involving "a minor accident (or no accident at all) that produced minor injuries (or no injuries at all)," Opp. 8, Uber possessed more than "enough information to warrant an investigation which, if reasonably diligent, would have led to the discovery of the [purported] fraud," *Pincay*, 238 F.3d at 1110.[2] Beyond that, Uber's argument that it did not have "knowledge of a *pattern* of illegal behavior" for statute of limitations purposes, Opp. 75, rests on a failed legal premise—as Emrani already pointed out, the Supreme Court rejected Uber's "injury *and pattern* discovery rule" more than a quarter century ago, Mot. 26 (quoting *Rotella v. Wood*, 528 U.S. 549, 555-57 (2000)). Uber's claims are thus barred by the statute of limitations.

4. Even setting aside the threshold deficiencies, the First Amended Complaint (FAC) fails to satisfy the Rule 9(b) pleading standard. Although the entire alleged scheme turns on the premise that Emrani and his Firm—lawyers without medical training—knew that doctors were supplying unnecessary medical care, Uber argues that it suffices to plead the bare legal allegation that "'Defendants committed these acts willfully and knowingly and with specific intent to defraud.'" Opp. 53 (quoting FAC ¶ 381). According to Uber, "all that is needed at the pleading stage" is "general allegations" of scienter. *Id.* That misunderstands what "general allegations" require. Even though Rule 9(b) does not require "particularity" in pleading scienter, that "does not empower [Uber] to plead the bare elements of [its] cause of action, affix the label 'general allegation,' and expect [its] complaint to survive a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 686-87 (2009). When it comes to the alleged "circumstances constituting fraud" for which particularity *is* required, Fed. R. Civ. P. 9(b), Uber fares even worse: the Opposition does not even

_____

[2] Emrani of course disputes these allegations, but, accepting them as true for purposes of this Motion only, Uber's failure to act with diligence triggers the limitations bar.

- 5 -

attempt to defend the FAC's reliance on dozens and dozens of allegations inadequately supported by "information and belief." *See* Mot. 5, 30-31.

Uber also fails to properly plead RICO's elements.

a.    Uber ignores precedents holding that "[l]itigation activities alone generally cannot serve as predicate acts for civil RICO claims," including ordinary acts like "signing and filing declarations" and also unwarranted acts like "the filing of malicious lawsuits," pursuit of "meritless litigation," or "proffering [of] false affidavits and testimony to a state court." *Acres Bonusing, Inc. v. Ramsey*, 2022 WL 17170856, at *10 (N.D. Cal. Nov. 22, 2022) (alteration adopted). Despite spanning more than 75 pages, the Opposition never addresses the line of cases, starting with *Kim v. Kimm*, 884 F.3d 98 (2d Cir. 2018), that bar RICO claims predicated upon the sort of litigation activities that form the basis of Uber's RICO claims against Emrani and his Firm, *see* Mot. 5-6, 32-33. Uber's RICO claims fail for this reason alone.

b.    The FAC also fails to allege with specificity any "concrete financial loss" that bears a "direct causal connection" to any alleged RICO violation. *Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975, 983 n.13 (9th Cir. 2008). In response to the argument that it cannot establish causal injury because none of its settlements exceeded its $1 million insurance minimum, Uber resorts to "inference," "implication," and unspecified claims of unidentified "legal fees, settlement costs, and other out-of-pocket costs." Opp. 58-61 (emphasis omitted). Not only are such vague allegations insufficient under Rule 9(b), but the Court would be "sorely pressed" to identify the "specific portion" of the loss caused by the alleged RICO conspiracy, thus requiring dismissal. *Canyon Cnty.*, 519 F.3d at 984. Similarly unavailing is the Opposition's legal fees theory. The Ninth Circuit has never "recognized the incurment of legal fees as a cognizable injury under RICO," *Limcaco v. Wynn*, 2023 WL 154965, at *2 (9th Cir. Jan. 11, 2023); *Thomas v. Baca*, 308 F. App'x 87, 88 (9th Cir. 2009), and courts in this circuit have applied those precedents to bar RICO claims even where alleged fees were incurred in defending against

- 6 -

underlying actions, *e.g.*, *Pac. Surf Designs, Inc. v. Whitewater W. Indus., Ltd.*, 2021 WL 5326529, at \*2 (S.D. Cal. Nov. 16, 2021); *Ogden v. Wells Fargo Bank, N.A.*, 2015 WL 13413390, at \*1-3 (C.D. Cal. Feb. 20, 2015), *aff'd on other grounds*, 674 F. App'x 650 (9th Cir. 2017); *Holloway v. Clackamas River Water*, 2014 WL 6998069, at \*9 (D. Or. Sept. 9, 2014).  But even if fees could constitute a cognizable interest, Uber's unspecified allegations of "defense costs," FAC ¶¶ 71, 95, 142, 361, are, like its other allegations, too "vague and abstract" to allege a "concrete financial loss."  *See Hunt v. Zuffa, LLC*, 361 F. Supp. 3d 992, 1001 (D. Nev. 2019).

        c.     The Opposition also cannot overcome the FAC's failure to allege a pattern of predicate acts of racketeering committed by either Emrani or his Firm. Mot. 38-41.  It is not enough to tell a long story with a lot of pages.  Nowhere does the FAC identify the "who, what, when, where, and how" of the alleged mail and wire fraud. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003); *JST Distrib., LLC v. CNV.com, Inc.*, 2018 WL 6113092, at \*6 (C.D. Cal. Mar. 7, 2018). Instead, in its retaliatory pursuit of the illogical claim that competing law firms conspired with each other, Uber now resorts to falsely impugning Emrani with State Bar charges against his rival. Opp. 17 n.3.  Describing charges against the Downtown LA Law Group (DTLA) or its co-founder as "evidence of *Defendants'* fraudulent and unethical conduct," *id.* (emphasis added), is a serious misrepresentation given that Emrani has absolutely nothing to do with those charges.  Uber's tactic only confirms that it is pursuing this action merely to defame its litigation adversaries.

      The FAC's deficiencies are particularly acute as to Emrani personally.  In its entirety, the FAC alleges that Emrani signed and mailed a demand letter to Uber in connection with Claimant B, FAC ¶ 75, and signed, but did not himself send, a demand letter to Uber on behalf of Claimants D and E, *id.* ¶¶ 128, 139.  But Uber's allegation as to Claimant B's "fraudulent" demand letter cannot possibly constitute a predicate act as part of "a scheme with [Dr. Greg] Khounganian" to "fabricate exorbitant medical costs" that "drive up [personal-injury claimants'] recovery against

Uber," Opp. 3-4, because, as the FAC alleges, Emrani sent the demand letter *before* Claimant B even had his first appointment with Dr. Khounganian, FAC ¶¶ 75, 78. That leaves only *one* predicate act that Emrani is alleged to have committed, which is plainly insufficient. *Howard v. Am. Online Inc.*, 208 F.3d 741, 746 (9th Cir. 2000).

d.    Nor can the Opposition save the FAC's inadequate "enterprise" allegations. The FAC makes no plausible allegation that Emrani conducted the affairs of his Firm as a RICO enterprise as opposed to running it as a law firm. The mere allegation that Emrani and his Firm "are associated in a manner directly related to their own primary business activities [] is insufficient to state a claim under § 1962(c)." *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, 826 F. Supp. 2d 1180, 1202 (C.D. Cal. 2011). The FAC's allegations of "association-in-fact" conspiracies between Emrani, his Firm, Dr. Khounganian, his medical practice, and Emrani's rivals at DTLA similarly fail. FAC ¶¶ 366-369. Uber alleges that Emrani and his Firm referred their clients—individuals injured by Uber's drivers—to medical providers for diagnoses and treatment. But "[c]ourts have overwhelmingly rejected attempts to characterize routine commercial relationships as RICO enterprises," *Gomez v. Guthy-Renker, LLC*, 2015 WL 4270042, at *8 (C.D. Cal. Jul. 13, 2025), and instead require more than conclusory allegations that defendants came together for a wrongful purpose, *Ford I*, 2025 WL 3306280, at *13-14. And for the association-in-fact conspiracies, the FAC fails to plausibly allege that Emrani or his Firm played any "part in directing [the] affairs" of any such enterprise. *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008).[3]

For all—or any single one—of these reasons, the FAC should be dismissed.

## II.    ARGUMENT

### A.    Uber's Claims Are Barred by the *Noerr-Pennington* Doctrine

To decide whether alleged conduct "is immunized under *Noerr-Pennington*,"

---

[3] Emrani and his Firm once again adopt and join in all of the arguments of their co-defendants. *See* Mot. 14 n.2.

the Ninth Circuit applies "a three-step analysis to determine: (1) whether the lawsuit imposes a burden on petitioning rights, (2) whether the alleged activities constitute protected petitioning activity, and (3) whether the statute at issue may be construed to avoid that burden." *B&G Foods*, 29 F.4th at 535 (quotation marks and alteration marks omitted). Here, all three steps establish immunity.

### 1.    This Lawsuit Burdens Petitioning Rights

Uber cannot seriously dispute that its claims against Emrani and his Firm— that is, a *lawyer* and his *law firm*—burden petitioning rights. The whole point is to retaliate against Emrani's Firm for litigating cases against Uber. And every step of the alleged "fraud" makes that clear. The purported scheme begins when Emrani and his Firm "aggressively pursue clients to sue Uber" through "online advertisement." FAC ¶ 26; Opp. 4. As even laypersons understand, that is the first step in the practice of litigation through which victims and their lawyers exercise their First Amendment petitioning rights. Thereafter, as a condition of representing them "in *suing* Uber," Emrani and his Firm allegedly direct their clients to "medical providers." Opp. 5 (emphasis added); *see also* FAC ¶¶ 2, 31, 59, 124. The medical providers, according to Uber, are chosen specifically to maximize recoveries in "*lawsuits*," and the victims "enter into agreements with the medical providers that grant such providers a lien on recoveries *from the claim* and purport to promise full payment to the medical providers in the event of a *shortfall in recovery*." FAC ¶¶ 2, 31 (emphases added); *see also* Opp. 5. "Khounganian accepts referrals from lawyers *who have cases against Uber* with the understanding that he will perform specific acts to increase the value of *their lawsuits*." FAC ¶ 10 (emphases added); *see also* Opp. 5. Thus, the alleged referrals and treatment are specifically designed for litigation—i.e., petitioning activity. The medical providers then generate allegedly "artificially inflated bills" that are "utilized as the basis for a false and artificially inflated *damages claim*," thereby "driving up the value of those claimants' *lawsuits* and settlement demands." FAC ¶¶ 2-3 (emphasis added); Opp. 7 (emphasis added).

- 9 -

Again, the point is clear—medical bills are supposedly inflated for litigation purposes. And that is also how they are purportedly used at the final step of the alleged scheme: the bills are "presented to Uber" as part of "a personal-injury *lawsuit* and/or a pre-suit demand letter" "in order to extract inflated settlements from Uber in personal-injury *litigation*." FAC ¶ 3 (emphasis added); Opp. 8 (emphasis added).

There is thus zero merit to the Opposition's claim that the "fraud in this case is prior to and external to the litigation" and "significantly predated the personal-injury lawsuits." Opp. 12, 14. The entire alleged scheme involves identifying injury victims to litigate claims against Uber, referring them to doctors for the purpose of increasing the value of their legal claims, and then using medical records to pursue litigation. The theoretical possibility that the alleged acts of fraud could have been committed if they had *not* been "used as the basis for a personal injury lawsuit" is beside the point. Opp. 16. What matters is *Uber's allegations* against Emrani and his Firm. Those allegations strike directly at the heart of the Petition Clause. *See Sosa*, 437 F.3d at 932-33 (lawsuit that "seeks to impose RICO liability" for "sending the demand letters" would "quite plainly" burden petitioning rights); *Pick v. Kay*, 2022 WL 193197, at *1 (9th Cir. Jan. 21, 2022) ("the filing of . . . lawsuits . . ., and any conduct incidental to filing, are quintessential protected petitioning activities"). Indeed, Uber does not dispute that, compared to *Ford*, this case is an even stronger candidate for *Noerr-Pennington* immunity given that the targeted "attorney fee litigation" in *Ford* was "collateral to the main action." Opp. 23. If a collateral scheme by attorneys to "inflate their fees" is sufficiently tied to litigation to constitute "petitioning activity," *Ford I*, 2025 WL 3306280, at *1, 8, there should be no dispute that an alleged scheme to inflate the value of *the lawsuits themselves* also fits the bill.

The balance of the cases Uber cites all involved out-of-court conduct completely untethered to litigation. Opp. 13-15. In *Hakak v. Geffen*, the defendants had engaged in a campaign of bank and identity fraud that was *separate* from their elder abuse claim against their father's caretaker. 2023 WL 4681385, at *2, 5 (C.D.

Cal. Jun. 28, 2023). Far from endorsing Uber's claim that the underlying fraud was committed "in order to manufacture [the] elder abuse claim," Opp. 14, the court was *not persuaded* by the allegation that the fraud was "part and parcel to the filing and prosecution of the Elder Abuse Case." *Hakak*, 2023 WL 4681385, at \*5 (alteration marks omitted). "A call to Wells Fargo or the fraudulent use of another's identity to cancel issued checks are *not* petitions seeking redress from the government[.]" *Id.* (emphasis added). By contrast, the court explained, the allegations of underlying witness tampering did encompass "conduct incidental to the prosecution of a suit." *Id.* Similarly, in *California Pharmacy Mgmt., LLC v. Zenith Ins. Co.*, the court found that the fraudulent conduct occurred "entirely outside" of the petitioning action, which "was merely a vehicle to effectuate Defendants' scheme." 669 F. Supp. 2d 1152, 1168 (C.D. Cal. 2009). And in *Perez v. DirecTV Grp. Holdings, LLC*, the court concluded that the "RICO claim, as pleaded, could survive even absent any reliance on a communication that threatens litigation" when the defendant's conduct "has nothing to do with a petition to the court." 2019 WL 6362471, at \*7 (C.D. Cal. Jul. 23, 2019). These cases do not support Uber's argument; they refute it.

## 2. Uber Collapses Steps One and Two of *Noerr-Pennington*

Because there can be no real dispute that this case "imposes a burden on petitioning rights," *B&G Foods*, 29 F.4th at 535, Uber tries instead to knock out *Noerr-Pennington* entirely by suggesting that so long as a plaintiff alleges activity that "the First Amendment does not protect"—here, "fraud"—the suit may proceed. Opp. 10-11. That fundamentally misguided argument conflates the first and second steps of the *Noerr-Pennington* test. As Uber's own lead authority recognizes, the first-step question is "not whether the conduct at issue is fraudulent and abusive, but instead whether the success of [the] lawsuit would constitute a burden on petitioning rights." *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 645 (9th Cir. 2009). The determination of whether a lawsuit burdens petitioning rights "is separate from the question of whether the conduct challenged included intentional misrepresentations

- 11 -

or fraud." *Id.* That is why, at step one, courts "do not consider any alleged misconduct tied to the petitioning activities." *B&G Foods*, 29 F.4th at 535.

In arguing otherwise, the Opposition advances the exact argument that the *Ford* cases rejected twice. Like Uber here, Ford "echo[ed] the plaintiff in *Kearney*, who contended that 'if her lawsuit were successful, it would not discourage future eminent domain proceedings, just fraudulent behavior in those lawsuits,'" *Ford I*, 2025 WL 3306280, at *7, and that "because perjury lacks First Amendment protection, any declarations to courts which could be considered perjury and any false statements to Plaintiff while settling cases would fall outside the ambit of *Noerr-Pennington* protection," *Ford II*, 2026 WL 691879, at *8. The court rejected these arguments, explaining that Ford, like the *Kearney* plaintiff, sought to "conflat[e]" step one of the *Noerr-Pennington* analysis "with the sham litigation inquiry under step two." *Id*. The "step one inquiry requires no more" than determining whether the successful lawsuit would burden petitioning activity. *Id*.

Just as the Opposition's conflation of the first two steps of the *Noerr-Pennington* test has already been rejected twice by the *Ford* court, so too has its attempted reliance on *Pyankovska v. Abid*, 65 F.4th 1067 (9th Cir. 2023). Opp. 10-13. In *Pyankovska*, the Ninth Circuit held that the plaintiff's lawsuit seeking to hold her ex-husband liable under the Federal Wiretap Act for filing the transcripts of private conversations obtained through a recording device in their child's backpack did not burden the ex-husband's petitioning activity, because merely filing illegally obtained evidence on a public docket did not involve "mak[ing] representations and present[ing] arguments to support [a] request that the court do or not do something" and thus did not constitute petitioning activity. *Id*. at 1077. As the *Ford* court explained in "deem[ing] [*Pyankovska*] an inappropriate comparator," submitting "a declaration in support of a fee petition" requires the sort of advocacy that merely filing "the product of a secret recording device does not." *Ford II*, 2026 WL 691879, at *9. Moreover, because the Ninth Circuit held in *Sosa* that "RICO claims 'quite

- 12 -

plainly' burden petitioning activity" and "*Pyankovska* arose under the Wiretap Act rather than as a RICO claim" it is apparent that *Sosa*, not *Pyankovska*, is the applicable precedent. *Ford I*, 2025 WL 3306280, at *8.

The *Ford* reasoning applies with full force here. Again, Uber alleges a scheme predicated upon litigation-related activities, and conduct incidental to litigation, all of which is "protected to afford breathing space to the right of petition guaranteed by the First Amendment." *Sosa*, 437 F.3d at 933. *Sosa* was not "limited to a narrow category of incidental activity, namely prelitigation communications demanding settlement," Opp. 15 (quotation marks omitted). The Ninth Circuit held broadly that *Noerr-Pennington* protects "conduct incidental to the prosecution of the suit." 437 F.3d at 934. That standard encompasses Uber's allegations here.

Nothing about the decision in Uber's Eastern District of Pennsylvania suit, *Simon*, Dkt. 99, changes the analysis. The Third Circuit "has never opined on when conduct is 'incidental' enough to litigation to be covered by *Noerr-Pennington*, noting only that 'prelitigation threat letters' sent to a potential defendant might qualify." *Id.* at 11 (quoting *A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 252 (3d Cir. 2001)). But as Uber and the court agreed at the hearing in that case, *this* lawsuit is "governed by Ninth Circuit law"—"a *Sosa* jurisdiction." *Simon*, Dkt. 96-2, at 85. And *Sosa* held that *Noerr-Pennington* encompasses "presuit litigation-related conduct" and "prelitigation communications." 437 F.3d at 936-38, 948. Whatever the law in the Third Circuit, the Ninth Circuit has held that *Noerr-Pennington* "requires courts to construe statutes to avoid burdening conduct that *implicates* the protections of the Petition Clause of the First Amendment." *Relevant Grp.*, 116 F.4th at 932 (emphasis added). Accordingly, binding Circuit precedent does not endorse the *Simon* approach of walling off prelitigation conduct as unworthy of protection at all.[4] Instead, the prelitigation conduct is presumptively protected,

---

[4] *Simon* also went off course by failing to appreciate the distinction between unprotected communications with a private third-party designed to "run [a

- 13 -

with the sham litigation exception supplying "adequate protection against baseless claims." *See Sosa*, 437 F.3d at 836.

### 3.  RICO Can Be Construed to Avoid Burdening Protected Activity

Uber fares no better in contending that its RICO claims overcome *Noerr-Pennington* because the predicate mail and wire fraud statutes cannot possibly be construed to avoid burdening petitioning activity. Opp. 16-17.  The question is only whether the mail and wire fraud statutes "unambiguously reach" the petitioning conduct at issue.  *Sosa*, 437 F.3d at 940.  A construction that avoids burdening petitioning conduct is required "unless the statute clearly provides otherwise." *Id.* at 931.  *Sosa* rejected the claim that the mail and wire fraud statutes mandate a construction that would burden petitioning activity where a RICO action is premised on the defendant's "demands to settle reasonably based legal claims," *id.* at 940, and *Ford I* ruled that the mail and wire fraud statutes do not unambiguously reach factual misrepresentations in inflated fee petitions, 2025 WL 3306280, at *12.  Those conclusions apply here, as Uber alleges that Emrani and his Firm committed mail and wire fraud through their transmission of "a personal-injury lawsuit and/or a pre-suit demand letter."  FAC ¶ 3; *see also* FAC ¶¶ 386-390 (alleging mail and wire fraud based on transmission of litigation-related demands and documents).  Other cases applying *Noerr-Pennington* to bar RICO claims alleging mail and wire fraud are in accord.  *See, e.g.*, *Plouviez v. Duel*, 2022 WL 18278581, at *9 (C.D. Cal. Nov. 23, 2022); *Silver v. Duel*, 2022 WL 1837076, at *6 (C.D. Cal. Apr. 26, 2022); *Cal. Pharmacy*, 669 F. Supp. 2d at 1168.

Uber identifies no contrary case holding that Congress clearly intended to sweep in petitioning-related activity as part of a "scheme or artifice to defraud," 18 U.S.C. §§ 1341, 1343.  All Uber can muster is a citation to *Living Designs, Inc. v.*

competitor] out of business," *see Montway LLC v. Navi Transp. Servs. LLC*, --- F. Supp. 3d ----, 2026 WL 866290, at *3 (D. Del. 2026), and protected communications with an alleged co-conspirator designed specifically to facilitate litigation, *see* FAC ¶ 3.  The former are not incidental to filing a lawsuit; the latter plainly are.

- 14 -

*E.I. DuPont de Nemours & Co.*, 431 F.3d 353 (9th Cir. 2005), Opp. 16-17, which "did not explicitly discuss the *Noerr-Pennington* doctrine" at all and involved conduct that "quite clearly fell within" *Noerr-Pennington*'s "sham litigation exception," *Sosa*, 437 F.3d at 940.  The fact that a suit could proceed under the sham litigation exception does not prove that *Noerr-Pennington* is inapplicable to any RICO claims alleging mail and wire fraud.  Quite the opposite.  Reliance on an *exception* establishes that the doctrine applies in the first instance.[5]

4.    <u>The Sham Litigation Exception Does Not Apply</u>

Because all of the conduct and communications underlying Uber's claims are protected, the *Noerr-Pennington* doctrine bars Uber's claims unless the targeted petitioning activity constitutes "sham litigation."  *Sosa*, 437 F.3d at 938. The Opposition's claim that this exception applies fails multiple times over.

First, the "Supreme Court has endorsed a two-part test for sham litigation," which is satisfied only when the underlying lawsuit was (1) "objectively baseless" and (2) "an attempt to interfere directly with the business relationships of a competitor." *Theme Promotions, Inc. v. News Am. Mtkg. FSI*, 546 F.3d 991, 1007 (9th Cir. 2008); *see Octane Fitness*, 572 U.S. at 556.  The sham litigation exception thus requires "*both* objective baselessness and an improper motive." *Sosa*, 437 F.3d at 934.  The Opposition concedes that neither "of those circumstances is present here."  Opp. 18 n.4.  Nor could Uber claim otherwise since it settled after having the opportunity to scrutinize each lawsuit through discovery.  *See Relevant Grp.*, 116 F.4th at 932 ("settlement indicates a lawsuit is not objectively baseless").  Because Uber concedes that it cannot satisfy the Supreme Court's test, that alone forecloses the Opposition's reliance on the sham litigation exception.

---

[5] The RICO claim in *Kearney* was also premised on mail fraud, *see* First Am. Compl., *Kearney*, 2006 WL 436181, at ¶ 47 (S.D. Cal. Jan. 20, 2006), yet, there too, the Ninth Circuit proceeded to the sham litigation exception without suggesting that the mail fraud statute unambiguously reaches petitioning activity, 590 F.3d at 646-47.

- 15 -

Instead, the Opposition asserts a purported alternative "sham litigation" exception for instances where "a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy." *Kottle*, 146 F.3d at 1060; *see* Opp. 18-22. To the extent that exception contravenes intervening Supreme Court precedent, including *Octane Fitness*, it is not cognizable. But even assuming this exception remains viable, it is inapplicable. It "consists of making intentional misrepresentations *to the court*." *Kottle*, 146 F.3d at 1060 (emphasis added). *Kottle* itself belies Uber's assertion that no case limits the exception to in-court misrepresentations, Opp. 23, and the Ninth Circuit has confirmed the point: "out-of-court misconduct" does not "fall[] within the third *Kottle* exception," *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1185 n.2 (9th Cir. 2005).

Every single case Uber cites satisfied the requirement of misrepresentations to the court itself. In *Kearney*, the defendant's lawyer "said in trial" that testing had not been performed when in fact it had been. 590 F.3d at 642. In *Living Designs*, the defendant was sanctioned "for falsely representing to the court" that withheld documents lacked evidence they in fact contained. 431 F.3d at 358. In *Moore v. Saniefar*, the plaintiff "lied to the court." 2016 WL 2764768, at *8 (E.D. Cal. May 12, 2016). In *Natural-Immunogenics Corp. v. Newport Trial Grp.*—which actually qualified for the true "objectively baseless" sham litigation exception—the defendants filed "court documents that contained intentional false representations" 2016 WL 11520711, at *7-8 (C.D. Cal. Aug. 1, 2016) ("*Nat.-Immunogenics I*"). And in *Experian Information Solutions, Inc. v. Stein Saks, PLLC*—which also qualified for the objectively baseless sham litigation exception—allegations "in the operative complaint were intentionally false." 2024 WL 5261159, at *5 (C.D. Cal. Nov. 19, 2024). Having failed to allege any misrepresentations *to a court*, Uber cannot invoke a rule designed to protect the judiciary from misrepresentations.

Independently, the sham litigation exception for misrepresentations to the judiciary is reserved for conduct that "deprived the entire litigation" of its legitimacy.

- 16 -

*Ford I*, 2025 WL 3306280, at *11. "[I]t is apparent that any misrepresentation exception to the [*Noerr-Pennington*] doctrine should be limited to misrepresentations respecting the substance of the claim that show that the party's litigation position had no objective basis." *Nat.-Immunogenics Corp. v. Newport Trial Grp.*, 2020 WL 5239856, at *9 (C.D. Cal. Aug. 3, 2020) ("*Nat.-Immunogenics II*"). For that reason, the *Ford* court concluded that where the theory is that the "Defendants sought 'inflated' attorneys' fees, but not Defendants lacked any entitlement to fees," it is "difficult for the Court to find that the fee petition process lacked any legitimacy." *Ford I*, 2025 WL 3306280, at *11.

The Opposition's invocation of this purported sham litigation exception fails for the same reason. The Opposition alleges that fraudulent medical records "provided the basis for artificially inflated *damages* claims" and allowed the Emrani Defendants "to obtain higher settlements." Opp. 19-20 (emphasis added). There is an obvious difference between contriving a suit and inflating its value. Cases like *Experian*, where the defendant allegedly filed "sham lawsuits in U.S. courts across the country," 2025 WL 3306280, at *11, at *1, and *Natural-Immunogenics II*, where the defendant allegedly "routinely fabricated class-action litigation," 2020 WL 5239856, at *1, involve actual sham litigation. Uber argues that it alleges fraud infecting "all aspects of the litigation," Opp. 24, but that is simply not true. Emrani and his Firm brought real suits based on real accidents. They were "suits involving genuine grievances," *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 532 (2002), that Uber settled for substantial sums after receiving discovery and, often, after conducting "[i]ndependent medical evaluations" and "independent expert" assessments of medical bills, Opp. 50; *see, e.g.*, FAC ¶¶ 70, 119, 172, 174, 183, 197, 221, 299, 321. Purportedly fraudulent medical records allegedly facilitating inflated settlements did not allow anyone to manufacture causes of action that did not exist. Because the purportedly fraudulent medical records were not "misrepresentations respecting the substance" of the underlying lawsuit that showed that the Claimants'

- 17 -

"litigation position had no objective basis," this exception is inapplicable. *Ford I*, 2025 WL 3306280, at *11; *Nat.-Immunogenics II*, 2020 WL 5239856, at *9.

The Opposition's cited authorities are not to the contrary on this score either. In *Kearney*, a law firm misrepresented the substance of its clients' claims by suppressing unfavorable percolation test results and then lying at trial that the testing had never been done. 590 F.3d at 642-43. Similarly, in *Living Designs*, the defendant falsified, destroyed, and misrepresented evidence that went to the very heart of the claim that its products were contaminated. 431 F.3d at 357-58. In *Moore*, the plaintiff lied to the court regarding his disability in an ADA case, where "disability is an essential element." 2016 WL 2764768, at *8. In *Natural-Immunogenics I*, the law firm bribed the lead plaintiff, who had never purchased the product. 2016 WL 11520711, at *1. And in *Experian*, the defendants fabricated evidence of credit denials to circumvent standing requirements. 2024 WL 5261159, at *5. In each case that the Opposition cites, the misrepresentation went to the substantive merits of the underlying claim, not merely the amount of damages.

*Simon* is distinguishable on this ground too. There, unlike here, 6 of the 13 predicate suits did *not* result in settlements, and, in fact, when Uber sought discovery from the principal doctor defendant, "the lawyers quickly dismissed Uber from each of the then-pending nearly thirty cases involving [him]." *Simon*, Dkt. 99 at 15 (quotation marks omitted), 16. Those allegations could reflect "a policy of starting legal proceedings without regard to merit" and a genuine dispute regarding whether litigation was filed merely "for purposes of harassment and to extract settlement value through the process of litigation." *Id.* at 16. Nothing of the sort happened here, where there is no plausible allegation that Emrani or his Firm manufactured wholly meritless claims. There is thus no basis to apply the sham litigation exception.

**B.  Uber's Claims Are Precluded by the Terms of Uber's Settlements**

The Opposition does not dispute that it voluntarily settled every case it now reimagines as a RICO predicate, that each settlement required dismissal ▮▮▮▮▮

- 18 -

██████████████████████████████████████████████████████

███████████ Mot. Exs. A–G. In fact, the Opposition does not once address the settlement agreements. Instead, Uber brushes aside Emrani's preclusion argument in a footnote, asserting only that California, not federal, law applies. Opp. 25 n.6.

Uber's approach, once again, seriously misses the mark. The question of whether federal or state law governs the scope of preclusion is academic, because the result is the same either way. Under federal law, courts "look to the intent of the settling parties to determine the preclusive effect of a dismissal with prejudice entered in accordance with a settlement agreement." *Wojciechowski*, 923 F.3d at 689. As a matter of basic contract law, California does the same. "A contractual settlement of a disputed claim is an agreement the interpretation and effect of which are governed by ordinary principles of contract law." *Gouvis Eng'g v. Superior Court*, 37 Cal. App. 4th 642, 649 (1995). Just as "parties may by agreement limit the legal effect of a dismissal with prejudice" for preclusion purposes, *Kim v. Reins Int'l Cal., Inc.*, 9 Cal. 5th 73, 91 (2020), so too may they "agree to a settlement release that is broader than the claims [the plaintiff] pleaded or could have pleaded," *LaCour v. Marshalls of Cal., LLC*, 94 Cal. App. 5th 1172, 1194 (2023). Accordingly, when a party agrees to a release that precludes its subsequent suit, the subsequent suit cannot proceed. *E.g., Edwards*, 205 Cal. App. 3d at 1167-69.

As to whether Uber's settlement agreements preclude this lawsuit against Emrani and his Firm, the Opposition entirely ignores Emrani's argument that they do. Mot. 3, 23-24. "Because [Uber] failed to address this argument in opposition, [Uber] waives the argument for purposes of this Motion." *Regueiro*, 671 F. Supp. 3d at 1104. That alone should end the analysis: the claims are barred.

Any untimely opposition would also be wrong. Each agreement, in verbatim or substantively identical language, states that it has a ████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ Mot. Ex. A §§ 11, 18; Ex.

- 19 -

B Recitals, § 11; Ex. C §§ 11, 18; Ex. D/E §§ 11, 18; Ex. F Recitals, § 11; Ex. G §§ 11, 18. Moreover, each agreement provides that ███████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████ Mot. Ex. A § 3 (emphasis added); Ex. B § 3; Ex. C § 3; Ex. D/E § 3; Ex. F § 3; Ex. G § 3. ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████ Uber agreed to the contracts it drafted and is bound by their terms.

### C.    Uber's Claims Are Barred By the Statute of Limitations

Uber does not dispute that the civil RICO statute of limitations is four years and that the limitations period begins when a plaintiff "knows or should know of the injury that underlies his cause of action." *Pincay*, 238 F.3d at 1109; *see also Crown Chevrolet v. Gen. Motors, LLC*, 637 F. App'x 446 (9th Cir. 2016) (affirming dismissal where plaintiff "experienced two injuries" before the statute of limitations deadline). Nor does Uber dispute that it received documents it now characterizes as "fraudulent" well before July 21, 2021—four years before it filed this suit.

Multiple facts amply establish constructive notice before July 21, 2021. To begin with, all six of Uber's crashes involving Emrani Claimants occurred in 2019. FAC ¶¶ 57, 72, 96, 122, 131, 143, 154. Thereafter, on December 28, 2020, "in furtherance of the [alleged] scheme," Emrani and his Firm allegedly mailed "a demand letter . . . to Uber's insurance provider" on Claimant B's behalf. *Id*. ¶¶ 75, 387a. Uber alleges that the demand letter itself "falsely represented that Claimant B suffered from numerous spinal injuries and would need to undergo future cervical fusion surgery." *Id*. ¶ 75. Moreover, before July 2021, three of the Emrani Claimants—B, C, and F—had already filed three separate lawsuits against Uber and, in each case, had served Uber with a supposedly "fraudulent complaint and related

papers."  FAC ¶¶ 387c, 388a, 390a.  Specifically, Emrani's Firm served the "fraudulent complaint and related papers" for Claimant B on April 2, 2021, Claimant C on May 11, 2021, and Claimant F on November 2, 2020.  *Id*.

Yet that is not all. The FAC also alleges that Emrani's Firm sent Uber's insurer a demand letter with respect to two other victims—Claimants D and E—on March 31, 2021, "demanding a $1 million settlement in furtherance of the scheme."  FAC ¶ 389b.  That letter added to Uber's constructive notice: it allegedly "bundled the claimed injuries and medical expenses for both Claimant[s] D and E," "claimed a total of $340,441.86 for past and future medical care [for Claimant D], with the majority of future medical expenses arising from Khounganian's fraudulent surgical estimate," and "claimed a total of $627,000 for past and future medical care [for Claimant E], with the majority of future medical expenses arising from Khounganian's fraudulent surgical estimate."  FAC ¶¶ 128-29, 139, 141.

"It is hard to imagine what would constitute 'enough information to warrant an investigation' if receiving a written disclosure of one's purported injury does not."  *Pincay*, 238 F.3d at 1110.  Courts can and do resolve civil RICO statute of limitations questions at the pleading stage when the complaint's own allegations establish constructive knowledge.  *See, e.g.*, *id.* (holding "as a matter of law" that plaintiffs had constructive notice upon receiving written disclosures); *Patel v. Am. Dental Ass'n*, 2024 WL 5279870, at *7-8 (C.D. Cal. Dec. 16, 2024) (finding civil RICO claims barred by statute of limitations on motion to dismiss where plaintiff "had sufficient knowledge to suspect wrongdoing" five years before filing), *aff'd*, 2026 WL 252639 (9th Cir. Jan. 30, 2026).

Uber advances three counterarguments, each of which fails.

*First*, the assertion that the limitations period did not begin until Uber had "knowledge of a *pattern* of illegal behavior" in multiple cases, Opp. 75, is the exact "injury and pattern discovery rule" that the Supreme Court rejected more than 25

years ago, holding that the "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Rotella*, 528 U.S. at 555.

*Second*, the claim that additional alleged injuries after July 21, 2021 extends the limitations period beyond the last injury suffered, Opp. 73, runs headlong into even earlier Supreme Court precedent. Nearly 30 years ago, the Court rejected a "last predicate act rule" whereby the statute of limitations would run from "the last predicate act which is part of the same pattern of racketeering activity." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 186 (1997). Such a rule would encourage plaintiffs to "sleep[] on their rights," undermining the civil RICO's statute of "encouraging potential private plaintiffs diligently to investigate." *Id*. at 187. This rationale is particularly pertinent here. Uber has unlimited resources and had every opportunity to investigate the allegedly fraudulent complaints it received before July 2021 through the ordinary course of litigation. Because Uber sat on its rights despite possessing more than enough information to warrant an investigation, the civil RICO statute of limitations bars its claims. Uber's reliance on 18 U.S.C. § 1961(5) is a similar red herring. Opp. 72, 74. This provision allows pre-limitations predicate acts to be used as evidence of a pattern, but it does not extend the four-year limitations period. *Klehr*, 521 U.S. at 186-87.

*Third*, in a related gambit, Uber invokes the "separate accrual rule" under *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996), arguing that each post-July 2021 settlement constituted a "new and independent injury" with its own limitations period. Opp. 73. This fails twice over. To begin with, the separate accrual rule requires two elements: the later act "must be a *new and independent act* that is not merely a reaffirmation of a previous act" and it must "*inflict new and accumulating injury* on the plaintiff." *Grimmett*, 75 F.3d at 513. Yet, Uber's theory is that Emrani and his Firm engaged in the same scheme with the same medical providers, across all of the predicate cases. FAC ¶¶ 2-5. Because the alleged acts and injuries before and after July 2021 belonged to "the same . . . scheme," they "cannot therefore form

- 22 -

the basis for a separate cause of action." *Grimmett*, 75 F.3d at 514. Moreover, even if the "separate accrual rule" were to apply, the "corollary" to this rule is "that damages may not be recovered for injuries sustained as a result of acts committed outside the limitations period." *Id.* at 512. Thus, if the Court were to accept this theory, which it should not, it would require that the Court grant Emrani and his Firm's motion to dismiss at least as to all injuries that occurred before July 2021.

### D.   Uber Fails to Satisfy the Rule 9(b) Heightened Pleading Standard

The Opposition also cannot remedy the FAC's multiple pleading defects.

With respect to scienter, the Opposition claims that the FAC need only allege the bare legal conclusion that "'Defendants committed these acts willfully and knowingly and with specific intent to defraud.'" Opp. 53 (quoting FAC ¶ 381). That is inaccurate. Although it is true that Rule 9(b) does not require "particularity" in pleading "intent, knowledge, and other conditions of a person's mind," Fed. R. Civ. P. 9(b), that "does not give [Uber] license to evade the less rigid—though still operative—strictures of Rule 8," *Iqbal*, 556 U.S. at 686. "And Rule 8 does not empower [Uber] to plead the bare elements of [its] cause of action, affix the label 'general allegation,' and expect [its] complaint to survive a motion to dismiss." *Id.* Uber's "threadbare recitals" of scienter, "supported by mere conclusory statements, do not suffice." *Id.* at 678. On that basis alone, the FAC is inadequately pled.

Nor does Uber even attempt to defend its profligate reliance on "information and belief," which appears *80 times* in the FAC. FAC ¶¶ 32 & n.2, 33 & n.3, 67, 69, 91, 93, 112, 124, 126, 133, 137, 141, 145, 148, 149, 151, 157, 160, 164, 167, 177, 185, 191, 192, 194, 201, 209, 219, 227, 237, 243, 248, 249, 255, 259, 262, 263, 269, 277, 282, 284, 289, 292, 293, 302, 312, 313, 323, 332, 345, 352, 370, 374, 377, 386, 387, 388, 389, 390, 391, 396, 400, 401. As Emrani pointed out, Uber is required to "state the factual basis for the belief" in order to satisfy Rule 9(b). Mot. 5, 30-31, 34; *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993). The Opposition does not address that argument at all, nor does it attempt to defend its use of two footnotes

- 23 -

(which are themselves woefully inadequate) as the only support for its allegations resting on information and belief. *See* Mot. 31-32. Accordingly, all such allegations should be struck from the FAC, stripping away many of the assertions necessary to Uber's claims. That includes the allegation that lawyers and medical providers "secretly enter into side agreements," which is based only on unadorned "information and belief." FAC ¶ 33. And because the insufficiently pled "side agreements" are an essential component of Uber's claims—appearing at least 64 times, FAC ¶¶ 3, 4, 10, 33 & n.3, 34, 36, 40, 44, 55, 67, 69, 91, 93, 112, 114, 126, 127, 137, 138, 149, 150, 160, 167, 177, 185, 194, 201, 209, 219, 227, 237, 243, 251, 263, 269, 277, 284, 293, 302, 310, 320, 332, 334, 345, 352, 372—the claims cannot survive on their face.

Uber's claims also fail to satisfy Rule 9(b) with respect to RICO's elements.

### 1. There Are No Predicate Acts of Racketeering

The Opposition simply ignores the rule that "[l]itigation activities alone generally cannot serve as predicate acts for civil RICO claims." Mot. 32-33; *Acres Bonusing*, 2022 WL 17170856, at *10; *see also Rose v. Slater, Slater & Schulman, LLP*, 2025 WL 3691864, at *5 (C.D. Cal. Nov. 19, 2025), *report and recommendation adopted*, 2026 WL 67236 (C.D. Cal. Jan. 7, 2026). That rule, which applies even when litigation activities are "wrongful," has been adopted by "[n]umerous other circuit courts and district courts across the country." *Republic of Kazakhstan v. Stati*, 380 F. Supp. 3d 55, 61 (D.D.C. 2019), *aff'd on other grounds*, 801 F. App'x 780 (D.C. Cir. 2020); *see, e.g.*, *Kim*, 884 F.3d at 104; *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 525 (5th Cir. 2016); *United States v. Pendergraft*, 297 F.3d 1198, 1208-09 (11th Cir. 2002); *I.S. Joseph Co. v. J. Lauritzen A/S*, 751 F.2d 265, 267-68 (8th Cir. 1984). Put simply, "allegations of frivolous, fraudulent, or baseless litigation activities—without more—cannot constitute a RICO predicate act." *Kim*, 884 F.3d at 104. "[A]ttorney conduct" will not "give rise to RICO liability" unless the attorneys go "well beyond their capacities as legal representatives." *Lockwood v. Sheppard, Mullin, Richter & Hampton, LLP*, 2009

- 24 -

WL 9419499, at *6 (C.D. Cal. Nov. 24, 2009). And any attempt to distinguish activities during litigation from those that precipitate litigation "is nonsensical." *Quick v. EduCap, Inc.*, 318 F. Supp. 3d 121, 142 (D.D.C. 2018).

This nationwide body of law developed in part to ensure that RICO is not used to "chill litigants and lawyers and frustrate the well-established public policy goal of maintaining open access to the courts." *Kim*, 884 F.3d at 104. Those concerns are at their apex when, as here, the party weaponizing the RICO statute is a multi-billion-dollar corporation seeking to cap its own liability for countless torts.

Uber nonetheless appears to believe that neither these precedents nor the concerns motivating them matter because in *Living Designs* and *United States v. Marbella*, 73 F.3d 1508 (9th Cir. 1996), the Ninth Circuit allowed fraud claims involving litigation activities. Opp. 49-50. But those cases do not endorse Uber's supposition that litigation activities are categorically subject to RICO retaliation. *Living Designs* suggests only that "litigation conduct" is not "entitled to *absolute* immunity." 431 F.3d at 364 (emphasis added). There, however, the alleged misconduct involved "falsification, destruction, and misrepresentation of evidence" that demonstrated contamination of the defendant's products and that the defendant "concealed, withheld, and lied about" in "cases across the country." *Id.* at 357, 364. Nothing remotely so substantial is alleged here. *Marbella* is even further afield. That criminal case—involving multiple fraudulent personal injury claims submitted to multiple insurers—did not even involve RICO at all, let alone any argument that litigation activities cannot qualify as RICO predicates. *See Marbella*, 73 F.3d at 1510. Uber has identified no case contravening the rule that even fraudulent litigation activities ordinarily cannot serve as predicate acts supporting its RICO claims.

The Opposition complains that if the widely accepted rules are applied here, Uber will have "no recourse but to be stuck defending itself against fraudulent personal-injury actions, one at a time, with no end in sight." Opp. 3. But "[i]t is a fact of our system of justice that parties are often compelled to engage counsel and

- 25 -

defend lawsuits"—even, unlike here, in suits "that ultimately prove to have little merit." *Sosa*, 437 F.3d at 935. Besides, Uber is not powerless. It can start by better screening and training its drivers to protect passengers and reduce the number of crashes for which it is responsible. It can also pursue redress through multiple viable legal avenues. *See* Mot. 33-34. What it cannot do is settle cases for value and then turn around to assert civil RICO liability against the attorneys who litigated them.

## 2. There Is No Proximately Caused Injury

Uber also has not specifically alleged any "concrete financial loss" that bears a "direct causal connection" to the purported scheme. *Canyon Cnty.*, 519 F.3d at 975. The Opposition does not dispute that all of the settlements at issue were within Uber's $1 million insurance policy limit. *See* Mot. 35. Rather, Uber resorts to "inference," "implication," and unspecified "legal fees, settlement costs, and other out-of-pocket costs." Opp. 58-61 (emphasis omitted). Those are exactly the sort of "vague and conclusory" allegations that do not satisfy "the particularity required by FRCP 9(b)." *Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948, 958 (9th Cir. 2023). Uber responds with an inapposite standard. Opp. 59. "[G]eneral factual allegations of injury resulting from the defendant's conduct may suffice to establish *standing*." *Washington v. U.S. Food & Drug Admin.*, 108 F.4th 1163, 1174 (9th Cir. 2024) (emphasis added and alteration marks omitted). But establishing Article III standing is not the same as meeting the requirements of Rule 9(b). *See Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1128 (11th Cir. 2019) ("general allegation" was "not fatal to the Article III standing" question but "falls short of Rule 9(b)'s heightened pleading standard"). In any event, Uber has not pled "*factual* allegations of injury." Opp. 59 (emphasis added). Incanting the words "costs," "legal expenses," "fees," and "other out-of-pocket costs," FAC ¶¶ 15, 25, 362, supplies no facts at all.

Uber points to the same unspecified allegation of "out-of-pocket costs" as the only basis to distinguish the Ninth Circuit's binding holding that plaintiffs whose alleged damages "were covered by insurance" have not suffered "financial loss" for

"RICO" purposes, *Steele v. Hosp. Corp. of Am.*, 36 F.3d 69, 70 (9th Cir. 1994). Opp. 61 (citing FAC ¶ 362). But *Steele* itself repudiates that approach. A RICO plaintiff must "specify an instance where he had to pay a claim out of his own funds because his insurance had been exhausted." *Steele*, 36 F.3d at 71. Since Uber specifies no such instance, it cannot rely on settlement payments to establish loss.

Nor can Uber claim damages based on its legal fees. Opp. 61-62. There is no dispute that the Ninth Circuit has never "recognized the incurment of legal fees as a cognizable injury under RICO." *Limcaco*, 2023 WL 154965, at *2; *Thomas*, 308 F. App'x at 88. The Circuit has also never endorsed Uber's distinction between legal fees a party incurs as a plaintiff versus those it incurs as a defendant. Opp. 62-64. And district courts in this circuit have applied the rule to bar RICO claims based on legal fees incurred by the defense. *E.g.*, *Pac. Surf*, 2021 WL 5326529, at *2; *Ogden*, 2015 WL 13413390, at *1-3; *Holloway*, 2014 WL 6998069, at *9. However, even if Uber's distinction were cognizable under RICO, the Opposition only underscores that the FAC's allegations "still fail to be sufficiently financial or concrete." *Limcaco*, 2023 WL 154965, at *2. As with Uber's conclusory claims of out-of-pocket losses, the Opposition fails to explain how purported unidentified "defense costs" are anything other than "vague and abstract." *Hunt*, 361 F. Supp. 3d at 1001.

The Opposition also fails to explain how the FAC alleges a "direct relation between the injury asserted and the injurious conduct alleged." *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010). Uber must allege a "*direct causal connection*" between the alleged violation and the alleged injury, *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 460 (2006) (emphasis added), and a "link that is too remote, purely contingent, or indirect is insufficient." *Hemi Grp.*, 559 U.S. at 9 (quotation marks and alteration marks omitted). The Opposition claims that "the causal chain alleged in the [FAC] is simple and direct: false and fraudulent evidence is manufactured to extract artificially inflated settlements or verdicts." Opp. 64. But that is not enough. There is no identification of any particular damages that resulted

- 27 -

from any particular inflated or above-market charges on any particular medical bills, FAC ¶¶ 2-3, 6, 14, 55, 71, 94, 95, 121, 130, 142, 153, 169, 187, 223, 239, 256, 271, 304, 324, 339, 353, let alone damages that could be traced to the purportedly "false" or "sham" lien agreements, *id.* ¶¶ 3, 11, 33, or the supposed "secret side agreement," *id.* ¶¶ 4, 10, 69, 93, 114, 167, 185, 201, 219, 237, 251, 269, 284, 302, 334, 352.

The Opposition reinforces, rather than remedies, those deficiencies by explaining the theory at a level of heightened generality: "Uber alleges that [Claimant A's] case would have been resolved much more quickly and at less overall expense because it would have been worth far less (if anything at all) absent the fake injuries and unnecessary treatment." Opp. 65. The missing details include how Claimant A's case would have resolved "more quickly" and how much less expensive it would have been to Uber (and not its insurer). *Id.* Uber's decision to settle each predicate case—often after conducting its own "[i]ndependent medical evaluations," *id.* 50— further complicates the analysis. The FAC leaves readers to guess how much the allegedly inflated bills should have been, what additional defense costs Uber supposedly incurred as a result of those bills, how and to what extent the purportedly inflated bills increased the settlement value of each predicate case, and what would have happened if any case had gone to trial. "The proximate causation requirement is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation." *Canyon Cty.*, 519 F.3d at 982 (quotation marks omitted).

3. There Is No Pattern of Racketeering

The FAC also fails to allege a pattern of predicate acts of racketeering activity committed by either Emrani or his Firm. The problem is especially obvious with respect to Emrani personally. The Opposition claims that Emrani is alleged to have signed "two allegedly fraudulent demand letters," Opp. 58, but that is not true: the FAC alleges that Emrani signed *one* single letter regarding Claimants D and E on March 31, 2021, FAC ¶¶ 128, 139. The only other allegation against Emrani is that he sent a demand letter regarding Claimant B on December 28, 2020. FAC ¶ 75. But

- 28 -

that letter could not possibly qualify as a predicate act in the scheme Uber alleges because it was purportedly sent nearly five months *before* Claimant B's first appointment with Dr. Khounganian. FAC ¶ 78. There is thus only one claimed act alleged against Emrani, which is definitively inadequate. *Howard*, 208 F.3d at 746 ("Two acts are necessary, but not sufficient, for finding a violation."). As for Emrani's Firm, the Opposition simply fails to respond to the FAC's failure to identify "who" at Emrani's Firm transmitted any alleged fraudulent materials, "who" the recipients were, "what" specifically was fraudulent about the materials, and "where" the senders and recipients were located. *Vess*, 317 F.3d at 1106.

### 4.    There Is No RICO Enterprise

Each of Uber's three enterprise theories fails too.

(Count 2): The Association-in-Fact Enterprise with the Medical Provider Defendants. The FAC's alleged association-in-fact enterprise between Emrani, his Firm, and the Medical Provider Defendants fails. Uber's allegations of "secret side agreements" and fraud are linked to a screenshot of charges from 2008 to 2014—before the relevant time period—that does not involve either of the Medical Provider Defendants. FAC ¶¶ 45, 47. Furthermore, without Uber's inadequate allegations of fraud, the FAC alleges standard business: Emrani and his Firm referred their clients to medical providers who administered treatment and provided medical records that were used in litigation. But courts have "overwhelmingly rejected attempts to characterize routine commercial relationships as RICO enterprises." *Gomez*, 2015 WL 4270042, at *8; *Ford I*, 2025 WL 3306280, at *13-14 (plaintiff only alleged "an ordinary commercial relationship"). And the FAC also does not allege that Emrani or his Firm played any role in "directing" the affairs of the alleged enterprise. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993); *Walter*, 538 F.3d at 1249 ("[s]imply performing services for the enterprise does not rise to the level of direction").

(Count 5): Emrani's Firm as Enterprise. The allegation that Emrani "operated, managed, and controlled his law firm," FAC ¶ 378, describes the ordinary operation

of a law practice. RICO liability "depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001). Claiming that Emrani and his Firm "are associated in a manner directly related to their own primary business activities," does not suffice. *Toyota Motor*, 826 F. Supp. 2d at 1202.

(Count 6): The Association-In-Fact Enterprise With All Defendants. Uber's claim that all defendants formed an "association-in-fact" enterprise makes even less sense. FAC ¶¶ 366-369. The FAC does not allege a single communication between Emrani or his Firm and DTLA or Igor Fradkin, and it certainly does not allege any "interpersonal relationships" or "common interest" between them. *Boyle v. United States*, 556 U.S. 938, 946 (2009). Nor could it, as the firms are competitors that represented different clients in different cases. Any thoroughly implausible claim that rivals formed a continuing unit would be further undermined by Uber's allegation that other unidentified individuals participated in the scheme. *See, e.g.*, FAC ¶¶ 50, 73, 101, 124, 133, 145. The fact that the so-called "association" never all worked together on a single case and includes numerous other, unidentified members is emblematic of an enterprise that does not actually exist. *See, e.g., Capitol W. Appraisals v. Countrywide Fin. Corp.*, 2009 WL 10677052, at *5 (W.D. Wash. Sept. 30, 2009) (plaintiff failed to allege a RICO enterprise where it alleged "unnamed [participants] working independently from one another"). And even if any such enterprise actually existed, the FAC does not plausibly allege that Emrani or his Firm played any "part in directing [its] affairs." *Walter*, 538 F.3d at 1249.

## III.   CONCLUSION

The FAC suffers from numerous independently dispositive deficiencies. It should be dismissed with prejudice.

- 30 -

Dated: May 20, 2026                  HUESTON HENNIGAN LLP


By:   */s/ John C. Hueston*
       John C. Hueston
       Marshall A. Camp
       Bram M. Alden
       Stewart J. Rickert

       *Attorneys for Defendants Jacob Emrani and The Law Offices of Jacob Emrani*

- 31 -