**WINSTON & STRAWN LLP**
David Scheper (SBN 120174)
dscheper@winston.com
Alexander Cote (SBN 211558)
acote@winston.com
Katelyn Taira (SBN 359683)
ktaira@winston.com
333 S. Grand Ave.
Los Angeles, CA 90071-1543
Telephone:  +1 213-615-1700
Facsimile:   +1 213-615-1750

Attorneys for Defendants
Igor Fradkin and Downtown LA Law Group

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UBER TECHNOLOGIES, INC., | **Case No. 2:25-cv-06612-SPG** |
| Plaintiff, | **IGOR FRADKIN AND DOWNTOWN LA LAW GROUP'S REPLY IN SUPPORT OF THEIR MOTIONS TO DISMISS** |
| v. | |
| DOWNTOWN LA LAW GROUP; IGOR FRADKIN; THE LAW OFFICES OF JACOB EMRANI; JACOB EMRANI; VALLEY ORTHOPEDIC AND SPINE CENTER D/B/A GSK SPINE; and GREG KHOUNGANIAN, | [Filed concurrently with Igor Fradkin and Downtown LA Law Group's Request for Judicial Notice and the Supplemental Declaration of Igor Fradkin] |
| Defendants. | Date:    June 24, 2026<br>Time:    1:30 p.m.<br>Court:   Hon. Sherilyn Peace Garnett |
| | Complaint Filed: July 21, 2025<br>FAC Filed:     December 19, 2025 |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................1

ARGUMENT ........................................................................................................1

I.    Uber fails to plead fraud at all, let alone with particularity...................1

      A.    The Opposition misrepresents the lien agreements......................1

      B.    The FAC's specific allegations belie any claim of unnecessary
            surgeries..........................................................................................4

      C.    Uber offers only conclusory allegations that DTLA dictated treatment.......6

      D.    Dr. Khounganian's disclosed medical rates cannot be fraud. ......................7

      E.    Uber's "boilerplate causation" theory adds nothing to its allegations..........8

II.   *Noerr-Pennington* requires dismissal. ...................................................9

      A.    Uber's suit burdens petitioning rights. .......................................9

      B.    DTLA's conduct was protected petitioning activity. ...................10

      C.    The sham litigation exception does not apply..............................12

            1.    The lawsuits were not objectively baseless. ....................12

            2.    There is no series of lawsuits without regard to the merits. .............13

            3.    No "knowing fraud" deprived the litigation of its legitimacy..........14

            4.    Uber's attempt to distinguish *Ford* cuts against the FAC. ...............16

      D.    The mail and wire fraud statutes need not reach this conduct. ...................17

III.  Uber's RICO claims are baseless. ........................................................17

      A.    Uber fails to plead an association-in-fact enterprise in Count 1.................17

            1.    DTLA exercised no control over the alleged enterprise....................18

            2.    Uber alleges no common purpose.....................................19

      B.    Uber fails to plead an association-in-fact enterprise in Count 4.................21

      C.    Uber fails to plead a RICO conspiracy. .....................................22

IV.   Uber's claims are time-barred. ............................................................22

V.    Claim preclusion bars Uber's RICO claims. .........................................23

A.    Uber could have asserted its claims in state court. ....................................24

B.    DTLA is in privity with its clients. ...........................................................25

VI.    California's compulsory counterclaim rule bars Uber's RICO claims. ................28

VII.    The *Rooker-Feldman* doctrine bars Uber's RICO claims. ...................................29

CONCLUSION ...................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agha-Khan v. United States*,
  2015 WL 5734380 (E.D. Cal. Sept. 29, 2015) ...................................................25

*B&G Foods N. Am., Inc. v. Embry*,
  29 F.4th 527 (9th Cir. 2022) .........................................................................14

*Baltimore Scrap Corp. v. David J. Joseph Co.*,
  237 F.3d 394 (4th Cir. 2001) ........................................................................15

*Benavidez v. Cnty. of San Diego*,
  993 F.3d 1134 (9th Cir. 2021) ......................................................................29

*Biofeedtrac, Inc. v. Kolinor Optical Enter. & Consultants, S.R.L.*,
  832 F. Supp. 585 (E.D.N.Y. 1993) ...............................................................18

*Brunsvick v. Hartford Life and Acc. Ins. Co.*,
  2011 WL 5838221 (E.D. Cal. Nov. 21, 2011).................................................26

*Bucur v. Ahmad*,
  244 Cal. App. 4th 175 (2016) .......................................................................23

*Bui v. Nguyen*,
  712 F. App'x 606 (9th Cir. 2017) ..............................................................20, 21

*Bus. Dev. Corp. of S.C. v. Rutter & Russin, LLC*,
  37 F.4th 1123 (6th Cir. 2022) .......................................................................26

*Charles J. Vicanti, M.D., Inc. v. State Comp. Ins. Fund*,
  24 Cal. 4th 800 (Cal. 2001).........................................................................24

*Cianci v. Super. Ct.*,
  40 Cal. 3d 903 (Cal. 1985).........................................................................24

*City of Morgan Hill v. Brown*,
  71 Cal. App. 4th 1114, 1123 (1999) .............................................................22

*Cooper v. Ramos*,
  704 F.3d 772 (9th Cir. 2012) .......................................................................28

*Design Pallets, Inc. v. Gray Robinson, P.A.*,
  2008 WL 3200275 (M.D. Fla. Aug. 5, 2008).........................................................18

*DKN Holdings v. Faerber*,
  61 Cal. 4th 813 (2015).........................................................................................25, 26

*Drummond v. Zimmerman*,
  454 F. Supp. 3d 1210 (S.D. Fla. 2020).........................................................18, 21

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
  751 F.3d 990 (9th Cir. 2014) .............................................................3, 6, 12, 14

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*,
  544 U.S. 280 (2005)..................................................................................................28

*Fisher v. Fisher*,
  118 Cal. App. 5th 899 (2026) ................................................................................5

*Fluck v. Bevins*,
  969 F. Supp. 1231 (D. Or. 1997) .......................................................................29

*Ford Motor Co. v. Knight Law Group*,
  2025 WL 3306280 (C.D. Cal. Nov. 24, 2025), *dismissing with prejudice*,
  2026 WL 691879 (C.D. Cal. Mar. 10, 2026)....................................................*passim*

*Freeman v. Lasky, Haas & Cohler*,
  410 F.3d 1180 (9th Cir. 2005) ............................................................................10

*Gonzalez v. Hadid*,
  2018 WL 11474122 (C.D. Cal. June 22, 2018)................................................26

*Grimmett v. Brown*,
  75 F.3d 506 (9th Cir. 1996) ................................................................................22

*Jackson v. Dow Chem. Co.*,
  902 F. Supp. 2d 658 (E.D. Pa. 2012)..................................................................26

*In re JNC Cos.*,
  996 F.2d 1225 (9th Cir. June 30, 1993)............................................................26

*Kearney v. Foley & Lardner, LLP*,
  590 F.3d 638 (9th Cir. 2009) ........................................................9, 10, 15, 16

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) ................................................................3

*Kerner v. Superior Court*,
    206 Cal. App. 4th 84 (2012) ...............................................25, 26, 27

*Kottle v. Nw. Kidney Ctrs.*,
    146 F.3d 1056 (9th Cir. 1998) .........................................................12, 14

*Kougasian v. TMSL, Inc.*,
    359 F.3d 1136 (9th Cir. 2004) ..............................................................29

*LaCour v. Marshalls of Cal. LLC*,
    94 Cal. App. 5th 1172 (2023) ..............................................................25

*Langone v. Schad, Diamond & Shedden, P.C.*,
    406 Ill. App. 3d 820 (2010) .................................................................27

*Lechter v. Aprio, LLP*,
    565 F. Supp. 3d 1279 (N.D. Ga. 2021)..................................................21

*Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*,
    431 F.3d 353 (9th Cir. 2005) ..........................................................15, 16

*Miroth v. County of Trinity*,
    136 F.4th 1141 (9th Cir. 2025) .............................................................29

*Miroth v. Cty. of Trinity*,
    2025 WL 2912274 (E.D. Cal. Oct. 14, 2025)........................................29

*Monco v. Zoltek Corp.*,
    397 F. Supp. 3d 1165 (N.D. Ill. 2019).................................................27

*Moore v. Kayport Package Exp., Inc.*,
    885 F.2d 531 (9th Cir. 1989) ................................................................3

*Natural-Immunogenics Corp. v. Newport Trial Grp.*,
    2020 WL 5239856 (C.D. Cal. Aug. 3, 2020) ........................................15

*Odom v. Microsoft Corp.*,
    486 F.3d 541 (9th Cir. 2007) ..........................................................20, 21

*Pebley v. Santa Clara Organics, LLC*,
    22 Cal. App. 5th 1266 (2018) ..........................................................8, 20

*Pincay v. Andrews*,
   238 F.3d 1106 (9th Cir. 2001) ...............................................................22

*Pyankovska v. Abid*,
   65 F.4th 1067 (9th Cir. 2023) ...............................................................10

*Relevant Grp., Ltd. Liab. Co. v. Nourmand*,
   116 F.4th 917 (9th Cir. 2024) ...............................................................13

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993)...............................................................................18

*Rolloco Holdings, Inc. v. VLP Cap., Inc.*,
   2019 WL 1491175 (C.D. Cal. Apr. 4, 2019).........................................26

*Rotella v. Wood*,
   528 U.S. 549 (2000)...............................................................................22

*Searle v. Allen*,
   148 F.4d 1121 (9th Cir. 2025) ...............................................................28

*Shaw v. Nissan N. Am., Inc.*,
   220 F. Supp. 3d 1046 (C.D. Cal. 2016) .................................................20

*Slack v. Int'l Union of Operating Eng'rs*,
   2014 WL 4090383 (N.D. Cal. Aug. 19, 2014) .......................................19

*Sosa v. DIRECTV, Inc.*,
   437 F.3d 923 (9th Cir. 2006) .........................................................*passim*

*State Farm Mut. Auto. Ins. Co. v. Abrams*,
   2000 WL 574466 (N.D. Ill. May 11, 2000).............................................18

*Swartz v. KPMG LLP*,
   476 F.3d 756 (9th Cir. 2007) ..............................................................1, 6

*Tafflin v. Levitt*,
   493 U.S. 455 (1990)...............................................................................24

*Turkish v. Kasenetz*,
   964 F. Supp. 689 (E.D.N.Y. 1997) ........................................................18

*Uber Techs., Inc. v. Simon & Simon, P.C.*,
   No. 25-5365 (E.D. Pa. May 11, 2026) .................................6, 7, 14, 19

*United States v. Jesenik*,
    152 F.4th 924 (9th Cir. 2025) ...................................................................................3

*United States v. Shields*,
    844 F.3d 819 (9th Cir. 2016) ...................................................................................2

*USSPOSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council*,
    31 F.3d 800 (9th Cir. 1994) ...................................................................................13

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) ...............................................................................13

*Wood v. McEwen*,
    644 F.2d 797 (9th Cir. 1981) ..................................................................................29

**Statutes**

Bus. & Prof. Code § 2052(a) ..........................................................................................7

Bus. & Prof. Code § 6068(e)(1) ......................................................................................2

Code Civ. Proc., § 386 ...................................................................................................22

**Other Authorities**

18A Wright & Miller's *Federal Practice & Procedure* § 4464.1 (2d. ed. 2002) ...........................................................................................................................27

CACI 3928 ......................................................................................................................5

Cal. Rules of Prof. Conduct, R. 1.6 ................................................................................2

Cal. Rules of Prof. Conduct, R. 4.1(b) ............................................................................2

Fed. R. Civ. P. 9(b) ......................................................................................................3, 6

U.S. Const. amend. I ......................................................................................................10

## INTRODUCTION

Uber's Opposition confirms why its retaliatory RICO suit must be dismissed. Faced with multiple dispositive arguments that lay bare the First Amended Complaint's ("FAC") deficiencies, Uber ignores governing case law, mischaracterizes its own allegations, offers conclusory and hyperbolic arguments without factual support, and invents facts nowhere alleged in the FAC. Uber's Opposition does not obscure the FAC's failure to state a claim. The Court should dismiss it with prejudice.

## ARGUMENT

## I.     Uber fails to plead fraud at all, let alone with particularity.

### A.     The Opposition misrepresents the lien agreements.

The FAC's centerpiece is that Igor Fradkin and Downtown LA Law Group (collectively, "DTLA") concealed "secret side agreements" in which Dr. Khounganian would discount his lien rights against DTLA's clients ("Clients") if the recovery proved insufficient. But the Opposition does not meaningfully engage with DTLA's arguments about the lien agreements. Instead, it offers mischaracterization, misdirection, and silence. Point by point, Uber's position is indefensible.

*First*, Uber's foundational premise, that the so-called "side agreements" are secret, is false. As demonstrated in Fradkin's opening brief, the lien agreements *themselves* disclose the very provision Uber characterizes as a "concealed side agreement." *See, e.g.*, FAC ¶¶ 34, 36; Fradkin Decl. Ex. A (Dkt. 95-2) ¶ 10. In response, Uber asks this Court to ignore the agreements' plain text and instead credit Uber's mischaracterization. *See* Opp'n at 55 n.19. But on a motion to dismiss, the Court examines the documents themselves, not counsel's gloss on them. *See Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) (courts "may consider a writing referenced in a complaint but not explicitly incorporated therein if the complaint relies on the document and its authenticity is unquestioned").

Also unavailing is Uber's claim that the lien agreements "are impermissibly . . . outside the complaint." Opp'n at 55 n.19. Uber itself quotes from and relies on the lien

agreements throughout the FAC and its Opposition. *See, e.g.*, FAC ¶¶ 11, 32, 177, 184, 194, 199, 209, 218, 220, 235, 243, 250, 259, 263, 267, 277, 283, 289, 293, 301, 309–10, 319, 332–33, 337, 341, 345, 351, 357–58, 371. A plaintiff cannot rely on a document to build its case and then demand the Court ignore that same document when the actual language disproves the plaintiff's theory. *See* Request for Judicial Notice and Incorporation by Reference (Dkt. 95) at 4.

Uber also claims the lien agreements are too "opaque" to understand. Opp'n at 55 n.19. But the language could not be clearer: "A lien reduction will be authorized if the total medical bill of all providers exceed 1/3 of the total settlement." Dkt. 95-2 ¶ 10. There is nothing opaque about this. And even if Uber could find some ambiguity in this language (and it cannot), ambiguity is not fraud.

*Second*, even if these provisions were somehow "secret," DTLA had no obligation to disclose them with its complaints and demand letters. Uber's Opposition ignores this argument entirely because it has no answer. Nondisclosure cannot constitute wire fraud absent "an independent duty that has been breached." *United States v. Shields*, 844 F.3d 819, 822 (9th Cir. 2016). No such duty exists between litigation adversaries. Rather, DTLA must *preserve* the Clients' confidences, not disclose them. *See* Bus. & Prof. Code § 6068(e)(1); Cal. Rules of Prof. Conduct, R. 1.6; Cal. R. of Prof. Conduct, Rule 4.1(b) cmt. 1. Although the Opposition cites other Rules of Professional Conduct in passing, it says nothing about Rules 1.6 and 4.1(b)—the very rules that prohibit the disclosure Uber would now require. Uber cannot transmute compliance with an ethical obligation into a federal crime. Nor does Uber cite a single case suggesting that a plaintiff's attorney must disclose lien arrangements in a complaint or settlement demand rather than in discovery. The silence is telling.

*Third*, even if concealed, the "side agreements" could not have injured Uber. A personal injury defendant is liable for the reasonable value of medical services rendered to the plaintiff. That liability exists even if the medical provider later agrees to accept less from the patient after the case settles. Uber's liability in the underlying cases turned on

the reasonable value of the Client's medical expenses, not on how the Client later divided settlement proceeds with her doctor. In other words, the lien provisions allocate the settlement proceeds between the Client and her doctor *after* Uber has paid. They do not increase Uber's exposure by a single dollar. That economic reality is fatal to Uber's theory.

Nor is there anything fraudulent in asking Uber to pay the reasonable value of medical services without volunteering that the doctor might, at some future date, reduce what the patient owes. Uber never cites a single authority suggesting that a doctor's agreement to discount fees after the case ends can injure a tort defendant, because no such authority exists. Certainly, no case suggests that it is racketeering for a doctor to agree in advance not to financially ruin his patients.

*Fourth*, Uber ignores that Dr. Khounganian's agreement to give a discount was *conditional*—the discount would occur only *after* the case ended and only *if* the recovery is insufficient to cover all medical bills. When DTLA transmitted the records to Uber in demand letters and complaints, neither condition had yet occurred, because the case was still pending and Uber had not yet paid anything. The records thus correctly stated amounts that the Clients owed *when DTLA sent them*. The conditional possibility that a future shortfall might trigger a discount did not render those records false *when sent*. *See United States v. Jesenik*, 152 F.4th 924, 938 (9th Cir. 2025) (no "scheme to defraud" without "material falsehoods"). Uber cannot base its mail or wire fraud claims on admittedly true statements.

In sum, Uber must allege at least one predicate act, pled with particularity, causing an actionable injury within the limitations period. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (Rule 9(b) requires "the who, what, when, where, and how" of the alleged fraud); *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 541 (9th Cir. 1989) (Rule 9(b) requires allegations of "the time, place, and specific content of the false representations"); *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 998 (9th Cir. 2014) (requiring plaintiffs to plead nonconclusory facts that the falsehood caused

the injury). Because Uber does not plead any such misrepresentations concerning the lien agreements, it does not state a viable RICO claim.

**B.    The FAC's specific allegations belie any claim of unnecessary surgeries.**

Although the Opposition asserts a scheme to funnel patients to Dr. Khounganian for unnecessary surgery, the particular allegations in the FAC tell a different story. Opp'n at 3–8. Those allegations reveal that *every* Client pursued extensive conservative treatment from independent providers—often for months or years—before Dr. Khounganian performed surgery.

*First*, Uber points to Claimants H and O, presumably its best cases on this point. Opp'n at 7. But the FAC admits that in the 17 months after his accident, Claimant H saw other treaters more than 50 times before seeing Dr. Khounganian, including 36 chiropractor visits, 16 physical therapy visits, and eight different pain management visits. FAC ¶ 175. Uber also admits it hired two experts who agreed that Claimant H suffered injury—but only disputed its cause. *Id.* ¶¶ 172, 183. Similarly, Uber admits that before Claimant O even met Dr. Khounganian, he saw another doctor, who suggested nonsurgical care. *Id.* ¶ 290. Claimant O then met with Dr. Khounganian, who *also* suggested *nonsurgical* treatments. *Id.* ¶ 294. Only when these procedures failed did Claimant O undergo surgery. *Id.* ¶¶ 295–96. Uber's hired expert agreed that Claimant O suffered injury but again disputed its cause. *Id.* ¶ 299. If anything, these allegations suggest that the Clients had *necessary* surgery, not unnecessary treatment.

Indeed, every Client sought treatment before seeing Dr. Khounganian: Claimant I went to three other doctors; Claimant J went to a chiropractor 23 times (*id.* ¶ 206); Claimant K saw a chiropractor twice (*id.* ¶ 228); Claimant M went to Kaiser, two chiropractors, and a pain doctor (*id.* ¶¶ 258–61); Claimant N saw other doctors (*id.* ¶ 275); and Claimant P saw a chiropractor 16 times (*id.* ¶ 306). And Uber's unnecessary surgery argument fails with respect to Claimants L, Q, and R twice over. Not only did these Clients also see other treaters before seeing Dr. Khounganian, they each *declined* Dr. Khounganian's recommended surgery. *Id.* ¶¶ 244–45, 252, 328–30, 337, 342, 349. Even

Uber's expert agreed that Claimant Q suffered injury and presented with "subjective complaints of constant pain." *Id.* ¶ 338.

*Second*, Uber spills much ink describing the Clients' prior injuries, claiming that it could never be liable for making them worse. *See* Opp'n at 50–51. It points to Claimant I—presumably its best case on this point—arguing that "there was not even any accident at all." Opp'n at 5. The Opposition thus raises (but does not answer) a question: if it was so obvious that the non-accident could never have hurt Claimant I, how could Uber ever believe it was liable? The FAC provides the answer. Claimant I was an elderly man with extensive preexisting conditions, was already under treatment for back injuries before the accident, and was slammed into the vehicle's front seat when it abruptly stopped. FAC ¶¶ 188–91.

Uber could have argued in the state court cases that Claimant I's preexisting injuries immunized Uber from liability. Uber chose not to put on that defense, presumably because the defense ignores California personal injury law. That well-established law makes Uber liable for all harm it caused to a plaintiff—even if the plaintiff has a preexisting condition that makes them more susceptible to injury. *See Fisher v. Fisher*, 118 Cal. App. 5th 899, 923 (2026); CACI 3928 (defendant liable even if plaintiff "was more susceptible to injury than a normal healthy person [and] even if a normal healthy person would not have suffered similar injury"). Uber cannot recast a personal injury suit as a fraud merely because the Client is an eggshell plaintiff.

Even Uber's own expert rejected the argument Uber makes today, admitting that Claimant I "sustained cervical and lumbar strains from the alleged accident." FAC ¶ 197. It is thus no surprise that Uber settled the case this year—even *after* alleging in this RICO suit that it could *never* be liable for Claimant I's injuries and that the entire case was a fraud. *See* Fradkin Supp. Decl., Ex. W.

*Third*, the Opposition overlooks that Uber settled each Client's case after retaining experts (or having the opportunity to do so). Those experts told Uber that the treatments were unnecessary (for Claimants I, J, P, and Q), that the accident did not cause the injury

(for Claimants H, J, O, P, and Q), or that the bills were excessive (for Claimants I, P, and Q). *See, e.g.*, FAC ¶¶ 172, 174, 183, 197, 200, 221, 231, 299, 321, 323, 338. Despite having these expert opinions in its pocket, Uber settled anyway, which can only mean one of two things: either Uber settled with its eyes wide open, or the claims were not baseless. Either way, Uber's actions speak louder than the Opposition's rhetoric, and those actions reveal the implausibility of its claims. *See Eclectic Props.*, 751 F.3d at 998.

### C.    Uber offers only conclusory allegations that DTLA dictated treatment.

The Opposition next claims that the FAC adequately alleges that DTLA dictated Dr. Khounganian's treatments, but it can only point to a single paragraph in support. *See* Opp'n at 41. FAC ¶ 22. That paragraph alleges that on "September 9, 2019, Defendant DTLA sent an email to Defendant Khounganian's office asking that Claimant K be scheduled for an appointment 'ASAP' and listing the type of case as 'Passenger v. Uber Driver.'" *Id*. This email does not suggest that the lawyers dictated treatments—it instead reveals only that the lawyer asked Dr. Khounganian to see the Client soon. And the remaining FAC allegations direction are too conclusory to satisfy Rule 9(b). FAC ¶ 357 (alleging that DTLA "direct[ed] these providers to recommend specific treatments" with no further detail); ¶ 30 (alleging DTLA "encourage[s] providers to exaggerate their findings" with no further detail).

Rather than plead DTLA's conduct with the particularity Rule 9(b) demands, Uber lumps DTLA and Emrani together under the label "Law Firm Defendants." *See, e.g.*, Opp'n at 3, 5–8. But Uber cannot treat the two firms as interchangeable. *See, e.g.*, Opp'n at 3, 5–8. But "Rule 9(b) does not allow a complaint to merely lump multiple defendants together." *Swartz*, 476 F.3d at 764.

Uber's reliance on *Uber Techs., Inc. v. Simon & Simon, P.C.*, No. 25-5365 (E.D. Pa. May 11, 2026) (Dkt. 112-2) (*Simon*), cannot save it. *Simon* involved detailed allegations that the attorney dictated medical treatment at every stage. There, the lawyers allegedly routed clients onto a "conveyor belt of preselected treatment providers and medical experts;" instructed those providers to send clients for MRIs; and directed

continued chiropractic treatment that generated treatment records, including records allegedly describing treatment that was not actually provided or using cut-and-pasted boilerplate. *Id.* at 3–4. The lawyers then allegedly directed clients to pain management doctors, sent those doctors scheduling emails identifying which clients to see, controlled appointment logistics, directed the doctors to perform specific procedures, compensated those providers on a flat-fee, per-procedure basis with the attorneys' own funds, and then set up independent medical examinations to lend the supposedly fraudulent scheme a veneer of legitimacy. *Id.* at 4–5. Uber pleads nothing comparable here. DTLA never instructed a medical provider to refer clients to a particular facility, never instructed any treating provider to perform (or falsely claim to have performed) specific treatments, never paid a doctor with its own funds, and never sent the Clients to an independent medical examination.

Those allegations—attorney direction to chiropractors, to the medical facilities, to the doctors, and to medical examiners—were the factual engine compelling the *Simon* decision. The court relied on the alleged pre-filing direction to doctors in rejecting *Noerr-Pennington* immunity (*id.* at 10–13) and res judicata (*id.* at 22–23) and finding that Uber alleged enterprise conduct, proximate cause, and conspiracy with the required particularity (*id.* at 26–27, 32–33, 36–37).

But the FAC pleads no medical directions by DTLA here. Instead, it alleges only that the firm referred clients to a doctor and then relied on that doctor's independent medical judgment.[1]

**D.    Dr. Khounganian's disclosed medical rates cannot be fraud.**

Uber also argues that Dr. Khounganian's bills were fraudulent because his rates were too high. Opp'n at 51. Nonsense.

---

[1] Uber has no response to Fradkin's argument that it would be *unlawful* for DTLA to second-guess Dr. Khounganian's medical diagnoses and treatments. *See* Fradkin Mot. at 14; *see also* Bus. & Prof. Code § 2052(a) (prohibiting non-doctors from diagnosing or treating a patient). This is yet another reason why the argument fails.

*First*, there can be no fraud in charging a disclosed rate, and Uber admits the bills disclosed the amounts charged. *See* FAC ¶¶ 35–36, 199–201, 301–02. The FAC also alleges that Uber compared those rates to the market through its own experts and forensic billing reviews—and then chose to settle anyway. *Id.* ¶¶ 200, 321. A doctor cannot commit racketeering merely by charging more than another doctor would, especially when the putative victim knows the market.

*Second*, as a tort defendant, Uber is responsible for the reasonable value of the Clients' medical expenses, nothing more. *See Pebley v. Santa Clara Organics, LLC*, 22 Cal. App. 5th 1266, 1280 (2018). If Uber believed Dr. Khounganian's rates were unreasonable, it could have challenged those rates in the personal injury cases with its own expert evidence. *Id.* Uber did hire those experts—and those experts told Uber what it wanted to hear—but then it chose to settle anyway. Those settlements necessarily reflected Uber's view of the medical expenses' reasonable value. Settling such a dispute is not mail fraud, nor can it proximately cause a RICO injury.

**E.    Uber's "boilerplate causation" theory adds nothing to its allegations.**

Finally, the Opposition argues that Dr. Khounganian's medical reports used boilerplate causation language and, in the same breath, calls that boilerplate the "evidentiary foundation" for the causation claims. Opp'n at 51. That is not a fraud theory; it is a contradiction. If the language was boilerplate, Uber cannot have relied on it over the claim-specific accident evidence, medical records, billing reviews, and expert opinions it already had. Because Uber knew the true facts surrounding each accident, hired experts to dispute causation, and then settled anyway, it suffered no RICO injury.

Nor can Uber allege that DTLA needed Dr. Khounganian's form causation sentence to allege causation in the underlying cases. Personal injury plaintiffs allege causation from accidents, symptoms, treatment history, imaging, percipient testimony, and expert testimony; they do not need a treating doctor's "boilerplate" sentence to file a complaint or send a demand. The FAC pleads no facts showing that DTLA relied on that sentence to allege or prove causation, much less that Uber paid because of it. Uber's own allegations

show the opposite: Uber had all the information from which to draw the contrary inference, its experts did draw that inference, and Uber still settled with eyes wide open.

## II.    *Noerr-Pennington* requires dismissal.

*Noerr-Pennington* bars this action. Uber's Opposition rehashes arguments that binding Ninth Circuit precedent already forecloses and that Judge Court rejected on nearly identical facts in *Ford Motor Co. v. Knight Law Group*, 2025 WL 3306280 (C.D. Cal. Nov. 24, 2025), *dismissing with prejudice*, 2026 WL 691879 (C.D. Cal. Mar. 10, 2026) (*Ford*). Nothing in the Opposition justifies a different result from *Ford*.

### A.    Uber's suit burdens petitioning rights.

The FAC targets petitioning activity: the filing of personal injury complaints and sending settlement demands. Indeed, the FAC alleges no other predicate acts by DTLA. FAC ¶¶ 392–402. But "[a] successful RICO claim [here] would quite plainly burden [DTLA's] ability to settle legal claims short of filing a lawsuit." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 932 (9th Cir. 2006). "Like the antitrust laws, RICO provides for private enforcement and treble damages," making a RICO suit a "burden on [defendant's] communication of the demand letters almost identical to that posed by the Sherman Act claims on the petitioning conduct at issue in *Noerr* and its progeny." *Id.* at 932–33. *Ford* reached the same conclusion on similar facts, holding that "a successful RICO claim would 'quite plainly' burden Defendants' ability to seek fees for its litigation activity." 2025 WL 3306280, at *7. Indeed, the Court needs look no further than the FAC's demand for an injunction against filing lawsuits to see this is so. *See* FAC Prayer ¶¶ 6–7.

In response, Uber repeats the argument that *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638 (9th Cir. 2009), rejected and that *Ford* rejected again—that its lawsuit merely "holds Defendants to their obligation to play by the rules." *Ford*, 2025 WL 3306280, at *7; Opp'n at 21–24. The Ninth Circuit has squarely rejected efforts to conflate the burden inquiry with the sham exception. *See Kearney*, 590 F.3d at 645 ("[T]he question at this stage is not whether the conduct at issue is fraudulent and abusive, but instead whether the success of [the] lawsuit would constitute a burden on petitioning rights."). As the

Ninth Circuit explained in *Kearney*, Uber's argument improperly collapses "the question of petitioning conduct" with the separate question of "the sham exception's application." *Id.* at 646; *see also Ford*, 2025 WL 3306280, at *7.

Uber's reliance on *Pyankovska v. Abid*, 65 F.4th 1067 (9th Cir. 2023), is also misplaced, for two reasons. First, unlike the plaintiff in *Pyankovska*, Uber could have suffered no injury or loss *but for* the prosecution of the Clients' claims. *Pyankovska* involved the Wiretap Act and illegally intercepted communications—conduct that was a federal crime independent of any litigation. *Id.* at 1071. As *Ford* explained, *Pyankovska* is inapplicable because Ford "dispute[d] the accuracy of [the lawyers'] fee petitions to the courts," making the conduct "more squarely . . . 'petitioning activity' than did that of the defendant in *Pyankovska*." 2025 WL 3306280, at *8. The same is true here. Uber disputes the accuracy of medical records and billing statements that DTLA transmitted to Uber *during litigation*. That is petitioning activity.

## B.     DTLA's conduct was protected petitioning activity.

Uber's Opposition concedes a critical point: "[a]ttorneys exercise First Amendment petitioning rights in filing lawsuits on behalf of clients." Opp'n at 12. Uber's attempt to argue around this admission runs afoul not only of Ninth Circuit precedent, but also the FAC's express allegations. *Noerr-Pennington* protects petitions and "conduct incidental to the prosecution of the suit." *Sosa*, 437 F.3d at 934. This includes "documents and pleadings, in which plaintiffs or defendants make representations and present arguments to support their request that the court do or not do something." *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1184 (9th Cir. 2005).

*Ford* held that "Defendants' conduct in preparing billing records and submitting fee petitions was based on petitioning activity" because the billing was "based on litigation activity and in anticipation of submitting fee petitions." 2025 WL 3306280, at *8. Here, every alleged predicate act attributed to DTLA—filing complaints and sending demand letters and medical records—was likewise based on and incidental to litigation.

FAC ¶¶ 392–402. "Prelitigation communications demanding settlement of claims must be afforded *Noerr-Pennington* protection." *Sosa*, 437 F.3d at 942.

Although Uber argues that the "fraud" here is "prior to and external to the litigation" because it involved the "creation of fraudulent medical bills and records," there are two flaws in this argument. Opp'n at 12.

*First*, every fraudulent litigation scheme *begins* outside the courtroom. If Uber's truism were enough to carry the day, cases like *Sosa* could never have applied *Noerr-Pennington*. *See Sosa*, 437 F.3d at 926–27. In *Sosa*, DIRECTV chose to send 100,000 demand letters alleging signal piracy when it had no basis for that assertion. This decision must have occurred "prior to and external to the litigation." After all, DIRECTV acquired the list of hardware purchasers, and necessarily decided to send its baseless demand letters to each purchaser, *before* putting pen to paper. Yet *Noerr-Pennington* still shielded it from liability.

That is because *Noerr-Pennington* is concerned with where a scheme *culminates*, not where it *originates*. *Id*. at 932–33 (characterizing the suit as imposing "RICO liability on DIRECTV for sending the demand letters," i.e., for the *last step* in the fraud, not the first step). As in *Sosa*, Uber's case here depends on DTLA *transmitting* supposedly fraudulent medical records *to Uber in litigation*. Without that transmission, there is no wire or mail fraud, no causation, and thus no RICO liability. After all, if DTLA had fraudulent medical records *but never showed them to Uber*, there would be no mail or wire fraud (because there would be no use of the mail or wires), and thus no RICO claim. And Uber could suffer no injury from fraudulent medical records that no one uses *in the litigation*. Uber's claims are thus not about conduct before or external to the litigation— they instead depend entirely on the transmission of information in the litigation itself.

*Second*, the FAC does *not* allege that DTLA "creat[ed] [the] fraudulent medical bills and records" in any event. Opp'n at 12. Instead, the FAC admits that Dr. Khounganian made the diagnoses, performed the treatments, and prepared the bills. *See* FAC ¶¶ 53–55; *supra* Section I.B. DTLA merely transmitted those records during

litigation, which is what lawyers do. When a defendant is engaging in activity that is facially legitimate, "a significant level of factual specificity is required to allow a court to infer reasonably that such conduct is plausibly part of a fraudulent scheme." *Eclectic Props.*, 751 F.3d at 997–98. The FAC's conclusory allegations that DTLA "directed" treatments or "encouraged" exaggeration—unsupported by any factual detail—fall well short of that standard.

As *Ford* observed, a plaintiff cannot plead around *Noerr-Pennington* by "omit[ting] the basis for [the fraud]—litigation." 2025 WL 3306280, at *8. If anything, DTLA's case for protection is stronger than in *Ford*. In *Ford*, the lawyers themselves fabricated billing records—they assembled a team to create fake time entries, directed paralegals to back-date records, and personally signed false declarations under oath. *Ford*, 2025 WL 3306280, at *3–5. Here, by contrast, Uber alleges only that DTLA transmitted an independent doctor's records in litigation. DTLA's conduct is several steps removed from any actionable fraud.

### C.     The sham litigation exception does not apply.

Uber invokes the sham litigation exception to *Noerr-Pennington.* A plaintiff "can get around the *Noerr-Pennington* doctrine only if his allegations show" the sham exception applies. *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1062–63 (9th Cir. 1998). But none of the three sham circumstances applies here.

#### 1.     The lawsuits were not objectively baseless.

The first sham test asks whether the underlying litigation was "objectively baseless." *Sosa*, 437 F.3d at 938. It was not. The Clients obtained settlements in every case, often after Uber retained its own experts to dispute causation, medical necessity, and billing. *See* FAC ¶¶ 70, 119–20, 174, 183, 197, 200, 221, 299, 321, 338. That fact defeats the sham theory twice over. If Uber *believed* its hired experts proved the claims were baseless, then Uber settled with its eyes open; there is no fraud-induced injury when a sophisticated defendant pays after learning the supposedly concealed facts. If, instead, Uber settled because its experts left causation uncertain—or because it feared a jury might

credit treating records, Client testimony, and competing medical inferences over Uber's hired gun experts—then Uber compromised a *disputed* case, not a *baseless* one. Either way, Uber's theory collapses.

Uber cannot convert a settlement into a sham merely because it now regrets settling. Instead, a settled lawsuit is "by definition a reasonable effort at petitioning for redress and therefore not a sham." *White v. Lee*, 227 F.3d 1214, 1232 (9th Cir. 2000); *Relevant Grp., Ltd. Liab. Co. v. Nourmand*, 116 F.4th 917, 932 (9th Cir. 2024) ("[W]e have previously said that settlement indicates a lawsuit is not objectively baseless"). In *Ford*, the court found that because the defendants "prevailed on both the overall Lemon Law litigation and the fee petitions," their actions were not objectively baseless. 2025 WL 3306280, at *9. Like Ford, Uber identifies no case where a party prevailed, but its actions nonetheless fell within the sham litigation exception. This is reason enough to reject its sham argument.

### 2. There is no series of lawsuits without regard to the merits.

The second sham test asks whether the conduct involves "a series of lawsuits 'brought pursuant to a policy of starting legal proceedings without regard to the merits.'" *Sosa*, 437 F.3d at 938. The inquiry is "prospective: Were the legal filings made, not out of a genuine interest in redressing grievances, but as a pattern or practice of successive filings undertaken essentially for the purposes of harassment?" *USSPOSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council*, 31 F.3d 800, 811 (9th Cir. 1994). But the FAC never even suggests that DTLA brought suits for harassment without regard to the merits. In fact, Uber's theory is the opposite: DTLA allegedly used fraudulent medical records and concealed liens to secure settlements for admittedly injured Clients. *See* FAC ¶¶ 358, 404. A lawyer trying to maximize a client's recovery is seeking to win. That is not indifference to the merits, and it is not harassment divorced from a desire to secure maximum recovery for the Client.

The argument fails for another reason: when a complaint alleges a high success rate, a plaintiff cannot plausibly allege that the defendant filed suits without regard to the

merits. *See B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 539 (9th Cir. 2022); *Ford*, 2025 WL 3306280, at \*10. Here, the FAC admits not a high success rate, but a perfect one: DTLA's clients obtained favorable settlements in every case. FAC ¶¶ 358, 362, 375, 403–05.[2] This shows that DTLA brought each suit intending to maximize Client recovery, not as a tool of harassment.

*Simon* does not change this result. If anything, it highlights the shortcomings in the FAC. The *Simon* court recited the same series-of-lawsuits test—whether the lawyers filed the lawsuits "without regard to merit" as harassment, rather than "out of a genuine interest in redressing grievances." Dkt. 112-2 at 14. But the fact that drove *Simon* is absent here: Uber alleged there that, after it sought subpoenas and depositions from the doctors, the lawyers "quickly dismissed Uber" from approximately thirty pending cases while continuing to litigate against other defendants. *Id.* at 15–16. That allegation permitted the inference that the lawyers "did not intend the filings to adjudicate claims on the merits but to leverage the litigation process itself." *Id.* at 16.

Uber alleges no such pattern here. The FAC alleges no mass dismissal at the first sign of resistance, no abandonment of claims to conceal a supposed scheme, and no facts showing DTLA filed cases for any reason other than to prosecute them vigorously and settle them favorably. In short, *Simon* lends Uber no support. It instead highlights what the FAC fails to say.

### 3. No "knowing fraud" deprived the litigation of its legitimacy.

Ninth Circuit law provides that a plaintiff can overcome *Noerr-Pennington* by alleging that the defendant "so misrepresented the truth" in the underlying proceeding that "the *entire* . . . proceeding was deprived of its legitimacy." *Kottle*, 146 F.3d at 1063 (emphasis added). The sham exception "extends only to the type of fraud that deprives the litigation of its legitimacy," and "[a]lleged frauds that 'do not infect the core' of a

---

[2] The only exception is Claimant I's case, which was still pending when Uber filed the FAC. *See* FAC ¶ 203. Uber has since settled the suit, *despite* claiming in this RICO case that no jury could ever find it liable and that the entire case is a sham. *See* Fradkin Decl., Ex. V (Dkt. 95-23). Again, Uber's actions speak louder than its words and prove that its claims are inherently implausible. *See Eclectic Props.*, 751 F.3d at 998.

case will receive *Noerr-Pennington* immunity because regardless of the alleged fraud, the outcome would have been the same." *Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 402 (4th Cir. 2001); *see also Natural-Immunogenics Corp. v. Newport Trial Grp.*, 2020 WL 5239856, at *9 (C.D. Cal. Aug. 3, 2020) ("[A]ny misrepresentation exception to the doctrine should be limited to misrepresentations respecting the substance of the claim that show that the party's litigation position had no objective basis.").

Here, the Clients had real injuries, as the FAC admits for each Client. Uber settled after its own experts disputed causation, meaning Uber itself evaluated the merits and concluded settlement was appropriate. Any alleged misrepresentations could not "infect the core" of these cases. *See supra* Section I.B.

If Uber were correct that a purportedly inflated damages theory or disputed causation claim was enough to make a case a sham, the sham exception would swallow the rule. By that logic, *Noerr-Pennington*, which "overprotects baseless petitions," would crumble away any time a plaintiff characterized a fact disputed in litigation as a "misrepresentation." *Sosa*, 437 F.3d at 934. That cannot be the case. Uber cannot claim that DTLA fabricated the substance of the litigation itself: Clients with admitted injuries after car accidents with Uber drivers. It instead disputes causation and damages, even though Uber had every opportunity to investigate and dispute (and admittedly *did* investigate and dispute) the injuries and their cause. *See, e.g.*, FAC ¶¶ 70, 119–20, 174, 183, 197, 200, 221, 299, 321, 338. But a dispute about damages or their causation does not strip the litigation of legitimacy. As *Ford* held, "even accepting as true the allegation that some of Defendants' purported work entitling them to fees was fictitious, that misrepresentation is not sufficient on its own to deprive the entire fee petition process— let alone the entire lawsuit—of legitimacy." 2025 WL 3306280, at *11.

Uber's reliance on *Kearney* and *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353 (9th Cir. 2005), is misplaced. *Living Designs* did not even address *Noerr-Pennington*, and both cases involved defendants' fraudulent "suppression of evidence" that went to "the central issue" in the case." *See id.*; *Kearney*, 590 F.3d at 647

n.2. Here, Uber does not allege suppressed evidence on any issue. Instead, it admits it had the opportunity to take discovery and hire experts before choosing to settle. *See, e.g.*, FAC ¶¶ 172, 174, 183, 197, 210, 213, 217, 221, 299, 321–22, 338, 349. Uber had every opportunity to evaluate the claims and did so. Buyer's remorse is not enough to render a settled case a sham.

The alleged "side agreements" do not change that conclusion. The lien agreements disclosed the billed charges, and the lien-reduction provision merely addressed how the Client and doctor would divide the recovery if the ultimate settlement could not satisfy all medical bills. *See* Dkt. 95-2 ¶ 10. That conditional, post-recovery allocation had no bearing on causation, injury, or Uber's liability for reasonable medical expenses—and thus no bearing on the amount Uber believed was appropriate to pay in settlement. Thus, any alleged misrepresentations did not "infect the core" of these cases; at most, Uber alleges it settled disputed personal-injury claims despite having the facts, experts, and defenses it needed to contest them.

### 4.     Uber's attempt to distinguish *Ford* cuts against the FAC.

Uber argues the fraud here is "different in kind" than in *Ford* because it involved "the creation of fraudulent medical bills and records for unnecessary treatment," not inflated attorney fee petitions. Opp'n at 12. Uber is right that *Ford* is instructive on this point, but it draws the wrong lesson from the case. In *Ford*, the lawyers *themselves* created false records, signed false declarations under oath, and Ford did not discover the fraud until years later. 2025 WL 3306280, at *3–5. Yet *Noerr-Pennington* still protected their conduct.

Here, DTLA did not create the medical records. It sent only demand letters and complaints—not declarations under oath. Uber investigated every claim, and its own experts opined on damages and causation in the moment, not years later. Yet Uber still settled. If lawyers fabricating their own billing records under penalty of perjury cannot deprive the litigation of legitimacy, then DTLA's transmitting a third-party doctor's

---

medical opinions with demand letters and complaints—opinions Uber's own medical examiners disputed—cannot either.

### D. The mail and wire fraud statutes need not reach this conduct.

Where a "plausible construction of the applicable statute is available that avoids the burden" on petitioning, a court "must give the statute the reading that does not impinge on the right of petition." *Sosa*, 437 F.3d at 932. As set forth in Fradkin's opening brief, RICO does not unambiguously reach the conduct at issue. The Ninth Circuit has already held that RICO and the asserted predicate statutes—including mail and wire fraud—do not reach presuit demands to settle legal claims where the demand does not amount to sham petitioning. *Id.* at 940–42. *Ford* applied this reasoning directly, holding that "the text of the mail and wire fraud statutes" does not "unambiguously reach the submission of inflated fee petitions." 2025 WL 3306280, at *12.

The same analysis applies here with even greater force. DTLA's alleged conduct, filing complaints and transmitting demand letters incorporating medical records, is at least as protected as filing fee petitions. The demand letters and complaints DTLA sent were "so characteristic of the posturing that occurs at the start of any litigation and capable of being tested in any ensuing suit" that they cannot form the basis of mail or wire fraud liability. *Sosa*, 437 F.3d at 942. Uber had every opportunity to test DTLA's claims—and did so, through independent medical experts, forensic billing reviews, and discovery—and then settled the cases anyway. FAC ¶¶ 172, 183, 197–98, 200, 207, 221, 299, 321, 338. If the mail and wire fraud statutes do not unambiguously reach inflated fee petitions, they cannot unambiguously reach DTLA's supposedly inflated complaints and demand letters either.

### III. Uber's RICO claims are baseless.

### A. Uber fails to plead an association-in-fact enterprise in Count 1.

Uber cannot establish that DTLA controls or has a common purpose to establish an association-in-fact enterprise, and thus, Count 1 fails to state a claim.

### 1.    DTLA exercised no control over the alleged enterprise.

Uber fails to allege an association-in-fact enterprise between DTLA and the doctors. Uber does not dispute that DTLA must control the doctors to participate in "operating or managing the enterprise." Opp'n at 44–47. Nor does Uber dispute that courts routinely hold that "providing standard legal services does not subject an attorney to RICO liability, even if the attorney's services furthered the alleged illicit nature of the enterprise's affairs." *Drummond v. Zimmerman*, 454 F. Supp. 3d 1210, 1219 (S.D. Fla. 2020) (citing *Reves v. Ernst & Young*, 507 U.S. 170 (1993)); *see Design Pallets, Inc. v. Gray Robinson, P.A.*, 2008 WL 3200275, at *5 (M.D. Fla. Aug. 5, 2008) (same); *State Farm Mut. Auto. Ins. Co. v. Abrams*, 2000 WL 574466, at *11 (N.D. Ill. May 11, 2000) (same); *Turkish v. Kasenetz*, 964 F. Supp. 689, 694–95 (E.D.N.Y. 1997) (same); *Biofeedtrac, Inc. v. Kolinor Optical Enter. & Consultants, S.R.L.*, 832 F. Supp. 585, 591 (E.D.N.Y. 1993) (same). Uber's silence admits that providing legal services alone cannot constitute control of an association-in-fact enterprise.

But when challenged to find "a single email, text, or phone call where DTLA instructed, directed, or communicated" with the doctors to perform specific medical treatments (Fradkin Mot. at 9), Uber could only conjure one: Uber alleged that on "September 9, 2019, Defendant DTLA sent an email to Defendant Khounganian's office asking that Claimant K be scheduled for an appointment 'ASAP' and listing the type of case as 'Passenger v. Uber Driver.'" Opp'n at 47; FAC ¶ 226. This anecdote lends no support to the conclusory allegations that DTLA participated in, directed, or controlled a RICO enterprise by allegedly directing specific medical treatments from doctors to inflate medical bills. Asking a doctor to see a Client soon is nothing like telling the doctor how to treat that Client—and it lends no support whatever to the suggestion that DTLA directed Dr. Khounganian's treatment of *other* Clients.

Uber thus pleads no manner or mode in which DTLA directed or controlled any doctor. It alleges no communications from Fradkin and DTLA that lay out expectations

or directions for the types of medical treatments that clients should receive. This lack of control is fatal to establishing an association-in-fact enterprise.

*Simon* proves the point. There, Uber pled a sustained pattern of attorney control: lawyers steered clients to selected providers and dictated referrals, treatment, records, funding, and examinations. Dkt. 112-1 at 3–5. But Uber pleads no comparable attorney-directed medical machinery against DTLA. The one "ASAP" scheduling email identified in the FAC is not control of a RICO enterprise.

The Opposition points to other supposedly "specific allegations about control exercised by each Defendant," but they are anything but. Opp'n at 48 (citing FAC ¶¶ 30, 41, 50, 51, 403). Those FAC paragraphs contain the most conclusory words, like "encourage," "direct," "coordinate," "request[]," or "authorize[]," without alleging the who, what, when, and where required to plead control under RICO. *See Slack v. Int'l Union of Operating Eng'rs*, 2014 WL 4090383, at *22 (N.D. Cal. Aug. 19, 2014) (holding that general allegations of "direction," "counseling," "commanding," "inducing," or "procuring," "unadorned by any factual support, are insufficient to state a claim sufficient to satisfy *Twombly* and *Iqbal*"). Without more, Uber's assertion that DTLA controls the association-in-fact enterprise fails.

### 2.    Uber alleges no common purpose.

Uber also fails to establish that DTLA had the required common purpose with the doctors to establish an association-in-fact enterprise. Uber declares that the "[FAC] alleges a scheme far outside the ordinary business relationship between a personal injury lawyer and his client's treating physician" and then paints a fanciful tale—divorced from the allegations in the FAC—that (1) DTLA "directed" the doctors, (2) the doctors performed unnecessary surgeries, and (3) the parties engaged in "side deals" where the doctors had a contingency fee discount if the litigation did not cover the medical bills. Opp'n at 45. But the FAC pleads nothing like this.

*First*, as discussed above, the only non-conclusory allegation against DTLA is a benign scheduling email—exactly the ordinary business behavior expected from an

attorney referring a client to a trusted medical provider. Apart from that email, the FAC alleges no fact suggesting that DTLA had any role in medical treatment. To the contrary, the FAC alleges that Dr. Khounganian exercised his independent medical judgment *without consulting the* attorneys. *Compare, e.g.*, FAC ¶¶ 226–27 (alleging only that DTLA asked Dr. Khounganian's office to schedule Claimant K "ASAP" and that Dr. Khounganian executed a lien agreement with Claimant K, not that Dr. Khounganian consulted lawyers for treatment decisions)*, with id.* ¶ 228–33 (alleging that Dr. Khounganian recommended and performed surgery and provided follow-up care based on his own reported assessment). Uber's allegations reflect Dr. Khounganian's independence, not a common scheme.

*Second*, as described above, Uber alleges no unnecessary surgeries for any DTLA Client. It instead concedes that the Clients were in car accidents with Uber drivers, suffered injuries, and saw multiple treaters for those injuries before seeing Dr. Khounganian. Uber also admits that it hired experts to dispute causation and damages, only to settle those cases anyway. *See supra* Section II.C.1.

*Third*, the "side deal" that Uber depicts as nefarious is a lien agreement recognized by California courts as appropriate, typical in certain circumstances, and potentially needed if pursuing litigation. *Pebley*, 22 Cal. App. 5th at 1277. Uber never contests this alternative rationale for the lien agreements—indeed, it never discusses *Pebley* at all, as if ignoring binding California precedent will make it go away. Thus, the Court must favor the explanation that the lien agreements are ordinary business behavior rather than Uber's erroneous claim that they somehow "violate" criminal and ethical law. Opp'n at 45. *See Shaw v. Nissan N. Am., Inc.*, 220 F. Supp. 3d 1046, 1056 (C.D. Cal. 2016) (holding that if there are two explanations for behavior, the Court must assume the explanation that leads to no liability). As discussed above, all of Uber's "secret side agreement" arguments fail to plead any predicate acts. And in any event, Uber cites no case that suggests there is anything improper about a doctor agreeing to discount fees at the end of the case. Nor

does Uber cite any case suggesting that a plaintiff's lawyer must disclose such an agreement in the complaint or a settlement demand rather than in discovery.

Uber's reliance on *Odom v. Microsoft* and *Bui v. Nguyen* only underscores the gap in its enterprise theory. Opp'n at 46–47. *Odom* involved allegations that Best Buy secretly shared customers' payment information so Microsoft could bill customers for unwanted services without their permission. That is not routine professional conduct equally consistent with lawful business. *Odom v. Microsoft Corp.*, 486 F.3d 541, 543–44, 552–53 (9th Cir. 2007). *Bui*, an unpublished memorandum, is thinner still: it allowed amendment based on allegations of a scheme to "plunder millions" through "actual fraud, wire fraud and forgery," but said nothing about transforming ordinary lawyer-doctor referrals or lien arrangements into a RICO enterprise. *Bui v. Nguyen*, 712 F. App'x 606, 608 (9th Cir. 2017). By contrast, the FAC pleads only conduct with obvious lawful explanations— referrals to a litigation-capable physician, lawful lien agreements, and advocacy for admittedly injured clients. These ordinary business explanations defeat Uber's attempt to infer a common criminal purpose from ordinary business conduct.

In the end, Uber fails to allege allegations that extend beyond an ordinary business relationship between DTLA and Dr. Khounganian. It is striking when, as here, Uber "do[es] not allege how Defendants *agreed* to employ any . . . procedures as part of a long-term criminal enterprise predicated on acts of mail and wire fraud." *Lechter v. Aprio, LLP*, 565 F. Supp. 3d 1279, 1315 (N.D. Ga. 2021). There are no allegations of an email, meeting, document, note, or text where DTLA and Dr. Khounganian even discuss—let alone agree—to any procedures for the alleged enterprise. "That is fatal to Plaintiffs' Federal RICO claim." *Id.* An ordinary business relationship cannot form a common purpose to establish a RICO enterprise.

**B.    Uber fails to plead an association-in-fact enterprise in Count 4.**

Uber cannot establish that DTLA formed a RICO enterprise for one of the same reasons above—a lawyer performing legal tasks cannot be subject to RICO liability even if the services furthered the enterprise's affairs. *See Drummond*, 454 F. Supp. 3d at 1219.

## C.     Uber fails to plead a RICO conspiracy.

Uber's conspiracy claim fails for the same reasons as its substantive RICO claims. A RICO conspiracy claim cannot survive where the complaint fails to plead a viable RICO violation, and Uber's opposition identifies no well-pled facts showing that DTLA agreed to conduct or participate in the affairs of any alleged enterprise—much less the separate enterprises allegedly involving other law firms, other doctors, or other Clients. The FAC instead alleges, at most, that DTLA represented the Clients in personal-injury litigation and communicated with medical providers in connection with those cases. This is not an agreement to operate a RICO enterprise.[3]

*Simon* is of no help to Uber. There, Uber alleged that the lawyers orchestrated every step of the medical pipeline—steering clients to chosen providers, dictating treatments, funding procedures, and directing examination findings. *See* Dkt. 112-2 at 3–5. Here, Uber pleads no such orchestration by DTLA, and a single scheduling email cannot substitute for the detailed, coordinated conduct that made the conspiracy claim plausible in *Simon*.

## IV.    Uber's claims are time-barred.

RICO's four-year statute of limitations also bars Uber's claims. The limitations period begins to run when a plaintiff "knows or should know of the injury that underlies his cause of action." *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996). It is the discovery of the *injury*—not the pattern—that starts the clock. *Rotella v. Wood*, 528 U.S. 549, 555 (2000).

---

[3] Fradkin's motion also noted that DTLA had been adverse to Dr. Khounganian and other doctors in state court by filing interpleaders against them, which was fatal to both enterprise and conspiracy. Dkt. 93 at 9, 22. In response, the Opposition argues only that "interpleader does not reflect 'competing claims'" because the interpleading party must 'disclaim any interest in the property claimed.'" Opp'n at 47. Uber is wrong. "Partial interpleader, where the obligor admits some liability but makes a partial claim or asserts a partial interest, is also allowed. Code Civ. Proc., § 386.; *City of Morgan Hill v. Brown*, 71 Cal. App. 4th 1114, 1123 (1999). Thus, Uber must concede that the interpleader cases do establish adversity between DTLA and Dr. Khounganian and nullify the FAC's enterprise and conspiracy allegations.

Uber's Opposition invokes the "separate accrual rule" and argues that some settlements occurred within the four-year limitations period. Opp'n at 73. But the FAC's own allegations establish that Uber knew or should have known of any alleged fraud long before it settled. In each DTLA case, Uber retained independent medical examiners, conducted forensic billing reviews, took depositions, and reviewed accident photos—all *before* settlement. FAC ¶¶ 172, 183, 197–98, 200, 207, 221, 299, 321, 338. A plaintiff has "constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to the discovery of the fraud." *Pincay v. Andrews*, 238 F.3d 1106, 1110 (9th Cir. 2001). Uber did not merely have enough information to warrant an investigation; it *conducted* the investigation. Its own experts told Uber that it did not cause the injuries and that the surgeries were unnecessary. Uber settled anyway. The limitations period began running when Uber discovered the injury, not years later when it decided to recharacterize its settlement regrets as fraud.

Uber's contention that the alleged "fraud" was not apparent on a "claim-by-claim basis" runs counter to the FAC's specific allegations. Opp'n at 68, 75. Uber claims that the fraud was so obvious that any reasonable person would have recognized it from the accident photos or videos (FAC ¶¶ 170, 183, 204–05, 224, 325), medical records (*id.* ¶¶ 172–74, 189–91, 207, 306–07), discovery (*id.* ¶¶ 210, 217, 332, 349), medical evaluations (*id.* ¶¶ 172, 119–20, 197, 221, 338), and billing reviews (*id.* ¶¶ 200, 321). But Uber had all this evidence long ago and cannot now claim it needed years to discover it. Uber chose to sit on its rights, and its claims are thus untimely.

## V.    Claim preclusion bars Uber's RICO claims.

Uber's claims are also barred by claim preclusion. Under California law, claim preclusion applies when the later action involves the same claim or a claim that could have been litigated, the prior proceeding ended in a final judgment on the merits, and the party against whom preclusion is asserted was a party or in privity with a party to the prior proceeding. *Bucur v. Ahmad*, 244 Cal. App. 4th 175, 185–86 (2016). Uber does not dispute finality. The remaining elements are met.

## A.    Uber could have asserted its claims in state court.

Uber correctly notes that California's claim preclusion law looks beyond the stated causes of action in the prior suit and instead looks to the primary rights that the prior suit sought to vindicate. Opp'n at 30. But Uber errs in pretending that its federal claims involve different primary rights than those raised in the settled state cases.

*First*, Uber argues that it seeks to vindicate its right to operate its business without being the target of a pattern of fraud. *See* FAC ¶¶ 15, 25. But the alleged fraud goes to the very heart of the state court cases it settled: whether Uber caused the Clients' injuries. *Id*. Uber could have contested that question in state court, but it chose to settle instead. Now, in this federal case, Uber attacks those settlements by raising the same arguments it *could have* raised in the state court cases. While Uber says it is uninterested in relitigating the state court cases, the FAC devotes 300 paragraphs to doing exactly that. *See id.* ¶¶ 57–353. As it must: after all, if Uber *is* responsible for a given Client's injury, then that case is not part of the scheme—or there is no scheme at all.

*Second*, Uber argues that it would present "substantially different proof" in the two cases. Opp'n at 32. Not so. Uber cannot prove that the state court settlements were obtained through fraud *without first* proving that it was not responsible for the Clients' injuries. To be sure, Uber's RICO claim would require it to do more than refute injury and causation, but it must offer the same proof here that it could have offered in the state cases to disprove that it caused the Client's injuries. Again, the Court need look no further than the FAC's 300 paragraphs proclaiming Uber's innocence to see the overlap.

Uber also could have brought its RICO claim as a counterclaim in the state court cases. State courts have concurrent jurisdiction with federal courts to decide RICO claims. *Tafflin v. Levitt*, 493 U.S. 455 (1990). Not surprisingly, California courts regularly address RICO claims. *See, e.g.*, *Charles J. Vicanti, M.D., Inc. v. State Comp. Ins. Fund*, 24 Cal. 4th 800, 826–27 (Cal. 2001) (allowing RICO claim predicated on mail and wire fraud to proceed); *Cianci v. Super. Ct.*, 40 Cal. 3d 903, 909–14 (Cal. 1985) (holding that California courts had jurisdiction over civil RICO claims pre-*Tafflin*).

Uber does not dispute that case law permitted it to assert a RICO counterclaim in state court. It instead argues that it would have been "highly impractical if not impossible" to do so. Opp'n at 32. But it is no more impractical or impossible to try a RICO claim in state court than in federal court. Uber could have brought its counterclaim in a state court case and added DTLA, Dr. Khounganian, and any other defendants it sought to pursue.

*Third*, Uber argues that it did not pursue its claims in the state court cases because it could not have recognized a RICO pattern at the start of the alleged scheme. *See, e.g.*, FAC ¶ 14; Opp'n at 3, 9–10. Although the *first* case alone could not establish a pattern, Uber admits that it did discover the pattern after DTLA filed more cases. Uber does not say whether the third, tenth or twentieth case was enough to reveal the pattern, but it is undeniable that at *some* point the pattern became clear. Once that happened, Uber could have filed its RICO claim in that suit. Instead, it settled every case, only to bring a RICO suit years later, claiming that DTLA hoodwinked it into settling. Indeed, Uber is still settling DTLA cases *today*, despite knowing about the alleged fraud. *See* Supp. Fradkin Decl., Ex. W.

*Fourth*, although Uber claims it would be "untenable" for it to have sued personal injury lawyers in the state court cases (Opp'n at 36), its actions once again speak louder than its words. Uber—through the same counsel representing it here—did exactly that in another state court personal injury case. *See* Fradkin Decl., Ex. V (Dkt. 95-23). Nothing stopped it from doing the same thing in DTLA's cases. Uber instead settled and allowed final judgments to be entered, abandoning those claims. Claim preclusion prevents Uber from reviving them here as a federal RICO claim.

**B.      DTLA is in privity with its clients.**

Uber's privity argument fares no better. *First*, DTLA cited numerous authorities holding that attorneys are in privity with clients they represented in prior litigation when later sued for that representation. DTLA Mot. at 11–12. Uber's attempt to cabin those cases as federal or non-California law misses the point: California and federal claim-preclusion principles are substantially similar, and California treats agents and principals

as the same parties for preclusion purposes. *LaCour v. Marshalls of Cal. LLC*, 94 Cal. App. 5th 1172, 1190 (2023); *DKN Holdings v. Faerber*, 61 Cal. 4th 813, 827–28 (2015).

Uber responds with *Kerner v. Superior Court*, 206 Cal. App. 4th 84 (2012), but that case held only that an attorney-client relationship in one context does not place the attorney and client in privity in all contexts. *Kerner* did not involve an attorney who represented a client in actual litigation in a prior suit, as DTLA did with respect to each Client, which makes *Kerner* consistent with the law DTLA cites. *See, e.g.*, *Agha-Khan v. United States*, 2015 WL 5734380, at *5 (E.D. Cal. Sept. 29, 2015) ("While privity does not automatically exist with respect to every attorney-client interaction, when a law firm defendant appears in a subsequent action 'by virtue of their activities as representatives' of a party in a prior action, privity exists.") (internal citations omitted).

Indeed, the trial court in *Kerner* found there was no attorney-client relationship at all, as the attorney merely assisted the purported client as a friend. The Court of Appeal reversed, finding that an attorney-client relationship can form even informally, without a formal agreement or payment, and that one existed here because the client requested and received legal advice. *Kerner*, 206 Cal. App. 4th at 104–05, 117–18. *Kerner* then held that an incidental attorney-client relationship did not establish privity between the attorney and client as to a litigation matter where the attorney did *not* act as trial counsel. *Id.* at 129. But DTLA's representation here was hardly incidental. Uber instead alleges that DTLA fully represented the Clients throughout the litigation, from demand letter to settlement. FAC ¶¶ 392–402.[4]

*Second*, DTLA's lawyers are also in an agency relationship with the Clients, which places them in privity with one another for claim preclusion purposes. *See, e.g.*, *In re JNC Cos.*, 996 F.2d 1225, at *3 (9th Cir. June 30, 1993) (attorney representing a party in prior action was in privity with the client); *Bus. Dev. Corp. of S.C. v. Rutter & Russin, LLC*, 37

---

[4] In any event, *Kerner* is an intermediate state court decision that is not binding on this Court, particularly as to any *dicta*. *See, e.g.*, *Brunsvick v. Hartford Life and Acc. Ins. Co.*, 2011 WL 5838221, at *2 (E.D. Cal. Nov. 21, 2011) (California Court of Appeal decisions are "not binding" interpretations of California law, and less persuasive when they do not "squarely address the decisions presented" in a federal case).

F.4th 1123, 1137 (6th Cir. 2022) (applying ordinary agency principles in finding an attorney in privity with client); *Jackson v. Dow Chem. Co.*, 902 F. Supp. 2d 658, 671 (E.D. Pa. 2012) (attorney sued for his representation of client in prior litigation is in privity with the client and "is also entitled to invoke claim preclusion"). Uber's alleged injuries arise from DTLA acting in its capacity as agents for its Clients, and California law treats agents and principals as "effectively the same parties for purposes of preclusion." *DKN Holdings*, 61 Cal. 4th at 827; *see Rolloco Holdings, Inc. v. VLP Cap., Inc.*, 2019 WL 1491175, at *5 (C.D. Cal. Apr. 4, 2019); *Gonzalez v. Hadid*, 2018 WL 11474122, at *6 (C.D. Cal. June 22, 2018). Thus, DTLA and its clients were essentially the same parties in the state court proceedings below for res judicata purposes.

*Third*, DTLA's contingent-fee interest only reinforces that conclusion. Because DTLA's recovery depended on the clients' recoveries, DTLA had a direct financial stake in the judgments. *See Monco v. Zoltek Corp.*, 397 F. Supp. 3d 1165, 1180 (N.D. Ill. 2019); *Langone v. Schad, Diamond & Shedden, P.C.*, 406 Ill. App. 3d 820, 832 (2010).

*Fourth*, Uber misquotes authorities in claiming that "the requirement of mutuality generally will not be satisfied, because 'the circumstances' will rarely 'support a finding of privity to invoke preclusion against' the attorney based on the first lawsuit in which he or she was not a party." Opp'n at 28 (quoting *Kerner*, 206 Cal. App. 4th at 127 (quoting 18A Wright & Miller's *Federal Practice & Procedure* § 4464.1, at 716–17 (2d. ed. 2002)). Uber's reliance on *Kerner* and Wright & Miller is misplaced. *Kerner* held only that an attorney-client relationship, standing alone, does not establish privity for purposes of binding an attorney to an adverse judgment against a client. *Kerner*, 206 Cal. App. 4th at 126–28. In doing so, the court criticized out-of-state cases that had found "privity" in the opposite posture—where attorney-defendants invoked an earlier judgment defensively against a losing plaintiff—as resting on little analysis and on what Wright & Miller calls "[b]ogus privity." *Id.* at 127–28. Wright & Miller's point is not that attorney-defendants may "rarely" invoke preclusion, but that courts should not manufacture fictional privity to reach a nonmutual claim-preclusion result without candidly analyzing

the relationship between the parties and the fairness of applying preclusion. *See* 18A Wright & Miller, *Federal Practice & Procedure* § 4464.1. Here, DTLA does not rely on fictional privity. Uber seeks to relitigate the same alleged injury against the lawyers who represented their Clients. The relevant question is not whether an attorney-client relationship automatically creates privity in every case. It is whether DTLA's relationship to the Clients and those judgments is close enough to support preclusion—a question that can only be answered in the affirmative.

In short, Uber could have defended the state court cases by contesting causation and damages, as its FAC does here. It could have sought sanctions against both DTLA and its clients for bringing baseless claims, as the FAC admits. FAC ¶ 14. It could have sued the lawyers prosecuting those claims, as it has done in another case. *See* Supp. Fradkin Decl., Ex. W. All these "could haves" preclude Uber's suit here.

## VI. California's compulsory counterclaim rule bars Uber's RICO claims.

Uber's argument against the compulsory counterclaim rule rehashes the same argument it makes above—that DTLA was not in privity with the clients it represented in the California state cases and that its RICO claim does not rest on the same events at issue in the state court cases. Opp'n at 35–37. Both arguments fail for the same reasons stated above. *First*, DTLA was in privity with its clients in state court. *Second*, Uber's RICO case requires it to reverse each underlying personal injury case on its merits. To succeed here, Uber must prove that each Client suffered no injury from Uber's negligence—a burden the FAC concedes by devoting hundreds of paragraphs to that question. FAC ¶¶ 57–353. After all, if Uber did injure a given Client, then either that case is not part of the fraudulent scheme or there is no fraudulent scheme at all. Uber will thus present the same evidence to prosecute this federal case that it would have to defend the state court cases, had it not settled them. The RICO claims are thus compulsory counterclaims.

## VII.    The *Rooker-Feldman* doctrine bars Uber's RICO claims.

Uber concedes that *Rooker-Feldman* bars federal suits by state-court losers complaining of injuries caused by state-court judgments rendered before the federal action. Opp'n at 37 (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)). As the Ninth Circuit explained, "[w]here federal relief can only be predicated upon a conviction that the state court was wrong," the federal suit is "a prohibited appeal of the state-court judgment." *Cooper v. Ramos*, 704 F.3d 772, 779 (9th Cir. 2012); *see also Searle v. Allen*, 148 F.4d 1121, 1128 (9th Cir. 2025) ("de facto appeals" are "suits in which 'the adjudication of the federal claims would undercut the state ruling'").

Uber's suit depends on that conviction. Uber wants to recover the money it paid to resolve state-court cases that ended in final dismissals with prejudice. This relief would require this Court to conclude that those dismissals were procured by fraud and should not have resolved the cases as they did. Thus, this suit is a *de facto* appeal barred by *Rooker-Feldman*.

Uber responds with an outlier decision by a divided Ninth Circuit panel in *Miroth v. County of Trinity*, 136 F.4th 1141 (9th Cir. 2025),[5] but the case highlights the flaw in Uber's claims. Opp'n at 38–39. There, parents blamed the county's alleged failure to provide social services and its false statements to the state court for their loss of parental rights. But the parents' federal suit sought only damages, not to undo the custody

---

[5] Even if it applied, *Miroth* is not good law. The dissent is correct that the majority decision ignores "our prior precedents" and "causes serious tension with cases in our court as well as other circuits." *Id.* at 1164 (VanDyke, J., dissenting). Ninth Circuit precedent limits any exception to extrinsic fraud that prevented a party from presenting its case, not intrinsic fraud concerning the merits of the prior action. *Wood v. McEwen*, 644 F.2d 797, 801 (9th Cir. 1981); *Kougasian v. TMSL, Inc.*, 359 F.3d 1136 (9th Cir. 2004); *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134 (9th Cir. 2021). Uber alleges intrinsic fraud: allegedly inflated medical records, causation opinions, and bills that went to the heart of the state cases and that Uber had every opportunity to challenge. Because one Ninth Circuit panel cannot overrule a prior panel, the earlier decisions remain the controlling precedent. *See, e.g.*, *Fluck v. Bevins*, 969 F. Supp. 1231, 1236 (D. Or. 1997) ("When two Ninth Circuit panel decisions conflict, the trial court ordinarily follows the older case. That is because one Ninth Circuit panel cannot overrule another; only an *en banc* court can overrule the prior decision. . . .").

judgment or reinstate their parental rights. *Miroth* emphasized that the "true consequences" of the state judgment were the loss of custody, and that the amended complaint avoided *Rooker-Feldman* because the parents did "not request[] the return of their children." *Id.* at 1155, 1158.

Uber's claim is different. It complains that it paid to settle the state court cases and now wants its money back. Uber therefore asks this Court to redress the very harm imposed by the state court judgments. Unlike in *Miroth*, Uber's claim depends on the premise that the state courts were wrong to enter the judgments. That is precisely what *Rooker-Feldman* forbids.

In any event, the *Miroth* majority opinion provides no more than cold comfort to Uber here, because the Ninth Circuit signaled that the case should still be dismissed. It recognized that preclusion may bar claims even where *Rooker-Feldman* does not. 136 F.4th at 1144, 1154. On remand, the district court dismissed the claims on preclusion grounds. *Miroth v. Cty. of Trinity*, 2025 WL 2912274 (E.D. Cal. Oct. 14, 2025). Thus, even if the Court frames the defect as preclusion rather than *Rooker-Feldman*, it must still dismiss Uber's suit.

## CONCLUSION

Once stripped of its conclusory and implausible allegations, the FAC alleges only that: DTLA referred its admittedly injured Clients to a lien doctor, which is legal; DTLA lawyers deferred to that doctor's medical judgment and did not second-guess him, which is not only legal, but required by law; DTLA filed suits and served demand letters based in part on the doctor's diagnoses and opinions, which even Uber admits is protected petitioning activity; and Uber disputed the Client's claims with discovery and its own expert opinions before settling. Properly understood, Uber's allegations fail to state any claim. The FAC should be dismissed with prejudice.

Dated: May 20, 2026

/s/ David Scheper

WINSTON & STRAWN LLP
David Scheper (SBN 120174)
dscheper@winston.com
Alexander Cote (SBN 211558)
acote@winston.com
Katelyn Taira (SBN 359683)
ktaira@winston.com
333 S. Grand Ave.
Los Angeles, CA 90071-1543
Telephone:   +1 213-615-1700
Facsimile:    +1 213-615-1750

Attorneys for Defendants
Igor Fradkin and Downtown LA Law Group

## CERTIFICATION OF COMPLIANCE

The undersigned, counsel of record for Igor Fradkin and Downtown LA Law Group, certifies that this brief contains no more than 30 pages, which complies with the page limit set by court order. *See* Standing Order, Dkt. 85 at 2.

Dated: May 20, 2026                    WINSTON & STRAWN LLP


By: */s/ David Scheper*
David Scheper
Alexander Cote
Katelyn Taira