**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UBER TECHNOLOGIES, INC.,<br>Plaintiff,<br>v.<br>DOWNTOWN LA LAW GROUP; IGOR FRADKIN; THE LAW OFFICES OF JACOB EMRANI; JACOB EMRANI; VALLEY ORTHOPEDIC AND SPINE CENTER d/b/a GSK SPINE; and GREG KHOUNGANIAN,<br>Defendants. | Case No. 2:25-cv-06612-SPG-PD<br>**ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANTS' MOTIONS TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT AND GRANTING DEFENDANTS' MOTIONS FOR ATTORNEY'S FEES [ECF NOS. 87, 88, 93, 94, 96, 97, 98]** |

Before the Court are four Motions to Dismiss Plaintiff's First Amended Complaint, filed by (1) Defendants Jacob Emrani ("Emrani") and the Law Offices of Jacob Emrani (the "Emrani Firm," or, together with Emrani, the "Emrani Defendants"), (ECF No. 87 ("Emrani MTD")); (2) Igor Fradkin ("Fradkin"), (ECF No. 93 ("Fradkin MTD")); (3) Downtown LA Law Group ("DTLA"), (ECF No. 94 ("DTLA MTD")); and (4) Greg Khounganian ("Khounganian") and Valley Orthopedic and Spine Center d/b/a GSK Spine ("GSK Spine," or, together with Emrani, the Law Offices of Jacob Emrani, DTLA, and Khounganian, "Defendants"), (ECF No. 96 ("Khounganian Motion")).

Also before the Court are three Motions for Determination of Prevailing Party Status and Attorney's Fees, filed by (1) the Emrani Defendants, (ECF No. 88 ("Emrani Fees Motion")); (2) Khounganian, (ECF No. 97 ("Khounganian Fees Motion")); and (3) Radiance Surgery Center ("Radiance"), (ECF No. 98 ("Radiance Motion")).

Having considered the parties' submissions, oral arguments, the relevant law, and the record in this case, the Court (1) GRANTS the Fees Motions and awards Radiance a modified fee award; (2) GRANTS the Motions to Dismiss with respect to Plaintiff's RICO Conspiracy claim; and (3) DENIES the Motions to Dismiss with respect to the remaining arguments.

## I. BACKGROUND

### A. Factual Background

The following allegations are taken from Plaintiff Uber Technologies, Inc.'s ("Plaintiff") First Amended Complaint ("FAC"). (ECF No. 77 ("FAC")). Plaintiff is a rideshare and technology company, with many thousands of users who rely on Plaintiff's application for transportation and deliveries. (*Id.* ¶¶ 1, 8). Defendants are personal injury attorneys, law firms, and medical providers in the Los Angeles area. (*Id.* ¶¶ 2, 17-22). In brief, Plaintiff alleges that Defendants have collectively engaged in a fraudulent scheme to target Plaintiff with false and artificially inflated personal injury lawsuits following accidents involving Plaintiff's drivers. Plaintiff brings this action under the Racketeer Influenced and Corrupt Organizations ("RICO") Act to recover excess litigation and settlement costs incurred in defense of these lawsuits.

#### 1. <u>Defendants' Alleged Practices</u>

Plaintiff alleges that Defendants have engaged in a collective scheme involving the creation of fraudulent bills and medical records to inflate damages claims in personal injury lawsuits against Plaintiff. (*Id.* ¶ 25). Defendants target Plaintiff because of its statutorily required $1 million insurance coverage, which makes it possible to extract more lucrative settlements. (*Id.* ¶¶ 26, 28). Plaintiff alleges that the attorney and law firm Defendants—Emrani, the Emrani Firm, Fradkin, and DTLA (collectively, the "Law Firm

Defendants")—direct personal injury claimants to pre-selected medical providers, including Khounganian and GSK Spine (the "Medical Provider Defendants"). (*Id.* ¶ 2). These medical providers provide treatment to the claimants that is unnecessary or causally unrelated to the accidents, and certain providers generate artificially inflated bills. (*Id.*). The Law Firm Defendants facilitate these unnecessary medical treatments by scheduling appointments, authorizing diagnostic tests, and coordinating medical treatment for personal injury claimants. (*Id.* ¶ 51).

Although many of these personal injury claimants have private medical insurance, the medical providers issue bills on a lien basis, under which the claimants grant the medical providers a lien on recoveries from their personal injury claims. (*Id.* ¶¶ 2, 31). While the liens purport to promise the medical providers full payment in the event of a shortfall in recovery, Plaintiff alleges that these agreements are shams. (*Id.* ¶ 3). Instead, Plaintiff alleges that the Law Firm Defendants secretly enter into side agreements with medical providers, under which the medical providers agree to take a substantial discount in the event that the recovery is insufficient. (*Id.*). Despite actually charging lower rates, these medical providers generate bills at above-market, artificially inflated rates. (*Id.* ¶ 35). These bills falsely claim that the treatment at issue is medically necessary and causally linked to the claimants' car accidents. (*Id.* ¶ 36).

Plaintiff states that certain medical providers have voluntarily provided Plaintiff with documentary evidence of these concealed side agreements. (*Id.* ¶ 40). According to these unnamed medical providers, the Law Firm Defendants typically begin a relationship with a medical provider by directly contacting them and inquiring about the price for services and the possibility of a volume discount. (*Id.* ¶ 42). The medical providers and the Law Firm Defendants then reach an agreement to a set price for medical services. (*Id.* ¶ 43). However, the Law Firm Defendants then tell the medical providers to create bills on a lien basis showing a different and higher amount. (*Id.*). While the medical providers create bills showing the higher amount, they are paid by the Law Firm Defendants at the lower, agreed-upon price. (*Id.* ¶ 44). Plaintiff has provided charts showing billing details for

patients referred by the Emrani Firm and DTLA to a certain medical imaging provider. (*Id.* ¶¶ 45, 47). These charts show consistent discrepancies between the amounts paid by the Law Firm Defendants and the amount billed by the medical providers, including one patient who was purportedly billed $2,375 for services for which the medical provider was paid $300. (*Id.* ¶ 46).

While the Law Firm Defendants refer claimants to a wide range of medical providers, Plaintiff alleges that Khounganian and GSK Spine are central to the fraudulent scheme. (*Id.* ¶¶ 50, 52). The Law Firm Defendants refer claimants to Khounganian in connection with alleged spinal injuries, and Khounganian diagnoses these claimants with serious spinal injuries, causally connects the injuries to the underlying accidents, and recommends costly surgery. (*Id.* ¶ 53). Khounganian then frequently performs the requested surgeries and produces false bills showing artificially inflated charges. (*Id.* ¶¶ 54-55). In executing lien agreements with claimants, Khounganian does not check their credit histories, make intermittent payment demands, or sell unpaid balances to third-party collection agencies. (*Id.* ¶ 11). Instead, he operates with the understanding that, if a claimant's litigation results in a shortfall, he will negotiate a lower fee and release the claimant from personal liability. (*Id.*).

2. <u>The Claimants</u>

The FAC identifies 18 different personal injury claimants ("Claimants A" through "R") whose experiences allegedly demonstrate how this scheme operates in practice. Claimants A through G retained the Emrani Firm (the "Emrani Claimants"), while Claimants H through R retained DTLA (the "DTLA Claimants"). The Court summarizes the allegations as to each Claimant below.

*a) Claimant A*

On December 9, 2019, Claimant A was driving a vehicle that was struck by an Uber driver in Los Angeles. (*Id.* ¶ 57). Claimant A's vehicle sustained minor damage, and he did not report any injuries at the scene. (*Id.*). However, the following week, Claimant A

visited an emergency room, where he used his own insurance and was diagnosed with muscle pain. (*Id.* ¶ 58).

Claimant A then retained the Emrani Firm, which directed Claimant A to the Radiance Surgery Center. (*Id.* ¶ 60). In communicating with the Radiance Surgery Center, the Emrani Firm authorized a referral to Khounganian and noted that the "Defendant was an Uber driver and the BI policy limit is 1 million." (*Id.* ¶¶ 60, 62). Khounganian recommended that Claimant A undergo two spinal surgeries and stated that this diagnosis was "caused by and/or exacerbated by the injury during the date of loss." (*Id.* ¶ 61). On at least two occasions, Claimant A expressed confusion about the large number of medical treatments. (*Id.* ¶ 63). However, Claimant A ultimately agreed to the treatment, and Khounganian performed the two surgeries. (*Id.* ¶¶ 64-66). Claimant A executed a lien agreement with Khounganian, and Khounganian prepared bills amounting to more than $230,000. (*Id.* ¶¶ 67-68). According to an independent medical evaluation, the surgeries performed on Claimant A were medically unnecessary, and the reported charges for the procedures were ten times the accepted norms for such procedures. (*Id.* ¶ 70). Plaintiff ultimately settled Claimant A's claims, incurring higher settlement and defense costs as a result of the allegedly fraudulent medical and billing records. (*Id.* ¶ 71).

*b) Claimant B*

On March 10, 2019, Claimant B was involved in a low-speed accident with an Uber Eats driver in Menifee, California. (*Id.* ¶ 72). Claimant B denied any injuries when speaking to the responding officer. (*Id.*). Claimant B then retained the Emrani Firm, which directed Claimant B to schedule appointments with a select group of medical providers. (*Id.* ¶ 73). More than two months after the accident, Claimant B reported the accident to the Menifee Police Department but did not report any injuries. (*Id.* ¶ 74). More than 18 months after the accident, the Emrani Defendants sent a demand letter to Plaintiff, stating that Claimant B suffered from numerous spinal injuries and would need to undergo future cervical fusion surgery. (*Id.* ¶ 75). The Emrani Firm subsequently initiated a suit against Plaintiff and referred Claimant B to Khounganian. (*Id.* ¶ 77).

During Claimant B's first appointment with Khounganian—a telehealth meeting—Khounganian recommended lumbar decompression/discectomy for her lower back, at a cost of approximately $226,000. (*Id.* ¶ 78). Khounganian stated that, "within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." (*Id.* ¶ 81). Claimant B underwent spinal surgery on July 16, 2021, during which her sciatic nerve was nicked. (*Id.* ¶¶ 84-85). Khounganian referred Claimant B to physical therapy and, after thirteen appointments, she reported her pain as zero out of ten. (*Id.* ¶¶ 86-87). Despite Claimant B reporting no pain, Khounganian signed a record opining that Claimant B would likely require a lumbar fusion procedure and an anterior cervical disc placement procedure, each of which would cost approximately $265,000. (*Id.* ¶ 88). Claimant B's treatment ultimately totaled $330,308.42, the vast majority of which was procured through medical liens, including a lien agreement with Khounganian. (*Id.* ¶¶ 90, 91). Plaintiff alleges that Khounganian's rates were inflated nearly four times more than those quoted by a separate spine surgeon. (*Id.* ¶ 94). Plaintiff settled Claimant B's claims, incurring higher settlement and defense costs as a result of the allegedly fraudulent medical and billing records. (*Id.* ¶ 95).

*c) Claimant C*

On March 12, 2019, Claimant C was a backseat passenger in an Uber when another driver collided with the right side of the vehicle. (*Id.* ¶ 96). Claimant C reported no injuries and was able to leave the scene in another rideshare vehicle. (*Id.*). However, approximately one hour after the accident, Claimant C went to urgent care, where she was evaluated for body aches, disorientation, and confusion before being transferred to the emergency room for evaluation of a possible head injury. (*Id.* ¶ 99). At the emergency room, Claimant C exhibited a full range of motion, was not in pain, and underwent a CT scan, a chest x-ray, and an electrocardiogram, all of which rendered normal findings. (*Id.* ¶ 100). Plaintiff was diagnosed with a mild concussion. (*Id.*). Claimant C had previously been involved in two accidents, including a severe collision with a semi-truck and an accident in which her vehicle was t-boned. (*Id.* ¶ 98).

On March 17, 2019, Claimant C retained the Emrani Firm, which arranged for medical imaging appointments. (*Id.* ¶ 101). In the ensuing months, Claimant C attended 29 chiropractic appointments, three neurological consultations, and a series of appointments with neurologists, imaging centers, and a pain management specialist. (*Id.* ¶¶ 103, 105-06). On March 21, 2019, Claimant C received x-rays of her cervical, thoracic, and lumbar spine, which revealed little evidence of acute injury, as well as normal alignment of her thoracic spine. (*Id.* ¶ 104). On June 5, 2019, Claimant C received an MRI of her cervical and lumbar spine, which revealed a disruption/reversal of the cervical lordosis and straightening of the lumbar lordosis but did not reveal any evidence of acute injury. (*Id.* ¶ 107). On October 8, 2020, Claimant C received a CT scan of her brain, which did not reveal any signs of acute trauma. (*Id.* ¶ 108). On May 6, 2021, Claimant C's pain management specialist cleared her to resume normal activities. (*Id.* ¶ 109).

Two months later, Claimant C presented to Khounganian, who asserted that Claimant C had "approximately 50% of normal observed" range of motion in her cervical and lumbar spine. (*Id.* ¶ 110). Khounganian recommended a disc replacement surgery at a total cost of approximately $215,000 to $238,000. (*Id.*). Khounganian asserted that, "[w]ithin a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." (*Id.* ¶ 111). Claimant C executed a lien agreement with Khounganian, promising to repay Khounganian from recoveries for any claim. (*Id.* ¶ 112). Claimant C incurred $124,223.08 in medical bills, of which only $3,391 was paid by her insurance. (*Id.* ¶ 116). The Emrani Defendants also asserted future medical expenses based on Khounganian's surgery recommendation. (*Id.*).

On August 15, 2022, Claimant C underwent an independent medical evaluation by a neurological medical expert, who found no abnormalities in her MRIs or cervical and lumbar spine studies. (*Id.* ¶ 119). An orthopedic medical expert later reviewed Claimant C's medical records and opined that Claimant C had no orthopedic problems, that her lumbar spine MRI was normal, that every disc in her cervical spine was normal, and that it was "criminal" to recommend further treatment. (*Id.* ¶ 120). Plaintiff settled Claimant C's

claims, incurring higher settlement and defense costs as a result of the allegedly fraudulent medical and billing records. (*Id.* ¶ 121).

*d) Claimant D*

On August 10, 2019, Claimant D was a passenger in Claimant E's vehicle, which was rear-ended by an Uber driver in Los Angeles. (*Id.* ¶ 122). Claimant D did not immediately report any injuries and was not transported to the emergency room. (*Id.*). Six days after the collision, Claimant D presented to Kaiser Hospital with complaints of headaches and dizziness. (*Id.* ¶ 123). A CT scan was found to be normal, and she was prescribed medication for the headaches. (*Id.*).

Claimant D then retained the Emrani Firm, which referred her to Khounganian. (*Id.* ¶¶ 124-25). Khounganian asserted that Claimant D would require a cervical fusion surgery at a cost of approximately $250,000 to $295,000, and he concluded that, "within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." (*Id.* ¶ 125). Claimant D executed a lien agreement with Khounganian, under which she promised to repay Khounganian from recoveries for any claim. (*Id.* ¶ 126). On March 31, 2021, the Emrani Firm sent a demand letter to Plaintiff, seeking $1 million in damages for Claimants D and E, based on future medical expenses arising from Khounganian's estimates. (*Id.* ¶ 128). The majority of Claimant D's treatment costs were procured through medical lien billing. (*Id.* ¶ 129). Plaintiff settled Claimant D's claims, incurring higher settlement and defense costs as a result of the allegedly fraudulent medical and billing records. (*Id.* ¶ 130).

*e) Claimant E*

Claimant E was the driver of the vehicle involved in the crash with Claimant D. (*Id.* ¶ 131). Claimant E was transported to the emergency room, where he received an x-ray of his cervical spine, which showed no significant damage. (*Id.* ¶ 132). Claimant E was diagnosed with a muscle strain. (*Id.*).

Claimant E then retained the Emrani Firm, which referred Claimant E to medical providers for further treatment. (*Id.* ¶ 133). On August 21, 2019, Claimant E began

receiving chiropractic care, which continued through November 19, 2019. (*Id.* ¶ 134). On January 27, 2020, the Emrani Firm arranged an appointment for Claimant E with Khounganian. (*Id.* ¶ 135). Khounganian found that Claimant E had "approximately 50% of normal observed" range of motion in his cervical and lumbar spine, and he recommended a cervical discectomy and fusion, with an estimated cost of $250,000 to $295,000, as well as a multi-level lumbar decompressive procedure, at an estimated cost of $215,000 to $238,000. (*Id.*). Khounganian concluded that, "within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." (*Id.*). Claimant E executed a lien agreement with Khounganian, promising to repay Khounganian from recoveries for any claim. (*Id.* ¶ 137). On March 31, 2021, the Emrani Firm sent a demand letter to Plaintiff, seeking $1 million in damages for Claimants D and E. (*Id.* ¶ 139). On May 18, 2021, Claimant E received a posterior instrumented fusion surgery, performed by a different physician than Khounganian. (*Id.* ¶ 140). Plaintiff alleges that the majority of the treatment received by Claimant E was procured through medical lien billing with various medical providers. (*Id.* ¶ 141). Plaintiff settled Claimant E's claims, incurring higher settlement and defense costs as a result of the allegedly fraudulent medical and billing records. (*Id.* ¶ 142).

*f) Claimant F*

On March 2, 2019, Claimant F was involved in an accident where an Uber driver struck the right side of his truck. (*Id.* ¶ 143). Claimant F's vehicle sustained moderate damage but could still be driven, and neither police nor paramedics were called to the scene. (*Id.*). Claimant F did not seek medical care until five days after the accident. (*Id.* ¶ 144).

At some point after the accident, Claimant F retained the Emrani Firm, which referred him to medical providers and coordinated his medical appointments. (*Id.* ¶ 145). Claimant F attended approximately 65 chiropractic sessions through September 30, 2019, when the chiropractor concluded that maximum therapeutic benefit had been attained. (*Id.* ¶ 146). On April 2, 2019, Claimant F received x-rays of his cervical and lumbar spine,

which revealed cervical muscular spasm with straightening of the normal cervical lordosis and mild degenerative changes in the lumbar spine. (*Id.* ¶ 147). On October 14, 2019, Claimant F presented to Khounganian, who recommended surgery, at an estimated cost of $250,000 to $295,000. (*Id.* ¶ 148). Claimant F executed a lien agreement with Khounganian promising to repay him from recoveries for any claim. (*Id.* ¶ 149). The majority of treatment received by Claimant F was procured through medical lien billing, totaling at least $97,903.70. (*Id.* ¶ 151). Plaintiff settled Claimant F's claims, incurring higher settlement and defense costs as a result of the allegedly fraudulent medical and billing records. (*Id.* ¶ 153).

*g) Claimant G*

On November 5, 2019, Claimant G was a passenger in an Uber when the vehicle collided with a stopped vehicle. (*Id.* ¶ 154). The collision was minor, and Claimant G did not seek immediate medical attention. (*Id.*). However, two days after the accident, Claimant G presented to the emergency room with complaints of neck soreness. (*Id.* ¶ 155). A CT scan did not reveal any acute fractures or malalignment, and Claimant G was diagnosed with a cervical and thoracic sprain. (*Id.* ¶ 155). Before the accident, Claimant G had an extensive history of health problems, including a brain tumor that affected part of her neck, at least one prior neck surgery, and numerous mental health struggles. (*Id.* ¶ 156).

Following the accident, Claimant G retained the Emrani Firm, which referred her to medical treatment from a select group of providers. (*Id.* ¶ 157). Between December 16, 2019, and June 1, 2021, Claimant G received extensive medical treatment, including 13 chiropractic visits, nine physical therapy sessions, and four epidural injections. (*Id.* ¶ 158). Claimant G was evaluated by Khounganian in October 2021 and executed a lien agreement with Claimant G, wherein she promised to repay Khounganian from recoveries for any claim. (*Id.* ¶¶ 159-60). Khounganian recommended that Claimant G receive a multilevel cervical disc replacement, with an estimated cost between $250,000 and $295,000, an L4-S1 decompression/discectomy, with an estimated cost between $215,000 and $238,000,

and physical therapy. (*Id.* ¶ 161). Between October 2021 and February 2022, Claimant G had 18 physical therapy sessions. (*Id.* ¶ 162). On July 13, 2022, Claimant G returned to Khounganian, who provided the same surgery recommendations. (*Id.* ¶ 163). Khounganian prepared a report stating that, "[w]ithin a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." (*Id.* ¶ 165). Plaintiff settled Claimant G's claims, incurring higher settlement and defense costs as a result of the allegedly fraudulent medical and billing records. (*Id.* ¶ 169).

*h) Claimant H*

On September 30, 2017, Claimant H was riding on a Los Angeles Metro Bus that was involved in a low-speed collision with an Uber driver. (*Id.* ¶ 170). Claimant H did not visit the emergency room following the accident. (*Id.*). Video footage of the accident showed Claimant H shift from her seat, brace a metal rail, and shift back to her seat, and photos from the scene depicted negligible damage to the bus. (*Id.*). An independent medical evaluation of the accident video footage concluded that Claimant H should not have experienced anything more than soft tissue strains or muscle pain. (*Id.* ¶ 172). On October 4, 2017, Claimant H visited a doctor and was diagnosed with a neck strain, lumbar strain, right trapezius strain, and a left knee sprain. (*Id.* ¶ 174). An independent medical examiner later reviewed MRIs of Claimant H's lumbar spine and cervical spine and concluded that Claimant H's disc bulges were all chronic in nature. (*Id.* ¶ 183). The examiner concluded that herniation of any disc would require compression, flexion, and a twist, while the video footage of Claimant H during the accident showed no twisting. (*Id.*).

A few weeks after the accident, Claimant H retained DTLA, which referred Claimant H to a select group of medical providers. (*Id.* ¶ 171). These medical providers did not diagnose any soft tissue trauma or swelling but instead diagnosed injuries consistent with longstanding preexistent degenerative disease of the cervical and lumbar spine. (*Id.* ¶ 172). Claimant H had an extensive history of cervical and lumbar complaints dating back to 2011, when she was involved in a different motor vehicle accident. (*Id.* ¶ 173). In the

year before the current incident, Claimant H had at least 40 chiropractic visits. (*Id.*). Following the accident, Claimant H saw various DTLA-approved medical providers, including 36 visits to a chiropractor, 16 visits to a physical therapist, and eight visits to a pain management specialist for cervical and lumbar injections. (*Id.* ¶ 175).

At some point, Claimant H began treatment with Khounganian and executed a lien agreement, wherein Claimant H promised to repay Khounganian from recoveries for any claim. (*Id.* ¶¶ 176-77). On April 18, 2019, Khounganian recommended that Claimant H undergo a C4-C5 disc replacement, with an estimated cost of $275,000, and an L2-L3 decompressive procedure, with an estimated cost of $225,000. (*Id.* ¶ 178). On May 17, 2019, Khounganian performed an L2-L3 discectomy surgery on Claimant H. (*Id.* ¶ 179). On June 11, 2020, Claimant H saw Khounganian again, who recommended a C4-C5 disc replacement and an L2-L3 lumbar fusion. (*Id.* ¶ 180). On April 12, 2021, Claimant H again saw Khounganian, who recommended a multilevel anterior cervical discectomy fusion and an L2-L3 surgery. (*Id.* ¶ 181). Khounganian executed a report stating, "[w]ithin a reasonable degree of medical probability, the diagnosis above were caused by the injury during the date of loss." (*Id.* ¶ 182). Plaintiff ultimately settled Claimant H's claims, incurring higher settlement and defense costs as a result of the allegedly fraudulent medical and billing records. (*Id.* ¶ 187).

*i) Claimant I*

On January 29, 2021, Claimant I was a passenger in an Uber when the car stopped quickly to avoid colliding with another vehicle, causing Claimant I's neck and back to hit the passenger seat in front of him. (*Id.* ¶ 188). Five months before the accident, Claimant I slipped and fell while in the shower and imaging of his spine revealed multilevel disc disease in his lumbar spine. (*Id.* ¶ 189). Claimant I began chiropractic treatment for neck, back, and foot pain in November 2020 and continued these visits through February 19, 2021. (*Id.* ¶ 190). Claimant I reported the same pain scores for his neck, mid-back, and low back prior to the Uber incident, on the day of the Uber accident, and after the Uber accident. (*Id.*). Claimant I's medical history also includes a slip-and-fall accident in 2017,

which caused injury to his neck and back, and a motor vehicle collision in 2019, which also caused injury to his body and neck. (*Id.* ¶ 191). CT scans from November 2019 revealed that Claimant I had moderate to severe degenerative changes to his cervical spine, well before the Uber accident. (*Id.*).

Claimant I retained DTLA, which referred him to medical treatment from a select group of providers. (*Id.* ¶ 192). Between February 2, 2021, and May 20, 2021, Claimant I presented to four different medical providers, including Khounganian. (*Id.* ¶ 193). Claimant I executed a lien agreement with Khounganian, under which he agreed to repay Khounganian from recoveries for any claim. (*Id.* ¶ 194). Khounganian recommended an L4-L5 and L5-S1 laminectomy procedure, which he ultimately performed on July 30, 2021. (*Id.* ¶¶ 195-96). An independent medical evaluation of Claimant I and his records concluded that Claimant I sustained only cervical and lumbar strains from the incident. (*Id.* ¶ 197). Nevertheless, Khounganian prepared a report claiming that, "[w]ithin a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." (*Id.* ¶ 198). Khounganian prepared bills of over $100,000, which a forensic billing review found was 640% above the customary value of the treatment. (*Id.* ¶¶ 199-200). Claimant I's claims remain open, and Plaintiff is incurring significant costs defending the action. (*Id.* ¶ 203).

*j) Claimant J*

On October 26, 2019, Claimant J was driving his truck with an attached trailer, when an Uber driver struck the left side of the trailer. (*Id.* ¶ 204). Claimant J's trailer sustained minor damage, but Claimant J's truck was not impacted, and he had no complaints of pain at the scene of the accident. (*Id.*).

Claimant J retained DTLA, which referred him to a select group of medical providers, for which he did not utilize his insurance coverage. (*Id.* ¶ 205). On December 11, 2019, Claimant J sought medical care for the first time, ultimately attending 23 chiropractic sessions. (*Id.* ¶ 206). On January 7, 2020, and February 10, 2020, Claimant J

obtained MRI imaging of his lumbar and cervical spine, which showed no evidence of acute injury and only degenerative conditions. (*Id.* ¶ 207).

On September 25, 2021, Claimant J presented to Khounganian, who diagnosed him with C3-C4, C5-C6, C6-C7, and L4-L5 disc herniations, despite prior imaging showing no such injuries. (*Id.* ¶ 208). Khounganian claimed Claimant J had "approximately 50% of normal observed" range of motion in his cervical and lumbar spines and recommended him for decompression/discectomy, with an estimated cost of $215,000 to $238,000. (*Id.*). Khounganian concluded that, "[w]ithin a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." (*Id.*). Claimant J executed a lien agreement with Khounganian, promising to repay Khounganian from recoveries for any claim. (*Id.* ¶ 209).

On December 29, 2021, Khounganian performed an L4-L5 discectomy on Claimant J. (*Id.* ¶ 211). Shortly thereafter, Claimant J began experiencing a sudden escalation in pain and numbness in his lower back. (*Id.* ¶ 213). On August 15, 2022, Claimant J received an MRI and x-ray of his lumbar spine, which revealed new and worse injuries. (*Id.* ¶ 214). Claimant J followed up with Khounganian, who recommended a revision decompression and L4-L5 posterior lumbar instrumented fusion, estimated at $250,000 to $290,000. (*Id.* ¶ 215). Khounganian once again claimed that, "within a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." (*Id.*).

Claimant J testified during a deposition that he had hesitations about an additional surgery, and that he wanted to seek a second opinion from his "own doctors." (*Id.* ¶ 217). On June 21, 2023, Claimant J was examined by an independent orthopedic surgeon, who confirmed that there was no medical basis to support the December 29, 2021, surgery. (*Id.* ¶ 221). The expert opined that Claimant J's MRI did not reveal any issues related to nerve compression or irritation, that his MRI showed a degenerative condition, that the only identified injury related to the accident was a muscle spasm, and that the surgery recommendation by Khounganian was treatment for a preexisting condition. (*Id.* ¶ 221).

Plaintiff ultimately settled Claimant J's claims, incurring higher settlement and defense costs as a result of the allegedly fraudulent medical and billing records. (*Id.* ¶ 223).

*k) Claimant K*

On August 8, 2019, Claimant K was a passenger in the back passenger seat of an Uber that was struck on the driver's side. (*Id.* ¶ 224). Claimant K did not seek immediate medical treatment, and pictures depict the minor nature of the collision. (*Id.*).

Claimant K retained DTLA, which referred Claimant K to a select group of providers rather than using his own health insurance. (*Id.* ¶ 225). DTLA communicated with Khounganian to schedule an appointment and referred to the type of case as "Passenger v. Uber Driver." (*Id.* ¶ 226). Khounganian executed a lien agreement with Claimant K, under which Claimant K promised to repay Khounganian from recoveries for any claim. (*Id.* ¶ 227). Khounganian recommended that Claimant K undergo a cervical discectomy and fusion at C6-C7, with an estimated cost between $250,000 and $295,000. (*Id.* ¶ 228). Khounganian performed the surgery on October 23, 2019. (*Id.* ¶ 229). After an initial recovery, Claimant K complained of increased pain, and Khounganian diagnosed Claimant K with nerve root irritation from scar tissue adjacent to the surgery point. (*Id.* ¶ 231). On January 22, 2020, Claimant K received an MRI of his cervical spine, which noted degenerative changes around C6-C7. (*Id.* ¶ 232). On February 27, 2020, Claimant K presented for reevaluation and reported feeling much better, but Khounganian reported that Claimant K might need additional surgical intervention at an estimated cost between $250,000 and $295,000. (*Id.* ¶ 233). Khounganian reported that, "[w]ithin a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." (*Id.* ¶ 234). Khounganian's office ultimately prepared bills for treatment totaling nearly $125,000. (*Id.* ¶ 235). Plaintiff ultimately settled Claimant K's claims, incurring higher settlement and defense costs as a result of the allegedly fraudulent medical and billing records. (*Id.* ¶ 239).

*l) Claimant L*

On January 2, 2019, Claimant L was a passenger in a vehicle involved in a low-speed, three-car accident with an Uber. (*Id.* ¶ 240). Claimant L did not seek emergency care, and the police report described the accident as resulting in "property damage only." (*Id.* ¶¶ 240-41).

Claimant L retained DTLA, which referred Claimant L to a pre-selected group of medical providers. (*Id.* ¶ 242). Between January 8 and May 31, 2019, Claimant L sought medical treatment from a shockwave therapist and a chiropractor, and he later visited a pain management clinic. (*Id.* ¶¶ 244-45). DTLA referred Claimant L to Khounganian, and Claimant L executed a lien agreement, promising to repay Khounganian from recoveries for any claim. (*Id.* ¶¶ 243, 246). On July 16, 2020, Khounganian opined that Claimant L needed a lumbar microdiscectomy at an estimated cost between $225,000 and $238,000. (*Id.* ¶ 247). Khounganian asserted that, "[w]ithin a reasonable degree of medical probability, the diagnosis above were caused and/or exacerbated by the injury during the date of loss." (*Id.* ¶ 249).

On December 23, 2020, Claimant L filed a lawsuit against Plaintiff, represented by DTLA and Fradkin. (*Id.* ¶ 253). On March 12, 2021, DTLA sent a demand letter to Plaintiff, demanding $750,000 to resolve Claimant L's claims. (*Id.* ¶ 254). Plaintiff ultimately settled Claimant L's claims, incurring higher settlement and defense costs as a result of the allegedly fraudulent medical and billing records. (*Id.* ¶ 256).

*m) Claimant M*

On January 16, 2020, Claimant M was a backseat passenger in an Uber that was involved in an accident on the front driver's side. (*Id.* ¶ 257). Police responded to the accident, but no airbags were deployed, and Claimant M did not seek immediate medical treatment. (*Id.*). The following day, Claimant M presented to urgent care with complaints of lower back and neck pain, and Claimant M was diagnosed with muscular pains and instructed to apply ice and heat. (*Id.* ¶ 258).

Claimant M retained DTLA, which referred Claimant M to a select group of medical providers. (*Id.* ¶ 259). On January 21, 2020, Claimant M was evaluated by a chiropractor, with DTLA listed as his attorney on the chiropractor's intake forms. (*Id.* ¶ 260). Claimant M later underwent chiropractic care and acupuncture, as well as eight physical therapy sessions and eight visits with a pain management expert. (*Id.* ¶ 261). DTLA referred Claimant M to Khounganian, and Claimant M executed a lien agreement, promising to repay Khounganian from recoveries for any claim. (*Id.* ¶ 263). On May 6, 2021, Claimant M had a consultation with Khounganian who recommended lumbar decompression surgery, with an estimated cost between $215,000 and $238,000. (*Id.* ¶ 264). Khounganian performed the surgery on July 27, 2021. (*Id.* ¶ 265). Khounganian prepared a report concluding that, "[w]ithin a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." (*Id.* ¶ 266). Plaintiff ultimately settled Claimant M's claims, incurring higher settlement and defense costs as a result of the allegedly fraudulent medical and billing records. (*Id.* ¶ 271).

*n) Claimant N*

On February 11, 2022, Claimant N visited DTLA regarding representation in a prior accident. (*Id.* ¶ 272). On an Uber ride home from DTLA's office, Claimant N was involved in a collision with another vehicle. (*Id.*). No police or ambulances were called, and Claimant N walked to a nearby train station afterwards. (*Id.*). Claimant N already had a relationship with DTLA, which had previously referred Claimant N to Khounganian, who performed two different back surgeries on Claimant N. (*Id.* ¶ 273).

Between February 22, 2022, and March 26, 2022, Claimant N sought treatment for pain in his spine, shoulder, and ankle. (*Id.* ¶ 275). Both medical providers recommended that Claimant N seek conservative treatment for his complaints. (*Id.*). Claimant N instead presented to Khounganian, who executed a lien agreement under which Claimant N promised to repay Khounganian from recoveries for any claim. (*Id.* ¶¶ 276-77). Khounganian recommended additional disc replacements at C4-C5, C5-C6, L4-L5, and L5-S1. (*Id.* ¶ 278). Khounganian performed cervical spine surgery on June 16, 2023. (*Id.*

¶ 279). Following the February 11, 2022, accident, Claimant N was involved in two additional incidents, including a May 27, 2022, incident in which he was beat up by a bouncer at a nightclub, causing head, neck, lower back, and foot injuries. (*Id.* ¶ 281). Despite these possible intervening causes, Khounganian signed a report stating that, "[w]ithin a reasonable degree of medical probability, the diagnosis above were caused by the injury during the date of loss." (*Id.* ¶ 282). Plaintiff ultimately settled Claimant N's claims, incurring higher settlement and defense costs as a result of the allegedly fraudulent medical and billing records. (*Id.* ¶ 286).

On September 15, 2025, Claimant N sent an unsolicited email to Plaintiff's counsel claiming that DTLA was withholding undisputed funds from the settlement and stating that he had "first-hand evidence of systemic misconduct by Downtown LA Law that overlaps directly with Uber's pending RICO claims." (*Id.* ¶ 287). Claimant N stated that Fradkin personally told him that DTLA "used medical bills from other cases to leverage [his] Uber settlement." (*Id.*). Claimant N further stated that he has a "lien sheet with duplicate charges across multiple cases used to pad liens and block disbursement." (*Id.*).

*o) Claimant O*

On June 28, 2019, Claimant O was attempting to enter an Uber, when the vehicle drove away, pulling him forward and causing him to fall. (*Id.* ¶ 288). Claimant O did not immediately receive medical treatment but presented to an emergency room three days later, complaining of anxiety without mentioning any neck or back pain. (*Id.*).

Claimant O retained DTLA, which referred Claimant O to a select group of medical providers. (*Id.* ¶ 289). Claimant O first sought medical treatment six months after the accident, and the medical provider ordered MRIs and suggested conservative care. (*Id.* ¶ 290). Rather than pursuing conservative care, DTLA and Fradkin referred Claimant O to Khounganian, and Claimant O executed a lien agreement, promising to repay Khounganian from recoveries for any claim. (*Id.* ¶¶ 291-93). On March 2, 2020, Khounganian recommended that Claimant O see a pain management specialist, begin physical therapy, and return for reevaluation of possible surgery. (*Id.* ¶ 294). Over the

ensuing months, Claimant O saw a pain management specialist and underwent several medial block branch injections. (*Id.* ¶ 295). On May 11, 2020, Claimant O returned to Khounganian, who recommended a lumbar microdiscectomy, with an estimated cost of $215,000 to $238,000, and a two-level cervical discectomy and fusion, with an estimated cost of $250,000 to $295,000. (*Id.* ¶ 296). Khounganian performed both surgeries in the ensuing months. (*Id.* ¶¶ 297-98). Khounganian prepared a report stating that, "[w]ithin a reasonable degree of medical probability, the diagnosis above were caused by and/or exacerbated by the injury during the date of loss." (*Id.* ¶ 300).

An independent medical evaluation of Claimant O found that Claimant O experienced low back pain for at least five years leading up to the accident. (*Id.* ¶ 299). The evaluation concluded that Claimant O had significant, pre-existing degenerative changes in his spine and that no aggravation or injury could be attributed to the June 2019 accident. (*Id.*). Plaintiff ultimately settled Claimant O's claims, incurring higher settlement and defense costs as a result of the allegedly fraudulent medical and billing records. (*Id.* ¶ 304).

*p) Claimant P*

On March 8, 2019, Claimant P was sitting in the rear passenger's side of an Uber when the driver had a minor collision on the driver's side of the vehicle. (*Id.* ¶ 305). Claimant P was traveling to Los Angeles International Airport for a flight to return home to St. Louis, Missouri. (*Id.*). Following the accident, Claimant P called another ride and returned to St. Louis, where he has continued to live since the accident. (*Id.*). Claimant P first sought treatment at a chiropractic facility in St. Louis eight days after the accident. (*Id.* ¶ 306). Claimant P attended approximately 16 chiropractic sessions and, by late April 2019, reported low levels of pain in his neck and back. (*Id.*). The treating doctor at the last chiropractic session noted that there was "no reason to expect any major change in [Claimant P's] clinical picture in the near future." (*Id.* ¶ 307). Following the accident, Claimant P posted multiple video clips of himself showing that he had no debilitating back

pain, including a clip of him bouncing and dancing less than one month after the accident. (*Id.* ¶ 308).

Claimant P retained DTLA, which referred him to a select group of medical providers in California. (*Id.* ¶ 309). On September 5, 2019, DTLA directed Claimant P to Khounganian, and Claimant P executed a lien agreement, promising to repay Khounganian from recoveries for any claim. (*Id.* ¶ 310). At Khounganian's office, Claimant P reported lumbar spine pain, and Khounganian stated that Claimant P had "approximately 50% of normal observed" range of motion. (*Id.* ¶ 311). Despite Claimant P reporting no neck pain, Khounganian diagnosed Claimant P with cervicalgia and cervical disc displacement, and he recommended multiple injections and possible disc replacement surgery. (*Id.* ¶ 314). On October 12, 2021, Khounganian claimed that conservative management had failed, such that surgical intervention was needed. (*Id.* ¶ 316). Claimant P then received no treatment for eleven months until another visit with Khounganian. (*Id.*). On January 17, 2023, Claimant P underwent an L5-S1 microdiscectomy and decompression with Khounganian in Los Angeles. (*Id.* ¶ 317). Khounganian paid for Claimant P and his mother to travel roundtrip to Los Angeles and stay in a hotel. (*Id.*). Khounganian's total bill was $108,463.15 for his services, but an independent expert determined the reasonable value of those services was $10,374.98. (*Id.* ¶ 321). In a May 2023 deposition, Claimant P testified that he never paid anything to Khounganian, never saw any invoices or bills, and was never told by Khounganian that he was late on a payment. (*Id.* ¶ 322). Plaintiff ultimately settled Claimant P's claims, incurring higher settlement and defense costs as a result of the allegedly fraudulent medical and billing records. (*Id.* ¶ 324).

*q) Claimant Q*

On November 29, 2018, Claimant Q was a passenger in an Uber when the car was side swiped by a truck. (*Id.* ¶ 325). Claimant Q left the scene in another Uber and met his girlfriend for dinner. (*Id.*). Plaintiff includes photos of the Uber, showing minimal damage to the vehicle. (*Id.*). Claimant Q had previously been represented by DTLA in an earlier motor vehicle collision as an Uber driver in 2017, where he sought treatment from a

chiropractor, received injections, and received two surgical estimates for his right shoulder. (*Id.* ¶ 326).

Claimant Q contacted DTLA before beginning any new medical treatment, and DTLA referred Claimant Q to a select group of medical providers. (*Id.* ¶ 327). Claimant Q attended approximately 24 chiropractic sessions over the ensuing months. (*Id.* ¶ 328). Claimant Q later began seeing a pain management specialist and received several steroid injections. (*Id.* ¶ 329). On May 16, 2019, Claimant Q presented to Khounganian, who concluded that Claimant Q had "approximately 50% of normal observed" range of motion in his cervical and lumbar spine. (*Id.* ¶ 330). Khounganian recommended an L3-L4 discectomy at an estimated cost of $225,000 and a cervical discectomy and fusion at an estimated cost of $225,000. (*Id.*). Khounganian asserted that, "within a reasonable degree of medical probability, the diagnosis above were caused by the injury during the date of loss." (*Id.* ¶ 331). Claimant Q executed a lien agreement with Khounganian, promising to repay Khounganian from recoveries for any claim. (*Id.* ¶ 332).

On June 22, 2021, DTLA and Fradkin sent a demand letter to Plaintiff, demanding $1 million to settle Claimant Q's claim. (*Id.* ¶ 335). Claimant Q's future medical expenses were based solely on Khounganian's surgical estimates. (*Id.* ¶ 337). On November 22, 2021, an independent medical expert examined Claimant Q and concluded that Claimant Q's MRIs showed only mild degenerative changes normal for his age. (*Id.* ¶ 338). The expert further concluded that Claimant Q's steroid injections were not reasonable. (*Id.*). Plaintiff ultimately settled Claimant Q's claims, incurring higher settlement and defense costs as a result of the allegedly fraudulent medical and billing records. (*Id.* ¶ 339).

*r) Claimant R*

On May 11, 2019, Claimant R was entering an Uber vehicle when the car reversed, running over a portion of his right foot. (*Id.* ¶ 340). Claimant R did not call the police or summon an ambulance, and he completed the ride home without seeking immediate medical attention. (*Id.*).

Claimant R retained DTLA two days after the accident, and DTLA referred Claimant R to a select group of medical providers for treatment. (*Id.* ¶ 341). On May 15, 2019, Claimant R visited a medical provider for complaints of pain in his right foot. (*Id.* ¶ 342). Over the ensuing months, Claimant R visited a pain management provider on referral from DTLA. (*Id.* ¶ 343). DTLA then referred Claimant R to Khounganian, and Claimant R executed a lien agreement with Khounganian, promising to repay Khounganian from recoveries for the claim. (*Id.* ¶ 345). Following a consultation, Khounganian asserted that Claimant R's difficulty with ambulation, due to pain in his right ankle, had caused overcompensation in his lower back. (*Id.* ¶ 346). On August 26, 2019, Khounganian recommended that Claimant R undergo a lumbar discectomy, at an estimated cost of $225,000 to $238,000. (*Id.* ¶ 347). Khounganian stated that, "[w]ithin a reasonable degree of medical probability, the diagnosis above were caused by the injury during the date of loss." (*Id.* ¶ 350). Claimant R ultimately decided not to proceed with any back surgery because he believed the surgery was invasive and disproportionate to his situation. (*Id.* ¶ 349). Plaintiff ultimately settled Claimant R's claims, incurring higher settlement and defense costs as a result of the allegedly fraudulent medical and billing records. (*Id.* ¶ 353).

3. Racketeering Allegations

Plaintiff alleges that each of the Defendants plays a key role in the alleged scheme and is personally liable. Plaintiff alleges that Khounganian and GSK Spine have participated, and are likely to participate in the future, by performing unnecessary and/or causally unrelated surgeries, producing fraudulent medical records, and transmitting these medical records using interstate mail or wires. (*Id.* ¶ 355). Khounganian also frequently engages in "unbundling," meaning that he submits separate billing codes for individual components of a procedure, resulting in higher fees overall. (*Id.* ¶ 356). Plaintiff alleges that the Law Firm Defendants participate in this scheme by accepting clients with low-value or meritless claims, directing them to Khounganian and other medical providers for treatment of exaggerated or unrelated injuries, directing these providers to recommend specific treatments, directing clients to sign sham lien agreements, and entering into

concealed kickback agreements with Khounganian. (*Id.* ¶¶ 357, 359). The Law Firm Defendants use these fraudulent medical records to pursue claims for inflated damages against Plaintiff. (*Id.* ¶¶ 358, 360). Plaintiff alleges that this conduct has resulted in millions of dollars of harm from defense costs and settlements. (*Id.* ¶ 361).

Plaintiff identifies two separate "association-in-fact" enterprises within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c): (1) an enterprise consisting of Emrani, the Emrani Firm, Khounganian, and GSK Spine; and (2) an enterprise consisting of DTLA, Fradkin, Khounganian, and GSK Spine. (*Id.* ¶¶ 366, 368). Both of these enterprises originated as early as 2019, continued for several years, and threaten to continue into the future. (*Id.* ¶¶ 367, 369). Plaintiff also asserts that each of GSK Spine, DTLA, and the Emrani Firm constitute "legal enterprises" within the meaning of 18 U.S.C. § 1961(4). (*Id.* ¶¶ 370-79).

Plaintiff alleges that each set of Defendants engaged in multiple predicate acts in violation of the federal mail and wire fraud statutes. (*Id.* ¶ 380). Plaintiff identifies numerous allegedly false statements made by Defendants in connection with the personal injury claims of Claimants A through R. Plaintiff alleges that Defendants faxed information demands to insurers, corresponded via email, caused records to be transmitted through interstate wires to cloud-based platforms, and caused service to be performed through U.S. mail. (*Id.* ¶¶ 386-402). Plaintiff alleges that these predicate acts are part of a common plan, under which the Law Firm Defendants direct the Medical Provider Defendants to perform certain medical treatments and produce fraudulent medical records concerning unnecessary or non-existent surgeries, which the Law Firm Defendants use to pursue false claims against Plaintiff. (*Id.* ¶ 403). Plaintiff further alleges that a specific threat of repetition exists because these practices are part of Defendants' regular way of conducting an ongoing and open-ended enterprise. (*Id.* ¶ 404).

For the five alleged enterprises, Plaintiff asserts separate RICO claims against (1) Fradkin, DTLA, Khounganian, and GSK Spine; (2) Emrani, the Emrani Firm, Khounganian, and GSK Spine; (3) Khounganian; (4) Fradkin; and (5) Emrani. (*Id.* at 121-27). Plaintiff also asserts a claim of RICO conspiracy under 18 U.S.C. § 1962(d) against

all Defendants. (*Id.* at 127). Among other forms of relief, Plaintiff seeks restitution, monetary and punitive damages, and an order under 18 U.S.C. § 1964(a) preventing and restraining Defendants from further RICO violations. (*Id.* at 128-29).

### B. Procedural History

Plaintiff initiated this case on July 21, 2025. (ECF No. 1). In the initial complaint, in addition to the RICO claims, Plaintiff asserted claims of unjust enrichment and violation of California's Unfair Competition Law ("UCL"). (*Id.* at 2). In addition to the Defendants named in the FAC, the initial complaint named Radiance as a defendant. (*Id.*). On November 14, 2025, Defendants filed an initial round of responsive motions. Among these motions were several motions to strike Plaintiff's state law claims under California's anti-SLAPP statute, filed by Radiance, the Emrani Defendants, and Khounganian. (ECF Nos. 60, 65, 66). Pursuant to a stipulated deadline, Plaintiff filed an amended complaint on December 19, 2025, mooting the pending motions. (ECF Nos. 77, 79).

Defendants filed the instant round of Motions on January 23, 2026. On March 23, 2026, Plaintiff filed a consolidated opposition to Defendants' Motions to Dismiss, (ECF No. 105 ("MTD Opposition")), and to the Motions for Attorney's Fees, (ECF No. 106 ("Fees Opposition")). On May 20, 2026, Defendants filed replies in support of the Motions. *See* (ECF No. 114 ("Emrani MTD Reply"); ECF No. 115 ("Emrani Fees Reply"); ECF No. 118 ("Radiance Reply"); ECF No. 121 ("DTLA MTD Reply"); ECF No. 122 ("Khounganian MTD Reply"); ECF No. 123 ("Khounganian Fees Reply")).

## II. FEES MOTIONS

### A. Legal Standard

California's anti-SLAPP statute allows a defendant to file a "special motion to strike" any "cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech." Cal. Civ. Proc. Code § 425.16(b)(1). Acts in furtherance of the right of petition include "any written or oral statement or writing made before a . . . judicial proceeding" or "made in connection with an issue under consideration or review by a . . . judicial body." *Id.* § 425.16(e). The

purpose of the anti-SLAPP statute is "to allow early dismissal of meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1109 (9th Cir. 2003) (citation omitted). Except in relation to certain types of claims not relevant here, "a prevailing defendant on a special motion to strike shall be entitled to recover that defendant's attorney's fees and costs." Cal. Civ. Proc. Code § 425.16(c)(1). Defendants in federal court "can bring anti-SLAPP motions to strike state law claims and are entitled to attorney's fees and costs when they prevail." *Verizon Del., Inc. v. Covad Commc'ns Co.*, 377 F.3d 1081, 1091 (9th Cir. 2004).

**B. Discussion**

In the Fees Motions, the Emrani Defendants, Khounganian, and Radiance seek to recover attorney's fees and costs incurred in connection with their anti-SLAPP motions to strike Plaintiff's initial complaint. Citing *Coltrain v. Shewalter*, 66 Cal. App. 4th 94 (1998), the moving Defendants argue that Plaintiff's amendment of its complaint to remove the state-law claims creates a presumption that Defendants are the "prevailing parties" on their anti-SLAPP Motions. (Emrani Fees Mot. at 6-7; Khounganian Fees Mot. at 7; Radiance Mot. at 15-17). Defendants argue that Plaintiff cannot overcome this presumption because of the timing of the amendment and the fact that Plaintiff has continued to pursue state-law claims in similar RICO-based lawsuits brought in other states. (Emrani Fees Mot. at 7; Khounganian Fees Mot. at 8; Radiance Mot. at 18). Khounganian and the Emrani Defendants state that they will move for reasonable fee awards in separate motions. (Emrani Fees Mot. at 9; Khounganian Fees Mot. at 10). Radiance, meanwhile, seeks a fee award of $461,134.50, based on a lodestar calculation. (Radiance Mot. at 30-32; Radiance Reply at 19).

In its Opposition, Plaintiff argues that the Ninth Circuit's decision in *Verizon Delaware, Inc. v. Covad Communications Co.*, 377 F.3d 1081 (9th Cir. 2004), precludes an award of attorney's fees following Plaintiff's amendment as of right. (Fees Opp. at 10). While Plaintiff acknowledges that *Verizon* did not directly address the question at issue here, it argues that an award of attorney's fees is incompatible with the *Verizon* court's

reasoning, and it asserts that the majority of post-*Verizon* district courts have so held. (*Id.* at 11-13). Plaintiff contends that this situation is distinguishable from cases involving voluntary dismissal of state-law claims because that situation does not implicate the liberal amendment policy of Federal Rule of Civil Procedure 15(a)(1). (*Id.* at 16-19). Plaintiff also argues, based primarily on Judge Bress's concurring opinion in *Gopher Media LLC v. Melone*, 154 F.4th 696 (9th Cir. 2025), that the anti-SLAPP statute should not apply at all in federal court. (*Id.* at 14-16). Finally, Plaintiff contends that Radiance's fee request should be denied or reduced because the requested fees are unreasonable and lack sufficient proof. (*Id.* at 20-25).

1. <u>Defendants' Entitlement to Attorney's Fees</u>

Under California law, "a prevailing defendant on a special motion to strike shall be entitled to recover that defendant's attorney's fees and costs." Cal. Civ. Proc. Code § 425.16(c)(1). Interpreting this provision, California courts have held that, "[w]here the plaintiff voluntarily dismisses an alleged SLAPP suit while a special motion to strike is pending, the trial court has discretion to determine whether the defendant is the prevailing party for purposes of attorney's fees." *Coltrain v. Shewalter*, 66 Cal. App. 4th 94, 107 (1998). The same is true following the filing of an amended complaint. *See Sylmar Air Conditioning v. Pueblo Contracting Servs., Inc.*, 122 Cal. App. 4th 1049, 1054-55 (2004) (stating that "[i]t is settled that a plaintiff may not avoid liability for attorney fees and costs by voluntarily *dismissing* a cause of action to which a SLAPP motion is directed" and rejecting contention "that an amendment of the complaint is qualitatively different"); *ARP Pharm. Servs., Inc. v. Gallagher Bassett Servs., Inc.*, 138 Cal. App. 4th 1307, 1323 (2006) ("[A] plaintiff cannot amend a pleading to avoid a pending SLAPP motion."). Under such circumstances, California courts apply a "presumption" that the defendant was the prevailing party because it "realized its objectives in the litigation." *Coltrain*, 66 Cal. App. 4th at 107. The plaintiff may attempt to rebut this presumption by showing that "it actually dismissed [the SLAPP suit] because it had substantially achieved its goals through a

settlement or other means, because the defendant was insolvent, or for other reasons unrelated to the probability of success on the merits." *Id.*

In federal court, however, procedural state laws, including the anti-SLAPP statute, do not apply "if to do so would result in a 'direct collision' with a Federal Rule of Civil Procedure." *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 845 (9th Cir. 2001) (quoting *Walker v. Armco Steel Corp.*, 446 U.S. 740, 749-50 (1980)); *see also Hanna v. Plumer*, 380 U.S. 460, 471 (1965) ("When a situation is covered by one of the Federal Rules . . . the court has been instructed to apply the Federal Rule."). Applying this principle, the Ninth Circuit has concluded as a general matter that the special motion to strike, including the fee-shifting provisions in § 425.16(c), can "exist side by side" with Federal Rules 8, 12, and 56. *U.S. ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963, 972 (9th Cir. 1999) (citation omitted). However, in subsequent cases, the Ninth Circuit has identified several conflicts between the anti-SLAPP statute and the Federal Rules, including provisions limiting discovery, *Metabolife Int'l, Inc.*, 264 F.3d at 846, prescribing a burden-shifting standard, *Planned Parenthood Fed. of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018), and permitting interlocutory appeal of denials, *Gopher Media LLC*, 154 F.4th at 702.

As discussed above, Plaintiff relies primarily on the Ninth Circuit's decision in *Verizon* to argue that attorney's fees cannot be awarded where a plaintiff voluntarily amends its complaint in the face of an anti-SLAPP motion. In *Verizon*, the district court granted a motion to dismiss the initial complaint with leave to amend but deferred ruling on the defendant's anti-SLAPP motion, concluding that it was not clear from the face of the complaint whether the suit arose from an act in furtherance of the defendant's rights of free speech or petition. *See Verizon Del., Inc. v. Covad Commc'ns Co.*, No. 5:01-cv-20524-JF, slip op. at 4-5 (N.D. Cal. Nov. 27, 2001). Following the filing of an amended complaint, the district court denied the anti-SLAPP motion, concluding that the defendant had failed to show that the claims against it were motivated by the defendant's free speech activities. *See id.*, slip op. at 8 (N.D. Cal. Mar. 3, 2002). On appeal, the defendant argued that the

district court erred in deferring consideration of the anti-SLAPP motion pending receipt of the plaintiff's first amended complaint. *Verizon Del., Inc.*, 377 F.3d at 1091. The Ninth Circuit affirmed the decision to delay consideration of the anti-SLAPP motion, concluding that "granting a defendant's anti-SLAPP motion to strike a plaintiff's initial complaint without granting the plaintiff leave to amend would directly collide with Fed. R. Civ. P. 15(a)'s policy favoring liberal amendment." *Id.* The Ninth Circuit rejected as irrelevant the argument that this approach would encourage forum shopping, concluding that, because "a direct collision with a federal procedural rule exists," the court was obligated to apply the federal procedural rule. *Id.* The Ninth Circuit emphasized that "the purpose of the anti-SLAPP statute, the early dismissal of meritless claims, would still be served if plaintiffs eliminated the offending claims from their original complaint." *Id.* Following leave to amend, "[i]f the offending claims remain in the first amended complaint, the anti-SLAPP remedies remain available to defendants." *Id.*

*Verizon*, in turn, relied primarily on *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003). There, the district court granted the defendants' motions to dismiss with leave to amend and deferred ruling on the defendants' anti-SLAPP motions. *Id.* at 1102. After the plaintiff declined to amend his complaint, the district court dismissed the claims with prejudice, granted the anti-SLAPP motions, and awarded attorney's fees. *Id.* On appeal, the Ninth Circuit noted its agreement with the district court's decision not to rule on the anti-SLAPP motions until after ruling on the motions to dismiss. *Id.* at 1110. Because the Ninth Circuit reversed the ruling on the motion to dismiss as to one of the defendants, the court also reversed the ruling on the anti-SLAPP motion and the award of attorney's fees as to that defendant. *Id.*

From the Court's review of *Verizon* and *Vess*, neither case stands for the proposition that Rule 15 directly conflicts with the anti-SLAPP statue's fee-shifting provision under the circumstances of this case. Indeed, *Verizon* does not discuss the availability of attorney's fees at all, while *Vess* affirmed the award of attorney's fees as to two of the defendants. *See Vess*, 317 F.3d at 1110. *Verizon* found a direct collision not with any fee-

shifting provision but rather between Rule 15's policy of liberal amendment and state procedural rules limiting the right to amend after an anti-SLAPP motion is filed.[1] *See Verizon Del., Inc.*, 377 F.3d at 1091. Thus, under *Verizon*, Rule 15 would govern the question of *whether* Plaintiff could amend its complaint in the face of an anti-SLAPP motion. However, *Verizon* says nothing about whether attorney's fees may be awarded to a defendant when a plaintiff chooses to amend its complaint to omit the allegedly offending claims. *See Rutherford v. Palo Verde Health Care Dist.*, No. ED CV13-01247 JAK (SPx), 2014 WL 12634510, at *5 n.3 (C.D. Cal. May 13, 2014) ("*Verizon* does not hold that attorney's fees cannot be recovered by the moving party when the challenged claims have been dismissed voluntarily. Rather, *Verizon* confirms that the federal policy of applying a liberal policy toward the amendment of complaints applies, notwithstanding California's anti-SLAPP statute.").

The Court sees no direct conflict between Rule 15 and the fee-shifting provisions of the anti-SLAPP statute. As the Ninth Circuit has explained, "if the federal and state rules 'can be reconciled,' then they do not qualify as in conflict." *Hamilton v. Wal-Mart Stores, Inc.*, 39 F.4th 575, 585 (9th Cir. 2022) (quoting *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 410 (2010) (plurality op.)). In *Verizon*, there was a direct conflict between Rule 15, which requires courts to "freely give leave when justice so requires," and state law prohibiting amendment after the filing or granting of an anti-SLAPP motion. This conflict is evident; a court cannot both "freely give leave" and categorically prohibit leave. Under current precedent, however, there is no similar conflict

---

[1] In contrast to Rule 15's liberal policy favoring amendment, California law provides that "a plaintiff whose complaint is stricken by a successful anti-SLAPP motion cannot try again with an amended complaint." *Dickinson v. Cosby*, 17 Cal. App. 5th 655, 676 (2017). At least one California court has held that the filing of an anti-SLAPP motion effectively freezes the pleadings, prohibiting amendment even before the court has adjudicated the motion. *See Salma v. Capon*, 161 Cal. App. 4th 1275, 1294 (2008) (concluding under state law that permitting amendment while anti-SLAPP motion is pending "would undermine the legislative policy of early evaluation and expeditious resolution of claims arising from protected activity").

between the Federal Rules and the fee-shifting provisions of California Code of Civil Procedure § 425.16(c). Applying California's fee-shifting provisions would not prohibit Plaintiff from filing an amended complaint; Plaintiff can both file an amended complaint and pay Defendants' attorney's fees incurred in bringing the anti-SLAPP motion. Thus, there is no direct collision because these provisions "can exist side by side . . . each controlling its own intended sphere of coverage without conflict." *Walker*, 446 U.S. at 752.

The Ninth Circuit recently reached the same conclusion in an unpublished opinion. *See Evans Hotels, LLC v. Unite Here! Loc. 30*, No. 23-55692, 2025 WL 17120 (9th Cir. Jan. 2, 2025). In *Evans*, the Ninth Circuit affirmed an award of attorney's fees where, after the district court dismissed the plaintiff's complaint with leave to amend, the plaintiff dropped the challenged state law claims in its amended complaint. *Id.* at *3. The panel rejected the plaintiff's reliance on *Verizon*, concluding that "the *Verizon* court did not address whether a defendant may obtain fees and costs under Section 425.16(c) when it seeks to strike an amended complaint." *Id.* Instead, the panel concluded that, "[w]here a plaintiff abandons its claims after the defendant files an anti-SLAPP motion, the defendant is entitled to fees and costs if it would have prevailed on the merits of its motion." *Id.* Because the defendants "would have partially prevailed on their anti-SLAPP motion," the defendants were the prevailing parties and were entitled to attorney's fees. *Id.* at *3-4; *see also Law Offs. of Bruce Altschuld v. Wilson*, 632 F. App'x 321, 322-23 (9th Cir. 2015) (finding no error in award of attorney's fees after plaintiff voluntarily dismissed claims in response to anti-SLAPP motion).

In arguing for a contrary interpretation of *Verizon*, Plaintiff relies primarily on *Conlan v. Reilly*, No. CV 24-3002-GW-JPRx, 2025 WL 4058569 (C.D. Cal. May 16, 2025). There, while the district court acknowledged that *Verizon* did not directly address the availability of attorney's fees following the filing of an amended complaint, it noted that "a strictly-blinkered attention only to the 'holdings' of decisions is not always an appropriate manner of analysis for district courts." *Id.* at *3. Focusing on the *Verizon*

court's statement that "[i]f the offending claims remain in the first amended complaint, the anti-SLAPP remedies remain available to defendants," *Verizon*, 377 F.3d at 1091, the district court concluded that *Verizon* implicitly prohibits an award of attorney's fees following the filing of an amended complaint, *Conlan*, 2025 WL 4058569, at *2. The district court explicitly disagreed with the unpublished decision in *Evans*, concluding that the Ninth Circuit panel's reading of *Verizon* was "clearly inaccurate and wrong." *Id.*

The Court respectfully disagrees with the decision in *Conlan* and with those other courts that have reached similar conclusions. As the *Conlan* court recognized, *Verizon* addressed only the availability of leave to amend, not the availability of attorney's fees following the filing of an amended complaint that drops any offending claims. Given that *Verizon* did not address the issue here, the proper inquiry is that set forth in *Erie*. The first step of this inquiry is whether there is a "direct collision" with a Federal Rule. In *Verizon*, there was a direct collision because a court cannot apply both Rule 15's liberal policy of amendment and the anti-SLAPP rule prohibiting amendment. Here, however, no such collision exists because a plaintiff can easily comply with both rules. Neither *Verizon* nor *Conlan* identify any direct collision with Rule 15 under these circumstances.

Absent a "direct collision" with a federal rule, the Court must make the "typical, relatively unguided *Erie* Choice." *Hanna*, 380 U.S. at 471. "This choice should be made by balancing the state interest in its procedural rule with the twin purposes of the *Erie* doctrine, 'discouragement of forum-shopping and avoidance of inequitable administration of the laws.'" *Metabolife Int'l, Inc.*, 264 F.3d at 845 (quoting *Hanna*, 380 U.S. at 468). While the parties have made no argument to this effect, the Court has little trouble concluding that these factors favor applying the fee-shifting provision in federal court. Plaintiff has identified no federal interest that would be undermined by applying this provision, while "California has articulated the important, substantive state interests furthered by the Anti-SLAPP statute." *U.S. ex rel. Newsham*, 190 F.3d at 973. In particular, the fee-shifting provisions are designed to "compensat[e] the prevailing defendant for the undue burden of defending against litigation designed to chill the exercise

of free speech and petition rights." *Barry v. State Bar of Cal.*, 2 Cal. 5th 318, 328 (2017). The policies against forum shopping and inequitable administration of the laws also favor applying the fee-shifting provision in federal court under these circumstances. As the *Conlan* court recognized, if the fee-shifting provisions did not apply in federal court, SLAPP plaintiffs would preferentially file in federal court, at least where there is some basis for federal jurisdiction. *See Conlan*, 2025 WL 4058569, at *5. If a plaintiff could avoid the fee-shifting provision by filing in federal court, "SLAPP plaintiffs could achieve most of their objective with little risk—by filing a SLAPP suit, forcing the defendant to incur the effort and expense of preparing a special motion to strike, then dismissing the [claims] without prejudice." *Coltrain*, 66 Cal. App. 4th 106. Because there is no direct conflict with the Federal Rules and because a contrary approach would undermine California's state interests while encouraging forum shopping, the Court concludes that the anti-SLAPP statute's fee-shifting provisions should apply in federal court, even where the plaintiff responds to an anti-SLAPP motion by amending its complaint to remove the offending claims.

The Court also rejects Plaintiff's argument that the anti-SLAPP statute should not apply at all in federal court. Under current Ninth Circuit precedent, the anti-SLAPP statute continues to apply in federal court except for certain procedural aspects that conflict with the Federal Rules. *Cf. Gopher Media LLC*, 154 F.4th at 709, 716 (Bress, J., concurring) (calling for en banc court to overrule existing Circuit precedent "allowing California's anti-SLAPP statute to apply in federal court," given that the Circuit has already "stripped away every major procedural aspect of the statute geared toward the early termination of claims," and noting that the attorneys' fee-shifting provisions of the statute are really all that continue to apply). As Plaintiff recognizes, "this Court of course must follow Ninth Circuit precedent." (Fees Opp. at 16).

Having concluded that the anti-SLAPP statute, including the fee-shifting provisions, apply under these circumstances, the Court must next determine whether Defendants are entitled to attorney's fees. As discussed above, California law applies a "presumption"

that the defendants are the prevailing parties where a plaintiff dismisses the offending claims following the filing of an anti-SLAPP motion. *Coltrain*, 66 Cal. App. 4th at 107. A plaintiff may overcome this presumption by showing that "it actually dismissed because it had substantively achieved its goals through a settlement or other means, because the defendant was insolvent, or for other reasons unrelated to the probability of success on the merits." *Id.*

Here, because Plaintiff dismissed the state law claims shortly after the filing of the anti-SLAPP motions, the Court will apply a presumption that Plaintiff did so to avoid the anti-SLAPP motions. This presumption makes sense given the timing of the amendment and the fact that Plaintiff has not similarly amended its complaints in other RICO cases brought in other states. In its Opposition, Plaintiff does not argue that it amended its complaint for any reason other than to avoid Defendants' anti-SLAPP motions. Absent any contrary argument from Plaintiff, the Court concludes that Defendants are the prevailing parties because they "realized [their] objectives in the litigation" by achieving the early dismissal of Plaintiff's offending state law claims. *Id.* While Plaintiff continues to assert the RICO claims against Defendants, "[a] defendant who partially prevails on an anti-SLAPP motion is generally the prevailing party, unless there is a determination that that party achieved no practical benefit from bringing the motion." *Evans Hotels, LLC*, 2025 WL 17120, at *4 (citing *Mann v. Quality Old Time Serv., Inc.*, 139 Cal. App. 4th 328, 340 (2006)). As the prevailing parties, Defendants are entitled to recover reasonable attorney's fees and costs incurred in bringing the motion, as well as "fees incurred in connection with litigating the fee award itself." *Frym v. 601 Main St. LLC*, 82 Cal. App. 5th 613, 622 (2022) (citation omitted).

2. Radiance's Requested Fees

As discussed above, the Emrani Defendants and Khounganian have not yet filed a specific request for attorney's fees. Accordingly, the Court will defer adjudication of the reasonable amount of fees until such a motion is filed.

In its Motion, Radiance initially sought an award of $427,409.50 in attorney's fees based on a total of 470.5 hours spent litigating this case at hourly rates of $375 for paralegals and $895–$1095 for attorneys. (Radiance Mot. at 30-32). This total includes 396.5 hours spent on the case through the day before filing the instant Motion and an estimated 74 hours that Radiance's Counsel will spend finalizing the motion, replying to Plaintiff's Opposition, and attending the hearing on the motion. (*Id.* at 31). In its Reply, Radiance has updated these figures to reflect the time actually spent after drafting the initial Motion. The Reply now seeks $461,134.50 in fees, based on a total of 498.1 hours spent to date and an estimated 11 additional hours to finalize the Reply and attend the hearing on the Motion. (Radiance Reply at 19); *see* (ECF No. 118-1 at 4-5).

Radiance argues that it is entitled to recover all of its fees because the anti-SLAPP motion and motion to dismiss were "inextricably intertwined" and served the same purpose of defeating the SLAPP claims on the merits. (*Id.* at 26). Radiance provides an itemized breakdown of its fees, showing the hours worked and redacted descriptions of the associated work. (ECF No. 99-8). In a declaration, Radiance's Counsel Grant Gelberg ("Gelberg") attests that Radiance paid Counsel for all of these hours except for November 2025, where Radiance and Counsel negotiated a 10% discount. (ECF No. 99 ("Gelberg Declaration") ¶¶ 17-19). Gelberg further states that he engaged in meet-and-confer efforts with Plaintiff to avoid the need to file an anti-SLAPP motion, which resulted in Plaintiff agreeing to "drop" its state law claims on November 7, 2025. (*Id.* ¶¶ 4-6). However, Plaintiff declined to dismiss the claims under Rule 41 in advance of Defendants' November 14, 2025, motion filing deadline, forcing Radiance to file the motion. (*Id.* ¶¶ 7-11).

In its Opposition, Plaintiff argues that the fees should be denied or significantly reduced for several reasons. First, Plaintiff argues that Radiance's time entries consist largely of block-billing and heavily redacted entries, such that it is impossible to tell what work is attributable to the anti-SLAPP motion. (Fees Opp. at 21). Second, Plaintiff argues that Radiance should not be entitled to fees incurred after November 7, 2025, when Plaintiff informed Radiance that it intended to drop the state law claims and amend its complaint.

(*Id.* at 22). Third, Plaintiff argues that Radiance should not recover fees associated with preparing the motion to dismiss because the legal issues in the two motions were demonstrably different. (*Id.*). To the extent the arguments overlap, Plaintiff argues that Radiance's fee requests related to the motion to dismiss are unreasonably duplicative of the anti-SLAPP fees. (*Id.* at 23). Plaintiff cites to several cases to argue that the $430,000 requested by Radiance is far out of line with fee awards in similar cases. (*Id.* at 24-25). Plaintiff proposes omitting these categories of fees and applying a 30% reduction across the board to account for the block billing, resulting in a total proposed award of $101,431.10. (*Id.* at 23-24); *see* (ECF Nos. 106-1, 106-2).

For state law claims, federal courts apply state law "in determining not only the right to [attorney's] fees, but also [] the method of calculating the fees." *Mangold v. Cal. Pub. Utils. Comm'n*, 67 F.3d 1470, 1478 (9th Cir. 1995). Under California law, in determining a reasonable attorney's fees award, courts apply the "lodestar method," which requires "ascertain[ing] whether under all the circumstances of the case the amount of actual time expended and the monetary charge being made for the time expended are reasonable." *Reck v. FCA US LLC*, 64 Cal. App. 5th 682, 691 (2021) (citation omitted). Courts may then adjust the lodestar figure based on consideration of case-specific factors, including "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, [and] (4) the contingent nature of the fee award." *Ketchum v. Moses*, 24 Cal. 4th 1122, 1132 (2001). "The party seeking attorney fees has the burden of showing that the fees incurred were allowable, were reasonably necessary to the conduct of the litigation, and were reasonable in amount." *Grossmont Union High Sch. Dist. v. Diego Plus Educ. Corp.*, 98 Cal. App. 5th 552, 590 (2023) (internal quotation marks and citation omitted).

As an initial matter, the Court finds the proposed hourly rates to be reasonable. Plaintiff does not appear to dispute any of the hourly rates charged by Radiance's Counsel. In this Court's experience, rates of $895–$1095 for attorneys and $375 for paralegals are

within the range of rates typically charged within this District for similar litigation work. The Court further notes the impressive credentials and experience of Radiance's Counsel. *See* (ECF Nos. 99-5, 99-6, 99-7). On this record, and in the absence of any specific opposition, the Court finds the rates to be reasonable.

Turning to the number of hours sought by Radiance's Counsel, Plaintiff first argues that fees incurred after November 7, 2025, should not be recoverable because Plaintiff informed Defendants on that date that it intended to drop the state law claims and amend its complaint. (Fees Opp. at 22). The Court disagrees that this is a basis to reduce Radiance's fees. While it is undisputed that Plaintiff stated to Radiance on November 7, 2025, that it intended to "drop" its state law claims, *see* (Gelberg Decl. ¶ 6), the parties did not reach a stipulation to dismiss the claims or to extend Radiance's response deadline. To the contrary, while the parties attempted to reach a stipulation, Plaintiff explicitly refused to dismiss the claims. *See* (ECF No. 99-4). In the absence of such a stipulation, Radiance's November 10, 2025, deadline to respond to the complaint remained active, and Radiance faced the possibility of default if it chose not to file a responsive motion. Under these circumstances, it was reasonable for Radiance's Counsel to continue to spend time preparing the responsive motions.

Second, Plaintiff argues that Radiance should not be entitled to recover fees related to its motion to dismiss. (Fees Opp. at 22). Under California law, "[a] prevailing defendant on an anti-SLAPP motion is entitled to seek fees and costs incurred in connection with the anti-SLAPP motion itself, but is not entitled to an award of attorney fees and costs incurred for the *entire* action." *569 E. Cnty. Boulevard LLC v. Backcountry Against the Dump, Inc.*, 6 Cal. App. 5th 426, 433 (2016) (internal quotation marks and citation omitted). A fee award may include "fees incurred to litigate the special motion to strike (the merits fees) plus the fees incurred in connection with litigating the fee award itself (the fees on fees)" but should not include "matters unrelated to the anti-SLAPP motion." *Id.* Where a defendant prepares both an anti-SLAPP motion and a motion to dismiss, the defendant may only recover fees for the motion to dismiss if it is "inextricably intertwined with[] the anti-

SLAPP motion." *Metabolife Int'l, Inc. v. Wornick*, 213 F. Supp. 2d 1220, 1223 (S.D. Cal. 2002). The relevant question is whether the motions involve "common legal issues." *Kearney v. Foley & Lardner*, 553 F. Supp. 2d 1178, 1184 (S.D. Cal. 2008). "[M]ere common issues of fact are insufficient to award all fees when legal theories do not overlap or are not inextricably intertwined." *Id.*

From the Court's review of Radiance's motions, the motion to dismiss and anti-SLAPP motion involved substantially different legal issues. *See* (ECF Nos. 60, 61). The anti-SLAPP motion was premised primarily on the California litigation privilege and the *Noerr-Pennington* doctrine. *See* (ECF No. 60 at 20-25). The motion to dismiss, meanwhile, asserted arguments under Rule 9(b) and attacked the sufficiency of the factual pleading of the claims. *See* (ECF No. 61 at 13-33). Neither motion devoted more than a handful of sentences to discussing the legal arguments raised in the other. *See* (ECF No. 60 at 25-26; ECF No. 61 at 33). Thus, the two motions are not "inextricably intertwined" because they raise entirely different legal bases for dismissal. *See Kearney*, 553 F. Supp. 2d at 1184 (permitting recovery for overlapping arguments "premised on the *Noerr-Pennington* doctrine and/or litigation privilege but not otherwise"); *Garrick v. Freeman Garrick*, No. 22-cv-04549-JST, 2025 WL 1735732, at *3 (N.D. Cal. June 23, 2025) (denying attorney's fees for failure to demonstrate that "the legal theories [defendants] asserted in their Rule 12(b)(6) motion to dismiss the FAC were 'inextricably intertwined' with the legal theories raised in their anti-SLAPP motion"); *see also Hilton v. Hallmark Cards*, 599 F.3d 894, 902 (9th Cir. 2010) (concluding motion to dismiss targeting same claim as anti-SLAPP motion was not "inextricably intertwined" for purposes of interlocutory appeal because the anti-SLAPP motion could "be resolved without necessarily resolving" the motion to dismiss). Accordingly, the Court agrees with Plaintiff that Radiance should not be entitled to recover fees attributable to the motion to dismiss.

As Plaintiff argues, given the heavy redactions and block billing in Radiance's time entries, it is difficult to directly calculate the appropriate apportionment. In its opposition, Plaintiff has attempted to reduce the requested fees by omitting work that is "unrelated to

the anti-SLAPP motion, vague, or billed after 11/08/2025," resulting in a reduction of $306,064.50. (ECF No. 106-1 ¶ 3). However, the Court finds this reduction to be overbroad, both because it excludes all work after November 7 and because it excludes entirely portions of the billing record that do not differentiate between the motions. Instead of attempting a line-by-line assessment, the Court will exercise its discretion to "make across-the-board percentage cuts . . . in the final lodestar figure as a practical means of excluding non-compensable hours from a fee application." *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1203 (9th Cir. 2013) (citation and brackets omitted)). This method is particularly appropriate where, as here, "many billings involved entries that were either vague or were 'blockbilled' time entries." *569 E. Cnty. Boulevard LLC*, 6 Cal. App. 5th at 441 (citation omitted).

As to the amount of the reduction, the Court concludes that a 50% reduction is appropriate under the circumstances. Based on the arguments raised in Radiance's initial motions and on the unredacted portions of the billing entries, it appears reasonable to assume that the motion to dismiss accounted for roughly half of Radiance's billing on the merits. Moreover, as the party moving for attorney's fees, Radiance bears the burden of showing that specific items are recoverable. Its failure to differentiate between the two motions makes a larger reduction appropriate. Finally, when a court "is concerned that a particular award is excessive, it has broad discretion to adjust the fee downward or deny an unreasonable fee altogether." *Ketchum*, 24 Cal. 4th at 1138. While this is a complex case, the Court is concerned that the requested $461,134.50 is out of proportion to the fees reasonably necessary to respond to the initial complaint. Indeed, Radiance itself negotiated a reduction in fees for the month of November 2025, the busiest month in the billing records. *See* (Gelberg Decl. ¶ 18). Accordingly, the Court will exercise its discretion to reduce Radiance's fee award by 50% to $230,567.25. The Court finds that this figure more accurately captures the portion of fees attributable to the anti-SLAPP and fees motions, while cutting down on unnecessary, duplicative, or excessive billing.

## III. MOTIONS TO DISMISS

### A. Legal Standard

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). "Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013). To survive a 12(b)(6) motion, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks and citation omitted).

If a claim sounds in fraud or mistake, courts apply the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires such claims to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To meet this standard, a plaintiff must identify "[t]he time, place, and content of [any] alleged misrepresentation," as well as the "circumstances indicating falseness" or the "manner in which the representations at issue were false and misleading." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547–48 (9th Cir. 1994) (internal quotation marks, citation, and alterations omitted). Those allegations "must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citation omitted). Although the circumstances of the alleged fraud must be alleged with specificity, knowledge "may be alleged generally." Fed. R. Civ. P. 9(b).

When ruling on a Rule 12(b)(6) motion, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The Court is "not required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice," nor must it accept "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Seven Arts Filmed Ent., Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013) (internal quotation marks and citation omitted). Where dismissal is appropriate, a court should grant leave to amend unless the plaintiff could not possibly cure the defects of the pleading. *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009).

**B. Request for Judicial Notice**

As an initial matter, the DTLA Defendants request that the Court take judicial notice of 22 documents, consisting of (1) lien agreements between each of the DTLA Claimants, DTLA, and Khounganian; (2) copies of the notices of dismissal filed in each of the DTLA Claimants' state court actions; and (3) a copy of a cross-complaint filed by Plaintiff in *Uber Tech. Inc. v. Glendale Law Group*, Case No. 25VECV04860 (Cal. Sup. Ct. Oct. 20, 2025). (ECF No. 95). The DTLA Defendants have also filed a supplemental request for judicial notice of a copy of the dismissal of Claimant I's case, which postdated the opening briefs. (ECF No. 121-3). Additionally, though they have not explicitly requested judicial notice, the Emrani Defendants have submitted six exhibits with their Motion, consisting of settlement agreements between each of the Emrani Claimants and Plaintiff. (ECF No. 87-1). Plaintiff has not specifically opposed the Court taking judicial notice of any of these documents.

Generally, at the motion to dismiss stage, courts may not consider any material beyond the pleadings when assessing the sufficiency of a complaint under Federal Rule of Civil Procedure 12(b)(6). *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) ("[R]eview is limited to the complaint." (citation omitted)). If a court considers such extrinsic evidence, "the motion must be treated as one for summary judgment under Rule

56" and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). However, under certain circumstances, courts may consider the contents of extrinsic documents "without converting the motion to dismiss into a motion for summary judgment." *Lee*, 250 F.3d at 688.

First, pursuant to the "judicially created" incorporation-by-reference doctrine, courts may consider an external document to be "part of the complaint itself" if "the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (citation omitted). This doctrine seeks to prevent "plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Id.* A court may also "assume an incorporated document's contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Id.* at 1003 (alterations and citation omitted). However, "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Id.*

Second, judicial notice under Federal Rule of Evidence 201 authorizes courts to notice an adjudicative fact if it is "not subject to reasonable dispute." Fed. R. Evid. 201(b). A fact is "not subject to reasonable dispute" if it is "generally known," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1), (2). Accordingly, "[a] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment." *Lee*, 250 F.3d at 689 (internal quotation marks and citation omitted). A court, however, may not "take judicial notice of disputed facts contained in such public records." *Khoja*, 899 F.3d at 999.

The Court finds that each of these documents may be considered without converting the Motions into motions for summary judgment. First, the 11 lien agreements between the DTLA Claimants and Khounganian are referred to extensively in the FAC and form the basis of Plaintiff's claims. Plaintiff alleges that each of the Claimants entered into a

"sham lien agreement" with Khounganian, and that statements in the lien agreements that the fees were "not contingent on any settlement" were knowingly false when made. *See, e.g.*, (FAC ¶ 177). In the absence of any opposition from Plaintiff, the Court will consider these documents to be incorporated by reference. *See Khoja*, 899 F.3d at 1002. Second, the dismissal notices and the cross-complaint filed by Plaintiff are all court filings and matters of public record. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record."). The Court will therefore take notice of the "existence and contents" of these documents, "but not [] the truth of the matters asserted therein when the facts are disputed." *Friends of the Clearwater v. Higgins*, 523 F. Supp. 3d 1213, 1222 (D. Idaho 2021). Third, the Court finds that the settlement agreements with the Emrani Claimants are incorporated by reference into the FAC, as the FAC extensively refers to the settlements as the basis for Plaintiff's damages claims.[2] *See, e.g.*, (FAC ¶ 71). Accordingly, the Court will consider each of these documents in discussing the claims.

**C. Discussion**

1. *Noerr-Pennington* Doctrine

Defendants first argue that this suit violates the *Noerr-Pennington* doctrine by attempting to impose liability based on Defendants' petitioning activity. (Emrani Mot. at 25; Fradkin Mot. at 12; Khounganian Mot. at 42). Plaintiff opposes, arguing that the elements for *Noerr-Pennington* immunity are not met, and that the sham litigation exception applies. (MTD Opp. at 26).

The *Noerr-Pennington* doctrine derives from the First Amendment's guarantee of "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I. The doctrine provides that "those who petition any department of the

[2] The Court notes that the Emrani Defendants have not explicitly requested judicial notice or incorporation by reference. Nevertheless, the Court will construe the Emrani Defendants' filing of these documents as such a request given the posture of the Motion. Given the Court's disposition of the Motions, Plaintiff suffers no prejudice from this determination.

government for redress are generally immune from statutory liability for their petitioning conduct." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006). While it originally emerged in the antitrust context, *see E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965), the doctrine has been "extended . . . to provide immunity for the use of the channels and procedures of state and federal courts to advocate causes," *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 644 (9th Cir. 2009) (internal quotation marks and citation omitted).

"[T]o determine whether conduct that allegedly violates a statute is immunized from liability" under *Noerr-Pennington*, courts in this Circuit apply a three-part test, asking "(1) whether the lawsuit imposes a burden on petitioning rights, (2) whether the alleged activities constitute protected petitioning activity, in other words, neither the Petition Clause nor the *Noerr-Pennington* doctrine protects sham petitions, and (3) whether the statute at issue may be construed to avoid that burden." *Pyankovska v. Abid*, 65 F.4th 1067, 1077 (9th Cir. 2023) (internal quotation marks, citation, and brackets omitted); *see also B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 535 (9th Cir. 2022) (stating that the court decides "whether the sham exception applies within step two of the three-part analysis"). "If the answer at each step is 'yes,' then a defendant's conduct is immunized under *Noerr-Pennington*." *Pyankovska*, 65 F.4th at 1077 (citation omitted). The doctrine "is a rule of statutory construction that requires courts to construe statutes to avoid burdening conduct that implicates the protections of the Petition Clause of the First Amendment." *Relevant Grp., LLC v. Nourmand*, 116 F.4th 917, 927 (9th Cir. 2024) (citation omitted). The doctrine "overprotects baseless petitions so as to ensure citizens may enjoy the right of access to the courts without fear of prosecution." *Sosa*, 437 F.3d at 934.

*a) Whether the Suit Burdens Defendants' Petitioning Rights*

At step one of the *Noerr-Pennington* analysis, courts ask "whether the success of [the plaintiff's] lawsuit would constitute a burden on petitioning rights." *Kearney*, 590 F.3d at 645. This inquiry does not "consider any alleged misconduct tied to the petitioning activities." *B&G Foods*, 29 F.4th at 535. Instead, "the question is whether [the] plaintiff's

lawsuit places a burden on [the] defendant's ability to prosecute its suit." *Id.* (internal quotation marks, citation, and alterations omitted).

Plaintiff's suit would plainly burden Defendants' petitioning rights. Among other forms of relief, Plaintiff seeks an injunction "imposing restrictions on the future activities of such Defendants, including, but not limited to, prohibiting Defendants from engaging in the same type of endeavor as the above enterprises engaged in." (FAC at 129). The "type of endeavor" that the enterprises are alleged to have engaged in is a scheme to bring "[f]raudulent personal injury claims" in state courts. (*Id.* ¶ 1). Plaintiff's suit thus seeks to enjoin conduct that is at the core of the right to petition—the right to submit "petitions . . . directly to the court in the course of litigation." *Sosa*, 437 F.3d at 934. While Plaintiff argues that the suit would not burden petitioning rights because it only seeks to stop "the creation and dissemination of fraudulent evidence," (MTD Opp. at 28), "the question at this stage is not whether the conduct at issue is fraudulent and abusive, but instead whether the success of [Plaintiff's] lawsuit would constitute a burden on petitioning rights," *Kearney*, 590 F.3d at 645; *see also B&G Foods*, 29 F.4th at 535 ("[W]e do not consider any alleged misconduct tied to the petitioning activities [at step one]."). Because Plaintiff's suit seeks to enjoin Defendants from engaging in petitioning activity, it burdens Defendants' petitioning rights.

*b) Whether Defendants' Conduct is Protected Petitioning Activity*

Under step two of the *Noerr-Pennington* analysis, courts ask "whether the alleged activities constitute protected petitioning activity." *Pyankovska*, 65 F.4th at 1077 (citation omitted). In making this determination, courts "first decide whether the Petition Clause extends to Defendants' conduct." *B&G Foods*, 29 F.4th at 536. If it does, courts "next decide whether the sham exception to *Noerr-Pennington* applies." *Id.*

Starting with the first question, the Court agrees with Defendants that the alleged conduct qualifies as petitioning activity. "In determining whether the burdened conduct falls under the protection of the Petition Clause, [courts] must give adequate 'breathing space' to the right of petition." *Sosa*, 437 F.3d at 931-32 (quoting *BE & K Constr. Co. v.*

*NLRB*, 536 U.S. 516, 531 (2002)). "Consistent with the breathing space principle," the Ninth Circuit applies *Noerr-Pennington* immunity not only to "petitions sent directly to the court in the course of litigation, but also [to] 'conduct incidental to the prosecution of the suit.'" *Id.* at 934 (citation omitted). Applying this principle, the Ninth Circuit has found that *Noerr-Pennington* immunity applies to discovery communications, *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1185 (9th Cir. 2005), trial advocacy, *Kearney*, 590 F.3d at 646, settlement talks, *Columbia Pics. Indus., Inc. v. Prof. Real Est. Invs., Inc.*, 944 F.2d 1525, 1528-29 (9th Cir. 1991), and, most relevant here, "presuit demand letters," *Sosa*, 437 F.3d at 936.

The conduct alleged here is either direct petitioning activity or "conduct incidental to" the prosecution of a suit. The FAC alleges that the Law Firm Defendants committed mail and wire fraud by making false statements in presuit demand letters, settlement offers, and complaints. *See, e.g.*, (FAC ¶¶ 383, 389b, 389c). Each of these actions clearly falls within the protection of *Noerr-Pennington* under the cases discussed above. Khounganian's alleged statements pose a closer call, as Khounganian himself is a step removed from the litigation. However, the FAC is premised on the allegation that Khounganian's medical treatment and causation statements were procured not out of medical necessity but specifically for the purpose of litigation. Moreover, Khounganian's statements were used in the presuit demand letters and settlement offers sent by the Law Firm Defendants. *See, e.g.*, (*id.* ¶ 128 (alleging that "[a] majority of the future medical expenses claimed" in a presuit demand letter "arise from Khounganian's fraudulent surgical estimates")). Because Khounganian's statements were prepared for use in litigation—and, in some cases, were prepared during litigation, *see, e.g.*, (*id.* ¶¶ 77-78)—the Court finds these statements to be "conduct incidental to the prosecution of the suit."

Because the *Noerr-Pennington* doctrine applies only to "*protected* petitioning activity," *B&G Foods*, 29 F.4th at 535-36, the Court must next consider whether Defendants' petitioning activity was legitimate or merely a "sham," *Kearney*, 590 F.3d at 644. Where the underlying petitioning activity is litigation, the Ninth Circuit has

recognized three circumstances in which the sham exception might apply: (1) "where the lawsuit is objectively baseless and the defendant's motive in bringing it was unlawful," (2) "where the conduct involves a series of lawsuits brought pursuant to a policy of starting legal proceedings without regard to the merits and for an unlawful purpose," and (3) "if the allegedly unlawful conduct consists of making intentional misrepresentations to the court, litigation can be deemed a sham if a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy." *Relevant Grp.*, 116 F.4th at 928 (internal quotation marks and citation omitted). "Whether something is a genuine effort to influence governmental action, or a mere sham, is a question of fact." *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1253 (9th Cir. 1982). On a motion to dismiss, the factual allegations underlying the sham exception "must be assumed true." *Kearney*, 590 F.3d at 646.

In its Opposition, Plaintiff relies solely on the third exception. Plaintiff argues this exception is met because Defendants made false and misleading statements concerning the severity of their clients' injuries, the necessity of the medical treatment, and the nature of the lien agreements, each of which was an "essential element" of their claims. (MTD Opp. at 35). Plaintiff relies primarily on the Ninth Circuit's decision in *Kearney* to argue that this exception applies where fraudulent litigation conduct taints proceedings by prompting a party to settle on less favorable terms than it otherwise would have. (*Id.* at 36-38). Plaintiff argues that the sham exception is not limited to in-court misrepresentations but encompasses deceptive practices in discovery or in anticipation of litigation. (*Id.* at 39).

Taking the allegations in the FAC as true, the Court finds that Plaintiff has alleged sufficient facts to plausibly establish the third sham litigation exception. In the FAC, Plaintiff alleges that Defendants engaged in a concerted scheme to produce fraudulent medical records "diagnosing non-existent or exaggerated injuries, falsely linking these injuries causally to the accidents and then proposing and performing costly, invasive, and/or unnecessary surgeries." (FAC ¶ 5). Defendants incorporated these allegedly fraudulent claims of injuries and treatments into "demand letters and [] complaints in court

that seek damages." (*Id.* ¶ 37). Plaintiff identifies eighteen separate claims brought by Defendants, many of which Plaintiff alleges involved either no injury or only insignificant injuries. For example, Claimant B was involved in a "low-speed accident," "denied any injuries" at the scene of the accident and when reporting the accident, and did not seek any medical treatment before contacting the Emrani Firm. (*Id.* ¶¶ 72, 74). Nevertheless, 18 months after the accident, the Emrani Firm sent a demand letter indicating that Claimant B suffered from numerous spinal injuries and would need to undergo cervical fusion surgery. (*Id.* ¶ 75). These claims were based on a telehealth appointment with Khounganian, who did not conduct a physical exam of Claimant B before recommending surgery. (*Id.* ¶ 78). Similarly, while Claimant P sought chiropractic treatment in his hometown of St. Louis after his accident, he reported nearly non-existent pain at the end of this treatment, and his doctor stated that there was "no reason to expect any major change in [his] clinical picture in the near future." (*Id.* ¶¶ 305-07). Moreover, approximately one month after the accident, Claimant P posted videos of himself online that showed him "bouncing, dancing, and singing," suggesting that he did not suffer from debilitating back pain. (*Id.* ¶ 308). Nevertheless, after retaining DTLA approximately six months after the accident, Claimant P sought treatment in California from Khounganian, who reported that Claimant P had "approximately 50% of normal observed" range of motion and recommended multiple surgeries. (*Id.* ¶¶ 311, 314).

Based on these and other allegations in the FAC, the Court finds that the alleged fraud is not limited simply to estimates of damages; instead, it goes to the fact and the extent of the Claimants' injuries, as well as the causal connection between the accidents and the injuries. While it is true that Plaintiff does not challenge whether the underlying accidents occurred, the Claimants' lawsuits are based not merely on the accidents but on the resulting injury. Thus, fraudulent statements about the injuries, and about the causal connection between the accidents and the injuries, go to the very heart of the litigation. These facts impact whether the Claimants had claims at all, whether the claims would be brought in a court of law, and whether Plaintiff could be considered liable for the claims.

As another district court recently concluded with respect to similar claims brought by Plaintiff against a group of law firms in Philadelphia, the third litigation exception applies because the "alleged misrepresentations concern the claims, including the existence, cause, and medical necessity of the claimed injuries," not merely "the extent of damages." *Uber Techs., Inc. v. Simon & Simon* ("*Simon & Simon*"), No. 25-5365, 2026 WL 1284178, at *12 (E.D. Pa. May 11, 2026).

The Court finds Defendants' contrary arguments unpersuasive. First, Defendants contend that this exception is not met because there are no allegations of any in-court misrepresentations. (Khounganian MTD at 47; Emrani MTD Reply at 24). However, while the Court agrees that the third sham litigation exception must be premised on "knowing fraud upon, or [] intentional misrepresentations to, *the court*," *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1060 (9th Cir. 1998) (citation omitted) (emphasis added), Plaintiff has plausibly alleged that Defendants made intentional misrepresentations to the courts. While much of the FAC focuses on misrepresentations made in demand letters, Plaintiff also alleges that Defendants repeated these false statements in complaints and other documents formally filed before the courts. *See* (FAC ¶¶ 37, 46, 48). Thus, even if the Court were to assume Defendants' prelitigation conduct would not qualify for this exception, Plaintiff has plausibly alleged that Defendants made these misrepresentations directly in court. To the extent Defendants contest the knowledge element, Plaintiff has repeatedly alleged that Defendants acted with intent or reckless indifference in recommending unnecessary surgeries and bringing large claims premised on non-existent or insignificant injuries. *See, e.g.*, (*id.* ¶¶ 53, 85, 285). For purposes of a motion to dismiss, this is sufficient. *See In re JUUL Labs, Inc., Marketing, Sales Pracs., & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 614 (N.D. Cal. 2020) ("Whether or not an otherwise non-actionable statement falls within the sham exception is generally a question of fact not appropriate for resolution on a motion to dismiss.").

Defendants also argue that Plaintiff cannot demonstrate that any alleged misrepresentations "deprived the entire litigation" of its legitimacy because the alleged

misconduct involves only inflated damages claims. (Emrani MTD Reply at 25; DTLA MTD Reply at 23). However, as discussed above, the alleged misrepresentations here do more than simply inflate estimates of damages. Instead, Plaintiff alleges that Defendants engaged in misrepresentations affecting both the fact and extent of injury, as well as the causal connection between any injury and the underlying accidents. These alleged misrepresentations go to the heart of the claims at issue and deprive the litigation of its legitimacy by fundamentally changing the nature of the claims and any resulting settlements.

As Plaintiff argues, the Ninth Circuit has recognized that fraud materially impacting the terms of a settlement agreement or jury award can satisfy the third sham litigation exception. In *Kearney*, in the underlying eminent domain action, the law firm for a school district failed to disclose certain evidence in discovery and affirmatively stated that the evidence did not exist during trial, allegedly leading to a lower valuation of the plaintiff's property. *Kearney*, 590 F.3d at 642. On appeal from a decision dismissing the plaintiff's derivative RICO suit against the law firm under the *Noerr-Pennington* doctrine, the Ninth Circuit reversed, finding that the third sham litigation exception applied. Specifically, the Ninth Circuit found that the plaintiff had plausibly alleged "intentional misrepresentations to the court, and fraud upon the court through the suppression of evidence, that ultimately led to her property being valued lower than it should have been." *Id.* at 646-47. Citing to *Sosa*, the Ninth Circuit noted that "fraudulent discovery conduct in prior litigation that induced the plaintiffs to settle the suit for a lower amount than they would have in the absence of the fraud" was sufficient to deprive the entire action of its legitimacy. *Id.* at 647 (quoting *Sosa*, 437 F.3d at 940). Because the law firm's fraudulent discovery conduct was alleged to have significantly lowered the plaintiff's trial verdict, this conduct implicated "the central issue in the litigation" and deprived the entire litigation of its legitimacy. *Id.* at 648.

The same is true here. Like in *Kearney*, the alleged misrepresentation goes to the central issue in the litigation—the existence and severity of the Claimants' injuries and the

reason for those injuries. And like the situation described in *Sosa* and recognized in *Kearney*, the result of the alleged misrepresentation is that Plaintiff was induced to settle the suit on less favorable terms than it otherwise would have. For purposes of a motion to dismiss, this is sufficient to satisfy the third sham litigation exception.

Finally, the Court is unpersuaded by Defendants' citation to *Ford Motor Co. v. Knight Law Group*, No. 2:25-cv-04550-MWC-PVC, 2025 WL 3306280 (C.D. Cal. Nov. 24, 2025). There, Ford brought a RICO action against a group of plaintiff's law firms, alleging that they created inflated billing records in connection with Lemon Law claims against Ford. The district court concluded that the suit was barred by the *Noerr-Pennington* doctrine and rejected the applicability of the third sham litigation exception because the alleged conduct did not "deprive[] the entire litigation or the fee petition proceedings of their legitimacy." *Id.* at *11. Because Ford did not allege that "the inflated fee petitions so undermined Defendants' clients' claims that the whole suit was illegitimate," the court rejected application of this exception to the overall litigation. *Id.* Moreover, even considering just the fee petitions, the court concluded that the claim failed because Ford alleged that "Defendants sought 'inflated' attorneys' fees, but not that Defendants lacked any entitlement to fees in the relevant Lemon Law cases." *Id.*

While *Ford* bears some similarity to this case, the alleged fraud here is distinct in both kind and degree. Whereas the allegations in *Ford* involved only "a few extra hundred in fees here and a few extra thousand in fees there," the alleged fraud here involved exponential increases in costs. *See, e.g.*, (FAC ¶ 70 (alleging reported charges for procedures were 10 times the accepted norms); *id.* ¶ 200 (alleging increase of 640% above usual billing); *id.* ¶ 321 (alleging reasonable value of services was less than one-tenth the billing rate)). More significantly, *Ford* solely involved allegations of fraud related to claims for attorney's fees brought after prevailing on concededly meritorious claims. Thus, any fraud was collateral to the central subject of the litigation. Here, in contrast, the alleged fraud goes to the core of the Claimants' claims, relating to whether the Claimants suffered injuries, the extent of those injuries, and the reasons for those injuries. *See Simon & Simon*,

2026 WL 1284178, at *14 ("Uber distinctively alleges the misrepresentations went to the factual predicate of the underlying negligence claims themselves: whether the claimants suffered serious accident-related injuries, whether the treatment was medically necessary, whether future care would be required, and whether the claims belonged in litigation rather than no-fault resolution or compulsory arbitration."). Thus, the Court is not persuaded that the court's reasoning in *Ford* should apply here.

Because Plaintiff has adequately pleaded facts establishing the sham litigation exception, the Court need not decide at this time whether the third element of *Noerr-Pennington* immunity is met. Based on the above, the Court DENIES the Motions insofar as they seek dismissal under the *Noerr-Pennington* doctrine.

2. <u>Claim Preclusion</u>

Defendants next argue that Plaintiff's claims should be barred by the doctrine of claim preclusion. Pursuant to the full faith and credit statute, 28 U.S.C. § 1738, "[t]he preclusive effect of a state court judgment in a subsequent federal lawsuit generally is determined . . . [by] the preclusion law of the State in which judgment was rendered." *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985). Under California law, claim preclusion applies "if a second suit involves: (1) the same cause of action (2) between the same parties (3) after a final judgment on the merits in the first suit." *DKN Holdings LLC v. Faerber*, 61 Cal. 4th 813, 824 (2015). "If claim preclusion is established, it operates to bar relitigation of the claim altogether." *Id.*

The DTLA Defendants argue that Plaintiff's claims here are the "same cause of action" as the underlying suits because the "primary rights" asserted in Plaintiff's RICO claims are simply the inverse of the rights asserted by the Claimants: the right to compensation for physical injuries caused by Plaintiff. (DTLA MTD at 20). The DTLA Defendants also argue that this element is met because Plaintiff could have asserted its present claim as a defense or counterclaim in the underlying actions. (*Id.* at 16, 20, 23-24). The DTLA Defendants further argue that, as the Claimants' attorneys in the underlying cases, they are in privity with the Claimants such that they are entitled to invoke claim

preclusion. (*Id.* at 24-25). Finally, the DTLA Defendants argue that the state cases ended in final judgments on the merits in the form of settlement agreements. (*Id.* at 25).

For their part, the Emrani Defendants assert that the Emrani Claimants all entered into settlement agreements with Plaintiff, which provided for [redacted] (Emrani MTD at 34). Because these claims settled, the Emrani Defendants argue that the terms of the settlements control the question of whether Plaintiff's claims may proceed. (Emrani MTD at 34; Emrani MTD Reply at 27). The Emrani Defendants argue that, because these agreements [redacted], Plaintiff is barred from asserting these claims.

In its Opposition, Plaintiff argues that claim preclusion does not apply because neither the parties nor the causes of action are the same as those in the underlying personal injury cases. Plaintiff argues that Defendants were not the parties in the underlying cases and cannot meet the privity requirement because there is no "mutuality," such that Defendants would have been bound by an adverse judgment in the initial action. (MTD Opp. at 42). Plaintiff also argues that these claims seek to vindicate a substantially different "right to operate its business without being the target of a pattern of fraud," while the Claimants sought to vindicate only the "right to be free from bodily injury in the context of the automobile accidents." (*Id.* at 46). Additionally, Plaintiff argues that it could not have raised these claims in any of the underlying actions because the RICO activity was not apparent from any one case and because it would have been impractical to join all Defendants as a counterclaim in a personal injury action. (*Id.* at 49).

*a) Same Parties*

Claim preclusion requires a showing that the prior suit involved either "the same parties" or "their privies." *Grande v. Eisenhower Med. Ctr.*, 13 Cal. 5th 313, 323 (2022). The parties agree that Defendants were not parties to the underlying claims. Thus, the only question is whether Defendants were in privity with the Claimants such that they can invoke the preclusive effect of the underlying cases.

"Privity is a concept not readily susceptible of uniform definition." *Clemmer v. Hartford Ins. Co.*, 22 Cal. 3d 865, 875 (1978), *overruled on other grounds by Ryan v. Rosenfeld*, 3 Cal. 5th 124 (2017). While it has "[t]raditionally" referred to "an interest in the subject matter of the litigation acquired after rendition of the judgment through or under one of the parties, as by inheritance, succession or purchase," it has been expanded to include a relationship "which is sufficiently close so as to justify application of the doctrine of collateral estoppel." *Id.* (internal quotation marks and citation omitted). "As applied to questions of preclusion, privity requires the sharing of an identity or community of interest, with adequate representation of that interest in the first suit, and circumstances such that the nonparty should reasonably have expected to be bound by the first suit." *DKN Holdings LLC*, 61 Cal. 4th at 826 (internal quotation marks and citation omitted). This latter requirement, known as the "rule of mutuality," provides that litigants may "only take advantage of an earlier judgment if that judgment would have bound *them*, had it been decided differently." *Grande*, 13 Cal. 5th at 324 (citations omitted).

As the DTLA Defendants point out, a number of courts have held that the existence of an attorney-client relationship is sufficient to establish privity for purposes of preclusion. *See, e.g.*, *Plotner v. AT&T Corp.*, 224 F.3d 1161, 1169 (10th Cir. 2000); *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1235 n.6 (7th Cir. 1986); *see also Weinberger v. Tucker*, 510 F.3d 486, 492-93 (4th Cir. 2007) (finding privity between attorney and client but declining to hold "that privity exists with respect to every attorney-client interaction"). However, the California Court of Appeals has explicitly rejected this approach, describing this line of cases as "bogus privity," and concluding as a matter of California law that "the existence of an attorney-client relationship does not establish privity between the attorney and client." *Kerner v. Superior Court*, 206 Cal. App. 4th 84, 126-27 (2012). As the *Kerner* court explained, "an attorney for a party is not the party and does not share the party's legal rights and interests. Although an attorney may control the litigation to a significant degree, the attorney does so on behalf of the client rather than in service of the attorney's own interests." *Id.* at 126. The court found that any contrary rule "could create a potential

conflict of interest" by causing attorneys "to consider not only their client's best interests with respect to the subject of the representation, but also the potential impact of any finding in the proceeding on the attorney's interests in another proceeding." *Id.*

As Plaintiff argues, the rule adopted in *Kerner* makes intuitive sense. Given the rule of mutuality, a contrary rule of privity would necessarily imply that an attorney is not only entitled to invoke claim preclusion as a defense but may also be bound by offensive claim preclusion. *See Grande*, 13 Cal. 5th at 324 (stating that claim preclusion "restricts the set of litigants who can benefit from a prior judgment to those who could have had the judgment used against them"). Absent more, such a rule would seem to exceed the permissible scope of claim preclusion. *See S. Cent. Bell Tel. Co. v. Alabama*, 526 U.S. 160, 168 (1999) (rejecting on constitutional due process grounds the argument that representation of plaintiffs by the same attorney "created [a] special representational relationship between the earlier and later plaintiffs" for purposes of res judicata); *see also* 18A C. Wright & A. Miller, Fed. Prac. & Proc. Juris. § 4464.1 n.5 (3d ed. 2026) ("Of course the attorneys would not be bound by an unfavorable judgment without a much stronger showing of grounds for preclusion. An attorney cannot be bound, for example, on the simple theory of participation and control."). Regardless, *Kerner* is the controlling law in California and is binding on this Court.[3]

In their Reply Brief, the DTLA Defendants attempt to distinguish *Kerner* as limited to its facts, which involved only an "incidental attorney-client relationship." (DTLA MTD Reply at 34). However, nothing in *Kerner* suggests that its discussion of privity was limited

---

[3] The DTLA Defendants briefly argue that "*Kerner* is an intermediate state court decision that is not binding on this Court." (DTLA MTD Reply at 34 n.4). However, "when (1) a federal court is required to apply state law, and (2) there is no relevant precedent from the state's highest court, but (3) there *is* relevant precedent from the state's intermediate appellate court, the federal court must follow the state intermediate appellate court decision unless the federal court finds convincing evidence that the state's supreme court likely would not follow it." *Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 994 (9th Cir. 2007). Defendants offer no reason to believe that the California Supreme Court would adopt a different approach. Accordingly, *Kerner* is binding on this Court.

to its facts. Instead, the *Kerner* court invoked broad public policy principles and unequivocally concluded that "the existence of an attorney-client relationship does not establish privity between the attorney and client." *Kerner*, 206 Cal. App. 4th at 126. While *Kerner* specifically involved the doctrine of issue preclusion, the Court sees no reason why the rule would not apply to claim preclusion—particularly given the rule of mutuality discussed above. The DTLA Defendants also argue that this situation is distinct because they are in an agency relationship with the Claimants. (DTLA MTD Reply at 34-35). However, this is no distinction at all given that the attorney-client relationship is, by definition, "one in which the attorney acts as agent for the client." *Contreras v. Dowling*, 5 Cal. App. 5th 394, 418 (2016). Third, the DTLA Defendants argue that they had a contingent-fee interest in the outcome of the underlying litigation, giving them a direct financial stake in the judgments. (DTLA MTD Reply at 35). However, regardless of the form of payment, an attorney acts "on behalf of the client rather than in service of the attorney's own interests." *Kerner*, 206 Cal. App. 4th at 126. Finally, the DTLA Defendants argue that *Kerner*'s holding is merely that an attorney-client relationship does not, "standing alone," establish privity. (DTLA MTD Reply at 35). However, even if *Kerner* is so limited, the DTLA Defendants fail to show that the attorney-client relationship here was in some way extraordinary, such that privity would apply notwithstanding the general rule in *Kerner*. In the absence of any contrary California case law, the Court agrees with Plaintiff that there is no privity between Defendants and the Claimants. Accordingly, the DTLA Defendants are not entitled to invoke claim preclusion.[4] Because the Court denies this argument on these grounds, the Court need not decide whether the other elements of claim preclusion are met.

---

[4] To the extent Khounganian raises any claim preclusion defense, the Court's conclusion as to privity would apply even more strongly given the added layer of distance between Khounganian and the Claimants.

*b) Settlement Agreements*

In their Motion, the Emrani Defendants take a different tack, arguing that Plaintiff's claims are barred as a result of the settlement agreements in the underlying cases. (Emrani MTD at 33). The Emrani Defendants cite to *Wojciechowski v. Kohlberg Ventures, LLC* for the proposition that courts should "look to the intent of the settling parties to determine the preclusive effect of a dismissal with prejudice entered in accordance with a settlement agreement, rather than to general principles of claim preclusion." 923 F.3d 685, 689 (9th Cir. 2019). California courts have similarly explained that "[a] contractual settlement of a disputed claim is an agreement the interpretation and effect of which are governed by ordinary principles of contract law." *Gouvis Eng'g v. Superior Court*, 37 Cal. App. 4th 642, 649 (1995). Under these principles, parties may agree to either "limit the legal effect of a dismissal with prejudice," *Kim v. Reins Int'l Cal., Inc.*, 9 Cal. 5th 73, 91 (2020) (citation omitted), or adopt "a settlement release that is broader than the claims [the plaintiff] pleaded or could have pleaded," *LaCour v. Marshalls of Cal., LLC*, 94 Cal. App. 5th 1172, 1194 (2023).

Having reviewed Plaintiff's settlement agreements with the Emrani Claimants,[5] the Court concludes that the settlement agreements do not facially demonstrate the parties' intent to bar Plaintiff's claims. Aside from slight differences in wording, each settlement agreements generally provides that [redacted] Thus, the focus of the settlement agreements is [redacted]. The Emrani Defendants have identified [redacted]

[5] As the Emrani Defendants points out, Plaintiff has not explicitly challenged this portion of the Motion to Dismiss except to argue that the Emrani Defendants improperly rely on federal preclusion law. *See* (MTD Opp. at 41). While the Court could therefore grant this portion of the Motion as unopposed, this is a matter of discretion. *See* C.D. Cal. L.R. 7-12; *Ghazali v. Moran*, 46 F.3d 52, 53-54 (9th Cir. 1995). Given the volume of the briefing in this case, the Court will exercise its discretion to consider the merits of this argument.

[redacted]. While the agreements state that [redacted]. The Emrani Defendants point to provisions in the agreements stating that [redacted] Again, however, these provisions [redacted]. Absent some contractual language, or perhaps extrinsic evidence, demonstrating that [redacted], the Emrani Defendants have not shown that the parties intended to impose broader preclusive effect than the ordinary rules of claim preclusion, which, as discussed above, do not preclude Plaintiff's claims.

3. Compulsory Counterclaim Rule

Defendants next argue that Plaintiff was required to bring its RICO claims as compulsory counterclaims in the underlying litigation. (Emrani MTD at 35-36; DTLA MTD at 26-31). Federal courts apply state law to determine the preclusive effect of the failure to raise a compulsory counterclaim in an earlier state court action. *See Pochiro v. Prudential Ins. Co. of Am.*, 827 F.2d 1246, 1253 (9th Cir. 1987). Under California's statutory compulsory counterclaim rule, "if a party against whom a complaint has been filed and served fails to allege in a cross-complaint any related cause of action which (at the time of serving his answer to the complaint) he has against the plaintiff, such party may not thereafter in any other action assert against the plaintiff the related cause of action not pleaded." Cal. Civ. Proc. Code § 426.30(a). The phrase "related cause of action" is separately defined as any "cause of action which arises out of the same transaction, occurrence, or series of transactions or occurrences as the cause of action which the plaintiff alleges in his complaint." Cal. Civ. Proc. Code § 426.10(c).

As the statutory language makes clear, California's compulsory counterclaim rule only requires a defendant "to raise any related causes of action which he has against the *plaintiff* in that action." *Maldonado v. Harris*, 370 F.3d 945, 951 (9th Cir. 2004); *see* Cal. Civ. Proc. Code § 426.30. Where a defendant's cause of action is only available against a third party, cross-complaints are permissive rather than compulsory. Cal. Civ. Proc. 428.10(b). Thus, in *Maldonado*, following a nuisance action brought by a state agency, the Ninth Circuit rejected the application of the compulsory counterclaim rule to the defendant's § 1983 claim because any such claim could only be brought against the director of the agency, who was not the plaintiff in the action. *Maldonado*, 370 F.3d at 951-52. Here too, even assuming Plaintiff "*could* have brought a cross-complaint" against Defendants in the underlying actions, Plaintiff was not "*required* to do so" because Defendants were not the plaintiffs in any of these actions. *Id.*

The DTLA Defendants argue that the compulsory counterclaim rule should apply not only to claims against the plaintiff in the underlying action, but also to parties in privity with the plaintiff. (DTLA MTD at 30-31). Even assuming, however, that a privity rule could be implied in the language of § 426.30, the Court has already determined that Defendants were not in privity with the Claimants for purposes of claim preclusion. The Court sees no reason why that conclusion would be any different as to the compulsory counterclaim rule, which the DTLA Defendants concede is "narrower" than claim preclusion. (DTLA MTD at 26). Because Defendants are not themselves the plaintiffs in the underlying actions, and are not otherwise in privity with the plaintiffs, the Court concludes that California's compulsory counterclaim rule does not apply.

4. *Rooker-Feldman* Doctrine

The DTLA Defendants also argue that Plaintiff's claims are barred by the *Rooker-Feldman* doctrine. (DTLA MTD at 32-37). The *Rooker-Feldman* doctrine bars a losing party in a state court action "from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights." *Johnson v. De Grandy*, 512

U.S. 997, 1005-06 (1994). The doctrine is jurisdictional, premised on the rule that "[f]ederal district courts . . . are empowered to exercise original, not appellate, jurisdiction." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283 (2005).

The *Rooker-Feldman* doctrine has no application here. As the Ninth Circuit has explained, the doctrine applies only to "de facto appeals" of state court judgments, in which the plaintiff "complains of a legal wrong allegedly committed by the state court, and seeks relief from the judgment of that court." *Noel v. Hall*, 341 F.3d 1148, 1163 (9th Cir. 2003). "If, on the other hand, a federal plaintiff asserts as a legal wrong an allegedly illegal act or omission by an adverse party, *Rooker-Feldman* does not bar jurisdiction." *Id.* at 1164. Thus, "even if a plaintiff seeks relief from a state court judgment, such a suit is a forbidden de facto appeal only if the plaintiff *also* alleges a legal error by the state court." *Bell v. City of Boise*, 709 F.3d 890, 897 (9th Cir. 2013); *see also Kougasian v. TMSL, Inc.*, 359 F.3d 1136, 1140 (9th Cir. 2004) ("[A] plaintiff must seek not only to set aside a state court judgment; he or she must also allege a legal error by the state court as the basis for that relief."); *Miroth v. Cnty. of Trinity*, 136 F.4th 1141, 1158 (9th Cir. 2025) ("[O]ur caselaw has further narrowed the doctrine as applying only to suits alleging errors by the state courts in rendering judgment, as opposed to misconduct by litigants in obtaining such a judgment." (citation omitted)).

The FAC here includes no allegations of any legal error by the state courts in the Claimants' cases. Instead, Plaintiff's claims are premised solely on allegations of fraudulent misconduct by Defendants in state court litigation. The Ninth Circuit has repeatedly found that *Rooker-Feldman* does not apply in such situations. For example, in *Miroth*, the plaintiff raised claims that county officials "made false and misleading statements to the state court that caused the court to terminate [the plaintiff's] parental rights." *Miroth*, 136 F.4th at 1151. On appeal, the Ninth Circuit concluded that *Rooker-Feldman* did not apply to these claims because the plaintiff was "assert[ing] a wrong by adverse parties, not the state court." *Id.* Similarly, in *Kougasian*, the Ninth Circuit concluded that claims premised on "extrinsic fraud on the state court" were not barred

because "[e]xtrinsic fraud on a court is, by definition, not an error by that court." 359 F.3d at 1140-41. And in *Benavidez v. County of San Diego*, the Ninth Circuit found that claims "based on the alleged misrepresentation" to the state court were not barred because the claims were "alleged legal wrongs by" the defendants, not the court. 993 F.3d 1134, 1143 (9th Cir. 2021). Here, because Plaintiff's claims are premised on Defendants' alleged fraud, rather than any legal error by the state court, *Rooker-Feldman* does not bar this Court's exercise of jurisdiction.

5. <u>Statute of Limitations</u>

Fradkin and the Emrani Defendants also challenge the timeliness of Plaintiff's claims under the statute of limitations. (Fradkin MTD at 29-30; Emrani MTD at 36-39). Defendants argue that Plaintiff knew or should have known about its alleged injury more than four years before it initiated this suit on July 21, 2025. With respect to the Emrani Defendants, all six of the Claimants' car accidents occurred in 2019, and five had sent the allegedly fraudulent demand letters and/or filed allegedly fraudulent complaints as of July 21, 2021. (Emrani MTD at 38). With respect to the DTLA Defendants, nine of the Claimants had filed suit by July 2021, and Plaintiff had already obtained significant documents, testimony, and expert analysis by this time. (Fradkin MTD at 29).

In its Opposition, Plaintiff argues that the RICO statute explicitly permits consideration of acts of racketeering activity that occur within ten years of one another. (MTD Opp. at 88). Plaintiff further argues that, under the "separate accrual rule," Plaintiff accrued a new cause of action for each new and independent injury. Because much of the fraud alleged in the FAC occurred within the limitations period, Plaintiff argues that the FAC is not barred by the statute of limitations. (*Id.* at 89). Plaintiff further argues that the pattern of fraudulent activity only became apparent over time, and that it was not on notice of its claims merely as a result of the filing of Claimants' demand letters or complaints. (*Id.* at 90-91).

In the Ninth Circuit, "a civil RICO cause of action arises when the plaintiff knows or should know that she has been injured." *Grimmett v. Brown*, 75 F.3d 506, 512 (9th Cir.

1996). However, the Ninth Circuit also applies the "'separate accrual rule,' which provides that a new cause of action accrues for each new and independent injury, even if the RICO violation causing the injury happened more than four years before." *Id.* at 510. A new cause of action accrues "when new overt acts occur within the limitations period, even if a conspiracy was formed and other acts were committed outside the limitations period." *Id.* at 512 (quoting *State Farm Mut. Auto. Ins. Co. v. Ammann*, 828 F.2d 4, 5 (9th Cir. 1987) (Kennedy, J., concurring)). "[T]wo elements characterize an overt act which will restart the statute of limitations: 1) It must be a *new and independent act* that is not merely a reaffirmation of a previous act; and 2) It must *inflict new and accumulating injury* on the plaintiff." *Id.* at 513 (quoting *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987)).

As the parties agree, the statute of limitations for a civil RICO claim is four years. *Pincay v. Andrews*, 238 F.3d 1106, 1108 (9th Cir. 2001). Because Plaintiff initiated this action on July 21, 2025, to invoke the separate accrual rule, Plaintiff would need to allege new overt acts on or after July 21, 2021.

Taking the allegations in the FAC as true, the Court finds that Plaintiff has plausibly alleged facts demonstrating "new overt acts" within the limitations period. With respect to the Emrani Defendants, it is true that all of the Claimants' injuries occurred before July 21, 2021. *See* (FAC ¶¶ 57, 72, 96, 122, 131, 143, 154). However, the FAC includes allegations of fraudulent medical diagnoses, inflated billing, and related communications, that occurred after July 21, 2021. *See* (*id.* ¶¶ 88, 110-13, 161-64). These additional allegations of fraud are not merely reaffirmations of previous acts. Instead, they are additional instances of fraud that inflicted a new and accumulating injury by significantly increasing the potential damages against Plaintiff. For example, for Claimant B, Khounganian is first alleged to have made false causation statements on July 16, 2021—just outside the limitations period. (*Id.* ¶ 83). However, following Claimant B's July 16, 2021, surgery, Khounganian signed an additional record opining that Claimant B "would likely 'require[] a lumbar fusion procedure in the future,' estimated at approximately

$265,000, as well as an 'anterior cervical disc placement procedure,' also estimated at approximately $265,000." (*Id.* ¶ 88). Thus, within the limitations period, Plaintiff alleges that Khounganian inflicted an additional and accumulating injury on Plaintiff by fraudulently attesting that Claimant B would require more than $500,000 in future medical expenses. Similarly, Plaintiff alleges that Claimant G had her first consultation appointment with Khounganian on October 11, 2021, and received a surgical estimate of more than $500,000. (*Id.* ¶ 161). The Emrani Defendants then included these estimates in a settlement offer sent to Plaintiff on May 24, 2022. (*Id.* ¶ 164). Given that Claimant G had not previously met with Khounganian, it appears that these communications constitute a new act of alleged fraud, rather than a reaffirmation of a previous act.

With respect to the DTLA Defendants, the allegations of overt acts within the limitations period are clearer. Claimant N's accident occurred on February 11, 2022, well within the limitations period. (*Id.* ¶ 272). Several other Claimants received allegedly fraudulent diagnoses from Khounganian within the limitations period, which were then communicated to Plaintiff in the course of litigation. *See* (*id.* ¶¶ 196, 208-12, 265, 316-18). As discussed above, these new fraudulent diagnoses and communications constitute new overt acts because they increased the damages claims against Plaintiff, creating an accumulating injury. On a 12(b)(6) motion, a complaint may not be dismissed on the ground that it is barred by the applicable statute of limitations "unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010) (citation omitted). Because the FAC includes multiple allegations of fraudulent surgical estimates that occurred within the limitations period, "the running of the statute is [not] apparent on the face of the complaint." *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006) (citation omitted).

As Defendants point out, a "corollary rule" to the separate accrual rule "is that damages may not be recovered for injuries sustained as a result of acts committed outside the limitations period." *Grimmett*, 75 F.3d at 512 (quoting *Ammann*, 828 F.2d at 5). As

such, the Emrani Defendants argue that the Court should, at a minimum, grant the motion to dismiss as to all injuries that occurred before July 2021. (Emrani MTD Reply at 31). It is true that the FAC includes no allegations of any actions within the limitations period with respect to several of the Claimants. Thus, to the extent Plaintiff's claims had accrued by July 2021, damages related to these Claimants' cases may well be barred. However, it is not clear from the face of the FAC exactly when Plaintiff's RICO claim first accrued. Although Defendants imply otherwise, the mere initiation of a suit by a personal injury claimant is not sufficient to put Plaintiff on notice that the suit is premised on fraud. Instead, whether any given Claimant's allegations of injury, causation, and damages are fraudulent would only become evident in the course of litigation, perhaps as a result of depositions or independent medical examinations. Moreover, as Plaintiff argues, RICO claims require showing a "pattern of racketeering activity." Thus, Plaintiff's knowledge of fraud in an individual case is not necessarily sufficient by itself for a RICO claim to accrue. Ultimately, the question of when Plaintiff knew or should have known of its alleged injury will require a fact-intensive inquiry. On a motion to dismiss, the Court declines to resolve this question.

6. <u>Civil RICO Claim</u>

The Court turns at last to the merits of Plaintiff's RICO claims. As the parties agree, the elements of a civil RICO claim are "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to [the] plaintiff's 'business or property.'" *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005) (citation omitted). RICO claims premised on fraud must satisfy the particularity requirements of Rule 9(b), meaning Plaintiff must "state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004) (citation omitted). Defendants challenge the sufficiency of Plaintiff's allegations as to the latter four elements of this claim. The Court will discuss each of these elements in turn.

*a) Enterprise*

To satisfy this element, Plaintiff must plausibly allege that Defendants were "employed by or associated with any enterprise." 18 U.S.C. § 1962(c). The statutory definition of enterprise encompasses "two categories of associations": (1) "legal enterprises" such as corporations and partnerships; and (2) groups that are "associated in fact" but not recognized as legal entities. *United States v. Turkette*, 452 U.S. 576, 581-82 (1981) (citing 18 U.S.C. § 1961(4)). Association-in-fact enterprises "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). The existence of an enterprise is proved "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Turkette*, 452 U.S. at 583.

The FAC identifies five separate enterprises: (1) an association-in-fact enterprise consisting of Emrani, the Emrani Firm, Khounganian, and GSK Spine; (2) an association-in-fact enterprise consisting of Fradkin, DTLA Law Group, Khounganian, and GSK Spine; (3) a legal enterprise consisting of GSK Spine; (4) a legal enterprise consisting DTLA Law Group; and (5) a legal enterprise consisting of the Emrani Firm. (FAC ¶¶ 366-379).

*(1) The Association-in-Fact Enterprises*

Defendants first argue that Plaintiff's allegations of an association-in-fact enterprise are insufficient because the relationship between the Law Firm Defendants and the Medical Provider Defendants is a "routine commercial relationship." (Fradkin MTD at 16-17; Emrani MTD at 53; Khounganian MTD at 19-20). As such, Defendants contend that Plaintiff cannot show that Defendants acted with a "common purpose." (*Id.*).

As Defendants argue, courts "have overwhelmingly rejected attempts to characterize routine commercial relationships as RICO enterprises." *Shaw v. Nissan N.A., Inc.*, 220 F. Supp. 3d 1046, 1054 (C.D. Cal. 2016) (citation omitted). Standing alone, allegations "that Defendants' primary business activity . . . was conducted fraudulently" are insufficient to state a claim under § 1962(c). *In re Toyota Motor Corp. Unintended Acceleration Mktg.,*

*Sales Pracs., & Prods. Liab. Litig.*, 826 F. Supp. 2d 1180, 1202-03 (C.D. Cal. 2011). Thus, courts have rejected enterprises absent plausible factual allegations that the participants "specifically joined that distinct Enterprise, as opposed to going into business with [the other participant] to support the general business of [the other participant] for their mutual benefit." *JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 497 F. Supp. 3d at 603.

However, taking the allegations in the FAC as true, Plaintiff has plausibly alleged that the relationship here is more than a routine commercial relationship between a personal injury law firm and a spine surgeon. Plaintiff alleges that the Law Firm Defendants (1) direct claimants to forego use of their own medical insurance and instead enter into lien agreements with the Medical Provider Defendants, (FAC ¶ 2); (2) enter into secret side agreements with the Medical Provider Defendants under which the Medical Provider Defendants agree to write off expenses that exceed litigation recoveries, (*id.* ¶ 3); and (3) inform Khounganian about the applicable insurance policy limits and direct Khounganian to perform specific medical procedures, (*id.* ¶ 8). These allegations of purposeful direction of the means, nature, and financing of claimants' medical treatment go beyond a typical arm's length business relationship. The Medical Provider Defendants, meanwhile, (1) enter into lien agreements that state recoveries are not contingent on settlement, without ever checking the claimants' credit history, *see, e.g.*, (*id.* ¶ 67); (2) make no efforts to recover unpaid fees, *see, e.g.*, (*id.* ¶ 322 (deposition statement from Claimant P that Khounganian never sent an invoice or collected payment)); (3) on one occasion, personally pay for claimants' travel expenses, (*id.* ¶ 319); (4) recommend, and in some cases perform, unnecessary surgeries on the claimants, *see, e.g.*, (*id.* ¶¶ 346-49 (recommending spinal surgery for claimant who suffered foot injury, which claimant rejected as "invasive and disproportionate to his situation")); (5) on one occasion, make such recommendations without even examining the claimant, (*id.* ¶ 78 (recommending surgery following telehealth appointment)); (6) generate above market-rate medical bills, (*id.* ¶¶ 70, 94, 200, 321); and (7) repeatedly issue substantially identical reports of the

claimants' injuries and the causes for those injuries, *see, e.g.*, (*id.* ¶¶ 110, 135, 208, 330 (diagnosing four separate claimants with "approximately 50% of normal observed" range of motion in their cervical and lumbar spine)). Again, these allegations suggest that the Medical Provider Defendants were engaged in more than the routine business of diagnosing and treating injuries for profit.

Plaintiff includes numerous specific factual allegations demonstrating the atypical nature of the relationship among the Defendants. For example, Plaintiff provides an email from Claimant A's treatment in which the Emrani Firm authorized the Claimant to receive specific medical treatment and informed Radiance Surgery Center that "Defendant was an Uber driver and the BI policy limit is 1 million." (*Id.* ¶ 62). The FAC also alleges that Khounganian personally paid for Claimant P and his mother to be flown from St. Louis to Los Angeles to receive medical treatment. (*Id.* ¶ 317). Claimant P further testified that he never paid anything to Khounganian, never received an invoice, and was never told that he was late on any payment. (*Id.* ¶ 322). Claimant N, meanwhile, contacted Plaintiff after settling his lawsuit to inform Plaintiff that DTLA was engaged in "duplicate/inflated billing." (*Id.* ¶ 287). Further, the FAC includes spreadsheets provided by unidentified medical providers detailing discrepancies between the charges listed on invoices and the amounts actually paid by the Law Firm Defendants for the treatment.[6] (*Id.* ¶¶ 45, 47). All of these allegations suggest that Defendants acted not pursuant to an ordinary business relationship but in furtherance of a "common purpose" of generating inflated medical bills to extract higher settlements from Plaintiff. For purposes of a motion to dismiss, the Court finds this to be sufficient. *See Simon & Simon*, 2026 WL 1284178, at *22 (finding association-in-fact enterprise based on allegations of "repeated coordination among the same participants in furtherance of a shared objective, including recurring referrals to Dr.

[6] As Defendants point out, these allegations involved different medical providers during an earlier time period. Nevertheless, taken in conjunction with the other evidence, the spreadsheets still support an inference that a similar relationship was in place here.

Burt, Dr. Burt's standardized reporting practices, and repeated use of the same procedures and fraudulent records to support claims").

Defendants also argue that Plaintiff's allegations fail to show that they participated in operating or managing the alleged association-in-fact enterprise. (Fradkin MTD at 17-18; Emrani MTD at 53-54; Khounganian MTD at 21-23). Khounganian notes that the FAC alleges that the operational and managerial aspects of the alleged enterprise were performed by the Law Firm Defendants, while Khounganian is alleged only to have accepted referrals and provided medical treatment. (Khounganian MTD at 21-22). The Emrani Defendants argue that allegations of its management are conclusory and implausible given that they do not participate in any medical practice's management decisions. (Emrani MTD at 54). Similarly, the DTLA Defendants argue that they are alleged to have done nothing more than provide routine legal services, which do not constitute operation or management of an enterprise. (Fradkin MTD at 18).

"In order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (quoting 18 U.S.C. § 1962(c)). "One can be 'part' of an enterprise without having a role in its management and operation," and "[s]imply performing services for the enterprise does not rise to the level of direction." *Walters v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008). However, RICO liability "is not limited to those with primary responsibility for the enterprise's affairs" or with "a formal position in the enterprise." *Reves*, 507 U.S. at 179. Instead, RICO liability may attach to one who "occup[ies] a position in the chain of command . . . through which the affairs of the enterprise are conducted," who "knowingly implement[s] decisions of upper management," or who is "indispensable to achievement of the enterprise's goal." *Walter*, 538 F.3d at 1249.

Here, the FAC includes concrete allegations that each Defendant played "*some* part in directing the enterprise's affairs." *Reves*, 507 U.S. at 179. Among other allegations, Plaintiff alleges that the Law Firm Defendants refer clients to specific providers, coordinate medical treatment, and authorize specific diagnostic tests and treatments. (FAC ¶¶ 30, 51).

The Law Firm Defendants also play the key role in the alleged enterprise by sending demand letters, filing complaints, and negotiating settlements that reflect the inflated bills produced by Khounganian. Khounganian, meanwhile, accepts these referrals with the understanding that he will diagnose the clients with specific injuries, ascribe the injuries to the underlying accidents, and recommend costly surgeries. (*Id.* ¶ 10). Khounganian enters into lien agreements with the Claimants and enters into secret side agreements with the Law Firm Defendants, which create the false impression that the Claimants have incurred medical expenses. (*Id.* ¶ 11). Thus, the enterprise is dependent on both the Law Firm Defendants and the Medical Provider Defendants, with each set of Defendants primarily responsible for a different portion of the enterprise's activities. If the alleged enterprise consists of a scheme to generate inflated medical bills to extract higher settlements from Plaintiff, Khounganian directs the medical bills portion of the enterprise, while the Law Firm Defendants direct the settlement portion of the enterprise. This is more than "[s]imply performing services" for the enterprise. *Walter*, 538 F.3d at 1249. Instead, Defendants are each "indispensable to achievement of the enterprise's goal" because they direct different essential aspects of the enterprise. *Id.*

*(2) <u>The Legal Enterprises</u>*

Defendants also challenge the existence of a legal enterprise. Fradkin argues that DTLA and Fradkin cannot form an enterprise because "a law firm and an employee cannot be both the defendants and the enterprise." (Fradkin MTD at 20). The Emrani Defendants reiterate their arguments that Plaintiff fails to allege a common purpose of illegality or show that Emrani directed the allegedly fraudulent conduct. (Emrani MTD at 55). Khounganian argues that the FAC is devoid of allegations of alleged fraud by GSK Spine, such that it has not identified the existence of any enterprise distinct from the underlying predicate acts. (Khounganian MTD at 23-24).

"[A]ny individual, partnership, corporation, association, or other legal entity" may qualify as an enterprise. 18 U.S.C. § 1961(4); *see Turkette*, 452 U.S. at 581. However, an enterprise "is not simply the same 'person' referred to by a different name." *Cedric*

*Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). To plead a RICO claim, a plaintiff must "allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Id.*

Plaintiff's allegations here satisfy these requirements. The FAC identifies three "legal entity" enterprises—DTLA, the Emrani Firm, and GSK Spine—each of which is alleged to be a corporation or limited liability partnership. *See* (FAC ¶¶ 18, 19, 21). As the Ninth Circuit has explained, "the very existence of a corporation meets the requirement for a separate structure." *United States v. Feldman*, 853 F.2d 648, 660 (9th Cir. 1988); *see also United States v. Blinder*, 10 F.3d 1468, 1474 (9th Cir. 1993) ("Legal entities are garden-variety 'enterprises' which generally pose no problem of separateness from the predicate acts." (citation omitted)). While Fradkin argues that "a law firm and an employee cannot be both the defendants and the enterprise," the FAC brings these claims only against the individual Defendants, not the entities themselves. As such, these claims have identified both a "person" and a legal "enterprise" that is distinct from the person.

To the extent Defendants argue that there is insufficient separation between the corporate enterprise and the individual Defendants, the Supreme Court has rejected such argument. *See Cedric Kushner Promotions, Ltd.*, 533 U.S. at 163 ("The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more 'separateness' than that."). As to the arguments about a common purpose, the case law that the Emrani Defendants cite all relates to association-in-fact enterprises, and the Court is not aware of any cases imposing such a requirement on legal enterprises. Finally, as to Khounganian's argument, it is true that "the mere naming of a corporation will not satisfy the enterprise requirement if there are no allegations that the corporation was involved in the acts of racketeering." *Gonzalez v. Lloyds TSB Bank, PLC*, 532 F. Supp. 2d 1200, 1209 (C.D. Cal. 2006). However, the FAC here includes allegations that GSK Spine is Khounganian's medical practice, and that

Khounganian used GSK Spine as a tool to bill the Law Firm Defendants. (FAC ¶¶ 10, 370-73). For purposes of a motion to dismiss, the Court finds these allegations sufficient.

*b) Racketeering Activity*

Defendants next challenge the sufficiency of Plaintiff's allegations of racketeering activity. "Racketeering activity" is broadly defined to include "any act which is indictable under any of" various enumerated federal statutes, including the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343. *See* 18 U.S.C. § 1961(1). The mail and wire fraud statutes are "identical except for the particular method used to disseminate the fraud, and contain three elements: (A) the formation of a scheme to defraud, (B) the use of the mails or wires in furtherance of that scheme, and (C) the specific intent to defraud." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014).

Plaintiff identifies three categories of allegedly fraudulent conduct that it argues are sufficient to show racketeering activity: (1) the production and transmittal of false diagnoses, performance of unnecessary surgeries, and transmittal of false medical records; (2) the production and transmittal of false causation statements linking the Claimants' alleged injuries to the accidents; and (3) the production and transmission of medical bills listing the lien agreements while failing to mention the secret side agreements. (MTD Opp. at 65-68).

For the first category of conduct, the FAC includes numerous factual allegations, based on independent medical evaluations of the Claimants, that Khounganian's diagnoses and surgeries of the Claimants were medically unnecessary. *See* (FAC ¶¶ 70, 197, 216). The FAC also includes allegations that Khounganian recommended surgery for one Claimant without ever conducting a physical examination of the Claimant. (*Id.* ¶ 78). For another Claimant, the FAC alleges that Khounganian diagnosed multiple disc herniations despite no evidence of acute injury and prior imaging that showed no such injuries. (*Id.* ¶¶ 207-08). For the second category, the FAC includes allegations that Khounganian repeated the same boilerplate causation finding for every Claimant. (*Id.* ¶¶ 61, 83, 111, 125, 165, 182, 198, 208, 234, 249, 266, 282, 300, 313, 331, 350). This occurred even

where Khounganian had not conducted any physical examination of the Claimant, (*id.* ¶¶ 80-83), where the Claimant had a preexisting or degenerative condition, (*id.* ¶¶ 165, 300), and where the Claimant's injury was to his foot rather than his spine, (*id.* ¶ 350). For the third category, the FAC's allegations of side agreements are based on information and belief. However, the FAC includes spreadsheets provided by other medical providers who worked with the Law Firm Defendants, which show that the medical providers were paid much lower rates than what they listed on bills. (*Id.* ¶¶ 40-48). The FAC also includes allegations that, despite representing that the liens were "not contingent on any settlement, judgment verdict, or other recovery," Khounganian never checked Claimants' credit history and never sought to collect on the lien agreements. *See, e.g.*, (*id.* ¶ 67). Further, the FAC includes allegations from one Claimant who testified that he never paid anything to Khounganian, never saw an invoice, and never received any notice that payment was late. (*Id.* ¶ 322).

The Court agrees with Plaintiff that these allegations are sufficient to plausibly allege violations of the mail and wire fraud statutes. First, the allegations plausibly demonstrate that Defendants formed a "scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." *Carpenter v. United States*, 484 U.S. 19, 27 (1987). As detailed above, the FAC includes numerous, specific allegations of statements from Defendants designed to deprive Plaintiff of money through false pretenses. For example, allegations that Khounganian recommended surgery and made a medical finding of causation without having ever physically examined Claimant B are strong evidence that Khounganian knew or should have known that his representations were false. Similarly, allegations that Khounganian personally paid to transport Claimant P to California for surgery and never sent Claimant P any invoice or bill for the medical treatment suggest that Khounganian's representations about the nature of his billing were knowingly false. The FAC also suggests that the Law Firm Defendants were aware of and participated in this scheme. For example, Claimant N reported to Plaintiff that Fradkin personally informed him that DTLA engaged in duplicate/inflated billing. (FAC ¶ 287).

Further, the FAC includes allegations that the Law Firm Defendants entered into secret side agreements to write off portions of the lien agreements before transmitting demand letters citing the medical liens as the Claimants' damages. While Plaintiff pleads these allegations on information and belief, other factual allegations in the FAC—including the specific allegations of similar agreements with other medical providers—support the plausibility of these allegations. Taking the factual allegations in the FAC as true, and drawing all reasonable inferences in Plaintiff's favor, the FAC plausibly demonstrates that Defendants engaged in a scheme to deprive Plaintiff of money through false pretenses.

Second, the FAC includes numerous specific allegations that the false medical records, causation statements, and billing information were transmitted through the interstate mail and wires. *See* (*id.* ¶¶ 386-401). Defendants do not appear to specifically contest this element.

Third, Plaintiff has plausibly alleged that Defendants had the specific intent to defraud. "The intent to defraud may be inferred from a defendant's statements and conduct." *United States v. Peters*, 962 F.2d 1410, 1414 (9th Cir. 1992). "In the absence of direct evidence of intent, the party asserting fraud must first prove the existence of a scheme which was reasonably calculated to deceive persons of ordinary prudence and comprehension, and then, by examining the scheme itself the court may infer a defendant's specific intent to defraud." *Eclectic Props.*, 751 F.3d at 997 (internal quotation marks and citation omitted). As described throughout this Order, the scheme here involved multiple layers, including (1) the Law Firm Defendants referring personal injury claimants to the Medical Provider Defendants; (2) the Law Firm Defendants encouraging Claimants to enter into lien agreements with the Medical Provider Defendants rather than using their own medical insurance; (3) the Law Firm and Medical Provider Defendants entering into secret side agreements to pay lower amounts or write off portions of medical bills; (4) the Medical Provider Defendants diagnosing the Claimants with serious spinal injuries requiring costly surgeries; (5) the Medical Provider Defendants providing statements attesting to the causal connection between the accidents and the Claimants' injuries; (6) the

Medical Provider Defendants generating inflated bills for the treatments; and (7) the Law Firm Defendants using these diagnoses, causation statements, and inflated bills to extract more lucrative settlements out of Plaintiff. This scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension. In particular, Defendants' representations that the lien agreements constituted actual medical expenses would be likely to mislead a reasonable person because Defendants concealed the existence of the secret side agreements. The recipient of such a message would ordinarily have no means of determining the statement's falsity. Because Defendants knew of the side agreements, and knew that Plaintiff did not, the Court can infer from the nature of the scheme that Defendants intended to defraud Plaintiff. For purposes of a motion to dismiss, the Court finds these allegations sufficient. *See Odom v. Microsoft Corp.*, 486 F.3d 541, 554 (9th Cir. 2007) ("[S]pecific intent to deceive or defraud [] requires only a showing of the defendants' state of mind, for which general allegations are sufficient.").

The Court is unpersuaded by Defendants' contrary arguments. First, Defendants argue that the FAC fails to satisfy the particularity requirements of Rule 9(b). The Emrani Defendants argue that the FAC is too general, referring at times to "defendants," without specifying which Defendant is responsible for which actions. (Emrani MTD at 40). The DTLA Defendants argue that Plaintiff has failed to specifically plead who relied upon the complaints and demand letters. (Fradkin MTD at 21).

The Court disagrees. As to Khounganian, the FAC includes numerous specific factual allegations about allegedly false statements that specify the "who, what, when, where, and how" of the alleged fraud. *Vess*, 317 F.3d at 1106 (citation omitted). For example, for Claimant A, the FAC alleges that Khounganian issued a report on February 24, 2020, stating "[w]ithin a reasonable degree of medical probability" that Claimant A's injuries were caused by the accident; that Khounganian recommended surgery on October 8, 2020; that Khounganian executed a lien agreement stating that "fees were not contingent on any settlement"; and that Khounganian prepared bills for the resulting treatment that listed full charges despite his knowledge of the secret side agreements. (FAC ¶¶ 61, 64,

67, 69). These allegations clearly identify the who (Khounganian), the what (reports diagnosing injuries, attesting to causation, and listing damages, as well as lien agreements stating that fees were not contingent), the when (February 24, 2020, and October 8, 2020), the where (in writing transmitted through the interstate wires to cloud-based storage in other states), and the how (misrepresenting the nature and extent of the Claimants' injuries, the causes of those injuries, and the actual costs of treatment). The FAC includes similar allegations, with similar levels of specificity, for each of the 18 Claimants. This is sufficient for purposes of Rule 9(b). As discussed above, while the plausibility of the allegations varies for each of the 18 Claimants, taken together and drawing all reasonable inferences in Plaintiff's favor, these allegations plausibly demonstrate Khounganian's participation in a fraudulent scheme.

The Law Firm Defendants pose a closer call. As the Emrani Defendants argue, the FAC lacks specific information about any statements made by the Law Firm Defendants with respect to many of the Claimants. Conclusory statements that the Law Firm Defendants filed a fraudulent complaint or demand letter, absent allegations of their contents, do not satisfy Rule 9(b) or plausibly demonstrate fraud. However, the FAC includes several specific factual allegations of alleged fraudulent statements by the Law Firm Defendants: (1) the Emrani Defendants sent a demand letter on December 28, 2020, in connection with Claimant B's case that "represented that Claimant B suffered from numerous spinal injuries and would need to undergo future cervical fusion surgery," (*id.* ¶ 75); (2) the Emrani Defendants sent a demand letter on March 31, 2021, with respect to Claimants D and E that sought $1 million in damages, the majority of which were based on Khounganian's fraudulent surgical estimates, (*id.* ¶¶ 128, 139); (3) the Emrani Defendants sent a settlement offer on May 24, 2022, with respect to Claimant G, which repeated Khounganian's surgery recommendations estimating approximately $500,000 in future medical expenses, (*id.* ¶ 164); (4) the DTLA Defendants sent a demand letter on March 12, 2021, demanding $750,000 to settle Claimant L's claims and falsely representing that Claimant L suffered significant injuries as a result of the accident that

will require long term future medical care, (*id.* ¶ 254); and (5) the DTLA Defendants sent a demand letter on June 22, 2021, demanding $1 million to settle Claimant Q's claim, citing to Khounganian's false surgical estimates, (*id.* ¶ 335).

As with Khounganian's statements, these allegations identify the who (Emrani, Fradkin, and other partners at the firms), what (demand letters claiming specific damages), when (December 28, 2020; March 31, 2021; May 24, 2022; March 12, 2021; and June 22, 2021), where (written demand letters sent via interstate wires or mail to Plaintiff or its insurer), and how (repeating false allegations of injury and stating that all damages are actually owed). In addition, the FAC includes several allegations that the Law Firm Defendants incorporated Khounganian's statements into litigation communications. *See, e.g.*, (*id.* ¶¶ 392d, 394d, 399c). Coupled with the specific allegations about Khounganian's statements, these allegations provide the requisite specificity "to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong." *Vess*, 317 F.3d at 1106 (citation and alterations omitted).

As to the DTLA Defendants' argument that Plaintiff has not identified who at Uber relied on any fraudulent misrepresentations, reliance is not an element of mail or wire fraud, so Plaintiff need not plead such facts with specificity. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 649 (2008) ("[N]o showing of reliance is required to establish that a person has violated § 1962(c) by conducting the affairs of an enterprise through a pattern of racketeering activity consisting of acts of mail fraud.").

Defendants also argue that the FAC fails to plausibly allege knowledge of the alleged wrongdoing. (Emrani MTD at 40-41). The Law Firm Defendants contend that they are not medical experts and had no reason to discount the treatment recommendations from Khounganian. (Fradkin MTD at 24). At this stage, however, knowledge may be alleged generally. *See Odom*, 486 F.3d at 553. As discussed above, the factual allegations in the FAC—including the allegation that one of the Claimants contacted Plaintiff to inform it about DTLA's inflated billing practices and the allegation that medical providers who work with the Law Firm Defendants provided Plaintiff with spreadsheets detailing discrepancies

in billing—lead to the plausible conclusion that the Law Firm Defendants knew of the alleged fraud.

Defendants also argue that neither lien agreements nor discounted medical bills are in any way unlawful. (Fradkin MTD at 27-28; Khounganian MTD at 27-29). Defendants point out that California courts have specifically approved the use of medical liens, even where the patient has medical insurance. *See Pebley v. Santa Clara Organics, LLC*, 22 Cal. App. 5th 1266, 1277 (2018). However, Plaintiff does not claim that the lien agreements, or even the side agreements, are unlawful in a vacuum. Instead, the alleged fraud is that Defendants made statements about the Claimants' damages while concealing the existence of side agreements that rendered those damages claims false or misleading. Recognizing such a claim would not contravene California's public policy favoring medical liens. Indeed, as Plaintiff points out, under California law, a personal injury plaintiff may not recover "amounts that were included in a provider's bill but for which the plaintiff never incurred liability because the provider, by prior agreement, accepted a lesser amount as full payment." *Howell v. Hamilton Meats & Provisions, Inc.*, 52 Cal. 4th 541, 548 (2011).

While Defendants argue that no such side agreements exist, (Khounganian MTD at 27; Fradkin MTD at 23), the Court must take the allegations in the FAC as true and, as discussed above, there is sufficient information in the FAC to plausibly allege the existence of these side agreements. As to the DTLA Defendants' argument that the lien agreements themselves require Khounganian to reduce his fees when damages are inadequate, (Fradkin MTD at 26), at this stage, the Court must draw all reasonable inferences in Plaintiff's favor. Thus, even if the lien agreements are incorporated by reference into the FAC, drawing all reasonable inferences in Plaintiff's favor, the lien agreement language does not foreclose the possibility of additional side agreements or negate the allegations of falsity as to Defendants' statements that the medical liens are not contingent on settlement.

As to Defendants' argument that they had no duty to disclose the existence of any side agreements, (Fradkin MTD at 28; Khounganian MTD at 30), there may be no duty to

disclose these agreements in the abstract. However, absent disclosure of this information, Defendants' alleged statements about the Claimants' damages constituted affirmative misrepresentations. *See United States v. Jesenik*, 152 F.4th 924, 938 (9th Cir. 2025) ("False statements [for purposes of wire fraud] can include misleading half-truths [and] representations that are partly true but misleading because of the defendant's failure to state additional or qualifying matter." (internal quotation marks, citations, and alterations omitted)), *petition for cert. docketed sub nom.*, *MacRitchie v. United States*, No. 25-7522 (June 4, 2026).

The Emrani Defendants also argue that the alleged predicate acts merely consist of litigation activity, which cannot serve as predicate acts for civil RICO claims. (Emrani MTD at 43-44). However, the Ninth Circuit has rejected the argument that "a party's litigation conduct in a prior case is entitled to absolute immunity and cannot form the basis of a subsequent federal civil RICO claim." *Living Designs, Inc.*, 431 F.3d at 364. "In fact, the RICO statute, itself, provides that conduct relating to prior litigation may constitute racketeering activity." *Id.* at 365 (citing 18 U.S.C. § 1961(1)(B)).

Finally, Defendants argue that Plaintiff's theory of injury is implausible because Plaintiff settled all of the underlying cases despite possessing the same knowledge that it now has. (Fradkin MTD at 21-22). As discussed with respect to Defendants' statute of limitations arguments, the question of what Plaintiff knew when is a factual question that the Court cannot resolve at the motion to dismiss stage. Moreover, Plaintiff's decision to settle as a defendant in an individual personal injury suit may reasonably differ from its calculations as a plaintiff in a RICO action, where it is permitted to aggregate evidence from multiple cases. The Court has rejected Defendants' arguments that Plaintiff's claims are precluded as a matter of law by the settlement agreements, and Defendants do not otherwise point to any other *per se* bar on bringing these claims. At this stage, the Court finds that Plaintiff's previous settlements do not render its theory of injury implausible.

*c) Pattern*

The Law Firm Defendants also briefly argue that Plaintiff has failed to allege a pattern of fraudulent conduct. The DTLA Defendants argue that Plaintiff has identified only "a few recent, isolated incidents of illegality" and has not demonstrated any pattern of illegality. (Fradkin MTD at 30). The Emrani Defendants reiterate their arguments under Rule 9(b) and argue that the FAC identifies only a few specific instances of actions by Emrani himself. (Emrani MTD at 50-51).

To establish a "pattern of racketeering activity," Plaintiff must allege "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). To prove the requisite "pattern," a plaintiff "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). Predicate acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240 (citation omitted). Continuity, meanwhile, may refer to either "a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241. A party may demonstrate continuity over a "closed period by proving a series of related predicates extending over a substantial period of time." *Id.* at 242. Open-ended continuity, meanwhile, may be established "by showing either that the predicate acts include a specific threat of repetition extending indefinitely into the future or that the predicate acts were part of an ongoing entity's regular way of doing business." *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1527 (9th Cir. 1995) (internal quotation marks and citation omitted).

The Court finds that Plaintiff has plausibly alleged a pattern of racketeering activity. First, the predicate acts discussed above are all "related" in that they have the same purpose of inflating medical bills to extract higher settlements from Plaintiff. They also have the same participants, victims, and methods of commission, and each occurred within ten years

of the others. The allegations also satisfy the continuity requirement under either test. The predicate acts occurred over a period of several years, from 2019 through at least 2023. *See* (FAC ¶¶ 386-402). Defendants are also all ongoing entities, and the FAC alleges that the predicate acts are part of Defendants' regular way of doing business. (*Id.* ¶ 404). As to Emrani, while the FAC includes only two specific allegations of demand letters, RICO requires only two predicate acts of racketeering activity. The Court finds that these two allegations are both related and continuous for the same reasons discussed above.

*d) RICO Injury*

Defendants next argue that Plaintiff has failed to plausibly allege an injury for purposes of RICO liability. First, Defendants argue that Plaintiff is statutorily required to carry $1 million in liability insurance, such that any injury caused by the inflated settlements is suffered by Plaintiff's insurer, not Plaintiff. (Emrani MTD at 46-47; Fradkin MTD at 30-31; Khounganian MTD at 40-41). Second, Defendants argue that Plaintiff's allegations of increased litigation costs do not constitute a cognizable injury and are insufficiently concrete. (Emrani MTD at 48; Khounganian MTD at 36-37). Third, Defendants argue that Plaintiff has failed to allege a direct causal connection between the alleged violation and its injury. (Emrani MTD at 48-49; Khounganian MTD at 37-41).

The RICO statute provides that "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c). To have standing to sue under this provision, a plaintiff must show "(1) that his alleged harm qualifies as injury to his business or property; and (2) that his harm was 'by reason of' the RICO violation, which requires the plaintiff to establish proximate causation." *Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008) (citation omitted). Courts in the Ninth Circuit consider "three nonexhaustive factors" in determining whether an injury is too remote to allow recovery: "(1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will

be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether the court will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries." *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1169 (9th Cir. 2002) (citation omitted).

In the FAC, Plaintiff identifies two primary sources of injury: increased settlement costs and increased legal expenses as a result of the alleged scheme. The FAC includes numerous allegations that Plaintiff was forced to bear these costs. *See, e.g.*, (FAC ¶¶ 15, 25, 71, 95, 362). The FAC also alleges that Plaintiff has incurred "other out-of-pocket costs in defending these lawsuits and responding to fraudulent evidence and inflated damages claims." (*Id.* ¶ 362). The FAC specifically alleges that Plaintiff has incurred these additional costs "notwithstanding the insurance it is required by law to carry." (*Id.* ¶¶ 25, 362).

The Court finds the allegations of increased settlement costs to be sufficient to state a RICO injury. The FAC plausibly alleges that settlement costs in the Claimants' cases were significantly higher due to the alleged fraud than they would have been without the alleged fraud. This caused an injury to Plaintiff's business or property by causing it to spend more on settlement than it otherwise would have. While the FAC does include allegations that Plaintiff was obligated to maintain $1 million insurance policies, it does not follow from this allegation that Plaintiff incurred no direct expenses from settlement. Indeed, Plaintiff explicitly alleges that it incurred increased settlement costs notwithstanding its insurance policies. As Plaintiff argues, dismissing the FAC on this basis would require drawing multiple inferences against Plaintiff, including that Plaintiff's insurer paid all settlement costs without any "deductible, coinsurance, self-insured retention, or other cost sharing," and that no costs were ever passed on to Plaintiff through increased insurance premiums. (MTD Opp. at 75). Relying on such negative inferences would be inappropriate on a motion to dismiss.

Defendants point to *Steele v. Hospital Corp. of America*, in which the Ninth Circuit found no RICO injury in a case brought by patients of a hospital based on allegations that

the hospital conspired to bill the patients' insurance companies for services that were not provided or were inappropriate. 36 F.3d 69, 70 (9th Cir. 1994). The Ninth Circuit concluded that the patients had "suffered no financial loss" because all the charges "were covered by insurance" and "the patients have paid none of the allegedly excessive charges out of their own pockets." *Id.* However, as an initial matter, *Steele* was decided on appeal from a motion for summary judgment, and the only evidence of injury was that the "insurance company had to pay out more than it otherwise would have without the alleged RICO violation." *Id.* In contrast, this case is on a motion to dismiss, and Plaintiff has alleged that it directly incurred additional settlement, litigation, and other out-of-pocket expenses, notwithstanding its insurance coverage. Taking these allegations as true, this case is distinguishable from *Steele* because Plaintiff *did* pay some of the "allegedly excessive charges out of [its] own pockets." *Id.* Moreover, this case differs from *Steele* in that it is Plaintiff, not its insurer, that is the direct target of the alleged fraud. Thus, it is Plaintiff that incurred a direct injury. While Plaintiff maintains third-party insurance that may compensate Plaintiff for some portion of its injuries, Plaintiff could still recover these funds under the collateral source rule. *See Berg v. First State Ins. Co.*, 915 F.2d 460, 467 (9th Cir. 1990) ("[I]f an injured party receives some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor." (quoting *Helfend v. S. Cal. Rapid Transit Dist.*, 2 Cal. 3d 1, 6 (1970))).

The Court also finds that Plaintiff has plausibly alleged proximate causation of its injuries. Plaintiff's theory of causation is straightforward: Defendants' fraudulent claims of injury, causation, and damages inflated the settlement value of the Claimants' claims, causing Plaintiff to incur higher settlement costs than it otherwise would have. There is nothing "remote" about this chain of causation. First, Plaintiff is the most "direct" victim of the alleged wrongful conduct because it was directly targeted as the defendant in all 18 of the Claimants' cases. While Plaintiff maintained insurance, its insurer is the more attenuated victim in that it was not directly targeted by Defendants. Unlike Plaintiff, the

insurer could recoup its increased costs by charging higher premiums or could avoid further injury by dropping Plaintiff's coverage altogether. Second, while there may be some difficulty in ascertaining the amount of damages, courts "distinguish between uncertainty in the *fact* of damage and in the *amount* of damage." *Mendoza*, 301 F.3d at 1171 (emphasis added). Here, any uncertainty as to damages relates only to the amount of damage—the difficulty of calculating a fair settlement value in the absence of any fraud. However, "[w]hether experts will be able to measure the difference between the allegedly" increased settlement costs and "the price that would have prevailed but for" the RICO violation is not a question for a motion to dismiss. *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 991 (9th Cir. 2000). Moreover, as Plaintiff points out, the Ninth Circuit has recognized that a difference in settlement value may be a proper RICO injury. *See Living Designs, Inc.*, 431 F.3d at 368-69 (reversing summary judgment and concluding that evidence of "comparable settlements of much larger amounts and expert testimony" were "sufficient to create a triable issue of fact and [] not so speculative that damages are incapable of calculation"). Third, there are no overly complex rules of apportionment that would be required to avoid the risk of multiple recoveries. Instead, as discussed above, the collateral source rule appears plainly applicable and has been routinely applied by courts. Accordingly, the Court finds that Plaintiff has plausibly alleged that Defendants proximately caused its injuries.[7]

*e) Interstate Commerce*

Finally, Khounganian argues that Plaintiff has failed to allege any effect on interstate commerce because all of the alleged conduct occurred in California. (Khounganian MTD at 25). RICO requires a showing that the enterprise "engaged in" or "affect[ed]" interstate or foreign commerce. 18 U.S.C. § 1962(c). To satisfy the jurisdictional nexus requirement, "all that is required . . . is a showing that the individual predicate racketeering

[7] Because the Court finds that Plaintiff has plausibly alleged injury in the form of higher settlement costs, the Court need not address at this time the question of whether litigation costs could qualify as a RICO injury.

acts have a de minimis impact on interstate commerce." *United States v. Juvenile Male*, 118 F.3d 1344, 1348 (9th Cir. 1997).

The allegations in the FAC meet this standard. Defendants are alleged to have used the channels of interstate commerce—interstate wires and mail—to target Plaintiff with a fraudulent scheme to extract money. *See United States v. Jinian*, 725 F.3d 954, 968 (9th Cir. 2013) ("Wires are channels or instrumentalities of interstate commerce."). "When Congress regulates the use of the channels of interstate commerce, or protects the instrumentalities of interstate commerce or persons or things in interstate commerce, it may do so without showing that the regulated activity substantially affects interstate commerce." *United States v. Ripinsky*, 109 F.3d 1436, 1444 (9th Cir. 1997), *overruled on other grounds by United States v. Sablan*, 114 F.3d 913, 916 (9th Cir. 1997). "The corollary of this is that a finding that the transaction was 'in' interstate commerce or utilized the instrumentalities of interstate commerce is sufficient to satisfy [RICO's] jurisdictional element." *Id.* Here, because the FAC alleges that Defendants utilized the instrumentalities of interstate commerce in committing the alleged offense, the fraud was "in" interstate commerce. And because the alleged fraud was financial in nature, it is plausible that it had at least a de minimis effect on interstate commerce.

7. RICO Conspiracy Claim

Defendants next challenge the RICO Conspiracy claim. In addition to reiterating the same arguments made with respect to the RICO claims, Defendants argue that Plaintiff has not plausibly alleged the existence of a single conspiracy among all Defendants. (Emrani MTD at 56; Fradkin MTD at 31-32; Khounganian MTD at 41).

The RICO conspiracy statute makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). Conspiracy to violate RICO "requires a showing that [the] defendant was aware of the essential nature and scope of the enterprise and intended to participate in it." *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993) (internal quotation marks and citation omitted). To establish a violation of this section, Plaintiff "must allege either an agreement that is a

substantive violation of RICO or that the defendants agree to commit, or participated in, a violation of two predicate offenses." *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000).

The FAC alleges that Defendants collectively entered into a conspiracy "to conduct and participate, directly and/or indirectly, in the conduct of the affairs of each enterprise." (FAC ¶ 448). However, the FAC is devoid of any allegations to support the existence of such a broad conspiracy. Instead, throughout the rest of the FAC, Plaintiff distinguishes between separate association-in-fact enterprises consisting of (1) the DTLA Defendants and the Medical Provider Defendants, and (2) the Emrani Defendants and the Medical Provider Defendants. The FAC contains no allegations of any coordination or agreement between the Emrani Defendants and the DTLA Defendants, nor does it contain any allegation that Khounganian somehow acted as the link between the law firms in forming a broad conspiracy. The touchstone of a RICO conspiracy claim is the existence of an agreement requiring "the assent of each defendant who is charged," *United States v. Brooklier*, 685 F.2d 1208, 1222 (9th Cir. 1982). Absent factual allegations demonstrating that, despite their status as direct competitors, the Law Firm Defendants reached a mutual agreement to violate RICO, the allegation of a broad conspiracy is implausible. Accordingly, the RICO Conspiracy claim is DISMISSED, with leave to amend.

8. <u>Injunctive Relief</u>

Lastly, Fradkin requests that the Court dismiss Plaintiff's request for injunctive relief as barred by Circuit precedent. (Fradkin MTD at 33 (citing *Oregon Laborers-Emps. Health & Welfare Tr. Fund v. Philip Morris Inc.*, 185 F.3d 957, 967 (9th Cir. 1999)). However, as Plaintiff argues, a Rule 12(b)(6) motion solely targets "claims for relief" based on a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A request for injunctive relief is not a claim but a remedy. As a potential remedy, Plaintiff's request for injunctive relief is "not subject to dismissal under Rule 12(b)(6)." *Segura v. City of La Mesa*, 647 F. Supp. 3d 926, 942 (S.D. Cal. 2022) (collecting cases).

## I. CONCLUSION

For the foregoing reasons, the Court GRANTS, in part, and DENIES, in part, the Motions as follows:

1. The Fees Motions filed by the Emrani Defendants, Khounganian, and Radiance are GRANTED. Radiance is awarded $230,567.25 in fees for its successful anti-SLAPP motion. To the extent Khounganian and the Emrani Defendants are seeking an award of fees, each shall file a separate motion requesting such an award within sixty (60) days of the issuance of this Order;
2. The Motions to Dismiss are GRANTED with respect to Plaintiff's RICO Conspiracy claim. The RICO Conspiracy claim is DISMISSED with leave to amend; and
3. The Motions to Dismiss are otherwise DENIED in their entirety.

Because this Order references sealed filings, the Court has redacted materials as to which the Court previously approved a sealing application.

Plaintiff may file an amended complaint, addressing the deficiencies identified in this Order only, on or before the Parties' stipulated deadline of September 30, 2026. *See* (ECF No. 144 at 2). If Plaintiff fails to file an amended complaint, the FAC as modified by this Order shall be the operative complaint, and Defendants shall answer the FAC on or before October 21, 2026. *See* (*id.*).

**IT IS SO ORDERED.**

DATED: August 19, 2026

HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE